1    VIRGINIA:

2        IN THE CIRCUIT COURT FOR THE COUNTY OF HENRICO

3

4    - - - - - - - - - - - - - - - - - - - - - - -:

5    COMMONWEALTH OF VIRGINIA, : Case Nos.:

6                 Plaintiff,              :   CR17-4909-00F

7    vs.                                 :   CR17-4910-00F

8                                        :   CR17-4911-00F

9    ROLAND E. ANDERSON,                 :   CR17-4913-00F

10               Defendant.              :

11   - - - - - - - - - - - - - - - - - - - - - - -:

12

13                              Transcript of the proceedings in

14   the above-styled matter, when heard on January 4, 2019

15   before the Honorable Richard S. Wallerstein, Jr., Judge.

16

17

18

19

20

21

22

23

24

25

**APPEARANCES:**

Matthew C. Ackley, Esquire

Deputy Commonwealth's Attorney

Sarah E. Ulmer, Esquire

Assistant Commonwealth's Attorney

County of Henrico, Virginia

4301 East Parham Road

Post Office Box 27032

Richmond, Virginia 23273

    Counsel for the Commonwealth


Matthew T. Mikula, Esquire

GILLIAM & MIKULA PLLC

7821 Ironbridge Road

Chesterfield, Virginia  23832

    Counsel for the Defendant

1          **I N D E X**

2

3                                                            <u>Page #</u>

4    <u>Special Agent Jeremy A. D'Errico</u>

5    Direct Examination by Ms. Ulmer                8

6    Voir Dire Examination by Mr. Mikula            17

7    Further Direct Examination by Ms. Ulmer        19

8    Cross Examination by Mr. Mikula                63

9    Redirect Examination by Ms. Ulmer             91

10   Re-Cross Examination by Mr. Mikula            94

11   <u>William Jacob Green</u>

12   Direct Examination by Mr. Mikula              99

13   Voir Dire Examination by Mr. Ackley           104

14   Further Direct Examination by Mr. Mikula      106

15   Cross Examination by Mr. Ackley               121

16

17

18

19

20

21

22

23

24

25

1

# **E X H I B I T S**

2

3                                                    Page #

4   Commonwealth

5   Exhibit 1:  DVD                               7

6   Exhibit 2:  Photographs                       58

7   Exhibit 3:  Document                          59

8   Exhibit 4:  Jail Call                         62

9   Exhibit 5:  Presentation                      97

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    THE CLERK:  Commonwealth of Virginia versus
2  Roland Ellisworth Anderson, case numbers CR17-4909, 4910,
3  4911, and 4913-00F.
4    THE COURT:  Good morning to you, sir.  Are you
5  Roland E. Anderson III?
6    DEFENDANT ANDERSON:  Yes, sir.
7    THE COURT:  The record will so reflect.  You may
8  have a seat, sir.  Mr. Mikula, good morning.
9    MR. MIKULA:  Good morning.
10    THE COURT:  Mr. Ackley, good morning.  Ms. Ulmer,
11  good morning again.
12    MS. ULMER:  Good morning.
13    THE COURT:  The matter is set for eleven o'clock
14  today January 4, 2019 by the clock it's 10:52, any objection to
15  starting a few minutes early Mr. Mikula?
16    MR. MIKULA:  No, sir.
17    THE COURT:  And on behalf of the Commonwealth,
18  Ms. Ulmer?
19    MS. ULMER:  No, sir.
20    THE COURT:  All right.  This comes before the Court
21  by way of Defendant's motion in limine.  How would you folks
22  like to handle that issue?
23    MS. ULMER:  Your Honor, the Commonwealth
24  agrees with the Defense that it is the Commonwealth's burden
25  so we are happy to go with that.

1          THE COURT:  Treat it much like a motion to

2   suppress and the Commonwealth to go first?

3          MR. MIKULA:  That's fine.

4          THE COURT:  That works for you Mr. Mikula?

5          MR. MIKULA:  Yes, sir.

6          THE COURT:  All right.  On behalf of the

7   Commonwealth, Ms. Ulmer?

8          MS. ULMER:  Yes, sir, your Honor.  Your Honor, at

9   first the Commonwealth would like to submit Commonwealth's

10  Exhibit number one, the raw DVD video, which we will be

11  using in our presentation.  It has been provided to the Defense.

12         THE COURT:  Any objection?

13         MR. MIKULA:  No objection.

14         THE COURT:  All right.  That looks like it's a DVD or

15  CD?

16         MS. ULMER:  Yes, sir.

17         THE COURT:  Okay and will it work if the Court

18  places the exhibit sticker on the disk itself as opposed to on

19  the sleeve?

20         MS. ULMER:  Yes, sir.

21         MR. MIKULA:  I've printed off hard copies as well

22  that I can administer.

23         THE COURT:  I would prefer to put it on the disk if it

24  turns out that somehow or another it doesn't work, it doesn't

25  allow it to be played on the disk, I'll remove the exhibit sticker

1    and put it on the envelope.

2              MR. MIKULA:  Yes, sir.

3              THE COURT:  Marked as Commonwealth's Exhibit

4    number One and return it to the Commonwealth, Deputy.

5

6    NOTE:  Commonwealth's Exhibit 1.

7

8              THE COURT:  Thank you.  Ms. Ulmer?

9              MR. ACKLEY:  Actually, I don't think we need that

10   exhibit.  It can just be introduced into evidence.

11             THE COURT:  All right, thank you.  Commonwealth's

12   One.

13             MS. ULMER:  Your Honor, the first witness is

14   Jeremy D'Errico.

15             THE COURT:  I'm sorry Jeremy?

16             MS. ULMER:  D'Errico.

17             THE COURT:  Mr. D'Errico, please.

18             THE DEPUTY:  Would you step up to the witness

19   stand for us, please?

20             THE COURT:  Watch your step as you step through

21   the opening and when you have a moment, would you raise

22   your right hand?  Do you swear or affirm the testimony you're

23   about to give is the truth, the whole truth and nothing but the

24   truth?

25             WITNESS D'ERRICO:  I do.

1        THE COURT:  You can have a seat.

2        WITNESS D'ERRICO:  Thank you.

3        MS. ULMER:  Your Honor, Agent D'Errico has

4   prepared a presentation today.  I've given a hard copy to Mr.

5   Mikula.  It is going to be displayed on the television but I also

6   have a hard copy for your Honor if you would like to look at

7   that.

8        THE COURT:  All right, any objection Mr. Mikula?

9        MR. MIKULA:  No, sir.

10       THE COURT:  All right, I'll be happy to review and

11  receive the hard copy.  That's not an exhibit, this is for simply

12  demonstrative purposes, is that correct?

13       MS. ULMER:  Yes, demonstrative or a visual aid.

14       THE COURT:  Okay.  The witness has been sworn.

15       MS. ULMER:  Thank you.

16

17       **<u>SPECIAL AGENT JEREMY A. D'ERRICO</u>**, the

18  witness, having previously been duly sworn, testified as

19  follows:

20

21       DIRECT EXAMINATION

22  BY MS. ULMER:

23       Q     Agent D'Errico, can you please state your name for

24  the Court?

25       A     Good morning.  My name is Jeremy D'Errico.  The

1  last name is D-apostrophe-capital E-R-R-I-C-O.

2      Q      And I've already called you Agent but how are you

3  employed?

4      A      I'm a Special Agent with the Federal Bureau of

5  Investigation.

6      Q      How long have you been employed by the FBI?

7      A      Approximately six years.

8      Q      And how do you, before being in your current

9  position, have you held any other positions with the FBI?

10     A      Yes, so I'm currently a Special Agent.  I've been a

11  Special Agent for the past four years.  Prior to being a Special

12  Agent, I was a computer scientist for the FBI for two years.

13     Q      And where did you receive your education?

14     A      My undergrad is a Bachelor's of Science or a

15  Bachelor's of Science in Computer Science from James

16  Madison University.  And I also have a Master's of Information

17  Security from the Johns Hopkins University.

18

19             MR. MIKULA:  For purposes of the record, we're

20  willing to stipulate to his expertise as a digital forensics expert.

21             THE COURT:  Is that acceptable with you?

22             MS. ULMER:  Judge, just in the chance of appeal,

23  your Honor, we'd like to go through a little more questions.

24             THE COURT:  All right.

25             MS. ULMER:  Just to qualify him but I appreciate

1    Mr. Mikula's motion.

2            THE COURT:  Please proceed.

3

4    BY MS. ULMER:

5        Q    What team are you currently a member of at the

6    FBI?

7        A    I'm assigned to the Richmond division and assigned

8    to the violent crimes squad.  This case in particular I

9    investigate organized crime.  But I also handle threats to life,

10   bank robberies, other violent crime matters as well as an

11   additional duty, the CAST team, which is the Cellular Analysis

12   Survey Team.

13       Q    And before you came to the FBI, did you work

14   anywhere else?

15       A    I did.  I worked for about seven years for the Meyer

16   Corporation.  And as part of the Meyer Corporation I was an

17   information systems engineer where I was detailed to the FBI

18   to investigate some of the largest criminal cyber matters

19   dealing with large quantities of data.

20       Q    And you mentioned the CAST team that's what you

21   currently are on, could you please explain to the Judge what

22   CAST is?

23       A    The CAST team, the Cellular Analysis Survey Team.

24    We're a team of approximately 75 Special Agents or task force

25   officers located throughout the world.  And we are specially

1   trained in analyzing historical cell site records and providing

2   analysis of tower locations and where telephone calls may or

3   may not have been placed.  The CAST team is specially trained.

4    All of us have in excess of 300 hours of specific training,

5   which may include radio frequency analysis, training from the

6   major telecom providers, their network engineers and their

7   custodians of records so that we understand how these records

8   are collected and how their networks work.  We also receive

9   training from academic instructors both Bureau instructors

10  and from the private sector.

11      Q     And so you've already touched on this but do you

12  receive training directly through cell phone providers as well?

13      A     We do.  We receive training from Verizon, Sprint,

14  AT&T, US Cellular and T-Mobile.

15      Q     And before you become a CAST member, do you

16  have to pass a written test?

17      A     I do.  And we're evaluated throughout the course of

18  our training.  So our training starts off with a week of basic

19  training, which is how to understand these records and how to

20  plot them on maps.  The top performers from that class move

21  on to the advanced training class where we deal with more of

22  the same.  Top performers from that class move on to the field

23  training exercise where we are doing multiple analyses a day

24  and going out and working historical cases, where we know

25  phones were found.  And then we move on to the two-part

1    certification each two weeks where we meet and train with the

2    different providers on their networks and the academic

3    instructors.

4        Q    Once you become a CAST member, do you have to

5    recertify every year or do you maintain that status?

6        A    We do.  We recertify every year.  We take

7    approximately forty hours of training each year in order to

8    refresh on new technologies and to make sure that we still

9    have a good understanding of our trade craft.

10       Q    Approximately how many cases of historical cell site

11   requests does CAST receive every year?

12       A    We received I believe it was about 1700 since the

13   inception of CAST, which started in 2010.  Last year alone, or

14   FY17, I think we are up to 300 cases alone.  We provided

15   expert testimony on 300 occasions in 2017 in courts similar to

16   this.

17       Q    Is that courts in the entire country or?

18       A    That's across the country, both federal, state and

19   local courts.

20       Q    And you, yourself, have you ever testified in an

21   expert capacity in Virginia state courts?

22       A    I have as to Google location records and that was in

23   Henrico County on three occasions last year.

24       Q    Can you briefly explain to us what exactly historical

25   cell site analysis is?

1     A    Yeah, historical cell site analysis is matching up the

2    call detail records and the cell site information that's provided

3    by the carriers to a tower list that's provided by the carriers.

4    So the carriers document where all their towers are and the

5    directions of their antennas so that we can take that

6    information and marry it up with the call detail records.  That

7    tells us the starting tower of that phone call and the ending

8    tower of that phone call and we can place that, an indication

9    on the map of the approximate location of the mobile device,

10    the phone when it was making that call.

11    Q    So when you get historical cell site analysis, how do

12    you use that analysis, what do you use that to determine?

13    A    We determine the approximate location of the phone

14    at that time.  And we cannot get it down to a room in a house.

15    But we can tell an approximation of where that phone may

16    have been during that transaction.  And that can be a call or a

17    text message or a data transaction.

18    Q    As a CAST member, how do you apply your

19    knowledge of historical cell site data to what you are asked to

20    do for the FBI?

21    A    They are very similar.  So both the cell sites and the

22    collection of GPS and Wi-Fi data, they both depend on radio

23    frequency analysis.  We were provided records by Google to

24    review and analyze and Google has provided certain

25    information for us to be able to plot those records on a map,

1  along with what they call an accuracy radius of the

2  approximation of where they believe that phone was.

3      Q    And can you use that information in order to locate

4  fugitives?

5      A    Yes, we can and we have in the past.

6      Q    How else have you used that information?

7      A    We've used that information to help find missing

8  children, used that to help find fugitives that are fleeing from

9  the law.  We have used that information in numerous ways

10  and corroborate that information as much as possible, whether

11  that be witness statements or other data that's available to us

12  at that time.

13      Q    And when you are using this technology, whether it

14  be the cell site location information or Google information or

15  GPS information, what knowledge, skills and abilities are

16  required of you in order to be able to analyze that?

17      A    Knowledge of the records and how these records

18  come to be.  And that's where Cell Cos or cellular providers

19  provide instruction of how these records are generated.

20  Knowledge of the towers and an understanding of how radio

21  frequencies work.  How does a phone interact with a tower?

22  How does a phone interact with a GPS sensor or a Wi-Fi sensor

23  and overall how these things work in order to generate these

24  records which then we can take and plot on a map.

25      Q    Turning specifically to Google, have you prior to this

1   case, have you previously worked with Google location data?

2       A      Yes, I have.  Approximately 18 cases I've worked

3   with Google location data from various different cases.

4       Q      Have they all been cases involving Henrico County

5   or other jurisdictions as well?

6       A      Other jurisdictions as well.

7       Q      Have you used historical records such as Google or

8   cell site in order to exclude suspects as well as figure out

9   where they are?

10      A      I haven't personally done that but members of the

11  CAST team have used information from cell site to exonerate

12  subjects, yes.

13      Q      What kind of records do you look at in order to

14  conduct your cell site analysis?

15      A      I look at the records that are provided from the

16  provider.  And in this case it would be the Google records that

17  are reviewed.  And Google's records already provide a latitude

18  and longitude, a coordinate of where they estimate that mobile

19  device to be at that time.

20      Q      So when you get the records from Google, what is

21  your process, what do you do?

22      A      I look at the records and the records are coded in

23  UTC time, Universal Time.  So I adjust those records to be in

24  the local time zone.  And in this case, I believe it was Eastern

25  Daylight Time.  So we make that conversion so that we're

1    looking at the accurate time of where that device was when the

2    records, or according to the records.  I then take that

3    information and two pieces on there or three pieces, the type or

4    the source of that record and that could be one of many things.

5     It could be from a GPS sensor.  It could be from a Wi-Fi

6    sensor.  It could be from a cellular tower sensor.  Or it could be

7    unknown.  I take the coordinates and then I take that accuracy

8    radius that they give us and I plot that information on a map

9    so we can see where Google believes that phone was, their best

10   estimate.

11         Q    How do you plot that on a map?

12         A    I use a variety of tools.  What I need to do is convert

13   it into what we call keyhole markup language, it's KML and

14   that's the language that Google Earth understands in order to

15   import this data.  So I have a process to convert that into the

16   correct format for KML.  And then I load it into Google Earth so

17   I can view all of these points on a map.

18

19         MS. ULMER:  Your Honor, at this time, we are

20   asking that Agent D'Errico be an expert in the field of historical

21   cell site data and location data analysis at this time.

22         THE COURT:  I'm sorry, historical cell site data?

23         MS. ULMER:  And location data analysis.

24         THE COURT:  Do you care to voir dire Special Agent

25   D'Errico, Mr. Mikula?

1          MR. MIKULA:  With regard to the location service
2    expert or service expertise, yes, sir.
3          THE COURT:  All right.
4
5    VOIR DIRE EXAMINATION
6    BY MR. MIKULA:
7          Q     You've never had any specified training from a
8    Google developer or engineer, have you?
9          A     Not specifically from Google.
10         Q     So you're not privy to their algorithms or digital
11   formula and how they create the data that you're given,
12   correct?
13         A     I am not privy to the exact algorithm as it is a trade
14   secret to them.  However, based on the data that is collected
15   from the sensor from the phone, we can make some
16   estimations based on academic papers as to what techniques
17   they may be using.
18         Q     So you can see it as an approximation?
19         A     It is an approximation, that's correct.
20         Q     And so you're not aware of the margin of error for
21   the Google location services at all?
22         A     Other than we have conducted some testing where
23   we have tested the accuracy of that information.  We do not
24   have a precise number to tell you for an error rate.  But I can
25   show you in two slides some of the testing we have done to

1    determine the approximate location of, the approximation of

2    Google's estimation versus the actual location where we were

3    when we were testing.

4         Q    And so have you been to any seminars or any other

5    continuing education that's been presented from a Google

6    representative?

7         A    Not directly from a Google representative, no.

8         Q    Okay, so essentially what you're saying is, is you

9    received this data from Google, you analyze it based on your

10   training and expertise as a cell site expert and your other

11   credentials and then you plot it using the Google Earth

12   application as well as other methods of software, is that fair to

13   say?

14        A    That's correct, yes.

15

16        MR. MIKULA:  Okay, nothing further.

17        THE COURT:  Do you care to be heard on the

18   request for –

19        MR. MIKULA:  Well, I have no problem stipulating

20   his credentials as a digital expert, a forensic expert or a cell

21   site or a cell data expert.  The Google locations qualification,

22   Judge, I do have concern for because it's kind of part and

23   parcel with what our argument here is today is that he is

24   certainly somebody who is qualified in a lot of areas but with

25   regard to being an expert and opining as to the reliability of

1   Google's information, he has no background in that

2   information.  He doesn't know the DNA.  He doesn't know the

3   foundation of Google and certainly there are other ways in

4   which the Commonwealth can satisfy reliability through other

5   evidence but I don't think he's qualified to be a Google expert

6   in this Court's eyes.

7   　　　　THE COURT:  All right, at this time the Court will

8   receive Special Agent Jeremy D'Errico as an expert in historical

9   cell site data and location data analysis based upon his

10  testimony and the cross examination by defense counsel.  The

11  Court notes the exception to the Court's ruling by counsel for

12  the Defendant.  Proceed.

13

14  　　FURTHER DIRECT EXAMINATION

15  BY MS. ULMER:

16  　　Q　　You already touched on this a little bit but based on

17  your training and experience and in viewing academic papers,

18  can you tell us how Google can determine the approximate

19  location of a device?

