1          IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF VIRGINIA
2                  RICHMOND DIVISION

3

    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
4                                    )
    UNITED STATES OF AMERICA         )
5                                    )   Criminal No.
    v.                               )   3:19CR130
6                                    )
    OKELLO T. CHATRIE                )   January 21, 2020
7   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _)

8

9        COMPLETE TRANSCRIPT OF DISCOVERY MOTION
         BEFORE THE HONORABLE M. HANNAH LAUCK
10              UNITED STATES DISTRICT JUDGE

11

12  APPEARANCES:

13  Kenneth R. Simon, Jr., Assistant U.S. Attorney
    Peter S. Duffey, Assistant U.S. Attorney
14  Office of the U.S. Attorney
    SunTrust Building
15  919 East Main Street, Suite 1900
    Richmond, Virginia   23219

16
            Counsel for the United States
17

    Laura J. Koenig, Assistant Federal Public Defender
18  Office of the Federal Public Defender
    701 E. Broad Street, Suite 3600
19  Richmond, Virginia   23219

20  Michael W. Price, Esquire
    National Association of Criminal Defense Lawyers
21  1660 L Street, NW
    12th Floor
22  Washington, DC   20036

23          Counsel for the Defendant

24          DIANE J. DAFFRON, RPR
              OFFICIAL COURT REPORTER
25          UNITED STATES DISTRICT COURT

1

2                          I N D E X

3
                        DIRECT   CROSS   REDIRECT
4
    SPENCER McINVAILLE         17     107       130
5

6

7

8                        E X H I B I T S

9                                                    Page

    DEFENDANT'S EXHIBITS:
10
    No. 1       Geofence Warrant and Application      24
11
    No. 2       Google Amicus Brief                  26
12
    No. 3       PDF of Raw Data (sealed)             28
13
    No. 4       Activation Video                     35
14
    No. 5       Three Paths Video (sealed)           77
15
    No. 6       First Step 2 Request to Google       94
16
    No. 7       Second Step 2 Request to Google      96
17
    No. 8       Third Step 2 Request to Google       97
18
    No. 9       Step 3 Request to Google            100
19

20

21

22

23

24

25

1           (The proceedings in this matter commenced at

2   11:07 a.m.)

3           THE CLERK:  Case No. 3:19CR130, United States

4   of America versus Okello T. Chatrie.

5           The United States is represented by Kenneth

6   Simon and Peter Duffey.  The defendant is represented

7   by Laura Koenig and Michael Price.

8           Are counsel ready to proceed?

9           MR. SIMON:  The United States is ready, Your

10  Honor.

11          MS. KOENIG:  The defense is ready, Your

12  Honor.  Good morning.

13          THE COURT:  Good morning.

14          MS. KOENIG:  Your Honor, we are here on

15  defense motion 28, which is the motion requesting

16  discovery and the subsequent briefing after that.

17          THE COURT:  You're going to have to speak up.

18          MS. KOENIG:  I'm sorry.  We are here on

19  defense motion 28, which is the defense motion for

20  discovery and the subsequent briefing after that.

21          The defense has one witness that we will

22  present to help aid the Court in understanding the

23  materiality aspects of the argument that we make

24  related to the discovery requests.  His name is

25  Spencer McInvaille.  He already has the proposed

1    exhibits on the bench.  I'm sure the Court should have

2    the proposed exhibits on the bench with all but 4 and

3    5, which are in the witness folder that we'll seek for

4    admission later.

5         No. 4 and No. 5 are videos.  We had initially

6    thought that we would try to activate a cell phone in

7    the courtroom using a wireless hotspot, and that

8    proved to be a little difficult to try to practice for

9    and enact.  So what we did instead is we made visual

10   representations in terms of videos.  There are two

11   short videos.  And No. 4 is the activation of the cell

12   phone that we will play at the same time we're

13   describing with the witness what is happening.

14        And then No. 5 is the example -- plotting

15   examples of three individuals whose location data was

16   tracked with the geofence warrant data that Google had

17   provided.  In that video itself, there are no location

18   coordinates that are disclosed.  It does show a map,

19   like a Google Earth map, with plots being pointed, and

20   next to the plots is a date and time, but it does not

21   have location coordinates.

22        I think it would be next to impossible for

23   anybody in the audience to decipher any exact

24   locations based on that.  So we would proffer that the

25   exhibit could be admitted.  I should say it's next to

1   impossible for anybody sitting in the courtroom here

2   today.  I think it would be relatively easy for

3   anybody who has unfettered access to that exhibit to

4   figure out the location coordinates.  And so we have a

5   proposal, but if the Court would like us to have the

6   entire exhibit published and submitted under seal, we

7   can do that.  But I do think that it could be

8   published publicly here in the courtroom, but it would

9   need to be under seal for all the reasons that we had

10   submitted in ECF No. 68, and that the Court had

11   ordered sealed in ECF 69, based on the raw data,

12   because those plots are based on the raw data.

13        The only other issue before the Court is that

14   both parties have agreed to ask the Court to

15   cross-designate their experts as advisory witnesses.

16   Ours, as I mentioned before, is Spencer McInvaille,

17   and the government may call, in response to Mr.

18   McInvaille, Jeremy D'Errico.  And we have no

19   objection, and they have no objection to either being

20   cross-designated as advisory witnesses.

21        THE COURT:  All right.  Well, let me ask you

22   first, do you or the government have a position as to

23   whether or not the rules of evidence pertain to this

24   hearing?

25        MS. KOENIG:  I think that the rules of

1   evidence apply, but because this is relating to the

2   admission of evidence, I think we're seeking -- I

3   guess the purpose of this hearing is for the Court to

4   order whether or not evidence will be disclosed.  And

5   so that relates to the admissibility of evidence,

6   which under the rules of evidence operates under a

7   relaxed standard.  And so I don't think that,

8   specifically, like hearsay rules would apply.  I don't

9   anticipate that that's going to be too much of a

10  problem at this hearing.

11          THE COURT:  All right.  I'm going to ask the

12  government to speak, please.

13          MS. KOENIG:  Thank you, Your Honor.

14          THE COURT:  So, first, Mr. Simon, I'd like to

15  ask you to take a position on the defense's proposed

16  course of action, whether you have any objection or

17  different proposal, and I also want you to address

18  whether you think the rules of evidence apply.

19          MR. SIMON:  Judge, no objection to the use of

20  the raw data in this courtroom or the

21  cross-designation of the witnesses as advisory

22  witnesses.  And Special Agent D'Errico, we'll bring

23  him in during the testimony of Mr. McInvaille.

24          With respect to, Judge, the Federal Rules of

25  Evidence, we do believe they apply here, and I think

1    it brings into sort of the picture here a bigger

2    question, which is whether, at this stage, whether in

3    a motion for discovery hearing we're moving toward

4    where we will be for a suppression hearing in February

5    in terms of some of the testimony that I think will be

6    gleaned here.  We'll certainly listen to it, but there

7    may be a relevance objection to a number of the --

8    some of the testimony elicited here.

9           I think with respect to the Federal Rules of

10   Evidence, they should apply.  And to the extent

11   that they --

12          THE COURT:  Do the rules of evidence apply in

13   a motion to suppress?

14          MR. SIMON:  Yes, Your Honor, I think the

15   rules of evidence would apply here.

16          THE COURT:  In the motion to suppress.

17          MR. SIMON:  In the motion to suppress

18   hearing, yes, Judge.

19          THE COURT:  Well, what do I do, first of all,

20   with the fact that you all disagree about what rules I

21   should be applying?

22          MS. KOENIG:  Your Honor, I'm looking at

23   Federal Rule of Evidence 1101(d)(3), which says that

24   these rules, except for those on privilege, do not

25   apply to the following, and it says "miscellaneous

1   proceedings such as."  And then jumping to the portion

2   that would be applicable here, "The preliminary

3   examination in a criminal case" -- I'm sorry.  Not

4   that.  But (c) -- I'm sorry.  (d)(1), which is the

5   Court's determination under Rule 104(a) on a

6   preliminary question of fact governing admissibility.

7   But this is also a miscellaneous proceeding under

8   (d)(3).

9           I think under either one of those the Court

10  is looking at evidence in this case in a very

11  preliminary matter, not in terms of finality of what

12  would be presented at a trial or what would be

13  presented in something where a final judgment would be

14  rendered.  And so based on those exceptions to when

15  the rules of evidence apply, I think they don't apply,

16  but even if they did apply in some fashion, it would

17  be a very relaxed standard as in the motions to

18  suppress.

19          THE COURT:  Explain to me your position on

20  the standard in the motion to suppress.

21          MS. KOENIG:  Your Honor, and I apologize.  I

22  don't have the case in front of me, but I think there

23  is case law from the Fourth Circuit which indicates

24  that in a motion to suppress, because it is governing

25  the admissibility of evidence, that to the extent that

1    rules of evidence are adhered to in any motion to

2    suppress, they are under a very relaxed standard.  I'm

3    sorry I don't have the case cite, Your Honor.

4            THE COURT:  That's fine.

5            MR. SIMON:  Judge, I'll agree with that.  I

6    think the -- I was incorrect to the extent that I

7    indicated that they would apply.  And certainly to the

8    extent they would, it would be a relaxed standard in

9    terms of the suppression hearing.  And here, the

10   bigger point there, Judge, is just with respect to the

11   testimony elicited and its potential relevance here to

12   the motion for discovery.  And I think we can get to

13   that point based off of the testimony that they will

14   elicit.

15           I think it would be helpful, Judge, to kind

16   of note, and maybe for defense counsel, to the extent

17   that they disagree, to put on the record where I think

18   there is agreement at this point with respect to the

19   motion for discovery, which paragraphs have been

20   addressed sufficiently, which are still in dispute,

21   and which relate purely to documents that might be in

22   the possession of Google to the government's

23   viewpoint.

24           THE COURT:  Well, why don't you all discuss

25   that together and see if you can put that on the

1    record in a stipulated fashion.

2            MR. SIMON:  Okay.  And, Judge, I'm happy to

3    say it right now before the Court, and to the extent

4    that defense counsel disagrees, I think some of this

5    has already been put on the record.  I just wanted to

6    be clear before testimony was elicited about some of

7    the paragraphs here.  So in --

8            THE COURT:  Just a minute.  Let me catch up

9    with you.

10           All right.

11           MR. SIMON:  And so in ECF 28, this is the

12   discovery motion, first, to note which have -- the

13   parties agree have been made sufficiently and where

14   that can be found.  Paragraph 6 with relation to the

15   physical access to any and all devices and software,

16   to the extent that that would be provided, the defense

17   agrees on page 1 of their reply that that is

18   sufficient at this stage for their warrant.  Same with

19   paragraph 7, copies of the raw data produced and

20   utilized by law enforcement.  I think both parties

21   now, obviously, recognize that that's been produced,

22   and I think that's made clear on page 1.

23           The reply of the defendant, as well as

24   paragraphs 11(a) and (b), that relates to

25   communications concerning the geofence request in this

1  case, communications with Google, as well as any

2  arrests and investigative reports.  I don't believe

3  there were any as it related to that, but to the

4  extent that there were, they were turned over.  And so

5  there's agreement as to those three paragraphs.

6       There could potentially be additional

7  disagreement about paragraph 2 and paragraph 8.  So

8  paragraph 2 is the anonymous identifier as it relates

9  to Mr. Chatrie's -- pardon me -- anonymous identifiers

10  provided by Google and its returns.  The United States

11  has made clear that that was provided and gave the

12  last four digits of that as it's laid out in the raw

13  returns from Google.  It just seems that the defendant

14  was unable to ascertain which account was his, but

15  that number is in the raw data return in paragraph 2.

16  So I believe we agree at this point that they have the

17  anonymous identifier that relates to Mr. Chatrie.

18       And then for paragraph 8, all information

19  about how law enforcement officials manipulate and

20  analyzed the data in this case to identify the second

21  and third rounds of the search process, there's no

22  documented record of that in terms -- that would be

23  turned over by a *Jencks*, or if there was some other

24  sort of documented piece of that.  There will be

25  witness testimony to that point, and certainly to the

1   extent that it's involved in expert notice, we

2   provided there.  But I don't think that there's

3   anything discoverable at this point, documentary

4   evidence as to paragraph 8.  Purely, there would be

5   witness testimony.  To the extent that our expert was

6   involved in that, it would be certainly provided in

7   the expert notice that the Court has ordered produced

8   on February 3rd, to the extent that that comes.

9           With relation to paragraph (c), (d), and (e)

10  of paragraph 11, it continues to be the position of

11  the United States that to the special agent who's

12  tasked with or who has a knowledge of those kinds of

13  documents, they are not available.  They do not exist.

14  And, again, to the extent that that were to change,

15  we'd provide those documents to the defense.

16          The remaining paragraphs, paragraphs 1, 3, 4,

17  5, 9, 10, all relate to documents that we have argued

18  and continue to argue are in the possession, custody,

19  and control of Google for purposes of Rule 16, and to

20  the extent that there would be some sort of *Brady*

21  requirement, Google is not a part of the United

22  States' investigative team in terms of those

23  documents.  But, again, we produced everything that

24  Google has provided to us.  And so I think that is an

25  accurate and fair lay of the land, but to the extent

1    that there's some disagreement there, I think defense

2    counsel can inform the Court.

3          THE COURT:  All right.  So, I'm just going to

4    make the finding so it's clear on the record that for

5    purposes of this hearing with respect to the rules of

6    evidence, I do think under Rule 1101(d), it is

7    appropriate to apply the relaxed standard similar to

8    that undertaken in a motion to suppress.  It certainly

9    makes no sense that it would be harsher than a motion

10   to suppress, and it's quite possible that under some

11   of the provisions in (d)(1), they may not apply at

12   all, but we will address each issue as it comes up.

13          So I'll hear from the defense as to what is

14   or is not in dispute.

15          MS. KOENIG:  Your Honor, as it relates to

16   paragraph 6 and 7 of document No. 28, we will agree

17   that those have been provided sufficiently and

18   satisfactorily.

19          As it relates to paragraph 2, which is the

20   anonymous identifier, we still don't have any formal

21   recognition of which identifier is Mr. Chatrie's.  I

22   think we have a good idea, but I don't want to

23   foreclose that until we have witness testimony.

24          Paragraphs eight and eleven, we do anticipate

25   presenting evidence as to why we need those requests

1    satisfied.

2            And then, as Mr. Simon indicated, the

3    remaining paragraphs 1, 3, 4, 5, 9, and 10, we will

4    lay a foundation as to why those are material, and

5    then we'll get into the legal arguments about how that

6    applies at this hearing.

7            THE COURT:  All right.

8            MS. KOENIG:  Thank you, Your Honor.

9            THE COURT:  Mr. Simon, I'm sorry to make you

10   bounce up and down, but the defense has provided

11   a witness list and exhibit list.  Do you have one?

12           MR. SIMON:  Yes, Judge.  I received it this

13   morning.

14           THE COURT:  No.  Do you have one for me?

15           MR. SIMON:  No, we do not have an exhibit

16   list, in part because we're not certain we'll call

17   Special Agent D'Errico, and so there's no formal

18   exhibit list.

19           THE COURT:  And no witness list?

20           MR. SIMON:  No witness list, that's right,

21   Judge.

22           THE COURT:  Okay.  Thank you.

23           All right.  We can begin the process.  And

24   with respect to the pieces of evidence and the video

25   or the ones that are under seal, I am inclined to have

1  this evidence on the record under seal rather than

2  just having it viewed during the hearing itself.  So I

3  grant the motion to seal and place it in the

4  evidentiary record.  Does anybody object to that?

5          MR. SIMON:  No objection, Your Honor.

6          MS. KOENIG:  No objection.

7          THE COURT:  All right.  I want to be clear

8  that I think for purposes -- I've read your briefing,

9  and I understand that this is meant to elucidate to me

10  the importance of what is or is not discoverable.

11          I want to be clear that both parties have to

12  be exacting in whether they are talking to me about

13  the Rule 16 standard or the *Brady* standard because

14  they are not the same.  And I want the arguments not

15  to blend those standards because it's not helpful to

16  the Court.  Specifically, with respect to materiality,

17  it's not the same test.

18          I also want you all to keep in mind that

19  there is -- I want you to educate me about how I apply

20  these standards.  And the specific issue being that

21  the *Brady* standard for materiality is whether it's a

22  reasonable probability that had the evidence been

23  disclosed to the defendant, the result of the

24  proceeding would have been different.  Under Rule 16,

25  "materiality" is defined as some indication that the

1    pretrial disclosure of the evidence would have enabled

2    the defendant to significantly alter the quantum of

3    proof in his or her favor.

4         Now, obviously, these are both

5    backward-looking tests, and so I want you to educate

6    me about how I apply them forward-looking, because we

7    don't have an outcome.  And so I just want you all to

8    be mindful of that as well.

9         I also need, at some point, for the defense

10   to address the 17(c) argument raised by the United

11   States.  It is not addressed at all in briefing, and I

12   think it's relevant, and so that's got to be addressed

13   also.

14        So those are my preliminary comments.

15        MS. KOENIG:  Your Honor, the defense first

16   calls Spencer McInvaille.

17        THE COURT:  Is there a witness exclusion

18   motion?

19        MS. KOENIG:  Your Honor, if the Court will

20   order that we can cross-designate Mr. McInvaille and

21   Mr. D'Errico as advisory witnesses, we don't need an

22   order of sequestration because there would be no order

23   witnesses presented.

24        THE COURT:  All right.  Agreed?

25        MR. SIMON:  No objection to that, Your Honor.

 1              THE COURT:  All right.  Okay.  We'll move

 2    forward.

 3

 4       SPENCER MCINVAILLE, called by the Defendant, first

 5    being duly sworn, testified as follows:

 6

 7              MR. PRICE:  Good morning, Your Honor.

 8              THE COURT:  Good morning.  Can you place your

 9    name on the record?

10              MR. PRICE:  Sorry.  Michael Price with the

11    NACDL Fourth Amendment Center for Mr. Chatrie.

12

13       DIRECT EXAMINATION

14    BY MR. PRICE:

15    Q   Good morning, Mr. McInvaille.

16    A   Good morning.

17    Q   Could you please state your full name for the

18    record?

19    A   Spencer McInvaille.

20    Q   Where do you currently work?

21              THE COURT:  Can you spell it, please?

22              THE WITNESS:  Yes, ma'am.  It's

23    M-c-I-N-V-A-I-L-L-E.

24              THE COURT:  Thank you.

25    A   I currently work for Envista Forensics.  That's

1    E-N-V-I-S-T-A.

2    Q    What do you do at Envista Forensics?

3    A    I am a digital forensics examiner.

4    Q    What does that entail, generally?

5    A    I deal with various types of location data, cell

6    phone forensics, records from phone carriers, various

7    types of location information, GPS, several different

8    forms.

9    Q    Prior to working at Envista, were you employed?

10   A    Yes.  I was a law enforcement officer in

11   Lancaster, South Carolina.

12   Q    What did you do as a law enforcement officer in

13   South Carolina?

14   A    I was a violent crimes investigator.  Part of my

15   task was also on the Internet, Crimes Against Children

16   Task Force, as well as mobile phone forensics, and

17   location data examination.

18   Q    Could you expand on that a little bit more?  You

19   used location data for what?

20   A    Location data for various things.  So

21   investigations of various violent crimes.  Also

22   similar types of data for investigations of child

23   exploitation, as well as locating fugitives from our

24   county.

25   Q    Thank you.  Do you have any certifications that

1    are relevant?

2    A    Yes.  I hold certifications from Cellebrite for

3    mobile phones forensics, as well as certifications for

4    telecommunications.  So dealing with the different

5    networks that we see.

6    Q    Have you had any training dealing with location

7    data and interpreting location data?

8    A    Yes, training in GPS, call detail records,

9    historical records.  I believe I mentioned GPS, and

10   then various types of information that we get from

11   Google and various places.

12   Q    Do you recall how many hours of training you might

13   have had?

14   A    Quite a few.  Several different classes.

15   Q    Have you been qualified as an expert before?

16   A    I have.

17   Q    How many times?

18   A    I believe 11 times.

19   Q    Do you know what a geofence warrant is?

20   A    Yes.

21            THE COURT:  An expert in what?

22            MR. PRICE:  Sorry.

23   BY MR. PRICE:

24   Q    You've been qualified as an expert before 11

25   times.  How have you been qualified?

1   A    In mobile phone forensics as well as historical

2   cell site analysis.

3           THE COURT:  And who were the trainings with?

4           THE WITNESS:  Cellebrite, as well as

5   Terracom, and my company as well.

6           THE COURT:  Thank you.

7   BY MR. PRICE:

8   Q    So, we'll get into the details in a minute.  I

9   just want to ask you, generally speaking, do you know

10  what a geofence warrant is?

11  A    Yes.

12  Q    Generally speaking, how does a geofence warrant

13  operate?

14  A    A Geofence request to Google is a request based on

15  an incident occurring, determine that incident's

16  location, and its date and time, and drawing some sort

17  of boundary around that area that you would like

18  searched.  That request goes to Google for them to

19  then search the users that could have been in that

20  area at that time and then return that information for

21  it to be analyzed.

22  Q    Is that an iterative process?

23  A    Sir?

24  Q    Does that process take place in more than one

25  step?

1    A    Yes, it does take several steps.

2    Q    How is that different from the usual way that you

3    have seen location data produced?

4         THE COURT:  You're going to have to pull up

5    the microphone a little bit, because you're looking

6    more at him than you are into the microphone.  And

7    it's hard for me to hear and I'm sure my court

8    reporter, too.

9    BY MR. PRICE:

10   Q    The location data in this case, how is that

11   different from location data that you have seen in

12   other cases?

13   A    So, typically, when we're dealing with like

14   historical cell cite information, different requests

15   from Google, those requests are made based on

16   individual users.  So we know a certain account or a

17   phone number that we're looking for, and we make a

18   request to the correct company to get those records.

19   Q    Thank you.  Have you received any formal training

20   or in-class training on geofence warrants?

21   A    No, sir.

22   Q    Why not?

23   A    That is not available to non-law enforcement.

24   Q    What materials have you reviewed that are related

25   to the geofence warrant in this case?

1   A    We have the returns from Google, the amicus brief

2   from Google, the emails and correspondence between the

3   detective and Google.  I believe that's it.

4   Q    Anything else?  The warrant?

5   A    Oh, as well as the search warrant.  Excuse me.

6   Q    What sort of experience do you have with Google's

7   public-facing policies, their privacy policy?

8   A    Just what you can find available on their website.

9   Q    What is your past experience with Google's

10  location data production?  Is this typical?

11  A    I have seen both geofence responses as well as

12  account-specific responses.

13          MR. PRICE:  Your Honor, at this time I'd like

14  to tender Mr. McInvaille as an expert in the field of

15  digital forensic examinations, mobile forensics, and

16  cellular location analysis.

17          THE COURT:  No objection, correct?

18          MR. SIMON:  No objection, Your Honor.

19          THE COURT:  He will be deemed an expert.

20          MR. PRICE:  Thank you, Your Honor.

21  BY MR. PRICE:

22  Q    I'd like to ask you some questions now

23  specifically about Google and what Google provided to

24  law enforcement in this case.  How does Google say it

25  categorizes different types of location data it

1  obtains?

