IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

*Richmond Division*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 3:19-CR-130-MHL |
| | ) | |
| OKELLO T. CHATRIE, | ) | |
| | ) | |
| Defendant. | ) | |

**GOVERNMENT'S SUPPLEMENTAL MEMORANDUM IN
OPPOSITION TO DEFENDANT'S MOTION FOR DISCOVERY OF
SENSORVAULT DATA**

The United States of America, by its undersigned attorneys, hereby submits this supplemental briefing pursuant to the Court's Order entered on January 22, 2020.  ECF No. 78.

The Court's Order called for discussion of two distinct questions: (1) whether the requested discovery is material under Federal Rule of Criminal Procedure 16 and *Brady v. Maryland*, 373 U.S. 83 (1963); and (2) whether the United States is obligated to obtain that information from Google, LLC ("Google") under those standards.

As an analytical matter, however, the latter question should be answered first, because neither Rule 16 nor *Brady* burden the United States with identifying and turning over information outside its own possession. Thus, the threshold issue raised by the defendant's motion is whether the United States, by virtue of executing a search warrant directing Google to disclose a narrowly limited set of business records, turned one of the world's largest technology companies into a member of the United States' prosecution team.  The clear answer is "no," and this Court would stand alone if it answers "yes."

Both Rule 16 and *Brady* pertain to obtaining information from "the government."  The United States' obligation to produce material in the actual possession, custody, and control of a

nongovernmental actor like Google would, if ever, be guided by the agency principles underlying *Brady* and its progeny.  On that front, the best the defendant can argue here is that Google responded to a search warrant lawfully issued by a Virginia magistrate.  But precedent in the Fourth Circuit and beyond make the Court's path clear:  rules regarding the scope of a "prosecution team" do not extend so far as to place an affirmative obligation on prosecutors to secure documents in the actual possession, custody, and control of third parties responding to search warrants.  And mere negotiation between the United States and the third party over the execution of that search warrant does not change that conclusion, especially when the third party rebuffs the government in the course of those discussions.

To obtain information from a third party, a defendant can use the subpoena power under Rule 17.  When pressed by this Court about why the defendant had not issued a Rule 17(c) third-party subpoena to Google, defense counsel conceded that the choice was purely strategic:

> [W]e considered it. And then Google interjected and decided to file an amicus brief in this case. Our understanding of the way that Google has responded to subpoenas in the past has been to oppose them fiercely and to move to quash any sort of  subpoena like this.

Disc. Hr'g Tr. at 148.

But a defendant should not be allowed to shift the burden of obtaining a third-party company's business records onto the United States whenever he thinks the company will put up a fight.  Neither Rule 16 nor *Brady* support that novel extension of federal criminal discovery obligations, and the Court should reject it.   If the defendant wants the materials it seeks from a third party, the Federal Rules of Criminal Procedure demand that they do so via Rule 17.  Accordingly, the Court's analysis of the defendant's attempt to secure material from Google should be guided by the bounds of Rule 17, not Rule 16 or *Brady*.  *See* ECF Nos. 82, 86.

If the Court reaches the question of materiality, the defendant's argument should be

rejected.   Under both Rule 16 and *Brady*, the defendant bears the burden of showing the demanded information is material.   The defendant has not established that the Google information he seeks is material to establishing that the GeoFence warrant was a general warrant. The questions relevant to defendant's suppression motion include whether he had a reasonable expectation of privacy in Google's location information and whether the GeoFence warrant complied with the Fourth Amendment.   At best, the testimony of the defendant's expert raised only conjecture about whether Google's Sensorvault data would be material to the defendant's suppression motion.   When plotting coordinates provided by Google, the expert relied on plotting accounts of three other individuals.   But because suppression cannot be based on the privacy interests of other account holders, whatever the expert thinks about other individuals' Google information does not make it material here.

## I.   BACKGROUND

The facts of this case have been recited by the United States in its response.  *See* ECF No. 38, at 1–6.   On January 21, 2020, the Court held a hearing on the Motion, during which the defendant elicited testimony from Spencer McInvaille.

At the suppression hearing, McInvaille gave equivocal testimony regarding the information sought by the defendant.   For example, when asked who might have information about the Wi-Fi access points for the location history information provided in stages 1 and 2 of the GeoFence warrant, the defendant's expert responded, "Google, *possibly*."   Disc. Hr'g Tr. at 67 (emphasis added).   In explaining that answer, the defendant's expert merely provided, "[w]ell they've got to have something to base[] the  . . . location."   *Id.*   Then, when asked whether the access points would permit the parties to assess whether any points were outside the 150-meter radius relevant to stage 1 of the warrant, the expert demurred, "[i]t *could*."   *Id.* at 68 (emphasis

added).   The expert's testimony remained elusive when addressing Google's algorithm—an algorithm he admitted he possibly might not comprehend or be able to manipulate.   *Id.* at 72, 119.

