IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Case No. 3:19cr130 |
| ) | |
| OKELLO T. CHATRIE, ) | |
| Defendant ) | |

### DEFENDANT'S RESPONSE TO THE GOVERNMENT'S SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO DEFENDANT'S DISCOVERY OF SENSORVAULT DATA

Okello Chatrie, through counsel, respectfully submits this response to the government's Supplemental Memorandum in Opposition to Defendant's Discovery of Sensorvault Data. *See* ECF No. 88. Notwithstanding the government's arguments, Mr. Chatrie is entitled to discovery on all of the outstanding items in his discovery request, ECF No. 28, under *Brady v. Maryland*, 373 U.S. 83 (1963), and/or Federal Rule of Criminal Procedure 16.

### INTRODUCTION

On January 21, 2020, this Court ordered cross-briefing on the application of Rule 16 and *Brady* to a suppression hearing, a relatively novel issue raised by the facts of this case. ECF No. 77. On February 18, 2020, the parties submitted their briefs. *See* ECF Nos. 87 & 88. Mr. Chatrie argued that he is entitled to receive discovery on all of the requested items under both *Brady* and Rule 16. *See* ECF No. 87 at 1-4. Mr. Chatrie maintains that it is not sufficient for the government to tell him to "go ask Google." Rather, Google played an indispensable role in the investigation, making it a part of the prosecution team for *Brady* and Rule 16 purposes. Moreover, the government is in actual possession of quite a few documents requested by Mr. Chatrie that do not

1

require Google's involvement at all. The government did not address these latter requests in its submission.

As an initial matter, it is hugely significant that the government does not deny Google's essential role in the initial phases of this investigation. In fact, the government appears to agree with Mr. Chatrie that the relevant legal question is whether Google functioned as a part of the government under a "practical analysis" of the facts. *See* ECF No. 88 at 8. The government admits that Google *did* play a role in the initial investigation, the results of which are the only evidence tying Mr. Chatrie to the robbery in the first place. *See* 1/21/20 Tr. at 172-73. The government states that "Google played a limited role," denying only that it was involved in the "*longterm* investigation" and "*overall* presentation" of the case. ECF No. 88 at 11. But the government concedes Google's role in identifying Mr. Chatrie as a suspect, *see* 1/21/20 Tr. at 172-73, a role that Mr. Chatrie submits is central to the government's case.

Second, Mr. Chatrie has made thorough arguments supporting the materiality of each of the requested discovery items. *See* ECF No. 87 at 8-19, 24-28. And as Mr. Chatrie has explained on at least two previous occasions, he does not seek to assert the Fourth Amendment rights of others; he seeks to assert his own. *See* ECF No. 29 at 17 and ECF No. 48 at 16-17. A warrant like the one in this case, so lacking in particularity and so overbroad as to render it a general warrant, is no warrant at all. Instead, it is *void ab initio*, invalid from the beginning. That is why the broad parameters of the initial search are material, and that is why Mr. Chatrie is entitled to information about the full extent of Google's search conducted at the government's behest.

Finally, Mr. Chatrie is entitled to information about the government's role in the geofence search that is undoubtedly in the government's actual possession. The government's brief devotes its attention to minimizing Google's role in the geofence search, but it does not adequately address

the discovery items that it possesses directly, including requests 10, 11(c)-(e), and 12. All of these items seek information about law enforcement's part in the search process, including the government's own policies, procedures, and memoranda, all of which may be provided to Mr. Chatrie without contacting Google.

**ARGUMENT**

1. **Google is Part of the Prosecution Team**

At least at one point, the government seems to agree with Mr. Chatrie that the touchstone for determining whether Google is part of the "prosecution team" under *Brady* and Rule 16 is whether there is an agency-principal relationship. *See* ECF No. 88 at 7. Yet the government also focuses on extraneous factors, such as federalism concerns, and relies on cases that are readily distinguishable. *See, id.* at 6, 11, 15. Under the facts in this case, however, it is apparent that Google had an agency-principal relationship with the government and functioned as a critical part of the prosecution team. Indeed, there would be no prosecution but for Google's role in conducting a boundless search of its users at the behest of the government.