20  　　A　　Yes.  There are several ways that Google can do that.

21   And that's tied to the source column that I was speaking

22  about in the records before.  So the first way and the way

23  that's probably most accurate for outdoors would be using the

24  GPS, the Global Positioning System sensor in the phone.  And

25  Google is constantly collecting information from phones.  And

1   they admit to such and documentation both on their website
2   and marketing material and in other locations.  So Google is
3   collecting this information and GPS is very accurate when
4   outdoors.  Indoors there is some reliability issues with it but
5   Google doesn't collect just GPS.  It also collects other wireless
6   signals in the area.  So in the case of a Wi-Fi source, Google is
7   collecting all of the Wi-Fi access points that we may have in
8   our house or a business to try to identify where it is.  And
9   Google collects information on a normal basis of, you know,
10  from our phones, from every Android phone that has location
11  services turned on.  It's collecting a GPS coordinate and the
12  Wi-Fi that's around the area.  So that when it gets into a
13  situation where a GPS signal might not be turned on on the
14  phone, because GPS is very expensive as far as resources, it
15  drains the battery faster than Wi-Fi would, Google has
16  reference data so they can say well I've seen these four Wi-Fi
17  access points before at this signal strength and last time I saw
18  them, this was the GPS coordinate of the phone that saw it at
19  those similar strengths.  So I believe that the coordinate or the
20  estimation of this phone would be in this area.  And that's
21  accurate because Wi-Fi has a limited distance in which it can
22  actually broadcast out.  Approximately 250 meters outside on
23  a perfect, under perfect conditions is about the range that Wi-
24  Fi can broadcast.  Other sensors are less but indoors and most
25  access residentially are indoors, a paper has said that it's

1    about seventy meters of accuracy.  So Google knows that these

2    signals degrade over time to a point where a phone can't see

3    that signal.  So if that phone is seeing that Wi-Fi signal, that

4    means it's in the immediate vicinity of that Wi-Fi access point.

5     And Google has previously collected information on where Wi-

6    Fi access points are located across the entire world.  It's a huge

7    industry to collect that type of data and the location data

8    services market.  And research on this topic goes back way

9    past 2006.  It's not really a new topic.  We've had radio

10   frequency research done for years at this point.

11         Our third classification of data would be cellular and

12   that's through cell towers.  So if they can't get a fix on a GPS

13   signal, if they can't get a fix on Wi-Fi signals, it's going to fall

14   back to the cellular towers.  And as you may know, the cellular

15   towers have a much larger span than a Wi-Fi access point.

16   And cellular towers can reach out a mile or so if not more

17   depending on how the network has set up those cellular

18   towers.  So Google can fall back on that information saying well

19   at least I know that this phone was in this vicinity of this

20   cellular tower and can draw say a mile radius around that

21   tower.

22         Q    You made a lot of statements about what you believe

23   Google does, how do you know this, what is your knowledge

24   about that?

25         A    I've done a bunch of research on Google, on

1  documents that Google has provided themselves, on

2  documents that other researchers have provided and

3  documented in papers.  And I also understand other tests that

4  have been conducted on Android phones to understand what

5  type of data is flowing from the phone up to Google in order to

6  make these decisions on the location services.

7      Q      And you already kind of hinted at this a little bit, but

8  is the field of determining where a mobile device is based on

9  radio signals new?

10     A      It is not new at all.  CAST has been doing this type

11 of work since 2006.  The unit was formed in 2010 to formalize

12 it but cellular providers have been collecting this type of

13 information to troubleshoot their networks pretty much since

14 instantiation of cell phones.  And they need this information to

15 be able to operate their network, to run diagnostics on their

16 network and to make sure that their customers are being

17 served.  They are profit seeking and if they are not properly

18 serving their customers, they are not making a profit, which

19 means they would not survive.  So they have much motivation

20 to make sure they know where their customers are while

21 making phone calls.

22     Q      So can you determine the approximate location of a

23 mobile device by using the location history data?

24     A      Yes, we can.

25     Q      Okay and that's by using all the different points that

1   you described, Wi-Fi, GPS and cell tower?

2        A      That's correct.  And we try not to rely on any single

3   one point.  But we try to take multiple points and multiple

4   pieces of data into consideration in making a determination of

5   where the approximate location of that phone.

6        Q      And did you complete that analysis for this case that

7   we're here for today?

8        A      Yes, I did.

9        Q      And typically were you asked to review location data

10  for a Google account that was

11  Roland.Anderson1907@Gmail.com?

12       A      Yes, I was.

13       Q      And in doing that analysis, did you prepare this

14  PowerPoint presentation we're about to look at?

15       A      I did, yes.

16       Q      Speaking about Google, can you give us a general

17  overview of Google as a company?

18       A      Yeah, Google is a subsidiary of Alphabet.  And it is, I

19  believe, it is number three or four, the number three or four

20  highest trading company on the stock exchange.  It depends on

21  which day you look.  But their 2017 revenues were $110

22  billion and of that $110 billion, $95 billion of it was from

23  advertising revenue.  Their main source of income is

24  advertising.  And the same with Q1 to Q3 of 2018.  $97 billion

25  of revenue with $83 billion of it coming from advertising.

1   Google provides a number of products.  The notable ones here

2   might be the search engine Google.com, their email program

3   Gmail.com, their Google Maps that is used to, you know,

4   provide directions or navigation, their Android operating

5   system, which is one of the top two operating systems for

6   mobile phones.  And then of course advertising, all the ads

7   that we see on Google.com or in our emails or other on their

8   mobile phones as well.

9        Q    And to give all these products, they have to have a

10  privacy policy, are you familiar with Google privacy policies?

11       A    Yes, I am and they've had several privacy policies

12  over the years.

13       Q    Do they discuss location data in their privacy

14  policies?

15       A    They do and they started discussing location data in

16  their privacy policy back in 2009, again, nothing that's new in

17  this field.

18       Q    Specifically do they talk eventually about Wi-Fi

19  location data in their privacy policy?

20       A    They do.  In 2012, they modified their privacy policy

21  to specifically include that they may receive from your phone

22  nearby Wi-Fi access points and cell towers.

23       Q    And do they continue to update their privacy

24  policies?

25       A    They do.  They've updated it, they've updated the

1    location portion of it three times since the current policy.

2         Q      And do those privacy policies continue to indicate

3    Wi-Fi access point and cell towers as well?

4         A      Yes, they do.

5         Q      And is this a current privacy policy?

6         A      This is a portion of it dealing with the location

7    information.

8

9              MS. ULMER:  This is slide four for the record.

10

11   BY MS. ULMER:

12        Q      And I believe on slide four you've highlighted a

13   particular portion, what is that portion?

14        A      I did.  So when you hover over the fourth point on

15   the bottom left, the information about things in that device, I'm

16   sorry, information about things near your device, such as Wi-Fi

17   access points, cell towers and Bluetooth enabled devices.  If

18   you click on that link, you'll see that panel on the right side

19   that explains a little bit more the information about things

20   near your device.  And specifically, I've highlighted the other

21   sensors that Google says that it's going to collect such as

22   information from accelerometers or nearby cell towers or Wi-Fi

23   access points and specifically the MAC address or the Machine

24   Access Code address and signal strength of that Wi-Fi access

25   point.

1    Q    And when you were talking earlier about the
2    accuracy of Wi-Fi points, you were talking about signal
3    strength, is that what a MAC address is?
4    A    The MAC address is the unique identifier for the Wi-
5    Fi access point.  So it's kind of a like a telephone number for
6    that device.  The signal strength would be, you know, how loud
7    and how clear is that signal being received.
8    Q    Turning to the next slide, Google itself talks about
9    and categorizes locations in two different categories, correct?
10   A    It does.  Google says that it's going to collect
11   information on implicit location information or explicit location
12   information.  And implicit location information would be
13   similar to, you know, actually I'll read their example.  If you
14   type in Eiffel Tower, we, Google, infers that you may like to see
15   information for places near Paris and then we can use that to
16   provide recommendations about those local places to you.  So
17   based on your search history and what you're searching,
18   they're inferring in where you may be or the information that
19   you were trying to see.
20   Q    And what about explicit location information?
21   A    Explicit location information is collecting information
22   but from the sensors of your phone; so from the GPS sensor in
23   your phone, from the Wi-Fi sensors and the accelerometer and
24   gyroscope that are all built into modern day smart phones.
25   Q    Going to slide six, what does Google say location

1    history does?

2        A        Location history will include information that Google

3    receives from location reporting, which is a device level setting

4    that allows your device to send location data back to Google for

5    use in location history.  Essentially what it's saying is, it's

6    determining your location history from the information that

7    you are allowing your phone to send back to Google.  And

8    that's an option that you can turn on or off on your Android

9    device.

10       Q        And why would Google want to use location history

11   data?

12       A        Location history data is good for ad revenue.  It

13   allows their ad subscribers to target individuals in a certain

14   area.  For example, and this is a made up example but maybe

15   PetSmart would like to target customers that are going to

16   Petco, a competitor.  They can set up an area that they would

17   like to send a five dollar coupon to, to anybody approaching a

18   Petco store.  And the same thing, you know, they could also

19   send a five dollar coupon to anybody approaching a PetSmart

20   store.  But they would not send that five dollar coupon to

21   somebody say approaching a Walmart that is nowhere near a

22   Petco or a PetSmart.  It allows them to really focus in location-

23   wise on where they want to send that advertisement.  And with

24   advertisement revenue being such a large portion of Google's

25   revenue, they have a huge incentive to get this right, this

1    location correct.

2         Q      And based on your knowledge, do they tell

3    prospective buyers of Google advertising that they can target a

4    particular location?  Is that something that they advertise as

5    being a service?

6         A      They do.  As part of their Google Ads service, which

7    you can subscribe to and start pushing out ads, one of the

8    categories of ads is a radius around a location.  So they are

9    saying that it allows you to choose to show your ads to

10   customers within a certain distance from your business rather

11   than choosing individual cities or regions or countries.

12        Q      That was the example you were giving us of Petco

13   and PetSmart?

14        A      It was.

15        Q      For advertising?

16        A      Correct.

17        Q      And in order to use radius advertising, the Google

18   information, location information must be accurate?

19        A      Correct, that's correct.

20

21             MR. MIKULA:  Objection.

22             THE COURT:  State your objection, please.

23             MR. MIKULA:  I think to assume that it's accurate.

24             THE COURT:  It calls for speculation.

25             MR. MIKULA:  I would say so.

1          THE COURT:  All right, objection sustained on that

2    question.

3          MS. ULMER:  I'll move on.

4

5    BY MS. ULMER:

6          Q       Moving on to slide eight, why else would Google

7    want to use location data?

8          A       Google has their Google Maps platform where they

9    use web services.  And this is where Google can allow other

10   companies or other applications to use their geolocation

11   services.  And in this advertisement for their geolocation with

12   Google Maps, Google claims that they have the largest network

13   of Wi-Fi points and cell IDs to ensure coverage anywhere on

14   the Earth and that they are consistently updating through

15   crowdsourcing from billions of Androids phone.  No GPS is

16   required in order to use their crowdsourcing location.  And

17   they also make a claim on their accuracy of their geolocation.

18   The claim is, you know, advanced positioning algorithms

19   deliver typical accuracies of ten to twenty meters and excel and

20   problematic indoor and urban environments where GPS

21   struggles.  Perfect for IOT, which is internet of things, asset

22   tracking, wearables and compliance.

23         Q       We've already touched on this a little bit but how

24   can the location be determined?

25         A       The location can be determined using various

1    sensors on the smart phone.  I listed a few of them, GPS, Wi-Fi,

2    cellular, Bluetooth and those cover the radio frequency or the

3    radio spectrum sensors.  Then you have accelerometers and

4    gyroscopes that determine if the phone is moving or how the

5    phone is positioned.  If it is positioned north, south, east, west,

6    you know, on a tilt.  A barometer that helps Google determine

7    which floor in a building that you may be in.  And then other

8    user provided information such as directions from one place to

9    another to determine approximate location.

10        Q     And how do you know that Google uses these

11   different sensors?

12        A     Google has listed them in their various privacy

13   policies and I believe we saw most of them in previous policies.

14        Q     Turning back the next slide, specifically GPS, how is

15   that location collected through the GPS sensors?

16        A     There is a GPS receiver chip on all modern, most

17   modern smart phones.  And that GPS chip is listening to radio

18   broadcasts from, you know, I believe it's 32 different satellites

19   that the U.S. military has put into orbit.  And Google needs or

20   the phone needs about four of them to come up with a precise

21   location of where that receiver or that phone may be.  It's very

22   accurate and very precise, especially outdoors.  But it does

23   have some downfalls.  Specifically, what we call urban canyons

24   or big cities where it's hard to see blue sky above you that does

25   interfere with those radio signals.  And the way that it

1    determines its location from those radio signals is that one of

2    the elements of messaging in that radio signal is the precise

3    time that that signal was sent.  And that GPS receiver

4    understands the orbit that that satellite is in and can calculate

5    the distance that that signal needed to travel from that satellite

6    to that receiver and the amount of time that it took to transmit

7    that signal.  And based on that information and signals from

8    three other satellites, it can determine a precise location of

9    where that receiver is.

10        Q    How do you know how the GPS works?

11        A    Based off of research papers that are published in

12   academia and documentation from GPS.gov, which is the

13   governing body for GPS in the U.S.

14        Q    Do you get training in GPS?

15        A    We have discussed it.  I wouldn't call it explicit

16   training in it.  It's more research that I've conducted.

17        Q    Research on your own.  Turning now to Wi-Fi, how

18   exactly does Wi-Fi work in terms of position of a cell?

19        A    There is multiple ways that you can use Wi-Fi

20   access points in order to determine positioning.  And a lot of

21   this research was done back in 2006, 2008 when they really

22   started tackling alternative ways to determine location other

23   than GPS.  In particular, most of the research is for indoor use

24   to determine which particular room or which particular area in

25   a building that you may be.  And that's in an area where there

1    is many, many Wi-Fi access points crammed into a small area
2    so that you have a really good understanding.  There's also
3    been papers about using Wi-Fi in the outdoors and particularly
4    studies walking down city streets because of the limitations of
5    GPS and how they can determine locations from multiple Wi-Fi
6    access points.

7            And the three techniques that I pulled out here are
8    cell identity, which is probably the least accurate of the three.
9    And that is essentially using a single Wi-Fi access point and
10   looking at the signal strength from that Wi-Fi access point and
11   then translating that into an approximate distance.  So of
12   course, if we don't see that Wi-Fi access point, we know that
13   we're nowhere near that Wi-Fi access point.  But if we see that
14   Wi-Fi access point, we know that we're at least in proximity of
15   it.

16           And as we mentioned before, Google does a lot of
17   crowdsourcing and a lot of collection of where Wi-Fi access
18   points are.  So they have a huge database of the approximate
19   locations of Wi-Fi access points.  In fact, they have mine at
20   home and they most likely have everybody's here, the location
21   of their Wi-Fi access points because they've collected that
22   through crowdsourcing or driving their Google street cars
23   through the streets.  So cell identity, they can't tell you a
24   direction from that access point, it just knows that you're in
25   the vicinity of that Wi-Fi access point.

1    Trilateration uses multiple Wi-Fi access points.
2   Similar to how GPS measures the distance, trilateration is
3   trying to measure the distance based on the signal strength of
4   multiple Wi-Fi access points and knowing where those Wi-Fi
5   access points are.  So what you can do is, I drew three Wi-Fi
6   access points out there in blue, green and red.  And based on a
7   signal strength, we can calculate a distance from each of those
8   Wi-Fi access points.  And if I draw a circle around the Wi-Fi
9   access point from that, of that distance correlating to that
10   signal strength, I can see that all three circles intersect in one
11   point and that point is the believed, the estimated location of
12   where that cell phone is located.  Because it can see all three of
13   those access points and it can measure the signal strength
14   from all three of those access points.  And that calculation
15   would put it in that area.  Now that again requires an exact
16   location of where that Wi-Fi access point is.
17    But there is a third method that does not require the
18   exact location and that's called fingerprinting.  And
19   fingerprinting, the way that it works is mainly through the
20   crowdsourcing platform.  So again, our phones, the Android
21   phones are constantly collecting GPS coordinates when
22   available Wi-Fi access points and their signal strength.  And
23   Google collects all that information and puts it into a database
24   and then can run an algorithm when Google receives only Wi-
25   Fi access points.  It can compare that signal strength of the Wi-

1  Fi access points of this device with an unknown location has,

2  query its database using a K nearest neighbor algorithm or

3  some other statistical algorithm.

4

5          THE COURT:  I'm sorry?

6          WITNESS D'ERRICO:  K nearest neighbor.  It's a

7  statistical algorithm that helps you determine when you don't

8  have an exact match where that may be.

9          THE COURT:  Based upon where other people have

10 been, historical data?

11         WITNESS D'ERRICO:  Exactly, that's exactly right.

12 Historical data from other cell phones that have been in that

13 area that have collected data for Google.  And it compares this

14 unknown location that is seeing three or more Wi-Fi access

15 points to all this data that it's collected and looking for

16 somebody that has seen those three Wi-Fi access points at

17 similar strengths and then looking at what their GPS

18 coordinates were at that time.  And they can determine an

19 approximate location of where that phone was.  And that's

20 called fingerprinting.  And you don't necessarily need to know

21 the exact locations down to the centimeter of where that Wi-Fi

22 access point is.  All you're comparing are known Wi-Fi access

23 points and the signal strength received by that device.  And

24 this data is collected billions of times a day through anybody

25 that has the location services turned on on their Android

1   phone or uses Google's apps on an iPhone.

2

3   BY MS. ULMER:

4       Q    So you mentioned the range of a Wi-Fi signal when

5   it's outdoors, do you know what the Wi-Fi signal range is if

6   someone's device is indoors?

7       A    It's approximately seventy meters.  And that again is

8   very, I think it's very generous.  You know, if you walk outside

9   your house with your phone on Wi-Fi, it's going to disconnect

10  from your Wi-Fi shortly thereafter walking outdoors.  It could

11  be a few meters away but I don't think you're going to get

12  seventy meters away from your house.  That's almost, that's

13  three-quarters of a football field.  I don't think you're going to

14  get that far before switching off Wi-Fi.  At least I can't at my

15  house.

16

17      MR. MIKULA:  I'm going to object.  He said seventy

18  feet, or he said seventy meters.  I think that answers the

19  question.  When you look at his presentation where I think on

20  page 11 of 46, we can move along.  My objection just is she

21  asked the question about the distance, he said seventy.  I

22  think that answers the question.

23      THE COURT:  Do you object to seventy meters being

24  approximately three-quarters of a football field?

25      MR. MIKULA:  I don't object to that.  Just that –

1       THE COURT:  The generosity of the –

2       MR. MIKULA:  Judge, my position is, is that he,

3  she's certainly asking questions and he's answering those

4  questions and going on and I'm just trying to move things

5  along.  So I think that he answered the question she asked.

6       THE COURT:  I do as well.  Objection is overruled.

7       MR. MIKULA:  Yes, sir.

8

9  BY MS. ULMER:

10      Q       You've already mentioned but for data location, how

11  does Google collect that data?

12      A       Google collects it mainly two different ways.  One is

13  with their Google street cars and the second way –

14      Q       This is a picture of a Google street car?

15      A       That is a picture from Google's website of a Google

16  street car complete with the cameras on top.  And the other

17  way is through the Android phone and the Google Apps

18  platform, which I believe we discussed.

19      Q       Can you please explain what a geolocation API is?

20      A       Yes, the geolocation API is an application

21  programmer interface.  This allows the developer of an

22  application to use Google services in order to determine the

23  approximate or the estimated location of that phone.  So

24  Google will ask for certain parameters to be sent to Google in a

25  particular format and then Google will send a response back in

1    a particular format.