2  A    As far as Google, they classify them differently.

3  They have Google location services, your web and app

4  activity, as well as Google location history.

5  Q    And can you tell us briefly what each one of those

6  is?  What is Google location services, generally

7  speaking?

8  A    So, Google location services is a service through

9  Google that uses their various systems through your

10  device to locate you so that you can navigate around

11  town, find restaurants, all of the conveniences that

12  we find in our devices.

13  Q    And what about web and app activity?

14  A    So web and app activity also track similar items.

15  So searches, the things that you do within your apps.

16  Those items are used and tracked across platforms with

17  Google to, again, enhance the user's experience.

18  Q    And then there's a third category, location

19  history.  What is that, generally?

20  A    So, location history is essentially a kind of

21  gathering of those pieces of information stored so

22  that your device and your account can better aid you

23  in finding relevant locations that you would want to

24  use, as well as being able to keep the data that you

25  generate.

McINVAILLE - DIRECT                    24

1  Q    Thank you.  I want to ask you to turn to what's

2  been marked as Exhibit 1 in your folder there.  Do you

3  recognize the document?

4  A    Yes, affidavit for a search warrant.

5  Q    And is that the search warrant you reviewed in

6  this case?

7  A    Correct.

8          MR. PRICE:  I'd like to introduce that into

9  evidence as Exhibit 1.

10          THE COURT:  Any objection?

11          MR. SIMON:  No objection, Your Honor.

12          THE COURT:  It's entered.

13          (Defendant's Exhibit 1 is admitted into

14  evidence.)

15  BY MR. PRICE:

16  Q    Could you read the first bullet point, page 2?

17  I'm sorry, the second bullet point, the first full

18  sentence beginning with "for each type."

19  A    I'm sorry.  I'm not picking up where you're at.

20  Q    It's marked page 2.  It's actually page 4 of the

21  PDF.

22  A    Gotcha.  So, the second bullet point?

23  Q    The second bullet, first sentence, please.

24  A    "For each type of Google account that is

25  associated" --

1        THE COURT:  Sir, it's human nature, if you're

2   reading something, to speed up, but our court reporter

3   needs to get every word.  So just read it as if you

4   were saying it, not as if you are reading it.  It

5   happens all the time.

6   A    I understand.  That's all right.

7        "For each type of Google account that is

8   associated with a device that is inside the

9   geographical area described further and attachment to

10  during the time frame listed above, Google will

11  provide anonymized information regarding the accounts

12  that are associated with a device that was inside the

13  described geographical area during the time frame

14  described above.  The anonymized information will

15  include numerical identifier for the account, the type

16  of account, time stamp location coordinates, and the

17  data source that information came from, if available.

18  The information initially provided by Google will not

19  contain any further content or information identifying

20  the user of a particular device or account."

21  Q    I just want to call your attention to the first

22  sentence there.  It says "for each type."  So what

23  types of location information did this warrant ask

24  Google to produce?

25  A    Each, all, is what it appears to be.

1  Q    What would that mean to you?  "Each" meaning?

2  A    Anything that Google retains as far as accounts

3  with location that they can search.

4  Q    Would that include the three types of location

5  data that we just talked about?

6  A    Correct.

7  Q    I want to ask you to turn to Exhibit 2 in your

8  folder there.  Do you recognize that document?

9  A    Yes, the Google amicus brief.

10  Q    And that's the brief that you reviewed in this

11  case?

12  A    Correct.

13         MR. PRICE:  Your Honor, this is already a

14  part of the record, ECF No. 59-1.  We don't seek to

15  introduce it as evidence here but just to mark it as

16  Exhibit 2 for purposes of this hearing.

17         THE COURT:  All right.  It will be marked.

18  No objection, correct?

19         MR. SIMON:  No objection, Your Honor.

20         (Defendant's Exhibit No. 2 is marked for

21  identification purposes.)

22  BY MR. PRICE:

23  Q    Would you turn to page 12 of that document for me

24  and read the last sentence of the first full paragraph

25  in parenthesis?

1   A    "In order to comply with the" --

2   Q    It begins with "in practice."

3   A    Excuse me.

4   Q    The last sentence of the first full paragraph.

5   A    The first full paragraph.  Excuse me.  "In

6   practice, although the legal requests do not

7   necessarily reflect this limitation, such requests can

8   cover only Google users who had location or LH,

9   location history, enabled and were using it at the

10  time in question."

11  Q    Just so we're clear, what does LH stand for?

12  A    Location history.

13  Q    Okay.  And so what is Google saying there?

14  A    It's saying the request can only cover Google

15  users who had location history enabled.

16  Q    So they're saying they only produced one of the

17  three categories?

18  A    Correct.

19  Q    All right.  I want you to turn now to what's

20  marked as Exhibit 3 in your folder.

21           MR. PRICE:  And this, Your Honor, should be

22  published only to the Court.  It's under seal.

23           THE COURT:  All right.  So that will be

24  published just to the Court and the parties under

25  seal.

1    BY MR. PRICE:

2    Q    Do you recognize the document?

3    A    Yes.

4    Q    What is it?

5    A    It is the Google returns from Google, the returns.

6    Q    And these are the raw data returns that you

7    reviewed in this case?

8    A    Correct.

9            MR. PRICE:  Your Honor, these are marked as

10   Exhibit A attached to document 68.  We would like to

11   mark them as Exhibit 3 here.

12           THE COURT:  All right.

13           MR. SIMON:  No objection.

14           THE COURT:  Thank you.  They will be marked

15   as Exhibit 3 and entered under seal.

16           (Defendant's Exhibit No. 3 is marked and

17   entered under seal.)

18   BY MR. PRICE:

19   Q    So tell us what you see at the beginning of the

20   raw data provided here.  What types of location data

21   did Google produce?

22           THE COURT:  You're going to have to direct

23   the Court as to what page you're looking at, at least.

24   Somehow identify it.

25           MR. PRICE:  Excuse me, Your Honor.  It's page

1   6 of the PDF itself.  I don't believe they have page

2   numbers.  It's the first page with data on it.

3   A    So, this is the location history for various

4   device IDs.

5   BY MR. PRICE:

6   Q    How do you know that it's location history?

7   A    It has locations, and this is what we typically

8   get in return.

9   Q    Does it indicate the source of the data here?

10  A    It indicates what the measurement was taken from,

11  as far as Wi-Fi or GPS.

12  Q    Does it say whether it was data obtained from

13  Google location services or web and app activity or

14  location history?

15  A    It does not.

16  Q    So it doesn't say what type of -- as far as Google

17  is concerned, not GPS or Wi-Fi, but the types of

18  categories of data that we talked about before, it

19  doesn't indicate that here?

20  A    Correct.  It doesn't specify the Google category

21  that this falls into.

22  Q    Why?

23  A    I'm not sure.

24  Q    How is that different from Google location data

25  produced to you in other contexts that you've worked

1   on before?

2   A    So, typically, if you were to see a return for a

3   specific account, for one, the document is named by

4   the user's account name as well as the user name,

5   location history, and then the file type.

6   Q    So it would indicate location history, for

7   example, if it was produced from location history

8   data?

9   A    That's correct.

10  Q    Do you know why Google doesn't do that here?

11  A    I'm not sure.

12          THE COURT:  Wait.  When you say "typically,"

13  what do you mean?  Typically, when you're just looking

14  at a known account or typically when you're not

15  looking at a known account?

16          THE WITNESS:  When you are looking at

17  account-specific requests, that's how it is shown.

18          THE COURT:  Okay.

19  BY MR. PRICE:

20  Q    So Google didn't indicate location history, but

21  they said they did only location history.  Do you know

22  why they would have produced only location history

23  data?

24  A    No, I do not know.

25  Q    Do you know why they wouldn't have produced web

1    and app activity data?

2    A    I don't.

3    Q    Do you know why they wouldn't have produced Google

4    location services data?

5    A    I'm not sure.

6    Q    Why don't you know?

7    A    There's not an explanation of why.

8    Q    Would --

9              THE COURT:  Not an explanation of why on the

10   document, is that what you mean?

11             THE WITNESS:  Correct, in any of the

12   documents provided.

13             THE COURT:  All right.

14   BY MR. PRICE:

15   Q    Would Google have policies and procedures about

16   this?

17   A    I'm sure they would.

18   Q    Why do you think so?

19   A    Clearly, something guided them to provide a

20   certain data or search a certain set of data.

21   Q    Have you seen those policies or procedures?

22   A    I have not.

23   Q    What do you think they might tell you if you were

24   to see them?

25   A    I'm sure they would outline the process that

McINVAILLE - DIRECT                    32

1    Google has outlined for their analysts who provide

2    data in response to a legal process request.

3    Q    Is that information in the warrant or application?

4    A    The information -- I'm sorry?

5    Q    Is that information in the warrant or application?

6    A    The request?

7    Q    The information that you might learn from looking

8    at the policies and procedures.

9    A    I don't see it in the search warrant, no.

10   Q    And it hasn't been provided to you in any way?

11   A    No, sir.

12   Q    I'd like to talk a little bit now about location

13   history specifically and what's involved in enabling

14   it.  In the amicus brief that you reviewed, Exhibit 2

15   that we've already talked about, Google says that this

16   sort of trademarking is entirely voluntary, citing six

17   steps.  Can you tell us what those six steps are on

18   page 8?

19             THE COURT:  Are we back to --

20             MR. PRICE:  We're back to Exhibit 2, Your

21   Honor.

22             THE COURT:  -- Exhibit 2?

23             MR. PRICE:  Yes, Your Honor.

24   BY MR. PRICE:

25   Q    The bottom of page 8.

1  A    I'm sorry.  I'm not seeing it on 8.

2           THE COURT:  The paragraph starts, "The user

3  thus controls her Google location history data, which

4  is LH, unlike, for instance, the CSLI at issue in the

5  *Carpenter* case that the parties have referenced for

6  cellular data."

7           MR. PRICE:  Excuse me, Your Honor.  It's my

8  fault.  It's the first paragraph on page eight.  And

9  it starts on page 7, the last sentence.

10  "Specifically, the user must opt into."

11          THE COURT:  Okay.  Make this clear.  What do

12  you want him to read from so I can follow you, please?

13          MR. PRICE:  The paragraph starting on page 7

14  beginning with "specifically."

15          THE COURT:  So it's the middle of the --

16          MR. PRICE:  The last sentence on page 7 going

17  into page 8.

18          THE COURT:  Are you with us, sir?

19          THE WITNESS:  I am.

20          THE COURT:  All right.

21  A    "Specifically, the user must opt into location

22  history in her account settings and enable "Location

23  Reporting," a subsetting within location history, for

24  the particular device.  And to actually record and

25  save location history, the user must then sign into

1  her Google account on her device and travel with that

2  device."

3  BY MR. PRICE:

4  Q    So Google is saying that this is a fairly

5  deliberative process.  Do you agree that enabling

6  location history requires such deliberate choices?

7  A    Yes and no.

8  Q    Can you explain a little more?

9  A    So you do have to make the selection to activate

10  location history.  The method in which that typically

11  happens and the way that you see it on the device is

12  through prompts that tell you not that location

13  history needs to be enabled, but that if you opt into

14  certain functions, that it does improve your

15  experience.  You do not receive the type of

16  information that would lead you to believe that what

17  you have here contained in location history and what

18  it can be used for is exactly what you're opting into.

19  Q    So did you prepare a demonstration to illustrate

20  this point?

21  A    Correct.

22  Q    All right.  Let's talk about what you did.  You

23  made a visual presentation of the setup process?

24  A    I did.

25  Q    For an Android phone?

1   A    I did.

2   Q    And the visual presentation is in the form of a

3   video?

4   A    It is.

5   Q    That's 4 minutes and 46 seconds long?

6   A    Yes.

7   Q    And you have that video on a DVD in front of you

8   marked Exhibit 4?

9   A    I do.

10  Q    And you have reviewed that DVD prior to coming to

11  court today and have verified it's the same video you

12  created?

13  A    I have.

14  Q    You marked the DVD with your initials reflecting

15  that?

16  A    I did.

17  Q    All right.

18          MR. PRICE:  Your Honor, I'd like to move to

19  introduce the video as Exhibit 4 and publish it.

20          THE COURT:  Any objection?

21          MR. SIMON:  No objection, Your Honor.

22          THE COURT:  All right.  It will be entered.

23          (Defendant's Exhibit No. 4 is admitted into

24  evidence.)

25  BY MR. PRICE:

1    Q    Before we get started with this video, I want to

2    ask you a couple of preliminary questions.  Is this

3    the same phone that the defendant -- at issue here

4    with the defendant?

5    A    It is not.

6    Q    Why is it not the same phone?

7    A    This is a test device that we have at Envista.

8    Q    Okay.  Is it running the same operating system?

9    A    It is an Android operating system.

10   Q    Is it running the same version as the defendant's

11   phone?

12   A    This is running Android 7.

13   Q    So it's one version earlier?

14   A    It is.  Android 8, I believe, was the defendant's

15   phone.

16   Q    Have you had an opportunity to compare version 7

17   and version 8?

18   A    I haven't device to device, but I was able to

19   review articles and literature that I could find

20   between comparing the two, and they're very similar.

21   Q    How did you make that determination?

22   A    In comparison to what I've seen here as well as

23   the various screenshots and things that I was able to

24   find for that setup.

25   Q    So just to be clear, the screenshots for version 8

1  are the same as version 7, to your knowledge?

2  A    They're very similar, yes.

3  Q    All right.  So, let's go through this video.  Can

4  you talk us through the steps here on what you've

5  done?

6  A    Absolutely.  So, when you first boot the phone up,

7  this is the welcome screen that you would get prior to

8  a phone being set up.  So similar to it coming

9  straight out of the box after you purchased it.  So

10  you will begin the process.

11     In this first screen, which is labeled "input

12  method," you're going to --

13          THE COURT:  So, listen.  I'm going to ask you

14  all to be very careful about establishing the record.

15  If you're switching the screens you're looking at, you

16  have to stop and be clear the first one is the

17  start-up.  Give us a moment to keep up with you.  This

18  is the second screen that pops up.

19          THE WITNESS:  Yes, ma'am.

20          THE COURT:  It does pop up or however you

21  access it.  So we need to slow down so I can follow

22  you, because I haven't seen this before, and it's

23  helpful for me to be able to be sure I'm absorbing

24  what you're saying.

25          THE WITNESS:  Understood.

1  A    This is the second screen.  This is the input

2  method.  So we're choosing what type of keyboard and

3  icons that you would see in the -- through the process

4  of setting up the device and then later that you will

5  see in the device.

6       So here we're going to select that we would like

7  the English keyboard, and we're going to move to the

8  third screen.

9       Here we have to establish on the third screen an

10 Internet connection so that we can complete the

11 process.  So here you will see several steps to

12 complete that process.

13      Moving to the next screen where we will select the

14 Wi-Fi access point to use to complete the setup.

15      So we enter the password here for that access

16 point so that we can establish a connection.

17           THE COURT:  To be clear, a pop-up came up

18 prompting the entry of the password.

19           THE WITNESS:  That's right.

20 A    And after that's entered, we will be connected and

21 move to the next screen.  In this next screen, we have

22 the terms and conditions for the device itself from

23 its manufacturer.  We will see several different terms

24 and conditions, but this is the first relating to the

25 manufacturer of the device.

1  BY MR. PRICE:

2  Q    Before you go through that, or when you're going

3  through that, can you tell us if that mentions

4  location history or mentions Google, specifically?

5  A    It does not.

6       So after scrolling through those items and

7  clicking to the next button, you're prompted to either

8  agree or disagree with the terms of service for the

9  device.

10          THE COURT:  Can I ask you a question?  Did

11  you go all the way through?  How many terms and

12  conditions are there?

13          THE WITNESS:  There are six.  That's the

14  extent of them there.

15  A    So now we'll move to the next screen, and it will

16  check the connection for the device and take a moment

17  before it moves to the next screen where we have to

18  make indications or selections on the device.

19  BY MR. PRICE:

20  Q    While we're doing this, I just want to be clear.

21  The privacy policy for the phone itself, the ASUS

22  policy, can you explain what, if any, relationship

23  that has to Google?

24  A    I did not see a direct relation or mention of

25  Google in that setup.

1        So, we're finally to the next screen.  On this

2   screen it's asking if we have another device to use to

3   set up this new device.  So this would be if you want

4   to transfer data and settings from one device to this

5   new device that you're accepting up.  Here, since I'm

6   setting this up for the purposes of this and not

7   trying to retain any previous data, I'm going to

8   select "no thanks" and move on to the next selection.

9        So, again, it's going to run through checking the

10  device for various things that it needs to complete

11  for setup, and we'll move on to the next indication

12  when available.

13       So, for Android devices to complete the kind of

14  user experience and use all of the functions of the

15  device, Android would like for you to activate or

16  connect a Gmail account to the device itself.  So here

17  you can either enter in an existing account or create

18  a new account.

19       For the purposes of this, we're going to create a

20  new account.  After that selection, it will move to a

21  new screen.  And on that new screen we will enter a

22  name and some various other information so that we can

23  begin to complete the account creation.

24       We're moving to the next screen.

25            THE COURT:  I'm going to interrupt you a

```
 1    little bit.  You said the Android would like you to

 2    activate through a Gmail account.  Is there an option

 3    not to?

 4            THE WITNESS:  You can skip that function.

 5    BY MR. PRICE:

 6    Q    May I follow up on that?

 7    A    Yes.

 8    Q    What's the consequence of skipping that function?

 9    A    You lose much of the functionality of the device

10    where you would go download applications from the app

11    store and many of the other functions --

12            THE COURT:  Are you getting to that later?

13            THE WITNESS:  We did not skip that process.

14    We're setting this phone up as if --

15            THE COURT:  Are you going to testify about

16    how that happens later?

17            THE WITNESS:  About how --

18            THE COURT:  If you don't use Google, what

19    happens?

20            THE WITNESS:  Correct.  We can discuss that.

21    Q    Please.  So if we don't have --

22            THE COURT:  Go back to the Android account,

23    the screen before.  So the person's index finger is

24    covering the word "skip."

25            THE WITNESS:  Correct.
```

McINVAILLE – DIRECT                    42

1          THE COURT:  On the screen, it says you can

2    skip it.

3          THE WITNESS:  Yes.

4          THE COURT:  All right.

5    BY MR. PRICE:

6    Q   In your experience, have you ever received a

7    pop-up message when hitting skip?

8    A   Yes.  It does ask you are you sure you want to not

9    set up an account on the device.

10   Q   And it describes some of the features that you

11   might be missing out on; is that correct?

12   A   I do believe so.

13         THE COURT:  Wait.  I'm sorry.  I got -- say

14   that again, please.

15         THE WITNESS:  That's all right.  If you skip

16   the function, it does ask you are you sure you want to

17   skip this function as it may hinder you from being

18   able to use the device to its fullest extent.

19         THE COURT:  All right.  What happens if you

20   say you're sure?

21         THE WITNESS:  Then you don't set up an

22   account on that device, and then you aren't able to

23   access things like the application store and other

24   functions of the device that we would all normally

25   use.

1  BY MR. PRICE:

2  Q    Would you be able to use any Google service at

3  all?

4  A    I still do believe you would be able to use some

5  of the functions of the device.

6  Q    But the Google services in particular without an

7  account?

8  A    I do not believe you would be able to use like

9  Google location services, and things like that, that

10 help with your map functions.  Location as a whole in

11 the device would still be available, but many of the

12 Google-related functions would not be available.

13 Q    Like maps?

14 A    Correct.

15      THE COURT:  Anything else?  I'm looking for

16 specifics here.

17 BY MR. PRICE:

18 Q    What about email?

19 A    You would not have your Gmail account attached.

20 There again, you wouldn't be able to access the app

21 store, which is where you --

22 Q    Can you explain what that is?

23 A    Yes.  That's where you download the various

24 applications that you would use.  So if you wanted to

25 add your bank application or various other

1  applications that people typically use, you wouldn't

2  have that functionality.

3  Q   So you'd be left with what on the phone?  What it

4  came with?

5  A   Essentially, yes.

6  Q   And you wouldn't be able to install any apps from

7  the app store?

8  A   Correct.

9  Q   Or use any of the Google app services?

10  A   Correct.

11         THE COURT:  I'm going to interrupt you again.

12  I'm not an expert in this.

13         THE WITNESS:  That's all right.

14         THE COURT:  So, first off, I know we're

15  talking about an Android because there's an Android at

16  issue.  Would this testimony be different under Apple?

17         THE WITNESS:  Yes, it can be.

18         THE COURT:  Do you know whether or not if you

19  don't sign up with a Google account in Apple -- first

20  of all, does it ask you to do that?

21         THE WITNESS:  What?  In Apple?  No, I think

22  Apple would probably prefer that you didn't use Google

23  services.  I think they would prefer that you use

24  theirs.

25         THE COURT:  Just making it clear.

McINVAILLE - DIRECT                45

1           THE WITNESS:  But you can add Google services

2    to your iPhone.

3           THE COURT:  All right.  And I want to be

4    clear about -- you testified earlier about the system.

5    So, this is an Android phone.

6           THE WITNESS:  Yes, ma'am.

7           THE COURT:  And is this the same kind of

8    phone that Mr. Chatrie is alleged to have carried?

9           THE WITNESS:  No, it's not the same device.

10          THE COURT:  Why are they comparable?

11          THE WITNESS:  They are running Android

12   software.

13          THE COURT:  Okay.

14          MR. PRICE:  Perhaps I can ask a few questions

15   to clarify, Your Honor.

16          THE COURT:  All right.

17   BY MR. PRICE:

18   Q    The current version or the phone that the

19   defendant had was the Samsung S9; correct?

20   A    Correct.

21   Q    Did you purchase an S9?

22   A    We did.

23   Q    When you go through this process, what operating

24   system does it load up?

25   A    It loads with Android 9.

1    Q    Is Android 9 significantly different from Android

2    8?

3    A    It seemed to be.  Between 7, 8, and 9, 9 seemed to

4    be much more different than the comparison of 7 to 8.

5    Q    And with 9, again, which is not at issue here, did

6    you find that some of the information about location

7    services was different?

8    A    It does.  It prompts differently, but you still

9    end up with the same prompts for location services and

10   location history.

11   Q    Would a normal user who purchases an S9 today be

12   able to downgrade and load the previous operating

13   system through the normal process of setting up the

14   phone?

15   A    Not through the normal process.  It's -- I mean,

16   it's not terribly complicated, but it's not something

17   that you would typically see from the average user.

18   Q    You had to download special software from the

19   Internet to even give this a try; is that correct?

20   A    Yes.  You would have to download the old firmware

21   version and load it to the device.

22   Q    When you attempted to do that and reboot the

23   phone, what happened to the operating system you

24   installed?

25   A    On that device when you provide it with the old

1  software, it still wants to, without a connection or

2  with a connection, still pushes towards that Android 9

3  interface and its functionality.

4  Q    So, would it be fair to say that one of the

5  reasons we used a different phone and a different

6  operating system here is because it is the most

7  comparable to the system and the phone at issue in

8  this case?

9  A    Between what I worked on, yes, it was more

10 comparable.