The expert witness did not address other portions of the defendant's Motion.  He gave no meaningful testimony regarding the parameters of Google's "Sensorvault data" (sought in Paragraph 4(a) through (e) of the Motion).   Likewise, the defendant elicited no testimony or argument about the identity of Google analysts requested in Paragraph 5.   When asked about Google's policies and procedures, the defendant's expert merely opined that he was "sure [Google] *would*" have such documents because "something guided them to provide a certain data or search a certain set of data."   *Id.* at 31 (emphasis added).   As the defendant's expert had to concede on cross-examination, his testimony on direct examination was an amalgam of "*could* be, *may* be, but *you don't know*."   *Id.* at 120 (emphasis added).   Lastly, the defendant's expert acknowledged that Google users voluntarily disclosed their location information and were appraised of the storage of this location information after the setup.  *Id.* at 107.

## II.   ARGUMENT

The items relevant to this supplemental briefing are the Defendant's Motion for Discovery requests for information in the possession, custody, or control of Google. *See* ECF No. 28, at ¶¶ 1, 3, 4, 5, 9.  The crux of the analysis here, therefore, remains whether Google is part of "the government" for purposes of Rule 16 or *Brady*.  As explained below, it is not.  But even if it were somehow deemed part of the United States' prosecution team, the information sought from Google would not be material to the defendant's motion to suppress.   On either basis, therefore, the Court should deny the Motion for Discovery.

**A.      Neither Rule 16 nor *Brady* require the United States to Obtain Information from Google for the Defendant, Because Google is Not Part of the Prosecution Team.**

**1.      Rule 16(a)(1)(E) requires disclosure of documents and other items actually possessed by "the government."**

Federal Rule of Criminal Procedure 16(a)(1)(E) provides for the discovery of certain documents and materials "if the item is within *the government's* possession, custody or control." Fed. R. Crim. P. 16(a)(1)(E) (emphasis added).   And even then, Rule 16 "'triggers the government's disclosure obligation *only* with respect to documents within the federal government's *actual* possession, custody, or control.'"  *United States v. Pinto*, 905 F.2d 47, 50 (4th Cir. 1990) (quoting *United States v. Gatto*, 763 F.2d 1040, 1048 (9th Cir. 1984)) (emphasis added). Given the "actual" possession, custody, or control requirement, the prosecutor's knowledge of any information in someone else's possession is irrelevant under Rule 16(a)(1)(E). *See id.* (recognizing that where the prosecution lacks "*actual* knowledge of the existence, *much less possession* or control, of the documents" sought by the defendant, Rule 16 cannot apply) (emphasis added).

The Fourth Circuit, like others, has not defined the scope of "the government" under Rule 16.  *See, e.g.*, *United States v. Rosenschein*, No. 16-4571 JCH, 2019 WL 2298810, at *4 (D. N.M. May 30, 2019) (recognizing the lack of Tenth Circuit authority defining "the government" under Rule 16).   Nevertheless, even the broadest, plain meaning of "government" does not include a private corporation.   *See Government*, Black's Law Dictionary (11th ed. 2019) (defining "government" as "[t]he sovereign power in a country or state" or "[a]n organization through which a body of people exercises political authority"); *cf. United States v. Davis*, 679 F.3d 190, 196 (4th Cir. 2012) (reviewing the meaning of Federal Rule of Criminal Procedure 35(b) using "the rule's plain language").

Courts grappling with the meaning of "government" under Rule 16 have largely done so while considering whether federal prosecutors are obliged to disclose information held by some other component of the federal government or another law enforcement agency. *See Rosenschein*, No. 16-4571 JCH, 2019 WL 2298810, at *4 (collecting cases). Those courts have measured the reach of "government" under Rule 16 using the *Brady* standard addressing the membership of the "prosecution team." *See, e.g.*, *id.*; *United States v. Chalmers*, 410 F. Supp. 2d 278, 289 (S.D.N.Y. 2006) (rejecting the argument that "the 'government' for purposes of Rule 16 should be any broader than the 'prosecution team' standard that has been adopted in the *Brady* line of cases"); *cf. United States v. Cano*, 934 F.3d 1002, 1023 (9th Cir. 2019) ("The 'possession' element of *Brady* is treated as coextensive with that of Rule 16.").