Contrary to the government's characterization, Google was not simply asked to produce "a narrowly limited set of business records" *Id.* at 1. Nor does it "[fit] the role of a prototypical third-party witness." *Id.* at 9. On the contrary, the government commandeered Google to conduct an extraordinary search of its users, one of such unprecedented scope that Google filed an *amicus* brief to explain its "uniquely broad" requirements. ECF No. 59-1 at 16. Whereas typical warrants compel Google to disclose information associated with a specific user, "[g]eofence requests represent a new and increasingly common form of legal process that is not tied to any known person, user, or account." *Id.* As Google notes, not even so-called "tower dumps" are comparable, because they are at least limited to "records of the mobile devices that connected to a particular

3

cell tower at a particular time." *Id*. at 14. Here, by contrast, Google had to search *every* user with Location History data enabled. That number is so large that neither the Court nor the parties have been able to ascertain it with certainty, but it is likely in the millions or billions. *See* 1/21/20 Tr. at 168. This is far from a "narrowly limited" or "prototypical" warrant.

Nonetheless, such requests are, distressingly, "increasingly common." ECF No. 59-1 at 16. According to Google, there has been a "1,500% increase in the number of geofence requests it received in 2018 compared to 2017; and to date, the rate has increased over 500% from 2018 to 2019." *Id.* at 8. It is therefore unsurprising that Google felt the need to establish a process for handling this deluge of novel requests. As Google explains, it "developed a multi-step anonymization and narrowing protocol to ensure privacy protection for its users," which entails the three-step process used here. *Id*. at 17. Developing such a process was necessary because of "the steps Google must take to respond to a geofence request," namely a "broad an intrusive search across Google users' [Location History] information" at the government's command. *Id*. at 8-9. In short, Google had to come up with a way of participating in the government's investigation, as required by law, while attempting to preserve the privacy of its users, albeit imperfectly. Google's creation of this process, as well as its adherence to it, demonstrate Google's role in this case beyond that of a mere witness or custodian of records. Witnesses do not generally negotiate the terms of their cooperation or opt to provide "anonymized information" to investigators. Rather, the existence of such a multi-step process illustrates Google's unique obligations when searching user location data on the government's behalf.[1]

---

[1] If anything, Google functioned like a filter team, a group of walled-off investigators responsible for searching large amounts of irrelevant or potentially-privileged documents in order to provide responsive items to prosecutors. Use of a filter team, however, does not alter or relieve the government of its responsibility to comply with its discovery obligations under *Brady* and Rule 16.

4

The government argues, without support, that private companies like Google can never be government actors. *See* ECF No. 88 at 7 ("[T]he United States reiterates that Google was not, is not, and never will be a government agency or actor."). But private actors can become a part of the prosecution team for discovery purposes when they act as the government's agent to execute a search. This was the case in *McCormick v. Parker*, where a nurse was a member of the prosecution team because she conducted an examination of a sexual assault victim "at the behest of" law enforcement. 821 F.3d 1240, 1247 (10th Cir. 2016). Because the exam was "investigative in nature" and initiated as part of a criminal investigation, the Tenth Circuit concluded that those conducting the exams were part of the prosecution team for *Brady* purposes. *McCormick*, 821 F.3d at 1247 (citing *State v. Farris,* 656 S.E.2d 121, 126 (W. Va. 2007) (concluding that forensic psychologist who interviewed child sex abuse victim at law enforcement's request "became part of the prosecutor's investigation team" for *Brady* purposes)). Similarly, in *Bracamontes v. Superior Court of San Diego County*, a California court determined that a private technology company providing DNA analysis for law enforcement was a part of the prosecution team. 2019 WL 6044552, at *6-10 (Cal. Ct. App. Nov. 15, 2019). And in *United States v. Rosenschein*, a federal court determined that the National Center for Missing and Exploited Children ("NCMEC") was a member of the prosecution team under *Brady* due to its role in using IP address information to identify the location of a user. No. CR 16-4571 JCH, 2019 WL 2298810, at *7 (D.N.M. May 30, 2019). As in *Rosenschein*, it was Google's act of investigating users and providing that information to law enforcement that effectively commenced the prosecution in this case. *Id.*; *see also United States v. Ackerman*, 831 F.3d 1292, 1301-1302 (10th Cir. 2016) (finding that NCMEC was a government agent for Fourth Amendment purposes). Here, Google did the search that set the rest of the case in motion. It was not an expert analyzing results. It was not working on an unrelated

case. It was commandeered by the government to do an unprecedented search of user location data, without which, there would be no prosecution at all.