2         Q     Why would you want to know this information?

3         A     Applications want to know where the phones are.

4    So a lot of applications that I've used in the past such as

5    Panera Bread, they want to give you the opportunity to locate

6    the nearest Panera Bread and they do that by determining

7    your location and they can use Google services to do that if

8    they don't have a program to do that on their own.

9         Q     And turning to slide fourteen, what is this?

10        A     This is the Wi-Fi access point object of this

11   geolocation API.  And this is the information that Google is

12   requesting that you provide when querying the geolocation

13   services or the location services when you only have Wi-Fi

14   access points.  So it's asking for a MAC address, which is that

15   unique identifier for that access point, the signal strength, the

16   age of when you saw it, so how long ago you saw this.  Is this

17   today, is it yesterday?  Because we know access points do

18   move.  And then the signal to noise ratio.  And some of these

19   are optional.  The only one that's actually required is the MAC

20   address.

21        Q     And when Google responds, what do you receive?

22        A     In response back, we receive a location, which

23   contains a latitude and a longitude and then an accuracy in

24   meters of where they believe this device may lie.

25        Q     Turning now to Google geolocation, you've already

1   talked about the background and the methodology a little bit

2   but is this, did you guys conduct your own analysis basically

3   or observations of Google location data?

4        A      I did.  I went out and wanted to compare our actual

5   locations with the Google estimates that they provided using

6   this geolocation API.

7        Q      Can you explain the methodology to the Court how

8   you did that?

9        A      Yes, absolutely.  So essentially, I took a phone with

10  me to determine my actual location and I recorded the

11  coordinates of my actual locations.  And then I used a

12  computer and software that was not connected to the network

13  so that Google could not receive any information in advance of

14  this request and I scanned for all of the Wi-Fi access points

15  that were visible to this computer.  I collected the MAC

16  addresses and the signal strength as well as some other

17  information.  And then I provided this information to Google

18  through their geolocation API and received the coordinates

19  back from Google of Googles estimated location for these

20  points.

21       Q      As turning to slide eighteen, you made multiple

22  observations, is that correct?

23       A      That's correct.

24       Q      Can you please explain slide eighteen observation

25  one?

1    A    This is an observation outside the Henrico County
2    Administration Building.  The red dot on that chart is my
3    actual location when I conducted the observation.  I collected
4    the information, the Wi-Fi information sent it up to Google at a
5    later date and Google returned back to me that the point was
6    located at the green marker and that the accuracy radius is
7    illustrated in the green circle around the point.
8    Q    So for observation one, was your observed location
9    within the accuracy circle?
10   A    Yes, it was.  The observed, the actual distance
11   between Google's estimated location and my actual location
12   was 35 meters.  And Google's accuracy was 57 meters, so well
13   within the range.
14   Q    Turning to observation two, could you please explain
15   what happened in that situation?
16   A    Yes, this was an observation outside the Henrico
17   County Courthouse, pretty much right in front of the front
18   doors illustrated by the red dot.  And similar, I collected Wi-Fi
19   information, sent it up to Google using the location API and
20   they returned the position of the green marker with the radius
21   of that circle.  And in this case, Google was off.  The actual
22   distance was 69 meters.  And Google estimated their accuracy
23   would be 48 meters.  But in this case, it still puts it at the
24   Henrico County Courthouse.  I know that I'm not at Hermitage
25   High School, or Google doesn't estimate them at Hermitage

1   High School or even at the juvenile relations, which are the

2   nearest buildings.  It still sees it at the Henrico County

3   Courthouse.

4       Q    Turning to observation three, could you please

5   explain where you are at that time?

6       A    This time I'm at Parham Doctor's Hospital, down the

7   street from here.  The red dot again is where I am.  The green

8   dot is Google's estimated location and the ring is Google's

9   accuracy.  At this point, the distance between Google's

10   estimate and my location was fifteen meters and their accuracy

11   was up to 74 meters.

12       Q    So were you standing within the Google circle of

13   accuracy for observation three?

14       A    Yes, I was.

15       Q    Okay, going to observation four, could you please

16   explain where you were at that time?

17       A    This is an observation on Winchmere Court, which I

18   wanted to make observations in both townhomes and

19   apartment complexes, public buildings and public areas to get

20   a variety of estimates.  So this is an apartment complex down

21   the street from, not too far from here, about a mile or so from

22   here.  And, you know, again, observation of the red dot, Google

23   returns the green dot and the ring of accuracy is 130 meters.

24   We turned about to be 42 meters from Google's actual

25   estimate, or Google's estimate, excuse me.

1    Q    So within the Google accuracy circle?

2    A    Yes.

3    Q    For observation four, are you still in an apartment

4    complex?

5    A    Yes, this is.

6    Q    Okay and is it the same apartment complex?

7    A    It's across Schrader Road but related complex.

8    Q    Can you please explain what happened in

9    observation five?

10    A    Observation five, we collected Wi-Fi.  My position

11    was at the red dot and the green estimated distance away was

12    about twelve meters from Google, with an accuracy radius of

13    39 meters.

14    Q    Again you were within the accuracy circle?

15    A    Yes, we were.

16    Q    And observation six, could you please explain where

17    you are in observation six?

18    A    On Channing Green Court in front of the building

19    marked, between the buildings marked 8401 and 8404

20    indicated by the red dot.  Google provided the estimated

21    location, approximately nineteen meters away.

22    Q    And is that within the Google accuracy circle?

23    A    Yes, it is.

24    Q    Turning to observation seven, where are you now?

25    A    I'm at Shannon Green Court, which are townhomes,

1  not too far from my last observation.  In fact, it's probably
2  about, just looking at the scale on the map, it's probably a little
3  over a hundred meters away, probably yeah, just a little under
4  a hundred meters.  And this point has put me, Google's
5  estimate was nine meters away from my actual location and
6  within the circle of accuracy.

7      Q      Observation eight, are you still in the apartment
8  complex or what kind of area are you now?

9      A      These are townhomes with, on Green Run Drive.
10  And I'm actually on the street in between the two complexes.
11  I'm on the right side of the street as you can see from the red
12  dot.  Google provided an estimated accuracy or an estimated
13  distance 21 meters away from my location.  And it was inside
14  the 113 meter ring of Google accuracy.

15     Q      Turning to observation nine, what kind of area are
16  you in now?

17     A      Again some townhomes over on Coachford Court.
18  The red dot indicates my location.  Google places its estimate
19  46 meters away from me and it's within the 67 meters that
20  Google has provided for its accuracy.

21     Q      Observation ten, are you still in the townhomes or
22  where are you located?

23     A      I am.  I'm actually only a few meters away from
24  where I was.  So my last observation nine, if you look at my red
25  dot and follow that road to the left, I am near the intersection

1    of it's Old West Drive and Coachford Court.  I moved just to the

2    other side of that small little townhouse street.  And I received

3    an estimated location that was 54 meters away but again

4    inside the 102 meters that Google has provided.

5         Q    Observation eleven, where are you?

6         A    I'm at the Kroger that's at 9000 Staples Mill Road at

7    the intersection of Hungary Spring Road and Staples Mill Road.

8         Q    And again, are you at the red dot?

9         A    I am.  I'm at the red dot in the center of the parking

10   lot, trying to be further away from Wi-Fi access points.

11        Q    Okay and so what happened in this instance?

12        A    Google provided an estimated distance that was 71

13   meters away from my location outside of Google's accuracy

14   radius of 58 but still places me inside that Kroger parking lot.

15        Q    How many meters was it off, Google accuracy versus

16   where you are?

17        A    The accuracy off doing the quick math, thirteen

18   meters.

19        Q    Yes.

20

21             THE COURT:  Would you mind if I asked a question?

22             MS. ULMER:  Yes.

23             THE COURT:  So for the difference between

24   observation nine and ten you've indicated that it's a short

25   distance that you moved?

1      WITNESS D'ERRICO:  That's correct.

2      THE COURT:  But the range of accuracy went from

3  67 meters to 102 meters, is that because of the different Wi-Fi

4  strengths, what increases the accuracy radius?

5      WITNESS D'ERRICO:  I did not compare to see if I

6  collected the same Wi-Fi access points from both location nine

7  and ten to see if they saw the same Wi-Fi access points.  And

8  again, I don't know exactly how Google comes up with their

9  estimates.  All I'm doing here is testing pretty much in a black

10 box, providing it inputs and seeing where it sees that I am.

11 And based off of those tests, I can still see it provides different

12 accuracy radiuses but still in the same general area of where

13 my observation was.

14     THE COURT:  Okay.

15

16 BY MS. ULMER:

17     Q     Okay, going to observation twelve now, which is

18 slide 29, are you still at the Kroger?

19     A     I am at the Kroger and I'm about I think it's about

20 five parking spaces away from the Marketplace side of the

21 Kroger, near Marketplace door.

22     Q     And where does Google think you are?

23     A     Google places the estimate location, estimated

24 location inside the Kroger or within the footprint of the Kroger,

25 which is 57 meters away from where I actually was and it's

1   outside of Google's accuracy ring.

2   Q     By how much outside are you from the Google

3   accuracy?

4   A     It's about 15 meters, doing the math on the fly.  But

5   again, puts me in the Kroger parking lot, in that Kroger area.

6   Q     For observation thirteen, where are you?

7   A     I'm in the Kroger parking lot, this time near the

8   pharmacy door, which is just on the other side of the Kroger

9   building.  And this time Google provides me an estimate and

10  this was the largest difference that I saw in my testing and it

11  believed that I was 253 meters away towards the top of the

12  shopping center versus near the Kroger door.

13  Q     And can I ask you to do some quick math about the

14  difference in the distance?

15  A     Yes.  That looks like it's 190 meters away.

16  Q     And did you compile this into a table, is that on slide

17  31?

18  A     I did.  That's the table of the locations, the latitude

19  and longitude for each of the points and then it did some

20  calculations here, too.  So the actual distance away, which we

21  saw in the slides, the number of BSS IDs, that's the base

22  station identifier, that MAC address.  So this is how many MAC

23  addresses I submitted to Google for each location.  And then

24  the maximum RSSI, which is the received signal strength

25  indicator, so the strength of the signal.  And then I calculated a

1    maximum, a minimum and an average.  And the way to read
2    those received signal strength indicators, you'll see that they
3    are all negative numbers.  The closer to zero, the stronger the
4    signal.  So for example, picking out two signals on here, you
5    know, I'll just take the first line of course the maximum is
6    larger than the minimum, so -58 is a stronger signal than -90
7    on that first line.

8        Q     And again, what does that mean to you?

9        A     That means, you know, for those signal strengths
10   that are higher, it is much likelier that the phone is nearer to
11   that device.  So you can use that fingerprinting algorithm or
12   any of the other algorithms up there to determine the
13   approximate location of that phone.

14       Q     In addition to the tests that you yourself conducted
15   and that we've just gone through, are you aware of accurate
16   papers that have also written about Wi-Fi locations
17   themselves?

18       A     Yes, I am.  And some of those papers are listed for
19   you.

20       Q     And you, of course, did your own observations but
21   are you aware of any other studies that have been done by
22   other entities?

23       A     Yes, I am.

24       Q     And what are those?

25       A     There was a study conducted by Oracle, where they

1    developed a system to, it's called a man in the middle.  They

2    are looking at the network traffic that's actually coming off of

3    the telephones and that is going to Google so they can

4    determine the exact information that is being transmitted to

5    Google in order to determine the location of the phone.

6         Q    And so as part of that study, what are they trying to,

7    what were their findings and what are they trying to do?

8         A    Their study was mainly to, it started off to determine

9    if there was any privacy implications with smart phones.  And

10   they were looking at data and they came across this data as

11   they were conducting their research.

12        Q    And what was the finding of the study?

13        A    That the information that came off the phone –

14

15        MR. MIKULA:  I'm going to object.  This is hearsay,

16   Judge.  I think if he can provide the actual study and submit

17   that into evidence by way of witness, then they can but that's

18   hearsay.

19        THE COURT:  Do you care to be heard on it?

20        MS. ULMER:  Yes, sir.  Judge, I believe that as an

21   expert he can rely on other studies and other knowledge so he

22   can testify as to what his knowledge of other studies are and

23   he can, of course, be cross examined on that but it is

24   something that he is aware of as an expert and he can testify

25   as to what he knows.

1      THE COURT:  I believe that he can testify based

2    upon what the data showed but not what the opinion of the

3    person who authored the data is.  So I don't believe that this

4    witness is testifying as to what the opinion is but basically

5    what the data showed.  So I overrule the objection.

6

7    BY MS. ULMER:

8      Q      Can you please tell us what the data showed?

9      A      The data showed similar to what the geolocation API

10   contained.  It showed information such as Wi-Fi access point,

11   BSSIDs or MAC addresses and signal strengths being

12   transmitted to Google as well as the GPS coordinates, part of

13   their collection platform.  And in return Google was sending

14   back an estimated latitude and longitude and estimate radius

15   for those coordinates.

16     Q      Was the data collected by the study similar to the

17   data that they later received from Google?

18     A      Yes, it was.

19     Q      Turning now to, you've already mentioned that you

20   testified three times about Google location services in Henrico

21   County, was that in the Commonwealth versus Denise and

22   LaToya Gay cases?

23     A      Yes, it was.

24     Q      All right and can you please explain to the Court a

25   little bit of the background of that case and what you were

1    asked to do?

2        A    Yes.

3

4        MR. MIKULA:  I'm going to object to the relevance as

5    to what happened in another case.  I don't know how that's

6    applicable here in terms of the reliability of this information.

7    It's a separate case, a separate fact pattern, I don't know the

8    relevance.

9        THE COURT:  Does it make a difference as to what

10   he did and he was determined to be an expert in those cases

11   and you'd stipulate to that Mr. Mikula?

12       MR. MIKULA:  Well, I stipulated as to his expertise

13   with regard to the cell phone data.

14       THE COURT:  Do you concur that he was

15   determined to be an expert in those previous cases?

16       MR. MIKULA:  I don't have any objection to that.

17       THE COURT:  And he testified as an expert in those

18   cases, do you agree with me?

19       MR. MIKULA:  I agree with that, sir.

20       THE COURT:  Okay, so what is it that you are

21   asking Special Agent D'Errico to testify to as to the previous

22   cases?

23       MS. ULMER:  In those previous cases, your Honor,

24   the reason why we are here is whether or not this information

25   is inherently unreliable or if it can be presented to the Jury.

1  This case in particular, what I'm hoping to show through Agent

2  D'Errico is going to whether or not the Google information is

3  reliable and what he knows and I believe that is a direct issue

4  in this case.

5          THE COURT:  Well, doesn't that go to the weight of

6  the evidence?  Isn't it basically that he testified and the finder

7  of fact made its determination based upon the testimony of the

8  witnesses?

9          MS. ULMER:  Well and they did ultimately, I don't

10 know exactly, you know, obviously was not in the Jury Room,

11 Judge, to know what weight they gave it.  But I think it's

12 relevant for your Honor to see that in another case with Google

13 location services, the accuracy of that information that was

14 provided it has great weight onto the accuracy of the

15 information before your Honor today in regards to Mr.

16 Anderson's case.

17         THE COURT:  But everything goes to the weight.

18         MS. ULMER:  Well, Judge, in the Denise and Latoya

19 Gay case there is specific corroborations to the Google location

20 information that was available in the Gay case but was not

21 necessarily available in the case before your Honor.  So I think

22 it is important for the Court to see that in another case in

23 Henrico where we have the exact same type of information how

24 it can be corroborated and how it was corroborated in that

25 case and thus the information is reliable in this case and

1   should be admitted into evidence.

2          THE COURT:  What I believe I'm hearing you say is

3   that the Special Agent testified to Google location services in

4   these previous cases.

5          MS. ULMER:  Yes.

6          THE COURT:  And there was independent evidence

7   to show the corroboration?

8          MS. ULMER:  Yes, sir.

9          THE COURT:  So why does he need to go through all

10  these slides as opposed to say it was my opinion that it was

11  located here and then the evidence that was independent

12  showed that it was either exactly or close by or in the same

13  town or anything like that, why do we need to go through these

14  slides?

15         MS. ULMER:  Well, Judge, if we're willing to have the

16  Defense stipulate that it was extremely accurate, then I have

17  no issue with that.  However, if he is not willing to stipulate, I'd

18  rather go through the slides to show that when Google says

19  that, for instance, Denise Gay is at one particular location and

20  something else shows that at that exact same time she was at

21  that location.  If Mr. Mikula is willing to stipulate that the

22  evidence was corroborated that the Google location was

23  corroborated exactly, then I have no issue.  I don't need to go

24  through the slides.

25         THE COURT:  Does this Special Agent, is he able to

1  testify as to the corroborated testimony?

2       MS. ULMER:  Yes, sir.  That's what he's testified to

3  in the Gay case.

4       THE COURT:  Why can't he, then do you agree Mr.

5  Mikula he could say my Google location services had this and

6  that the corroboration testimony had the location dead on,

7  outside the zone or anything like that?  I just don't know that I

8  need to, we need to go through these slides to get to that point.

9   I think that, do you agree with that Mr. Mikula?

10      MR. MIKULA:  I don't know if, I mean I think that

11  he, they are certainly doing what they need to do in terms of

12  showing how it is reliable and it's our burden, well not our

13  burden but it's our duty to certainly cross on issues that's

14  already been presented to the Court.  How, we're left to assume

15  a lot in terms of what happens in a separate case and so –

16      THE COURT:  Let me think about it this way.  If we

17  hold on this, if on cross examination it gets to that issue, then

18  on redirect you can ask the Special Agent more particular

19  questions.  Fair enough?

20      MR. MIKULA:  That's fine.

21      MS. ULMER:  Yes, Judge.

22      THE COURT:  Okay.

23      MS. ULMER:  Judge, am I allowed to ask a general

24  question about the Gay case?

25      THE COURT:  It depends on what the general

1    question is.

2          MS. ULMER:  Okay.

3          THE COURT:  You can try.

4

5    BY MS. ULMER:

6       Q    In the Denise and Latoya Gay cases, were you able

7    to corroborate the Google location data you received with other

8    evidence such as her bank statements?

9       A    Yes, we were.

10      Q    And that data from the Google location, the Google

11    location data, was that accurate with what you saw in her

12    bank statements of her location?

13      A    Yes, it was.  It provided the estimated location of

14    where she was, which matched Google's estimation.

15      Q    Okay, let's turn to slide 38.

16

17         THE COURT:  May I ask one other question?

18         MS. ULMER:  Yes, sir.

19         THE COURT:  The Commonwealth has allegations

20    that this Defendant was at certain locations, is that correct?

21         MS. ULMER:  Yes, sir.

22         THE COURT:  Has this Special Agent gone to those

23    specific locations and done the independent analysis to

24    determine whether or not that he's within or outside of the

25    zone of accuracy?

1       MS. ULMER:  Well, Judge, that's what we are getting

2   to.  He did not go back out with the cell device.  However,

3   similar to the Gay case, we have other evidence that will be

4   presented to your Honor that corroborate the Google location

5   data with where Mr. Anderson was.

6

7   BY MS. ULMER:

8       Q       All right and the Roland Anderson case,

9   approximately how many data points did you receive?