11          THE COURT:  And there's no material

12 differences between the terms and conditions of this

13 example and what Mr. Chatrie is alleged to have had?

14          THE WITNESS:  That would be hard to speak to

15 just because how often Google can change the terms.

16 So at the time, across platforms, the terms would be

17 the same as they come from Google, and through that

18 Internet connection is where you're receiving those.

19 So they seem to be, across platforms, the exact same

20 terms and policies that come from Google.  Most are

21 dated with their release time.

22          THE COURT:  Okay.

23 BY MR. PRICE:

24 Q    You said -- you mentioned seeing articles that

25 describe the setup process in version 8.  Did those

1  have images of the setup process?

2  A    They did.

3  Q    Were they the same as the ones in version 7?

4  A    Yes, they looked very similar.

5  Q    Were both of those different than the information

6  about location history provided in operating system 9?

7  A    The materials are the same.  It doesn't look

8  different, but it's the same request and prompt from

9  Google.

10  Q    Thank you.

11        MR. PRICE:  Your Honor, do you have any more

12  questions before we proceed?

13        THE COURT:  No.  Thank you.

14        MR. PRICE:  Okay.

15  A    So we're going to go back into the setup process

16  here.  We're just creating the account by providing a

17  name.  After you provide the name, it will move on to

18  the next selection.

19      On the next screen, it provides -- it wants you to

20  provide a date of birth.  That's typically for the

21  play store so you can determine what you're going to

22  download if it's appropriate.

23        THE COURT:  Just to be clear, that screen was

24  entitled "Google Basic Information."

25        THE WITNESS:  Correct.

1   A    And after that selection has been made, it moves

2   to the next screen, which is "choose your Gmail

3   address."  It provides two selections that it created

4   as well as a selection where you can create your own.

5   I just opted to use one of the already generated

6   addresses.

7        And it moves to the next screen where we'll now

8   input -- and it prompts you to create a password for

9   your account.

10  BY MR. PRICE:

11  Q    In your expert opinion, is password 1-2-3 a strong

12  password?

13  A    It's a terrible password.

14       After you enter your password and confirm it, it

15  will now prompt you to the next screen.

16       This next screen would like you to add a phone

17  number to the account.  It explains that there are

18  several different reasons you would use this; to reset

19  your account, receive messages, as well as make Google

20  services relevant to you.  And there's a scroll down

21  here to add other -- to kind of further explain some

22  of those -- what can be used and how you can use it.

23  Q    To be clear, does this mention location history?

24  A    It does not.  And you can either skip, you can say

25  yes, I'm in, and add a phone number, and then there's

1   also a "more options" selection.  So I'm going to

2   select "more options" here.

3       So it just takes you to the screen to give you the

4   three different choices that you have here.  You can

5   not add your phone number, you can add your phone

6   number with all of the features, or you can add your

7   phone number only for security reasons.  I did not add

8   a phone number and moved on to the next screen.

9       Here it's going to show you your account name,

10  your name, and you can select "next" to continue with

11  the process.

12          THE COURT:  The title of that screen is

13  "Review Your Account Info," the new screen.

14          THE WITNESS:  On the next screen after moving

15  on, this is Google privacy and terms.  Here is where

16  it explains out and has all of the links to the

17  various websites or web addresses within Google where

18  you can read all of the terms and conditions for

19  various -- the account itself, for like Google Play as

20  well as the privacy policy.

21          This goes down quite a -- it has quite a bit

22  of information contained within it as well as several

23  links to Google's website with pages upon pages of

24  information about their privacy policy.

25  BY MR. PRICE:

1   Q    Just to be clear, does this screen say anything

2   about location history?

3   A    It doesn't yet.  There is various information down

4   this screen.  You can still choose not to create the

5   profile that you have begun to create.  You can simply

6   agree now and move on or you can select "more

7   options."

8        Under "more options," we now get into some of the

9   information that we spoke about earlier that Google

10  has as far as their services, starting here with web

11  and app activity.

12  Q    Is there a default setting for that?

13  A    The default setting for web and app activity there

14  is the affirmative already.  So it would be for you to

15  deselect that if you didn't want that selection within

16  the Google services.

17       The next being "add personalization."  It is, as

18  well, in the affirmative selection.  It, again, would

19  be up to you to deselect.

20       "YouTube history," the same.  It is in the

21  affirmative to save your Google or your YouTube

22  history into your Google account.

23       And then, finally, "Google location history" being

24  the final selection on this page.  Out of that group,

25  it is the only one that is not currently selected.  It

1    would be up to you to opt into the Google location

2    history at this time.

3        Once you get down to the bottom again, you still

4    have the choice to not create the account or you can

5    agree and move on with the account.

6        I'm going to press "agree," and move to the next

7    screen.  Again, it's checking the device.  "Checking

8    info" is what it displays, and you have to wait until

9    the next prompt.

10       The next prompt is labeled "Google Services."  It

11   says you can turn on or off any service for the

12   following account.  And then it goes through and

13   advises the different services, again, that you can

14   turn on or off.

15       You'll see "automatically backup data" is in the

16   affirmative position.  "Google location services,"

17   again, affirmative.  "Improve location accuracy," it

18   is also selected.  And "improve your Android

19   experience," it is also selected.

20       "Keep me up to date," meaning receive emails about

21   Google, is in the affirmative.  And then if you agree,

22   you can move to the next or deselect any of those.

23       It's going to ask to set up payment information on

24   the next screen.  You can choose to set it up or not.

25   We said "no thanks" and continued.  Again, checking

1   the device and waiting for the next prompt.

2       The next is for you to confirm the date and time

3   for the device to be used, and we will select "next."

4       And then to this next screen it is "protect your

5   phone."  This is where you would enable a pass code or

6   some kind of lock on the device to protect the device.

7   Q   May I pause here, Spencer?

8   A   Yes.

9   Q   Sorry.  Mr. McInvaille.

10      Prior to this step where you're setting up the

11  pass code, can you tell us which of the three

12  categories of location history have been enabled by

13  default?

14  A   So no location history has been activated, but

15  location services and Google location services, as

16  well as web and app activity are selected at this

17  point.

18  Q   And a user who's going through this process would

19  see "location history" was turned off?

20  A   Correct, if they opened the "more options" tab to

21  see that.

22      So, moving on.  I'm not going to set up a pin to

23  the device.  Then it's asking us to wait another

24  second.  It also then, on the next screen, says

25  "review additional apps."  It asks if you would like

1  to add these three other Google applications

2  immediately to the device upon setup.  Just due to

3  them automatically downloading and updating, I

4  selected that they not be downloaded.  And we pressed

5  "okay."

6      These final screens are referring to registering

7  your device with the manufacturer, which is ASUS in

8  this case.  You can either create an account using an

9  existing account or skip this function.

10     Moving to the next screen, still dealing with the

11 ASUS account, whether or not you want to register,

12 sign in, or register by Google ID, or you can skip.

13     On the next, it determines what data --

14         THE COURT:  To be clear, you didn't undertake

15 any of those options?

16         THE WITNESS:  No, ma'am.

17         THE COURT:  All right.

18         THE WITNESS:  Those functions are not

19 directly related to Google.

20         THE COURT:  Okay.

21 A   The next is accounts and sync for you to determine

22 what accounts you would like to sync across your

23 accounts.

24         THE COURT:  Just so the record is clear, just

25 say some of the stuff that's on the screen, please.

1    So back up, please.

2            THE WITNESS:  Okay.

3    A    So, on the screen you can add another account, you

4    can sync data across your ASUS account, your exchange

5    or email, as well as the application called Flickr, or

6    your -- or the Gmail account that's selected here, and

7    it is already preselected with the check to sync data

8    for that account as you set it up.

9        Moving forward, it provides you with a prompt on

10   the next screen for Google drive.  It's a promotion to

11   get storage from Google for your various information.

12   We can skip this offer and move to the next screen.

13       We're finishing up the setup.  This is where it

14   tells you your device is now ready and you can make

15   changes to your configurations in the settings area of

16   the device.  We'll click the check and move on to the

17   next screen.

18       And the next screen is where it launches the

19   device as you would normally see it as you were using

20   it throughout the day.

21   Q    So this is the normal setup process at this point.

22   You've got a phone that you can use?

23   A    Yes.

24   Q    What happens when you click on Google Maps for the

25   first time?

1   A   So we've now made all of the selections to set up,

2   and now we go to use the device.  Here, once these

3   initial pop-ups are done telling me kind of how to use

4   my new phone, I'll go in and select Google Maps, which

5   is an application already on the device.

6   Q   Does it bring up a map immediately?

7   A   It does not.  So you will see the prompt here for

8   "get the most out of Google Maps."  It says that

9   Google needs to periodically store your location to

10  improve route recommendations, search suggestions, and

11  more.  You can opt in or skip.

12  Q   What are the options?  When it says opt in, it

13  says what?

14  A   "Yes, I'm in."

15  Q   And the text, does any text on this screen mention

16  location history?

17  A   It does not.

18  Q   So prior to this setting up the phone, we did see

19  a screen with location history, and it was marked

20  as --

21  A   It was turned off.

22  Q   It was off.  And your understanding is that if you

23  hit "yes, I'm in," what happens?

24  A   Yes.  If you select "yes, I'm in," it turns on

25  Google location history.

1    Q    And it doesn't mention location history in the

2    text on this screen?

3    A    It does not.

4    Q    What happens when you click on "learn more"?

5    A    It's a hyperlink to Google's website where all of

6    the terms and conditions are located.

7    Q    The entire privacy policy?

8    A    All of the terms and conditions.

9    Q    It doesn't direct you to anything specifically

10   about location?

11   A    No, but it is -- you can find it in there.  It's

12   there.

13        That's the end of the video.

14   Q    So that is the end of the video?

15   A    Yes.

16   Q    Can you tell us, how long is that video?  How long

17   did it take you, the entire process, from start to

18   finish here?

19   A    Without stopping, 4 minutes and 45 seconds.

20   Q    How many screens mention location history?

21   A    I believe one.

22   Q    And that was only if you clicked on "more options"

23   and scrolled down; correct?

24   A    Correct.

25   Q    How many of them fully explained what location

1    history is?

2    A    You would need to -- none.  You would need to go

3    look at the policies and terms.

4    Q    Thank you.

5         So, the government says that we can function in

6    modern society without enabling location services like

7    this.  Tell us, how did you get here today?

8    A    I used my phone.

9    Q    You were driving?

10   A    Correct.

11   Q    You used your phone to get directions?

12   A    I did.

13   Q    Did you look up where the courthouse was online?

14   A    I did.

15   Q    Did you plug it into Google Maps?

16   A    Waze.  Just about the same thing.

17   Q    You didn't use a road map, did you?

18   A    I did not.

19   Q    Out of curiosity, when was the last time you used

20   a road map?

21   A    It's been quite some years.

22   Q    You're a forensic examiner.  You examine a lot of

23   phones; correct?

24   A    Correct.

25   Q    How frequently do you encounter devices that are

McINVAILLE – DIRECT                    59

1    also used for Google Search?

2    A    Most.

3    Q    What about Google Maps?

4    A    Most.

5    Q    What about Gmail?

6    A    Very often.

7    Q    And YouTube?

8    A    Quite often.

9    Q    How common is it for you to encounter phones with

10   location services enabled?

11   A    Pretty often.

12   Q    What about location history, specifically?

13   A    Typically, that's a hard function to see

14   activated.  It's not something you typically go seek

15   out on the device to see if it's turned on.  But based

16   on the different returns that I see for Google

17   account-specific requests, as well as these geofences,

18   it's clear that a lot of people have this function

19   activated on their devices because of how they show up

20   in these returns.

21   Q    Do you know what percentage of all devices use

22   Google services?

23   A    No, I don't.

24   Q    Who would know that?

25   A    I'm sure Google would.

1    Q    Do you know --

2              THE COURT:  I'm sorry.  Say that again.

3              THE WITNESS:  I said I would be sure that

4    Google would know how many devices use their services.

5    BY MR. PRICE:

6    Q    Do you know what percentage of devices have

7    location history enabled?

8    A    I don't.

9    Q    What about web and app activity?

10   A    I don't.

11   Q    What about Google location services?

12   A    I don't.

13   Q    Who would know the answers to those questions?

14   A    I would be certain that Google would have

15   statistics on their services being used.

16   Q    Thank you.

17        I want to turn now to the scope of the geofence

18   warrant here.

19              THE COURT:  Before you get there, if you

20   enable YouTube or Google Search when the default has

21   gone to location history off, do you get any kind of

22   pop-up?  Does it change the default?

23              THE WITNESS:  So, across the platform for

24   location history, it's my experience that that prompt

25   comes from Google Maps, but there are certain, as far

McINVAILLE - DIRECT

 1  as YouTube and things like that, other prompts for

 2  them to want to track the web and app activity and

 3  things like that that all fall into those categories

 4  that Google explained earlier or have explained in

 5  their brief.

 6          THE COURT:  But I'm asking specifically about

 7  location history.

 8          THE WITNESS:  So, no, they do not -- I have

 9  not seen them promote location history.

10          THE COURT:  Do you know whether or not the

11  default changes?

12          THE WITNESS:  No, I do not.

13          THE COURT:  You don't know?

14          THE WITNESS:  I do not.

15  BY MR. PRICE:

16  Q   When you were reviewing information about Android

17  version 8 and you came across screenshots of the

18  various prompts here, we saw one that looked just like

19  this; right?

20  A   It's the same screen, besides the sign-in

21  information at the bottom with your account.

22  Q   Were there other prompts that you discovered in

23  your research that trigger location history enabling,

24  such as when you go to photos, my places, for example?

25  A   Nothing that directly activated location history.

1  Q   In the sense that they didn't mention it

2  specifically here?

3  A   Correct, it's not mentioned as location history.

4          THE COURT:  Is it activated?

5          THE WITNESS:  It does activate the sharing of

6  location data for that application but not directly

7  linking the activation of Google location history to

8  that selection.

9  BY MR. PRICE:

10 Q   I want to turn to the scope of the geofence

11 warrant and the question of whether it was really

12 limited to 150 meters.  How big was the geofence here,

13 according to the warrant?

14 A   I believe it was 150 meters.

15 Q   I apologize for making you do math, but do you

16 know what area that is in terms of square meters?

17 A   I don't think I looked up square meters.  I

18 sometimes look it up on Google just to figure out how

19 large of an area it is.

20 Q   Would it surprise you if it was 70,686 square

21 meters?

22 A   No, that wouldn't surprise me.

23 Q   Do you have an idea what that translates into in

24 terms of acres?

25 A   I did try to look it up in acres.  It's about

1   17 acres.

2   Q    Did the bank take up all 17 acres?

3   A    No, it didn't.

4   Q    What else was inside that radius?

5   A    There was a parking lot -- well, a large parking

6   lot, a church, and I believe the back of a hotel or

7   very close to the parking lot and one side of the

8   hotel was also encompassed in that circle.

9   Q    I'd like you to return to Exhibit 3, that raw data

10  on the spreadsheet there.  Go to the same page you

11  were on before, which is page 4 of the PDF itself.

12  A    Okay.

13  Q    Take a look at column F.

14  A    Okay.

15  Q    What's the label on column F?

16  A    "Source."

17  Q    What does that mean?

18  A    It is telling you what type of calculation was

19  made.  So here it displays either Wi-Fi or GPS was

20  used to provide a location.

21  Q    So those are the two sources of location data at

22  issue here?

23  A    That is provided in the data, yes.

24  Q    Do you know how many data points came from Wi-Fi

25  here?

1   A    There were quite a few.  Probably out of the data,

2   I believe over 600.

3   Q    Would it surprise you if it was 605?

4   A    No.

5   Q    Okay.  And that means how many came from GPS?

6   A    There were quite a few.  It was more than 60 or

7   70, I believe.

8   Q    Would it surprise you if it was 75?

9   A    That sounds about right.

10  Q    So the percentage of the initial geofence

11  warrant -- the percentage of the initial geofence

12  returns that came from Wi-Fi, what would that be?

13  A    Over 80 percent.

14  Q    Would it surprise you if it was 88 percent --

15  A    No.

16  Q    -- coming from Wi-Fi?

17       Okay.  Which is more accurate, Wi-Fi or GPS?

18  A    GPS.

19  Q    So based on your training and experience with

20  Google location data in other cases, can you tell us,

21  generally speaking, how Google uses Wi-Fi to locate

22  somebody?

23  A    Yes.  So the phone is constantly scanning for

24  Wi-Fi access points, so a router.  It's constantly

25  scanning and seeing the signal strength from those

1   access points.  Based on the signal strength and

2   Google doing a lot of work to understand where each of

3   those access points is, they can generally understand

4   where you are located based on several points, giving

5   a specific distance to that point.  So, several of

6   those put together helps determine a location for the

7   device.

8   Q    Is it possible, because this data is coming from

9   Wi-Fi with its own range, that the step 1 returns here

10  included devices that were actually outside of the

11  150-meter radius?

12  A    Yes.

13  Q    Why?  How does that work?

14  A    So, of course, the signal coming from the Wi-Fi

15  routers isn't bound by that arbitrary circle that's

16  drawn.  They can spill out farther.  Google doesn't

17  know the exact position of every Wi-Fi access point.

18  So if it's off by where it thinks the access point is,

19  that provides kind of an error in accuracy as far as

20  where it thinks it is.  So if the access point reaches

21  out farther, it could think that the phone was in the

22  circle if it saw that access point versus being

23  outside.

24  Q    What's the typical range of a Wi-Fi network?

25  A    About 150 feet is kind of a general estimate.

1    Q    So, how far outside the radius might the initial

2    search have reached?   Twenty-five meters?

3    A    It possibly could have, yeah.

4    Q    Fifty meters?

5    A    Possibly.

6    Q    So, step 1 can actually include devices that are

7    up to 50 meters outside of that radius.   Do you know

8    what the effective reach, the effective area, of the

9    geofence warrant was here?

10   A    It makes it quite larger.

11   Q    Surprise you if it's 125,000 square meters?

12   A    No.

13   Q    Which would be about 30 acres; is that correct?

14   A    It's probably going to go up quite significantly

15   by adding that extra area.

16   Q    If you add that extra area, what else was inside

17   the effective range of this geofence warrant besides

18   the church and the bank?

19   A    You would include the -- there's a mini store --

20   or a self storage north of the bank and church.

21   Probably more of the hotel and hotel area.   The road

22   going past the church.   There's a business across the

23   street, the wooded area behind the church.   There's

24   quite a bit of stuff in that area.   If you kept

25   expanding, you would just keep --

1  Q    What about residences or apartment buildings?

2  Would it reach some of those, too?

3  A    It possibly could have.  There is a set of

4  apartments that kind of backs up to kind of the back

5  side of the bank, but there's a wooded area there.

6  Q    Right now we're talking about theory, though.  You

7  don't actually know where any of those Wi-Fi access

8  points are located; right?

9  A    No.

10  Q    Who would have that information?

11  A    Google possibly.

12  Q    Why do you think so?

13  A    Well, they've got to have something to base the --

14  you know, they've got to know the general area of the

15  access point to use it as a reference to derive

16  location.  With the GPS system, the reason we're able

17  to determine location is because we know where the

18  satellites are.  So it's a point of reference to then

19  find yourself.

20  Q    And here we don't -- what's the equivalent to the

21  satellites?  We know where the satellites are, so we

22  can figure out our GPS location?

23  A    This would be knowing where the actual access

24  point is.

25  Q    And we don't know where those are?

McINVAILLE – DIRECT                    68

1    A    No, we don't know which points were used.

2    Q    Have they been provided to you by Google?

3    A    No.

4    Q    What would having that information allow you to

5    do?

6    A    You could use their various functions to -- if you

7    knew the access point that was used, its location,

8    signal strength, you could, in essence, kind of

9    recreate or at least see what the results are.  Here

10   we just see the results.

11   Q    Would it allow you to figure out how many hits

12   were likely outside the 150-meter radius to begin

13   with?

14   A    It could.

15   Q    Do you know the range of the Wi-Fi access points

16   in this case?

17   A    No, not specifically.

18   Q    Would Google have that information?

19   A    I don't know that they would have the range.

20   Q    Certainly it hasn't been provided to you, has it?

21   A    No, it has not.

22   Q    If you did have that range, what would it enable

23   you to do?

24   A    I don't know that we would ever get the range, and

25   I don't know that range would exactly assist other

1  than knowing, you know, kind of how far some of the

2  access points may reach.  You would never end up with

3  an actual range.

4  Q   But it would allow you to try and figure out how

5  far outside of the 150-meter radius some of those

6  reach?

7  A   It could.  If you could determine just how far

8  away you could actually see the church's Wi-Fi, it

9  could be quite a bit of distance outside of the circle

10 just based on how close they are to the outer edge of

11 the circle.

12         MR. PRICE:  Your Honor, do you have any

13 follow-up questions?

14         THE COURT:  Let me make sure I understand

15 that.

16         Why don't you restate what you just said.

17         THE WITNESS:  So if the -- again, the circle

18 that has been drawn around this area for the search to

19 be given to Google, that circle doesn't limit really

20 anything other than Google in their search.  Out in

21 the actual -- in this area, if you went and looked,

22 the church's Wi-Fi, which the church is located within

23 the circle, their Wi-Fi could extend out past the

24 circle.  And due to that, those measurements could be

25 taken and actually place you in the circle even if you

 1  weren't in the circle.

 2  BY MR. PRICE:

 3  Q    So, if I can clarify.  Google doesn't know where

 4  the location -- doesn't know the location of the

 5  access point for the church's Wi-Fi; correct?

 6  A    They generally know where it is, but not down to

 7  the specific, exact -- you know, they couldn't walk

 8  into the building, I don't think, and point it out to

 9  you.

10  Q    But they have a general idea where it is, and they

11  know that it's in that circle; right?

12             MR. SIMON:  Your Honor, I would ask that he

13  stop leading the witness.

14             MR. PRICE:  I'm just trying to clarify your

15  point, Your Honor.

16             THE COURT:  I think I understand.

17             MR. PRICE:  Okay.  I'd like to move on, if

18  that's all right.

19  BY MR. PRICE:

20  Q    I want to continue asking you about the scope of

21  the warrant but shift slightly and talk about Google's

22  process, Google's algorithm for determining device

23  location.  So, you just talked generally about how

24  Google uses Wi-Fi to locate devices, but do you know

25  mathematically how Google actually does that?

1    A    Generally, I know the process, but know how they

2    label a display radius or how well they determine the

3    accuracy of their calculation, no.

4    Q    What would you need to know to figure that out?

5    A    I assume we would just need to know what Google

6    knows as far as how they actually process this data to

7    determine how accurate it is.

8    Q    How would you describe that process?  Is it an

9    algorithm?

10   A    I honestly don't know.

11   Q    Why don't you know?

12   A    It never -- I just don't know their inner

13   workings.  Again, I know generally how it operates,

14   but we don't know the fine print here that they have

15   labeled out as to how this works.

16   Q    And if you did know the fine print, what would it

17   enable you to determine in this case?

18   A    It could possibly determine a little more

19   information as to how accurate it is but, again,

20   without knowing what they possibly have or could tell

21   us, I don't know.

22   Q    Would Google have documentation about how this

23   process works?