To be sure, Rule 16 and *Brady* do not operate coextensively when it comes to the scope of material that must be disclosed. *United States v. Caro*, 597 F.3d 608, 620 (4th Cir. 2010) (recognizing that "Rule 16 differs from *Brady*"). As a practical matter, however, the best path to assessing the reach of "government" under Rule 16 in this case is to look to the *Brady* line of case law setting the scope of the "prosecution team."

> **2.   Common-sense agency principles set the bounds of the "prosecution team" under *Brady* and require consideration of the practical burdens that would result from making an outsider a member of that team.**

The defendant in this case presents such a novel – and groundless – theory that there are simply no cases addressing whether a private entity providing a narrowly limited set of business records pursuant to a search warrant are consequently members of the government's prosecution

team.[1]  As a result, the government has no choice but to borrow from cases arising in the typical situation where *a government agency or actor* does some work on a case, and the court considers whether that agency or actor is therefore on the prosecution team.  Nonetheless, the United States reiterates that Google was not, is not, and never will be a government agency or actor.

The Fourth Circuit's analysis of the "prosecution team" standard under *Brady* centers on the practical implications of obliging the prosecutor to ascertain information from the member and the existence of an agency-like relationship.  It remains true that "*Brady*'s commands do not stop at the prosecutor's door," and some level of constructive knowledge can be imputed to prosecutors when members of their "investigative" or "prosecution team" know of relevant information.  *United States v. Robinson*, 627 F.3d 941, 951 (4th Cir. 2010).  But the obligation of *Brady* does not overextend "where doing so would cut against the agency principles underlying imputed knowledge" and "impose unacceptable burdens on prosecutors and the police."  *Id.* at 952.

The Fourth Circuit's early decisions assessing the reach of *Brady* and its progeny hued closely to a principal tenet: prosecutors are responsible for ensuring that other prosecutors and officers working the case have provided all exculpatory and impeachment information.  *See United States v. Sutton*, 542 F.2d 1239, 1241 (4th Cir. 1976) (attributing FBI agent's false statement to prosecution despite record providing no suggestion that "prosecutor then knew of Agent['s] . . . threat"); *Boone v. Paderick*, 541 F.2d 447, 451 (4th Cir. 1976) (imputing an undisclosed promise made to a cooperating witness by a detective assisting with the

---

[1] Several cases addressing private entities are discussed in some detail in the United States' surreply.  *See* ECF No. 64 at 5-6.  Those cases— *United States v. Josleyn*, 206 F.3d 144, 154 (1st Cir. 2000) and *United States v. Gray*, 648 F.3d 562 (7th Cir. 2011) (Posner, J.)—provide no support for the defendant's position here.

prosecution); *Barbee v. Warden*, 331 F.2d 842, 846 (4th Cir. 1964) ("The police are also part of the prosecution, and the taint on the trial is no less if they, rather than the State's Attorney, were guilty of the nondisclosure."). As one member of this Court aptly explained, "[d]efendants cannot compel prosecutors to seek out exculpatory or impeachment evidence the government does not possess, and as the Fourth Circuit has made clear, '*Brady* requests cannot be used as discovery devices' to obtain evidence the defendant believes would be helpful." *United States v. Ducore*, 309 F. Supp. 3d 436, 439 (E.D. Va. 2018) (Ellis, J.) (quoting *United States v. Caro*, 597 F.3d 608 (4th Cir. 2010)); *see also Horton v. United States*, 983 F. Supp. 650, 654 (E.D. Va. 1997).

More recent Fourth Circuit decisions have followed the same practical analysis of "prosecution team" questions under *Brady* and *Giglio v. United States*, 405 U.S. 150 (1972). In *United States v. Taylor*, the court addressed the reach of "investigative team" under *Brady* when analyzing whether undisclosed impeachment information about a government witness should be imputed to prosecutors working the case. 942 F.3d 205, 225–26 (4th Cir. 2019). In concluding that information held by the ATF could not be imputed to prosecutors working a case led by the FBI, the *Taylor* panel set forth a straightforward rationale:

> Imputing their [the ATF agents'] knowledge to the prosecutors in this case would require us to stretch *Brady* beyond its scope and would effectively impose a duty on prosecutors to learn of any favorable evidence known by *any* government agent.

*Id.* at 225. The prosecutors in *Taylor* therefore did not have a duty under *Brady* to inquire about the existence of investigations into cooperating witnesses by other federal agencies not working the case. Notably, that conclusion held even though both federal law enforcement agencies fall under the umbrella of the Department of Justice.