Many of the cases the government cites, including *Rosenschein*, actually support Mr. Chatrie's analysis. The government describes *Rosenschein*, inaccurately, as "collecting cases" that focus on whether a "federal prosecutor['s]" disclosure obligation extends to "some other component of the federal government." ECF No. 88 at 6. But *Rosenschein* concerned a private entity, NCMEC, and held that it was "part of the prosecution team" because NCMEC conducted "a limited investigation into the facts of [the] case." 2019 WL 2298810, at *7. (The cases *Rosenschein* collects actually concern a different point, *i.e.*, whether "[t]he courts that have defined 'the government' for purposes of Rule 16 interpret the phrase to include only the prosecution team." *See Rosenschein* at *4; ECF No. 87 at 28.)

Similarly, the government cites *United States v. Joselyn*, 206 F.3d 144 (1st Cir. 2000), and *United States v. Gray*, 648 F.3d 562 (7th Cir. 2011), and without describing their facts, states that they do not support Mr. Chatrie's position that Google, while generally being a private entity, is part of the prosecution team. ECF No. 88 at 7 n.1. These cases do quite the contrary. *Joselyn* held that despite a third party's discussion of legal issues with the government, "there [was] no evidence that [its] lawyers were, in any sense, prosecutors here. Instead, they were trying to dodge prosecution of their client." 206 F.3d at 152. The court held the third party was not part of the prosecution team due to this disconnect, focusing on the lack of an agency-principal relationship. Likewise, *Gray* held that a private entity was not part of a Medicaid fraud prosecution team because "[i]t had been hired . . . to process and pay bills submitted to Indiana Medicaid," not to do investigative work. 648 F.3d at 566. But *Gray* contrasts its facts with "a *private* detective agency hired by the state agency to assist state and federal prosecutors," indicating that such a private firm

6

would be considered a part of the prosecution team. *Id*. at 566-67 (emphasis added) ("Otherwise investigators assisting in a prosecution could conceal from the prosecutors exculpatory evidence that the investigation had revealed and then evidence would never be revealed to the defense."). In sum, the government's case law actually supports the focus on the agency-principal relationship, irrespective of whether the entity in question is private.

The government also cites cases in which third parties, like witnesses, were found to not be part of the prosecution team, but again, these cases simply reaffirm the centrality of the agency-principal relationship. *See* ECF No. 88 at 10-11. In *United States v. Stewart*, 433 F.3d 273 (2d Cir. 2006), an expert witness was not part of the prosecution team because he was not "in any way involved with the investigation or presentation of the case to the grand jury," and he did not "interview witnesses or gather facts." *Id*. at 298-99. Similarly, in *Avila v. Quarterman*, 560 F.3d 299 (5th Cir. 2009), the expert witness's "own affidavit [did] not portray his role as anything but a pathologist" and so he was not "part of the prosecution team pursuant to the principles of agency law." *Id*. at 308-309. Lastly, *United States v. Meregildo*, 920 F. Supp. 2d 434 (S.D.N.Y. 2013), held that a witness who signed a plea agreement was not part of the prosecution team because "[i]nteracting with the prosecution team, *without more*, does not make someone a team member." *Id*. at 441-42 (emphasis added). Rather, "the more involved individuals are with the prosecutor, the more likely they are team members." *Id*. at 442. "At bottom, imputation involves a question of agency law." *Id*. at 443.

The remainder of the government's citations are irrelevant to the facts and legal issues of this case. *See* ECF No. 88 at 10-11. For example, *United States v. Stein*, 488 F. Supp. 2d 350 (S.D.N.Y. 2007), did not concern the prosecution team issue. The accounting firm in *Stein* gave "the government the legal right to obtain the documents in question," making it clear the

government had "custody and control" under Rule 16. *Id*. at 363. Next, as the government admits, *Moreno-Morales v. United States*, 334 F.3d 140 (1st Cir. 2003), and *United States v. Beers*, 189 F.3d 1297 (10th Cir. 1999), were both decided based on federalism concerns that are not relevant here. ECF No. 88 at 10-11. *Moreno-Morales* discusses how the "Puerto Rico Senate was not acting on behalf of the federal government; rather, it was conducting independent investigations." 334 F.3d at 146. *Beers* discusses how "[i]t is unrealistic to expect federal prosecutors to know . . . information result[ing] from an unrelated state investigation." 189 F.3d at 1304.