10      A       2,608 data points.

11      Q       And what was the timeframe for those points?

12      A       October 12th, 2017 from 8:01:24 p.m. to October 16,

13  2017 7:59:51 p.m. in Eastern Daylight Time.

14      Q       And so that is when you converted from UTC to

15  Eastern Daylight Time?

16      A       That's correct, yes.

17      Q       And we've already gone over the different fields that

18  you received in that data.  So turning exactly to slide 39, what

19  does this slide show?

20      A       Slide 39 shows the Google location points that

21  Google provided between the time of 11:58 a.m. and 1:44 p.m.

22  on October 15, 2017.

23      Q       And what do the blue balloons mean?

24      A       The blue markers indicate that the source of that

25  data as marked by Google was Wi-Fi.

1    Q    And what about the red ones?

2    A    And the red balloon is GPS as provided by Google.

3    Q    And what is this location?

4    A    This location is, the general location is the Kings

5    Point Apartments.  The yellow marker indicates where Mr.

6    Anderson's residence was in apartment B and the crime scene

7    location in the same building in apartment H.

8    Q    And so what does the slide mean to you?

9    A    The slide indicates to me that the mobile device was

10   at this apartment complex between the times of 11:58 a.m. and

11   1:44 p.m.

12   Q    Turning to slide forty, what is this, is this Google

13   location information you received?

14   A    This is.  Between the times of 10:22 a.m. to 10:37

15   a.m.

16   Q    And again, what is the blue marker?

17   A    The blue markers are Google location history data

18   points marked with a Wi-Fi source.

19   Q    And what about the green?

20   A    And the green is Google location history records

21   marked with a cellular source.

22   Q    And what is the, you said the times are 10:22 a.m.,

23   where is the first point at 10:22 a.m.?

24   A    The first point is near Mr. Anderson's residence,

25   near the apartment complex.

1    Q    And for the record, can you explain the travel and

2  the timing of these different data points?

3    A    Yes.  So you can see in sequence the data points are

4  moving up Laburnum Avenue and make a left turn, I'm not

5  familiar exactly what that street is but it ultimately leads down

6  to the Kroger.  And in this case, you can see the green

7  markers, the times are shaded a little darker and they are not

8  included in the sequence because the error radiuses were

9  nearly 1300 meters for that.  So that point in particular would

10  put that device in the 1299 meter radius circle, which doesn't

11  really help with the accuracy of this information.  So I added it

12  for completeness but I'm relying on the Wi-Fi because they

13  have a much smaller accuracy range.

14    Q    What is the accuracy range?

15    A    It's between 22 and 98 meters for each of those

16  points.

17

18        THE COURT:  And that's the blue?

19        WITNESS D'ERRICO:  That's the blue points,

20  correct.

21

22  BY MS. ULMER:

23    Q    Were you able to corroborate this travel pattern

24  using any other information provided to you by the

25  Commonwealth?

1    A    I was, yes.

2    Q    And that is slide 41?

3    A    That's correct.

4    Q    What is that?

5    A    This is an overlay of the Google information that we
6    just saw on the last slide with the red marker or the red
7    markers, which is RTT data, it's a tool that Verizon uses to
8    determine the approximate location of phones.  And in this
9    case, we are looking at the victim's phone, the victim's phone
10   records.  So in this case, up near points three and four, there
11   are two records provided by Verizon; one at 10:27:46 and one
12   at 10:27:51 that indicated that the phone, that Google
13   approximates the phone was located at that location inside the,
14   it's difficult to see but it's kind of like a red band.  In this
15   example, it's pretty much directly next to the cell tower and the
16   cell towers are illustrated by the red dots on the map, the small
17   red dots with the wedges originating out.  And that shows us
18   our direction from a cell phone that Verizon believed that
19   phone was positioned in at that time.

20   Q    So are the, was the victim's phone and the Google
21   location data similar?

22   A    They are.  They're actually in sequence all the way
23   through.

24   Q    Turning now to the Kroger itself, what was the
25   information we received from Google?

1    A    Between 10:37 a.m. and 10:47 a.m., Google

2    provided these ten points.  Two of them were GPS points.

3    Eight of them were Wi-Fi points.  And it provides that the

4    phone was in the area of the Kroger between those times.

5    Q    And there are blue balloons and then there is a red

6    balloon.  What is the red balloon there?

7    A    The red balloon is the GPS as well as the rings

8    around it illustrate the accuracy range for those GPS points.

9    So that smaller circle in there represents six meters and the

10   larger circle is 23 meters of accuracy for those GPS points.

11

12         MS. ULMER:  Your Honor, at this time, the

13   Commonwealth would like to admit three photos into evidence,

14   which are from the Kroger surveillance for the purposes of the

15   record.  It shows Mr. Anderson entering at 10:39:28 and it

16   shows him exiting at 10:47:49 and then that second photo of

17   him exiting at that 10:47:51.

18         MR. MIKULA:  We have previously stipulated.

19         THE COURT:  Any objection?

20         MR. MIKULA:  No, sir.

21         THE COURT:  The photographs will be collectively

22   Commonwealth's number Two.

23

24   NOTE:  Commonwealth's Exhibit 2.

25

1      THE COURT:  Before I forget, if we don't get to the

2  issues having to do with the Gay case on cross, how are you

3  going to have those slides that were not addressed redacted

4  from the DVD that's been introduced into evidence?

5      MS. ULMER:  Judge, I have a copy on my desktop of

6  the presentation.  I'm happy to go and delete whatever slides.

7      THE COURT:  Any objection to that, Mr. Mikula?

8      MR. MIKULA:  No, sir.

9      THE COURT:  Okay.

10      MS. ULMER:  Your Honor, as Commonwealth's

11  Exhibit number Three, we'd like to enter into the record that

12  ECO ATM receipt, which shows Mr. Anderson entering the

13  victim's cell phone on October 14, 2017 at approximately

14  10:39:23 at the Kroger, Commonwealth's Exhibit number

15  three.

16      THE COURT:  Have you seen that as well, Mr.

17  Mikula?

18      MR. MIKULA:  I have.

19      THE COURT:  Any objection?

20      MR. MIKULA:  No objection to that.

21      THE COURT:  Commonwealth's number three,

22  without objection.

23

24  NOTE:  Commonwealth's Exhibit 3.

25

1  BY MS. ULMER:

2      Q      Did Google also send location information about a

3  Tweeter Court address?

4      A      Yes, it did, yes.

5      Q      And if you could explain what is before us?

6      A      Yes, the points mapped are between 1:30 a.m. and

7  3:51 a.m. on October 15th, 2017.  And they put it, they put the

8  phone in the vicinity of 6308 Tweeter Court in Richmond,

9  Virginia.

10     Q      And as part of your analysis, did you also analyze

11 Mr. Anderson's cell phone?

12     A      Yes, I did.

13     Q      Did you find any text messages that corroborate Mr.

14 Anderson being in that general location at that time?

15     A      I did.  I found two text messages on Mr. Anderson's

16 phone.  One sent from Mr. Anderson at about 1:14 a.m. and I

17 apologize, let me explain the dates.  This is directly from the

18 Celebrite report.  And Celebrite uses a European date format.

19 So while it's marked 15/10/2017, it's actually October 15,

20 2017.  The first message reads, I'm at yo crib.  And he receives

21 a message back from Keon, and Keon is the name that is in

22 Mr. Anderson's phone that's associated with that telephone

23 number that was texted to and from.  At 1:23:59 a.m. saying,

24 about to pull up in about five to seven.

25     Q      On this slide, it looks like it says Keon Vaughn, how

1   did you come by that information?

2        A       I used a public record search based on that

3   telephone number to derive the name and address associated.

4        Q       Where does Keon Vaughn live?

5        A       6308 Tweeter Court, Richmond, Virginia.

6        Q       And in regards to the Google map itself where is

7   6308 Tweeter Court, Richmond, Virginia?

8        A       It is where that arrow is pointing, which appears to

9   be in the middle of many of the markers on there.

10       Q       And the markers that are on there, are they both

11  GPS and Wi-Fi markers?

12       A       Yes, they are with the blue being the Wi-Fi and the

13  red being the GPS.

14       Q       In the Google location information that you were

15  given, does it show a trip to Chippenham Hospital?

16       A       Yes, it does.

17       Q       And when was that?

18       A       Between 3:51 a.m. and 4:03 a.m. on October 15,

19  2017.

20

21       MS. ULMER:  Your Honor, at this time I'm going to

22  take a pause from the presentation and play a previously

23  stipulated jail call.

24       THE COURT:  Any objection?

25       MR. MIKULA:  No, sir.

1      THE COURT:  All right.

2

3   NOTE:  AN AUDIO RECORDING IS PLAYED BEFORE THE

4   COURT.

5

6      MS. ULMER:  Your Honor, the Commonwealth

7   would like to admit the jail call as Commonwealth's Exhibit

8   number four.

9      THE COURT:  Any objection?

10      MR. MIKULA:  No objection.

11      THE COURT:  The jail call will be Commonwealth's

12   number four.

13

14   NOTE:  Commonwealth's Exhibit 4.

15

16   BY MS. ULMER:

17      Q      Okay and going back to the Chippenham Hospital

18   slide, slide 44, the Google location points, are they Wi-Fi, GPS

19   or cell tower points?

20      A      Eight of the points are from Wi-Fi and one of the

21   points is from a cellular signal.

22      Q      And finally, did you receive geolocation information

23   regarding a Bradbury Road address?

24      A      Yes, I did.  I received Google location points in that

25   vicinity yes.

1    Q     And what type of points are those?

2    A     It's a mix between GPS points and Wi-Fi points.

3    Q     And do you know the owner of 8150 Bradbury

4    Road?

5    A     According to real estate records, it's Roland

6    Anderson, different than the Defendant Roland Anderson.

7    Q     Not Roland Anderson III, but another Roland

8    Anderson?

9    A     Correct.

10   Q     And you mentioned multiple times throughout your

11   report that and throughout the presentation that's it's based

12   on academic, your knowledge with academic journals and

13   other studies, have you listed all resources for his Honor?

14   A     Yes, I have.

15   Q     Okay and that is the next two slides?

16   A     That's correct.

17

18        MS. ULMER:  Your Honor, if I could have a brief

19   moment.  Judge, the Commonwealth would pass the witness.

20        THE COURT:  Cross?

21

22   CROSS EXAMINATION

23   BY MR. MIKULA:

24   Q     Remind me again of the pronunciation of your last

25   name.

1    A    D'Errico.

2    Q    D'Errico.  Mr. D'Errico, a few questions.  In terms of

3    the CAST presentation that you created, on page eight you had

4    made comments regarding the accuracy.  That information,

5    now you created this presentation, is that correct?

6    A    Yes, I did.

7    Q    Okay, but you pulled some of this information from

8    Google's website, is it fair to say?

9    A    Yes, I did.

10   Q    And the accuracy summary, that was derived from

11   Google themselves, correct?

12   A    If I could view the slide.

13   Q    Page eight.

14   A    Your Honor, I have a copy here if you don't mind.

15

16        THE COURT:  Okay, page eight.

17        WITNESS D'ERRICO:  And can you ask that

18   question again, please?

19        THE COURT:  Sure.  On page eight, where it says

20   accuracy, you took that from what Google gave you, is that the

21   question?       MR. MIKULA:  That's my question.

22        THE COURT:  Okay.

23        WITNESS D'ERRICO:  That is correct.  This is

24   directly from a leaflet that Google uses as marketing material.

25

1    BY MR. MIKULA:

2        Q      Okay and as part of that marketing material, you

3    said that Google obviously is profit seeking, correct?

4        A      Yes.

5        Q      And a major source of that profit is advertising

6    purposes, fair to say?

7        A      Yes.

8        Q      Okay.  With regard to and you testified as well and

9    you gave a hypothetical Petco versus PetSmart, do you

10   remember that hypothetical?

11       A      Yes, I do.

12       Q      Okay and you said in some instances let's say if

13   Petco gives, pays money to Google, they'll offer certain

14   discounts so that people that are close to PetSmart will instead

15   go to Petco or something to that effect, is that fair to say?

16       A      That's fair, yes.

17       Q      Okay, so you're basically saying that Google is

18   willing to manipulate the consumer to come to a specific

19   person?

20       A      What I'm saying in that case is Google is willing to

21   push out ads on behalf of their client.  And Google is not

22   determining the radius or where those ads are being pushed

23   out to, Google's client is, PetSmart in that case.

24       Q      Correct but my point is, is that Google will receive

25   money from people and they will in a sense look at where their

1  location is, determine where potential client is and tell the
2  client location that might be further or closer, is that fair to
3  say?

4       A      I'm sorry, I'm not understanding your question.

5       Q      What I'm asking is, you said the hypothetical Petco
6  versus PetSmart.

7       A      Yes, sir.

8       Q      Let's assume PetSmart is closer to a consumer.
9  Petco is further away.  But Petco pays Google money, will
10  Google in your understanding and your background and
11  expertise, will they tell a consumer to go to the further distance
12  one if that person is paying them money?

13       A      I don't know that Google tells them.  Google has an
14  ad platform and Google certainly pushes out ads on behalf of
15  their clients.  And what those ads contain, I don't believe that
16  Google has full control.  Of course, they have guidelines of
17  what can be in those ads, but I don't know that they, that
18  Google themselves are creating those ads rather than, in my
19  example as I was discussing, the client can develop a radius or
20  an area where they would like users targeted for those ads.

21       Q      Okay.  I'll move on.  With regard to you said the
22  history of obviously cell triangulation, Wi-Fi and GPS, that
23  predates using Google to get that information, is that fair to
24  say?

25       A      Yes, it does.

1    Q    Okay, so it's relatively recent that the FBI and other

2    experts in the field have been using Google to generate this

3    data?

4    A    Recent, more recent than –

5    Q    More recent than other ways in which to get the

6    information that you've used previously?

7    A    It is, yes.

8    Q    And historically it was some, Google was used for

9    purposes of a consumer, in other words my question is, is to

10   your understanding Google is historically and has created, I

11   should say this.  Has Google historically been used as a person

12   finder, a forensic tool or has that been a recent development?

13   A    I don't know the first time that the FBI or any law

14   enforcement agency approached Google.  So I don't have that

15   information.  I can tell you that I've used it multiple times in

16   the last year if not two years.

17   Q    Okay, when is the first time you testified in a case

18   using Google location services?

19   A    December 2017.

20   Q    Okay.  And to your knowledge, Google has been

21   using location services prior to December of 2017, is that

22   correct?

23   A    That's correct.

24   Q    When did that first start?

25   A    I don't know.  As I mentioned in the presentation,

1    they added it to their privacy policy in 2009.  I don't know

2    exactly when they started using it, though.

3          Q     So your testimony is you don't know when Google

4    first used location services?

5          A     I don't know the exact date, no I don't.

6          Q     Okay.  With regard to location services, you also

7    testified it's tied in to not just Gmail but other applications in

8    Google is that fair to say?

9          A     That's correct, yes.

10         Q     Okay and depending upon the type of let's say

11   phone, is it built into let's say a Samsung Galaxy, versus you

12   have to download it if you have an iPhone?

13         A     Well, a Samsung phone typically runs the Android

14   operating system.  And this setting is in the Android operating

15   system.  The applications are used more so on the iPhone

16   platform, which a user would have to download those

17   applications such as Gmail or Google maps, do not natively

18   come on an iPhone when you purchase it new from a store.

19   Did that answer your question?

20

21         THE COURT:  It's embedded in the Galaxy, in the

22   Samsung phone but it's not embedded in the iPhone?

23         WITNESS D'ERRICO:  That's correct.  It's embedded

24   in the operating system, the actual operating system.  So there

25   is no apps to download if you are using an Android based

1  phone, which Samsung creates an Android based phone.

2  There is a setting to turn it off in the Android operating system.

3   However, during the setup of those Android phones it asks if

4  you want to collect this data and in my experience, I am in a

5  rush to set up my new phone because I'm very excited and yes,

6  yes, yes, yes, click through just about everything.

7

8  BY MR. MIKULA:

9      Q    Okay, now you testified regarding the, I guess, the

10  building blocks of Wi-Fi technology.  And in that testimony you

11  talked about the MAC address, do you recall that?

12     A    Yes.

13     Q    Okay and you identified the MAC address as the

14  machine access control, is that correct?

15     A    Yes.

16     Q    Is it in fact called the media access control?

17     A    You are correct, yes, I did misspeak there.

18     Q    Okay.

19

20         MR. MIKULA:  Regarding this Google data that I

21  think has been previously marked and identified and moved

22  into evidence as Commonwealth's One, do you have that able

23  to be pulled up?

24         MS. ULMER:  No.

25         MR. MIKULA:  Okay.  Judge, for demonstrative

1    purposes, I printed off the raw Google data that's been

2    previously provided by the Commonwealth's Attorney's office

3    and I can provide one to the witness as well.

4              THE COURT:  Any objection?

5              MS. ULMER:  No, sir, your Honor.

6              THE COURT:  All right.

7              MR. MIKULA:  And I'd like to pass one up to the

8    Court as well.

9              THE COURT:  Thank you.  At this point in time it's

10   just for demonstrative purposes?

11             MR. MIKULA:  Yes, sir.

12             THE COURT:  Not an exhibit?

13             MR. MIKULA:  No, sir.

14             THE COURT:  Okay.

15             MR. MIKULA:  It's previously been moved in as an

16   exhibit.

17             THE COURT:  Is that part of the disk that was in?

18             MR. ACKLEY:  I think it is.

19             MS. ULMER:  It is the disk.

20             THE COURT:  The disk is number one?

21             MR. MIKULA:  Yes, sir.

22             THE COURT:  Okay.

23             MR. MIKULA:  Yes, sir.

24

25   BY MR. MIKULA:

1    Q    Sir, can you please identify that set of documents,

2    those pages you have in front of you?

3    A    Yes, it appears to be a printed copy of the Google

4    location history.

5    Q    Okay and that is, you have 59 pages, is that correct?

6    A    Yes, sir, I do.

7    Q    Okay.  There are a number of columns in this

8    document is that correct?

9    A    Yes, there are.

10    Q    Okay, I'm going to ask you about each column and

11    have you explain what it means.  You had testified previously

12    about the first column, which is UTC, correct?

13    A    Yes, I have.

14    Q    And remind me again of what UTC stands for?

15    A    It's Universal Time Coordinated.  It's not necessarily

16    a time zone but it's a time that actually marks up with

17    Greenwich Mean Time for purposes of time zone.  So that we

18    can shift time zones off of there.

19    Q    Okay and the second and third columns, what are

20    those?

21    A    Column B and column C are marked latitude and

22    longitude, which is the coordinates of Google's estimated

23    location.

24    Q    And that's a global positioning term is that fair to

25    say, that those are global positioning terms?

1       A       Yes, they are.

2       Q       Okay and the fourth column, what is that?

3       A       The fourth column, column D is marked display

4    radius meters and that is Google's accuracy radius back to us.

5       Q       Okay and for people that are not familiar with the

6    metric system, how long is a meter in feet?

7       A       It is just shy of three feet, so roughly equivalent to a

8    yard, I don't have the exact –

9       Q       Does it maybe is it 3.2 feet would you say, does that

10   sound familiar?