24   A    I assume they do.

25   Q    Have you seen it?

1   A    No, I have not.

2   Q    What do you think those documents might tell you

3   if you did see them?

4   A    I honestly don't know.  I guess it would outline

5   their policies and procedures on how they're going to

6   conduct a search, how they apply anonymity to these

7   devices and, really, all of the background work that

8   they do.

9   Q    What would it tell you about how far the search

10  may have reached beyond 150 meters?

11  A    I don't exactly know, but, I mean, it could

12  provide some insight into that.

13  Q    To the Wi-Fi access points?

14  A    If they can provide that, yes.

15  Q    Was any of that information in the warrant or the

16  application?

17  A    No, I didn't see any type of request like that.

18  Q    Has any of it been provided to you?

19  A    I haven't seen anything.

20          THE COURT:  So, by the application, you're

21  talking about Defense Exhibit 1?

22          MR. PRICE:  Yes, Your Honor.

23          THE COURT:  Now, Mr. Price, we've been going

24  for a little while here.  Do you have a while more to

25  go?

1        MR. PRICE:  I'm afraid I have a little bit

2   more, Your Honor.

3        THE COURT:  Okay.  That's fine.  I think we

4   should take a little break just to be sure that

5   everybody is fresh.  So we're going to take a

6   10-minute break.

7        I'm going to remind you, sir, that you will

8   remain under oath.  Don't speak to anybody about your

9   testimony or listen to any commentary about it.  And

10  I'll ask anybody here to do the same.

11       We'll just start fresh as if we didn't take a

12  break.  All right?  So let's take a 10-minute recess.

13            (Recess taken from 12:30 p.m. until 12:45 p.m.)

14       THE COURT:  All right, sir.  We'll resume

15  your testimony.

16       MR. PRICE:  Thank you, Your Honor.

17  BY MR. PRICE:

18  Q   Mr. McInvaille, I'd like to turn to the question

19  of whether the data provided by Google in steps 1 and

20  2 is truly anonymous?

21  A   No, I don't believe it is.

22  Q   We're going to talk about it, but thank you.  So

23  Google says that the data produced to law enforcement

24  here is in anonymized form.  You reviewed it.  Can you

25  take a look again at Exhibit 3 and tell us what you

McINVAILLE – DIRECT

1  see?

2  A   Yes.  So they provide device identifiers, date,

3  times, locations, the source of that, and then a

4  radius inside of that data.

5  Q   So you said device identifiers.  Can you tell

6  me -- column A.  Take a look at column A and the

7  column numbers in the far left.  What are those

8  numbers?

9  A   That is the anonymized device ID.

10  Q   Do you know what Google does to anonymize this

11  data?

12  A   I don't know specifically.

13  Q   Do you know their process?

14  A   I do not.

15  Q   Why don't you know?

16  A   It's not -- I don't know that it's published.

17  Q   Would Google have that information?

18  A   I'm sure they do have it.

19  Q   What about the latitude and longitude coordinates

20  in columns D and E?

21  A   That's the estimated location of the device.

22  Q   Are those masked in any way?

23  A   No.

24  Q   So that's the actual location data here?

25  A   Yep.  To their knowledge and to ours, yes.

1  Q    What were you able to do with this supposedly

2  anonymous information?

3  A    With the step 1, you can take the information and,

4  by device ID, plot out each of the devices and their

5  locations that were returned in that first step.  And

6  then in the second step, it is the same devices but

7  with an expanded time frame and the absence of a

8  restriction on location.

9  Q    So you took these latitude and longitude

10 coordinates from columns D and E, and you did what

11 with them?

12 A    You can plot them on the map.  I organized them by

13 the device IDs.

14 Q    So did you do that here?  Did you prepare a

15 demonstration for us?

16 A    I did.  There's a subset of those in a

17 demonstration.

18 Q    Let's talk about what you did for that

19 demonstration.  You made a visual representation of

20 some of this data provided by Google?

21 A    Correct.  So I took -- by device ID, I mapped out

22 each of the locations provided.  And we did that in

23 two steps.  So you have the first step that shows the

24 location for a particular device during the first step

25 or the first return from Google.

1     We then take that same device ID and now use the

2  data that was returned based on the step 2, which

3  removed the circle, the limitation as far as location,

4  and the expanded time frame, and then you can see

5  general movements for a portion of that data.

6  Q    So this visual representation of some of the data,

7  here you made a short video?

8  A    Yes.

9  Q    Two minutes and 46 seconds?

10  A    Correct.

11  Q    And you have that video on a DVD marked Exhibit 5?

12  A    Yes.

13  Q    Have you reviewed that DVD before coming into

14  court today to verify that it is the same one as the

15  video that you made?

16  A    I did.

17  Q    And you marked the DVD with your initials

18  reflecting that?

19  A    I did.

20        MR. PRICE:  I would like to move to admit the

21  video into evidence as Exhibit 5 and remind the Court

22  that this is under seal because it is based off of the

23  same raw data.

24        THE COURT:  All right.  No objection?

25        MR. SIMON:  No objection, Judge.

McINVAILLE - DIRECT                77

1           THE COURT:  All right.  It's entered under

2   seal.

3           MR. PRICE:  Thank you, Your Honor.

4           (Defendant's Exhibit No. 5 is entered under

5   seal.)

6   BY MR. PRICE:

7   Q   Mr. McInvaille, can you please walk us through

8   what we are looking at here?

9   A   Okay.  So this is device ID 965610516.  This is

10  the stage 1 request information that came back on that

11  number.

12          THE COURT:  Can you say the device number

13  again?

14          THE WITNESS:  Yes.  It's 965610516.

15          THE COURT:  Okay.

16  BY MR. PRICE:

17  Q   And for our purposes today, how do you want to

18  refer to this?

19  A    This is the -- the color is the easiest.  So this

20  is green.  What you'll see on the map is the locations

21  that we've been discussing throughout.  The circle,

22  which is in red, represents the geofence that was laid

23  on the map, as well as a green dot with a date and

24  time, of which that was the estimated location for

25  that device at that time.

1   Q    Where's that dot located?

2   A    For this particular map, it's there on top of

3   the -- which is the church.

4   Q    All right.  Why don't you go ahead and play it and

5   tell us what happens next.

6   A    The video will sit here for just a moment so that

7   you can see the beginning.  So, I'll pause here.

8   We're moving back in time now.  So, in the stage 2

9   request, we kept the same device identifiers but now

10  expanded the time frame to before and after the

11  incident, as well as removed the location restriction.

12          THE COURT:  So this is a stage 2?

13          THE WITNESS:  Correct.  So this would have

14  been -- this would have been the data -- the data used

15  to create this portion here was from the stage 2

16  production that Google made.

17          THE COURT:  So it's the broader time frame

18  before and after.  And what's the other distinction?

19          THE WITNESS:  No location restriction.  So

20  instead of just asking for inside of the circle, there

21  was no restriction on this request.

22          THE COURT:  How do we know that?

23          THE WITNESS:  I believe it's indicated in the

24  search warrant.  That would be the next step, or -- it

25  was either there or in the email request.  I can't

1   recall right offhand.

2           THE COURT:  All right.

3   A   So the first point that shows up is at 3:50 p.m.

4   that afternoon.  And you see that the dot is located

5   on top of the hospital.  I believe it was

6   Johnston-Willis, if I'm correct.  There at the

7   hospital.  And what you'll see at the beginning is

8   several points are located in a cluster at that

9   location prior to leaving that location.  And I'll

10  start now.

11      You see several of those points appear.  And then

12  now we see them begin to move away from that location,

13  and they will move in a southern direction.

14  BY MR. PRICE:

15  Q   Tell us, what does the increased spacing indicate

16  to you?

17  A   Definitely there was some travel from the area of

18  the hospital down south to now where you see the

19  original circle where we saw in the very beginning.

20      So, in this portion here, you will notice the kind

21  of general direction of travel as well as the timing

22  of that travel.

23      And in the next portion, you will see where --

24          THE COURT:  Why don't you put those numbers

25  on the record.

1          THE WITNESS:  Okay.

2          THE COURT:  The timing.  Down south is down a

3    road, which I think is marked as Commerce Road?

4          THE WITNESS:  I can give them, yes, ma'am.

5          THE COURT:  And then it returns to the

6    church.  So what kind of time frame is that in?

7          THE WITNESS:  So, this is 28 seconds in the

8    video.  And you will see the first dot in the northern

9    portion of the frame is at 4:36:59.  The next being

10   just south of that.  And I don't recall the name of

11   that.  It looks to be Courthouse Road, possibly.  The

12   next dot is at the intersection of Hull Street and

13   Courthouse at 4:39 p.m.

14         THE COURT:  I don't want to identify who the

15   user is.  I just want a sense of the timing.  So, you

16   say you see there's travel.  Is it five minutes?  Is

17   it 30 seconds?

18         THE WITNESS:  I understand.

19         From the intersection of Courthouse Road and

20   Hull Street, there is -- to the next point is about --

21   just over four minutes.  And then arrives at a

22   residence.

23         THE COURT:  Okay.  Now, what I'm really

24   trying to get a sense of is how far the distance is,

25   without specifics, and how long it takes.  So, for

1  instance, Johnston-Willis Hospital was not in the red

2  circle; correct?

3          THE WITNESS:  Correct.

4          THE COURT:  Do you have an estimate of how

5  far outside the red circle it was?

6          THE WITNESS:  Bear with me one second.  More

7  than seven miles.

8          THE COURT:  All right.  That's the kind of

9  general information I'm looking for.  Okay?

10          THE WITNESS:  Yep.  Moving into the area,

11  once it comes down south towards the circle, you

12  have -- from the time it gets here to then in the

13  circle and then past the circle is about three --

14  excuse me -- four minutes and some seconds, and then

15  moves even farther down to a particular residence.

16          THE COURT:  And the residence is also outside

17  the circle?

18          THE WITNESS:  Correct, it is.

19          THE COURT:  All right.

20          THE WITNESS:  So once it gets to the area of

21  that residence, you will see again another cluster of

22  points showing up indicative of that device stopping

23  at that general location.

24          THE COURT:  Okay.

25  BY MR. PRICE:

McINVAILLE - DIRECT                    82

1   Q    Can we just summarize what happened with Mr. Green

2   here?

3   A    Yes.

4   Q    Where did Mr. Green start?

5   A    The hospital up north.

6   Q    And then he drove south?

7   A    Correct.

8   Q    And passed by the bank, the church, what?

9   A    So it appears, based on the timing -- I'll scroll

10  back here.  It appears, based on the timing of those

11  three points, that the device was passing by.  So not

12  that it necessarily had to stop inside of the circle

13  when it shows up.  That dot that you see inside the

14  circle at 4:41:45 is the one that shows up in the

15  stage 1 return.

16  Q    And that's inside the church or the bank?

17  A    It shows on top of the church.

18  Q    So after passing by the church, after showing up

19  on the church, you said it settles on top of a

20  single-family residence?

21  A    It does.

22  Q    Were you able to determine whose house that was?

23  A    I reviewed tax records for the county and

24  determined some names for that location.

25  Q    And were you able to include -- draw a conclusion

1   about the likely identity of Mr. Green?

2   A    Not necessarily the exact identity, but generally

3   a family, I assume, who lived there.

4   Q    Would that information be identifiable to law

5   enforcement as well?

6   A    It could be, yes.  They're resources to look at.

7   Q    Let's go ahead and take a look at the next one.

8   A    So, moving to the next example, this device ID is

9   907512662.  And what you see on the map is the -- is a

10  single dot on top of the church.  And what this is is

11  the return for that device ID during the stage 1

12  production by Google.

13           THE COURT:  And it's blue?

14           THE WITNESS:  Yes, it is.

15  BY MR. PRICE:

16  Q    Why don't you go ahead and --

17  A    So, in the beginning of now the data for that same

18  device ID that begins prior to the incident, it shows

19  up at the apartment complex just to the south of the

20  circle, less than a thousand feet away.  And during

21  that time, you'll see -- as it begins, you'll see

22  several points show up in that general area of the

23  apartments.  And then shortly after, you will start to

24  see a trend in movement to the north, likely by the

25  road there beside the church.

1    Based on the timing, you have about a minute and

2    eight seconds, or so, until the -- from the time the

3    device is last showing at the apartments to the south

4    where it originates up until the point that it gets up

5    to -- towards Hull Street.

6    When we continue, it begins to move down Hull

7    Street before making another trend down to the south

8    towards another residence.  So once we get down to

9    this other residence farther south of the circle, we

10   see several dots appear on a single-family residence

11   here.  Remains there just a bit before leaving and

12   heading back north.

13         THE COURT:  Before doing what?  I'm sorry?

14         THE WITNESS:  Before heading back north.  And

15   in the video, you'll see it returns back to the

16   beginning location at the apartments.

17         And just for reference, Judge, just about --

18   it appears to be over a mile away from -- the

19   residence is -- from the circle down south.

20   BY MR. PRICE:

21   Q   Can you walk us through the chronology here like

22   you did with Mr. Green?  Can you walk us through the

23   chronology for Mr. Blue?

24   A   So, blue begins at the apartments here shown on

25   the map, leaves in a northern direction, very likely

1    up the road beside the church, heads up to Hull

2    Street.  Appears to head to the right on Hull Street

3    before coming back and making a southern travel down

4    to that house that's a little over a mile away from

5    the circle.  And then after making that visit, returns

6    back to the apartment complex where it began.

7    Q    So what were you able to determine about the

8    likely identity of Mr. Blue from this data?

9    A    So, blue is a little more difficult just due to it

10   originating in an apartment complex.  As we all know,

11   many people live in an apartment complex, and this is

12   not precise enough to show which apartment is being

13   used.

14       But based on the other travel to that known

15   location, the single-family residence down south,

16   determining identity of those individuals based on tax

17   records and other open-source information, that, in

18   conjunction with other open-source means, could help

19   you determine who could have left from the apartment

20   complex.

21   Q    Let's talk about those additional databases.

22            THE COURT:  Before you get there, how long of

23   a period of time did this cover in tracking the blue

24   dots?

25            THE WITNESS:  Both -- all of these, based on

McINVAILLE – DIRECT                    86

1   the stage 2 request, are all an hour before the

2   incident and an hour after.  So that's how it's

3   bracketed.

4           THE COURT:  Well, this particular one.

5           THE WITNESS:  It's very close to that.  It

6   appears the first point shows up at 3:55 p.m.  The

7   final showing up almost 5:50 time frame.

8           THE COURT:  Okay.  And is there any spot for

9   the blue example that appears inside the circle other

10  than the step 1 return information?

11          THE WITNESS:  No, ma'am, it does not.

12          THE COURT:  All right.  I'm done.

13  BY MR. PRICE:

14  Q   Based on your experience as a law enforcement

15  official, are you aware of any additional tools that

16  may be available to law enforcement to help identify

17  somebody based off of this open information that you

18  have?

19  A   Yes.  We had information like Sky X and Linx that

20  we could use to search names, locations, things such

21  as that, that would help during an investigation,

22  trying to identify people based on places that they

23  frequent.

24          THE COURT:  You're going to have to describe

25  what those are and maybe spell them.

1        THE WITNESS:  Okay.  Linx is L-i-n-x.  It's

2   essentially a database that we had access to.

3   People's -- different agencies' reports and things

4   would go in there so you would be able to search names

5   and vehicles, things like that, so you could see past

6   history on different people based on if they were

7   involved in different things.

8   BY MR. PRICE:

9   Q    And one of those different things, would that be a

10  traffic ticket?

11  A    Yeah, it would be as simple as a traffic ticket or

12  just filing some type of report from something being

13  stolen.  It could be really anything, any interaction

14  with local law enforcement or anybody who entered that

15  data into a report.

16  Q    And something like that would give you an address

17  associated with a name?

18  A    Yeah, you could have several identifiers.  You

19  could have varying things from addresses to vehicles.

20  Q    Did that happen in this example?

21  A    Was that requested?

22  Q    When you were looking at the data for Mr. Blue,

23  did you come cross any records of one of those

24  incidents?

25  A    So a name that was listed under tax records for

1  the residence that was visited down to the south, one

2  of those individuals did have where they had paid a

3  traffic ticket in the past just a few years back.

4  Same address.

5  Q   So, would law enforcement be able to figure out

6  the identity of Mr. Blue using these tools?

7  A   I think generally you could, based on the

8  combination of information.  Again, it would -- not so

9  much down to maybe the specific person, but I think

10  you could narrow it down to a very small group of

11  people based on these locations.

12  Q   Thank you.

13      Can we turn to the final example here?

14  A   So, here in the third example, we're looking at

15  device ID 1305167661.  On the map you will see three

16  yellow dots.  They also have corresponding times.

17      These dots show up at the -- either both -- there

18  are two on the bank and then one right beside the

19  bank.  And then, again, we're going to move into

20  stage 2 of the request and see the data prior to this,

21  earlier in the day, for this same user.

22  Q   So we're going back one hour now?

23  A   Yes.  So this starts at 3:51 p.m.  And what you'll

24  see is a data point again on top of a single-family

25  residence.  And for a moment here, you will see

1    several locations show up there at that same residence

2    prior to moving just a short distance north.

3           THE COURT:  So is the single-family residence

4    outside the circle?

5           THE WITNESS:  It is.  In just a moment when

6    this zooms out, I can tell you the approximate

7    distance.

8           Just after being at the single-family

9    residence, it moves just a very short distance north

10   to this location, which is the Manchester High School

11   there on Bailey Bridge Road.  It appears to show up

12   there in front of the school for just a brief moment

13   before continuing north.

14          I would say it's approximately three or

15   four miles from the circle is that original location.

16   BY MR. PRICE:

17   Q   So the single-family residence where this starts

18   an hour before the incident is how many miles from

19   the --

20   A   A few.  Three or four miles at least.

21   Q   Okay.

22   A   So, continuing, you'll see the trend north as it

23   moves towards the red circle.  So then you see that

24   device move into the circle there at the original dots

25   that we spoke of that show up at the bank, which would

1    have been returned in the stage 1 request.

2        As we continue, you will then see that device move

3    out -- move away from the circle and then move over to

4    another kind of business area there on the same -- on

5    Hull Street for just a moment before heading back

6    south to its original location down at the

7    single-family residence.  And, again, that happens in

8    that same time period as we've been speaking about.

9    Q    So, can you just summarize the chronology for

10   Ms. Yellow as well?

11   A    Yes.  So, again, that device starts out south of

12   the red circle at that single-family residence, moves

13   up towards the area of the Manchester High School.

14   Continuing north after that and going to the bank.

15   Leaving the bank area, going to some other -- in the

16   general vicinity of those other businesses on Hull

17   Street before returning back to the original location

18   of the home.

19   Q    So based on that information, were you able to

20   draw a conclusion about the likely identity of

21   Ms. Yellow?

22   A    So, again, I started with tax records for that

23   residence, located a name for an individual there.

24   Also looked at that individual's information on

25   Facebook and was able to see a group, a family, a

1   husband and wife, who also have a high school-age son

2   in some of their pictures, referenced some of his ROTC

3   events.  So, yeah, I would say that, generally

4   speaking, we were able to determine a likely group of

5   people that that device belongs to.

6   Q    And would this information be as identifiable to

7   law enforcement as it was to you?

8   A    Sure.

9   Q    Even in this anonymized form?

10  A    Yes, it is.

11  Q    Thank you.

12          THE COURT:  Let me just make clear.  Of the

13  yellow points that you have just indicated, how many

14  other than the three that showed up at step 1 or

15  stage 1 are inside the circle?

16          THE WITNESS:  Just those three.

17          THE COURT:  All right.  Thank you.

18  BY MR. PRICE:

19  Q    So, do you agree with Google's characterization of

20  the step 1 and step 2 returns as anonymous?

21  A    I do not.

22  Q    Why?

23  A    Our location and our frequent locations or our

24  trend of locations in a particular amount of time is

25  indicative of our identity.  Individuals, different

1  groups of families even, you know, go to different

2  places.  So, yeah, our location is part of our

3  identity.

4  Q    Why does Google describe it as anonymized, then?

5  A    Because all they did was strip away the

6  unanonymous ID that can later be revealed.  That's all

7  they stripped away.

8  Q    Do you know how they came up with the anonymized

9  figures here?

10 A    I don't.

11 Q    Do you know if they have any relation to the

12 actual Google ID?

13 A    I don't know that.

14 Q    Why?

15 A    I haven't seen it published.

16 Q    Would Google have policies and procedures that are

17 relevant to this question?

18 A    I would assume they do.

19 Q    Why do you think so?

20 A    They receive many of these requests a day, a year.

21 I would think that there's some process or, you know,

22 policy that dictates how these will be responded to

23 and searched.

24 Q    What might those policies tell you?

25 A    Kind of hard to say.  I'm sure, again, it would

1  dictate how they do the request, what they deemed

2  acceptable based on the request.  It could be

3  anything.

4  Q    And has any of that information been provided to

5  you?

6  A    Not that I've seen.

7  Q    All right.  Thank you.

8      So, I want to turn briefly to the question of

9  voluntariness here.  I seem to have misplaced a page.

10 Here we go.  I'm sorry.

11     So, we talked a lot about step 1.  I want to turn

12 now to steps 2 and step 3 and the question of how law

13 enforcement worked with Google to narrow the 19

14 initial hits down to 9 and then 3.  Can you tell us

15 what occurred at step 2 in this process?

16 A    So step 2 ended up being 9 of the original 19 that

17 showed up in the circle.  And then for that nine, they

18 expanded time frame again to an hour before and an

19 hour after and removed the geographical limit.

20 Q    Have you reviewed any of the correspondence

21 between law enforcement and Google about this request?

22 A    I have.

23 Q    Can you turn to the document marked as Exhibit 6

24 in your packet?

25 A    Yes.

McINVAILLE - DIRECT                            94

1   Q    Do you recognize the document?

2   A    Yes, I do.

3   Q    What is it?

4   A    It's an email between -- I believe it's Detective

5   Hylton and -- as well as the -- it just says the

6   Google team.  So I assume Google's legal response

7   group.

8   Q    And it's the correspondence that you've reviewed

9   in this case?

10  A    Yes.

11          MR. PRICE:  I'd like to introduce that into

12  evidence as Exhibit 6, please.

13          THE COURT:  Any objection?

14          MR. SIMON:  We won't object, Your Honor.

15          THE COURT:  Okay.  It will be entered.

16          Just for the record, Hylton is H-Y-L-T-O-N.

17          (Defendant's Exhibit No. 6 is admitted into

18  evidence.)

19  BY MR. PRICE:

20  Q    In this request for step 2 data, starting from 19,

21  how many users does Google -- does law enforcement ask

22  Google to provide additional information on in step 2?

23  A    It appears all 19.

24  Q    All 19.  Okay.  So, step 1 was 19, and step 2 they

25  also requested all 19, expanded data on all 19?

McINVAILLE – DIRECT                    95

1    A    It is with, you know, another sentence that if

2    they feel it's unreasonable, that they may use the

3    numbers that are listed 1 through 9.

4    Q    Who's "they" in that case?

5    A    I'm sorry?

6    Q    Who's "they" referring to?

7    A    "They" being -- Hylton appears to be the author of

8    this email.  So he advised that they could, if they

9    saw that this request was unreasonable, that they

10   could use 1 through 9 if it fit more likely.