That commonsense holding comports with the Fourth Circuit's earlier decision in *United*

*States v. Robinson*.  In that case, the court considered the practical consequences of imputing to the prosecutor the knowledge held by "everyone who touched the case," regardless of the meaningfulness of those contacts.  627 F.3d at 952.  The court rejected the defendant's argument in support of such an extension.  Importantly, no one disputed that the officers in question were working the defendant's case.  *Id.* at 951–52.  But creating a *Brady* obligation for the prosecutor to know what those officers knew was untenable when the ruling would "impose unacceptable burdens on prosecutors and the police" and it "would cut against the agency principles underlying imputed knowledge."  *Id.* at 952.

   **3.     Google is not a member of the United States' prosecution team.**

   Like the rejected argument in *Robinson*, the defendant's attempt here to extend prosecution-team membership to Google ignores the agency principles that underlie *Brady*'s imputation of knowledge and the resulting imposition of impractical burdens.  The Court should deny the defendant's motion.

   **a.  The United States lacks meaningful control over Google.**

   The United States cannot bind Google or direct its actions.  Were it otherwise, Google could not have resisted the United States at stage two of the search warrant.  Nor can the United States reasonably be called to put procedures or regulations in place to direct a private corporation to provide the information sought in this case.  *See, e.g.*, *Giglio*, 405 U.S. at 154 ("To the extent this places a burden on the large prosecution offices, procedures and regulations can be established to carry that burden and to insure communication of all relevant information on each case to every lawyer who deals with it.").

   At best, Google fits the role of a prototypical third-party witness in a criminal case.  It possesses information, specifically business documents, relevant to the investigation of a crime,

so agents used judicial process to communicate with and compel the production of that information. But participation as a witness—even a cooperative one—does not make one a member of the prosecution team. *See, e.g.*, *United States v. Graham*, 484 F.3d 413, 417 (6th Cir. 2007) (differentiating between *Brady* obligation over officers working the case and a cooperating witness because, as to the former, "the prosecutor has the means to discharge the government's *Brady* responsibility if he will," but a cooperator "remain[s] an independent actor.").

The decisions cited by the Fourth Circuit in *Robinson* reinforce the durability of the United States' position on this issue. The first case cited—*United States v. Stewart*—addressed whether an expert witness employed by a governmental agency was a member of the prosecution team, which would have imputed to the United States knowledge of the expert's perjured testimony. 433 F.3d 273, 298–99 (2d Cir. 2006). The Second Circuit concluded that the expert was not a member of the prosecution team despite ample communication between the expert and the prosecution in preparation for trial. This interaction included discussing potential testimony by a defense expert, helping prosecutors develop cross-examination questions, and participating in a mock examination to prepare for trial. *Id.* at 298. That was not enough to become a member of the team, the court explained, because the expert "acted only in the capacity of an expert witness" and nothing suggested he was "involved with the investigation or presentation of the case to the grand jury," such as through interviewing witnesses, gathering facts, or developing prosecutorial strategy. *Id.* at 298–99; *see also Avila v. Quarterman*, 560 F.3d 299, 307–09 (5th Cir. 2009) (concluding that pathologist's exculpatory opinion could not be imputed to prosecution team because he served only as an expert witness and did not play an active role in either the investigation or prosecution).

In the second decision cited in *Robinson*—*Moreno-Morales v. United States*—the First

Circuit declined to extend prosecutors' knowledge to that of the Puerto Rico Senate, where one of the government's immunized witnesses gave inconsistent statements.  334 F.3d 140 (1st Cir. 2003).  Notably, although the contradictory testimony came prior to the federal investigation, it appeared that "federal prosecutors may have observed some of the questioning and may have reopened their investigation as a result of what they learned in the hearings."  334 F.3d 140, 146–147 (1st Cir. 2003).  Nevertheless, "[p]rinciples of federalism" dictated that "[t]he federal prosecutors did not have access to the Senate's papers and notes," meaning prosecutors had no *Brady* obligation to disclose the witness's inconsistent statements.  *Id.* at 146.

The third decision cited in *Robinson*—*United States v. Beers*—applied the same federalism principles in the context of information held by state officials in an unrelated state investigation.  *See* 189 F.3d 1297, 1304 (10th Cir. 1999).  From a practical perspective, the court explained, "[i]t is unrealistic to expect federal prosecutors to know all information possessed by state officials affecting a federal case."  *Id.*

The reasoning underlying these decisions fits neatly into the threshold issue presented here.  Like the expert in *Stewart*, Google played a limited role in the case and is not involved in the longterm investigation or overall presentation of the case against the defendant.  And unlike the expert in *Stewart*, Google's role only came about due to the execution of a search warrant.  Just like the separate entities in *Moreno-Morales* and *Beers*, Google does not answer to the commands of the federal government—at least not without valid judicial process.  The important caveat of judicial process distinguishes away *United States v. Stein*, a case in which a third-party accounting firm was deemed part of the government's prosecution team under Rule 16. 488 F. Supp. 2d 350, 363–64 (S.D.N.Y. 2007).  In that case, the accounting firm had entered into a deferred prosecution agreement giving "the government the legal right to obtain . . .