The government argues that an entity negotiating over the execution of a search warrant is always "normal" and a "non-event" as to the prosecution team question, but inaccurately cites narrow case law as supporting this broad proposition. *See* ECF No. 88 at 13-15. In *United States v. Tomasetta*, No. 10 CR 1205 PAC, 2012 WL 896152 (S.D.N.Y. Mar. 16, 2012), third party Vitesse "negotiated details regarding document production" but these details were merely logistical, such as how to deal with its inability to "quickly identify the documents responsive to the Government's subpoenas because the original documents did not have bates numbers." *See id*. at *2. Google, by contrast, was not negotiating over logistics; it was negotiating a process for determining what content would be turned over to law enforcement, in what form, and at what step. Nothing about that process is a "normal" response to a search warrant. Similarly, the "how-to guides" cited by the government, *see* ECF No. 88 at 14 n.2, even if persuasive, merely provide logistical advice such as monitoring government agents during a physical search and "keep[ing] the lead agent happy." *See, e.g.,* Kirkland & Ellis, A How-To-Guide For an Effective FBI Search Warrant Response Program (Oct. 2002), https://www.kirkland.com/siteFiles/kirkexp/publications/2509/Document1/MA-9-search_dfa.pdf at 4, 7. This is a far cry from creating a three-step search process with an anonymization protocol.

Finally, the government cites its response to Google's amicus brief in support of its assertion that "service providers commonly review large sets of customer records" in response to government requests. ECF No. 88 at 21 (citing ECF No. 71 at 4-5). That brief cites, without description, *Ameritech Corp. v. McCann*, 403 F.3d 908 (7th Cir. 2005). *Ameritech* involved a civil lawsuit seeking statutory reimbursement from the government for the time spent responding to data requests. *Id*. at 909-10. It did not involve any Fourth Amendment or other constitutional issues, much less the grave ones posed by this case. It does not absolve the government of its burden to confront them.

The question here is less complicated than the government's argument would suggest. Rather, the question is whether—as Mr. Chatrie submits they do—Google's actions amount to an "actor participating in a specific criminal investigation at the behest of the government," *see* ECF No. 87 at 23, or—as the government argues—merely an "entity providing a narrowly limited set of business records," *see* ECF No. 88 at 6. The latter position is not supported by the law or the extraordinary facts before the Court.

### 2. Mr. Chatrie's Discovery Requests are Material

The government seems to generally agree with Mr. Chatrie on the legal standard for determining whether his discovery requests are material. Under Rule 16, "[t]here must be some indication" that the evidence would "significantly alter the quantum of proof in [the defendant's] favor," including in a "challenge [to] the constitutionality of admitting specific pieces of evidence." ECF No. 87 at 23-24 (citing *United States v. Caro*, 597 F.3d 608, 621 (4th Cir. 2010)); *see* ECF No. 88 at 16-17. Under *Brady*, nondisclosure of the evidence should create "a probability sufficient to undermine confidence in the outcome of the Court's anticipated suppression ruling." ECF No. 87 at 6. While the government first asserts applying *Brady* to a suppression hearing "contradicts well-settled precedent," it nonetheless offers a legal standard "that this Court can

9

follow" in applying *Brady* that is effectively the same. *See* ECF No. 88 at 17-18 (requiring a "reasonable probability" that the suppression outcome would be different). Regardless, the government does not cite any case law contradicting the fact that "[e]very circuit that has decided the question of whether *Brady* applies in the suppression context has held that it does." *See* ECF No. 87 at 6 (collecting cases).

The real dispute arises in applying these standards to Mr. Chatrie's discovery requests. The defense outlined how each request is material under Rule 16, ECF No. 87 at 8-19, and/or *Brady*, *id*. at 24-28. However, the government dismisses the requests *en masse* by claiming that Mr. McInvaille's testimony was "speculative" and repeating old arguments that the defense has rebutted. *See id*. at 19-22. Specifically, the government repeats that "Fourth Amendment rights 'may not be vicariously asserted.'" *Id*. at 19, 21-22 (citing *Rakas v. Illinois*, 439 U.S. 165, 174 (1969)). But as Mr. Chatrie has argued from the beginning, he does not seek to assert the Fourth Amendment rights of others; he seeks to assert his own. *See* ECF No. 29 at 17 and ECF No. 48 at 16-17. The parameters of the initial search, including how many users were affected, goes to the validity of the warrant. Mr. Chatrie maintains that it is so lacking in particularity and so overbroad that it is a general warrant. And a general warrant is no warrant at all. Instead, a general warrant should be treated as *void ab initio*, meaning that Mr. Chatrie is asserting his Fourth Amendment right to be free from warrantless searches and seizures. *See* ECF No. 29 at 7 (citing *United States v. Kreuger*, 909 F.3d 1109 (10th Cir. 2015) (Gorsuch, J., concurring); *Groh v. Ramirez*, 540 U.S. 551 (2004)); ECF No. 48 at 16-17. Moreover, with a warrant "that implicates . . . a million folks" or possibly "a billion," developing a record with information such as "the total number of Google users whose location is stored" is not simply a "fishing expedition." *See* 1/21/20 Tr. at 194; ECF No. 88 at 20. Rather, such a record will "alter the quantum of proof" as to whether this geofence