11      A       It may be.

12

13              THE COURT:  About 39 inches or so?

14              MR. MIKULA:  I think the Court can take judicial

15   notice that a meter is 3.2 feet approximately.

16              THE COURT:  There are less meters in a football

17   field than there are yards?

18              MR. MIKULA:  That's correct, yes, sir.

19              THE COURT:  Okay.

20

21   BY MR. MIKULA:

22      Q       And the next column, what is that?

23      A       The next column, column E is the source column.

24      Q       Okay and what's contained in the source column?

25      A       In this document there are four different values in

1    that source column.  It's Wi-Fi, GPS, cellular and unknown.

2           Q      Okay and device tag, what is that?

3           A      I don't have an official definition of what the device

4    tag is.  I'm unaware of what that column is.

5           Q      You don't have, in terms of all your hours and

6    experience in this type of field, you can't, you don't know what

7    it is?

8           A      No.  I can guess what it is but I can't tell you with

9    any certainty what it actually is.

10

11          THE COURT:  Okay, would it be fair to say that for

12   all the entries within the 59 pages the device tag is the same

13   Mr. Mikula?

14          MR. MIKULA:  Yes, sir.

15          THE COURT:  It would have something to do with a

16   device?

17          MR. MIKULA:  I believe it identifies the device itself,

18   yes, sir.  But again that's –

19          WITNESS D'ERRICO:  And I can offer that in other

20   cases that device tag does not show up in any other case that

21   I've worked.  It is a different identifier for each set of data that

22   I've analyzed.

23          MR. MIKULA:  I'd ask that be stricken from the

24   record.  I didn't ask that.

25          THE COURT:  Okay, we'll strike that.

1          MR. MIKULA:  Thank you.

2

3   BY MR. MIKULA:

4          Q     What is the last column please?

5          A     The last column is the platform column and it

6   describes the mobile device that was used as the source of this

7   data.

8          Q     Okay.  Going to let's see, so if you take for instance

9   columns B and C, which are marked as latitude and longitude

10  and you can take those figures, those numerical, I guess, the

11  numbers that are in B and C and you can plot a location point

12  on a map, fair to say?

13         A     Yes.

14         Q     Okay and going back to column D that's marked as

15  display radius in meters, is that fair to say?

16         A     Yes, it is.

17         Q     Okay, now when it says it's a radius, does it mean a

18  distance from that point you would plot on a map, like a

19  longitude and latitude to the outer edge of a radius?

20         A     It is a, with the latitude and longitude being the

21  center point of a circle, this is the radius away, the amount of

22  meters aware that that circle should be drawn?

23

24         THE COURT:  So the diameter is twice the radius?

25         WITNESS D'ERRICO:  That is correct, yes.

1          THE COURT:  From the point, got it.  All right.

2

3    BY MR. MIKULA:

4          Q     On row six, can you tell the Court what the display

5    radius is on row six?

6          A     On row six, the display radius is 23 meters.

7          Q     Okay and so as the Court just set forth double that

8    in meters would be the diameter, is that fair to say?

9          A     That's correct, yes.

10         Q     Okay and so based on what you testified previously,

11   that the positioning could really be within, it could be as far

12   north as 23 meters from that point of latitude and longitude, it

13   could be as far south as 23 meters, is that fair to say?

14         A     That's correct, yes.

15         Q     And as far west and east?

16         A     As Google's estimation is, it would be somewhere in

17   that circle, that is correct.

18         Q     Okay and you testified previously that an area let's

19   say of 180 feet can't put a specific, you can't put a specific data

20   point within let's say an apartment or a car, is that fair to say

21   with the Wi-Fi data?

22         A     Correct, using a single data point, or a single Wi-Fi

23   data point, I cannot tell you which apartment that mobile

24   device was originating out of.  This information provides an

25   approximate location of that device, not a specific pinpoint

1    location of that device.

2         Q    Okay.  The disclaimer that's on row two, do you see

3    that?

4         A    Yes, I do.

5         Q    Can you read that for the Court, please?

6         A    Yes, the map display radius fields reflects an

7    estimated uncertainty value regarding the reported coordinate.

8     Its value depends on a great many factors and is an

9    approximation sufficient for its intended product use.

10        Q    The phrase reported coordinate would that be

11   latitude and longitude?

12        A    Yes, it would.

13        Q    Okay, can you tell the Court what Google considers

14   quote, a great many factors as being?

15        A    I would have to assume here.

16

17             THE COURT:  Don't guess.

18

19   BY MR. MIKULA:

20        Q    So you don't know?

21        A    I don't know exactly what a great number of factors

22   may be.

23        Q    And you don't know how accurate or inaccurate

24   each would be, fair to say?

25        A    Purely from the records, that's correct.

1    Q    Okay.  Do you know if Google considers weather a

2  factor, for instance?

3    A    I don't know if they consider it.

4    Q    When you see row four through eight, they all read

5  23 meters, is that fair to say?

6    A    Yes.

7    Q    Can you tell us with any scientific certainty if that

8  figure is accurate?

9    A    Accurate as?

10   Q    Is it 23 meters or could it be a different amount?

11   A    I'm sorry, I don't know what you're asking.  Can you

12  rephrase the question?

13   Q    Well, I don't know –

14

15       THE COURT:  I think the question is, you don't

16  know from looking at rows four through eight as to those

17  particular entries whether the 23 meters is accurate or not, is

18  that your question?

19       MR. MIKULA:  Yes.

20       WITNESS D'ERRICO:  I don't know that it's one

21  hundred percent accurate.

22

23  BY MR. MIKULA:

24   Q    Okay, can you tell us how much variation of error

25  there would be in the uncertainty value?

1    A    Based on my own testing, I found these records to

2  be quite reliability up in the seventy percentile and beyond.  If

3  it was not accurate, as in if it was a miss, if I doubled the

4  distance of that accuracy radius, ninety percent were in that

5  radius.

6    Q    Does it depend on whether it's GPS, Wi-Fi or cell

7  triangulation?

8    A    I can tell you the GPS appeared to be more precise

9  as in they have a much smaller radius but the accuracy of

10  them being in that accuracy bubble, I believe are the same.  I

11  did not go out and test GPS specifically.

12    Q    So the answer is yes, it can depend upon what

13  source it comes from?

14    A    The precision certainly, yes.

15    Q    Okay.

16    A    The precision certainly depends on the source of the

17  data.

18    Q    Have you spoken to Google engineers or developers

19  about how to calculate that uncertainty value?

20    A    No, I have not.

21    Q    Okay, you testified previously that an average range

22  for a Wi-Fi data point is 250 meters if it's outside?

23    A    I wouldn't say outside.  That's not the average.

24  That's the maximum distance.

25    Q    The maximum distance, okay.

1    A    Correct.

2    Q    And what's the maximum distance indoors?

3    A    The paper said 70 meters.

4    Q    And what paper is that?

5    A    I'd have to refer back to my, do you mind if I refer

6    back to one of the slides?

7    Q    Sure.

8

9         THE COURT:  Page eleven?

10        WITNESS D'ERRICO:  I do not believe I list the

11   source in my sources document here but I can certainly add

12   that in.  I have the information on my laptop but not in this

13   presentation.

14

15   BY MR. MIKULA:

16   Q    So you testified as to the maximum, do you have an

17   idea as to what an average would be?

18   A    You know, from an actual scientific perspective, I

19   don't have an average.  It depends on many factors such as the

20   amount of power that's in that Wi-Fi radio.

21   Q    What type of router it would be?

22   A    The type, the design of the router.  So each router

23   can be a little different based on how far it can transmit.

24   Q    How many different routers would you say are on

25   the market today?

1    A    I have no way to estimate that.  I don't know, many.

2    Q    How many are you familiar with?

3    A    I know of at least six companies that manufacture

4  routers that sell routers, they have many models from that.

5  You know, I don't have an exact number.  I mean I could say

6  there is over a hundred, I don't have an exact number.

7    Q    So you know of at least over a hundred, is what your

8  testimony is?

9    A    Well, there are likely over a hundred different

10  routers, models and manufacturers out there.  I don't have an

11  exact listing of every router out there though.

12    Q    Okay.  With regard to, let's go to row 167 on this

13  data exhibit.  Tell me when you get there, please.

14    A    Bottom of page four, is that correct?

15    Q    Yes, sir.

16    A    Yes, I'm there.

17    Q    Okay, can you tell the Court what Google is saying

18  the display radius in meters that is?

19    A    2,045.

20    Q    Okay and if we are to assume that there are three

21  feet in a meter, is it fair to say it's over twelve or thirteen

22  thousand feet radius, correct?  I'm sorry, that's the diameter, I

23  was an English major.

24

25          THE COURT:  Two thousand times three, it would be

1    around six thousand.

2

3    BY MR. MIKULA:

4        Q        About 6500, is that fair to say, the radius?

5        A        Approximately, that's fair.

6        Q        Are you familiar with a router that can pick up the

7    signal that's that far away?

8        A        Unless it's highly modified, I don't know of a router

9    than can do that.

10       Q        Okay.  Look at the next row if you could, 168, what

11   does the display radius say there?

12       A        1,635 meters.

13       Q        Similarly you can't testify you are familiar with a

14   router than can pick that signal up, fair to say?

15       A        Other than one that's highly modified, correct.

16       Q        In your experience, what's the furthest distance that

17   you're familiar with that a Wi-Fi router can pick up a signal?

18       A        There was an experiment done at Black Hat in Las

19   Vegas where they beamed a Wi-Fi signal into the desert.

20       Q        I'm asking you in your experience.

21       A        I don't have an exact.

22

23       MS. ULMER:  Judge, objection.  He was answering

24   the question that is his experience, it's his knowledge of the

25   setting.

1          THE COURT:  Well, I guess the question is, is the

2    question how far has he actually beamed a Wi-Fi signal?

3          MR. MIKULA:  Yes, yes, sir.

4          WITNESS D'ERRICO:  I don't have an exact figure.

5    You know, once I leave my house, my Wi-Fi pretty much, my

6    phone turns off Wi-Fi and goes to cellular.  You know, outside

7    of my house, I don't know, fifty meters.

8

9    BY MR. MIKULA:

10         Q     Okay.

11         A     Usable.

12         Q     Right, okay, so anything over fifty meters is, are you

13   saying somewhat suspicious?

14         A     No, I'm saying my phone turns off at maybe

15   approximately fifty meters from my routers being inside.  That

16   doesn't mean that the signal is not viewable or out there.  It

17   just might mean that it's not usable or it's at such a degraded

18   capability that my phone would rather turn onto say LTE or

19   the cellular networks.  I'm not conducting traffic, you know,

20   more than fifty meters from my house on my Wi-Fi.

21         Q     Okay, all right.

22         A     But I guess to finish that what I'm saying is that

23   signal may still be visible past fifty meters.  It just might not be

24   usable.

25         Q     Okay.

1      A      If you're trying to connect to your Wi-Fi.

2      Q      For a usable signal, what do you see in a standard

3   observation presentation that you created here in this case?

4      A      Sir, I'm sorry, I need to clarify.  Are you asking what

5   a Wi-Fi router can do or what Google has provided when

6   marked as Wi-Fi?

7      Q      Fair point, what a Wi-Fi router can do in terms of

8   the distance that you generally see as a maximum?

9      A      I don't collect information on the distances from Wi-

10  Fi.  I've collected signal strengths but I haven't collected

11  distances from a Wi-Fi router.  So I don't have any information

12  to provide.

13

14           THE COURT:  Do you mind if I asked a question?

15           MR. MIKULA:  Yes, sir.

16           THE COURT:  Are you saying that there is a

17  difference between what might show up as being a signal mark

18  on this spreadsheet and what someone may be able to use his

19  or her phone as far as making a call is concerned?

20           WITNESS D'ERRICO:  Yes, I am.  I don't believe –

21           THE COURT:  So someone couldn't make a call but

22  it might show up as a hit or a printout for that particular time

23  and date?  The signal strength would be too weak to make a

24  call but it would not necessarily for it to be too weak to show

25  up as a data hit?

1    WITNESS D'ERRICO:  As a Wi-Fi, correct, yes.

2    THE COURT:  Okay.

3    WITNESS D'ERRICO:  Yes, your Honor.

4

5  BY MR. MIKULA:

6    Q    Looking at pages fifty and 58 if you could for a

7  moment, let me know when you're at page fifty.

8    A    I have page fifty.

9    Q    Okay.  And on rows 2202 and 2203, do you see the

10  display radius that's identified?

11    A    2202 and 2203, correct?

12    Q    Yes, sir.

13    A    Yes, a display radius of four meters.

14    Q    Okay and with regard to the source, do you see what

15  it identifies?

16    A    I believe it says unknown, the correct, the full value

17  is unknown as a source.

18    Q    Okay and what does that mean?

19    A    That Google, when Google provided the records, they

20  had an unknown source.

21    Q    And look at page 58 and you see two unknowns

22  there as well?

23    A    Yes, I do.

24    Q    Tell me, what rows are those on?

25    A    2259 and, I'm sorry, 2559 and 2560.

1    Q    Okay and like you said you don't know how, why

2    Google produced that information?

3    A    No, I don't.  It was obviously in their system, which

4    is why they produced it and they marked it as unknown

5    source.

6    Q    Okay, if we could turn back to your presentation

7    that you created for the day if you could.  And if you could turn

8    to page eighteen and let me know when you are there.

9    A    I have page eighteen.

10   Q    Okay, on this page you identified it as an

11   observation conducted here at the Henrico County

12   Administration Building, is that correct?

13   A    Yes, that's correct.

14   Q    And you show the location of the Google location

15   services point in green, is that correct?

16   A    That's correct.

17   Q    All right and you show your observed location in red,

18   is that what you're saying?

19   A    Yes, it is.

20   Q    Okay, did you go into the administration building

21   and locate the Wi-Fi access point?

22   A    No, I did not.

23   Q    Okay.  Wouldn't the location of the Wi-Fi access

24   point give you a better observed location to compare to Google

25   location services?

1    A    No, it would not.

2    Q    Why not?

3    A    Because that is the point where I was taking my

4    measurements from; that observed location.  So what I am

5    trying to test is what information is Google going to provide

6    back to me when I provide it observations from that point.  So

7    regardless of where that Wi-Fi access point is, I don't need to

8    know that.  Google is making that determination when it

9    calculates its Google estimated location.

10    Q    But you don't know how Google identifies the access

11    point, correct?

12    A    I know Google's collection practice because we

13    talked about that earlier that it crowdsources this information

14    from billions of phones.  And that was documented on its

15    leaflet and that it was documented to the FCC in fact that

16    Google collects Wi-Fi or collects this data using their street

17    cars.

18    Q    But today you can't say where the access point is in

19    this observation, number one?

20    A    That's correct.  I don't know where the access points

21    are.

22    Q    Okay.

23    A    And it was multiple access points observed if you

24    look at the chart in the rear, page 31.  You can see there is a

25    total number of BSSIDs was 35 for that location.

1      Q     Say that one more time?

2      A     So the number of access points that I observed from

3  that red point on slide eighteen.

4      Q     Right.

5      A     Course is documented on page 31, line one, under

6  the column number of BSSIDs.

7      Q     So are you saying that's the number of Wi-Fi access

8  points where you were standing were 35?

9      A     Where I was standing, my phone or my computer

10  observed signals from 35 different BSSIDs or access points.

11      Q     Okay, access points, thank you.

12      A     And let me clarify, too, there could be multiple

13  BSSIDs on a single access point.

14      Q     So if you can't determine the Wi-Fi access point and

15  you're saying Google knows that but you don't, how exactly did

16  you decide where to place your observation point?

17      A     I collected that observation point off my phone.  I

18  turned on my phone.  I asked it for the GPS coordinates of

19  where I was located and I plotted that on the map because

20  that's where my computer was stationed while collecting the

21  Wi-Fi data.  So essentially that's the equivalent of me standing

22  outside with my phone looking at my phone and Google

23  drawing the blue dot on the map of where I was.

24      Q     Okay, is it true that you could still get a Wi-Fi signal

25  at other locations in the parking lot?

1      A    I don't know, I didn't test it.

2      Q    Okay, if you didn't locate the access point that you

3 believe was being used by Google, how can you determine the

4 accuracy of Google location services?

5      A    I can determine the accuracy because I know where

6 I was and I measure where I was from where Google estimated

7 me to be and I can measure that distance and tell you that I

8 was standing here at this point, the red dot on the map.  And

9 that Google was telling me that it thinks I am standing at that

10 green point on the dot and I can measure that distance and

11 determine the difference.

12      Q    Okay.  But isn't it true that four of the thirteen

13 observations that you did, your observation location was

14 outside of Google's range?

15      A    That's correct, yes.

16      Q    Okay and do you know why that's the case?

17      A    I don't know why.  All I know is that I sent data up

18 to Google that was collected at those locations.  Google

19 processed it in its algorithm and did whatever it does and it

20 sends back to me the location information of where it believes

21 that it is.

22      Q    Okay.  Is there any reason why you chose just

23 thirteen tests to run, or thirteen different observations let's

24 say?

25      A    I know it was not a, just drove around to locations

1   that I thought would be interesting in order to collect

2   observations.  And I tried to mix it with public buildings, you

3   know, shopping centers, apartment complexes, townhouses, to

4   get just a general lay in this area what this information would

5   look like.

6          Q     Would you agree that running more tests would give

7   you a better point of accuracy if you did more tests than just

8   thirteen?

9          A     Most likely.  This is a very small sample size.

10         Q     Okay, what is the standard sample size to use in

11  this scenario?

12         A     Well, this was just observations.  I'm not writing a

13  scientific test or anything.  This is just a sample observation of

14  what I'm looking at.  I'm not a research scientist in that area so

15  I don't know what a standard sample set would be.

16         Q     Okay.

17

18         MR. MIKULA:  If I could have a minute, Judge.

19         THE COURT:  Sure.

20

21  BY MR. MIKULA:

22         Q     Can you turn to page 31 of this presentation?  Are

23  you there?

24         A     I am, yes.

25         Q     Okay.  You were testifying previously about the, I

1   believe it was the RSSI maximum and minimum and the closer

2   to zero is the more accurate it is?

3       A    It's a stronger signal strength.

4       Q    Okay, so how weak of a signal strength is it, what's

5   the scale of strength for an RSSI?

6       A    A strong RSSI would be in the negative thirty range.

7    That's fairly strong coming off of a Wi-Fi router.  And a usable

8   signal, you know, it depends on many factors but, you know,

9   basically once you get into negative one hundred it's unusable.

10      Q    Okay and it's fair to say that you have ten that's

11  listed under thirteen that is ninety or above, is that fair to say?

12      A    For which column, the minimum, maximum or

13  average?

14      Q    The minimum.

15      A    The minimum, ten, I have eleven but.

16      Q    So eleven of the thirteen are in the ninety range, is

17  that your testimony?

18      A    Yes.

19      Q    Okay and you said over a hundred is unusable?

20      A    Pretty much, yes.

21      Q    What are the experts in your field say about a range

22  that's ninety to a hundred?

23      A    It's a weak signal.

24      Q    Okay.  With regard to the Gay case that you testified

25  to previously, did the attorneys in that case challenge the

1    admissibility of the Google evidence?