11   Q    "They" being Google?

12   A    Oh, Google, yes.  I'm sorry.

13   Q    So, Google is the person who's going to determine

14   what's relevant.  Okay.  Can you turn to Exhibit 7,

15   marked Exhibit 7?

16   A    Okay.

17   Q    Do you recognize the document?

18   A    Yes, I do.

19   Q    What is it?

20   A    Another correspondence between Hylton and Google.

21   Q    And that's the correspondence that you reviewed in

22   this case?

23   A    Yes.

24        MR. PRICE:  I'd like to introduce that as

25   Exhibit 7, Your Honor.

1        THE COURT:  Any objection?

2        MR. SIMON:  No objection, Your Honor.

3        (Defendant's Exhibit No. 7 is admitted into

4   evidence.)

5   BY MR. PRICE:

6   Q   Can you tell us what that document says?

7   A   Again, it says it's writing to inquire about my

8   correspondence on 7-1 and 7-2.  It's, again,

9   requesting the same -- it's the same exact request,

10  just a follow-up on, I assume, a nonresponse from

11  Google.

12  Q   And how many users does that ask for additional

13  data on?

14  A   The request doesn't change.  All they did was add

15  the paragraph at the top.  So, the 19, but still with

16  the added piece that you could just do the 1 through

17  9.

18        THE COURT:  Use the language correctly.  It

19  says "If this request seems unreasonable, please keep

20  in mind that Google device numbers 1 through 9 may fit

21  the more likely profile of the parties involved."  You

22  don't need to paraphrase it.  You should say it.

23  Thanks.

24  BY MR. PRICE:

25  Q   I'd like you to turn to Exhibit 8 in your packet,

1   please.  Do you recognize that document?

2   A    I do.

3   Q    What is it?

4   A    Again, correspondence with Hylton and Google team.

5   Q    And this is concerning which step of the process?

6   A    Still appears to be the step 2, but it has now

7   been just narrowed down to devices 1 through 9.

8   Q    Do you have any idea how law enforcement --

9            THE COURT:  Well, first of all, is Exhibit 8

10  being moved into evidence?

11           MR. PRICE:  Oh, yes, Your Honor.  I'm sorry.

12           THE COURT:  Any objection?

13           MR. SIMON:  No objection, Your Honor.  I

14  don't think it's on the screen.

15           THE COURT:  It does need to get on the

16  screen.

17           MR. PRICE:  It is right now.

18           THE COURT:  Pardon me?  It's not on the big

19  screen.

20           THE CLERK:  It just takes a minute once it's

21  admitted.

22           THE COURT:  Got it.  That's why it wasn't on,

23  because it wasn't admitted.  So that is also entered.

24  Thank you for doing it correctly.  All right.

25           (Defendant's Exhibit No. 8 is admitted into

 1   evidence.)

 2            MR. PRICE:  Thank you.

 3   BY MR. PRICE:

 4   Q    Mr. McInvaille, do you know how law enforcement

 5   finally narrowed their list down from 19 to 9?

 6   A    I don't know the specifics, no.

 7   Q    Why don't you know?

 8   A    It's not in the correspondence that I've seen.

 9   Q    Did any of those nine seem like odd choices to

10   include to you?

11   A    I'm trying to remember the color.  The color was

12   blue, I believe.  That, if I had to say, blue is an

13   odd entry into this group.

14   Q    Were there any others?

15   A    Really, the -- I mean, honestly, once you -- well,

16   for the stage 2, both green and blue would have been

17   odd for the moving to the stage 9 process.

18   Q    Why did the inclusion of Mr. Green in the stage 2

19   process strike you as odd?

20   A    There was just one single point at the church.

21   Q    At the church, not the bank?

22   A    Right.

23   Q    And compared to other people?

24   A    Some -- there were others that were -- that showed

25   up at both the church and the bank.  There were some

1  that just showed up at the bank, and then there were a

2  few that only showed up at the church with just single

3  points.

4  Q   So who would know why law enforcement included

5  Mr. Green in stage 2?

6  A   I'm not sure.

7  Q   Would law enforcement know?

8  A   I assume they would.

9  Q   Would Google know?

10 A   They may if they had discussion with --

11            THE COURT:  You said they would or would not?

12            THE WITNESS:  I assume they would.

13 BY MR. PRICE:

14 Q   Would the magistrate judge who issued this warrant

15 know?

16 A   Oh, I don't know.

17            THE COURT:  I'm sorry.  You're sort of

18 looking down.

19            THE WITNESS:  I'm sorry.  I don't know.

20            THE COURT:  You don't know?

21            THE WITNESS:  No, ma'am.

22            THE COURT:  Just to be clear, can you

23 identify what numbers blue and green are on the list?

24            MR. PRICE:  With the corresponding device ID?

25            THE COURT:  Yes.

1          THE WITNESS:  Yes.  Green is 965610516.  Blue

2    is 907512662.

3          THE COURT:  And can you look at the list and

4    identify which ones those are in 1 through 9?

5          THE WITNESS:  Yes.  It is -- the green is

6    number 5 on the list.  Blue is number 8 on the list.

7          THE COURT:  All right.

8    BY MR. PRICE:

9    Q    Let's talk about step 3 here for a second.  You

10   reviewed the correspondence with Google about step 3?

11   A    Yes, I believe so.

12   Q    Can you turn to Exhibit 9, please, in your packet?

13   Do you recognize the document?

14   A    Yes.

15   Q    What is it?

16   A    Another email from Hylton to Google legal team.

17   Q    And that's the correspondence you reviewed in this

18   case?

19   A    Yes.

20          MR. PRICE:  I'd like to introduce that as

21   Exhibit 9, please, Your Honor.

22          THE COURT:  Any objection?

23          MR. SIMON:  No objection, Judge.

24          THE COURT:  All right.  It will be entered.

25          (Defendant's Exhibit No. 9 is admitted into

1   evidence.)

2   BY MR. PRICE:

3   Q    What additional data did the government receive

4   from Google in step 3?

5   A    I'm just going to read it.  "Please send

6   subscriber information for the above device IDs as

7   soon as possible."

8        So they asked -- law enforcement asked for the

9   subscriber information for all three devices, device

10  IDs, listed in this request.

11  Q    Can you turn back to the raw data in Exhibit 2,

12  please?  Oh, I'm sorry, Exhibit 3.  And the first page

13  of the last return, it is the fifth from the last

14  page.  It says "Stage 3 Return.CSV" at the top.

15  Sorry.  The fourth from the end.

16  A    I have it.

17  Q    Do we have it on the screen?  Great.  Can you tell

18  us what is in column A?

19  A    Column A is the Gaia ID.

20          THE COURT:  To be clear, this is a two-column

21  listing, which differs from the earlier listings that

22  had several, A through F or E.  This just has A and B,

23  and it has four rows under it.

24          Sorry to interrupt.

25  BY MR. PRICE:

McINVAILLE - DIRECT                    102

1    Q    Do you know what a Gaia ID is?

2    A    It's what they call the Google accounts ID,

3    administration ID.

4    Q    So, what's the significance of providing the Gaia

5    ID in this case?

6    A    So, this is the unanonymized number now.  In this

7    column here, it's displayed as a formal just because

8    of how the table was printed.  So that's not the full

9    number.

10          THE COURT:  I'm sorry.  Google accounts what?

11          THE WITNESS:  Google accounts ID

12   administration.

13          THE COURT:  Okay.  Pardon me.

14   BY MR. PRICE:

15   Q    And you're saying that the plus 11 in all of those

16   numbers indicates that the number is actually much

17   longer?

18   A    Yes, it is.

19   Q    And that gives a -- corresponds to the

20   pseudonymous device IDs?

21   A    Correct.  So, you have the Gaia ID, which is the

22   actual ID for the user.  In a corresponding column to

23   the right of that marked device ID, which is what

24   we've been seeing in the stage 1/stage 2 requests,

25   and that is the anonymous number.  So now what it's

1   giving you is it's labeling the anonymous number with

2   its real number now so that it can be identified.

3   Q   Do you know how law enforcement narrowed the list

4   of nine down to these three?

5   A   No, I don't.

6        THE COURT:  Do you know who narrowed it down

7   to three?

8        THE WITNESS:  I believe Hylton was the

9   requester for that.

10        THE COURT:  Okay.

11   BY MR. PRICE:

12   Q   Did any of these three seem like odd choices to

13   include to you?  We just talked about --

14   A   Yep.  So, the device ID ending 2662, which was the

15   blue example that we reviewed, that is the ID that you

16   see earlier in the day at the apartments passing by

17   the -- on the road there past the church and then

18   returning back to the apartments.  That ID made it to

19   the final three.

20   Q   Why did it strike you as odd that that ID would

21   make it to the final three?

22   A   From looking at the data, it appears that the

23   device only passed by the location, not having time to

24   stop.  It just doesn't appear that there was time in

25   there to even stop through the geofence based on the

1    data that was given in stage 2.

2    Q    Do you recall what time of day Mr. Blue hit inside

3    that geofence?

4    A    It was 4:35:45.

5    Q    How many minutes was that before the incident?

6    A    I believe about 20 minutes.  I don't know the

7    exact time.  I think it was just before 5:00.

8    Q    So he only hit once in the church 20 minutes

9    before the robbery?

10   A    Correct.

11   Q    But he was included in the final three here?

12   A    Correct.

13   Q    Do you know why law enforcement might include

14   someone who wasn't at the bank or in the parking lot?

15   A    I'm not sure.

16   Q    Do you know who might know?

17   A    I assume Hylton, since he made the request.

18   Q    What about the magistrate judge who issued this

19   warrant?

20   A    Oh, I have no idea.

21   Q    So, you can't tell, based on the information you

22   have, how the government went from 19 down to 9 down

23   to 3?

24   A    No.

25   Q    What would you need to know?

1   A    I assume their thought process as to what

2   constitutes needing to know more about each dot that

3   shows up.

4   Q    So you'd want to know how the law enforcement

5   officers made their determinations here?

6   A    Yes.  I would assume that there's a reason behind

7   choosing certain IDs over another.

8   Q    Anything else you would want to know?

9   A    I'm sure that would be helpful, just the reasoning

10  behind it, and just the application how it was -- how

11  the data was applied to the map to get an

12  understanding of what it was telling you.

13  Q    All right.  Thank you very much.

14        THE COURT:  I want to ask one question about

15  these exhibits.  These communications, Exhibits 6, 7,

16  8, and 9, is there anything on the exhibits themselves

17  to identify the date and time they were transmitted?

18        THE WITNESS:  No, I do not think there are.

19  The only one that has any reference of date and time

20  was one of the follow-up emails that references a

21  prior request on 7-1 and 7-2, but that's all.

22        THE COURT:  All right.  Thank you.

23        MR. PRICE:  No further questions at this

24  point.  Thank you, Your Honor.

25        THE COURT:  All right.

1      Mr. Simon, do you anticipate a long cross?

2      MR. SIMON:  Judge, I think probably between

3  30 and 45 minutes.

4      THE COURT:  Why don't we, then, just take,

5  again, a 10-minute recess just so that we can all

6  catch our breath.  I do appreciate that you all showed

7  up timely.  I want to be sure that we keep things

8  moving, and so it will just be ten minutes.  I have

9  2:26.  And I'll ask you all to be back again.  Sir,

10  you will remain -- I'm sorry.  1:26.  Daylight Saving

11  Time happened.

12      Sir, you will remain under oath, and I'll

13  advise you again, don't speak to anybody about your

14  testimony, and I'll ask everybody here not to speak to

15  him.  All right?  Ten-minute recess.

16      (Recess taken.)

17      THE COURT:  All right.  Mr. Simon, are you

18  prepared for cross?

19      MR. SIMON:  Yes, Judge.

20      THE COURT:  I remind you that you are under

21  oath, sir.

22      THE WITNESS:  Yes, ma'am.

23

24

25

1      CROSS-EXAMINATION

2   BY MR. SIMON:

3   Q    Mr. McInvaille; is that right?

4   A    Yes, sir.

5   Q    Good afternoon.

6   A    Good afternoon.

7   Q    Mr. McInvaille, you've been called to testify in

8   this hearing.  And your testimony, if I understand it

9   correct, is that you have -- you have to opt in in one

10  form or another into Google to collect your location

11  history; is that correct?

12            THE COURT:  Now, Mr. Simon, you're definitely

13  going to have to be closer to the microphone.  It's

14  natural to look at the witness, but when you do that,

15  your face is away from the microphone.

16            MR. SIMON:  Understood, Judge.  And my

17  apologies.

18  BY MR. SIMON:

19  Q    Mr. McInvaille, you've been called to testify in

20  this hearing today.  And, as I understand, your

21  testimony on direct examination was on a few fronts.

22  First, you say on location history the user has to opt

23  in for the collection of that location history;

24  correct?

25  A    That's correct.

McINVAILLE - CROSS                    108

1   Q    And your testimony with respect to the clarity

2   about that location information -- if we could pull

3   back up exhibit -- Defense Exhibit 4 and just go to

4   the end of that video and pause it.

5   A    The very end?

6   Q    Yes, the very end of Defense Exhibit 4.

7   A    Okay.

8   Q    Okay.  And so once that clears off the screen, can

9   you read what -- this is the 4-minute-45-second mark

10  of Defense Exhibit 4.  Can you read for the Court

11  what's there on the screen there?

12  A    Yes, sir.  It says "Get the most from Google

13  Maps."  Then "Google needs to periodically store your

14  location to improve route recommendations, search

15  suggestions, and more.  Learn more."  And then the

16  indicator is "yes, I'm in" or "skip."

17  Q    And you didn't click the "learn more" box in this

18  simulation; is that right?

19  A    Not in the video, no, sir.

20  Q    Okay.  But if you did click that "learn more" box,

21  you'd be told about what type of information they're

22  storing, how long they're storing it; right?

23  A    It takes you to the Google terms and privacy

24  agreements.  It takes you to their website where all

25  of that is located.

1    Q    So if you wanted to know, you could know; right?

2    A    Correct.

3    Q    It's clearly on that screen; right?

4    A    That's where you would navigate to it, yes.

5    Q    And with respect to your work with geofence

6    warrants -- you testified that you generally work with

7    geofence warrants.  Can you say that with more

8    clarity?  How many times have you examined a geofence

9    warrant?

10   A    I don't know about how many times.  I've looked at

11   several throughout several states.  I see them quite

12   often in North Carolina where I do a lot of work.  A

13   dozen.

14   Q    Okay.  A dozen.  And so your understanding --

15   right? -- is that there are three steps; correct?

16   A    Well, that's what they outlined in the brief, yes.

17   Q    Okay.  And you've looked at the search warrant in

18   this case in Defense Exhibit 2; right?

19   A    Correct.

20   Q    Okay.  And in that process, there's a multistep

21   process.  Step 1 is going to be from 4:20 to 5:20; is

22   that right?

23   A    I believe so, yes.

24   Q    Okay.  And that's going to be what we've been

25   talking about as inside the box; right?

1  A    Correct.

2          THE COURT:  Wait a minute.  What are you

3  referring to?

4          MR. SIMON:  We're referring to Defense

5  Exhibit 2, Your Honor.  This is the search warrant in

6  the case he was testifying to earlier about the

7  difference steps --

8          THE COURT:  The search warrant is Exhibit 1.

9  The Google amicus brief is Exhibit 2.

10         MR. SIMON:  My apologies, Your Honor.  I've

11  been asking the witness about Defense Exhibit 1.  My

12  apologies.

13         THE COURT:  That's all right.

14  BY MR. SIMON:

15  Q    And I'm referring to what would be, essentially,

16  the fourth listed page of Defense Exhibit 1.  That'll

17  be attachment 2.  It starts as attachment 2 and

18  basically outlines this process, this three-step

19  process.  First step is going to be inside that

20  150-meter radius; correct?

21  A    You're on page 3?

22  Q    I'm just asking you about the search warrant.

23  A    Yes, it is.

24  Q    Okay.

25         THE COURT:  Well, he's allowed to look at the

1    documents.

2              MR. SIMON:  Understood, Judge.

3              THE COURT:  So, you should give your answer

4    based on the documents.

5    A    I just thought you referred me to a page.  That's

6    just what I was clarifying.

7    BY MR. SIMON:

8    Q    Okay.  And so stage 1 gives you points that are

9    inside of that 150 meter radius; correct?

10   A    Correct.

11   Q    And then law enforcement can get additional

12   location information for 30 minutes before; correct?

13   A    Yes.

14   Q    And then 30 minutes after; correct?

15   A    Correct.

16   Q    And that's stage 2; right?

17   A    Correct.

18   Q    But in stage 1, you only get points that are

19   inside that radius; correct?

20   A    That's correct.

21   Q    All right.  Now, you've been testifying a little

22   bit about the anonymous nature of the returns in this

23   case.  And the raw data is Exhibit 3, but I won't

24   necessarily walk you page by page through that.  But

25   you've testified about a Mr. Green, a Mr. Blue, a

McINVAILLE - CROSS                112

1    Mr. Yellow; right?

2    A    Correct.

3    Q    And Mr. Green, in your three-pass video, Defense

4    Exhibit 5, that starts at about the 28-second mark

5    and it ends 1516, the identifier.  You don't know who

6    Mr. Green is; correct?

7    A    No, sir.

8    Q    And Mr. Blue, that starts at about, I think, the

9    1 minute and 50 second mark of Defense Exhibit 5.  You

10   don't know who Mr. Blue is; correct?

11   A    No, sir.

12   Q    And with respect to Mr. Yellow, that starts about

13   the 2 minute 27 second mark of Defense Exhibit 5.  You

14   don't know who Mr. Yellow is; correct?

15   A    No, sir, I don't.

16   Q    And that means they're anonymous; right?

17   A    No, not that they're anonymous.  Just that I can't

18   positively identify the person.

19   Q    But your testimony to this Court today under oath

20   is that you don't know who Mr. Green is; correct?

21   A    I do not know.

22   Q    And Mr. Blue, you don't know him; right?

23   A    No.

24   Q    Mr. Yellow, don't know him; right?

25   A    No.

1    Q    Okay.  Now, you've been in law enforcement before

2    you joined Envista.  You're with Envista now; right?

3    A    Correct.

4    Q    Okay.  And when you were with law enforcement, you

5    wouldn't go to a judge or place in an affidavit that

6    you can get a search warrant on a home based on the

7    data you reviewed in stage 3 at stage 1; correct?

8    A    From which stage?

9    Q    Let's say stage 2.  Stage 2.  You wouldn't go get

10   a search warrant based on this information that you

11   plotted in Defense Exhibit 5; correct?

12   A    Not from stage 2, no.

13   Q    Okay.

14          THE COURT:  A search of what?  Of which data

15   point?

16          MR. SIMON:  Well, we're talking about -- we

17   can go one by one, Judge.

18   BY MR. SIMON:

19   Q    Mr. Green -- this is at the 28-second mark that

20   began.  The testimony on direct examination was that

21   this was a single-family residence that you went back

22   to; correct?

23   A    Correct.

24   Q    And based on what you reviewed at stage 1 and

25   stage 2 about Mr. Green -- this is the identifier, the

McINVAILLE - CROSS

1  anonymous identifier that ends 1516 -- you wouldn't go

2  and get a search warrant based on that information;

3  correct?

4  A    No, I would not.

5  Q    You would need to know more; right?

6  A    Yes.

7  Q    And the same with respect to Mr. Blue.  You said

8  Mr. Blue went back to an apartment; correct?

9  A    Correct.

10  Q    And then he went to another residence; correct?

11  A    Correct.

12  Q    And you wouldn't get a search warrant for either

13  that apartment complex or that home based on those

14  returns; correct?

15  A    No, I wouldn't.

16  Q    Okay.  And that's because you don't know who they

17  are; right?

18  A    Correct, or what you would be searching for.

19  Q    Now, with respect to Mr. Yellow, again, with the

20  single-family residence, you wouldn't try to get a

21  search warrant based on that information; right?

22  A    No.

23  Q    You would want to know more?

24  A    Yes.

25  Q    Okay.  And speaking to wanting to know more, you

1   were talking about being a bit befuddled as to why

2   they might be looking at all these other people --

3   right? -- at stage 2 and stage 3; correct?

4   A    Correct.

5   Q    All right.

6           MR. SIMON:   Can we pull up Defense Exhibit 6?

7   BY MR. SIMON:

8   Q    Defense Exhibit 6, do you see that first listed

9   number there that ends with 5659?

10  A    Bear with me.

11  Q    I'll give you a minute.

12  A    Yes, I do.

13  Q    Okay.  Let's look at Defense Exhibit 7.  Do you

14  see that first listed number in Defense Exhibit 7, do

15  you see that?

16  A    Correct.

17  Q    That's the same as that first listed number in

18  Defense Exhibit 6?

19  A    It is.

20  Q    And then Exhibit 8, Defense Exhibit 8, this is

21  when it's narrowed down to nine; correct?

22  A    Correct.

23  Q    And what's the first listed number there?  It's

24  the same one as the first listed in Defense Exhibits 6

25  and 7; correct?

McINVAILLE - CROSS                116

1   A    Correct.

2   Q    And now let's look, finally, at Defense Exhibit 9.

3   The first listed number is the same as the first

4   listed number in 6, 7, and 8; correct?

5   A    Correct.

6   Q    Did you plot that number?

7   A    I did.

8   Q    Okay.  And what did you come to find out about

9   that number based on your expert opinion?

10  A    There were points within the area, of course

11  inside the circle, in the initial request.  Those were

12  both at the church and the bank.  And the stage 2

13  portion of that same person's data, it shows travel

14  from that area south, away from that area.  I don't

15  exactly recall the exact area to describe it, but

16  south, away from the circle.

17  Q    So based on your expert opinion, looking at this

18  case, in your expert opinion, is that the device that

19  likely was involved in the crime here?

20  A    Yes, it could have been.

21  Q    Okay.  Now, with respect to your understanding of

22  Google, you're here to testify about materials that

23  Google might turn over; correct?

24  A    Correct.

25  Q    That the defendant wants Google to turn over;

McINVAILLE – CROSS                    117

1    correct?

2    A    Yes.

3    Q    You never worked for Google?

4    A    No.

5    Q    Okay.  To the extent that you've worked with

6    Google, have you seen them provide, in a geofence

7    warrant, any additional information than what's been

8    provided to the United States here?

9    A    I've never seen it requested.

10   Q    You've not -- well, let me rephrase.  Have you

11   seen -- the stage 3 returns you've seen in this case;

12   correct?  The stage 3 returns you've seen?

13   A    I have seen them, yes.

14   Q    You've seen the longitude and the latitude in this

15   case?

16   A    Correct.

17   Q    Okay.  And you know it's a geofence warrant;

18   right?

19   A    Correct.

20   Q    You've worked with some other geofence warrants;

21   correct?

22   A    Correct.

23   Q    Are all of those from Google, all those geofence

24   warrants?

25   A    Yes.

McINVAILLE - CROSS                          118

1   Q    And Google has provided the same information;

2   correct?

3   A    Yes.

4   Q    Okay.  Nothing different; right?

5   A    I mean, besides the particulars of the case, no.

6   Q    Besides the fact that it's a different crime

7   committed elsewhere; right?