11

documents," meaning the government practically exercised control over those records.  *See id.*

Although the separation between Google and the United States is not informed by the principles of federalism invoked in *Moreno-Morales* and *Beers*, a more important structural dynamic informs the relationship here—the interplay between government actors and private enterprise.  Third parties like Google can only understand their obligations to comply with law enforcement requests based on the four corners of judicial process.  But under the defendant's theory, the service of the search warrant makes Google, a private corporation, an arm of the government.  That conclusion is at odds with the limitations of the federal government's police powers and the privacy interests of third-party private actors.

As a practical matter, the defendant's theory tees up various discovery issues that would likely require resolution by a court.  For example, if Google is part of the prosecution team, can the United States go back and demand more information than was allowed under the search warrant, perhaps even if that demand goes beyond what probable cause would support?  Regarding a defendant's discovery requests, if the United States and Google disagree over whether the defendant should receive information demanded from the "prosecution team," may Google refuse to provide the information to the United States?  And in that circumstance, does the United States bear the risk of dismissal of the prosecution?  Finally, in the next investigation of armed robbery attempting to use GeoFence information, what happens when Google refuses to comply with an otherwise valid search warrant to head off these thorny issues?

These questions can remain academic if the Court denies the defendant's motion here.  In that regard, the Court will join a chorus of courts routinely rejecting overreaching requests made to prosecutors for documents solely in the possession of third parties.

**b. Google's disclosure of business records—secured only through the execution of a search warrant—does not make them a member of the prosecution team in this case.**

No agency relationship exists between Google and the United States. Google's involvement in this case was necessitated and constrained by a search warrant. Indeed, the foundational premise behind seeking a search warrant is that the government does not have access to the information sought by the warrant. That should be enough to show the lack of any meaningful agency relationship. On that basis alone, the Court should reject the defendant's contention that information held by Google falls within the possession of the United States. Moreover, the defendant is now seeking from the United States Google information that falls outside the scope of the GeoFence search warrant. *See* ECF No. 28, at ¶¶ 1, 3, 4, 5. The warrant never provided the United States with the ability to compel Google to disclose this information. Furthermore, as the warrant was executed in the summer of 2019, it no longer provides the United States with any authority to require Google to disclose additional information.

**c. Google did not become an agent of the United States simply by complying with (and at times negotiating against) the execution of the search warrant.**

The substance of Google's involvement in the search warrant process was ordinary. The lead case agent sought and obtained a search warrant. Then, he served the search warrant on Google. In the course of executing each stage of the search warrant, the lead case agent exchanged emails with Google's response team to obtain material available pursuant to the warrant. This correspondence is a non-event. Focusing on arresting an armed robber, the lead case agent sought the entirety of the information available under the warrant at the second stage of the search warrant.

Notably, Google took an adversarial position regarding the execution of the warrant.

Rather than return the entirety of the additional location information requested at stage two of the search warrant, Google argued in a follow-up phone call to second-stage emails that Google would only provide additional location information at stage two for nine anonymized accounts. By protecting its own interests, which ran contrary to the United States' interest in investigating the robbery, Google asserted control over its own information. *See, e.g.*, *Graham*, 484 F.3d at 417–18 (explaining that *Brady* imputation not appropriate in context of cooperating witness who remains an "independent actor" as exemplified by prosecutors needing to obtain approval from the witness's attorney before interviewing him, serving a subpoena on him to compel the production of documents, and the witness's refusal to provide materials that were covered by the attorney-client privilege). The lead case agent accepted Google's proposal due to the time-sensitive nature of identifying the armed robber and his prioritization of obtaining information concerning the defendant's account.