warrant was a general warrant, and thus *void ab initio*. *See Caro*, 597 F.3d at 612 (internal quotation marks omitted).

By claiming Mr. McInvaille's testimony was "speculative," the government hopes to deny the materiality of Mr. Chatrie's requests for information about Google's Sensorvault, such as its algorithm, how often Google collects location data on non-Android phones, and identification of the individuals who gathered and turned over the data in this case. *See* ECF No. 19-21. The only thing "speculative" about Mr. McInvaille's testimony is that he does not have access to the information that the defense seeks because only Google and law enforcement officials do. *See* 1/21/20 Tr. at 21, 137-38. If the defense already had access to the information it seeks through the discovery request in ECF No. 28, it would have no reason to engage in protracted litigation to obtain it.

The government's brief only specifically discusses the request for Google's algorithm. Mr. McInvaille's testimony makes it clear that the algorithm is material to Mr. Chatrie's particularity and overbreadth arguments. Mr. McInvaille demonstrated that the algorithm's estimation of user location creates false positives, such as "Mr. Green," who was driving on a road outside the geofence. *See* 1/21/20 Tr. at 65, 69, 82. More information about the algorithm's accuracy "would likely confirm that the geofence captured users outside the 150-meter radius and demonstrate that Google was aware of this phenomenon." ECF No. 87 at 12. The government ignores this substantive testimony and instead focuses on Mr. McInvaille's use of words like "could" when describing the potential insight gained from the algorithm and "complex" when describing the algorithm's potential character. *See* ECF No. 88 at 3-4 (citing 1/21/20 Tr. at 72, 119). Yet perfect knowledge is neither possible nor required. That is why the materiality standards under both Rule

11

16 and *Brady* speak of probabilities, not certainties. *See Caro*, 597 F.3d at 621 ("some indication"); *Kyles*, 514 U.S. at 421-22 ("reasonable probability").

The Court has recognized that this is "a case of first impression involving technology that both parties, to some degree, are claiming ignorance [of]." 1/21/20 Tr. at 179. Mr. Chatrie's discovery requests address this ignorance and are integral to the Court's goal of "mak[ing] as good a record as [it] can." *See id*. at 184. While the government has simply dismissed the "plethora" of Mr. Chatrie's requests, *see* ECF No. 88 at 20, the defense has carefully and individually explained why each request is material to the "important Fourth Amendment and federal rules issues" in this case, *see* 1/21/20 Tr. at 179.

### 3. Information in the Government's Actual Possession

In its supplemental filing, the government did not address the discovery requests in paragraphs 10 (requesting name(s) and qualifications of individuals involved in using or analyzing the geofence warrant data), 11(c) and 11(e) (requesting training materials, policies, guidelines, and presentations law enforcement officials have relating to obtaining and using Sensorvault data), 11(d) (requesting contracts, memoranda of understanding, and agreements between Google and law enforcement relevant to the use of Sensorvault data for geofence warrants), and 12 (requesting all records produced as a result of the geofence warrant in this case, including notes or memoranda of conversations regarding the search or actions taken as part of the search process, as well as any written justification for such actions) of the discovery motion, *see* ECF No. 28. All of these requests seek information that is without question within the custody and control of members of the prosecution's team.[2]

---

[2] To the extent that some of the information sought in these requests simply does not exist, then all the government needs to do is state that. But, to simply to give no response will allow the Court to "consider directly any adverse effect that the prosecutor's failure to respond [to the discovery request] might have