2        A    No, they did not.

3

4        MR. MIKULA:  I have nothing further.

5        THE COURT:  Any redirect?

6        MS. ULMER:  Briefly, yes, sir.

7

8

9

10       REDIRECT EXAMINATION

11   BY MS. ULMER:

12       Q    In regards to the Google data, the large excel sheet

13   in front of you, for the device tag, have you seen that exact

14   duplicate number in any other Google location data sat that

15   you've ever –

16

17       MR. MIKULA:  Objection, asked and answered.

18       MS. ULMER:  Actually, he was not allowed to answer

19   that question.

20       MR. ACKLEY:  It was stricken.

21       MS. ULMER:  It was stricken from the record.

22       MR. MIKULA:  I don't know if I did that but I'll

23   stipulate to that.

24       THE COURT:  Stipulate to what?

25       MR. MIKULA:  I'll stipulate that that number is, I'll

1 stipulate that that number has not been used and has not
2 been seen in any other, I guess, case if that was the question.
3         THE COURT:  Well, I'd like for the witness to testify
4 so this Court would be clear as to what the answer would be.
5 So, did you understand the question?
6         WITNESS D'ERRICO:  I did, your Honor.
7         THE COURT:  And what's your answer?
8         WITNESS D'ERRICO:  I've never seen this sequence
9 of digits in any other Google location history data that I've
10 reviewed.
11
12 BY MS. ULMER:
13     Q     And then when talking about your own
14 observations, Mr. Mikula and you were discussing that the
15 double the accuracy radius, the Google had you within a
16 double accuracy radius ninety percent of the time, right?
17     A     That's correct.  And the point I was trying to make is
18 it's still in the ballpark.  We're not talking about that it's at
19 another location; that it's in Chesterfield County, that it's in
20 Richmond City.  All of these measurements were within double
21 digit meters off and except for the last one, which was two
22 hundred meters, I believe.  It's still a relatively small number
23 compared to, you know, the size of the universe.
24     Q     So we're talking about miles off?
25     A     No, we're not even miles.

1

2          MS. ULMER:  Those are all the questions I have.

3          THE COURT:  As to the points that you put into the

4   different bubbles for lack of a better word, you took those from

5   the entry on the assembled 59 pages, is that correct?

6          WITNESS D'ERRICO:  That's correct.  So every dot

7   or every marking up there is, corresponds to a line in this

8   report.

9          THE COURT:  So it's not, there is not any, there is

10  not a bubble for every entry?

11         WITNESS D'ERRICO:  There is not.

12         THE COURT:  Okay.

13         WITNESS D'ERRICO:  I looked at certain relevant

14  times to the investigation and plotted those out.

15         THE COURT:  And do you know what entry numbers

16  you have plotted on the presentation?

17         WITNESS D'ERRICO:  I would have to go back and

18  compare it to the time on the record to the times on the slides

19  but there is, they do correspond.

20         THE COURT:  My question to you is, do you know

21  whether any of the bubbles that you used had the unknown

22  source?

23         WITNESS D'ERRICO:  I do know the answer and

24  well, if I could review the slides real quick I can tell you that

25  answer.

1          THE COURT:  Okay.

2          WITNESS D'ERRICO:  If I did use an unknown, it

3   would appear in that box in the top left and that's where I

4   detail out the number of points and what type are on that

5   chart and the timeframes.  I did not use any unknowns on

6   these charts, your Honor.

7          THE COURT:  Does that prompt any questions for

8   anyone?

9          MS. ULMER:  No, sir.

10          MR. MIKULA:  I'd like to ask one.

11          THE COURT:  Okay.

12          MR. MIKULA:  Well, one quick question, Judge, if I

13   could.

14          THE COURT:  Okay.

15

16   RE-CROSS EXAMINATION

17   BY MR. MIKULA:

18   Q     With regard to the observations you did, you used

19   obviously your observation point as well as the range of

20   accuracy, correct?

21   A     That's correct.

22   Q     Would it be fair to say that for let's say, what is the

23   date range, for pages 39 through 45 would it be fair to say that

24   a Google accuracy range should be used in those as well as

25   opposed to a pinpoint drop?

1    A    Yeah and that's a great point.  By the markers on
2  here I'm not trying to indicate that there is a pinpoint of where
3  it is and that's why I include on the top left that block of the
4  estimated –
5
6         THE COURT:  As a range?
7         WITNESS D'ERRICO:  As a range, right.  So each
8  point in this slide, so if I could take slide 39 as an example.
9  On slide 39, I plotted two GPS points and 57 Wi-Fi points.
10  Now, those two GPS points because there is only two, one of
11  them is 13 meters and the other one is thirty meters.  For the
12  Wi-Fi points, every point in there is either somewhere between
13  20 and 29 meters.  I could plot those on the map.  It gets very
14  sloppy and very hard to understand very quickly.  So I chose to
15  create a box instead to capture that information.  And there is
16  a scale down in the bottom right hand corner to help you
17  determine what that range is.
18
19         THE COURT:  Any additional questions?
20         MR. MIKULA:  No, sir.
21         THE COURT:  May the Special Agent be excused?
22         MS. ULMER:  I'd ask him to remain for a while.
23         THE COURT:  All right, you may step down.
24         WITNESS D'ERRICO:  Thank you.
25  WITNESS STOOD ASIDE;

1

2          THE COURT:  Any additional evidence for the

3   Commonwealth?

4          MS. ULMER:  Your Honor, the Commonwealth

5   would like to move into evidence the presentation and for the

6   record and to make sure we're on the same page at this time,

7   the Commonwealth will take out slides 33 through 37 so

8   restarting with slide 38.

9          THE COURT:  Any objection, Mr. Mikula?

10          MR. MIKULA:  33 through 37, correct?

11          MS. ULMER:  Including into that 37.

12          MR. MIKULA:  Yes.

13          THE COURT:  Pages 33 through 37 inclusive?

14          MR. MIKULA:  Yes.

15          THE COURT:  Would be taken out, any objection?

16          MR. MIKULA:  No, sir.

17          THE COURT:  All right, the Court will use its copy

18   and will tear out pages 33 –

19          MS. ULMER:  I have a copy.

20          THE COURT:  Fair enough, all right, okay.  I'm still

21   going to do it for my copy to make sure that I don't have it.

22          MS. ULMER:  And the Commonwealth would like to

23   move the presentation as the Commonwealth's Exhibit number

24   four, I believe.

25          MR. MIKULA:  The observation presentation?

1         THE COURT:  Yes.

2         MR. MIKULA:  I thought that was two, so number

3    four?

4         MR. ACKLEY:  What was two?

5         THE COURT:  Two would be the photographs.

6         MS. ULMER:  The photographs, number three was

7    the –

8         MR. MIKULA:  The photos in Kroger.

9         MS. ULMER:  And the jail call should be four, so this

10   should be five.  This should be five.

11        THE COURT:  I have the number one is the first

12   disk.

13        MR. MIKULA:  Correct.

14        MS. ULMER:  Yes.

15        THE COURT:  Number two are the three pictures at

16   Kroger.

17        MR. MIKULA:  Correct.

18        MS. ULMER:  Yes.

19        THE COURT:  Number three with the Kroger ATM

20   pictures?

21        MS. ULMER:  Yes.

22        THE COURT:  Number four were the jail calls and

23   this would be Commonwealth's number five?

24        MR. MIKULA:  Yes, sir.

25        MS. ULMER:  Yes, Judge.

1         THE COURT:  Number five.

2

3    NOTE:  Commonwealth's Exhibit 5.

4

5         THE COURT:  Anything further?

6         MS. ULMER:  Not from the Commonwealth.

7         THE COURT:  Any evidence for the Defendant?

8         MR. MIKULA:  Yes, sir, Judge.  Judge, I'd like to call

9    Jake Green to the stand, please.

10        THE COURT:  Why don't we do this?  It's 12:58,

11   we've been doing this for a little bit more than an hour.  Let's

12   take about a five minute break and everybody stretch his or

13   her legs.

14

15   NOTE:  A RECESS IS HAD; WHEREUPON THE PROCEEDINGS

16   CONTINUE, VIS:

17

18        THE COURT:  We're back on the record at 1:07 p.m.

19    You may have a seat, sir.  The Defendant is present.  Mr.

20   Mikula continues on behalf of the Defendant.  Both Mr. Ackley

21   and Ms. Ulmer are present on behalf of the Commonwealth.

22   First witness on behalf of the Defendant?

23        MR. MIKULA:  Mr. Jacob Green, sir.

24        THE COURT:  Mr. Green, please.

25        THE DEPUTY:  Would you stand for me, please?

1      THE COURT:  Please watch your step as you step

2  through the opening.  Would you raise your right hand?  Do

3  you swear or affirm the testimony you're about to give is the

4  truth, the whole truth and nothing but the truth?

5      WITNESS GREEN:  Yes, sir, your Honor.

6      THE COURT:  You may have a seat.

7      WITNESS GREEN:  Thank you.

8      THE COURT:  Mr. Mikula?

9      MR. MIKULA:  Yes, sir.

10

11      **WILLIAM JACOB GREEN**, the witness, having

12  previously been duly sworn, testified as follows:

13

14      DIRECT EXAMINATION

15  BY MR. MIKULA:

16      Q    Could you please state your name for the record?

17      A    Yes, sir.  My name is William Jacob Green, last

18  name is G-R-E-E-N.

19      Q    And Mr. Green, how are you employed?

20      A    I work with Envista Forensics in Morrisville, North

21  Carolina.

22      Q    What is Envista?

23      A    Envista is a digital forensics company as well as an

24  engineering company that assists clients across the globe.  The

25  Morrisville office is specifically a digital forensics branch of

1   Envista.  We work with attorneys, businesses, insurance

2   companies to interpret digital evidence and occasionally

3   provide opinions within criminal and civil courts.

4        Q      Okay and how long has Envista been in existence?

5        A      Envista was previously a company called PT&C

6   LWG.  That company has been around since the nineties.

7        Q      Okay and what are your duties there?

8        A      I work with criminal defense attorneys as well as

9   sometimes prosecutors in the interpretation of records, the

10   analysis of cell phone and computer evidence, GPS evidence

11   and then the presentation of those devices and evidence in

12   Court.

13        Q      Okay and how long have you been with Envista?

14        A      A little over two and a half years.

15        Q      Okay, going back, where did you receive your

16   undergraduate education?

17        A      Received a Bachelor's of Science in criminal justice

18   from Appalachian State University in Boone, North Carolina.

19        Q      Okay and what was that degree in?

20        A      Criminal justice.

21        Q      Okay and did you receive any sort of forensic

22   experience after your undergraduate degree?

23        A      Yes, sir.  In 2006, I was hired to be a police officer

24   with the city of Rock Hill, South Carolina, just south of

25   Charlotte, North Carolina.  I was on patrol for five years and

1   then moved into the criminal investigations division as a

2   forensic investigator and assigned to our county task force to

3   investigate crime scenes and digital evidence.  In 2014, I was

4   selected to become a part of the United States Secret Service

5   electronic crimes task force based out of Columbia, South

6   Carolina.  The bulk of my training and experience came from

7   2014 on.

8        Q      Okay and what type of crimes do you have

9   experience with when you were with the Rock Hill Police

10  Department?

11       A      Everything ranging from car break-ins in the middle

12  of the night to burglaries to, all the way up to murders.

13       Q      Okay and you said that you were with the York

14  County multijurisdictional forensic service unit?

15       A      That is correct.  That is the forensic task force that

16  was assigned to our county.

17       Q      Okay and if you could explain to the Court a little bit

18  about your experience with electronic devices while you were

19  with the YCMFSU?

20       A      Yes, sir.  So within our county task force, specifically

21  and kind of happenstance, we were right next to our drug

22  enforcement unit.  They would bring in cell phones, we would

23  utilize the police technology that was brought up by the Special

24  Agent, Cellbrite to do the analysis of those cell phones and

25  provide that data back to the narcotics officers.  We would also

1    sometimes get computers and then assist with search warrants

2    to companies like Google, Facebook, Snapchat, Twitter, to

3    recover data that was not stored specifically on the device but

4    stored on those servers owned by those companies.

5         Q    Okay and in May of 2014, you left that I guess

6    employment and went somewhere else?

7         A    No, it was within 2014, the entire time while I was

8    assigned to the forensics task force, my paycheck still came

9    from the city of Rock Hill.

10        Q    Okay.

11        A    So I was still a police officer with Rock Hill on

12   assignment to these locations.  So I became a task force

13   member of secret services as a special deputy U.S. Marshal

14   and assigned to secret service for the tasks of assisting in the

15   analysis investigation of electronic crimes.

16

17             THE COURT:  You were still with the police

18   department but you were assigned as a special secret service

19   agent much like a special U.S. attorney would be from a state

20   prosecutor's office?

21             WITNESS GREEN:  Similar.

22             THE COURT:  A designation?

23             WITNESS GREEN:  Yes, sir.

24             THE COURT:  Got it.

25

1   BY MR. MIKULA:

2        Q      How many hours of experience do you have with

3   digital forensics?

4        A      Over six hundred hours at this point.  Over 1200

5   hours in forensic and investigations.

6        Q      Okay and do you have any specialized training or

7   any specialized degrees with regard to forensic science?

8        A      I have three certifications currently.  They are in cell

9   phone forensics through Cellbrite as a certified

10  operator/analyst and then a computer forensics certification

11  through a company called Black Bag Technologies.

12       Q      Okay.  And through your training and experience,

13  have you ever investigated or been educated on Google?

14       A      I have as a law enforcement officer and as a

15  reviewer, typically on the Defense side, I have personally

16  reviewed Google location services both while requesting that

17  with a search warrant to Google and receiving a response from

18  Google and then also through discovery practices within

19  courts.

20       Q      So you've dealt with Google location services in

21  courts before?

22       A      Yes, sir.

23       Q      Which jurisdictions?

24       A      Specifically, the United States Federal Court,

25  Northern District of Ohio in Cleveland, Ohio.

1    Q    Any other state courts?

2    A    No, sir.  I've testified as an expert in other state

3    courts but not specifically for location history.

4    Q    Okay.  Are you affiliated with any professional

5    memberships?

6    A    IACIS, the International Association of Computer

7    Investigative Specialists.

8    Q    Okay.

9

10    MR. MIKULA:  And at this time I'd ask that he be

11    identified as an expert in digital forensics as well as location

12    services, Judge.

13    MR. ACKLEY:  If I could voir dire on that, please,

14    your Honor.

15    THE COURT:  Yes.

16

17    VOIR DIRE EXAMINATION

18    BY MR. ACKLEY:

19    Q    Sir, with respect to the, you said you dealt with

20    Google location services in a case in the Northern District of

21    Ohio?

22    A    Yes, sir.  United States versus Sean Smith.  We dealt

23    with many location evidence pieces of which the CAST team

24    had provided us responses from Verizon as well as Google.

25    Q    So similar to this case?

1    A    It was a totality of many pieces of evidence.

2    Q    Okay, but you got a report that was similar to what

3 has been provided to Mr. Mikula in this case?

4    A    Similarly, yes, sir.

5    Q    Okay and when was that case?

6    A    That was I believe April of 2018.

7    Q    All right and did you testify as an expert with regard

8 to the Google location information?

9    A    Cellular analysis with the specific location

10 information.

11    Q    Okay, so the cellular analysis meaning the

12 information taken directly off of the phone itself?

13    A    Off the phone as well as the records as provided by

14 those companies.

15    Q    Okay, and so you did testify as an expert and you

16 were accepted by the court as an expert in that area?

17    A    Yes, sir.

18    Q    All right and but Cellbrite and Black Bag Technology

19 primarily when you are using those you are looking at call

20 detail records, is that fair?

21    A    Can you repeat that?

22    Q    When you are using Cellbrite and Black Bag's

23 information, you are typically dealing with call detail records?

24    A    No, sir, no.  Cellbrite and Black Bag focus on the

25 actual piece of hardware.

1    Q    Right.

2    A    So the cell phone and computer.

3    Q    But I mean when you download the information,

4 what are you reviewing in the, out of that?

5    A    The data as it was contained within that cell phone.

6    Q    Okay and you said sixteen hours is how much

7 training you've had in this, I think you said –

8    A    Over six hundred.

9    Q    Six hundred, all right.

10

11    THE COURT:  Six hundred in the digital, twelve

12 hundred on the forensic.

13    MR. ACKLEY:  Understood, all right.  Thank you.  No

14 other questions.

15    THE COURT:  Any objection to the designation as an

16 expert in digital forensics and location forensics?

17    MR. ACKLEY:  No, sir.

18    THE COURT:  The Court will receive Mr. William

19 Jacob Green as an expert in digital forensics and location

20 forensics.  Mr. Mikula?

21    MR. MIKULA:  Thank you, Judge.

22

23    FURTHER DIRECT EXAMINATION

24 BY MR. MIKULA:

25    Q    Let's talk a little bit about Google.  How does Google

1    location services work?

2         A      So Google location services is something that runs in

3    the background of our devices.  It's constantly tracking where

4    we are going, where we've been and historically recording that

5    within Google's methodology as they've been described through

6    APIs, which is the actual software within our cell phones and

7    then how that location, how that information is then taken up

8    to the cloud and stored on Google's servers.

9         Q      Okay, are you familiar with its intended use?

10        A      Intended use as a consumer and as an expert is

11   things like mapping your location, things like advertisements.

12   They've been described already to the courts.

13        Q      Okay, with regard to it being used as a forensic tool,

14   are you familiar with that?

15        A      Yes, sir, as a law enforcement officer and as an

16   expert.

17        Q      Okay and how long has that been used historically

18   as a forensic tool?

19        A      So Android, the actual operating system that is kept

20   up with by Google has been around since about 2008.  Early

21   stages were built on a Linux platform.  So Linux is an open

22   source tool for operating systems.  It's comparable to Windows

23   or Mac.  Linux is again an open source tool so the reason we

24   have so many different variations of Android is because they

25   are all built on that same piece of technology.

1      Q      Okay are you familiar with the process by which

2   Google says they collect Wi-Fi, GPS and cell data?

3      A      To a point, yes, sir.  Google has been, it's very, it's

4   confidential and a trade secret on how and why.  The vast

5   majority of things that we do know is due to reverse

6   engineering by people that work with the government as well

7   as entities outside of the government.

8      Q      Okay and has in your experience, has Google ever

9   acknowledged ways in which to improve accuracy of their

10  information?

11     A      So some of the most specific ways, again going back

12  to what's been testified, the location information is gathered

13  and the user actually has to submit an actual affirmative

14  response to Google during installation on the device like a cell

15  phone.  When that device, as soon as that location is approved,

16  the cell phone will begin that transmission of data back to

17  Google.  So it's typically done that way though it can be

18  disabled.

19     Q      Okay and how do they speak about improving

20  accuracy through their website and their different advertising

21  materials that you've seen?

22     A      So one of the most frequent ways that we see is that

23  Google requests through the Android operating system for the

24  user to turn on Wi-Fi to improve accuracy.  If the Wi-Fi is off,

25  the accuracy could diminish.

1    Q    And why is that?

2    A    Some of our most forensically valid, forensically

3    specific locations come from things like Bluetooth connections,

4    which are very limited in their distance and they can travel as

5    well as Wi-Fi.  GPS is very specific in the realm of location

6    evidence and then the most, broadest would be our cellular

7    tower services through companies like AT&T and Verizon.