8   A    Yes.

9   Q    And different devices then available.  In those

10  cases, not all of them, but let's say the vast

11  majority of them, they were prosecuted; correct?

12  A    I mean, either they are or are currently being,

13  yes.

14  Q    Okay.  Now, with respect to the specific request

15  made in this ECF No. 28, you've reviewed the motion

16  for discovery that the defendants filed; is that

17  right?

18  A    I don't know about the motion.

19  Q    But you have been made aware of the different

20  requests that the defendant is making in this case;

21  right?

22  A    Correct.

23  Q    Okay.  And your testimony earlier was that some of

24  this could be helpful; right?

25  A    Yes.

McINVAILLE - CROSS                119

1    Q    Might be helpful; correct?

2    A    Yes.

3    Q    Are you familiar with the facts of this particular

4    case?

5    A    Not the entire case, no.

6    Q    Are you familiar with the fact that a search

7    warrant was executed in this case on three residences?

8    A    No, sir.

9    Q    Are you familiar with the fact that there's

10   eyewitness testimony placing a blue Buick behind the

11   bank?

12   A    No, sir.

13   Q    Okay.  So, you're not familiar with the facts of

14   this particular case; correct?

15   A    No.  I've been -- this is what I've looked at.

16   Q    So, when you say it could be helpful, you say that

17   on a blank slate; right?

18   A    Yes, just in terms of the request itself, yes.

19   Q    Okay.  Now, let's talk about one of the holy grail

20   requests, it seems.  You were talking about an

21   algorithm; correct?

22   A    Correct.

23   Q    And that algorithm, to your mind, you would be

24   able to crack Google's case, know exactly what they're

25   doing and how they're doing it; right?

1    A    Sure.

2    Q    Okay.  Would you know how to do that?

3    A    Probably not.

4    Q    Okay.  So, your testimony in this case under oath

5    to this Court is that this information should be

6    provided by Google, but you personally could not do

7    anything with it; correct?

8    A    I don't know that I can, but I would assume it's

9    quite complex.

10   Q    Okay.  Too complex for you to get?

11   A    Could be.

12   Q    Okay.  Are you prepared to -- it seems that in

13   talking about Google, your testimony is at no point

14   going to be that you know anything for a fact;

15   correct?  With respect to Google?

16   A    From like -- from --

17   Q    In terms of the requests that the defendant has

18   apprised you of, that they've made you aware of that

19   they want from Google, your testimony has consistently

20   been could be, may be, but you don't know; correct?

21   A    Correct.  We don't know what we can get from

22   Google because we don't know what process, policies,

23   documentation they have on the process.

24   Q    And because of that, you can't actually sit here

25   and tell us what would be helpful; right?

1    A    Correct.

2    Q    Okay.  Now, I'm going to jump back a little bit

3    here.  You've been qualified as an expert here, but I

4    want to talk to you a little bit about your training

5    and expertise.  We received your C.V. in this case.

6    I'm sure you're aware of that; right?

7    A    Yes, sir.

8    Q    Okay.  And you've received approximately 100 hours

9    in location training; correct?

10   A    Somewhere in that area.  I don't know the exact

11   number.

12   Q    Okay.  But would it sound correct to you if I told

13   you that approximately half of your training came from

14   Envista Forensics, your employer?  Correct?

15   A    Correct.

16   Q    All right.  And Envista is a company -- as far as

17   you're concerned -- right? -- you're going out and

18   you're just testifying primarily for defendants across

19   the country; right?

20   A    We do plaintiff work.  We work both sides in civil

21   cases as well as criminal cases.

22   Q    Okay.  How many cases have you testified in for a

23   prosecution of a defendant?

24   A    None as an expert in Envista.

25   Q    But when you were in law enforcement, you did?

1   A    Correct.

2   Q    Okay.  Now, the stage 3 returns in this case,

3   that's going to be the returns that come -- that's

4   going to be the raw data we get.  I'm sorry.  That's

5   not the stage 3.  The raw data that we get in this

6   case that has the latitude and longitude; right?

7            THE COURT:  Which one are you asking about?

8   Are you asking about Exhibit 3 or stage 3 returns?

9            MR. SIMON:  I'm -- Judge, it's actually --

10  the stage 3 return is also the Defense Exhibit 3.  So,

11  that's just the three levels of that return that's

12  under seal.

13  BY MR. SIMON:

14  Q    And I'm asking, just generally, about the latitude

15  and longitude coordinates in this case.  You could

16  plot those; correct?

17  A    Correct.

18  Q    And you were testifying on direct examination,

19  essentially, that the Google information in this case

20  is 100 percent accurate; right?

21            THE COURT:  Wait.  Wait.  Wait.  I want to be

22  sure I understand what you're doing.

23            MR. SIMON:  Sure.

24            THE COURT:  The stage 3 return has two

25  columns, A and B, the G-A-I-A ID the device ID.  It

McINVAILLE - CROSS                    123

1   doesn't have latitude and longitude that I can see.

2   So if you're offering that presumption, you need to

3   tell me the basis of it.

4           MR. SIMON:  Your Honor, you've corrected me.

5   I'm talking about the stage 1 and 2 returns as a part

6   of the geofence.  I'm saying stage 3 because in my

7   mind, I'm just thinking about the latitude and

8   longitude, but that's incorrect.

9           THE COURT:  Which is not in stage 3 at all.

10          MR. SIMON:  Correct.

11          THE COURT:  So we've got to make the record

12   clear.

13          MR. SIMON:  Correct.  And I will correct

14   myself.

15   BY MR. SIMON:

16   Q   The stage 1 and 2 returns, they are Defense

17   Exhibit 3, that's going to be the latitude and

18   longitude coordinates for a certain number of devices;

19   correct?

20   A   Correct.

21   Q   The stage 1 was for 19; right?

22   A   Correct.

23   Q   And stage 2 was for 9; right?

24   A   Correct.

25   Q   And with respect to your testimony on direct

1    examination in Defense Exhibit 5 -- and I'm not asking

2    for it to be pulled up, but in Defense Exhibit 5, you

3    put particular points at particular places; right?

4    A    Correct.

5    Q    Now, if you'll look with me at column G there, the

6    map display radius, it's your understanding -- right?

7    -- that Google is approximating this information;

8    correct?

9    A    Correct.

10   Q    So, when you testify on direct examination to this

11   Court and you say this is where the person was at this

12   time and I know it for 100 percent certainty, that's

13   not correct; right?

14   A    It's an estimated location of the device.

15   Q    But your Defense Exhibit 5 doesn't show that it's

16   estimated; correct?

17   A    That's what I testified to.

18   Q    Defense Exhibit 5 shows a particular point at a

19   particular place; is that correct?

20   A    That's the latitude and longitude provided.

21   Q    Okay.  But the display radius here, it's your

22   understanding that Google tells you that a certain

23   point could be within a certain display radius; right?

24   A    Correct.

25   Q    Okay.  And so Defense Exhibit 5, if it were to

1  impress upon this Court that it is a point at a

2  particular place at a particular time, you wouldn't

3  actually say that; right?

4  A    No.  It's an estimation of the device's location.

5  Q    Okay.  So, Defense Exhibit 5 isn't accurate;

6  right?

7  A    It's accurately plotted based on the latitude and

8  longitude, yes.  That dot does not mean that the

9  device is exactly on top of that dot.

10 Q    But if I look at Defense Exhibit 5 -- and we can

11 pull it up if you'd like -- Defense Exhibit 5

12 indicates that it is a particular dot at a particular

13 point in time; isn't that right?

14 A    Again, from the latitude and longitude.

15 Q    Okay.  But that's how it is plotted in --

16        THE COURT:  That's asked and answered.

17 You've made your point.

18        MR. SIMON:  Okay.  Understood, Judge.

19 BY MR. SIMON:

20 Q    With respect to those points and the accuracy

21 thereof, wouldn't that inform your discussion of the

22 anonymous nature of the returns in this case?

23 A    As far as how big the radius is?

24 Q    Correct.

25 A    Yes, it could.

1    Q    So, if you see a radius is a certain circle, you

2    wouldn't be able to say that because it's here, I know

3    for certain that that's where I should be checking;

4    right?

5    A    That's correct.

6    Q    You'd check the next place; right?

7    A    You could have to check multiple, yes.

8    Q    Check maybe the block; right?

9    A    I don't know about the block, but, yeah, it could

10   be more than one place.

11   Q    But you'd give consideration to column G?  You'd

12   say let me look at what that display radius is; right?

13   A    Sure.

14   Q    Just to be clear, your understanding of the

15   display radius is that it's giving you the sort of

16   plus and minus on accuracy; right?

17   A    That's their approximation of within this area.

18   Q    Okay.  Now, you were in law enforcement for a

19   period of time.  How long were you in law enforcement?

20   A    Eight and a half years, I believe.

21   Q    Okay.  Eight and a half years.  And in your time

22   in being in law enforcement, if you were to get sort

23   of the stage 1 and stage 2 returns that law

24   enforcement received in this case, you would assess

25   multiple points over a period of time; correct?

McINVAILLE - CROSS                    127

1   A    Correct.

2   Q    And you would assess those points for a number of

3   reasons; right?

4   A    Sure.

5   Q    You would assess maybe whether you could look into

6   some further connection with the potential perpetrator

7   of the crime; right?

8   A    Correct.

9   Q    You'd maybe check if they -- you'd look at it to

10  see if maybe they could be a witness to a prosecution;

11  right?

12  A    That's possible, yes.

13  Q    And if you knew that there was evidence in a case

14  that showed the potential -- or the perpetrator of the

15  crime, they had a phone to their ear, you might say

16  let's see who else is there, see if they have a

17  connection to that robber; right?

18  A    Correct.

19  Q    So when you are befuddled at stage 3 and stage 2

20  when there are multiple devices requested, that

21  befuddlement comes because you don't really know all

22  the facts of this case; right?

23  A    Correct.  I'm looking at the data and how it comes

24  out.

25  Q    Okay.  Now, just to be clear, the data in this

1   case, its accuracy can be assessed at this point in

2   time; right?

3   A    Based on what they have provided, you can see -- I

4   mean, they're giving you their determination of how

5   accurate they think it is.

6   Q    Okay.  But if you had the algorithm, you wouldn't

7   be able to do anything with that; right?  We've

8   established that.

9   A    It's possible.  We don't know.

10  Q    Okay.  With respect to the anonymous identifier

11  from Mr. Chatrie in this case, the anonymous

12  identifier, as you understand it, is going to be the

13  column that's in the far left corner of Defense

14  Exhibit 3; correct?  That's going to be column A at

15  the stage 1 and stage 2 returns?

16  A    Yes, it can be located in there.

17  Q    And that's the anonymous identifier for these

18  folks?

19  A    Correct.

20  Q    All right.  And so presumably, if there's evidence

21  in this -- or if there's argument in this case made by

22  the United States that a particular account was at a

23  particular place in time, you could plot the

24  coordinates for the anonymous identifier related to

25  all these accounts; right?

1   A    Correct.

2   Q    And you could see which account would match up to

3   the allegations by the United States; right?

4   A    Yes.  And if you're talking about from stage 1 to

5   the final stage, you can compare those three, yes.

6   Q    And you could find out who that account belongs

7   to, by your testimony, if you were to get at least the

8   -- well, let's just talk about stage 3.  If you get

9   the subscriber info, you know who it is; right?

10  A    Right, it provides subscriber information.

11  Q    But until stage 3, you don't actually know who has

12  what account; right?

13  A    No, sir.

14  Q    And that's the stage where the United States only

15  got three subscribers; right?

16  A    It's stage 3, correct, yes.

17  Q    And, again, about that stage 3 piece, you

18  testified on direct that you were again -- I'm using

19  the word "befuddled" -- but you were a little

20  surprised that Mr. Blue ended up in stage 3; right?

21  A    Correct.

22  Q    And -- but, as we've talked about, there might be

23  multiple reasons to look at an account; right?

24  A    There could be, yeah.

25  Q    So it's not just that the United States or

1    Mr. Hylton here would be looking at who committed the

2    crime; right?

3    A    It's possible.

4    Q    You'd be looking at maybe who also had some other

5    involvement; right?

6    A    Correct.

7    Q    And that's what you would do when you were in law

8    enforcement; right?

9    A    Correct.

10   Q    Okay.  You'd run to ground everything you could?

11   A    Sure.

12   Q    Okay.

13           MR. SIMON:  Nothing further, Your Honor.

14           THE COURT:  Redirect?

15

16       REDIRECT EXAMINATION

17   BY MS. KOENIG:

18   Q    A few questions, Mr. McInvaille.  Thank you for

19   your testimony today.

20       I wanted to make sure that I understood what you

21   were saying in response to Mr. Simon's questions.

22   You've worked on several geofence warrants; is that

23   right?

24   A    Correct.

25   Q    Or cases involving geofence data.

McINVAILLE - REDIRECT          131

1   A    Correct.

2   Q    And did you say that just the teams that you've

3   worked with have never sought this extended discovery

4   that we have sought here?

5   A    Correct.  I've never seen it requested.

6   Q    And when did you first start seeing, in your

7   practice, these geofence warrants come about?

8   A    I believe I have one from a 2017 case.

9   Q    Would it be logical, then, to see more litigation

10  as a new technique comes out?

11  A    Absolutely.

12  Q    And if we were able to go -- let's go through --

13  so, in going through -- you testified on

14  cross-examination that we don't know exactly what we

15  would be able to get from Google until we ask for it;

16  right?

17  A    Correct.

18  Q    And if we were able to get information from Google

19  that indicated how they came up with this process, how

20  would that inform our ability to look at the legality

21  of this warrant that they sought?

22            MR. SIMON:  Objection, Your Honor.  I don't

23  know what his basis would be to know the legality of

24  it.

25            THE COURT:  I actually think that calls for a

1  legal conclusion, and he's not a lawyer.

2  BY MS. KOENIG:

3  Q   How would that inform our understanding of the

4  data?

5  A   It could help you understand, of course, these

6  display radiuses, how they determine that that's what

7  they approximate.  It could tell us more about the --

8  for instance, in the Wi-Fi, if they record what Wi-Fi

9  was used to generate those points.  Several of those

10 items could help you better understand how they came

11 up with the data that they provided.

12 Q   Let's break it down a little bit.  So, you've

13 talked about how Google provided an estimate of the

14 display radius; right?  Do we have any way of checking

15 that with any degree of certainty?

16 A   No.

17 Q   And the only way we can get that is if we get the

18 method that Google used to create that radius; right?

19 A   Correct.

20 Q   And is that what we generally think would be

21 encompassed in the algorithm?

22 A   I would assume so, or at least their processes of

23 generating this evidence.

24 Q   When we say "algorithm," what do we kind of mean?

25 A   I think more than, you know, than we're looking at

1    some elaborate mathematics here, that it's more of

2    just maybe what you guys are referring to and that

3    we've been talking about.  It's more of their

4    underlying process of taking unknown data or their

5    location history data and turning it into what we see

6    here.

7    Q    And then going -- you know, you were able to talk

8    with us about a couple of examples of Mr. Blue,

9    Mr. Green, Ms. Yellow as to what we think a path of

10   travel may indicate; right?

11   A    Yes.

12   Q    And if we were able to have the access point, if

13   we knew that you had an access point, what would you

14   then be able to do to help us assess the accuracy of

15   the data that's indicated to come from a Wi-Fi source?

16   A    That would just give you the known location that

17   Google used to approximate this location.  Then you

18   can -- if you wanted to, you could go try to determine

19   those locations, try your best to determine if it

20   was -- if it seems like an appropriate estimate of the

21   location or not.

22   Q    And if you have the Wi-Fi access point, would you

23   be able to take some kind of a device and go out and

24   map the range of a Wi-Fi source?

25   A    To an extent, yes, you could go find out where the

1    access point is and where you might be able to access

2    it from.

3    Q    And so, for instance, if we were able to get data

4    from Google that indicated that a device ID had

5    connected with the hotel Wi-Fi access point, could you

6    roughly map out the range of the hotel Wi-Fi access

7    point?

8    A    Again, knowing the location of whatever access

9    point was used, if it still exists and is there and

10   has not been changed, you could generally determine

11   maybe how far away from that location you could be and

12   still connect to it.

13   Q    Would that enable us to better understand how some

14   individuals who appear to be passing by this area of

15   the red circle, how they possibly got captured into

16   the circle even though the data indicates that they

17   may not have actually stayed at that location?

18   A    It could help, yes.

19   Q    In terms of -- and I want to go back to Defense

20   Exhibit 1, which is the warrant --

21          THE COURT:  Before you go there, I just want

22   to be clear.  As to Defense Exhibit 3, column G says

23   "Maps Display Radius (m)."  Can we confirm that it's

24   meters?

25   Q    Do you understand that to mean "meters"?

1   A    Yes, it's meters.

2            MS. KOENIG:  Thank you, Your Honor.

3            MR. SIMON:  That's my understanding, Judge.

4            THE COURT:  Okay.  I just want to be clear.

5            MS. KOENIG:  Sure.

6   BY MS. KOENIG:

7   Q    When we are talking about the warrant itself, is

8   the warrant indicating to the judge that they obtained

9   this warrant from, is the application for the warrant

10  indicating that they are looking for suspects?

11  A    Yes, I do believe it is.

12  Q    You don't recall any mention to the judge, "Well,

13  maybe we're going to look for witnesses to the event"

14  -- right? -- by trying to get this geofence data?

15  A    Bear with me just a second.  I know it asked for

16  unknown subject.  I don't recall about others.  Bear

17  with me.  The quotation there references other people,

18  but that was a quotation, I believe, that they alleged

19  by the suspect, but -- I don't know that -- bear with

20  me.  I may not see it, but -- I don't see anything

21  that refers to, based on what the law enforcement

22  wrote, that there is any mention of witnesses, but

23  again --

24  Q    Thank you, Mr. McInvaille.

25       Does it -- going back again to -- so, have you

1   actually plotted out all 19 people?

2   A    Yes.

3   Q    And have you plotted out the extensive data for

4   all nine individuals?

5   A    Yes.

6   Q    Were you able to determine that the examples that

7   we provided are not just isolated in the sense that

8   it's not just these three individuals whose data

9   appeared odd to you?

10  A    When we say "odd," I think that's referring to

11  just some of those that have single points within the

12  circle and no other data to really go off of.  And

13  then based on once you see the larger set of data, you

14  see a trend as though they're passing by.  So that is

15  what makes it appear that the point that references

16  them into the documentation actually reveals their

17  anonymous ID number in there.

18  Q    When we're trying to get information from the law

19  enforcement agents or the government about why they

20  chose to narrow the 19 down to the 9, why is that?

21  Why do we need that information?  What does that mean

22  to you?

23  A    For me, it would help understand just the -- the

24  reasoning behind certain people making it to certain

25  points.  For the case, that would help me understand

1  the -- you know, how things are playing out as far as

2  this data goes.

3  Q    And if you were better able to understand why the

4  government did what they did, would you be better able

5  to assist Mr. Price, and myself, and Mr. Chatrie,

6  eventually, as to what this selection process meant?

7  A    Sure.

8  Q    And if we were to get -- so, you mentioned -- far

9  earlier in your testimony today, Mr. Price had asked

10 you, are you aware that Google does provide trainings

11 on this geofence data?

12 A    I don't know that it comes directly from Google,

13 but there are places to get training that I've seen

14 for Google location history services, that mix of

15 data.

16 Q    Was there at least one time where you tried to

17 sign up for such a training?

18 A    Yeah.  I believe there was a webinar that detailed

19 information about these types of requests and how to

20 frame them and use them.

21 Q    Were you able to successfully sign up for that?

22 A    No.

23 Q    Why was that?

24 A    It was restricted to law enforcement only.

25 Q    Did you then do some further checking and find

1    that Google -- that whoever is providing this

2    information about the geofence warrants, that

3    information seems to be restricted to law enforcement?

4    A    From what I've seen, yes, it is.

5    Q    Okay.  And if you were able to access those

6    training materials, would you anticipate that you

7    would then be better able to understand how Google

8    used this process and provided the information?

9    A    I can only assume so, but I would assume a

10   training on that particular subject could help in the

11   understanding of different factors involved with

12   these.

13   Q    Likewise, that same thing with Google's policies

14   and procedures about how they search the data and how

15   they create this location data, would that also assist

16   us in understanding if it existed, and it was

17   provided, how this information applies in our case?

18   A    Yes, because, I mean, you see the difference in

19   what the government has asked but in comparison to

20   what Google said in their brief as to what they

21   provided.  So there's something in place that kept

22   them from fully responding.  I don't know if that's

23   the proper way to put it, but providing exactly what

24   the government asked for.

25   Q    Is it fair to basically sum it up to say that

1    there's a lot of questions that we have that you've

2    done your best to answer, but you just can't because

3    you don't have this data from Google?

4    A    Yes.

5          MS. KOENIG:  No further questions, Your

6    Honor.

7          THE COURT:  All right.  Can this witness be

8    excused?

9          MS. KOENIG:  Yes, Your Honor.

10         MR. SIMON:  Judge, could I just ask a few

11   more questions on recross?

12         THE COURT:  That's not our norm.  Is there an

13   objection from the defense?

14         MS. KOENIG:  No, Your Honor, unless it

15   elicits something else, if I could have the last word.

16         THE COURT:  We're definitely not going down

17   that rabbit hole.

18         MR. SIMON:  That's fine.  It's not a huge

19   deal.

20         THE COURT:  All right.

21         So, sir, thank you for your testimony.

22   You're excused from testifying.

23         THE WITNESS:  Thank you.

24         (The witness was excused from the witness

25    stand.)

1        MS. KOENIG:  Your Honor, the defense has no

2    further witnesses at this time.

3        THE COURT:  All right.  Is there any evidence

4    from the government?

5        MR. SIMON:  Your Honor, no, we won't elicit

6    any testimony.

7        THE COURT:  All right.  Well, I'll hear

8    argument.

9        MS. KOENIG:  Your Honor, could we take just a

10    few minutes of a break?  Mr. Price, he would love to

11    eat a little bit of a sandwich first.

12        THE COURT:  All right.  We do not want anyone

13    passing out in the courtroom.

14        MS. KOENIG:  Thank you, Your Honor.

15        THE COURT:  Again, I'm keeping it to ten

16    minutes just to keep us on schedule.

17        MS. KOENIG:  We can make that happen.

18        THE COURT:  We'll take a ten-minute recess.

19        (Recess taken from 2:25 p.m. until 2:35 p.m.)

20        THE COURT:  All right.  I'm prepared to hear

21    argument.  I want to make one thing clear because both

22    parties here were asking our witness, our expert,

23    about what the judge decided.  And I want to be clear,

24    in Chesterfield County, magistrates are not judges.

25    So this person who signed it appears to be David

1    Bishop.  And as far as I recall, to be a magistrate in

2    a county, all you need is a college degree.  You don't

3    even need a master's, and you definitely don't need a

4    J.D.  And because you all have been using the

5    nomenclature "judge," I want to have you all respond

6    to that, if you could.