Finding an agency relationship between the United States and Google based on these interactions would overextend *Brady* in the manner *Robinson* warned against. The back-and-forth between law enforcement and third parties subject to search warrants is normal and does not make the party producing documents a member of the investigative team.[2] *See United States v. Tomasetta*, No. 10 Cr. 1205(PAC), 2012 WL 896152, at *5 (S.D.N.Y. Mar. 16, 2012) ("[The

---

[2] Indeed, a cursory review of materials prepared by some of the nation's leading law firm's corporate criminal investigations practices demonstrate that a tool in the toolbox of any large corporation responding to a search warrant is interacting with the government and attempting to negotiate the terms of a search warrant. *See* JONES DAY, Expecting the Unexpected: How to Prepare for, Respond to, and Survive a Search Warrant (Jan. 2015), https://www.jonesday.com/en/insights/2015/01/expecting-the-unexpected-how-to-prepare-for-respond-to-and-survive-a-search-warrant; *see also* KIRKLAND & ELLIS, A How-To-Guide For An Effective FBI Search Warrant Response Program (Oct. 2002), https://www.kirkland.com/-/media/publications/article/2002/10/a-howtoguide-for-an-effective-fbi-search-warrant-r/ma9search_dfa.pdf.

fact that Vitesse complied with the Government's subpoenas and negotiated details regarding document production did not turn Vitesse into an agent of the Government."); *see also United States v. Meregildo*, 920 F. Supp. 2d 434, 441–42 (S.D.N.Y. 2013) ("Interacting with the prosecution team, without more, does not make someone a team member" and thus "does not require the government to act as a private investigator and valet for the defendant, gathering evidence and delivering it to opposing counsel."). *Cf. United States v. Josleyn*, 206 F.3d 144, 154 (1st Cir. 2000) (declining to extend prosecution team membership "to cooperating private parties who have their own set of interests").

### d. The defendant should not be permitted to use the United States as a pass-through to obtain information held by third parties.

Finally, if the defendant has his way in this case, the United States would effectively be called on to do his work—to seek out documents pursuant to Rule 17(c) and fight, if necessary, with Google over the permissibility of such a request.[3] But "*Brady* and Rule 16 are not a means for a defendant to require the prosecutor to do this work for him." *Cano*, 934 F.3d at 1026 (citing *Roth v. U.S. Dep't of Justice*, 642 F.3d 1161, 1175–76 (D.C. Cir. 2011) and *Boyd v. Crim. Div. of U.S. Dep't of Justice*, 475 F.3d 381, 386–89 (D.C. Cir. 2007)). As one sister district court explained, *Brady* did not impose on prosecutors a "duty to include issuing subpoenas to force production of documents in the possession of non-government third parties." *United States v. Bartko*, No. 5:09–CR–321–D, 2011 WL 2471556, at *4 (E.D.N.C. June 21, 2011) (collecting appellate cases from First, Third, Eighth, Ninth, Tenth, and Eleventh courts of appeals rejecting

---

[3] Of course, that avenue is fully available to the defendant. *Cf. United States v. Wilson*, 901 F.2d 378, 381 (4th Cir. 1990) ("[W]here the exculpatory information is not only available to the defendant but also lies in a source where a reasonable defendant would have looked, a defendant is not entitled to the benefit of the *Brady* doctrine.").

duty under *Brady* to subpoena third party documents).

At bottom, the outstanding discovery requests relate to the defendant's desire for information held by Google.  The dispute, if any, over his entitlement to that information is for the defendant and Google to address.  By using Rule 16 and *Brady* instead of Rule 17 to get information held solely by Google, the defendant inappropriately places the United States at the center of the conflict and transplants important discovery obligations to a place they do not belong.  The Court should reject those efforts and hold that Google is not part of the United States' prosecution team under Rule 16 and *Brady*.

**B.      The Defendant's Outstanding Discovery Requests Should Be Rejected Because He Fails to Show Materiality under Either Rule 16 or *Brady*.**

**1.      Rule 16 materiality requires the defendant to provide facts showing that the sought-after materials will actually help prove his defense.**

Under Rule 16, the defendant bears the burden to demonstrate that the requested discovery will enable him to "significantly alter the quantum of proof in his favor"—not just that the information bears some abstract logical relationship to the case.  *Caro*, 597 F.3d at 621.  To meet that burden, he must provide "facts . . . indicating that the information would . . . actually help[ ] prove his defense."  *Id.*   As stated in *United States v. Mandel*, a decision cited approvingly in *Caro*, "[n]either a general description of the information sought nor conclusory allegations of materiality suffice; a defendant must present facts which would tend to show that the Government is in possession of information helpful to the defense."  914 F.2d 1215, 1219 (9th Cir. 1990).  In *United States v. Armstrong*, the Supreme Court explained that, under Rule 16, "'the defendant's defense' means the defendant's response to the Government's case in chief."  517 U.S. 456, 462 (1996).