As set forth in Mr. Chatrie's supplemental briefing, these requests are also material to preparing for the suppression hearing on Mr. Chatrie's challenge to the constitutionality of the geofence general warrant in this case. *See* ECF No. 87 at 17-19 (describing materiality for information sought in paragraphs 11(c) and 11(e) of ECF No. 28), 26 (describing materiality under Rule 16 standard for information sought in paragraph 10 of ECF No. 28), 26-27 (describing materiality under Rule 16 standard for information sought in paragraph 11(d) of ECF No. 28), 27-28 (describing materiality under Rule 16 standard for information sought in paragraph 12 of ECF No. 28). The government appears to recognize that at least memoranda, notes, and documents relating to any legal consultation that law enforcement officials in the case had with an attorney about the constitutionality of the geofence warrant is material to the government's good faith argument. *See* ECF No. 88 at 17 (citing *United States v. Wilford*, 961 F. Supp. 2d 740, 756 (D. Md. 2013), for the proposition that "internal memoranda regarding the applicability of an appellate decision . . . [was] deemed material under *Brady*"). But, as of yet, the government has not responded to these requests.

For over two centuries, the Supreme Court has recognized that it is "essential to the administration of justice," that a criminal defendant have adequate time to investigate and present his case to the court after receiving material information from the prosecution. *See United States v. Stewart*, 2 U.S. 343, 343 (1795) (finding that defense must be given list of witnesses well enough in advance to allow the defense to investigate the potential testimony and veracity of the witnesses). To hold otherwise would render the production to the defense of material information "nugatory and delusive . . . ." *Id.* at 344. The Fourth Circuit has adhered to this fundamental principle of justice in requiring that the government produce material evidence in time for its

---

had on the preparation or presentation of the defendant's case." *United States v. Bagley*, 473 U.S. 667, 683 (1985).

13

effective use. *See, e.g.*, *United States v. Smith Grading and Paving, Inc.*, 760 F.2d 527, 532 (4th Cir. 1985); *Hamric v. Bailey*, 386 F.2d 390, 393 (4th Cir. 1967) ("If it is incumbent on the State to disclose evidence favorable to an accused, manifestly, that disclosure to be effective must be made at a time when the disclosure would be of value to the accused.").

As Mr. Chatrie argued in the discovery hearing, *see* 1/21/20 Tr. at 175-76, and in the supplemental briefing, much of the information requested in paragraphs 10, 11(c)-(e), and 12 of the discovery motion relates to potential impeachment materials and will likely spur further investigation and preparation by the defense. *See* ECF No. 87 at 17-19 (describing, as an example of potential impeachment that will likely need follow-up investigation, potential government use of private industry tool to create affidavit for geofence general warrant), 25-28 (describing potential impeachment that will likely need follow-up investigation). As a practical matter for effective use of the Court's time at the suppression hearing, the government's production of this information before the suppression hearing itself will likely prevent the need to recess the hearing to accommodate the need for the defense to investigate and integrate unwieldy information that could have been provided before the hearing. *See* 1/21/20 Tr. at 175-76. As set forth above, and in ECF Nos. 28, 49, and 87, this information is material, in the possession of the prosecution team, and the government must produce it in time for its effective use at the suppression hearing.

## CONCLUSION

For the foregoing reasons, Mr. Chatrie respectfully submits that he is entitled to discovery on all of the outstanding requests in ECF No. 28 under *Brady*, Rule 16, or both, regardless of whether the materials are in the government's actual possession or are maintained by Google, which functioned as an agent of the prosecution team in this case.

Respectfully submitted,
OKELLO T. CHATRIE

By: _____/s/_____
Michael W. Price
NY Bar No. 4771697 (pro hac vice)
Counsel for Defendant
National Association of Criminal Defense Lawyers
Fourth Amendment Center
1660 L St. NW, 12th Floor
Washington, D.C. 20036
Ph. (202) 465-7615
Fax (202) 872-8690
mprice@nacdl.org

_____/s/_____
Laura Koenig
Va. Bar No. 86840
Counsel for Defendant
Office of the Federal Public Defender
701 E Broad Street, Suite 3600
Richmond, VA 23219-1884
Ph. (804) 565-0881
Fax (804) 648-5033
laura_koenig@fd.org

CERTIFICATE OF SERVICE

    I hereby certify that on February 25, 2020, I filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to all counsel of record.

_____/s/_____
Laura Koenig
Va. Bar No. 86840
Counsel for Defendant
Office of the Federal Public Defender
701 E Broad Street, Suite 3600
Richmond, VA 23219-1884
Ph. (804) 565-0881
Fax (804) 648-5033
laura_koenig@fd.org