8    Q    Okay, with regard to any entities speaking on

9    reliability, are you familiar with any studies regarding that

10   have put forth reports on the reliability of Google's location

11   services?

12   A    Not necessarily the reliability of Google services.  I've

13   read scientific research papers regarding the application of

14   Google's location services through the Google location history

15   services but nothing specifically within the scientific

16   methodologies for that.

17   Q    What does Google say regarding the location services

18   that they provide?

19   A    Very limited.  They indicate that this is a proprietary

20   piece of technology.  They do not release how and what they

21   actually use these pieces of information for.

22   Q    Do you know anybody outside of Google that is

23   familiar with Google's algorithms?

24   A    No.

25   Q    Or the margin of error of their data?

1    A    No.

2    Q    Okay.

3

4         MR. MIKULA:  Regarding if we could, do you mind

5    sir placing the cellular data, or excuse me, cellular analysis

6    survey team's presentation observation, Exhibit number five

7    up?  Thank you.

8         THE COURT:  Would it be helpful for the witness to

9    have what's been previous marked as Commonwealth's

10   number five?

11        MR. MIKULA:  I think that's a better approach,

12   thank you, Judge.

13        THE COURT:  All right, you're welcome.

14        WITNESS GREEN:  Page five?

15

16   BY MR. MIKULA:

17   Q    Yes, sir.

18   A    Yes, sir.

19   Q    So, I'm sorry, pages two through nine if you could

20   look at those pages.  Do you see that range of pages?

21   A    Yes, sir, I do.

22   Q    Okay.  And you were in the courtroom previously

23   when Mr. D'Errico testified regarding those pages?

24   A    Yes, sir.

25   Q    Have you seen that information before today?

1       A      Yes, sir, I have.

2       Q      And to your knowledge, where does that information

3    come from?

4       A      So the vast majority of this comes from either the

5    privacy policies by Google as well as the terms and services of

6    use of the Android products that they maintain.

7       Q      Okay and is this advertising material to your

8    knowledge?

9       A      To my knowledge, this is the again going to back to

10   the policies and the how and why Google or I guess more the

11   how and, how Google is going to take this information.  Not

12   necessarily why they are taking it or what they are taking it for,

13   so to me this isn't advertisement, this is something a business

14   practice, not necessarily scientific research.

15      Q      Are you familiar with any scientific research of

16   Google's location services?

17

18             MR. ACKLEY:  Objection, asked and answered.

19             THE COURT:  I'll allow it.

20             WITNESS GREEN:  No, sir.  None that were

21   produced by Google.

22

23   BY MR. MIKULA:

24      Q      And if I could direct you to –

25

1        MR. MIKULA:  I'm sorry, Judge, I just need to look

2   at this a little closer.  I got it today.

3

4   BY MR. MIKULA:

5        Q     Let me go in a different direction briefly.  You heard

6   previous testimony regarding Mr. D'Errico talking about the

7   information received by Google, did you not?

8        A     Yes, sir.

9        Q     Okay and that information and his qualifications he

10  testified to having previous experience, you heard that?

11       A     Yes, sir.

12       Q     Within the Google location services application?

13       A     Yes, sir.

14       Q     Are you familiar with how CAST members are

15  educated on this information?

16       A     Through their testimony in courts, yes, sir.

17       Q     Okay and where does that information come from,

18  who educates CAST members on Google location services as

19  well as cell phone, Wi-Fi and GPS sources?

20       A     So much of CAST's training and experience comes

21  form cell phone providers like Verizon, AT&T, the major

22  carriers and that's done on an annual basis to keep those

23  members up to speed on changes to the networks and how to

24  interpret those reports.  To our knowledge, Google has never

25  provided training or any validation to their Google location

1    services reports.

2         Q    With regard to page sixteen of that presentation,

3    could you go to that page, please?

4         A    Yes, sir.

5         Q    Okay, do you have any concerns with regard to what

6    you observed with the methodology and observation location

7    that's identified as .2 and .2.1?

8         A    So the biggest issues that we see here are the

9    sample size that's used here.  Thirteen, especially when we're

10   looking at a set of data that spans over 2600 pieces of evidence

11   that were provided by Google, thirteen is an extremely low

12   number.

13        Q    Okay.  And if you could turn to page eighteen as

14   well.

15        A    Yes, sir.

16        Q    Page eighteen, what do you see?

17        A    So eighteen as it's been marked with the observed

18   location, the Google location and the Google accuracy range,

19   the Google location is a value that is assigned via a latitude

20   and longitudinal point by Google and is actually not a fixed

21   location.  The accuracy range would indicate that the point

22   that Google is trying to pinpoint in this area is within that

23   accuracy range, not that specific point.

24        Q    Okay.

25        A    So a specific point on a map can be very misleading.

1    Q    Okay, so with regard to the Wi-Fi access point and
2    this kind of goes back to the previous page, page seventeen, do
3    you, is there any sort of disclosure about the distance of the
4    access point from the observation point that you see?

5    A    So it's important to know, I think in the chart
6    towards the back of the state's exhibit, the number of locations
7    that are actually broadcasting these signals, it's important to
8    know where that is actually coming from.  You can be
9    extremely, much more confident if you know where that is
10   broadcasting from.  And if you have a lot of network traffic
11   being broadcast over 33 bandwidths, we need to know exactly
12   where it's coming from in order to pinpoint that actual
13   broadcasting antenna.

14   Q    Okay and in terms of the and I guess is that a factor
15   that might affect the range of the Wi-Fi router or the access
16   point?

17   A    Absolutely.  Going back to an indoor and outdoor
18   scenario.  In my experience and my training and the research
19   that I've seen, the theoretical distances, the numbers that were
20   provided to the Court earlier and much safer numbers for an
21   exterior mounted consumer antenna as we've seen in the data
22   is more likely to be less than those described to the Court.

23   Q    And what would you say is a more reliable figure or
24   figures?

25   A    So with a clear line of sight to the antenna, we can

1    be plus or minus fifty meters or about a hundred feet, or I

2    apologize, that would be 150 feet.

3         Q      And is that inside or outside?

4         A      That would be an exterior mounted Wi-Fi antenna.

5         Q      What about inside?

6         A      Interior depending on the way the structure is built,

7    concrete versus wood, glass structures more than likely less

8    than thirty meters.

9         Q      Okay and is that dependent upon other things as

10   well, not just being indoors or outdoors?

11        A      Yes, I mean there is many environmental factors,

12   humidity, temperature, all of these things can affect

13   wavelength and how data is transmitted over the air.

14        Q      Okay.

15

16            THE COURT:  Are you saying that you're disputing

17   the Google accuracy radius?

18            WITNESS GREEN:  Well, it's not necessarily the

19   Google accuracy radius because we don't know how Google

20   calculates that.  It's the overall broadcast distance of a

21   consumer level Wi-Fi point.

22

23   BY MR. MIKULA:

24        Q      So with regard to, you said 150 feet or fifty meters is

25   the most reliable or I'm sorry, can you repeat what you said

1   regarding what you see with regard to fifty meters and how

2   that figure could go down or up?

3        A    Yeah, so the numbers that were provided to the

4   Court of over 200 meters is a very specific alteration to a Wi-Fi

5   antenna that focuses that antenna.  You don't see this in the

6   wild.  I've never experienced it in law enforcement

7   investigations or as a defense investigator.  We don't see those

8   types of numbers in the real world.  It can be done in a

9   scientific lab for sure as it has been documented.  But we don't

10  see typical exterior mounted Wi-Fi antennas going beyond fifty

11  meters.

12       Q    What would you classify anything over fifty meters to

13  be?  So is it invalid or anything that you view like for instance,

14  if I could direct your attention to Exhibit number one and I can

15  pass this up.

16       A    Thank you.

17       Q    If you could go to line 167.

18       A    Yes, sir.  I'm there.

19       Q    What is that max radius, max display radius figure?

20       A    So Google is providing a radius of 245 meters.

21       Q    Okay and so have you ever seen that as you

22  classified in the wild before?

23       A    No, sir.

24       Q    Okay, have you ever seen a figure in the wild over

25  fifty meters?

1      A      It's possible.  Again, depending on the type of router

2  but fifty is really pushing what a consumer level in a

3  residential area router would push.

4      Q      What is a, let's say it's a consumer grade router,

5  what do you generally, what is the figure that is reliable in your

6  expertise?

7      A      I think under, for an exterior mounted, about fifty

8  meters.  Interior mounted, depending on construction, thirty

9  meters.

10     Q      Okay, so what does that figure tell you that you see

11 on line 167?

12     A      This is either an anomaly or inconsistent data.  It's

13 not physically possible for two thousand meters to use Wi-Fi

14 signal.

15     Q      Okay, so are you saying that based on your area of

16 expertise and your training and experience, anything over fifty

17 meters should be considered not reliable?

18     A      I think scientifically improbable.

19     Q      Anything over fifty meters?

20     A      Yes, sir.

21     Q      What about let's say thirty to fifty meters?

22     A      It's possible, but again it really comes down to the

23 type of antenna pushing that signal.  If it's in a residential

24 location versus a business.  Things like gas stations with

25 exterior mounted antennas can go as far as fifty meters if not

1    beyond.

2         Q     For each of these data points that you have seen in

3    this presentation, during the life of this case, have you ever

4    been given what the actual router style is for each of these data

5    points?

6         A     No, sir.

7         Q     Okay and let's assume, well there are data points

8    that you see in that presentation that are under thirty meters,

9    too?

10        A     Yes, sir.

11        Q     Okay.  Should we just accept those as being the

12   truth?

13        A     I think given the total nature of the data and that we

14   don't know how and why and what Google does with this, the

15   scientific possibilities, especially when we see huge issues of a

16   two thousand plus meter radius, there has to be more

17   information provided in order to be called scientifically certain.

18        Q     Okay, did you make any calculations with how many

19   data points are in that presentation that are over fifty meters?

20        A     Yes, sir.

21        Q     Okay, how many did you find?

22        A     A little more than ten percent of the total.  So if we're

23   looking at a total of about 2600, over 260 of those are over fifty

24   meters.

25        Q     Okay, of the Wi-Fi data points that you observed in

1    that presentation, how many did you find that were over thirty

2    meters?

3         A     35%, so a little more than seven hundred.

4         Q     So approximately 35% of the data points were over

5    thirty meters?

6         A     Yes.

7         Q     Okay, all right.  And what concerns do you have

8    regarding how that affects the data pool generally?

9         A     It's we don't know.  Google has provided us no

10   documentation on how to interpret their data.  We're relying on

11   this solely based on two figures of a latitude and longitude as

12   well as an unknown radius that we have no idea where this

13   point lies within that radius or if it lies outside of the radius.

14        Q     If you could, turn to page thirty of the, I'm going

15   back to the Exhibit number five, if you could turn to page

16   thirty of that?

17        A     Yes, sir.

18        Q     Tell me when you are there.

19        A     Yes.

20        Q     Okay.  Looking at that data point and the Google,

21   excuse me, Google location figure as well as the Google

22   accuracy range, do you see those?

23        A     Yes, sir, I do.

24        Q     Can you observe where that Wi-Fi access point is

25   coming from?

1        A        No, sir.

2        Q        And on observation number two, which is page

3    nineteen, or any of these observations, have you been given

4    what the access point is?

5        A        No, sir, we have not.

6        Q        How many total data points do you have in this

7    presentation?

8        A        I'm not sure.  I believe it's thirteen, thirteen

9    observations.

10        Q        I'm sorry, the total number of data points in the

11    Google data, I'm sorry.

12        A        In the raw Google data?

13        Q        Yes, sir.

14        A        I believe it's 2,611, 2,608.

15        Q        Okay.  And how many of those are Wi-Fi data

16    points?

17        A        I do not remember off the top of my head.

18        Q        Okay, is it the majority of those?

19        A        Absolutely.

20        Q        Okay.  And do you have any concern with regard to

21    the Wi-Fi access points as it relates to the cell phone data as

22    well as the GPS data, regarding what you see with the

23    anomalies?

24        A        The vast majority of the anomalies do occur within

25    our Wi-Fi ranges.  So when we see going well beyond the scope

1  of a consumer or business of a Wi-Fi, they do occur within the

2  Wi-Fi source, not within GPS or cellular towers.

3      Q      The number of observation tests done was thirteen,

4  correct?

5      A      Yes.

6      Q      And is that a fair number in your field to conduct

7  this type of study?

8      A      Not necessarily, a scientific study it would not be.

9      Q      Okay.

10

11          MR. MIKULA:  I have nothing further.

12          THE COURT:  Any cross?

13          MR. ACKLEY:  Yes, thank you, your Honor.

14

15      CROSS EXAMINATION

16  BY MR. ACKLEY:

17      Q      A few questions.  It seems like kind of your bottom

18  line issue with utilizing Google location services in the way we

19  are attempting to use it here is that Google has not provided

20  the algorithms and the, if you will, exactly how they arrived at

21  the location information that they provided to us, is that fair?

22      A      Well, it's not necessarily the algorithms, it's the

23  validity of this information.  They provided it as an uncertain

24  value.  So we don't know how scientifically valid all of these

25  data points are.

1    Q    Right but in order to be able to test that validity, you

2    have to know the algorithms, is that what you're saying?

3    A    Yes.

4    Q    Yes, so you know, if Google were to provide the

5    algorithms to the scientific community and the rest of us, there

6    would be no issue because we would be able to test it, correct?

7    A    Correct.

8    Q    Okay, so even though we don't know those

9    algorithms and we don't know exactly how Google arrives at

10   the location services data, we do know generally how it works

11   and I think both you and Special Agent D'Errico have outlined

12   that, right?

13   A    Yes, sir.

14   Q    And we do know that generally the location

15   information that Google provides us and that it provides all of

16   our phones when we are using our phones is generally

17   accurate, fair?

18   A    Yes, sir.

19   Q    Okay, so then when I'm driving down a road and it

20   tells me I'm on Staples Mill Road, I'm usually on Staples Mill

21   Road or a street just adjacent to it?

22   A    That's correct.

23   Q    Okay.  You said that the sample size of Special

24   Agent D'Errico's observations was too small.  And I think he

25   would probably agree that thirteen is not anything to base an

1  entire study on.  However, did you consider that also the

2  corroboration of other data points in the, did you say 2600,

3  how many data points, approximately 2600?

4      A    Yes, sir.

5      Q    So the corroboration outlined by the agent of many

6  of those 2600 data points with other information like the jail

7  call, like the video surveillance or the photographs that those

8  can be added to the thirteen as part of a larger examination of

9  the data, is that fair?

10      A    Yes, sir.

11      Q    Now, you said that the, you find that anything over a

12  fifty meter range is at least suspect in your mind for accuracy?

13      A    Yes, sir.

14      Q    And you said that there are about ten percent were

15  over fifty meters?

16      A    Yes, sir.

17      Q    Would you agree with me though that the fifty

18  meters that they are talking about when Google provides the

19  display radius does not necessarily mean that the point was

20  fifty meters away from the Wi-Fi source?  In other words, if the

21  receiver, the device that we're using to try to locate attaches

22  itself to four or five different Wi-Fi points, Google will take

23  those four or five different and then give an approximate

24  location, right?

25      A    We believe it's an approximate location.  We don't

1    know.

2        Q    But the thing says it's an approximate location,

3    right?  It's an estimated uncertainty value regarding the

4    reported coordinate.  So that's an estimated uncertainty value,

5    it's not necessarily an exact distance?

6        A    It is not an exact distance, no.

7        Q    Right, so when we are saying that anything over a

8    fifty meter display radius means that Google is saying that the

9    device was more than fifty meters away from the Wi-Fi point,

10   that's not exactly accurate?

11       A    Well, we don't know.  We don't know what the

12   display radius actually means.  We can only guess.

13       Q    So then the issue with the 2000 and I would agree

14   with you that's probably an anomaly but the, in looking at the

15   data, did you see how many were say over a thousand meters,

16   I would agree that those are large distance, estimated

17   uncertainty values, so how many were over a thousand out of

18   the 2600?

19       A    A few, I don't remember exactly.

20       Q    You would agree with me that it's a very small

21   number?

22       A    That's correct.

23       Q    And you would also agree with me, I think, based on

24   your numbers that most of the display radius numbers values

25   were less than thirty meters?

1    A    That's correct.

2    Q    And you are not saying that the Google location

3    services information is inherently unreliable as a whole?

4

5         MR. MIKULA:  I'm going to object.  I think that's a

6    determination by the fact finder to make.

7         THE COURT:  I think the question calls for his

8    opinion, which I've overruled the objection.  I think you can

9    ask him his opinion as to the reliability of it.

10

11   BY MR. ACKLEY:

12   Q    It's not your opinion that it is generally unreliable, is

13   that right?

14   A    We don't know.

15   Q    Okay.  But you did agree with me that the location

16   services that we see in a general sense is accurate?

17   A    It's accurate to the device, we don't know exactly

18   what it means.

19   Q    Right.  Incidentally, in reviewing your CV, it looked

20   like you had a great deal of background in crash

21   reconstruction as a police officer?

22   A    Yes, sir.

23   Q    In law enforcement.  In your work in that area, did

24   you utilize EDRs, Event Data Recorders, analyzing essentially

25   the black box?

1    A    Yes, sir.

2    Q    And you're aware that, did you rely on them for

3    information in reconstructing crash data?

4    A    Yes, sir.

5    Q    You found them to be reliable?

6    A    Reliable to a point, depending on the circumstances.

7    Q    All right and it's also true that if not all, most EDRs

8    are proprietary and require proprietary information in order to

9    access their content?

10    A    Yes, but most of those manufacturers do provide

11    guidance in interpretation of the data.

12    Q    All right but they don't share with you the exact

13    algorithms of how they arrived at that data, right?

14    A    No.

15

16    THE COURT:  I want to make sure the record is

17    clear.  You said right and you said no.  So is it correct that they

18    did not share?

19    WITNESS GREEN:  They –

20    THE COURT:  They did share or they did not?

21    WITNESS GREEN:  They do share, they provide

22    guidance.

23    THE COURT:  The algorithms?

24    WITNESS GREEN:  They do not provide the

25    algorithms.

1  THE COURT:  The question was, the question was,

2  did the providers provide you with the algorithms, that was

3  your question?

4  MR. ACKLEY:  That's my question.

5  WITNESS GREEN:  No.

6  MR. ACKLEY:  I don't have any other questions,

7  thank you.

8  THE COURT:  Any redirect?

9  MR. MIKULA:  No, sir.

10  THE COURT:  May Mr. Green be excused or may he

11  step down?

12  MR. MIKULA:  Step down.

13  WITNESS STOOD ASIDE;

14

15  THE COURT:  All right, any additional evidence for

16  the Defendant?  Thank you.  Any additional evidence for the

17  Defendant?

18  MR. MIKULA:  Well, I think we could stipulate to this

19  but I'll certainly ask the Commonwealth.  I was going to call

20  one other witness about the approximate distance from the

21  point in which, well, actually I'll call.  I was going to call

22  regarding the distance from the apartment to where the

23  location of the car was.  Do you want me to call Mariah to say?

24   You can object.

25  MS. ULMER:  What exactly are you asking?

1      MR. ACKLEY:  We don't understand.

2      MR. MIKULA:  Just to testify regarding the distance

3  from where the residence, from where the Defendant was living

4  at the time to the point which where the vehicle was found.