7           MS. KOENIG:  I think that the Court's

8    recollection is accurate, Your Honor.  I think we just

9    get so used to seeing magistrate judges in this

10   building sign off on warrants.  It's a colloquial

11   term, and it is does not indicate the person has a

12   J.D. necessarily or significant legal training of any

13   sort.

14          THE COURT:  Well, I need something on the

15   record about that.  I think you have to have some kind

16   of college degree.  I think we don't know if this

17   person has anything other than a college degree

18   because the record is blank as to that.

19          MS. KOENIG:  That's right.

20          THE COURT:  All right.  Mr. Simon.

21          MR. SIMON:  Judge, I can't speak with

22   100 percent certainty as to rules in Chesterfield, but

23   it is my understanding, as a general matter, that the

24   Court is correct, that you don't have to be a lawyer

25   with a J.D. or --

1        MR. DUFFEY:  Judge, I'm sorry to interrupt.

2   We would ask for time to check that because I know

3   that used to be the rule, but something tells me they

4   changed that, that there is a requirement.  Could we

5   file something?

6        THE COURT:  Yes, I would want you to file it.

7   Everybody referred to it the same way.  So I'd prefer

8   that you all, if you can agree to what the requirement

9   is, file it jointly on the record.

10        MR. SIMON:  Will do, Judge.

11        MR. DUFFEY:  Let's do that.

12        THE COURT:  I don't claim to know whether or

13   not that's changed.

14        MR. PRICE:  Your Honor, it is apparent that

15   we are not dealing with an ordinary search warrant

16   here.  It's not an ordinary search.  It's not an

17   ordinary warrant.  And it's also apparent that we are

18   not dealing with an ordinary amicus.  Nothing about

19   this case is ordinary.  And that is the point.

20        That is why the defense is requesting the

21   discovery that we are requesting here.  And it's also

22   why we believe that the search in this case involves

23   an unconstitutional general warrant that is infinitely

24   overbroad and profoundly lacking in particularity.

25        Think about the extraordinary breadth here.

1   Google initially is searching all of its users in

2   order to identify who might be in that circle.  More

3   than 1.2 billion of them.  It is hard to imagine how

4   you end up with a broader search than that regardless

5   of who ends up in the circle.

6          But even that circle is not what it seems.

7   And that's what we learned here today.  Google says

8   its data points are not facts but estimates.  And if

9   these are estimates, then we need to know how Google

10  is making those calculations.  We need to know what

11  goes into it in terms of the inputs.  That would be

12  the Wi-Fi location points.  As well as what Google

13  does with that information.  That would be the

14  algorithm.

15         It's also why defense is asking for Google's

16  policies and procedures in terms of responding to

17  this.  It is absolutely unclear to us why Google may

18  have -- and we're not even certain they did -- why

19  Google may have included only location history in this

20  warrant return.

21         They have other types of location data.  The

22  government requested those in the warrant.  The

23  warrant does not specify location history versus some

24  other type of location data.  So there's a factual

25  question lingering here about whether the data was

1    limited to that one category or not, and if so, why.

2            If it wasn't limited to location history,

3    then we have a whole set of other questions about how

4    voluntary that location data transmission was.

5            Location history, Your Honor, is arguably the

6    most voluntary of the three.  That's not to say it is

7    voluntary in the Fourth Amendment sense, but as you

8    can tell from the setup process, the first two types

9    of location data, web and app activity and Google

10   location services, are enabled by default and really

11   require no affirmative action on the part of the user

12   other that signing in with your Google account when

13   you start up the phone.

14           So if those two types of data aren't at

15   issue, then the argument about lack of voluntariness,

16   for example, gets even stronger than it is here.

17           That also speaks to the lack of particularity

18   in this warrant.  Again, it is as unclear to us as it

19   perhaps was to the issuing magistrate that this data

20   would be searching everybody, that it would

21   potentially expand beyond the scope of that radius.

22   And, frankly, that it may not be as anonymous as the

23   government and Google insinuate that it is.

24           The lack of particularity in this case cuts

25   from beginning to end, from the information presented

1   to the magistrate about the scope of the warrant,

2   about how anonymous that data really is.

3        In the middle, the government goes back to

4   Google in step 2 and asks for additional information

5   on all 19 users that were identified in step 1.  It's

6   not clear why they did that, but that certainly

7   doesn't seem to be the thrust of the warrant and

8   application that were presented.  In fact, the warrant

9   only says that the government will attempt to narrow

10  it down.  It is unclear whether they attempted here or

11  what that attempt looked like.  But in two instances,

12  they went back to Google and asked for information

13  about all 19 again.  It doesn't appear that the

14  government narrowed its request until the third time.

15       THE COURT:  Well, to be fair, they said if

16  you think the 19 is unreasonable, take the top 9;

17  right?

18       MR. PRICE:  And that is absolutely the

19  language that we're focusing on here, Your Honor.  It

20  does appear that the reasonableness determination was

21  left up to Google and not a judicial officer.

22       THE COURT:  What's the upshot of that?

23       MR. PRICE:  Well, the Fourth Amendment

24  requires particularity in the search, that the

25  government present all the information that it has

1   that's relevant to the judge.  And the process of

2   narrowing here is one of those limiting factors that a

3   judge would presumably consider when deciding whether

4   to issue a warrant like this.

5           So if there is a representation that the

6   government is going to narrow down its list or that

7   it's going to, in some way, limit the scope of what it

8   asks for, that's information that needs to be

9   presented to the Court, not to Google.  And it's great

10  that Google decided to, on its own, limit the scope of

11  the step 2 returns, but that, unfortunately, does not

12  absolve the government when it comes to particularity.

13  The *Groves v. Ramirez* case decided by the Supreme

14  Court just a few years ago made that point clear.

15          Even if the limitation, as a practical

16  matter, comes from law enforcement or the responding

17  party, that is not the same thing as a judge making

18  that determination.

19          And the fact that it may cut one way in one

20  case doesn't mean that it's not going to cut the other

21  way in a different case, and that is why the

22  determination is left up to the courts and not to

23  Google.

24          THE COURT:  Are you arguing at all about

25  whether or not the fact that it was limited in some

1   respect -- you seem to argue it was limited by Google

2   and not the government.  Are you arguing either under

3   Rule 16 that that suggests any kind of joint

4   investigation or that under *Brady* it makes Google a

5   member of the prosecution team?

6           MR. PRICE:  So, our position here, Your

7   Honor, is that Google did function as a member of the

8   investigative team.  And I think it is important to

9   look at that in the broad sense.  These policies and

10  procedures do not appear to have been created in a

11  vacuum.  And the process of requesting data in steps

12  and pseudo anonymizing it appears to be something that

13  a lot of thought was given to.  Our question is

14  whether that thought and that process involved the

15  government as well.

16          And it is unclear, for example, why Google

17  may have chosen location history to provide as opposed

18  to web and app activity or Google location services.

19  Why?

20          I do believe that if we were to receive

21  discovery from Google or the government about this

22  process, this would likely not be the first time that

23  Google and the government have talked about how the

24  process should go.

25          So to the extent that Google is creating this

1  process, is responding to the government without any

2  judicial intervention in between them, at least for

3  step 2 and step 3, would seem to indicate that Google

4  and the government -- at least for those steps, if not

5  for the process more broadly -- were, in fact, working

6  together.

7         And for Rule 16 purposes, that would subject

8  Google to discovery in the same way that the

9  government would be required to process discovery.

10        THE COURT:  Well, let me ask you this:  I

11  told you at the beginning of this hearing that you

12  were going to have to address the government's

13  argument about 17(c).  And so why aren't you just

14  issuing a subpoena to Google?

15        MR. PRICE:  Honestly, Your Honor, we

16  considered it.  And then Google interjected and

17  decided to file an amicus brief in this case.

18        Our understanding of the way that Google has

19  responded to subpoenas in the past has been to oppose

20  them fiercely and to move to quash any sort of

21  subpoena like this.

22        So we were, frankly, a little surprised but

23  also happy that Google, on its own, decided to submit

24  what we would consider to be an initial round of

25  discovery, an affidavit, in the form of an amicus

1    brief.

2              And so at this point we would like the

3    opportunity to follow up on that with them.

4              THE COURT:  So why follow up now through

5    justice argument rather than by issuing a subpoena?

6              MR. PRICE:  If Your Honor feels it would be

7    helpful, we would be more than happy to issue a

8    subpoena to Google.

9              THE COURT:  I don't give legal advice to

10   either side, but I'm asking why you don't do it.

11             MR. PRICE:  The reason that we didn't do it

12   was because Google, in a somewhat extraordinary move,

13   decided to come into this case on its own and provide

14   an amicus brief with information relevant to some of

15   the questions that we had in discovery.  In fact,

16   their brief does answer some of those questions.  The

17   problem is that it doesn't answer others, and it

18   raises even more.

19             THE COURT:  All right.  Go ahead.  Keep

20   arguing.

21             MR. PRICE:  I was going to say, even at the

22   end of this process it is unclear how we get from

23   point A to point B.  It is not clear how the

24   government went from 19 down to 9 to 3 requesting

25   additional information about users who were, as we

1   learned today, pretty clearly unconnected to the

2   crime.

3           If you have somebody who only hits once in

4   the church, not the bank, and all of the other stage 2

5   data shows that that person was likely to be just

6   driving next to the road -- on the road next to the

7   bank, it does raise a question about why that person

8   then advanced to stage 3.

9           Was the government just curious?  It's

10  unclear to us.  And the fact that there is no judicial

11  process after the warrant is signed initially I think

12  raises serious questions about the propriety of the

13  government or Google getting to decide which users get

14  de-anonymized at the end.  And especially given some

15  of the candidates that made it to step 3, it doesn't

16  appear that there is an obvious explanation.  So we

17  would like to know more information about how that

18  process worked.

19          With respect to voluntariness, this is an

20  issue because the government is arguing that there was

21  no search here at all because this information was

22  shared voluntarily with a third party, Google.  In

23  fact, what we learned is that that can be accomplished

24  in a matter of minutes, in under five minutes, simply

25  by clicking on "yes, I'm in" without any reference to

1     location history whatsoever.

2          So there is this factual question lingering

3     here about how voluntary this is.  How many people

4     actually click "yes, I'm in"?  That, to us, seems to

5     be a pretty important fact to have here.  And it

6     doesn't seem likely that people are going into the

7     depths of their settings on their telephones to enable

8     location history specifically.  So it raises the

9     question:  How is this happening?  How is it happening

10    if it's not really that intentional?  And it does seem

11    to be occurring through these pop-up screens.  And so

12    we want to know how common this is.  Does this happen

13    with most people or is it rare?

14         THE COURT:  But what does that go to as far

15    as what I have to decide?  So, if you learn the

16    percentages -- I'm looking at a motion for discovery

17    under *Brady* and Rule 16.  So, if you find out the

18    percentages, what does that go to?

19         MR. PRICE:  It ultimately goes to the merits

20    of our suppression argument.  The Supreme Court in

21    *Carpenter*, for example, talked about the ubiquity of

22    cell phones and the way that they are used today, the

23    way that most people have them, they may as well be

24    appendages.  And if that is similar with respect to

25    location history, in other words, if we were to learn

1   that 95 percent of users have location history

2   enabled, it brings us much more in line with the

3   reasoning in *Carpenter* about voluntariness.  So that

4   would be the relevance here.

5          The same goes for information about the

6   inclusion of web and app activity and Google location

7   services.  So those are those other two types of data

8   that Google supposedly didn't turn over.  But if those

9   were involved in this process, if they fed into

10  location history, for example, then I do think we

11  would be having an entirely different conversation

12  about voluntariness.

13         THE COURT:  So, one of the things I'm

14  struggling with in this case is I'm going back to

15  materiality, and I need you all to educate me about

16  this a little bit.  But materiality talks about, for

17  instance, under Rule 16, whether or not it

18  significantly alters the quantum of proof in the

19  defendant's favor if the evidence is suppressed.

20  Right?

21         And so is there a different kind of standard

22  for materiality under evidence that would support a

23  motion to suppress rather than evidence that supports

24  information at trial, a defense at trial?

25         A lot of these cases are post trial, right?

1   And so we're dealing with something that might be a

2   unicorn.  I don't know if I've seen anything like it.

3   I think if you had something dead-on, both of you

4   would have given it to me, but I'm not sure that I see

5   that.

6           So, is there a difference if you're trying to

7   get information for a motion to suppress versus

8   information for your actual defense?

9           MR. PRICE:  So, we haven't, obviously, gotten

10  into the trial phase of this case.  In fact, Your

11  Honor, we hope not to get to that phase and believe

12  that this motion is, in fact, dispositive.  And I

13  believe the government actually agrees with us on that

14  point.

15          If the defense succeeds on its motion to

16  suppress, that will be the deciding point, I believe,

17  in this case.  And if the Court were to suppress the

18  results of the geofence warrant, presumably that would

19  entail the suppression of all the fruits thereof, and

20  there would be no more case.  So --

21          THE COURT:  Well, that actually goes to

22  another question that I have.  I don't think that your

23  brief included anything about fruit of the poisonous

24  tree, but the United States made clear that there's

25  this plethora of information other than what was found

1  through the geofence and the Sensorvault information

2  that makes it -- I can't remember, actually, what they

3  argued.  I don't know if it's harmless error or -- it

4  doesn't matter because there's just tons of

5  information that otherwise shows guilt by a great

6  degree.

7      MR. PRICE:  I'm sorry.  I don't have my

8  suppression motion in front of me, but I am certain,

9  Your Honor, that we asked to suppress both the results

10  of the geofence warrant and their fruits.

11      And it is my understanding that the only way

12  that the government came to have any physical evidence

13  in this case was as a result of learning my client's

14  identity from that geofence warrant, and that absent

15  the geofence warrant, there would be no physical

16  evidence.

17      If the government is planning to make an

18  independent source argument, we haven't seen it.

19      THE COURT:  All right.

20      MR. PRICE:  I would add that it appears the

21  government has the same question as the defense when

22  it comes to the inclusion of only location history.

23  It is certainly not what the government asked for in

24  its warrant.  And it appears that this is a policy

25  that Google has internally.  It is unclear to what

1    extent the government was aware of it, but it seems as

2    if they were not here.  And we are both wondering why

3    Google responded the way that it did.

4         In short, Your Honor, I think we're -- what

5    we're asking for, if I can sum it up, is fairly

6    straightforward.  It's the Google policies and

7    procedures relating to geofence warrants.  We want to

8    know about location history versus web and app

9    activity and Google location services.  We want to

10   know the percentage of devices that have these

11   features enabled.  We would like to know about the

12   Wi-Fi access points and the algorithm used to

13   determine an estimate of location based on that.  And

14   we would like information about the narrowing process.

15        Every one of those pieces of discovery goes

16   to either breadth, particularity, or voluntariness.

17   They are material, central to each one of those

18   arguments.  And to round out the point here, Your

19   Honor, we believe the information about those is,

20   well, required under both Rule 16 and *Brady*.

21        I understand your point about not having an

22   ultimate outcome in this case, but if we tweak Rule 16

23   or interpret Rule 16 and *Brady* to mean the outcome of

24   the suppression hearing and thus the outcome of the

25   case, then we think under either standard we would be

1   entitled to the discovery we are seeking today.

2           THE COURT:  So, the United States is

3   basically saying there's nothing written -- I think

4   their briefing says there's nothing written about what

5   they do to narrow down the process.  And so you just

6   need to wait until the detective -- I think it was

7   Hylton -- testifies.  Why is that not correct?

8           MR. PRICE:  So, we have asked the government

9   for information about the analyst who did the work

10  here.  It's not clear that that was Detective Hylton.

11  It's not clear what his process was.  We would love

12  the opportunity to discuss it with him and to discuss

13  it with Google.

14          THE COURT:  The analyst where?

15          MR. PRICE:  Whoever for law enforcement was

16  responsible for the narrowing process, what

17  information they used to make that determination,

18  presumably, in addition to what they received from

19  Google.

20          THE COURT:  All right.  Okay.

21          MR. PRICE:  All right.  Thank you very much,

22  Your Honor.

23          THE COURT:  Thank you.

24          MR. SIMON:  Judge, just to start where they

25  ended, with respect to the culling down of the

1   anonymous identifiers, the folks we went from 19 to 9

2   on, Detective Hylton made that decision.  And the

3   Court was correct on our representation about that.

4   That testimony will be provided, but there's no

5   current documentation that would sort of fall within

6   the ambit of discovery rules.  And I think what we are

7   doing in this case is commensurate with what is done

8   in all cases.  And rightfully so.  There's no

9   requirement to create a document like that.  The

10  testimony will be presented, and he will be

11  cross-examined, I'm sure forcefully.

12          And with respect to any other analyst

13  involved here, Special Agent D'Errico, who we were

14  considering calling, certainly they will be provided

15  expert notice as to his testimony.  And the Court has

16  already ordered that to be produced on February 3.  So

17  we will fall in line with the requirements there.

18          With respect to Detective Hylton, who did

19  make the determination on culling them down, we will

20  elicit testimony from him on that point, but there's

21  nothing currently in hand.

22          With respect to Google, there is some

23  discussion -- I think the Court hit the point straight

24  on.  Rule 17 provides a process by which you get

25  documents from a third party if you want more than

1  what, in this case, magistrate order process, legal

2  process provided.  That is the standard.

3          It sounds like the defense counsel

4  acknowledges that, is willing to undertake that

5  process.  And to the extent that it's difficult, I

6  think that's neither here nor there for the Court.

7  It's just a process that has to be undertaken and is

8  considered in the Federal Rules of Criminal Procedure.

9          With respect to the point about Google sort

10 of working hand-in-hand with the United States, that

11 point's been briefed in this case.  There's no --

12 there's really no -- how do I say it? -- sort of

13 substance to that claim.

14         Google did what was required of it in

15 relation to court-ordered magistrate order process.

16 And the negotiation piece there, there were several

17 emails brought to the Court's attention today.  All of

18 those indicate -- right? -- that there is some

19 pushback potentially from Google.  And certainly to

20 the extent that we want something from them, we can't

21 compel that from them personally.  It all goes back to

22 that search warrant.

23         But more importantly, the cases cited by the

24 defendant sort of noting when a company like Google --

25 when a third party might be -- not a company like

1    Google, but a third party might be brought into the --

2    being a part of the investigative team for purposes of

3    *Brady*, which is really the only point there, because

4    we don't believe there's a constructive possession or

5    a due diligence requirement under Rule 16.  The most

6    recent Fourth Circuit precedent is somewhat old, but

7    it's very clear that there is no constructive

8    possession.  It's got to have been actual control.

9           And so we're clear there that --

10          THE COURT:  The issue there wouldn't be

11   constructive possession.  It would be joint

12   investigation under Rule 16.

13          MR. SIMON:  Under Rule 16.  But, Your Honor,

14   my point is is that there is no joint investigative

15   team precedent in this circuit under Rule 16 in terms

16   of producing something under Rule 16.  But we would

17   concede that to the extent they were to be seen as an

18   agent in this case for the government, much like, I

19   guess, a special agent, we'd have to certainly produce

20   documents created in that course.  So I guess as a

21   practical matter, it ultimately does extend to that

22   *Brady* sort of joint prosecution consideration.  But

23   under Rule 16, the *Pinto* decision is clear.  There's

24   no -- when the bail bondsman right there has the

25   document, says you don't have to get that, there's no

1   construction possession.  They're not a part of your

2   prosecution team or they're not a part of the

3   prosecution.

4          And so I guess there is sort of --

5          THE COURT:  Well, what the defense is saying

6   is that it's a little bit fact bound, right?  I mean,

7   the cases that have dealt with this do suggest that,

8   in the Fourth Circuit or not, do suggest that if the

9   more sort of independence and collaboration that goes

10  on between a third party and the government, the more

11  likely it is considered under Rule 16 or under *Brady*

12  to either be a joint investigation or the entity to be

13  a member of the prosecution team.  It's not quite as

14  black and white as you say, I don't think.

15         MR. SIMON:  Sure.  And, Judge, just to -- and

16  I understand the Court's point.  Even considering

17  that, even acknowledging the point about the

18  fact-bound nature of the inquiry as to whether we turn

19  over stuff in the possession of Google that we don't

20  have, the cases cited by the defendant don't support

21  their viewpoint.  And we've briefed that point, but

22  every one of those cases, one, there's no process

23  mandated from a magistrate saying you have to turn

24  this over pursuant to the Fourth Amendment probable

25  cause being found under Rule 41 for this evidence, the

1   search warrant.

2          And certainly, unlike those cases, Google is

3   not brought into this case to prepare documents for

4   purposes of this investigation.

5          So, *McCormick*, I guess, is the case out of

6   the Tenth Circuit, and all the other cases are state

7   court decisions from California, but they all focus on

8   folks who are literally brought into the prosecution

9   for purposes of the prosecution, and the documents and

10  anything they can provide is for purposes of the

11  prosecution.

12         Just from a factual standpoint, Google is

13  providing to us business records that they created in

14  the course of their business that they provided and

15  didn't create because the United States started

16  investigating the defendant in this case.  These are

17  just documents that they had in their possession.  So,

18  that's a meaningful difference in terms of sort of how

19  they come into this process.

20         And it would also go to the broader Sixth

21  Amendment piece, which is kind of an argument made in

22  the reply brief that these business records are not

23  testimony for purposes of the Sixth Amendment.  I

24  think there's clear case law on that point.

25         Google is not involved in this investigation

1   because we went to Google and said, We need you to

2   create some documents or do something for purposes of

3   this investigation.  What they had were business

4   records that they turned over.

5          But even considering cases where there might

6   be more of a sort of private hybrid, the cases cited

7   by the United States, the decision in the Seventh

8   Circuit, which I think is the *Gray* decision, which

9   talked about sort of Indiana hiring a private entity

10  to do some work on behalf of Medicare.  And they had

11  documents created in the course of their business that

12  were relevant to the prosecution.  They turned those

13  over, but that didn't turn that private company into

14  an arm of the prosecution and as part of the

15  investigation.

16         There's also the more -- sort of the legal

17  point here, which is the *Collins* decision in the

18  Southern District of New York, which says you have to

19  consider the fact that even if the United States

20  wanted to go back and tell Google to turn this over,

21  it's necessarily circumscribed by the basis upon which

22  they got the information in the first place.  Right?

23         So, in *Collins*, they wanted to go back and

24  search -- they wanted -- the defendant wanted the

25  United States to go back and search the computer of

1    somebody who had provided previous consent.  And the

2    District Court there said they can't do that.  They

3    have to -- they can't just tell the individual to turn

4    over their computer.  That would be much the same way.

5         I think Google has made it clear in this case

6    that they respond to legal process.  They don't

7    respond to the United States saying, "Give us

8    documents or else."  They don't respond to the United

9    States saying, "We're investigating something and thus

10   you need to participate and help us out."  And that's

11   just the reality of the situation.

12        We had to -- we were required to get process,

13   and that's what happened here.  And that's why Google

14   is engaged with this investigation at all.

15        And even with respect to the stage 2 --

16   right? -- so stage 1 you just turn over the

17   coordinates inside the radius, and in stage 2 there's

18   an attempt to narrow down to get additional location

19   information.  So, basically, a total of two hours of

20   location information was gathered for only nine

21   devices.  But that second stage gives you 30 minutes

22   before and 30 minutes after.  So that's what defense

23   counsel has referred to as that culling down process.