There is a relative dearth of case law applying the Rule 16 materiality at the suppression

stage. In one such case, however, a Maryland district court concluded that the Rule 16 materiality standard could simply be transposed to the suppression stage by assessing whether the requested material "might alter the 'quantum of proof' in [the defendant's] favor if the suppression motion were successful." *United States v. Wilford*, 961 F. Supp. 2d 740, 756 (D. Md. 2013). That decision focused on internal memoranda regarding the applicability of an appellate decision to federal agents. The court reasoned the information might go to the viability of the good faith exception, so it deemed the memoranda material under *Brady*. *Id.* *Wilford* sets forth a conceivable standard to apply in the motion to suppress context.

Considering *Wilford* through the clarification of *Caro*, a reasonable rule for Rule 16 materiality at this stage could be: whether the sought-after discovery would enable the defendant to significantly alter the quantum of proof in his favor for purposes of the suppression motion. And the bottom-line inquiry for the Court should be whether the defendant put forth "facts" that the requested discovery would "actually help[ ] prove his [suppression] defense." *Caro*, 597 F.3d at 621.

**2.    *Brady* Materiality, if applied at the suppression stage, should turn on whether the outcome of the motion to suppress would or should be any different with the sought-after materials.**

*Brady* materiality sets forth a "reasonable probability" standard that asks whether, in the context of all the information "collectively, not item by item," "the result of the proceeding would have been different" had the information been disclosed. *Kyles v. Whitley*, 514 U.S. 419, 433 (1995). "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States v. Agurs*, 427 U.S. 97, 109–10 (1976).

Similar to his Rule 16 request, the defendant's contention that the Court must provide a

ruling on his *Brady* motion prior to the suppression hearing contradicts well-settled precedent. "The *Brady* right . . . is a *trial* right" that "exists to preserve the fairness of a trial verdict and to minimize the chance that an innocent person would be found guilty." *United States v. Moussaoui*, 591 F.3d 263, 285 (4th Cir. 2010) (emphasis in original); *see also United States v. Bulloc*k, 130 F. App'x 706, 723 (6th Cir. 2005) (unpublished) ("It is hardly clear that the *Brady* line of cases applies to suppression hearings.") (quoting *United States v. Bowie*, 198 F.3d 905, 912 (D.C. Cir. 1999)).[4]

The Seventh Circuit recently provided a roadmap that this Court can follow if it seeks to assess materiality through the prism of the defendant's motion to suppress.  Without deciding whether *Brady* applied to pretrial suppression hearings, the Seventh Circuit explained that materiality is met only where "the outcome of the motion to suppress would (or should) have been any different" if the information sought had been disclosed or obtained.  *United States v. Thomas*, 835 F.3d 730, 735–36 (7th Cir. 2016).   In other words, the defendant must demonstrate that there is a reasonable probability that the outcome of the motion to suppress would or should be different with the sought after information.

### 3. The defendant has not established materiality under Rule 16 or *Brady* for the requested discovery.

The only "facts" set forth by the defendant on the materiality of the sought-after

---

[4] A later panel in *United States v. Fisher* did conclude that a defendant's guilty plea was not knowingly and voluntarily entered after affirmative misrepresentations by an officer working his case came to light.  711 F.3d 460, 469 (4th Cir. 2013).  The *Fisher* decision relied on *Brady v. United States*, 397 U.S. 742 (1970) not *Brady v. Maryland*.  Any conflict in these opinions should be resolved in favor of the *Moussaoui* panel.  *See McMellon v. United States*, 387 F.3d 329, 333 (4th Cir. 2004) (en banc) ("This court has adopted the rule that prior decisions of a panel of the court are binding precedent on subsequent panels unless and until overturned [e]n banc. Where there is direct conflict, the precedential decision is the first.").

discovery arise from his expert witness's testimony.  As explained below, that testimony falls short of meeting the standard for materiality under both Rule 16 and *Brady*.

> **a.   Under Rule 16, the defendant failed to show that the sought-after material would "significantly alter the quantum proof in his favor" for suppression.**

As explained above, Rule 16 materiality asks whether the discovery "would have helped" the defendant "prove his defense."  *Caro*, 597 F.3d at 621.  In the context of the suppression issue, the defendant's expert's testimony did not show "that the pretrial disclosure of the disputed evidence" would have the effect of "significantly … alter[ing] the quantum of proof in [the defendant's] favor."  *Caro*, 597 F.3d at 621.