5      MR. ACKLEY:  I mean I can –

6      MR. MIKULA:  I can call her and you can object.

7      MR. ACKLEY:  Well, I mean I don't think she's going

8  to lie.  I think the issue is Mr. Mikula wants to introduce

9  evidence that in our view is trial evidence and not germane to

10  the motion I guess is the best way to put it.

11      THE COURT:  I think I might need a little bit more

12  clarification then where we are.  We have the motion in limine,

13  which moves the Court to bar the Commonwealth from

14  presenting Google location services data.  The Court has heard

15  from the Special Agent and from Mr. Green.  Any additional

16  evidence for the Defendant?

17      MR. MIKULA:  No, sir.

18      THE COURT:  Any rebuttal evidence for the

19  Commonwealth?

20      MS. ULMER:  No, your Honor.

21      THE COURT:  Anyone care to argue?

22      MS. ULMER:  The Commonwealth will waive and

23  respond.

24      THE COURT:  Mr. Mikula?

25      MR. MIKULA:  Thank you, Judge.  Judge, what this

1   come down to is that the Commonwealth wants us to look at

2   some of the data points that they can, they're saying that they

3   can corroborate with other evidence and we should accept all

4   the data points as a whole as being reliable.  And I –

5           THE COURT:  Let me ask you this.  Would everyone

6   agree that this concept is above the lay juror's head?

7           MR. MIKULA:  Yes.

8           THE COURT:  And that it would need to the extent

9   that it is admissible with expert testimony, to the extent it is

10  admissible would be necessary for its admissibility?

11          MR. ACKLEY:  Yes.

12          MS. ULMER:  The Commonwealth would agree, yes.

13          THE COURT:  Great, okay.  Mr. Mikula.

14          MR. MIKULA:  Thank you, Judge.  What I will tell

15  the Court is, is that we have heard from two expert witnesses,

16  both of them have testified regarding things that are certainly,

17  require specialized knowledge and is certainly above the

18  layperson's head as well as it takes quite a bit of education not

19  just for the Court but also for Defense Counsel and the

20  Commonwealth.  The concerns that we have with that is it goes

21  down to what's reliable.  And so in this case, Judge, we are

22  guided by the principles set out in Spencer regarding whether

23  or not this information is inherently unreliable and the Court

24  should shield the Jury from it.  That's where we are.

25          THE COURT:  Let me ask you this.  What evidence

1   have I heard that it's inherently unreliable?

2          MR. MIKULA:  The evidence you heard that it's

3   inherently unreliable is the Wi-Fi data points based on Mr.

4   Green's testimony, anything over thirty meters, which he said

5   is something that should be taken with serious caution is over

6   35 is 35% of the data points are of question.  There are

7   certainly ten percent that is scientifically improbable.  The

8   question is because we don't know what Google is saying about

9   this information, all we heard from Mr. D'Errico is what the

10  advertising material is, is that we should accept that this data

11  is accurate.  And so that's a problem because certainly while

12  some of it might be considered possible based upon the

13  corroborating evidence that the Commonwealth put on today,

14  how does that affect everything else?

15         THE COURT:  But tell me what evidence I've heard

16  that it's inherently unreliable?

17         MR. MIKULA:  Row 167 of Exhibit number one.

18         THE COURT:  Bad as to one is bad as to all?  You

19  can't believe -

20         MR. MIKULA:  Well, we don't know.  Because no one

21  has been here to testify as to what this is.

22         THE COURT:  Tell me how the evidence, what the

23  evidence I've heard that the evidence as a whole is inherently

24  unreliable.  Are you telling me that row 167 because everyone

25  believes that that may be an anomaly or an outlier within the

1    spectrum that that in and of itself creates the inherent

2    unreliability of the rest of it?

3            MR. MIKULA:  Line 167 does not in and of itself.

4    There's more than just line 167.

5            THE COURT:  Okay.

6            MR. MIKULA:  There are four unknown data points.

7     There is also up to 35 percent of the Wi-Fi data points that say

8    that it's not, it's, we should approach it with caution and

9    there's ten percent that says it's scientifically improbable.  Not

10   only that, Judge, you have –

11           THE COURT:  Does it mean that there is ninety

12   percent that makes it scientifically probable if ten percent is

13   scientifically improbable?

14           MR. MIKULA:  Judge, inherently, what's inherently

15   unreliable means is in and of itself it should not be relied

16   upon.  So I guess it comes down to what the fact finder for

17   today's purpose, which I guess would be the Court, what

18   reliability, what calculation the Court is willing to accept.  If

19   the Court wants the ten percent makes something inherently

20   unreliable or does the Court feel like maybe 51%.  I think

21   that's a determination or the Court to make.

22           But the concern here, unlike Spencer, which is a

23   case this Court's probably well familiar with but, you know,

24   dealt with the Southside Strangler and you had DNA PCR

25   amplification, which was unique at that time.  The

1   Commonwealth in that case called two witnesses, a geneticist
2   and a serologist; both people that were trained and educated in
3   DNA.  Those two individuals testified it was something that
4   they were familiar with that had been used in the biological
5   field for over ten years and it was reliable.  And so what's
6   unique in this case is, is we don't know what the DNA is.
7   Certainly, we're left to believe Jeremy D'Errico, oh, it's, well we
8   don't know, I've never been told of any problems with it.  But
9   we should accept it.  And you know, here is some, here is a
10  PowerPoint presentation which shows that it's close to GPS.
11  But all that data comes from Google.  We don't know what the
12  foundation is of it.  We don't know what the DNA of Google is.
13           THE COURT:  So it's your position unless the
14  algorithms are made known to any potential expert witness, no
15  expert can testify on Google location services?
16           MR. MIKULA:  I think an expert has to testify that
17  within the field it's understood what this information is and we
18  don't know what Google information is.  We don't know, even
19  though it is certainly proprietary so I understand why they're
20  not going to, you know, provide that information and provide
21  that data, that formula if you will.  But there is nobody else
22  that knows about it.  There is no study that's been done.
23  They've never disclosed the rate of error.
24           And quite frankly, I've not heard any evidence with
25  regard to any of the other forms of Black Box or not Black Box

1    but the accident crash reconstruction, even though it's
2    proprietary, they are familiar with the error rates.  They are
3    familiar with that information.  But Google, we're not.  We're
4    not familiar with any of that.  And so we're left to just assume
5    it's good information.  It's turned over to the FBI and the FBI
6    goes into Google Earth and they drop it in.  And they say well,
7    yeah, here is a range.  It's not, you know, it's not this exact
8    location but if you look at and I think raw data is a little
9    misleading because it's raw, it gives the presumption that it's
10   reliable.  It's unadulterated.
11           But this is, we don't even know if that's the case.
12   They had figures that bear serious question to whether or not
13   this information should be assumed as a whole as being
14   reliable.  And I think the evidence has shown based upon the
15   witnesses that while certainly there is some of this that could
16   be considered based upon a reasonable degree of scientific
17   certainty to be reliable, the question is, is whether the other
18   data points, which are scientifically improbable, how does that
19   affect the whole.
20           And my concern is and my argument certainly here
21   today is that this information, there are serious questions; the
22   data itself, not the presentation regarding the advertising but
23   the 59 or 58 pages that all of this is, which is what we've been
24   looking at, a lot of this information bears serious question to
25   the reliability of this information.  And that just goes to one

1    issue.

2              The other issue is, is whether this is something that

3    should be given to a Jury to understand.  And I think it should

4    be shielded from the Jury.  Why?  Because for the one hand,

5    the Jury listens to this as I'm sure most people have been

6    watching this whole proceeding, eyes get glossed over.  They're

7    not sure what it is that they are hearing.  But even more

8    importantly than that is that we live in a digital age.  People

9    here oh, this is coming from Google and is given to the FBI and

10   here are specific data points that are dropped onto a

11   presentation, which even Mr. D'Errico admitted is somewhat

12   misleading, they see that and they just think oh, well, there is

13   no problems with it.  Even if they hear from another expert

14   witness that there is some questions as to this.

15             THE COURT:  It's a weight issue.

16             MR. MIKULA:  Judge, I think Spencer lays out two

17   prongs of the analysis, whether it's unreliable, it's inherently

18   unreliable and if the Court should shield the Jury from seeing

19   this information or hearing this information.

20             THE COURT:  Because of the inherentness of the

21   unreliability?

22             MR. MIKULA:  I think it's, I still think there are two

23   aspects of it, but yes, certainly the second one is somewhat

24   reliant upon the first.

25             THE COURT:  All right, anything further?

1    MR. MIKULA:  Judge, I just think that this evidence,

2  the Court has to make a determination as to what inherently

3  unreliable is.  And certainly the percentages laid out and

4  testified to by the experts go to the fact that in and of itself, it

5  is not reliable.  Thank you.

6    THE COURT:  Thank you.  Who would like to speak

7  on behalf of the Commonwealth?

8    MS. ULMER:  I will, your Honor.

9    THE COURT:  Ms. Ulmer?

10    MS. ULMER:  Your Honor, Mr. Mikula has laid out

11  exactly what the standard is in Spencer and that is the

12  standard inherently unreliable.  This data is not inherently

13  unreliable.  Mr. Mikula's own expert Mr. Green says that he

14  knows generally how it works and it's generally accurate when

15  used.

16    In addition to Mr. Mikula's own expert, your Honor,

17  the Commonwealth has given you many instances which show

18  that this evidence is credible and should be given to the Jury

19  for the Jury to determine what it would like out of this

20  evidence.

21    First, Judge, this is not new technology.  This is

22  technology that has been around.  You've heard from Agent

23  D'Errico that articles were written about Wi-Fi and radio wave

24  data since back in 2006, I believe.  One article was written in

25  2008 that was cited by Agent D'Errico.  Even Google itself

1  started talking about location data in their privacy policy back

2  in 2009 and updated it in 2012 to include Wi-Fi points and cell

3  towers in addition to the GPS.  This is not a new technology.

4  No expert here has come out and said that there is

5  some large study or some big paper saying that Google is a

6  complete farce and that all of this stuff is unreliable and, you

7  know, when you turn on your Google maps you're going to go

8  into a lake.

9  Secondly, your Honor, you can use your own

10  common sense.  Google is a multibillion dollar industry.  As

11  you saw in Agent D'Errico's presentation, most of the money

12  from Google comes from marketing.  And they use Google

13  location service and Google location systems in order to market

14  that to their clients.  They would not be in business, they

15  would not be making the money that they make if their

16  product, Google location data, was inherently unreliable.

17  THE COURT:  Well, let me ask you this.  Mr. Madoff,

18  who is an investor, he had an multibillion dollar business.

19  Was he legitimate?

20  MS. ULMER:  He wasn't, Judge, but if the time

21  comes when Google is found to be not legitimate then they

22  fooled us all.

23  THE COURT:  So we should, I believe your argument

24  was if you are a multibillion dollar business, then you are

25  legitimate.

1      MS. ULMER:  No, sir, Judge.  But in this instance,

2   people rely on it.  Many people have Samsung phones or

3   Android based phones.  People buy that technology.  If they

4   didn't, then everyone would own an Apple phone essentially.

5      THE COURT:  Perhaps it's not the size of the

6   company, it's the integrity of the company.

7      MS. ULMER:  The integrity but I think the integrity

8   is in this instance is outlined with the fact that this company is

9   extremely large and that people buy into it.  People choose to

10  buy Samsung phones and not buy iPhones.  People choose to

11  use Google Maps and not Apple maps.

12     THE COURT:  Are you saying that people are

13  intentionally deciding to buy an Android phone because the

14  Google location services is embedded in the phone versus

15  buying an Apple phone that you have to download an app, is

16  that the Commonwealth's position?

17     MS. ULMER:  I think that people do buy Android

18  based phones because they like the system and they like how

19  it works and that's why they choose to do that based

20  sometimes better than an Apple device.  If the Android system

21  itself was inherently unreliable, then who would buy the

22  phone?  No one would buy the phone.

23     In addition to that, your Honor, you saw in the

24  Commonwealth's evidence the prior testing and the

25  observations done by Agent D'Errico to show that he has

1   himself looked into the accuracy and the reliability of the

2   Google data.  He has also spoken to you about the Oracle

3   study and that the data points that they collected using their

4   methodology matched up to the points that were later provided

5   by Google.  And in addition to that, it was stipulated by the

6   Defense that in the Gay case that the Google location services

7   was corroborated by other evidence to show that she was at

8   the exact points that the Google said she was at, at the same

9   time that other evidence says that she was there.

10              THE COURT:  Was that a stipulation?

11              MS. ULMER:  That was stipulation and testimony.

12              MR. MIKULA:  I don't think that I stipulated to that.

13

14              THE COURT:  I'm not sure there was a stipulation to

15   that.  I believe that –

16              MS. ULMER:  That was testimony –

17              THE COURT:  I believe the Special Agent testified

18   that there was separate corroboration.

19              MS. ULMER:  Yes, sir.  And so that was before your

20   Honor.  And then looking to this particular case, Judge, you

21   can see from the data which we have presented to you that

22   some, a lot of the data is in known locations for the Defendant;

23   his residence, another residence belonging to Roland

24   Anderson, not this Defendant but someone in his family.  It

25   has also been corroborated by the victim's RTT data, which has

1  not been said to be unreliable.  It was corroborated by his text

2  messages to and from his friend Keion.  The Google location

3  services says he was at that Tweeter Court address at

4  approximately the same time where he tells his friend I'm at

5  your crib, which belongs and is registered to a Keion Vaughn.

6          In addition to that, your Honor, you can see from

7  the Kroger video, the GPS or the Google location data points,

8  which are Wi-Fi data points, in addition to the GPS data

9  points, said he was at Kroger at the exact same time that that

10  video has Roland Anderson going into Kroger and getting, and

11  leaving Kroger.  Not only do you have the Kroger video, you

12  have the ECO ATM receipt, which is a completely separate

13  company which shows that Roland Anderson was at that ATM,

14  which is ECO ATM, which is inside the Kroger, at 10:39 a.m.

15  which is exactly the same time that the Google location points

16  say that he is at Kroger, Judge.

17          There has been no evidence to say that the Google

18  information is inherently unreliable.  To the contrary, there is a

19  lot of evidence showing that it is reliable that this is credible

20  evidence and that should be left up to the fact finder, Judge.

21  This is a question for the Jury.  The Jury should be able to

22  hear from Agent D'Errico about this information.  And Mr.

23  Mikula is more than welcome obviously to bring Mr. Green

24  back and testify as to why they shouldn't listen to this

25  information.

1       But it is a Jury question.  The Jury does not need to
2   be shielded from this, Judge.  There has been no evidence to
3   show that it is inherently unreliable.  It goes to the weight of
4   the evidence and that is up to the fact finder in this case.  And
5   so I'd ask that you allow this information in and to be
6   presented before the Jury.
7       THE COURT:  All right, thank you.  The Court
8   commends counsel on both sides for a very well presented
9   motion in limine and defense thereof.
10       The Court denies the motion in limine.  The Court
11  does not find that the Google location services is inherently
12  unreliable.  The Spencer case is the seminal case for the test of
13  admissibility of this type of information.  And the Court
14  strongly believes that the issues go to the weight of the
15  evidence, which is a fact issue for the fact finder in this case;
16  that is the Jury.  The Court notes the exception to the Court's
17  ruling by Mr. Mikula, counsel for the Defendant.
18       Anything further at this time?
19       MS. ULMER:  No, your Honor.
20       MR. ACKLEY:  Select a date.
21       MR. MIKULA:  Let's choose a trial date.
22       THE COURT:  All right and how many days will you
23  need, we're set for three days, is that correct?  It can still be
24  tried in three days, Mr. Mikula, as far as you know?
25       MR. MIKULA:  Yes, sir.

1       THE COURT:  And this is set for a Jury, is that
2   correct?
3       MS. ULMER:  Yes, sir.
4       THE COURT:  Okay.  Mr. Anderson, did you
5   understand the Court's ruling?  I trust that you disagree with
6   it but do you understand it, sir?
7       DEFENDANT ANDERSON:  Yes, sir.
8       THE COURT:  All right.  How about a Monday, do
9   you have a Tuesday, Wednesday and then I can add a Monday
10  to it or a Thursday, Friday or excuse me, a Wednesday and
11  we'll add a Friday to it?
12      THE CLERK:  We have criminal like Wednesday –
13      THE COURT:  Folks what I think we're going to need
14  to do is to have Ms. Sanderford present with the book so that
15  we can attempt to force something.  And Ms. Sanderford is not
16  in the courthouse this afternoon.  So with everyone's
17  permission we have to reset the setting of the case as soon as
18  practicable.  Mr. Anderson is in the custody of the Henrico
19  Sheriff, is that correct?
20      MS. ULMER:  Yes, sir.
21      MR. MIKULA:  He is.
22      THE COURT:  Okay, so his whereabouts will be
23  approximately known or pretty close.  So I was thinking
24  perhaps next week at nine o'clock one morning or 8:45 we can
25  have a status and set it.

1      MR. MIKULA:  Yes, sir.

2      THE COURT:  And then with Special Agent

3  D'Errico's anticipated dates and Mr. Green's anticipated dates,

4  counsel would be able to secure those.  All right, what day of

5  the week next week works for everyone?

6      THE CLERK:  Wednesday at 8:45.

7      THE COURT:  I'm sorry?

8      MS. ULMER:  Wednesday the 9th at 8:45.

9      MR. MIKULA:  I'm sorry, I can't do that date.  I'm

10  here Thursday morning or Tuesday.

11      MS. ULMER:  I can't do Tuesdays.

12      THE COURT:  How about the 10th, Thursday the 10th

13  at 8:45?

14      MS. ULMER:  We can set it for then.

15      THE COURT:  8:30, eight?

16      MR. MIKULA:  Whatever time works for the Court.

17      THE COURT:  8:45 on January 10th for status.

18  Anything further?

19      MR. ACKLEY:  No, sir.

20      MR. MIKULA:  No, sir.

21      THE COURT:  Remanded to the custody of the

22  Sheriff.  We are off the record at 2:07 p.m.  Thank you folks.

23      MR. MIKULA:  Thank you.

24      MS. ULMER:  Thank you, your Honor.

25

1                    PROCEEDINGS CONCLUDED

2

1   STATE OF VIRGINIA,

2   COUNTY OF HENRICO, to-wit:

3

4          I, MEDFORD W. HOWARD, Registered Professional

5   Reporter and Notary Public for the State of Virginia at large, do

6   hereby certify that I was the Court Reporter who transcribed

7   the recorded proceedings of **COMMONWEALTH OF VIRGINIA**

8   **v. ROLAND ELLISWORTH ANDERSON,** heard in the Circuit

9   Court for the County of Henrico.  **I have transcribed the**

10  **recording to the best of my ability to understand the**

11  **proceedings herein**.

12         I further certify that the foregoing transcript, pages

13  numbered 1 through 142 is a true and accurate record of the

14  proceedings herein reported, **to the best of my ability to**

15  **understand the audio recording**.

16         Given under my hand this 18th day of February,

17  2019.

18

19

20

21

22             /s/    Medford W. Howard

23             Registered Professional Reporter

24             Notary Public for the State of Virginia at Large

25             Notary Registration Number:  224566