24        That process is set forth in the search

25   warrant.  And there's some discussion of what Google

1    turned over and why they sought to turn over certain

2    documents.  The numbered page 2 of Defense Exhibit 1,

3    which is the search warrant in this case, particularly

4    attachment 2, says Google will provide anonymized

5    information regarding the accounts that are associated

6    with the device that was inside the described

7    geographical area during the time frame described

8    above.  This anonymized information will include a

9    numerical identifier for the account, the type of

10   account, the time stamp, location coordinates, and the

11   data source that this information came from, if

12   available.  That's what was provided in this case.

13            We received latitude-longitude coordinates.

14   We received a time stamp on them.  We received the

15   source; Wi-Fi, GPS, and otherwise.  I think it's Wi-Fi

16   and GPS.  And so the search warrant's pretty clear

17   about what's being requested.

18            And the bottom line as it relates to the

19   possession, custody, and control argument, whether it

20   be under Rule 16, which plainly lays that out, is that

21   there's no case law supporting the premise.  And the

22   underlying premise is very simple.  Once you get a

23   search warrant, and once you serve it on a Yahoo!, a

24   Google, an Apple, an AT&T, if they respond in

25   accordance with that search warrant, they are part of

1    your investigation team.

2           And to the extent that there's a broad search

3    here, there's a broad search also in those cases as

4    well.  I think to the extent that there's a second

5    stage here, that would be the only argument that would

6    really be any -- would provide any meaningful

7    difference or any difference in this case.  I don't

8    believe it -- meaningful because, again, it's provided

9    for in the warrant.  There's no -- there's no Google

10   correspondence with the United States with no regard

11   for that warrant.  So everything is circumscribed by

12   that.  And I believe the reasoning out of the Southern

13   District of New York in the *Collins* decision is to

14   that point, that the defendant has to acknowledge,

15   even based on their own argument, that we can't just

16   go to Google and tell Google to turn over an account

17   without some legal process.

18          In this case, if you argue there's a

19   reasonable expectation of privacy, that's a search

20   warrant.  And so we think it's clear that Rule 17,

21   Federal Rule of Criminal Procedure 17, provides the

22   basis upon which the defendant would get these

23   materials from Google.

24          And both parties over the course of -- now I

25   guess it's been a few months -- received an email from

1    Google's outside counsel, reaching out to both sides

2    talking about the amicus brief.  So we certainly have

3    known who the sort of lead lawyer for Google has been

4    for some time.  And even before that the defendant

5    knew who we had corresponded with, who the United

6    States had corresponded with in terms of executing

7    this warrant.  And so that goes back to the *Cameron*

8    decision from the District Court in Maine, which,

9    again, I think, is insightful.  They know who to serve

10   the subpoena on.  They've got it.  And they can go

11   about that process.  Again, it seems that they've

12   acknowledged that that is the path to take for a third

13   party and to receive these documents.  And should

14   Google seek to quash that subpoena, that would be

15   analyzed under Rule 17, and appropriately so.

16           THE COURT:  If it is the case that they

17   decide to issue a subpoena to Google, what happens

18   next?

19           MR. SIMON:  Judge, I think that's where this

20   is, as the Court noted, a more difficult situation.

21   It is a hybrid, right?  So, the defendant has noted --

22   has argued that Rule 16 should apply in reference to a

23   suppression hearing in terms of sort of this

24   third-party request for materials.

25           The only decision cited for that is a

1    District Court decision that applied a 1970's Fourth

2    Circuit decision that had nothing to do with Rule 16.

3    I think that was cited in the *Cranson* decision out of

4    the Fourth Circuit.  It has nothing to do with

5    Rule 16.

6         And what we know from the Supreme Court is

7    that when we talk about materiality, we're talking

8    about in preparation for the defendant's defense, the

9    Supreme Court says that goes to rebutting the

10   government's case-in-chief, and arguably you could say

11   we certainly can see that the geofence warrant is how

12   we know this defendant was the target of the

13   investigation.

14        So, there could be an argument that that's

15   enough to be a part of the government's case-in-chief

16   as opposed to a constitutional claim, which we believe

17   this is, that doesn't really go to the merits of the

18   evidence against the defendant.

19        And so in *Armstrong*, that was a selective

20   prosecution claim, said the prosecution shouldn't have

21   been brought.  It's unconstitutionally -- they

22   proceeded on an unconstitutional basis or there

23   shouldn't be a prosecution.  And the Supreme Court

24   made clear that there should be a different standard

25   there when it comes to a claim like that.  That does

 1   not go to the defendant's defense.  The defendant's

 2   defense is actually rebutting against the government's

 3   case-in-chief.

 4        This is a little different because there's

 5   evidence -- there's evidence gathered from the search

 6   warrant in this case.  So I'd acknowledge that.

 7        But ultimately, this case can proceed, I

 8   believe, to a suppression hearing without ordering

 9   Google to turn these documents over.  I say that for a

10   few reasons, because there are undisputed facts.

11   There are undisputed facts as to there being other

12   Google users whose information was collected as a part

13   of this warrant.  Undisputed 19.  It's undisputed that

14   Google has many, many, many users.  Probably can be

15   part of the public record how many users Google has or

16   how many people are sort of a part of Google's

17   customer base.

18        Irrespective of how many, the Court's going

19   to have to acknowledge that there are over certainly a

20   million, and if we go to a billion -- I don't know the

21   number, but it's out there how many people Google does

22   business with.

23        It's also undisputed that we've got location

24   information for these people that expands outside of

25   the box for stage 2.  All right.  So we know that

1    there are nine people's information we received that

2    was outside the box for stage 2.

3          There's been no evidence elicited in this

4    case that any information received in step 1 was

5    necessarily from somebody who was outside of the box

6    of that stage 1 search warrant at stage 1.

7          And so I think the real facts that are at

8    issue are really undisputed.  We say there are a lot

9    of Google users, that it's voluntary.  Even their

10   witness said yes, it's voluntary.  And the question,

11   the voluntariness question, to the extent it's

12   informed by *Carpenter*, the *Carpenter* decision -- and,

13   again, this isn't the suppression hearing, and we're

14   going to argue that issue when it comes up, but the

15   *Carpenter* decision talked about the ubiquity of using

16   cellular telephones by powering them on and maybe them

17   hitting off of a cell tower, and that this information

18   occurs over, I think, a seven-day -- basically, the

19   cell towers collect this information once you power

20   the phone on.  Everybody has to use it.

21         I don't think there's any argument in this

22   case that you necessarily have to use Google to have a

23   cell phone, certainly not to talk on it, certainly not

24   to text on it, certainly not to travel.  There are

25   other applications to use to travel.

1        And so to the extent that the litigation

2    needs to be prolonged for purposes of this

3    information, I don't necessarily see it, but that

4    ultimately would be an issue that Google addresses in

5    response to a Rule 17 subpoena responding to whether

6    this information is relevant, whether it's oppressive,

7    and the other considerations that go with Rule 17.

8    But it's my position that the Court can proceed to

9    address the constitutionality of this warrant on the

10   basis of certain undisputed facts as set forth.

11        I don't think this information from Google is

12   going to give the Court any more understanding than

13   what has been provided, that there are lots of users.

14        THE COURT:  Let me ask you this:  The defense

15   said that there's an issue about it only being

16   location history and not the other information.  So,

17   respond to that.

18        MR. SIMON:  Again, the search warrant request

19   for time stamp location coordinates and the data

20   source for those coordinates, that's what this search

21   warrant provided.  It's not clear to me at all that

22   that is somehow a material issue in this case.  I

23   mean, how would that be material to -- and the Court

24   was asking about sort of how you apply that standard,

25   but how would that be material to the accuracy of this

1  information?  Because, ultimately, that's one of the

2  pieces that goes to sort of the merits of the claim.

3  What value would more points give us --

4       THE COURT:  The expert testified that it

5  doesn't normally just say location history.  And I

6  don't have anything to the contrary, right?

7       MR. SIMON:  Judge, no, that -- I mean, what I

8  can tell you is that what we -- certainly what he

9  responded to in terms of this geofence warrant to get

10 that, this is what Google provides, and there was

11 some, I think, lack of clarity about what this search

12 warrant asks for.  But this search warrant says to

13 provide the time stamp location coordinates and data

14 source for each type of Google account.

15      There is another search warrant in this case

16 that is for historical Google information.  That's

17 been made part of this record in this case, and there

18 is -- there is some sort of web activity and sources

19 like that, but that is sort of about the broader

20 count.  It's not clear to me that geofence warrants,

21 at any point, provide more than what we've been

22 provided here.

23      THE COURT:  But he testified they do.  It may

24 not be clear to you, but you can't testify to this.

25      MR. SIMON:  Well, Your Honor, I believe the

1  record will show that the witness, when asked whether

2  the information provided in response to a geofence

3  warrant has been in addition to what we have here, he

4  said no.  I think he did state that with respect to

5  warrants that go to other types, when it's a

6  user-specific search warrant, you know which account

7  you're going after, then you get that additional

8  information, but not with respect to the geofence

9  search warrant.

10        THE COURT:  Okay.

11        MR. SIMON:  And, Judge, I do think that it

12  is -- with respect to significantly altering the

13  quantum of proof, I think the Court has that correct,

14  that that has to be the standard.  And with respect to

15  how you apply that standard, it is backward-looking in

16  a case where we haven't gone to trial yet, but I think

17  it's undisputed that evidence was found at these three

18  different locations, that there was a statement of

19  probable cause, that there was certainly an admission

20  post-Miranda in this case to the crime.  And so

21  materially altering the quantum of evidence from a

22  Rule 16 standpoint --

23        THE COURT:  You have to agree that the way

24  you got there is through the geofence information.

25        MR. SIMON:  That's right, Judge.

```
 1              THE COURT:  So it's a little bit problematic

 2     to say, Listen, once we identified the guy, then we

 3     knew which house to search, and then we got

 4     everything.  Then the way we identified him was

 5     through the geofence warrant, but we're not going to

 6     say the geofence warrant is material because once we

 7     used it to go to his house, there was all this other

 8     proof.  That strikes me as too much tautology for the

 9     government in this case.

10              MR. SIMON:  And I understand that point,

11     Judge, and I think that's correct, that the first --

12     we can't deny that everything else flowed from the

13     geofence warrant.

14              Materiality goes to, I think, something more

15     than just saying sort of what happens, like how

16     material was the geofence warrant to the case.

17     Materiality goes to whether we're going to be led,

18     based on articulable facts, to something that is going

19     to significantly alter the quantum of proof for this

20     Court.

21              There is not a single request made by the

22     defendant in this case that is going to significantly

23     alter the quantum of proof because, again, we've

24     agreed on certain basic points.  Google --

25              THE COURT:  Okay.  I think I've got that
```

1     argument.

2             MR. SIMON:  Okay.

3             THE COURT:  All right.  Is there any

4     response?

5             MS. KOENIG:  Very briefly, Judge.  As it

6     relates to -- because I think we've got two separate

7     pieces.  We have -- one is the information we're

8     requesting from the government about how they made the

9     process themselves to go down from 19 to 9 to 3.  And

10    that doesn't involve the question of getting Google

11    involved.

12            THE COURT:  So, you're away from the

13    microphone.

14            MS. KOENIG:  I'm sorry.

15            THE COURT:  I heard about every fourth word.

16            MS. KOENIG:  Sorry.  I want to start with the

17    first question, which is the information that we have

18    sought from the government about how their actual

19    investigators, Detective Hylton and anybody else that

20    was involved in that process, narrowed down the scope

21    of the data sought from the 19, to the 9, to the 3.

22    That doesn't involve this issue about whether Google

23    was on the investigative team.  I think it's very

24    clear that Detective Hylton would be a part of the

25    investigative team.

1          THE COURT:  Why isn't it enough that they say

2     they don't have to create information for you, just

3     wait until he testifies?

4          MS. KOENIG:  So, we could do it that way.

5     But the reason we cited the case that we cited, which

6     is *Wilford* from the District of Maryland -- and this

7     is at least the quickest place I can put my hands on

8     it is in our reply brief, on page 9 of the reply brief

9     related to the discovery motion.

10          And I think the mechanics of how this would

11     work is we could do discovery finding on the stand,

12     but what Detective Hylton would essentially be

13     testifying to is I plotted all these points, and I had

14     the 19, down to the 9, down to the 3, and here's the

15     reasons why.  We're then going to have to be able to

16     very quickly -- and I don't know physically how we

17     would do this because we would have to essentially

18     have access to Mr. McInvaille's entire mapping

19     process, which, you know, we showed you 3 pathways

20     today, but there would be 19 pathways.  And the reason

21     I think that the *Wilford* court required the material

22     information related to pretrial motions must be

23     produced before the motions hearing is to ensure its

24     effective use.

25          I think we would be wasting a lot of the

1    Court's time in some senses because we would need to

2    take a break, take Mr. McInvaille back in the back,

3    have him show us how this all works so that we could

4    cross-examine the detective.  So that's problem number

5    one.

6              And problem number two, I think, is all we

7    need to do is interview Detective Hylton.  We've asked

8    for that conversation to happen.  I know Mr. Duffey,

9    very, very early on in this case, had suggested that

10   maybe we could do that, and then that discussion fell

11   through, and then here we are.

12             But I think it matters, as we've talked

13   about, that the crux of this case at this juncture is

14   the motion to suppress.

15             I did want to, before moving on to the last

16   few points, make sure that when the materials that

17   we're seeking -- one item which we had in small print

18   on our prepared materials Mr. Price accidently left

19   out, in addition to the policies and procedures and

20   the Wi-Fi points and those lists that he had provided.

21   We are seeking also information about the process that

22   Google used to create this anonymous ID that they

23   listed as device ID in column A on the stage 1 and 2

24   returns.

25             The device -- as we've indicated, I think, in

1   some of the briefing, there is some concern that we

2   have that that ID is not necessarily just something

3   that was generated for the purposes of this warrant.

4   Perhaps it's related to or is a number that resides on

5   an individual phone.

6         If that is the case, then that means that

7   that number is a Google tracking number, that yes, it

8   doesn't have Laura Koenig or someone else's name

9   attached to it, but it is not anonymous in the sense

10  that it cannot be refound.  So that's another point

11  that we wanted to make sure we're clear on that's what

12  we're requesting.

13        I think point number two, as it relates to

14  Google, is that the government, I think, in sum, is

15  availing themselves of this process.  And if Google

16  isn't made to provide the information that we are

17  seeking, then we have a limited, ineffective way to be

18  able to test the data, its accuracy, its range, the

19  radius that Google has turned over.  And that's why

20  we're seeking, as we've discussed, the access points,

21  the algorithm, or whatever process Google uses to do

22  that.

23        I think it is important, imperative, for us

24  to remember that unlike some of the other analogies

25  that the government is drawing to other types of

1   subpoenas or warrants that are served on technology

2   companies like, for example, call detail records,

3   those are business records.  Google has stated in its

4   amicus brief that the data that it provided, this is

5   not a business record that Google keeps.  Google has

6   to, instead of searching one user's account, search

7   all 1.2 billion of its users is what they proffered.

8   That makes this a very different type of search than

9   the analogies that we have been talking about.

10          In terms of Mr. Simon's representation that

11  we agree on some things, I think we need to know the

12  details for this Court and any reviewing court, should

13  that become necessary, to be able to work with.  Are

14  we talking about a million users?  Are we talking

15  about a billion users?  Those numbers make a

16  difference.  They made a difference to the Court in

17  *Carpenter*, and I anticipate that any future Court, as

18  well as this Court, need to know that information to

19  be able to effectively decide the issues in this case.

20          Last point, in terms of what Mr. McInvaille

21  had testified about, the location history versus the

22  web activity and the Google location services, he had

23  indicated that the cases that he has worked on where

24  there was an individual user's data sought had come

25  with an indication of the source of that, whether it

1   was the web activity or the Google location services

2   or location history.

3          In the geofence data, what I understood him

4   to say is that in the geofence data he has seen in

5   other cases, just as in this case, there is no

6   indication on the spreadsheets that Google provides as

7   to what the source of that data is.  That information

8   only comes in the amicus brief, and that's why we're

9   seeking to be able to test that through

10  cross-examination, not simply from a proffer from

11  Google.

12         Thank you, Your Honor.

13         THE COURT:  All right.

14         All right.  I'm going to get my thoughts

15  together for about ten minutes, and then I'm going to

16  speak to you about my response to your argument.

17         All right.  We'll take a recess.

18         (Recess taken from 3:30 p.m. until 3:50 p.m.)

19         THE COURT:  All right.  Well, clearly, we

20  have in front of us a case of first impression

21  involving technology that both parties, to some

22  degree, are claiming ignorance to and which affects

23  what has been received by the government in a manner

24  that implicates important Fourth Amendment and federal

25  rules issues.

1      So, here, I have a couple of concerns about

2   what is before me.  So, one is your first set of

3   briefing was very good.  It did not separate out the

4   standards of materiality under Rule 16 and *Brady*.  And

5   it did not separate out how the Court should find

6   whether or not there's a joint investigative team

7   under Rule 16, and, separately, whether Google would

8   be a member of the prosecution team under *Brady*.

9      So we can't merge those standards because

10  they are different.  If they end up being the same,

11  then you have to tell me why.  And I do think we have

12  some absence of facts, but the issue, of course,

13  really is how the record I have now affects, first,

14  materiality, and materiality as it pertains in this

15  case looking forward.

16     So, you all have to do some thinking about

17  how you take a standard that is based on cases that

18  are on habeas usually or appeal, about how it would

19  affect it backward to what happens here as to how it

20  would affect a decision looking forward.  It's an

21  importantly different procedural posture.

22     And just concluding that it would affect

23  materiality needs to be explicated a little bit more

24  under each standard.  And you have to use the language

25  that I'm going to have to apply, which is looking

1  forward, not looking backward, and whether that

2  changes anything.  If you don't think it changes

3  anything, then tell me that.  And tell me why you

4  don't think it changes anything.

5         There's note passing.  Do you want to say

6  something to me?

7         MS. KOENIG:  No, Your Honor.  I was just

8  trying to anticipate where the Court may be going,

9  thinking we will probably want to get a transcript.

10  And I just simply passed a note to say did they want

11  to split the cost of the transcript.  I'm sorry that

12  we were note passing.

13         THE COURT:  All right.  So, I do want

14  additional briefing.  I want it based on the testimony

15  today and the evidence that is currently before the

16  Court.  So you probably will need a transcript.  You

17  figure out how to pay for it.

18         And I do think that there is some continued

19  dispute as to exactly what standards apply and how.

20  And I want you to tell me what to do about that before

21  we get into the suppression hearing itself.

22         So, whatever the government may or may not

23  have any obligation to turn over, the process of

24  narrowing down, I'm just going to tell you there's

25  some practical sense of whether or not Mr. Chatrie is

1  going to be able to cross-examine that on the fly,

2  whether that's practical, because it's a lot of

3  information.

4         And so I'm going to ask you to take that into

5  consideration. We can have a two-part hearing. We

6  can do whatever you think is appropriate.

7         We are in a different procedural posture

8  here, and I do believe that the parties should address

9  some of the things that they disagreed about, some of

10 the things they've agreed about. Certainly I need to

11 know about what the magistrate is just so that's on

12 the record and clear about who that is.

13        I'm happy to have you all file that by

14 Friday. I think that's a single Westlaw search, and

15 I'm hopeful it can be a joint stipulation. It may or

16 may not matter. I just want to be clear because

17 everybody kept saying "judge."

18        So I don't know how quickly we can get a

19 transcript.

20        (Discussion with the court reporter.)

21        THE COURT: I'll tell you, based on what I

22 have in front of me, this would be my proposed

23 schedule. I would continue with the expert

24 disclosures. I think that's going to help flesh out

25 the record, in any event. And we're going to have a

1    motion to suppress one way or the other.  Is there any

2    objection to that?

3            MR. SIMON:  No objection, Judge.

4            MS. KOENIG:  Not from the defense, Judge.

5            THE COURT:  All right.  I think that's going

6    to help you submit your information.

7            You can speak with the court reporter as to

8    when you will be able to get a transcript, but in any

9    event, you can be planning your arguments with respect

10   to the legal aspects in the meantime.

11           I'm willing to wait for complete briefs both

12   as to materiality and as to member of the prosecution

13   team or joint investigation until February 18.  That

14   gives you plenty of time to address those issues.

15   Obviously, it means we will not have the motion to

16   suppress on the 20th and the 21st.

17           And I do want you to address the issues that

18   have come up today.  Just give me the information that

19   you think I need, and why, and apply the law as I

20   actually have to apply it as far as the standards and

21   as far as the facts.

22           On the 18th, I would like you to file cross

23   motions as to materiality and as to the joint

24   investigation, including the facts and the standards

25   that have to apply.

1          Then I want responsive cross motions on the

2     25th, seven days later.  And you all can address

3     whether or not you seek more argument, whether you

4     seek more evidentiary hearing, whatever you want to

5     address in your first motion.  And then I will take it

6     under advisement and schedule what I think is

7     appropriate once I have the full record on the 25th.

8          All right?

9          MR. SIMON:  Yes.  Thank you, Judge.

10          MS. KOENIG:  I understand.  Thank you.

11          THE COURT:  So I am going to say that I think

12    you all are working hard at this.  It is a case of

13    first impression, and it is coming at a weird

14    procedural posture.  I think that when we're talking

15    about a warrant that implicates even a million folks

16    who we can presume at least a million minus two of

17    them were definitely not involved in the robbery, we

18    have to be really careful about what we're doing.

19          And certainly if it's a billion, I think

20    that's something that we really have to be careful

21    about, and I want to be careful about how I find my

22    record.  So that either way, I may get it wrong, but

23    I'm going to make as good a record as I can, based on

24    what I have, and you all are helping me do that, but I

25    can't do it just yet.  It's a lot of information, and

1   it's new technology, and I really need to get it

2   right.

3          So, is there anything else?

4          MR. SIMON:  Judge, are you sufficient -- are

5   we sufficiently good on the Rule 17 piece here?  There

6   need not be additional briefing there, right?

7          THE COURT:  I think both parties here

8   acknowledged it was an option; right?

9          MR. SIMON:  Correct, Judge.

10          THE COURT:  I am disinclined to give a party

11   instructions about what to do.  Some things seem more

12   straightforward than others, but that's not for me to

13   say.  I don't think I can give advice.  I don't think

14   I need further briefing because it's certainly an

15   option.  And it's an option I think even if Google is

16   a member of the prosecution team.  It is a

17   belts-and-suspenders issue.  All right?  Does that

18   answer your question?

19          MR. SIMON:  Yes, Judge.

20          THE COURT:  Ms. Koenig, do you have any

21   comments or questions?

22          MS. KOENIG:  I do not, Your Honor.  Thank

23   you.

24          THE COURT:  All right.  Okay.  Thank you all

25   for your efforts.  I know it was a long day.

1          (The proceedings were adjourned at 4:00 p.m.)

2

3     I, Diane J. Daffron, certify that the foregoing is

4   a correct transcript from the record of proceedings

5   in the above-entitled matter.

6

                       /s/
7       _____   _____
8       DIANE J. DAFFRON, RPR, CCR      DATE