Regarding the material requested in paragraph 1 of the defendant's Motion, the expert's testimony about Wi-Fi access points focused on location points accessed by accounts *other* than those related to the defendant's Google account.  But suppression, as a remedy to a Fourth Amendment violation, requires the assertion of one's *own* rights.  *See Rakas v. Illinois*, 439 U.S. 165, 174 (1969).  Thus, whatever the import of the expert's testimony on Wi-Fi access points, it does nothing to move the needle on the issue of suppression.  The location of Wi-Fi access points do nothing to establish either the defendant's expectation of privacy in Google location information or that the GeoFence warrant was a general warrant.

As to the materials in paragraphs three through five of the defendant's Motion, the information concerning details of Google's Sensorvault similarly is, with one exception, not material to establishing the defendant's expectation of privacy in Google location information or

that the GeoFence warrant was a general warrant.[5]   The expert's testimony on Google's algorithm was speculative at best.  It evinced no specific facts suggesting how information about algorithm would demonstrate that the GeoFence warrant obtained in this case was a general warrant.  The defendant's expert simply speculated about the helpfulness of the algorithm—and even then he presumed the algorithm was complex and difficult to assess.   That testimony does not show how access to that information would alter the "quantum of proof," much less significantly.

The same can be said for a plethora of the defendant's other requests, including: (1) how Google stores the location data; (2) all manuals, policies, guidelines, presentations, and protocols relating to how Google stores the data; (3) how Google analyzes and sorts the location data to respond to law enforcement requests; (4) how often Google collects location data on non-Android phones using Google applications, services, or software; and (5) the name(s) and training, certifications, and qualifications of the individual(s) at Google who gathered and turned over the location data in this case to law enforcement officials.  *See* ECF No. 28, at ¶¶ 3, 4, 5, 9. The breadth of these requests in the absence of factual support for their relevance here suggests an unwarranted fishing expedition.

In sum, the manner in which Google stores or collects the location data and searches for the information sought in this case are not relevant to defendant's claim that the GeoFence warrant was a general warrant.  These requests do not speak to the constitutionality of the search

---

[5] One subcategory of information sought by the defendant is potentially material to whether he possessed an expectation of privacy in Google location information:  "privacy policies relating to Sensorvault."  ECF No. 28 at ¶ 4.e.  However, as the United States noted previously, Google makes its privacy policies publicly available.  *See* ECF 41 at 5 n.2; https://policies.google.com/privacy/archive.

warrant in this case.  As stated in the United States' response to Google's amicus brief, service providers commonly review large sets of customer records to produce information in response to appropriately limited legal process.  *See* ECF No. 71 at 4-5.  The names and certifications of Google analysts similarly will not help prove the defendant's suppression defense.

The questions relevant to defendant's suppression motion include whether he had a reasonable expectation of privacy in Google's location information and whether the GeoFence warrant complied with the Fourth Amendment.  The defendant has not provided this Court with facts demonstrating that the sought-after materials will significantly alter the quantum of proof in his favor regarding these issues for the suppression motion.

> **b.  Under *Brady*, the defendant failed to show a reasonable probability that the outcome of the motion to suppress would or should be any different with the sought-after information.**

Likewise, the defendant fails to meet his burden under *Brady*.  For purposes of *Brad*y, materiality turns on whether the suppressed evidence creates "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *Kyles*, 514 U.S. at 433.  That materiality must be considered "collectively, not item by item." *Id.* at 436.

Time after time, the defendant's expert speculated about the nature of the information sought in the motion for discovery.  For the same reasons given above in the analysis of Rule 16 materiality, there is not a reasonable probability that the defendant's suppression motion would be granted with discovery on Google's Wi-Fi access points, Google's algorithm, the manner of Google's storage of location information, Google's search for the location information responsive to the search warrant, or the total number of Google users whose location information is stored.  The defendant's expert did not indicate in a single sentence of his testimony that the

defendant's location coordinates were possibly "outside of the box" at the first stage of the search warrant.  Nor did he explain why an algorithm would possibly undermine the coordinates provided for the defendant.  To the contrary, the defendant simply points this Court to the coordinates provided for other Google users.  That argument takes him nowhere, because Fourth Amendment rights "may not be vicariously asserted." *Rakas*, 439 U.S. at 133-34 (quoting *Alderman v. United States*, 394 U.S. 165, 174 (1969)).

### III.   Conclusion

The Court should deny the defendant's motion to for discovery.

Respectfully submitted,

G. ZACHARY TERWILLIGER
United States Attorney

By:                                /s/
                                                               
Kenneth R. Simon, Jr.
Peter S. Duffey
Assistant United States Attorney
United States Attorney's Office
Eastern District of Virginia
919 E. Main Street, Suite 1900
Richmond, VA 23219
(804) 819-5400
Fax: (804) 771-2316
Email: Kenneth.Simon2@usdoj.gov