1

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF VIRGINIA
 2                     RICHMOND DIVISION

 3

    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
 4                                )
    UNITED STATES OF AMERICA      )
 5                                )    Criminal No.
    v.                            )    3:19CR130
 6                                )
    OKELLO T. CHATRIE             )    March 4, 2021
 7  _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _)

 8                        DAY ONE

 9       COMPLETE TRANSCRIPT OF MOTION TO SUPPRESS
          BEFORE THE HONORABLE M. HANNAH LAUCK
10             UNITED STATES DISTRICT JUDGE

11

12  APPEARANCES:

13  Kenneth R. Simon, Jr., Assistant U.S. Attorney
    Peter S. Duffey, Assistant U.S. Attorney
14  U.S. Attorney's Office
    SunTrust Building
15  919 East Main Street, Suite 1900
    Richmond, Virginia   23219
16
    Nathan P. Judish, Assistant U.S. Attorney
17  U.S. Department of Justice
    950 Pennsylvania Ave., NW
18  Washington, Virginia   20530

19          Counsel for the United States

20  Laura J. Koenig, Assistant Federal Public Defender
    Paul G. Gill, Assistant Federal Public Defender
21  Office of the Federal Public Defender
    701 E. Broad Street, Suite 3600
22  Richmond, Virginia   23219

23          Counsel for the Defendant

24              DIANE J. DAFFRON, RPR
               OFFICIAL COURT REPORTER
25            UNITED STATES DISTRICT COURT
```

2

1    APPEARANCES:  (Cont'd)

2    Michael W. Price, Esquire
     National Association of Criminal Defense Lawyers
3    1660 L Street, NW
     12th Floor
4    Washington, DC   20036

5          Counsel for the Defendant

6

7                    I N D E X

8
                         DIRECT   CROSS   REDIRECT
9
     SPENCER McINVAILLE        16      126      170
10
     MARLO McGRIFF            190      --       --
11

12

13
                    E X H I B I T S
14
                                                   Page
15   DEFENDANT'S EXHIBITS:

16   No. 1      Geofence Warrant and Application    27

17   No. 2      Google Amicus Curiae Brief         200

18   No. 3      PDF of Raw Data                     34

19   No. 5      Three Paths Video                   61

20   No. 6      Spencer McInvaille Report           75

21   No. 7      McInvaille Supplemental Report      81

22   No. 8      CSV Google Data File               120

23   No. 11     September 2018 Oracle Submission    92

24   No. 21     McGriff Declaration 1               52

25   No. 23     McGriff Declaration 3               73

3

1
2                         E X H I B I T S
3
                                                            Page
4    DEFENDANT'S EXHIBITS: (Cont'd)
5    No. 27      Every Step You Take                          96
6    No. 30      AZ Ex. 18                                   255
7    No. 31      AZ Ex. 19                                   258
8    No. 32      AZ Ex. 20                                   249
9    No. 33      AZ Ex. 24                                   250
10   No. 34      AZ Ex. 202                                  252
11   No. 36      AZ Ex. 209                                  243
12   No. 38      AZ Ex. 219                                  227
13   No. 40      AZ Ex. 236                                  245
14   No. 43      2018 Privacy Policy - Redline               261
15   No. 46      McGriff Blog 1                              219
16   No. 47      McGriff Blog 2                              218
17   No. 48      2018 Quartz Article                          85
18   No. 49      2018 AP Article 1                           225
19   No. 53      Blumenthal-Markey Letter to FTC             233
20
21   GOVERNMENT'S EXHIBITS:
22   No. 1       CAST Report                                  32
23
24
25

4

 1                    (The proceedings in this matter commenced at
 2      9:30 a.m.)

 3

 4                    THE CLERK:  Case No. 3:19CR130, United States
 5      of America versus Okello Chatrie.
 6                    The United States is represented by Kenneth
 7      Simon, Peter Duffey, and Nathan Judish.
 8                    The defendant is represented by Paul Gill,
 9      Laura Koenig, and Michael Price.
10                    Are counsel ready to proceed?
11                    MR. SIMON:  The United States is ready, Your
12      Honor.
13                    MS. KOENIG:  The defense is ready, Your
14      Honor.
15                    THE COURT:  Okay.
16                    MS. KOENIG:  Before we begin --
17                    THE COURT:  Okay.  I'm aware that we have
18      counsel for Google here.  I don't know if you want to
19      just state your name on the record because that you
20      will be representing witnesses that come forward.
21      It's really up to you.
22                    MS. CARROLL:  Thank you, Your Honor.
23      Catherine Carroll, present on behalf of Google.
24                    THE COURT:  Thank you.
25                    MR. CARROLL:  Thank you.

5

```
1              THE COURT:  All right.  Well, I understand
2     that you all have handled some logistics, that the
3     defense will begin presenting evidence first.  I'll
4     hear any introductory remarks that either side wants
5     to present.  And I think there's something else you
6     wanted to address, and I can't remember.
7              MS. KOENIG:  Yes, Your Honor.  We have a
8     modified sequestration order that the parties have
9     agreed to that we're asking the Court to enter.  Shall
10    I just come to the podium?
11             THE COURT:  Yes.
12             MS. KOENIG:  Each party has an advisory
13    witness.  The defense will designate Spencer
14    McInvaille, who's our expert, as our advisory witness,
15    and ask that he be allowed to remain in the courtroom
16    throughout the proceedings.
17             The government, I understand, will be
18    designating Detective Hylton, who is their case agent
19    as their advisory witness.  The government also has an
20    additional expert, Agent D'Errico, and so he will also
21    be allowed to remain in the courtroom in an expert
22    capacity.  But we are asking that the witnesses, in
23    order that the witnesses -- any other witnesses not be
24    allowed to be in the courtroom, except for during
25    their testimony.
```

6

```
 1              THE COURT:  All right.

 2              MS. KOENIG:  And then the last piece of it is

 3    that the witnesses are not allowed to discuss their

 4    testimony with other witnesses.

 5              THE COURT:  Right.  And, obviously, counsel

 6    aren't allowed to talk about testimony that's coming

 7    in.

 8              MS. KOENIG:  So that is -- that's the

 9    modification, Your Honor, is that the parties have

10    agreed that counsel will be able to talk to witnesses,

11    but the witnesses will not be able to talk to each

12    other.

13              THE COURT:  So that includes Google?

14              MS. KOENIG:  Correct.

15              THE COURT:  All right.  Now, I'm going to ask

16    you to spell the names on the record because I know

17    Hylton is spelled differently than a court reporter

18    might think, and just to be sure that we get

19    everything correct.

20              MS. KOENIG:  Sure.  The defense expert is

21    Spencer McInvaille.  M-c-I-N-V-A-I-L-L-E.  And

22    Detective Hylton is H-Y-L-T-O-N.  And Agent D'Errico,

23    I don't believe there's an apostrophe.  Oh, there is.

24    Okay.  D-apostrophe-E-R-R-I-C-O.  The spelling of the

25    agent was not my preparation today.  Thank you.
```

1          THE COURT:  Does the government have anything

2    to add?

3          MR. SIMON:  Nothing from us, Judge.

4          THE COURT:  All right.  So we will enter the

5    modified sequestration order.  Obviously, counsel will

6    be responsible in making sure that their witnesses

7    know not to speak to each other.  My bet is they

8    already know that, given the counsel that we have in

9    front of us.  And we'll certainly allow the experts to

10   hear the evidence as it goes in.  That's not uncommon

11   and will, I think, serve the interests of the hearing

12   overall.

13         Do we have folks calling in or not?

14         THE CLERK:  Yes, ma'am.  I have the line set

15   up, but it doesn't appear that anybody is on there at

16   this time.

17         THE COURT:  Okay.  So I want you to know

18   we've had some folks ask to call in on an AT&T line.

19   Of course, it's as if we're in open court.  I've

20   okayed that.  If you are aware of anybody who you know

21   who is calling in, I'm going to require counsel to

22   inform them of our Local Rule 53 and the standing

23   order that they cannot record or transmit or give any

24   kind of broadcast of this hearing.  We are in the

25   hearing.  Ms. Daffron will create our record.  And

8

1   especially with an AT&T line, it's a little odd, and

2   we're only really doing this because of COVID.  I just

3   want to be sure that they are aware that even if they

4   sort of want to save something to tell a friend, or

5   somebody who might have an interest in the case, they

6   just cannot.  They can order a transcript, but they

7   can't do anything more than that.

8           MS. KOENIG:  Your Honor, I will tell the

9   Court that we expect that several members of the NACDL

10  staff --

11          THE COURT:  So you have to talk slower and

12  say N-A-D-C-L more clearly.

13          MS. KOENIG:  Thank you.  I expect that

14  several members, staff members, of NACDL, which is the

15  organization that Mr. Price works for, will be calling

16  in.  We are a little surprised they haven't called in

17  already.  But they have already been instructed not to

18  do any recordings or --

19          THE COURT:  We'll say it to anybody who does

20  call in.

21          THE CLERK:  Hopefully, he can hear us.

22          THE COURT:  Can we confirm that he can?

23          THE CLERK:  Mr. Shoop, can you hear us?  No.

24          THE COURT:  So we have somebody from NBC

25  calling in?

9

```
 1              THE CLERK:  Yes.

 2              THE COURT:  I want to be sure that that

 3    person knows.  I have to announce that so he or she

 4    can hear it, too.

 5              THE CLERK:  It is NBC Universal.

 6              THE COURT:  Okay.  NBC Universal.  My

 7    apologies for the delay.

 8              MR. PRICE:  Your Honor, we just got word that

 9    lots of people are on the line considering the beeps,

10    but no one can hear anything.

11              THE COURT:  They can't hear.

12              THE CLERK:  All right.  I'm going to have to

13    call Martin.

14              THE COURT:  All right.  So we have to get our

15    IT involved.  While we're waiting, what I'd like to be

16    sure is that we put on the record the motion we're

17    taking evidence for and other sort of just standard

18    things.

19              MS. KOENIG:  Yes, Your Honor.  I don't expect

20    that the defense will have any introductory remarks.

21    We will be prepared to go straight into evidence.  But

22    this is an evidentiary hearing that is in support of

23    the motion to suppress the evidence obtained pursuant

24    to the geofence warrant, and that is ECF 29, for which

25    there has been a lot of subsequent briefing.
```

1           THE COURT:  Now, you definitely can't speak
2    that quickly, and I didn't hear at all what you said
3    at the end.
4           MS. KOENIG:  Sorry.  For which there has been
5    a lot of subsequent briefing.
6           THE COURT:  Right.  Okay.
7           So while we're waiting also, I want you to
8    know we've gone through a lot of COVID protocol
9    together.  I can see that you all have been very
10   mindful of it and will continue to be.  I'm going to
11   ask you to continue to be, certainly, all through this
12   process.
13          We have a jury trial going on in a courtroom
14   on this floor.  And so what I want you all to do is
15   not move in the hallways unless someone has allowed
16   you to do it.  We're trying to make sure that traffic
17   is not congested so that, I guess, we don't lead into
18   COVID congestion.
19          We can only do two people in an elevator at
20   any one time.  And we really are coordinating on the
21   sixth floor, and a little bit on the seventh floor,
22   with how we're moving people around.  So, certainly,
23   if you have any witnesses who are not in the
24   courtroom, be sure they know that, too.  Our biggest
25   issues with COVID have been, understandably probably,

11

1    I don't want to the say anything too negative, but

2    bored witnesses waiting for their time to be called

3    and then sort of wandering around.  And we just can't

4    have that.  So I'll appreciate your indulgence in

5    that, too.

6            This is our simplest technology.  I have

7    never had an AT&T conference call not work.  My

8    apologies.  They are only hearing us in binary

9    language of beeps.  I guess we need an interpreter.  (

10           (IT is here now.)

11           THE CLERK:  You can tell your folks they

12   might have to call in again.

13           OPERATOR:  Welcome to AT&T's teleconference

14   service.  Please enter your access code followed by

15   the pound sign.  There are 12 participants on the call

16   including you.

17           MR. PRICE:  I'm just letting them to know to

18   call back.

19           THE CLERK:  Okay.  Can the people on the call

20   hear us?  Can somebody say something?

21           AN UNIDENTIFIED PERSON:  Yes, we can hear

22   you.

23           THE COURT:  Thank you all.

24           All right.  I understand now that folks who

25   have called in on the AT&T line can hear us.  We've

1    had some introductory scheduling issues taken care of

2    about witnesses and presentation of evidence.

3            I also informed folks here, and I'm going to

4    inform folks listening in on the AT&T line, that our

5    Local Criminal Rule 53 and our standing order

6    prohibits any kind of broadcasting or telecasting or

7    recording of these events.  Of course, you're welcome

8    to listen in, but it is just as if you were in the

9    courtroom itself.

10           We have one court reporter, who is making the

11   single record that we will have of this proceeding.

12   And it is a violation of our rules to in any way make

13   a different or separate recording or record.

14           Can everybody hear me say that?  Is there

15   anybody on the AT&T call?

16           UNIDENTIFIED PERSON:  Yes.

17           THE COURT:  All right.  So you all are on

18   notice as to that?

19           UNIDENTIFIED PERSON:  Yes.

20           THE COURT:  All right.  Okay.

21           So I will allow the defense to begin

22   presenting evidence.  I guess I want to confirm, is

23   this a continuation of evidence that we heard with

24   respect to discovery, the request for discovery, or is

25   this a whole new record?

13

```
1          MR. PRICE:  Your Honor, we will be repeating
2   some of what we did in the discovery hearing but not
3   all of it, so it's a continuation.  There will be a
4   little bit of repetition, but hopefully not too much.
5          THE COURT:  Right.  That's fine.  I just want
6   to make sure that both sides -- is the government in
7   agreement that you're actually referring to both
8   hearings as far as the evidence that I'm taking into
9   consideration?
10         MR. SIMON:  Judge, I think we asked that the
11  Court certainly can consider that, but the record on
12  appeal, I think, in this case will be about the
13  evidence received at this particular hearing.  And so
14  we don't necessarily think that the transcript from
15  the discovery hearing should override or overtake
16  anything today.  So we'd say focus on the evidence
17  received here today, including from their expert
18  Spencer McInvaille.  But, you know, both sides may
19  refer back to that testimony.
20         THE COURT:  Well, that's my question.  I
21  don't want disputes about what I can take into account
22  or what I can't take into account.  You've been
23  agreeing about the important issues, but it's easier
24  to sort of set the parameters from the start rather
25  than not.
```

1           MS. KOENIG:  Sure.  Your Honor, from the

2      defense perspective, we have learned a lot of

3      information from the time of today past January 2020.

4      So to some extent, some of the issues that we talked

5      about before, like some of the exhibits that we have

6      on our exhibit list that we intend to introduce today,

7      we took to heart the Court's direction that we

8      shouldn't rely on past exhibits.  So we are going to

9      be referring and admitting those separately today.

10          There may be a couple of points that we may

11     not spend as much time on, like, for example, the

12     three paths video we spent quite a bit of time at the

13     discovery hearing on.  And we may not go too much in

14     depth on that simply just to save time because we have

15     a lot of witnesses and a lot of material to move

16     through.  But to the extent there is something

17     different or contradictory or something that is

18     changed, of course, today's record would control

19     simply because at least the defense has moved well

20     beyond where we were information-wise from January

21     2020.

22          THE COURT:  Right.  Which in part is --

23     although we've had, for lots of technological reasons

24     and pandemic reasons and making sure we can have

25     witnesses come in person from other places, we've had

15

1  delay, but we've also had delay that I think maybe

2  will have available to us a better record.

3       What I'm going to say is that I want you all

4  at the end of today, presuming we go into tomorrow,

5  just meet and get a sense if there's going to be any

6  dispute about what we can turn back to.  And if you

7  all want me to make any kind of speedy trial findings,

8  I can do so now.  Is that a good way to start or is

9  anybody objecting to the delay that we've had?  It's

10  been pretty well documented through our case, and, in

11  fact, Mr. Chatrie has asked for a couple of delays

12  himself.

13       I think we've all been on the same page with

14  respect to it, but if there should be findings on the

15  record, I'm happy to make them.

16       MS. KOENIG:  I think all the findings have

17  already been made as to that, Your Honor, and we're

18  just here today ready to move forward.  The defense

19  doesn't have any objections to the findings the Court

20  has previously made.

21       THE COURT:  Right.  Okay.

22       Mr. Simon, you're in agreement?

23       MR. SIMON:  Yes, Judge.  And I don't think

24  the Court was asking, again, about the record piece;

25  is that right?

```
 1              THE COURT:  I'm sorry?

 2              MR. SIMON:  You weren't asking, again, Judge,

 3    about our review of the record, what the Court should

 4    consider?

 5              THE COURT:  No.  I think you guys are going

 6    to agree.  I just want to anticipate before anything

 7    gets too old in our minds any piece of evidence that

 8    you all think you may disagree about, we'll have a

 9    hearing on that, about what to do about it, and we'll

10    do it now, not in two months, is what I'm saying.

11              MR. SIMON:  Understood, Judge.  And like

12    defense counsel know, concerns about the delay here.

13              THE COURT:  Okay.  Thank you.

14              All right.  So we're ready for the defense to

15    begin.

16              MR. PRICE:  Good morning, Your Honor.

17              THE COURT:  Good morning.

18              MR. PRICE:  Michael Price for Okello Chatrie.

19    The defense would like to call Spencer McInvaille,

20    please.

21         SPENCER MCINVAILLE, called by the defendant, first

22    being duly sworn, testified as follows:

23

24              THE COURT:  All right.  Now, as you're

25    approaching the podium and the witness stand, you all
```

1    may do whatever you wish with respect to your comfort

2    zone with respect to COVID.  You may take your mask

3    off as long as nobody here in this room objects.  We

4    do have these plastic barriers.  We have the

5    sanitizing wipes and hand sanitizer.

6         The only thing I would say is certainly every

7    time you leave any space, clean it off so that if

8    somebody else goes near it or sits there also, it is

9    fresh for them.  We try to follow-up on that, too.

10        THE WITNESS:  Yes, ma'am.

11        THE COURT:  All right.

12   BY MR. PRICE:

13   Q    Good morning, Mr. McInvaille.  How are you?

14   A    Good morning.

15   Q    Would you please state your full name for the

16   record.

17   A    Spencer McInvaille.

18   Q    And can you tell us who you are?

19   A    Yeah.  I'm a digital forensic examiner with

20   Envista Forensics.  I deal with cell phone location,

21   location evidence in general.  And I consult with

22   prosecutors, attorneys, and defense counsel on those

23   types of issues.

24   Q    Thank you.  And you've been previously qualified

25   as an expert in this case in the fields of digital

1   forensic examinations, global forensics, and cellular

2   location analysis?

3   A    Yes, that's correct.

4   Q    So I want to start with some basics.

5           THE COURT:  So, Mr. Price, I'm going to ask

6   you to move the microphone a little closer to you.

7           And also, Mr. McInvaille, if you could speak

8   into the microphone.  That's the way my court reporter

9   hears you.  She's not listening to you anywhere other

10  than from her earphones.

11          And I just want to confirm the government has

12  no objection to Mr. McInvaille testifying as an

13  expert; is that correct?

14          MR. DUFFEY:  We do not, Judge.  Thank you.

15  BY MR. PRICE:

16  Q    So I want to start with some basics here.  And I

17  want to ask you what sources of location data does

18  Google use to locate phones generally?

19  A    Sure.  So for locating devices, you're generally

20  going to see GPS data, Wi-Fi locations, Bluetooth

21  locations, and cellular.  Those are the main ways that

22  Google would locate a device.

23  Q    Can you explain each of those just a little bit?

24  What's GPS?

25  A    Sure.  GPS is our Global Positioning System using

 1   satellites to locate devices.  People commonly

 2   associate that with how they navigate around town or

 3   go places with their phone.

 4       As far as Wi-Fi goes, Wi-Fi access points are

 5   points on earth that we use to use data and things on

 6   our phones.  As they capture where those are on earth

 7   based on signal strengths from each of those points,

 8   you can relatively locate a device as it pertains to

 9   how close it is to a certain access point.

10       As far as cellular goes, similar principle there.

11   We know where the cell towers are.  They communicate

12   with a device.  And based on signal strengths, you can

13   determine where the device is in relation to the cell

14   phone tower.

15   Q   Are there any other sources of location data

16   besides the ones that you mentioned?

17           THE COURT:  So, Mr. Price, you're talking

18   really fast.

19   BY MR. PRICE:

20   Q   Are there any other sources of location data other

21   than GPS, Bluetooth, cellular, and Wi-Fi?

22   A   You can also use, say, IP addresses, too, to

23   locate -- to generally locate someone.

24   Q   How accurate are these sources?  Maybe you can

25   just talk about each one a little bit.

McINVAILLE - DIRECT                    20

1   A    Sure.  They're going to vary.  Cell phone towers,

2   of course, cover very large areas.  There are sectors.

3   Each of them cover large areas.  While they can,

4   again, generally locate a device, they may not be the

5   most accurate, but they can give us a relative

6   location on earth.

7       Wi-Fi.  Wi-Fi only extends so far.  So it is going

8   to give you a smaller area than what the cell tower

9   probably could.

10      GPS can be very accurate.  We can see that.  It

11  can be very accurate.  Sub-meter accuracy at times

12  with open skies.

13          THE COURT:  Sub-meter or some meter?

14          THE WITNESS:  Sub-meter.

15          THE COURT:  Thank you.

16          THE WITNESS:  Smaller than 1 meter.

17          So each has their own capability of how

18  accurately you can place someone on earth or place a

19  device on earth.

20  Q    So when Google is using location information to

21  find a phone, does it matter if someone is inside?

22  Does it still work?

23  A    No, it can still locate.

24  Q    It still locates people inside or outside?

25  A    Yes.

1    Q    What are the -- what does Google do with this

2    data?  What are the repositories of location data that

3    Google keeps?

4    A    Sure.  From my research, they keep this type of

5    data in several ways.  So you have Location History

6    being that, as has been described, this journal of

7    location history for a user.  That can include each of

8    those sources that we discussed on how information is

9    gathered.  And so it associates those with date and

10   times for the device.

11       There's also Google Location Accuracy, which keeps

12   up with some of that information we've talked about

13   before with the access points, where they are on

14   earth, how they make calculations, to make

15   comparisons.

16            THE COURT:  Did you say Location Accuracy?

17            THE WITNESS:  Yes, ma'am.

18            THE COURT:  Okay.

19            I'll let you say that again.  I interrupted.

20            THE WITNESS:  That's okay.

21   A    As far as Google, there's Location History.  There

22   is Google Location Accuracy, as well as Web & App

23   Activity also tracks IP addresses, and things like

24   that, web activity application usage for general

25   location.

McINVAILLE - DIRECT                    22

1          THE COURT:  Can you repeat what Location

2  Accuracy is?

3          THE WITNESS:  Sure.  So Location Accuracy is

4  going to -- is a repository of data as far as where

5  access points and things like that are located so that

6  it can be compared to other data for location

7  purposes.

8          THE COURT:  Thank you.

9  BY MR. PRICE:

10 Q    So what does Google do with all of this location

11 data?

12 A    Sure.  So this location data at this point, just

13 data in general on people and their activities, is a

14 lucrative -- it's a tangible item at this point.  It's

15 something that's used for advertising, understanding

16 consumers and their habits, things like that.  It's

17 used for advertising, essentially.

18 Q    The different kinds of advertising that Google

19 does with this?

20 A    Sure.  So you have targeted ads from understanding

21 what a person may want to -- you know, their

22 interests.  You can also target those ads based on

23 their proximity to certain places.  So if a particular

24 business would like to try to generate more activity

25 from the people that live and work around them, they

McINVAILLE - DIRECT                    23

1   can try to target those people based on pushing ads to

2   them because of their proximity to that location.

3   Q    So if Google offers this advertising service to

4   businesses based on location, do the businesses get

5   the information about user location?

6   A    Not to my knowledge.  What the end user or the

7   person paying for the advertising service receives is

8   pretty much reporting on how well these ads are

9   converting to revenue for them.

10  Q    How would you explain the difference between

11  targeting ads based on location and a law enforcement

12  request for user location data?

13  A    So as far as, again, with targeted ads for the

14  business, the business is seeing whether or not their

15  ads are becoming sales, whether or not people in the

16  area that they're trying to pay -- they're paying to

17  hopefully see these ads are coming to their business.

18      As far as in this law enforcement request or these

19  geofence warrants, the difference is, is the return is

20  different.  The return is that you are seeing

21  individual users, identifiers about those users, their

22  location, and other information provided.  So it's

23  much different.

24  Q    So just to clarify.  What personally identifiable

25  location information do businesses get when they do

McINVAILLE - DIRECT                        24

1   this targeting?

2   A    None that I'm aware of.

3   Q    So we'll start with an easy one.  What's a

4   geofence warrant?

5   A    So, a geofence warrant is a request by law

6   enforcement to, in this case Google, to find out the

7   users that are in a specific area.  So a circle or box

8   is drawn around a particular area where something

9   happens.  A time frame of that incident is also given.

10  And the request is made to Google to find out who was

11  inside of that particular area during the given time

12  frame.

13  Q    And did you review the geofence warrant in this

14  case?

15  A    Yes.

16  Q    So what type of data was searched as a result of

17  the geofence warrant in this case?  Which repositories

18  of data?

19  A    So Google Location History was the searched area

20  for Google.

21  Q    Any others?

22  A    No.

23  Q    Who decided what kind of information was going to

24  get searched?

25  A    From my understanding, Google made the

1  determination to search Google history -- Location

2  History, I'm sorry.

3  Q    So there are three kinds.  Google searched one and

4  it was up to them?

5  A    From my understanding, yes.

6  Q    Could you describe how a geofence warrant works,

7  what the stages are, how it unfolds process-wise, just

8  generally?

9  A    Sure.  So the warrant is broken up into three

10  steps.  Each of those steps gaining more information

11  as you go.  So the warrant will spell out each of

12  these steps for the process.

13      So, in Stage 1, a request is made for the

14  geofence.  So wherever the place is on earth.  In this

15  instance, it was a 150-meter circle, radius circle,

16  that was drawn around a fixed point.  And so the

17  Stage 1 request is what users were inside of the

18  circle during a one-hour time period.

19  Q    And does it end there?

20  A    No.  So it goes further into each of the steps.

21  So when that request is made, Google will respond with

22  the location of the users and an identifier for each

23  of the users who were inside of the circle at that

24  time.  So that's the steps from asking for Stage 1 to

25  the return of Stage 1.  Return of Stage 1 being a

1   spreadsheet of device IDs, locations, and the dates

2   and times of those locations.

3        So once you have that information, you move into

4   Step 2.  Step 2 requires that a determination be made

5   of how many of those users you want to know more

6   information about.  In Step 2, what Step 2 allows is

7   contextual data.  So it removes the geographical

8   limits as well as the time frame expands.  So you get

9   more information about the movements of the people

10  chosen out of Stage 1 about where they moved before

11  and after the original geofence.  You end up with that

12  group of people.  And now you know where they came

13  from before the incident and then after.

14       Another determination needs to be made, and that's

15  Step 3.  Step 3, when you make that request to Google,

16  you're asking for all of the subscriber information or

17  all of the account information for the users that

18  you've selected.

19       So in each step, you have -- you've made the large

20  search of all users.  Then you move into Stage 2 of a

21  defined group out of that that you received.  And then

22  Step 3, again, another group that you've defined out

23  of that to finally understand and reveal who those

24  people are.

25  Q    Thank you.  I want to turn to the geofence warrant

McINVAILLE - DIRECT                27

1   in this case.  Specifically, I'd like to call your

2   attention to what's been marked Defense Exhibit 1.

3          THE COURT:  So the record is clear, Exhibit 1

4   is being shown on the screens here in the courtroom.

5   Q   Can you tell us what Exhibit 1 is, Mr. McInvaille?

6   A   This is the affidavit for a search warrant in this

7   case, the geofence warrant.

8   Q   And this is the geofence warrant you reviewed?

9   A   Yes, that's correct.

10  Q   Thank you.

11         MR. PRICE:  I'd like to admit Exhibit 1 into

12  evidence, Your Honor.

13         THE COURT:  Any objection?

14         MR. DUFFEY:  No objection, Judge.

15         THE COURT:  It will be entered.

16         MR. PRICE:  Thank you, Your Honor.

17         (Government's Exhibit No. 1 is admitted into

18  evidence.)

19  BY MR. PRICE:

20  Q   Okay.  So you just explained how geofence warrants

21  work generally.  We're looking at the warrant in this

22  case.  What happened here?  Tell us how this works.

23  A   So, again, there's a three-step process outlined

24  in this warrant, as well.  Again, a Stage 1, Stage 2,

25  and Stage 3.  So here the -- there's a time frame for

1   May 20th of 2019.

2          THE COURT:  You have to talk about where

3   you're referring to on the piece of paper because

4   anybody reading this record is not going to have the

5   document in front of them.

6          THE WITNESS:  Yes, ma'am.  I'm under

7   Attachment 2 of the search warrant.

8   A    So it defines the time frame that's going to be

9   searched.  So it's May 20th of 2019 from 16:20 hours

10  until, on the same date, 17:20 hours.  So a one-hour

11  time period.

12      There's also a geofence drawn around a particular

13  location.  So they provide a latitude and longitude of

14  where they're going to draw this radius.  That radius

15  was 150 meters.  So the Stage 1 of that request was

16  for users located within that circle during that time

17  frame.

18         THE COURT:  Now I'm going to interrupt you

19  because it's my job to make sure the record is clear.

20  In Defense Exhibit 1, I have a document behind a

21  signed warrant that says Attachment 1, the place,

22  person or thing to be searched.  That has Roman

23  numeral -- not Roman numeral.  A numeral 1 at the

24  bottom.  And then the document I think you're showing

25  me, there's a version of it that has a page 2.  I'm

McINVAILLE - DIRECT                    29

1   trying to find what you're actually showing me in

2   Exhibit 1.

3            THE WITNESS:  I'm on Attachment 2.

4            THE COURT:  Got it.

5            THE WITNESS:  And it's pages 2 and 3 at the

6   bottom.

7            THE COURT:  My apologies.

8            THE WITNESS:  No problem.

9            THE COURT:  I'm with you now.

10  BY MR. PRICE:

11  Q    Okay.  So what happened at Stage 1 here,

12  specifically?

13  A    So Stage 1 was a request for all Google users for

14  that specific location.  So within that circle during

15  the hour time frame on May 20th.

16  Q    And what did Google have to do to produce that

17  information?

18  A    So from what Google has told us, they require the

19  search of all Location History accounts to complete

20  that search to find out who was inside of that circle.

21  Q    Do you know how many that was?

22  A    They stated it was numerous tens of millions of

23  accounts.

24            THE COURT:  When did they say that?

25            THE WITNESS:  That was in, I believe, Mr.

McINVAILLE – DIRECT                    30

1    McGriff's declaration.

2              THE COURT:  I think it's Marlo McGriff.

3              THE WITNESS:  That's correct.

4              MR. PRICE:  We'll come back to it, Your

5    Honor.

6              THE COURT:  All right.

7    BY MR. PRICE:

8    Q   So after conducting a search of every Google user

9    with Location History enabled, how many users were

10   then sent back to law enforcement?

11   A   Sure.  So as a return for Stage 1, 19 unique

12   identifiers were provided with location information

13   for that one-hour time frame.

14   Q   Thank you.  And what happened after that?  What

15   happened in Stage 2?

16   A   So a Stage 2 request was made to Google.

17   Initially, a request for contextual data for all 19

18   were made.  I believe that request was made more than

19   once.  And Google responded saying that that number

20   needed to be reduced before they could respond to the

21   Stage 2 request for contextual data.

22        That number was reduced to, I believe, nine.  So

23   nine users had contextual data provided.  So that was

24   the data that provides you 30 minutes before the

25   initial time frame and 30 minutes after.  So now our

McINVAILLE - DIRECT                31

1   time frame has expanded to two hours where there are

2   no geographical limits during Stage 2 so that you can

3   see movement before and after and outside of the

4   original geofence.

5   Q    Thank you.  And then what happened in Stage 3?

6   A    So Stage 3, again, a request was made by law

7   enforcement for the Stage 3 request.  In that request,

8   they identified three users to reveal account

9   information for.

10  Q    Thank you very much.  I would like to show you a

11  slide from the report prepared by the FBI's Cellular

12  Analysis Survey Team, the CAST team, and it's marked

13  as Government's Exhibit 1.  I'd like to show you page

14  8.  Can you tell us what we're looking at here?

15  A    So this is a similar picture to what you see from

16  page 3 of attachment to --

17           THE COURT:  Can we just go through the

18  formality?  Does the government object to this being

19  placed in evidence since we're taking evidence from

20  it?

21           MR. DUFFEY:  We do not, Judge.  It's our

22  exhibit.  So no objection.

23           THE COURT:  Okay.  So Government Exhibit 1

24  will be in evidence.

25           MR. PRICE:  Thank you, Your Honor.

McINVAILLE - DIRECT                    32

1           (Government's Exhibit No. 1 is admitted into
2    evidence.)
3    BY MR. PRICE:
4    Q    Sorry.  What are we looking at here?
5    A    So this is a similar picture to what is displayed
6    in the search warrant on attachment to page 3.  It
7    shows the actual geofence.  So that's the large red
8    circle here.  The point in the middle is the reference
9    point that they provided to draw that radius from.
10   And then you see the area that's encompassed by the
11   geofence.
12   Q    What are the places immediately implicated by this
13   geofence?
14   A    Sure.  So you have the Call Federal Bank.  You
15   also have the Journey Christian Church.  There's the
16   parking lot for the church and bank, and then some of
17   the wooded area surrounding both of those.
18   Q    Thank you.  Can we go to the next slide, please.
19   So this is the next slide.  Can you tell me what
20   places are right outside the geofence as drawn?
21   A    Sure.  Special Agent -- he was able to identify
22   some of these.  And so you can, from his chart here,
23   you can see the apartments.  There's two different
24   sets of apartment complexes here.  Again, the
25   previously mentioned locations.

McINVAILLE - DIRECT                    33

1      You have A.M. Davis, Inc., a company that's across

2   the street from the church.  You have the Hampton Inn

3   Hotel, which is just outside the church's parking lot.

4   There's restaurants as well as a mini storage facility

5   there.

6            THE COURT:  I'm just going to put on the

7   record this is page 9 of the same report of

8   Government's Exhibit 1.

9   Q   Okay.  I'd like you to take a look at Defense

10  Exhibit 3.  If we could bring that up.

11           MS. KOENIG:  Your Honor, this is an exhibit

12  that the Court had previously placed under seal.  It

13  is the raw data from what Google produced.  And so I

14  believe since we are broadcasting to a different

15  courtroom, it may be best to look at the paper copies

16  of this, but it is Defense Exhibit 3.

17           THE COURT:  Is there any objection to that

18  from the government?

19           MR. DUFFEY:  No objection, Judge.

20           THE COURT:  All right.  This has been placed

21  under seal because of the potentially identifying

22  information that is within it.  And so we will review

23  this document under seal.

24           MR. PRICE:  Thank you, Your Honor.

25  Q   Can you tell us what is Defense Exhibit 3?  What

McINVAILLE - DIRECT                    34

1   are we looking at?

2   A   Yes.  So it's the Stage 1 return for the Google

3   geofence.  It's the letters from Google telling you

4   what they provided as well as PDF versions of the

5   Excel spreadsheets or CSVs that were from Google.

6   Q   So just to clarify, this is the raw data returns

7   from the geofence warrant?

8   A   Yes.  This is what you would use to look and see

9   where one of these devices was on the map.  It

10  provides you with locations and information about what

11  was requested in Stage 1.

12  Q   Can we take a look at column A?

13          THE COURT:  Okay.  We have to move them into

14  evidence.

15          MR. PRICE:  Excuse me.

16  Q   You reviewed this in preparation for your

17  testimony?

18  A   That's correct.

19          MR. PRICE:  I'd like to move this into

20  evidence as Defense Exhibit 3, please.

21          THE COURT:  Right.  Any objection?

22          MR. DUFFEY:  No objection.

23          THE COURT:  All right.

24          MR. PRICE:  Thank you for reminding me.

25          (Defendant's Exhibit No. 3 is admitted into

1    evidence.)

2    Q    Can we take a look at Column A, please.

3    A    Yes.

4    Q    What does it say at the top of Column A?

5    A    Column A is defined as device ID.

6    Q    What about Columns B and C?

7    A    B and C provide us a date and time.

8    Q    How about D and E?

9    A    D and E are the estimated latitudes and longitudes

10   for those records.

11   Q    So tell me more about that.  How do those

12   estimated latitude/longitude points relate to the

13   geofence warrant?

14   A    Sure.  So these specific points -- so latitude and

15   longitude is a reference of a point on earth.  And

16   these are the points that fell within the red circle

17   that we previously spoke about.  So within the

18   geofence.

19   Q    So where that latitude/longitude point is

20   determines whether it gets reported in the geofence

21   warrant returns?

22   A    That's correct.  So if this point were to have

23   fallen outside of the red circle, it would not be

24   provided.  If it falls within the red circle, it is

25   provided.

McINVAILLE - DIRECT                    36

1    Q    Okay.  Now, let's look at Column G.  What's that

2    column?

3    A    That's the maps display radius in meters.

4    Q    In that column, there are some numbers, right?

5    A    Yes.

6    Q    What are those numbers?

7    A    That is the estimated radius.  So from the

8    estimated latitude and longitude, a circle is then

9    drawn, a radius circle is drawn around that point, and

10   that's the estimation that the device should be within

11   that circle by the estimate.

12        THE COURT:  Within the second circle, not the

13   original circle?

14        THE WITNESS:  Correct.  This circle is drawn

15   around the individual points for that specific user

16   for that specific record.

17   BY MR. SIMON:

18   Q    How does Google draw that display radius?

19   A    It would -- I don't know how they come up with it.

20   Q    How does it appear?

21   A    Oh, it appears -- when you draw it on the map, it

22   appears to be the estimated latitude and longitude

23   point in one place with a circle drawn around that to

24   show you the area that the phone could have been in or

25   the device could have been in.

McINVAILLE – DIRECT                37

1   Q   Google has talked about something called a

2   confidence interval.  What's a confidence interval?

3           THE COURT:  So you cannot be showing exhibits

4   you're not talking about.

5           MS. KOENIG:  Your Honor, that's my fault.  My

6   screen is locked, and I can't get out.  So if we could

7   unlock my screen, potentially I could get out to the

8   correct exhibit.

9           THE COURT:  Okay.

10          THE CLERK:  I don't have control of your

11  screen.

12          MS. KOENIG:  There's a little lock button on

13  the screen, Your Honor, on the right-hand side, and I

14  was able to change exhibits before that lock appeared.

15          THE CLERK:  Where it says "no stream

16  detected"?

17          MS. KOENIG:  Right above where it says "no

18  stream detected."

19          THE CLERK:  That's been there all along.

20          THE COURT:  I just want to be clear, this is

21  still part of Government's Exhibit 1.

22          MS. KOENIG:  Correct.  I wasn't intending to

23  go to this stage, Your Honor.  I was trying to get to

24  the next exhibit, but it is frozen.  There we go.  All

25  right.  Okay.

McINVAILLE – DIRECT                    38

1              MR. PRICE:  All set?

2              MS. KOENIG:  Yes.

3              MR. SIMON:  Okay.  Sorry about that, Your

4    Honor.

5              THE COURT:  That's okay.

6              MS. KOENIG:  We're down to one paralegal in

7    the Federal Public Defender's Office.  I'm serving

8    double duty, and it is not my specialty.

9              THE COURT:  Congratulations on having a

10   paralegal.

11             MS. KOENIG:  Fair enough.

12   BY MR. PRICE:

13   Q   Google has talked about something called a

14   confidence interval.  Can you explain to us what a

15   confidence interval is?

16   A   Yes.  So they described it -- when they estimate

17   the point on earth, so the latitude and longitude, and

18   once they draw that circle around that point, the

19   display radius, they have a rating or a goal of being

20   how confident they are that they made the correct

21   estimation, and that's 68 percent is their goal in

22   determining the location on earth.

23   Q   So they're saying -- so just to clarify.  They try

24   to be -- rephrase that.  Is that a probability that

25   somebody is going to be in there or just a certainty?

McINVAILLE - DIRECT                39

1   A    It's their goal to be correct 68 percent of the

2   time by estimating this latitude/longitude and drawing

3   a circle around it, and that the phone should be

4   located or the device should be located within that

5   circle.

6              THE COURT:  At 68 percent?

7              THE WITNESS:  Correct.  That's the goal.

8              THE COURT:  And you used a phrase "confidence

9   integral"?

10             MR. PRICE:  Interval.

11             THE COURT:  You've just got to be a little

12  more clear because your witness hasn't said it.

13             MR. PRICE:  Sorry.

14             THE WITNESS:  Yes.  That was their

15  description of their confidence interval in the --

16             THE COURT:  Interval not integral?

17             THE WITNESS:  Yes, interval.  Sorry.

18             THE COURT:  Okay.  Thank you.

19  BY MR. PRICE:

20  Q    Can you tell us what this confidence interval has

21  to do with the geofence warrant?  What does it mean

22  for how the results come in?

23  A    As far as the results, we have to look at where

24  the point is referenced on earth, the maps display

25  radius, and just understand that even though it

McINVAILLE – DIRECT                    40

1   provides that radius where the device should be

2   located, it doesn't mean that it's absolutely within

3   that radius either.

4   Q    So what does it do to the effective range of a

5   geofence warrant?

6   A    It could make it larger.

7   Q    I want to show you another slide from the CAST

8   report.  This will be Slide No. 20, page 20, of that

9   PDF.

10          THE COURT:  So that's Government's Exhibit 1,

11   page 20.

12          MR. PRICE:  Thank you.

13   BY MR. PRICE:

14   Q    Mr. McInvaille, what are we looking at here?

15   A    So, again, the red circle is the original geofence

16   drawn.  Each of the pin drops that you see, the blue

17   and the red, indicate that the two differences between

18   either GPS points that were located or Wi-Fi points

19   that were located for a user.  I believe this is an

20   aggregation of all of the people for the Stage 1

21   return shown on the map.

22       And each of the blue circles that you see are

23   those display radiuses provided in the records for

24   each of those points.

25   Q    So what do those -- those blue circles, that's the

McINVAILLE - DIRECT                    41

1   display radius?

2   A    Yes.  That's the estimation that Google has

3   provided for where the device could be based on their

4   estimate for that record.

5   Q    What do they tell us about the effective range of

6   the geofence in this case?

7   A    Sure.  So if you were looking at one of these

8   circles that extends outside of the geofence, so

9   there's a few that you see, you see the larger one,

10  and then you also see the others that encompass the

11  roadway to the right or to the north.

12       Since the device could be anywhere within that

13  circle, if the estimated latitude and longitude is off

14  enough that it places the device inside the circle,

15  even though it was not, that device is now included in

16  this return even though the device never actually

17  traveled within the circle.

18  Q    So I want to take a look at that big blue circle

19  there.  What is that?

20  A    That's a -- I believe that was the largest display

21  radius provided for one of the records in the Stage 1

22  return.

23            THE COURT:  Do you believe it or it is?

24            THE WITNESS:  It is.

25  Q    And what was the display radius for that point?

1   A    387 meters.

2   Q    How does that compare to the size of the radius

3   for the geofence as drawn?

4   A    You can see from the map that it's roughly twice

5   if not just a little bit larger than the original red

6   circle.  So the geofence circle.

7   Q    So the radius is about twice as large?

8   A    Yes, if not just a little more than twice.

9   Q    What about the area covered by that?

10  A    As far as like the squared area?

11  Q    Yes.

12  A    It would be a much larger area when you talk about

13  area.  Just expanding that circle greatly increases

14  the actual area that would be compassioned by that

15  circle.

16  Q    So I promised I wouldn't make you do math on the

17  stand.

18          THE COURT:  You know, you're talking to him,

19  but we need to hear you.  And so it is more formal --

20          MR. PRICE:  You can't hear me?

21          THE COURT:  I can't hear you.

22          MR. PRICE:  I said I promised Mr. McInvaille

23  I wouldn't make him do math on the stand on the fly.

24  BY MR. PRICE:

25  Q    So I'm just going to say the area of the geofence

McINVAILLE - DIRECT                    43

1   as drawn, did you calculate that at some point?

2   A    I did.

3   Q    And was it approximately 71,000 meters squared?

4   A    That's correct.

5   Q    And the area of the large blue circle, did you

6   calculate that area at some point?

7   A    I did.  So the larger was, I recall, to be about

8   470,000 meters.

9   Q    Thank you.  And --

10          THE COURT:  Can you repeat the first one,

11  please.  I'm sorry.

12          THE WITNESS:  Ma'am?

13          THE COURT:  The first, the regular geofence.

14          THE WITNESS:  About 71,000 meters, I believe.

15          THE COURT:  Okay.

16  BY MR. PRICE:

17  Q    And how many times larger is 470,000 compared to

18  71,000?

19  A    Roughly, I would say six times.

20  Q    About six times?

21  A    About six times.

22  Q    So is it possible that these map display radiuses

23  could create a false positive?

24  A    Yes, if you mean could someone be outside of the

25  original geofence and actually be returned as if they

1    were inside the geofence.

2    Q   How would that work?

3    A   So if you're traveling by this geofence and the

4    estimation that is made is incorrect enough that --

5    let's just say you're driving down the road here and

6    that your physical device is actually on --

7             THE COURT:  How about you name the road?

8             THE WITNESS:  I believe it's Price Club

9    Drive.

10   A   If you're on Price Club Drive driving past the

11   geofence and you don't actually cross into it, if

12   Google estimates your estimated latitude and longitude

13   to be within the circle, then you would have been

14   included in this return even though the device never

15   traveled within the geofence.

16            THE COURT:  Within the blue circle?

17            THE WITNESS:  Within the red circle.

18            THE COURT:  Okay.

19   BY MR. PRICE:

20   Q   So a false positive here would be putting somebody

21   inside the geofence that wasn't there.  Is it possible

22   to have a false negative?  How would that work?

23   A   Sure.  So if you -- if the opposite occurred, if

24   you were inside of the geofence, but the estimation

25   was made that your latitude and longitude fell outside

1   of the circle, then you would have not been included.

2          THE COURT:  Wait, wait, wait.  So why don't

3   you -- so you're saying that if you're inside the

4   original geofence and the estimate is larger than,

5   say, 150 meters, you wouldn't be reported?

6          THE WITNESS:  So what causes you to be

7   included is the estimated latitude and longitude.  If

8   you kind of leave off the display radiuses, those blue

9   circles, at the moment and just think of the estimates

10  of the point that's given, so the latitude and

11  longitude, if that estimate falls within the geofence,

12  you are included.  If that estimate falls outside of

13  the geofence, you are excluded.

14         So the false positive occurs when that

15  estimate is incorrect but actually falls within the

16  fence even though you weren't in the fence.  The

17  opposite, the false negative, occurs when the device

18  is actually inside the geofence but the estimate made

19  falls outside the geofence.

20         THE COURT:  So I'm looking at Column G in the

21  exhibit that's under seal.  In order to return a false

22  negative, would G have to have a number above 150?

23         THE WITNESS:  No, no.  The false positives

24  and negatives only occur due to D and F.  Excuse me, D

25  and E.  The display radius is just the error radius

McINVAILLE – DIRECT                    46

1  drawn around each point.  The estimated latitude and

2  longitude is what's critical in determining who will

3  or will not be returned in the geofence originally.

4          THE COURT:  So there's nothing in this

5  exhibit, Defense Exhibit 3, that shows you an estimate

6  that could fall outside, a false negative?

7          THE WITNESS:  So if the false negative

8  occurred, that means the device would have been inside

9  the geofence.  But by the estimate made by Google it

10  fell outside the fence, so they were not returned in

11  this, if that occurred.

12         THE COURT:  G reflects the -- tell me what G

13  reflects again.

14         THE WITNESS:  G just reflects the blue circle

15  that's drawn around these points.  And all that is is

16  the actual confidence that they place on the estimate.

17  So if you see a point on the map with a very small

18  circle, then they're giving you a smaller area that

19  the device could have been in.  A larger one, of

20  course, is a larger area the device could have been

21  in.

22         THE COURT:  I thought it was reflecting the

23  meters with which the confidence was expressed.

24  That's not true?

25         THE WITNESS:  I'm sorry?

McINVAILLE – DIRECT                 47

1          THE COURT:  I thought it was expressing the

2    meters within which the confidence was expressed.  So

3    if it said 50, that it was within 50 meters of the

4    longitude and latitude.  That is not correct; is that

5    right?

6          THE WITNESS:  That is the estimation.  That's

7    what the display radius is for is to understand in

8    relation to the estimated point of how far away the

9    device should generally be from that estimate.

10         THE COURT:  Right.  So that -- maybe I'm

11   going too far in depth, but if it's more than 150, if

12   the estimate can't fall within 150 meters, it is not

13   going to be reported because the geofence only goes to

14   150 meters.

15         THE WITNESS:  Yes, but that reporting occurs

16   because of D and F, not because of G.  G is just a

17   further piece of data that's given to us to understand

18   the individual points.

19         THE COURT:  Okay.  I get it.  No one else

20   gets what I get, but I get it.  So that's good.

21         MR. PRICE:  I might give it one more try.

22   BY MR. PRICE:

23   Q   Maybe we can run through a quick hypothetical

24   here.  All the blue and red points on this exhibit are

25   inside that red line; right?

1    A    That's correct.  So they report it as being within

2    the geofence, so they were returned.

3    Q    If we suppose that there was somebody standing

4    right outside of that red circle, maybe at the Ruby

5    Tuesday Restaurant, and they had an error radius –– a

6    delay radius of, say, 100 meters.  Would that display

7    radius intersect with the geofence warrant?

8    A    It could, but that point wouldn't be returned.  If

9    that point is outside of the red circle, then it will

10   not return within this stage of the request.

11   Q    And it's also possible if we had somebody whose

12   actual location was inside that geofence, but their

13   radius extended outwards, it's possible that they

14   might be outside that geofence?  That they wouldn't

15   actually be at their marker?

16   A    It's possible.  Like if you look at the point,

17   it's kind of a long point up to the top edge of the

18   red circle as you move north.  As you see, that

19   display, the point is within the circle, but the

20   radius actually extends out just a touch over towards

21   the Hampton Inn.

22       The phone actually or the device could be to the

23   outer edge of that circle, which is outside of the

24   geofence.

25            MR. PRICE:  Does Your Honor have any

1  questions further on that point?

2          THE COURT:  I will think about it, and I'll

3  ask questions.  We have Google folks coming.

4          MR. PRICE:  Thank you, Your Honor.

5  BY MR. PRICE:

6  Q   So if this big blue circle is the effective range

7  of the geofence, can you tell us which places were

8  encompassed by it?

9  A   For this specific device, if that's where the

10  device could be, you have -- again, you have the Price

11  Club Drive, the road, you have Hull Street included,

12  the Mini Price Storage, looks to be a few sets of

13  apartments down here to the south and southeast side

14  of it.  The A.M. Davis, Inc., again, that we spoke

15  about.  Rockwood Village Apartments is the one I -- I

16  can see it better now.  So there's two sets of

17  apartments there, as well, that are included.

18      So this device could have been anywhere around

19  that location.

20  Q   Thank you.  I'm just going to switch gears here

21  for a second.  The government likens the geofence

22  warrant to a tower dump in their briefing.  Can you

23  tell us, what's a tower dump?  And would it have been

24  useful here?

25  A   A tower dump is a similar request.  You don't

1    really know what you're asking for.  You're making a

2    request to the cell phone carriers for users, their

3    subscribers, that are using towers in the area of,

4    like, for instance, here, in the area of the bank.

5    What they're going to return is spreadsheets that are

6    going to tell you phone numbers that were using those

7    towers that service that area.

8         The kind of point of all that is normally what you

9    have is maybe one or two or more locations where

10   incidents have happened over time.  And what you're

11   looking for as a result of these tower dumps is a

12   common number or common numbers that show up in these

13   records.

14        As a result of that, based on the process of

15   elimination and the time of these incidents, if

16   they're far enough apart and unique enough in time

17   frames as far as small time frames, you would only

18   expect if several incidents occur over a three-day

19   period at different locations, that you -- if it's the

20   same person, that you should only see one or two or a

21   group of people working that specific thing.  So it's

22   a process of elimination that lets you understand when

23   you don't have a suspect or an unknown group of

24   suspects, it's meant to help you identify those

25   people.

1       So that's a -- it's a request similar to this.  We

2   don't know what we're looking for.  We just know that

3   people have phones.  So we're hoping that our suspect

4   was using one and that he will be captured within

5   those requests.

6   Q    So would it have been useful in this case?

7   A    It's difficult to say how useful it would be.  You

8   only have one location and date and time.  So if you

9   return back a thousand records, and you end up with a

10  thousand phone numbers, you have nothing to compare it

11  to, to really understand who in that group belongs

12  there, lives there, works there, any of that, unless

13  you know the phone number you're looking for.

14  Q    Okay.  Thank you.

15      Let's go back to the beginning of Stage 1.  I

16  think I asked you this earlier, but tell us how does

17  Google know which devices are there?

18  A    So within that geofence, again, it's a location on

19  earth.  They search the user's location history.  So

20  that repository of data of location history for their

21  users and compare that latitude and longitude to see

22  which users fit into that location.  So broadly look

23  at the data and pick out the ones that fall within

24  that group.

25  Q    So how did you learn about this?

McINVAILLE – DIRECT                52

1   A    Through the declarations submitted by Google.

2         MR. PRICE:  I'd like to pull up the first

3   McGriff declaration, please.  It's Defense Exhibit 21.

4   Q    What is this document?

5   A    It's the declaration of Marlo McGriff.

6   Q    And did you review this in preparation for your

7   testimony today?

8   A    I have.

9         MR. PRICE:  Your Honor, I'd like to move this

10  into evidence, please.

11        THE COURT:  Any objection?

12        MR. DUFFEY:  No objection.

13        THE COURT:  It will be entered.

14        (Defense Exhibit No. 21 is admitted into

15  evidence.)

16  BY MR. PRICE:

17  Q    So Google has to search through everybody in the

18  Location History database.  Do you know about how many

19  people that is?

20  A    They state numerous tens of millions.

21  Q    I'd like to draw your attention to paragraph 13,

22  please.  Can you read for us paragraph 13?

23  A    Yes.  So, "In 2019, the majority of Google users

24  worldwide did not have Location History, LH, enabled

25  on their account.  While a more precise percentage is

1    difficult to calculate in part due to fluctuating

2    numbers of users in 2019, roughly one-third of active

3    Google users (i.e., numbers tens of millions of Google

4    users) had LH enabled on their accounts."

5    Q    So to conduct the geofence search in this case,

6    the government had Google search through everyone with

7    Location History enabled and Google estimates that at

8    numerous tens of millions of users?

9    A    Correct.

10   Q    In your experience, how does that number, numerous

11   tens of millions, how does that compare to other types

12   of warrants seeking location information?

13   A    So, for -- you know, when we look at a request for

14   call detail records for a single user, of course,

15   that's a single user, normal Location History request

16   for a specific account when they name the account

17   because we know who we're looking at.  Again, that's

18   one user.

19        Probably the only thing comparable would be, say,

20   the tower dump that you asked about earlier.  But,

21   again, as far as that number of people, it's not -- it

22   wouldn't be close to that.

23   Q    So, I want to turn your attention back to the CAST

24   report.  And this is Government's Exhibit 1 at page

25   13.  Can you tell us what we're looking at here?

1   A    Yes.   This is the FBI CAST report, and there is --

2   you see the Sprint towers notated with the yellow kind

3   of antenna sign.   You have the Call Federal call out,

4   so showing you where the bank is.   You see the red

5   circle for the geofence in there.   And then a

6   parameter is outlined with blue here, which they've --

7   which they've indicated as the estimated tower dump

8   area had they conducted one with Sprint here.

9   Q    So there wasn't a tower dump in this case, just to

10  clarify?

11  A    No.   This looks to be a hypothetical of what that

12  would look like if one was conducted.

13  Q    How is this hypothetical set up?

14  A    So it's showing you three towers that would --

15  that are in proximity to the credit union.   Then you

16  also see the geofence there and how it relates to

17  those towers.

18       The blue appears to kind of indicate probably the

19  estimated coverage that you would get from those three

20  towers that are encompassed by the blue polygon.   So

21  what it's trying to show you is the area that would

22  likely be affected had that request been made.

23  Q    Would the government -- well, let me rephrase.

24  Working with this hypothetical, in your experience,

25  about how many people, how many users, would have

1    their records searched from a tower dump of just one

2    of these towers?

3    A    It's hard to say just because you're relying on

4    how many people are using their device at the time,

5    the number of people that you have in that area.  I

6    don't -- I have seen in past tower dump data sets a

7    thousand users can be pulled for one of these towers.

8    Q    So roughly a thousand for one tower?

9    A    Possible.

10   Q    And I guess if we're doing three, how many users

11   would that be?

12   A    Sure.  If you kept that estimate, you'd be looking

13   at, if you kept a thousand being what you think could

14   be encompassed, it could be 3,000 based on three

15   towers.

16   Q    So 3,000 for the hypothetical here.  How does that

17   number compare to the numerous tens of millions in a

18   geofence warrant?

19   A    I don't know that it really does compare, but it's

20   much less than numerous tens of millions.

21   Q    I won't make you do any more math.

22   A    Thank you.

23   Q    I'll change gears here slightly.  I want to ask

24   you what this information tells you.  What sort of

25   information can you get from Location History data?

1    A    From location?

2    Q    Yeah.

3    A    So with location for a specific person, you can

4    learn a lot about a person.  You can learn about their

5    movements, the places that they frequent, places that

6    they frequently travel or places they attend.  So, for

7    instance, when people have schedules, where they go to

8    church on Wednesday.  You could see if someone

9    commonly goes to one of those particular locations,

10   where they work, where they live, pretty much anything

11   about daily life if you have enough points to look at.

12   Q    How many is enough?

13   A    How many?

14   Q    How many is enough data points?

15   A    You wouldn't need too many.  You don't need days

16   and days' worth of records.  I mean, you can learn a

17   little bit with just a small amount of data.  You may

18   not learn everything, but it doesn't take many data

19   points to pick out a way of, you know, just a few

20   locations, only one specific person could likely show

21   up to each of those locations if you know the date and

22   time that they were there.  So it wouldn't take much

23   data.

24   Q    And how many data points do you think you might

25   need to determine someone's identity?

1   A    With just a handful, again, if you know if

2   somebody shows up at four or five places in any given

3   time, you know the date and time that they were there,

4   pretty much you could learn something about that

5   person.

6   Q    So how do you know all this?

7   A    I look at location data for a living.  It's what I

8   do.  It's what I did prior to this job.  I was in law

9   enforcement and looked at data to try and get patterns

10  for people's movements.

11  Q    Have there been any studies written about this?

12  A    Sure.  I researched a few studies about Location

13  History and how that information is gathered and used

14  for ads and personalizing stuff to particular people.

15  Q    I'd like to turn your attention to what's been

16  marked as Defense Exhibit 9.  Can you tell us what

17  this is, please?

18  A    Yes.  That was a report written.  It's called

19  "Unique in the Crowd:  The Privacy" -- I'm sorry.  The

20  "no stream detected" is blocking.  It's an article

21  about location and privacy.  "The privacy bounds of

22  human mobility" is the rest of it.

23  Q    And this is a report that you reviewed in

24  preparation for your testimony today?

25  A    Yes, I've reviewed this.

McINVAILLE - DIRECT                    58

1          MR. PRICE:  Your Honor, I move to admit this

2    into evidence.

3          THE COURT:  Any objection?

4          MR. DUFFEY:  Judge, I do object to this.  I

5    don't know what the relevance of moving an article in

6    that he didn't write.  He can testify about it, that

7    he read it, and talk about it, I suppose.  He's an

8    expert.  But to move the entire article into evidence

9    as if we all agree it's all factually correct, I have

10   no idea if it's correct.  I don't know who the author

11   is.  I don't believe Mr. McInvaille knows the author.

12   And so I object to it being moved wholesale into

13   evidence.  I don't object to him talking about it if

14   he wants to talk about it.  But that's my objection,

15   is to relevance.  And it's also quite clearly hearsay.

16   I understand we're at a motion to suppress, and that's

17   the Court's discretion on that.  But I just don't

18   understand the relevance of moving entire articles

19   into evidence just because he read them.  That's my

20   objection.

21         MR. PRICE:  Your Honor, Mr. McInvaille used

22   these reports in the preparation of his reports.  They

23   are not being admitted for the truth of the matter

24   even though we are under relaxed rules during our

25   hearing here today.  So we believe that it should be

McINVAILLE - DIRECT                    59

1  in evidence.  This is information that our expert

2  relied on to draw his conclusions.

3          THE COURT:  Well, I'm going to overrule the

4  objection, but it's clear that we're not admitting it

5  for the truth of what is in the article.  It is a

6  basis for the expert's testimony, and it cannot be

7  admitted wholesale for the purpose of what the

8  government is concerned about, which is that without

9  any other testimony, we don't know anything about the

10  study itself or how it was conducted.  So it's really

11  admitted as background information.

12          MR. PRICE:  Thank you, Your Honor.

13  BY MR. PRICE:

14  Q   Mr. McInvaille, can you tell us what your takeaway

15  was from this report?

16  A   Sure.  The idea here is that just a few data

17  points are revealing of a person's identity is the

18  gist.

19  Q   Do you remember how many were sufficient in this

20  case?

21  A   I believe they say four data points can tell you

22  about a person.

23  Q   So how long have you been working with location

24  data?

25  A   When I began working violent crimes.  So probably

1    eight or nine years.

2    Q    And in your experience, is that correct, the

3    report's conclusion about the number of data points

4    necessary on average to find somebody?

5    A    I mean, it's -- not always is four points

6    indicative of it, but yes, it can be.  It depends on

7    those points and what they tell you, but yes.

8    Q    So, for instance, in this case, you previously

9    created a video visualizing the geofence data for

10   three users; is that correct?

11   A    Yes, that was the Stage 2 return.  So that

12   contextual data for some of those users.

13   Q    I'd like to show you what's been marked as Defense

14   Exhibit 5.  Is this the video you created?

15   A    Yes.

16   Q    Can you tell us what you did to create it?

17   A    Yes.  So, just using the latitude and longitude

18   here so that you can understand the paths moving,

19   again, there are display radiuses that go along with

20   these, but this is more to just understand the general

21   movement of these three devices and how they related

22   from -- here what you see in the very beginning of

23   each is where they fell within the geofence.  And then

24   as it moves along, it shows you where they were

25   before, during, and then after the geofence for that

McINVAILLE – DIRECT                61

1  period of time.

2  Q    Thank you.

3           MR. PRICE:  Your Honor, I'd like to move this

4  video into evidence.

5           THE COURT:  No objection, is there?

6           MR. DUFFEY:  No, Your Honor.

7           THE COURT:  It's admitted.

8           (Defense Exhibit No. 5 is admitted into

9  evidence.)

10  BY MR. PRICE:

11  Q    Can we go ahead and play the video and have you

12  describe slowly what is the happening here?

13  A    Sure.

14      (Video is played.)

15  A    So, again, you have the -- this is the initial

16  return for this user.  So the user ID is in the top

17  left corner, and it shows you where they began in the

18  warrant return.

19           THE COURT:  I'm going to put on the record

20  it's not identifying as to an individual; right?  This

21  is the Google number?

22           MR. PRICE:  No, Your Honor.  We previously --

23  that's a time stamp that you're looking at there.

24  That's the number that you see.  And for

25  identification purposes, we've been referring to this

1    user or we had in the past as Mr. Green.

2              THE COURT:  All right.  Mr. Green.  Got it.

3    A    So in answering that question, the user here

4    starts at this hospital here.  And as you will see,

5    they leave that location and travel south towards the

6    geofence.  You can see generally the path that they

7    take, and as they travel south, it continues down to a

8    residential area where it finally ends and the -- as

9    far as the data goes that we were provided ends there

10   in this residential area.

11   Q    What does it tell you about what -- what do those

12   cluster of dots over a house tell you?

13   A    Sure.  So you notice that those dots end up

14   stopping at a given point.  So here they kind of

15   cluster around a house or a few houses here in this

16   one area, meaning that the --

17             THE COURT:  You're going to have to use

18   phrases other than "in this one area," because we have

19   a written record.

20             THE WITNESS:  Sorry.

21             THE COURT:  Because we have a written record.

22             THE WITNESS:  Understood.

23   A    So you see that the path had traveled down to this

24   residential area here on the map.  There is Decoy Lane

25   is shown.  So you see that it's at an address on Decoy

1    Lane or at least, you know, would be located very

2    close in proximity to a few of these houses here on

3    Decoy Lane.

4    Q    Were you able to determine whose residence that

5    is?

6    A    I think you could.  I looked at tax records and

7    things like that for these houses in the area to take

8    a look and see if based on knowing just the location,

9    that you could possibly determine names for people

10   there in that specific location.

11   Q    I won't ask you to put the name on the record, but

12   for Mr. Green, were you able to identify his likely

13   identity?

14   A    I was able to find some names for people from that

15   residence for tax records.  So, you know, I don't know

16   that they are positively identified, but yes, there's

17   information available for records for that area.

18   Q    Would law enforcement have access to the same sort

19   of information?

20   A    Yes, this is publicly available information.  You

21   can search it on the internet.

22   Q    Thank you.  Can we resume the video and talk about

23   Mr. Blue?

24   A    So, again, blue -- starting here, this would have

25   been the point that was returned for Stage 1 for that

McINVAILLE – DIRECT                    64

1   device, and then we will see it move into the Stage 2

2   portion.  So before, during, and after the geofence.

3      So you'll see to the bottom left here underneath

4   the geofence there's the apartment complex just to the

5   south.  I don't recall the specific name of it, but

6   it's just to the south off of Price Club Drive.  So

7   you see that the user's device is located in that

8   complex and then begins to move outside of the complex

9   up north to Hull Street before traveling some more.

10              THE COURT:  Can you identify where it starts?

11  You said it starts here in the geofence.  What is

12  that?

13              THE WITNESS:  So the first point that was

14  referenced from Stage 1 for that user, the point

15  given, the estimated latitude and longitude, was there

16  at the church, the Journey Christian Church.

17  Q   Is that the first point in time or just the one

18  that you got first?

19  A   I believe that's the point that was given for that

20  user for the Stage 1.  And then now you're also seeing

21  the Stage 2 portion of that.

22  Q   So this user starts where?

23  A   At the apartment complex just to the south of the

24  geofence.  So located along the southern side of Price

25  Club Drive just south of the geofence.

McINVAILLE - DIRECT                    65

1    Q    And then what happens after he leaves his house?

2    It looks like there's a point right inside the church.

3    A    Yes.  So you see that at some point during the

4    video right here, it moves from several points that

5    fall in the apartment complex and then begins to move

6    outward as if it's moving from the apartments to Hull

7    Street, which would, you know, the likely path would

8    take you past the -- down Price Club Drive and past

9    the geofence.

10                THE COURT:  Past what?

11                THE WITNESS:  The geofence.

12   BY MR. PRICE:

13   Q    So, in other words, this may be an example of a

14   false positive?

15   A    It's possible.

16   Q    Could you explain why?

17   A    So, of course, you see the point there on top of

18   the church which falls within the fence, which is how

19   you get included.  If this user was passing by and the

20   estimate was incorrect, if we assume that they were

21   driving down Price Club Drive and didn't enter the

22   parking lot and only continued down the roadway, which

23   was not included, if the estimate was incorrect and

24   thought that the device actually did travel through

25   the geofence, then this person was included even

1  though they did not pass through the geofence.

2  Q   How would that happen in terms of the location

3  data?  Was this a Wi-Fi or a GPS point?

4  A   I'm not sure, but it would be based off of a --

5  just due to the estimate, and its just inherent

6  inability to perfectly place someone on earth.

7  Q   So where does Mr. Blue wind up at the end of the

8  day?

9  A   Sure.  So you see it travel south.  It appears to

10 travel to another residence in this area.  I'm not

11 sure of the road name here, but it ends up in this

12 portion moving down to a more spread out residential

13 area just south of where the geofence was and clusters

14 around a single residence there before, I believe,

15 moving back north again.

16         THE COURT:  It's near the intersection of --

17 is it Alberta Road, counsel?

18         THE WITNESS:  Yes, I see Albert Road.  I was

19 going to try to annotate it.  Yeah, they're just south

20 of where Alberta Road intersects with this other

21 street.

22         MS. KOENIG:  Your Honor, Mr. McInvaille can

23 touch the screen and actually circle it so that it's

24 clear for everybody.

25         THE COURT:  It's three dots.  The more we can

1    tie it to something, somebody else looking at it can

2    find it, we need to do that.  All right.

3    BY MR. PRICE:

4    Q    So this is where the cluster ends for the records

5    that we have?

6    A    No, I believe it moves back north, but this is

7    where they cluster for just a moment.

8    Q    And would law enforcement be able to do anything

9    with the information about the location of that

10   residence?  Would they be able to identify the likely

11   residence?

12   A    Yeah, it's possible this is clustered enough on

13   that location that you would believe that that device

14   did travel to that address.  These are a little

15   more -- these homes are a little more disbursed than

16   the ones we spoke about on Decoy Lane.  But, again,

17   you could assume based on what you see here that that

18   device traveled to that location.  And, again, you can

19   use publicly available information as well as law

20   enforcement has other information at their disposal

21   that, yeah, you could likely determine who would

22   reside at that residence.

23   Q    Thank you.  All right.  Can we resume play here

24   and talk about Ms. Yellow?

25   A    Yes.  This is just the ending of what you see for

1   blue.  Blue returns to the apartment complex located

2   along Price Club Drive.  Looks like Mallard Landing

3   Circle, that area, is where it comes back to.  That's

4   where it started before it traveled to that residence

5   we just spoke about and now it has returned there.

6       So you have yellow is displayed now.  So yellow

7   shows you the points that were given in Stage 1.

8   Those points fall -- one falls just outside of the

9   bank.  Others fall on top of the bank.

10      So now it's moved to the point in time before the

11  geofence.  So we're again before everything, we're

12  here at another residential area.  These points seem

13  to center around one residence, and then will

14  eventually move as the data plays through.

15          THE COURT:  Can you say where the residence

16  is, what street?

17          THE WITNESS:  Right around Buffalo Spring

18  Drive.  There's an intersection there.  It's a

19  residential home close to that intersection.

20          THE COURT:  Okay.

21  BY MR. PRICE:

22  Q   How many dots are sitting on top of one residence

23  there?

24  A   I'm not sure.  It's a few.  And then it moves

25  north to a school that's up the road from the

McINVAILLE - DIRECT                69

1    residence.  The school is located along Bailey's

2    Bridge Road.  So after what appears to be a stop at

3    the school, it continues north to where you finally

4    see this device inside the geofence.

5        After the geofence, it moves out of the geofence

6    up Hull Street to some of the business area there

7    before returning back to that same residential area

8    from where it started.

9    Q    So based on this information, were you able to

10   identify Ms. Yellow?

11   A    To an extent.  I was able to see who owned the

12   home that those points clustered around.  And also

13   just doing research into those names learned some more

14   information about those people that's consistent with

15   what you see in some of that contextual video.

16   Q    Were you able to find social media about that

17   individual?

18   A    Yes.  So the -- looking at -- looking for just

19   publicly available social media stuff for the people

20   listed for that residence that the data clustered

21   around, you could also see that they had a school-aged

22   child, that they were just recently married.  So you

23   could learn a little bit.  You see that the school was

24   possibly -- you know, that a stop was made at the

25   school.  So it coincides with just some of the readily

1   available information.

2   Q    And the key for you here was which dots?

3   A    So, again, the residential dots, the residence

4   tells you, hey, there's, you know, that this may be

5   the specific location because they're so clustered in

6   that area, that that's the likely location, as well as

7   the school, the school being another reference point

8   just to understand something about someone.  Of course

9   you saw the bank, as well.  The bank's the center of

10  this.

11       So there was, you know, three locations there.

12  Then if you look, some of those other businesses could

13  have been traveled to as well in that area after the

14  bank before traveling back home.  So there's a few

15  locations within that that could be telling of a

16  person.

17  Q    So the most important ones for you, though, were

18  which in ascertaining Ms. Yellow's identity?

19  A    If you were going to try and figure out who that

20  person is, the home, the bank, and the school would be

21  probably the most beneficial locations.

22  Q    So three points?

23  A    Sure.

24  Q    And would this data be as identifying to you --

25  identifiable to law enforcement as it was to you?

McINVAILLE - DIRECT                    71

1   A   Sure.  I mean anybody that could take a look at

2   some of this data could learn something from it.

3   Q   They would have access to the same tax records

4   that you had access to?

5   A   Yes, that's publicly available.

6   Q   And social media?

7   A   Yes.

8           THE COURT:  I'm going to interrupt you.  I

9   know I asked you not to repeat too much, but is it the

10  case that an earlier version of this video had lines

11  about where the folks went in realtime or not?

12          THE WITNESS:  No, I don't know the specific

13  path.  You can kind of understand the path, but no, I

14  couldn't pick out the individual paths.

15          THE COURT:  Fine.  Just making sure.

16  BY MR. PRICE:

17  Q   That's all we have on this exhibit.  I want to

18  shift gears a little bit now and talk to you about the

19  opt-in method or Location History.

20          THE COURT:  All right.  So I'm actually going

21  to take a break.  We've been here awhile.  Folks need

22  to stretch.  I have that it's 11:06.  I'll give us 15

23  minutes.  And so that would be 11:21.

24          You, sir, of course, will remain under oath,

25  and you can't talk to anybody about your testimony,

McINVAILLE – DIRECT                    72

1   nor can any other witness.  And we'll come back and

2   hit this new topic in 15 minutes.  All right?

3            MR. PRICE:  Thank you, Your Honor.

4            THE COURT:  Okay.

5            (Recess taken from 11:06 a.m. to 11:21 a.m.)

6            THE COURT:  All right, sir.  Obviously,

7   you're still under oath, and we'll continue your

8   testimony.

9            I should probably do this every time in case

10  other folks have joined.  If anybody is here on the

11  AT&T line, we welcome you.  I need to remind you that

12  our local rule, Criminal Rule 53, and our standing

13  order prohibits anybody from recording or broadcasting

14  or telecasting this proceeding in any way.  We have a

15  court reporter here who is creating what will be the

16  official court record.

17  BY MR. PRICE:

18  Q   All right.  Mr. McInvaille, I want to talk with

19  you a little bit about the opt-in method for Location

20  History in this case.  As a part of your work in this

21  case, you reviewed the declarations of Marlo McGriff?

22  A   That's correct.

23  Q   I'd like to show you what's been marked as Defense

24  Exhibit 23.  Can you tell us what this is?

25  A   Yes.  This is labeled the "Third Declaration of

McINVAILLE – DIRECT                      73

1  Marlo McGriff."

2  Q    And you reviewed it in preparation for your

3  testimony today?

4  A    I have.

5          MR. PRICE:  I would move to admit this into

6  evidence, Your Honor.

7          MR. DUFFEY:  No objection.

8          THE COURT:  It will be admitted.

9          (Defense Exhibit No. 23 is admitted into

10 evidence.)

11 BY MR. PRICE:

12 Q    So do you know when Location History was first

13 enabled on Mr. Chatrie's account?

14 A    Based on this declaration, yes.

15 Q    When was that and how do you know?

16 A    It's indicated here.  They provided the audit

17 report from Google, which indicates when the -- when

18 the activation of location or the enabling of Location

19 History occurred.  There are times listed on here.

20 Q    And do you remember what time it was enabled on

21 his account?  I know we're having an issue here.

22 There we go.

23         MS. KOENIG:  Sorry.  I'm getting there.  Here

24 we go.

25 A    It was on July 9, 2018.  And that was at 04:09

1    UTC.  So in the a.m. for, of course, in UTC time zone.

2    Q    What is UTC?

3    A    UTC is a time standard.  So it's just a thing that

4    we reference time off of.  It's used for many

5    different types of records and everything, but, again,

6    it's just a concept of time that we can reference

7    local times off of.

8    Q    So it was enabled at 4:09 UTC.  I want to draw

9    your attention to a line on page 2 of this

10   declaration.  It says -- can you read the highlighted

11   part for us?

12   A    Yes.  So on this same page, Section C, "The user

13   opted in to LH," Location History, "either through

14   device settings or through a Google application on the

15   Samsung device."

16   Q    So can you translate that for us?  What does that

17   mean?

18   A    Yes.  So to enable Location History for an account

19   to gather Location History for a device, you must

20   enable Location History.  And there's two prescribed

21   ways of doing this.  It's either through opening up

22   the settings application on the device, logging in,

23   and opting in to Location History through that method

24   or when prompted through a supported Google

25   application.

McINVAILLE – DIRECT                    75

1   Q    Could it have been enabled during the initial

2   setup of the phone?

3   A    Based on the time that Google is giving us, no, it

4   would not have been enabled at setup.

5   Q    Why not?

6   A    Setup occurred July 2nd of 2018.  This is, of

7   course, July 9, 2018.  So it was after the phone is

8   setup.

9   Q    Have you had an opportunity to examine Mr.

10  Chatrie's cell phone in this case?

11  A    I have.

12  Q    And you produced a report detailing that

13  examination; correct?

14  A    I did.

15  Q    I'd like to show you what's marked as Defense

16  Exhibit 6.  What is this?

17  A    This is my report of the examination of the

18  device.

19          MR. PRICE:  Your Honor, I'd like to move this

20  into evidence.

21          THE COURT:  Any objection?

22          MR. DUFFEY:  No, Your Honor.

23          THE COURT:  All right.  It will be entered.

24          MR. PRICE:  Thank you, Your Honor.

25          (Defense Exhibit No. 6 is admitted into

1   evidence.)

2   BY MR. PRICE:

3   Q    Can you tell us, Mr. McInvaille, how you examined

4   the phone?  What did you use to examine the phone?

5   A    So I went to the FBI office and was given access

6   to the device, and using Celebrite software I was able

7   to download or extract the data from the device so

8   that it could be examined.

9   Q    Were you able to determine anything from that

10  extraction about how Location History was first

11  enabled?

12  A    I was able to.

13  Q    What did your determine?

14  A    So, in my analysis, what I was looking for was

15  activity that corresponded with the timing of what

16  Google indicated was the activation or enabling of

17  Location History.  Through that, through my analysis

18  of the data that I extracted, I was able to locate the

19  installation of Google Assistant, which happened

20  within just, I believe, a minute and a half or two

21  minutes of just prior to Location History being

22  enabled.

23  Q    Can you tell us when exactly Assistant was

24  installed?  You said it was a couple minutes.

25  A    Yes, I believe on UTC, it would have been 04:06

1  and some seconds, some milliseconds.

2  Q   So it was about two minutes apart?

3  A   Roughly, yes.

4  Q   What else, if anything, was happening on the phone

5  at that time?

6  A   Based on my analysis, I didn't see much occurring

7  during that time.  If I recall correctly, the only

8  thing very close in proximity to that was Google

9  Assistant.  I believe any activity prior to that was a

10 few hours before, and then the -- I believe the only

11 other Google application interaction that showed up

12 around that time frame was, I believe, 12 hours later,

13 if not more.

14 Q   Did you -- I know this took you quite sometime.

15 Did you look at anything else on the phone?  How did

16 you determine what else was going on on the phone at

17 that time?

18 A   So, to ensure that I feel I had adequately looked

19 at all the data, Celebrite, what it does is it takes

20 the data that's extracted --

21          THE COURT:  Can you spell that for our court

22 reporter who's not looking at your report, please.

23          THE WITNESS:  Cellebrite,

24 C-E-L-L-E-B-R-I-T-E.

25 A   So using the physical analyzer software and

1    reviewing the data extracted, that software, what it

2    attempts to do is take the data you have given it and

3    turn it into something that we all can read.

4        So it parses that information out.  Not always is

5    every detail parsed because of changes in software

6    supporting certainly applications and the level of

7    detail.  Oftentimes, you can look deeper into that

8    data into the databases to find other artifacts that

9    could be helpful.  Dates and times, locations, just

10   bits of information that can give you a better

11   understanding of what it is you're looking at.  So I

12   also try to look into that to see if I can locate

13   anything further that maybe wasn't readily available.

14       Again, my conclusion was that Google Assistant was

15   pretty much the only thing that I could find that was

16   occurring on the device during that time period.

17   Q    You were able to find evidence of -- what were you

18   able to find evidence of during that time?

19   A    That the application was installed to the device

20   at that time.

21   Q    And you said you were able to draw a conclusion

22   about how Mr. Chatrie likely enabled Location History?

23   A    That's correct.  So based on my understanding of

24   Google Assistant, Location History, and this

25   extraction, with those items occurring, so the

1    installation of the application occurring, as well as

2    the activation of Location History just a minute or so

3    after that, knowing that through the initial setup of

4    certain applications through Google that they will

5    prompt you to enable Location History, it's my

6    conclusion that that is what would have activated or

7    been the method of activating Location History at that

8    time.

9    Q    Thank you.  So I want to talk about what that

10   opt-in screen would have looked like in Assistant.

11   And I'll turn your attention to the setup process for

12   Google Assistant.  Can you explain in a little more

13   detail how that works?

14   A    So when you -- when the application is on the

15   device, generally people will activate that

16   application by long pressing the home button.  It's

17   meant to be a convenience feature.  So it opens the

18   application.

19        During most applications, upon first use of really

20   any application, there are certain things you have to

21   do to set those applications up so that you can use

22   them; preferences, permissions, those types of things.

23        So those would be things that would be prompted to

24   the user as you begin to use your app for the first

25   time.

McINVAILLE - DIRECT                    80

1  Q   Why is that process important in this case?

2  A   Well, in this case, the reason that it's important

3  is, of course, the only way that you are captured in

4  this warrant that we have here is to have Location

5  History enabled.  So that function is critical in all

6  of this.  So without it, you will not be found within

7  the warrant.  So knowing if Location History is on or

8  off, when it was activated, those things are important

9  in this matter.

10 Q   Did you attempt to determine what Mr. Chatrie

11 likely saw when he set up Google Assistant for the

12 first time?

13 A   Yes, I've tried to understand that, you know, the

14 2018 method of opt-in procedures.

15 Q   You actually prepared a supplemental report all

16 about this?

17 A   Yes.

18        MR. PRICE:  Can we bring up Defense Exhibit

19 7.

20 BY MR. PRICE:

21 Q   What is this?

22 A   This is the supplemental report that discusses the

23 opt-in.

24        MR. PRICE:  Your Honor, I'd like to move this

25 into evidence.

1        THE COURT:  Any objection?

2        MR. DUFFEY:  This is Exhibit 7?

3        THE COURT:  Exhibit 7, yes.

4        MR. DUFFEY:  No objection.

5        THE COURT:  It will be entered.

6        (Defense Exhibit No. 7 is admitted into

7   evidence.)

8   BY MR. PRICE:

9   Q   So tell us, how did you learn about this process

10  and what did you do first?

11  A   So I looked at Android devices to try and get an

12  understanding of what that procedure would be.  The

13  issue with trying to recreate some of these things is

14  that software changes over time.  Those updates when

15  you're setting up these devices often automatically

16  happen if you have them connected to Wi-Fi, which is

17  kind of a critical piece of actually setting up the

18  device as a normal person would.

19      So it kind of left me with the inability to see

20  the 2018 or a confident way of knowing that back in

21  2018 this is what it would have looked like.  So

22  instead of being able to recreate, I turned to try and

23  find information contemporaneous to that time to help

24  me understand what that would have looked like at that

25  time.

1    Q    So you tried to recreate it, but that didn't work?

2    A    Yeah, they just -- it looks different.  The setup

3    process is different than what it was.  There's

4    features that are different.  It's just not the --

5    from what I see from research and then trying to

6    recreate it, they don't look the same, and I didn't

7    feel it would be an accurate representation.

8    Q    Does it matter which phone you try and do this on?

9    A    No.  From everything that I know about this is

10   that the Android, and across the devices generally,

11   should be the same as far as this portion of the

12   setup.

13   Q    So unable to re-create it, what did you do next?

14   A    So that's when I turned to information that I

15   could find that was more in that time period of people

16   setting up these devices and showing what that

17   information actually looked like in 2018 versus now.

18   Q    And did you, through defense investigation, become

19   aware of any other information?

20   A    Yes.  So there were several articles or studies

21   that covered, you know, screenshots and different

22   information that would help you understand what those

23   setup procedures looked like for the phone or

24   applications, things of that nature.

25   Q    All right.  So, let's talk about what you found.

McINVAILLE - DIRECT                        83

1    Were any of those particularly helpful to you?  Which

2    ones?

3    A    I referenced three of the items in my supplemental

4    report.  There was an article and then two studies

5    that showed pictures of the screens as they set

6    devices up.  And based on the information that they

7    provided, you could see that these were Android

8    devices with similar, from our understanding, similar

9    operating systems and things and also were around this

10   relevant time period.

11   Q    So what was the first article that you came cross

12   that you found to be helpful?

13   A    I don't know that it's the first.  It's the first

14   that I reference here.  But it's from the Quartz.  And

15   the article talks about Location History as one of

16   the -- as the topic of the article.

17   Q    What is Quarts?

18            THE COURT:  Spell it.

19            MR. PRICE:  Q-u-a-r-t-z.

20            THE COURT:  Thank you.

21   A    They have editors and people who write articles.

22   It seems to kind of pertain around technology and

23   different items.

24   Q    All right.  I'd like to show you what's been

25   marked as Defense Exhibit 48.  What are we looking at

McINVAILLE - DIRECT                    84

1   here?

2   A    That appears to be that article.  Yes, that's the

3   article.

4   Q    So this is the article where you got the

5   screenshots from for your report?

6   A    Yes, lower in the report, in the article.  Yeah,

7   it was the Google Assistant permissions screen that I

8   found.

9   Q    Thank you.

10              MR. PRICE:  And I would like to move this

11  into evidence, as well, Your Honor.

12              THE COURT:  Any objection?

13              MR. DUFFEY:  Judge, same objection as the

14  other article.  If they're moving in, I guess, not for

15  the truth, then I don't know what the relevance would

16  be.

17              THE COURT:  I'm going to overrule it.  It's

18  the basis of his opinion.

19              MR. DUFFEY:  For the record, our objection is

20  as to relevance.  The point of the article doesn't

21  seem to me to be the opt-in process.  I understand

22  he's relied on some of it, and he's put that into his

23  report, and he can certainly talk about it, but we

24  object to the entire article.  And I understand the

25  Court's ruling.

McINVAILLE - DIRECT                    85

1          THE COURT:  All right.  I'm going to make

2    essentially the same ruling, which is that you can

3    argue the weight of the evidence, certainly, and

4    cross-examine the expert with respect to it, but

5    because, at least in part, it served as the basis for

6    his expertise, it is admissible to that degree.

7          MR. PRICE:  Thank you, Your Honor.

8          (Government's Exhibit No. 48 is admitted into

9    evidence.)

10   BY MR. PRICE:

11   Q   So in addition to the Quartz screenshots, did you

12   find any others?  What was the next one that you cited

13   in your report?

14         THE COURT:  Now, wait a minute.  Now, he said

15   there is the Quartz screenshot right there in that

16   article.  Would you like to identify for the record

17   where it is?

18         MR. PRICE:  We will certainly try, Your

19   Honor.  I'm not sure that there are page numbers.  It

20   is on page 6 of the PDF itself.

21         THE COURT:  Why don't you identify what's

22   on -- like, does it say, for instance, Google Maps,

23   Google app?  That are words and headings that help.

24         MR. PRICE:  There is a heading that says

25   "Google Assistant."  And there is a screenshot below

1   that which has a blue bar on top and says "Give your

2   new assistant permission to help you."

3           THE COURT:  Perfect.  That's great.  Thanks.

4   BY MR. PRICE:

5   Q   Mr. McInvaille, so this is one of the screenshots

6   that you believed might be similar to the one that the

7   user would have seen in July of 2018?

8   A   Yes, it's similar.

9           THE COURT:  Why don't you just put on the

10  record why.  Is this article dated?

11          THE WITNESS:  Yes, I believe January of 2018

12  was the date.  The reason that it's similar is, again,

13  you see a similar layout, give permission for your

14  assistant to help you.  Similar wording.  There are

15  some differences in some of them as they move along,

16  but as far as the structure and the question that is

17  being posed to the user, they are similar.

18          THE COURT:  Similar to what?

19          MR. PRICE:  I think we're going to try and

20  compare the different screenshots here, Your Honor.

21  So I just want to have all three so that we can talk

22  about their similarities and differences.

23          THE COURT:  Okay.

24  BY MR. PRICE:

25  Q   But, Mr. McInvaille, can you please read what it

1  says there under "Location History," just so we have

2  it?

3  A    Sure.  So on "Give your new assistant permission

4  to help you" is the kind of header of this permission

5  screen.  It tells you the -- it will tell you the

6  account that you're using as it's asking permission to

7  activate certain things for that account.

8       And then you have Location History, device

9  information, Voice & Audio Activity are the

10 permissions that are being asked to be given.  Each of

11 those topics have their own description and expansion

12 arrows.

13      Location History indicates that you're giving

14 permission to -- it creates a private map of where you

15 go with your signed in device.

16      Device information.  It includes contacts,

17 calendars, apps, music, battery life, and sensor

18 readings.

19      And then voice and audio activity.  Records your

20 voice, audio input, to help recognize your voice and

21 improve speech recognition.

22 Q    Thank you.  I'd like to move on and look at the

23 next screenshot that you found that you included in

24 your report.  Which one was that?

25 A    Sure.  This is from a study from Oracle.  Oracle

1    is a technology company, a computer science company, I
2    believe.  They show the Google Assistant process, but
3    they also show the previous screen to what you see
4    from the article that we just mentioned from Quartz.
5         So they're showing you both the initial screen
6    that you see when you open Google Assistant for the
7    first time to set it up, as well as the subsequent
8    permission screen that we just discussed.
9         The information contained with those, besides the
10   account, of course, because these are two different
11   people setting this up, the other substance is the
12   same here for these two screens.
13        So, first, you have "Meet your Google Assistant."
14   It asks how it can help.  And then you have to either
15   skip that procedure and not completely set up or press
16   "Next" to completely set up.
17        You press "Next," that's when it takes you to the
18   permission screen that we just outlined prior to this.
19   And so then you have another piece there at the bottom
20   that was not covered because you couldn't read it, but
21   the options that you have are "No, thanks" or "Yes,
22   I'm in."
23   Q    I'd like to show you --
24             THE COURT:  Wait.  Did you identify what
25   document that came from, the Oracle?

McINVAILLE – DIRECT                    89

1          MR. PRICE:  That's what we're going to do

2    right now.

3          THE COURT:  Okay.

4    BY MR. PRICE:

5    Q   Can you tell us what we're looking at here?

6    A   Sure.  So this is the cover page of the Oracle

7    study.  It's "Google's Advertising and" I believe that

8    says "Data Dominance."

9    Q   Is this the document where you got those

10   screenshots from?

11   A   That's correct.

12   Q   You reviewed it in putting together your report?

13   A   I did.

14          MR. PRICE:  I'd like to move it into

15   evidence, Your Honor.

16          THE COURT:  What number is it?

17          MS. KOENIG:  Sorry.  This is Defense Exhibit

18   10.

19          MR. DUFFEY:  Judge, same objection.  I'd also

20   point out Oracle is in protracted litigation with

21   Google.  They are adverse to Google.  I guess that

22   goes to the weight, but I'm still objecting to

23   relevance, and I'm objecting to hearsay for the entire

24   report to come in.

25          THE COURT:  All right.  Well, for the same

1   limited purpose, I am going to admit the exhibit.  And

2   you can argue the weight of the evidence, including

3   you can cross-examine about the fact that Oracle is

4   litigating against Google for perhaps a bias of the

5   report.  All of that can be part of the record.  And

6   then it will be introduced for that limited purpose.

7          (Defense Exhibit No. 10 is admitted into

8   evidence.)

9          THE COURT:  So, Mr. Price, I'm going to tell

10  you, for us who don't know what you're doing, if

11  you're showing a screenshot, you're really having the

12  witness testify from something that's not in evidence

13  yet.  So unless you refer to where the screenshot is

14  in the report, so we know where you got it from, it

15  would be not proper for him to be testifying from the

16  Oracle document yet.

17         So if you say what part of the page of the

18  report that you're using the screenshot, that helps

19  those of us who don't know in advance what you're

20  doing to understand what you're doing.

21         I was presuming, I'll tell you, that that

22  screenshot was from this report, and it wasn't in

23  evidence yet.  So we just -- we're not with you.  So

24  you have to be -- you have to go granular into where

25  these documents are coming from.  Okay?

McINVAILLE – DIRECT                    91

1           MR. PRICE:  I will, Your Honor.

2           Can we bring up the specific page in the

3    report, please.

4    BY MR. PRICE:

5    Q   Mr. McInvaille, you don't happen to remember which

6    page it was on, do you?

7    A   I don't.

8           MR. PRICE:  Apologies for the delay, Your

9    Honor.

10          We are going to move to withdraw Exhibit 10.

11   And we'd like to show Mr. McInvaille Defense Exhibit

12   11.

13          THE COURT:  So Exhibit 10 is withdrawn.  I

14   want to be clear.  Your exhibit list indicates that

15   that's a June 2018 Oracle submission.  And so maybe

16   also referring to it by date would be helpful.

17          MR. PRICE:  Yes, Your Honor.  We are

18   referring to the September 2018 Oracle submission.

19   Apologies for the confusion.

20   BY MR. PRICE:

21   Q   I'm now showing you what's been marked as Defense

22   Exhibit 11.  Can you tell us what this is?

23   A   Yes.  This is the correct exhibit for the

24   screenshot that I show in my report.

25   Q   And what page of the Oracle submission does the

McINVAILLE - DIRECT                    92

1  screenshot appear on?

2  A   The page number that I have is four here.  And it

3  is -- the paragraph surrounding it starts with

4  "Continuing through the Android smartphone setup

5  process."

6  Q   And this is where you got the screenshot for your

7  report?

8  A   That's correct, the screenshot that we're

9  referring to in the report came from this section

10 here.

11 Q   Thank you.

12         MR. PRICE:  Your Honor, I'd like to move this

13 into evidence, Exhibit 11.

14         THE COURT:  Mr. Duffey.

15         MR. DUFFEY:  Same objection as before, Judge.

16         THE COURT:  All right.  I'm going to admit it

17 for the limited purpose, not for the truth of the

18 matter, with the government's concern for the weight,

19 but as a basis for this expert's opinion, it will be

20 admitted.

21         (Defense Exhibit No. 11 is admitted into

22 evidence.)

23 BY MR. PRICE:

24 Q   How does this screenshot compare to the one from

25 Quartz that we just talked about?

McINVAILLE - DIRECT                    93

1   A    Yeah.  So, again, this is -- it gives you the

2   prior screen to the permission screen.  So the "Meet

3   your Google Assistant" screen where you can make two

4   options of either "Skip" or "Next," "Next" being the

5   one that takes you to the permission screen that we

6   outlined previously with the different paragraphs or

7   the different explanations.

8   Q    Is there any difference in the text as far as

9   you're aware?

10  A    No.  The Quartz article screenshot and this

11  screenshot is consistent.  They are consistent with

12  each other as far as wording.

13  Q    Okay.  Thank you.  I want to move on to that third

14  set of screenshots that you found.  And I want to show

15  you Defense Exhibit 27.  Can we look at your report,

16  and can you show us that third set of screenshots?

17  Can you tell us what these are?

18  A    Yes.  So another set of screenshots from a

19  different study.  This study is from the Norwegian

20  Consumer Council.  Again, taking you through kind of

21  what the setup process looks like for Google

22  Assistant.  These were from the June time period of

23  2018.

24  Q    Where did you get these from?

25  A    The Norwegian Consumer Council.  I don't know if

McINVAILLE – DIRECT                    94

1    you consider it like Better Business Bureau.  It's a

2    consumer reporting agency.  It's funded by the

3    Norwegian Government to educate consumers on different

4    products.

5    Q    What did they do relevant to this case?

6    A    Sure.  So they're showing Google features as far

7    as setup processes, requests, and permissions, and it

8    resolves around data collection.

9    Q    Do they publish anything?

10   A    Yes, they publish a study on their findings in

11   different data collected by Google.

12   Q    So I would now like to show you what's been marked

13   as Defense Exhibit 27.  Is this the -- well, what is

14   this?

15   A    This is an article.  It's titled "Every Step you

16   take."  I can't actually say the name of the

17   Norwegian -- the name of their agency, but it's the --

18   they call it the Norwegian Consumer Council.

19            THE COURT:  How about you spell it?  It's on

20   the diagram; right?

21            THE WITNESS:  Bottom right of the page.  It's

22   F-O-R-B-R-U-K-E-R-R-A-D-E-T.

23   Q    And this is the document where you got those

24   screenshots from?

25   A    Yes.

McINVAILLE - DIRECT                    95

1    Q    Can you tell us which page you found them on?

2    A    Working on it.  There is an -- it's page 19 of 44.

3    It's titled or the header is "Enabling Google

4    Assistant," and you see screenshots there for Google

5    Assistant.

6    Q    And you used these screenshots to prepare your

7    report?

8    A    Yes, I believe there's actually a section with

9    more of those expanded.

10            THE COURT:  Sir, did you say "I believe

11   there's more explained"?  Are you looking for more

12   documents?

13            THE WITNESS:  No.  Inside the -- inside the

14   document there's another section with, I believe, more

15   screenshots just underlying the same thing.  I pointed

16   out one of the sections that had some of those

17   screenshots in it.  I was trying to make sure that I

18   referenced all of the places where the --

19            THE COURT:  So you haven't told us about the

20   other ones yet.

21            THE WITNESS:  Ma'am?

22            THE COURT:  You haven't told us about the

23   other ones yet?

24            THE WITNESS:  No.  I'm just trying to see

25   where they were in the document, what page they were

McINVAILLE - DIRECT                96

1   on.

2              THE COURT:  In the meantime, Mr. Price, are

3   you moving this into evidence?

4              MR. PRICE:  Yes, Your Honor.

5              THE COURT:  Any objection?

6              MR. DUFFEY:  Yes, Judge.  Same objection as

7   before, irrelevance under hearsay.

8              THE COURT:  All right.  I'm going to overrule

9   for the same reasons.

10             (Government's Exhibit No. 27 is admitted into

11   evidence.)

12             THE COURT:  Can we just put on the record the

13   date of this report?  I think it's on the first page.

14             THE WITNESS:  Yes.  November 27, 2018.

15             THE COURT:  Thank you.

16   BY MR. PRICE:

17   Q   Did you receive any additional information from

18   the --

19             THE COURT:  He's still looking for pages.

20   Right?

21             THE WITNESS:  That question will answer that

22   issue.

23             THE COURT:  Okay.

24   BY MR. PRICE:

25   Q   Have you reviewed any additional screenshots

1   provided by the Norwegian Consumer Council?

2   A    Yes.  In their report, you see the page that I

3   referenced.  I believe it was page 19.  There were

4   more screenshots available than what is just displayed

5   on page 19.  It expands upon some of these expansion

6   arrows and just gives some more detail.

7   Q    And you've seen those?

8   A    I have.

9   Q    Where did they come from?

10  A    They were provided to me by counsel.

11  Q    And they were what in relation to this report?

12  A    So, they were the underlying information that the

13  counsel used to create this.  So it just -- it's more

14  of the screenshots, more of the detailed shots that go

15  along with this explanation.

16  Q    And you reviewed those for your report?

17  A    I did.

18          MR. PRICE:  Can we pull up the third set of

19  screenshots from your report?

20  BY MR. PRICE:

21  Q    These are the screenshots you obtained directly

22  from the Norwegian Consumer Council?

23  A    Yes, that's where they were obtained from.

24          THE COURT:  Do you want to refer to a page in

25  the report and what exhibit number it is?

McINVAILLE – DIRECT                              98

1        MR. PRICE:  We are on page 5 of the

2   supplemental report.  So that would be Defense Exhibit

3   7.

4        THE COURT:  Okay.  Thank you.

5   BY MR. PRICE:

6   Q   Can you tell us what these screenshots show us?

7   A   Sure.  Again, these are more screenshots for the

8   setup for Google Assistant.  These were helpful

9   because they just give more information than those we

10  saw in other articles.  They expanded the expansion

11  arrows.  They are also, from what we understand from

12  Google's declaration, a more accurate version of what

13  we think would have been seen during the actual setup

14  of this device that we're talking about today.

15  Q   When are these screenshots from?

16  A   These screenshots were -- I believe it was July 2.

17  Yeah.  Some were taken in August.  Some were taken in

18  July.

19  Q   So there are two sets here, two sets of

20  screenshots.  One that we're looking at now on page 4?

21  A   Yes.  Page 4 is the July 2 screenshots.

22  Q   And then we have one more set.  When are those

23  from?

24  A   August 9.  And those are on page 5, Figure 4.

25  Q   So I want to go up to the July one.  Can you tell

1   us how these screens differ from the Oracle and Quartz

2   screens that we just talked about?

3   A   So they look very similar as far as structure.

4   Really, the only difference is some of the wording

5   that you see as far as the descriptions of what

6   permissions are being given.  You're still provided

7   with the same permission.  So Location History, device

8   information, Voice & Audio Activity, but the

9   explanation underneath each of those or the

10  explanations are different in these screenshots.  And

11  as I understand from Google submissions, these are the

12  screens that the user would have seen during the setup

13  of this device.

14  Q   Can you remind us, for the record, when Location

15  History was enabled?

16  A   Location History in this case was July 9th of

17  2018.  So a set of these were just before and another

18  set was just after.

19  Q   How did that affect your confidence in determining

20  which one was the likely one that was in place at that

21  time?

22  A   Again, these are close in time to the time that we

23  know Location History was enabled.  And also Google

24  has submitted saying these are the screens that the

25  user would have seen at that time, as well.  So that's

1    why I lend more confidence to these being the true

2    depiction of the opt-in process.

3    Q    Is the language on these screens consistent with

4    the text in Mr. McGriff's affidavit?

5    A    With Mr. McGriff's affidavit?

6    Q    Yes.

7              THE COURT:  Is it Mr. or Ms.?  It's Marlo.

8              MR. PRICE:  Mr.

9              THE COURT:  Marlo is Mr.?

10             MR. PRICE:  Yes.

11             THE COURT:  My apologies.  Okay.  Thank you.

12   A    Yes.  So in Mr. McGriff's affidavit, he does show

13   a portion of these screens or he doesn't show a

14   screenshot, but the text from it.  So the give your

15   permission, Location History, what it says under

16   Location History, which says "Saves where you go with

17   your devices."  And then also the little footnote just

18   above the selections that you can make is included in

19   his affidavit or declaration.

20   Q    So we have the Quartz and Oracle screenshots that

21   say one thing.  And those are from when?

22   A    As I recall, probably January of '18.  That time

23   frame is my understanding.

24   Q    The beginning of 2018?

25   A    Beginning of 2018.

McINVAILLE - DIRECT                    101

1    Q    And these are when relative to that?

2    A    Mid 2018.   July, August area.

3    Q    The language changed between the Norwegian

4    screenshots and the Oracle and Quartz screenshots.

5    What does that tell you?

6    A    That just tells me that Google made a change in

7    how they display this information to the user.

8    Q    Can we scroll down to the August screenshots.   So

9    there's a couple of buttons at the end there.   What do

10   those say?

11   A    So, again, this screenshot is asking for

12   permission.   It says "Give your new assistant

13   permission to help you."   And then there are the three

14   categories that you're providing permission for.   And

15   then at the very bottom you have the choices of either

16   "No, thanks" or "Turn on."

17   Q    Are the "No, thanks" and "Turn on," are those the

18   same choices available in the Quartz and Oracle

19   screenshots?

20   A    No, I don't believe they're the same questions.

21   Q    Instead it says -- looking at the Oracle one, what

22   does it say?

23   A    "No, thanks" is one, and "Yes, I'm in" is the

24   other.

25   Q    So that language there is different, as well?

1    A    It is.

2    Q    Tell me about the long press on an Android phone.

3    What does that do?

4    A    Sure.  So the buttons on the front lower portion

5    of the phone down where your thumb would normally be

6    if you were holding the phone, kind of where you would

7    speak into the phone, down there our phones now really

8    don't have buttons on the screen anymore.  Everything

9    is touch screen.  But in the center of an Android, or

10   most Androids, you have a home button.  What you can

11   do is press, and it's called a long press.  It's kind

12   of a press and hold of that button to activate Google

13   Assistant.  So it will launch the application from

14   that long press.

15   Q    So if you press and hold the home button?

16   A    Yes.  It pops it up on the screen.

17   Q    So, in your opinion, which set of screenshots is

18   the likely one that Mr. Chatrie would have seen?

19   A    Those that we see, as in Figure 4, here in the

20   report from August, that or the others in the previous

21   figure.  Both of those are confirmed by Google as

22   being the most likely screens that would have been

23   seen by the user during this time period.

24   Q    Did you have an opportunity to compare these

25   screenshots with the screenshots that Mr. McGriff

1   provided in his declaration?

2   A    Yes.

3   Q    Those weren't for Google Assistant, though, were

4   they?

5   A    No, it was just a Location History permission

6   request.  I guess an opt-in screen for Location

7   History.

8   Q    So, can you tell us how these screenshots differ

9   from the ones that Mr. McGriff provided in his

10  affidavit?

11  A    So, Mr. McGriff's is -- I wouldn't call it so much

12  as a screenshot as it's just the plain text from what

13  you would see in the screen.  So, again, in the

14  screenshots that we have here from these articles,

15  they kind of show you what the user would see in kind

16  of the way they would see as far as the screens.

17  Mr. McGriff's just holds the text.

18          THE COURT:  Mr. McGriff just what?

19          THE WITNESS:  Just the text.

20          THE COURT:  Okay.

21          THE WITNESS:  Instead of the actual screen,

22  like pictures, he's showing more of just the words

23  that would have been displayed.

24          They're different just because in Mr.

25  McGriff's, he doesn't show you each of the options

1   that are being given in some of these screenshots.

2   He's only showing Location History and then that

3   footnote that's provided underneath it, as well as

4   what options there are for either "No, thanks" or

5   "Turn on."

6            MR. PRICE:  Perhaps we can pull up

7   Mr. McGriff's affidavit.

8   Q   This is the third affidavit, and it has previously

9   been marked as Exhibit --

10           THE COURT:  23.

11           MR. PRICE:  23.  Thank you.

12           Can we scroll down?  All right.

13  BY MR. PRICE:

14  Q   This is the text.  What are we looking at here?

15  A   Sure.  So it shows that the opt-in screen would

16  contain the following text:  Location History.

17      It has the "Saves where you go with your devices"

18  text that is consistent with the screenshots that we

19  were just looking at.  And then it also has, like, the

20  kind of footnote paragraph that's just above the

21  options that you have.  So "This data may be saved and

22  used in your Google service where you were signed in

23  to give you more personalized experiences.  You can

24  see your data, delete it, and change your settings at

25  account.google.com."  Then you have also the "No,

1    thanks" and "Turn on" options there.

2    Q   So in the actual screenshot, though, does the

3    language appear that way visually?

4    A   No.  There's more in the screenshots of what the

5    user would see.  So, again, they're asking permission

6    for Location History, as well as device information,

7    Voice & Audio Activity.  There are other descriptions

8    and expansion areas.  There's just more in the

9    screenshots that the user sees than what's displayed

10   there.

11   Q   And that language you just read from Mr. McGriff's

12   affidavit about how the data may be saved and used in

13   any Google service, where does that appear relative

14   the Location History prompt?

15   A   It's down the page.  It's at the very bottom of

16   the screen where the options for the selections are.

17   Q   How does it appear visually?  Is it the same

18   darkness as the other language on the page?

19   A   Is it the same -- I'm sorry?

20   Q   Font.

21   A   I'm not sure.  It does -- again, it's just the

22   words from the page.  It's not the actual screenshots.

23   The screenshots that the user sees has different icon

24   descriptions.  It's visually different and has some

25   content in the screenshots that's not in the

1    affidavit.

2         THE COURT:  Okay.  You're referring to the

3    language in the affidavit, paragraph 7; correct?  And

4    now you've turned back to page 4 of Exhibit 7, which

5    is your own report.  Are you talking about Figure 4?

6         THE WITNESS:  Yes, Figure 4, the picture to

7    the right.  What I'm referring to is that it contains

8    more information than what's put into the bottom page

9    of Mr. McGriff's declaration.

10         THE COURT:  Okay.

11   BY MR. PRICE:

12   Q    What do you mean by "more information" here?

13   A    Well, there is a request for more than just

14   Location History happening.  There are more

15   descriptions of those other permissions that are being

16   requested.  There are -- as well as expansion arrows

17   to open up and see what else is available to read.

18   It's just a little bit different than what you see in

19   his affidavit.

20         THE COURT:  So, specifically, it says -- on

21   the right-hand part of the screen, it has -- it says

22   "Location History," and it has an icon next to it, and

23   a line under it; "Device information," and an icon

24   next to it and a line under it; "Voice & Audio

25   Activity," and an icon next to it and a line under it.

McINVAILLE - DIRECT                107

1    And then it has, not as a footnote, it says, "This

2    data may be saved and used in any Google service where

3    you are signed in to give you more personalized

4    experiences.  You can see your data, delete it and

5    change your settings at account.google.com"; correct?

6    That's what you're testifying to.

7             THE WITNESS:  Yes.

8             THE COURT:  So there are two more subsections

9    than what is reflected in paragraph 7 of the third

10   McGriff declaration?

11            THE WITNESS:  That's right.  There's two

12   other permissions that you're being asked to provide

13   permission to.

14            THE COURT:  Okay.

15            MR. PRICE:  Thank you.

16            Can we bring up Mr. McGriff's affidavit one

17   more time?  I'd like to see the screenshots that he

18   provides or maps.

19   BY MR. PRICE:

20   Q   What are we looking at here?

21   A   This is Mr. McGriff's declaration, page 7.  These

22   are screenshots from Google Maps.

23            THE COURT:  This is Exhibit 23, McGriff

24   Declaration 3, since there are three of them.  We're

25   looking at Exhibit 23; am I correct?

1          MR. PRICE:  Yes, Your Honor.  Twenty-three,

2   page 7.

3          THE COURT:  Okay.

4   BY MR. PRICE:

5   Q   So, by comparison, comparing the Assistant setup

6   screen and the Map setup screen, can you tell us along

7   the lines of what you're saying, what is different

8   between these two?

9   A   These, again, appear differently.  They're asking

10  for similar permissions but appear differently.  They

11  actually have less permissions than what you're being

12  requested from for Google Assistant.  Location History

13  is one of those.  It has the drop down.  It also has

14  the line underneath it for "saves where you go with

15  your devices."  It also has the paragraph underneath

16  it that's just above the "No, thanks" and "Turn on"

17  buttons that you saw from previous requests but here

18  now for Google Maps.

19  Q   So there's one screen for maps, one set of

20  permissions for Location History, and two options,

21  "Turn on" or "No, thanks"?

22  A   Correct.

23          MR. PRICE:  Can we go back to

24  Mr. McInvaille's report, supplemental report, Exhibit

25  7, page 5.

1    BY MR. PRICE:

2    Q    By contrast here, how many permissions is Google

3    asking for?

4    A    For Assistant, it's askings for three permissions.

5    Q    What are the options at the bottom?

6    A    "No, thanks" and "Turn on."

7    Q    Does that apply to Location History?

8    A    Yes.

9    Q    Does it apply to device information?

10   A    It applies there, too.

11   Q    Does it apply to Voice & Audio Activity?

12   A    Yes.  It applies to everything you see on the

13   screen.  The request is for all three of those items

14   at once.

15   Q    So what are the users options at that juncture?

16   A    Either to turn it on or not turn it on.

17   Q    Turn what on?

18   A    Location History, device information, Voice &

19   Audio Activity.

20   Q    So either turn all three on or don't?

21   A    Correct.

22   Q    Those little upside down triangles, what are those

23   on the screen there that we're talking about?  There

24   are three of them.  One is next to Location History.

25   One is next to device information.  One is next to

1   Voice & Audio Activity.

2   A    They were referred to in some of the -- in the

3   declarations as expansion arrows.  It just expands the

4   area underneath each of those topics.  And there's

5   more information contained under each of those tabs.

6   Q    I think we have that on the screen.  If we can

7   show the language.

8        We're on page 4 of Exhibit 7.  Can you tell us

9   what we're looking at now?

10  A    Sure.  These were included due to the expansion

11  arrows actually being selected so that you can see the

12  information underneath each of the permissions being

13  given.

14  Q    But that information is not visible from that

15  first screen?

16  A    No.  Unless you click the arrow, you can't see all

17  of the data.

18  Q    Do you have to click the arrow?

19  A    No, you don't have to click the arrow to make a

20  determination of on or off.

21  Q    So, I could enable Location History without ever

22  clicking on that expansion arrow?

23  A    Right.  You don't have to see this to make a

24  selection.

25  Q    Does it say "learn more" or "more info" here?

McINVAILLE - DIRECT                    111

1    A    I don't recall any of these having that option.

2    Q    What does Google say in the screenshot about

3    whether Location History is necessary for Assistant to

4    work?

5    A    So the kind of, I guess, characterization that's

6    put at the top is Assistant depends on these settings

7    in order to work correctly.  Turn these settings on

8    for this account.  It specifies the account that

9    you're making that selection for.  And then tells you

10   what permissions you're acknowledging to make

11   Assistant work correctly.

12   Q    Can you set up Assistant this way?

13          THE COURT:  Wait a minute.  Where are you

14   reading from?

15          MR. PRICE:  Right under "Give your new

16   Assistant permission to help you."  It says -- it's

17   the middle screenshot.

18          THE COURT:  So you're on page 3.  You moved

19   to page 3?

20          MR. PRICE:  I believe we're still on page 4.

21   Three screenshots in a row.  We're looking at the

22   middle one.

23          MR. DUFFEY:  Judge, I have page 3.  So I'm a

24   little confused.

25          THE COURT:  Right.  My page 3 has on the top

1   of it "Device Information" and on the bottom "Voice &

2   Audio Activity."  And my page 3 has "Location History.

3   Saves where you go with your devices."  And that's the

4   one that has the "Meet your Google Assistant."

5            MR. PRICE:  One moment, Your Honor.  Your

6   Honor, are you looking at Exhibit 7?

7            THE COURT:  Yes.

8            MR. PRICE:  Page 4?

9            THE COURT:  I'm looking at page 3 and page 4.

10           MR. PRICE:  We have it on the screen now.

11  I'm not sure why your version -- page 3 has the Oracle

12  screenshot.  Page 4 has the one that we are looking at

13  from the Norwegian Consumer Council.

14           THE WITNESS:  The page number at the bottom

15  is different than the PDF page number is what it is.

16  Q    Okay.  What page?

17  A    Scroll down just a touch.  So, the page number at

18  the bottom right is 3.

19  Q    Okay.  My apologies.

20       So we're looking at page 3 of Exhibit 7, the

21  Norwegian Consumer Council screenshots from July 2,

22  2018.  And in the middle screen it says, "Give your

23  new Assistant permission to help you."  And then,

24  sorry, can you read that language one more time?

25  A    Yes.  So, in that middle screenshot, "Give your

McINVAILLE - DIRECT                    113

1   new Assistant permission to help you."  Just

2   underneath that, "The Assistant depends on these

3   settings in order to work correctly.  Turn on these

4   settings for," and that's referring to what account

5   you're turning the setting on for.  And then it

6   indicates what settings you are either turning on or

7   not turning on.

8   Q    Thank you.  And if we're setting up Google

9   Assistant in this way, and you want to turn it on,

10  Assistant, what do you have to do?

11  A    As they indicate for it to work correctly, you

12  need to give permission to these -- to the permissions

13  shown to the user.

14  Q    You need to give permission for all three?

15  A    Yes.  You don't get to pick individually.  It's

16  all three.

17  Q    So let me ask you, what would happen to Google

18  Assistant if you disabled Location History later on?

19  A    You could still use it.

20  Q    It works?

21  A    Yeah.

22  Q    Even if Location History is not enabled?

23  A    Yes.  You don't need Location History for it to

24  work.

25  Q    So why would Google make it a requirement to set

1  up Assistant?

2  A   I'm sorry?

3  Q   Why would Google make it a requirement to start

4  Google Assistant?

5  A   I think they're asking for permission to make it

6  better.  Again, you don't have to use it, but it's a,

7  as they say, for it to work correctly or as intended,

8  the permissions help in that way.

9  Q   But it works without Location History enabled?

10 A   You can use it without Location History.

11 Q   And where on here does Google tell us that?

12 A   I'm not sure they do.  I just know that you can

13 use it without Location History being enabled.

14 Q   Thank you.  Switching gears slightly.  I want to

15 talk about Location History collection more generally.

16 When does Google collect location history information?

17 A   When the user -- if it's enabled by the user from

18 everything that I have seen as far as data outputted

19 from Location History, it's always collecting.

20 Q   Always?

21 A   Very consistently throughout the day.

22 Q   What if the user is not using Assistant?

23 A   It -- again, from seeing the times of day and

24 things that are referenced in these records that we

25 see from Location History, it appears to happen all

```
 1   times of the day.  So when the user is sleeping, not

 2   sleeping.  It's a lot of information that's being

 3   gathered as far as just location is concerned.

 4   Q   What if a person isn't using an app at all on

 5   their phone?

 6   A   I think it would still collect location

 7   information.

 8   Q   What if the person is not doing anything at all

 9   with their phone?

10   A   It still could be collecting.

11          THE COURT:  Let me clarify that.  Do you mean

12   by not using the app at all that the app is open or

13   closed?  It doesn't matter?

14          THE WITNESS:  So the application is not

15   important here once it's enabled.  Just the phone

16   being on, not in use, or any specific application

17   being launched or not launched.  Once enabled, you are

18   now collecting your location history all the time.

19          THE COURT:  Thank you.

20   BY MR. PRICE:

21   Q   What about right now?  What if somebody in this

22   courtroom had an Android phone?  Would it be

23   collecting their location data?

24   A   It very well could be even if they're not using

25   it.
```

1    Q    How do you know this?

2    A    Again, based on looking at a lot of these records

3    from Location History accounts, not just geofence.  Of

4    course, you could get this data just at the account

5    level.  The time that it spans when you look at the

6    records, it consistently covers just about every hour

7    of the day, most of the time.  So, just looking at it,

8    I would assume somebody's got to sleep at some point

9    or, you know, just not using their device all the

10   time.  So it's constantly recording information.

11   Q    And did you review any of those types of records

12   in this case?

13   A    Yeah.  So the account that we're talking about

14   here was gathered by law enforcement.  So once the

15   particular account was identified, they actually did

16   another request to get the full account.  So the

17   location history associated with that account and all

18   the other data that you can normally get through that

19   type of request.

20        So, in this instance, I looked at that data.  So I

21   believe there was a 35-day period of data that was

22   provided in that request.

23   Q    Let's take a look.  I'd like to show you Defense

24   Exhibit 8, please.

25             MS. KOENIG:  Your Honor, this exhibit details

McINVAILLE - DIRECT          117

1   very detailed specific location information for an

2   individual, Mr. Chatrie.  And so we're going to look

3   at the paper copy of this.  This is Defense Exhibit 8,

4   and we would ask that this be put in under seal.

5        THE COURT:  All right.  There's no objection

6   to that being under seal; is that right?

7        MR. DUFFEY:  No objection, Judge.

8        THE COURT:  All right.  So we'll look at the

9   sealed version, which I don't have a copy of.

10       THE WITNESS:  I don't either.

11       MS. KOENIG:  I hadn't anticipated -- we have

12  a digital copy that had been provided to the Court.  I

13  hadn't thought ahead about how to present this since

14  we have broadcasting.

15       THE COURT:  Since we have what?

16       MS. KOENIG:  The broadcasting that is being

17  shown to another courtroom.  There's no issue with

18  showing it to everybody in this room if it's up on the

19  screens.  I don't know if it's just that I could show

20  it to the witness and the lawyer screens and the Court

21  screen instead of broadcasting it to the other

22  courtroom.

23       THE COURT:  Is there anybody in the other

24  courtroom?

25       THE CLERK:  It doesn't appear that there's

1    anyone in there.

2              THE COURT:  Can we talk to the CSO and close

3    the courtroom?

4              MR. DUFFEY:  Judge, I guess I'll raise my

5    objection.  Why are we talking about search warrant

6    No. 2?  I object to relevance if we're going to get

7    into a sealed second search warrant.  It's not the

8    subject of the motion today.

9              MR. PRICE:  I'm happy to explain.

10             Your Honor, the data obtained through that

11   search warrant was Mr. Chatrie's location information

12   over a, let's see, 35-day period.  What it allows us

13   to do is to determine how frequently Google was

14   actually collecting Mr. Chatrie's location

15   information.  So that point we believe is very

16   relevant, and this goes to show that directly in this

17   case.

18             THE COURT:  I'm going to overrule the

19   objection.

20             Is the courtroom closed?  Do we have an issue

21   with the folks on the phone?  Is there anybody on the

22   phone?

23             THE CLERK:  Yes.

24             MR. PRICE:  They won't be able to see it,

25   Your Honor, so it's okay for them to hear the

McINVAILLE - DIRECT                    119

 1   testimony about it.  We just don't want to have the

 2   longitude and latitude coordinates being captured or

 3   somebody being able to write them down.

 4            THE COURT:  Okay.

 5   BY MR. PRICE:

 6   Q   All right.  So this is Defense Exhibit 8.  Can you

 7   tell us what we are looking at here?

 8   A   Yes.  So very similarly to what we have seen when

 9   we refer to like the Stage 1, Stage 2 requests.  This

10   is account specific location history rather than a

11   group of people's location history.  But you'll see

12   very similar items throughout.  It will look very

13   similar besides just a few extra pieces of

14   information.

15            THE COURT:  I don't have this document.

16            MS. KOENIG:  Your Honor, it's a very large

17   file.  It would have taken hundreds of pages to print

18   off.  So we provided it digitally to the Court.  It's

19   in the box.com account that we had provided to the

20   Court.

21            THE COURT:  Okay.

22   BY MR. PRICE:

23   Q   Is this the CSV Google data file that you

24   reviewed?

25   A   Yes.

McINVAILLE - DIRECT                    120

1              THE COURT:  The what?

2              MR. PRICE:  CSV.

3              THE COURT:  Okay.

4              MR. PRICE:  It's just a type of file, Your

5     Honor.  It's a database file.

6     BY MR. PRICE:

7     Q   This is the file that you reviewed?

8     A   Yes, it's a comma separated value spreadsheet.

9              MR. PRICE:  I'd like to introduce this into

10    evidence, as well, Your Honor.

11             MR. DUFFEY:  Same objection, Judge.

12             THE COURT:  All right.  Well, I'm overruling

13    on the same basis.

14             (Defense Exhibit No. 8 is admitted into

15    evidence.)

16    BY MR. PRICE:

17    Q   So when you reviewed this file, can you tell us

18    what you found?

19    A   Yes.  So, again, this is account specific

20    information for one account rather than a group of

21    accounts.  The information contained spans, again, I

22    believe, a 35-day period.  And so you'll see that,

23    throughout this document, you'll see dates and times,

24    estimated latitudes and longitudes, those sources that

25    we talked about earlier, Wi-Fi, GPS, as well as those

1   display radiuses.  All of that information is given.

2   This is where the Stage 1 and Stage 2 information

3   actually comes from for each user.

4   Q    So what were the beginning and end dates here, if

5   you recall?

6   A    I don't.  From looking at -- the bottom date here

7   is May 1st of 2019.

8   Q    And that's the start date and the end date?

9   A    At the very top it is June 4th of 2019.

10  Q    So it's 35 days?

11  A    I believe so.

12  Q    And could you tell us how many records, how many

13  lines of information are in this file?

14  A    Sure.  Can you click on the A column, please?

15  8,349.  And that may include a few rows at the top.  I

16  believe there's three rows at the top.  So it's 8,346

17  individual records, I believe.  Yes.

18  Q    And were you able to determine about how many

19  records per day that is?

20  A    Yes.  So I just took, you know, how many days that

21  was just to try and understand about how many times

22  per day on average that record got entered.  I believe

23  it's around 238 times.

24  Q    228?

25  A    Somewhere around in there.  It's an estimate.

McINVAILLE - DIRECT                    122

1    Q    Did you work out how many times an hour that is?

2    A    Sure.  So if you broke that down just by a 24-hour

3    period, that's, I believe, almost 10 records per hour.

4    Q    Or once every how many minutes?

5    A    Once every 10 minutes.

6    Q    Six?

7    A    Sure.  It's a lot of data.

8    Q    So 10 times an hour, once every six minutes?

9    A    Roughly.  I mean, that's the average.  Again, it's

10   not on a specific interval.  That's just an average.

11   Q    Were there any times that Google wasn't collecting

12   data?  Like, did it only collect data during business

13   hours?

14   A    No.  So I looked to try and understand, like, how

15   often per hour, but like the actual hour ranges of

16   when data was collected.  And what I did when I looked

17   at that was just try to understand, you know, at, say,

18   12 a.m. to 12:59 a.m. of every day throughout that

19   period, like, how often it gathered records.  And what

20   I noticed was that it was consistently gathering data

21   24-hours a day.  Sometimes some areas had higher

22   rates, some had lower, but regardless, there were no

23   periods of data not being collected.  It was a

24   consistent collection of data across the date, if you

25   look at it just on average for that time.

McINVAILLE - DIRECT                    123

1    Q    There was no hour of the day when Google was not

2    collecting data?

3    A    There could be in certain days.  There could have

4    been a day where a particular -- but for the, again,

5    the average of across that time, you could see that it

6    generally always would collect data during hours of

7    the day.

8    Q    So even as you're sitting here, Google is

9    collecting your data?

10   A    Could be, if I had those options turned on.

11   Q    And if you did, how many times would they have

12   collected your data since you've been sitting on the

13   witness stand?

14   A    Quite a few times.  I've been here a few hours

15   now.

16   Q    So 20 or so?

17   A    It could be, yeah.

18   Q    Just one last thing.  What happens to Location

19   History, the setting, if the user deletes the

20   application that was used to enable it?

21   A    So you're saying in this instance, if Google

22   Assistant was used to opt in to Location History, but

23   then the application is then deleted?

24   Q    Uh-huh.

25   A    So if you delete that, your permissions are still

1    there.  You've enabled that permission on your account

2    even though the application that you used to do so is

3    no longer there.  It's not application based.  You're

4    activating it for your account.

5    Q    Let me make sure I understand.  Even if you delete

6    Google Assistant or even if Mr. Chatrie had deleted

7    Google Assistant, it wouldn't have affected whether

8    Google was getting his location history data?

9    A    No, because other applications are also

10   submitting -- it's still collecting because it's

11   activated for the account, not that specific app.  It

12   was just facilitated through an application.

13   Q    So it's a permission for the entire account?

14   A    It is, yes.  For that device for that account,

15   yes.

16   Q    Even though it was enabled through Assistant, if

17   you delete Assistant --

18   A    It's still going to collect.

19   Q    It's still collecting?

20   A    Yes.

21        MR. PRICE:  That's all I have, Your Honor.

22   Thank you very much.

23        THE COURT:  We probably should take a break

24   now before cross.  It's a natural breaking point, a

25   little earlier than when I normally do it.  Do you all

 1   want to break for lunch?  It's 12:30.

 2           MR. DUFFEY:  Fine with the government, Judge.

 3           MR. PRICE:  That's fine with us, Your Honor.

 4           THE COURT:  Do you need a full hour?  No.

 5   Half an hour?

 6           MR. DUFFEY:  Yes, ma'am.

 7           MR. PRICE:  That will be sufficient.  Thank

 8   you.

 9           THE COURT:  All right.  So I'll give a little

10   more than half an hour.  I have it as 12:35.  We'll

11   turn at 1:15.  That will give time for folks to move

12   back and forth.  All right?

13           MR. DUFFEY:  That's fine.

14           THE COURT:  Again, sir, you're still under

15   oath.  Please don't speak to anybody about your

16   testimony.  Don't speak to your witnesses about

17   testimony.  And please wait for our CSOs to move you

18   around as you're moving in our hallways.  All right?

19           So we will take a recess, please.

20           (Luncheon recess at 12:30 until 1:17 p.m.)

21           THE COURT:  All right.  I'm going to do our

22   reminders, which is, obviously, that our witness is

23   still under oath.  Do we have anybody on the AT&T

24   line?

25           THE CLERK:  Yes.

McINVAILLE – DIRECT                126

```
 1          THE COURT:  Anybody who is on our telephone
 2   conference, welcome.  And I need to remind you that
 3   our local rule, Criminal Rule 53, and our standing
 4   order prohibits anybody recording, transmitting or
 5   broadcasting this hearing.
 6          We have a court reporter here who's making
 7   the official record, and that's all we will have of
 8   this proceeding.
 9          All right.  Thank you.  Mr. Duffey.
10          MR. DUFFEY:  All right.  Thank you, Judge.
11
12      CROSS-EXAMINATION
13   BY MR. DUFFEY:
14   Q   So, good afternoon, sir.
15   A   Good afternoon.
16   Q   I'm Peter Duffey.  I'm with the U.S. Attorney's
17   Office.  Nice to meet you.
18      Let's start -- so we're going to talk about the
19   search warrant first.  Phase 1 you've already
20   testified to, but let's just clarify.  That's one
21   hour; right?  And a fence, 150-meter fence, around the
22   area where we say a crime was committed; right?
23   A   That's correct.
24   Q   And we got back multiple points of data from
25   Google; right?
```

1   A    In that return, yes.

2   Q    In Phase 1?

3   A    Yes.

4   Q    In fact, the multiple points of data applied to 19

5   different devices?

6   A    Correct.

7   Q    All right.  And we talked about Defense

8   Exhibit 21, which is Mr. McGriff's affidavit,

9   paragraph 13.

10              MR. DUFFEY:  I'm sorry.  I should have warned

11   you.

12              THE COURT:  That's okay.

13   BY MR. DUFFEY:

14   Q    That's where we got the tens of millions of

15   data -- tens of millions number about their location

16   history data; right?

17   A    Correct.

18   Q    And that came from McGriff who works for Google.

19   A    That's right.

20              THE COURT:  Can you repeat the exhibit

21   number, please?

22              MR. DUFFEY:  It's Defense Exhibit 21.

23              THE COURT:  Okay.

24              MR. DUFFEY:  And I'm talking about paragraph

25   13.

1   BY MR. DUFFEY:

2   Q   So let me just ask this:  You characterize that,

3   or maybe it was Mr. Price, characterized that as a

4   search of tens of millions of people's location

5   history data; right?

6   A   Correct.

7   Q   Mr. McGriff didn't call that a search, did he?

8   A   I don't recall.  If we can pull it up.

9   Q   We'll pull it up.  But I think you know the answer

10  to this.  Let me ask this.  This is one database that

11  Google has of location history that they run the

12  parameters that we give them in a search warrant, that

13  is one hour, and longitude and latitude parameters,

14  and ask them to give us location history from those

15  parameters; right?

16  A   Correct.

17  Q   Okay.  And it's one database?

18          THE COURT:  I'm sorry.  I know the timing of

19  cross is important, but I think -- are we having

20  trouble with accessing the exhibits?

21          THE CLERK:  Laura, it's not coming up on the

22  screen.  Is your plug pushed in all the way or

23  whatever they did last time?

24          MS. KOENIG:  I think I got it.

25          MR. DUFFEY:  Thank you, Judge.  It's a fairly

1   minor point.

2          THE COURT:  We're probably going to be using

3   this further.  So I want to start off --

4   BY MR. DUFFEY:

5   Q   So it's paragraph 13 that I was interested in.  So

6   maybe if we could just scroll up a little bit to get

7   by that, because I want to see all the words.  There

8   we go.

9          So paragraph 13, they're talking about the

10  majority of Google users worldwide did not have

11  Location History enabled on their account.  They

12  concede that it's difficult to come up with an exact

13  number, but one-third of active Google users, tens of

14  millions of Google users worldwide, had Location

15  History enabled on their accounts; right?

16  A   Correct.

17  Q   Now, that's where you get the tens of millions of

18  people's accounts that were searched; right?

19  A   Correct.

20  Q   Nowhere does McGriff refer to that as a search;

21  right?

22  A   No, he's telling you how many people they estimate

23  would use -- that use the Location History service

24  after he discusses that they have to search that

25  database for the people located within the fence.

1    Q    And you would agree with me, we're talking about

2    one database; right?

3    A    The Location History database.

4    Q    Right.  That's called Sensorvault, I think?

5    A    I believe that's where they keep it, yes.

6    Q    And when you're talking about searching that,

7    you're really talking about a computer and you're

8    putting in the parameters that you want it to look

9    for; right?

10   A    That's correct.  They're using computers to do

11   that work.

12   Q    Also to be clear, the government doesn't have

13   access to the Sensorvault.  The government gets the

14   results, that is the 19 devices that Google tells us

15   complied with the parameters that we gave them; right?

16   A    That's right.

17   Q    Okay.  So to be clear, when you compared our

18   search here, our geofence search, to a tower dump, the

19   tower dump example we gave you said probably would

20   give 3,000 numbers to the government?

21   A    It's possible.

22   Q    And so we're clear on a tower dump, one, you're

23   getting 3,000 numbers; right?

24   A    Correct.

25   Q    And you're getting phone numbers; right?

1    A    Correct.

2    Q    Phone numbers to people's accounts; right?

3    A    Correct.

4    Q    That is not true in the geofence; right?  We're

5    getting reference numbers.

6    A    Correct.  You're getting the device ID.

7    Q    Right.  But it's a device ID that we, even

8    standing here today after over a year, we can't

9    connect these device ID reference numbers to any

10   individual cell phone numbers; right?  At least not

11   through the device number.

12   A    Directly to the phone number?  No.

13   Q    Right.  And so when you compare 19 devices, and

14   then your Defense Exhibit 3, and that's under seal.

15   So you should have that in front of you; right?

16   A    You said three?

17   Q    Three.  That's the return that we got on Phase 1.

18   A    Okay.

19   Q    Actually, I think it also contains Phase 2, but I

20   want to talk to you about Phase 1.

21        Well, it's not numbered.  So if you can click to

22   the very beginning of the actual spreadsheet, and it

23   begins in the upper left-hand corner with the No.

24   No. 1.  And that No. 1.

25              THE COURT:  Are you in Exhibit 3?

McINVAILLE - CROSS                    132

1          MR. DUFFEY:  Yes, ma'am.

2          THE COURT:  So your face is away from the

3    microphone.  So we're not hearing everything.

4          MR. DUFFEY:  Let me move it over here.

5    BY MR. DUFFEY:

6    Q    So if we can go to the beginning of the

7    spreadsheet that begins with 1 and ends three or four

8    pages later at 210; right?

9    A    Correct.

10   Q    And it's only 19 different devices, but it's

11   actually 209 location plots?

12   A    That's correct.

13   Q    That's what the government got from the search

14   warrant, at least Phase 1; correct?

15   A    Correct, in one.

16   Q    Compared to 3,000 -- possibly 3,000 phone numbers

17   that are identified by their phone numbers in a tower

18   dump; right?

19   A    Correct.

20   Q    Okay.  And you testified, I think, on direct that

21   Google calculates to the best that they can that if

22   they are in our 150-meter radius, they're in, and we

23   get coordinates, and if they're out of the 150-meter

24   radius, we don't get anything from them; right?

25   A    Yes.  If that latitude and longitude falls

1    outside, it won't.

2    Q    In, we get it; out, we don't get it?

3    A    Correct.

4    Q    And the latitude, longitude, and that's Column C

5    in -- excuse me -- D and E in this, those are pretty

6    precise.  Those are the points that we see you used, I

7    think, in your Mr. Blue, Mr. Green, Mr. Yellow.  We've

8    used in some of these where we're pointing; right?  So

9    that's the exact point.  And then as you move over to

10   G, maps display radius in meters, that's where they

11   say some of these we're very confident on, and they

12   give you a low number in meters; right?  And some of

13   these we're not, and they give you a slightly higher

14   number; right?

15   A    That's correct.

16   Q    So that's like their margin of error, say, in a, I

17   don't know, a political poll, they give you a margin

18   of error.  This is like Google's margin of error.

19   They're telling you how confident they are, and how

20   close this phone is likely to be to this -- to those

21   longitude and latitude marks?

22   A    That's correct.

23   Q    And some they're pretty confident in, and some

24   they tell you we're not so confident in; right?

25   A    Based on radius, right.

McINVAILLE - CROSS                    134

1          THE COURT:  Based on what?

2          THE WITNESS:  The radius, how big or small it

3    is.

4    BY MR. DUFFEY:

5    Q   If we could go to Government's Exhibit 1, page 20.

6    And that's with the big blue circle.  On direct, you

7    talk a lot about this because this -- and you're

8    accurate.  This one big blue circle included

9    businesses, and streets, and apartments, and all kinds

10   of things; right?

11   A   Correct.

12   Q   All right.  And I think you testified that the

13   margin of error, so to speak, the map display radius

14   on that was 384 meters.

15   A   Somewhere around there, yes.

16   Q   That's pretty high?

17   A   Yes.

18   Q   In fact, if I can get you to look through the

19   Stage 1 returns, so let's start with the page at the

20   very beginning of the returns.  In the upper left-hand

21   corner, that's a one, and it goes down to line 33;

22   right?  Are you with me?

23   A   Yes.

24   Q   Looking at map display radius, do you see any

25   numbers in that that are even close to 384?

McINVAILLE - CROSS                    135

1   A    No.

2   Q    In fact, I think it's lines two, three, four, and

3   five, maybe the first six or seven are over 50, but

4   none are more -- there's two that are 100 even, and

5   then the rest are less than 50 meters; right?

6   A    That's fair, yes.

7   Q    Is that right?

8   A    Yeah, it is.

9   Q    Okay.  Second page, likewise.  That's line 34

10  through 66.  There's not a single map radius that's

11  over 50 in that; right?

12  A    Correct.

13            THE COURT:  Wait.  Where are you?

14            MR. DUFFEY:  Going to the next page.

15  Q    And that has line 67 through 99.  I think there's

16  only two, which is line 83 and 86, are slightly over

17  50.  The rest of the display radiuses are under 50;

18  right?

19            THE COURT:  Can you remind me which exhibit

20  we are?

21            MR. DUFFEY:  We are Exhibit 3.  And then

22  we're at the third page of the spreadsheet.  And that

23  has lines 67 through 99.

24            THE COURT:  Got it.

25  BY MR. DUFFEY:

McINVAILLE - CROSS                136

1    Q    So, I'm asking you, with the exception of line 83

2    and 86, which are slightly over 50, the rest of those

3    map radius numbers are all under 50 meters; right?

4    A    Correct.

5    Q    We go to the next one, that's line No. 100 to 132,

6    the entire sheet's well under 50; right?

7    A    They're under 50, yes.

8    Q    Not a single one's over 50?

9    A    It's not --

10   Q    Much least 384?

11   A    That's right.

12   Q    Similarly, line 133 to 166, that page, I think

13   there's two.  One's 104 and one's 122.  Well, let me

14   be precise.  Line 137, slightly over 100.  And line

15   150, a little over 100.  The rest significantly lower.

16   In fact, some of them are down to 3 meters; right?

17   A    Correct.

18   Q    In your training and experience, being down to

19   3 meters is probably a GPS point; right?

20   A    It is.  A reference is GPS for those points.

21   Q    All right.  Very similarly, on the next page, line

22   166 to line 198, lots of GPS points.  Nothing --

23   excuse me.  One over 50.  Line 186 shows 73.  The rest

24   well under 50; right?

25   A    Correct.

1   Q    So, finally, the last page.

2         MR. DUFFEY:  I'm getting to it, Judge.

3   Q    199 to 210, the very end of Phase 1.  The second

4   to the last one there, line 209, that's the three --

5   excuse me, 387, I think it is.  That's the blue

6   circle; right?

7   A    The largest one, yes.

8   Q    Right.  Now, if you look right above that also at

9   line 208, that's the same reference number; right?

10  A    Correct.

11  Q    So that's the same device; right?

12  A    Correct.

13  Q    And only about 30 seconds earlier, but their

14  radius -- map display radius on that is 84?

15  A    Correct.

16  Q    So they have the same device on here.  It has a

17  map radius of only 84, but the next one for some

18  reason goes to 387.

19  A    Correct.

20  Q    Do you know why it jumped to 387?

21  A    I don't.

22  Q    Do you have any idea?

23  A    I don't.

24  Q    Okay.  But you would agree with me, if we take

25  away that one anomaly, which is the only one in this

1    entire Phase 1 that's even close to 387, if you remove

2    that one anomaly, what we're left with is a fairly

3    concise circle.  Granted, some of them are slightly

4    outside the geofence radius.  But it's fair to say

5    this one, the one big blue circle, is pretty much an

6    anomaly here; right?

7    A    Again, it's larger than the others, and it's the

8    only one.

9    Q    Well, it's a lot larger than the others; right?

10   A    Yes.

11   Q    Okay.  And, in fact, the coordinates just 30

12   seconds earlier on that same device was only 84;

13   right?

14   A    Correct.

15   Q    Okay.  So, now, we've got -- as I said, Phase 1

16   was 19.  I'm calling it anonymous numbers.  I know you

17   don't agree with that, but these were 19 devices.  So

18   let's talk a little bit about the anonymity of these.

19   The reference numbers here, and those are all those

20   reference numbers in Column A from the Phase 1 thing;

21   right?  You've been looking at this for over a year;

22   right?

23   A    Correct.

24   Q    Is there some secret code to those reference

25   numbers that you've cracked that can tell you what the

1   cell number is that's associated with those reference

2   numbers?

3   A    No.

4   Q    And so to your knowledge, I mean, when we're

5   talking about anonymity, those reference numbers are

6   anonymous as far as identifying any particular phone

7   number; right?

8   A    Correct.  They don't associate to a phone number.

9   Q    So we can take out the reference number.  That's

10  not what you're talking about when you say the returns

11  aren't anonymous; right?

12  A    Correct.

13  Q    Okay.  Now, as we talked about the map radius, the

14  location is not precise, and Google gives you

15  different margins of error; right?

16  A    Correct.

17  Q    Some very, very small and some larger.  But every

18  single one of these plots that we got back, Google

19  reasonably believes, at least in their mind, that

20  every single one of these by longitude and latitude

21  should be plotted within our 150-meter radius; right?

22  A    That's how they returned it, right.

23  Q    And if they found a longitude and latitude outside

24  of our radius, we don't get it; right?

25  A    Right.

1    Q    So there's no search as far as the government is

2    concerned.  We don't get any information on that

3    device; right?  Is that right?

4    A    If the point falls outside of the geofence, you

5    don't get it.

6    Q    Okay.  They're not guessing at this.  They're

7    not -- it's not their discretion.  They have a set way

8    of doing this; right?

9    A    They certainly do.

10   Q    And they calculated longitude and latitude; right?

11   A    Yes.

12   Q    And they comply with the search warrant and the

13   parameters that we give them; right?

14   A    Correct.

15   Q    So at this point Phase 1, in your mind, is

16   anonymous; right?

17   A    Sure.  You only know who's inside -- you only know

18   the numbers for the people inside the circle.

19   Q    And you have these anonymous reference numbers;

20   right?

21   A    Yes.

22   Q    They don't give you any clue; right?

23   A    No, they just associate --

24   Q    So Phase 1 is anonymous just like everyone says;

25   right?

1    A    Sure.

2    Q    Okay.  Phase 2 is where you begin to diverge a

3    little bit; right?

4    A    Correct.

5    Q    Okay.  So let's talk about that.  So -- well,

6    first, let me ask you, you said government -- the

7    government asked in Phase 2 for all 19; right?

8    A    Correct.

9    Q    From Phase 1.  And I think you said, but I'm not

10   sure, was it your testimony that then Google decided

11   to give us only nine?

12   A    No.

13   Q    What did you say?

14   A    It was that 19 were requested and that Google

15   asked for them to be -- for that number to be reduced.

16   Q    Right.  Well, I think they just didn't respond.

17   But --

18          MS. KOENIG:  Judge, objection that Mr. Duffey

19   is, I think, testifying about that point instead of

20   the witness.

21          MR. DUFFEY:  Well, it was a question.

22          THE COURT:  The question is, what you think?

23   How does he know what you think?  Just rephrase it.

24          MR. DUFFEY:  All right.

25   BY MR. DUFFEY:

McINVAILLE - CROSS                    142

1    Q    The point is, is that Google didn't respond to the

2    initial request.   I mean, you reviewed the emails;

3    right?

4    A    Yes.

5    Q    Google didn't respond to the government's first

6    request that we get all 19 back; right?

7    A    I think that's right, yes.

8    Q    And, in fact, a couple of times when we asked,

9    Google just didn't respond?

10   A    Correct.

11   Q    And it's also true, then, that -- and this is

12   Detective Hylton's email, I think.   He added in, in

13   the alternative, here's our nine; right?

14   A    Correct.

15   Q    And so those nine numbers weren't chosen by

16   Google.   They were chosen by Detective Hylton?

17   A    Correct.

18   Q    Okay.   Just so we're clear on that.   And all

19   nine -- did you do the plot, all nine videos, too?

20   Did you plot all nine of those?

21   A    Yes.

22   Q    And, in fact, all nine of those, if you recall,

23   all the radiuses, with, I think, the exception of one,

24   all fell -- not only the point, but the radiuses, too,

25   the map display radiuses, all fell within the

1   150-meter circle.  Does that sound right?

2   A    I think that's correct.

3   Q    Now, so let's talk about that.  So then it's your

4   contention, then, though, that once we -- in Phase 2,

5   we drop the fence.  We add a half hour to each end.

6   That's what we did.  That's what the government asked

7   for in the search warrant; right?

8   A    Correct.

9   Q    And so now we're talking about two hours on one

10  particular day with no geographical restriction and

11  just on these nine phones; right?

12  A    Correct.

13  Q    So, basically, we already know some of this

14  because we've had them in Phase 1; right?  But now

15  we're going outside the circle; right?

16  A    Correct.

17  Q    So, in some of these, your contention is it's not

18  really anonymous because they go -- I think you really

19  center on the fact that they travel -- they appear to

20  travel to a single family residence; right?

21  A    That's part of it, yes.

22  Q    Well, we'll talk about that, then.  So, when they

23  go to the residence, would you dispute that not a

24  single one of these in Phase 2 of these nine phones

25  stay at any single family residence more than an hour?

1    A    Do they stay there for more than an hour?

2    Q    Right.

3    A    We've only got two hours of data.  So none stayed

4    for more -- no, none stayed for an hour.

5    Q    Less than an hour?

6    A    Sure.

7    Q    Okay.  All nine phones, when you mapped them out,

8    none of them stayed at the -- I realize you're

9    tracking them.  They're going down roads.  At some

10   point, they're all going into the circle; right?  At

11   least that's what we say; right?

12   A    Correct.

13   Q    And then some of them go back.  But none of them

14   stay at any single family residence for more than an

15   hour; right?

16   A    Correct.

17   Q    And many of them don't even stay very long at all;

18   right?

19   A    Correct.

20   Q    Okay.  Now, you would agree with me that -- I

21   mean, how old are you?

22   A    Thirty-three now.

23   Q    All right.  You've been to people's homes and

24   stayed more than an hour; right?

25   A    Sure.

1    Q    You didn't live there; right?

2    A    That's correct.

3    Q    In fact, people get guests at their homes all the

4    time; right?

5    A    That's right.

6    Q    So you're not saying, as an expert, because you

7    can track a cell phone to at or near a residence, that

8    that means they have to live there?

9    A    That's right.  That doesn't mean they have to live

10   there, you're right.

11   Q    I understand you say it's possible, and I would

12   agree with you it's possible.  Anything's possible.

13   But that doesn't mean that they live there; right?

14   A    That's correct.

15   Q    And I think when we're talking about -- I notice

16   when you plotted on your three plot -- let me get the

17   number.  Defense Exhibit 5.  We don't have to play it,

18   but in that you plot specific points, and you show

19   them hitting at or near a single family residence.

20   And that's for Mr. Green, and Mr. Yellow, and Mr.

21   Blue; right?

22   A    Correct.

23   Q    So, I notice we don't have the map display radius

24   around those points; right?

25   A    That's correct.

1    Q    Isn't it fair to say that many of those, if you

2    put up the map display radiuses, would probably

3    include the house next to it?

4    A    That's right.

5    Q    In fact, I think you said that on direct.

6    A    I did.

7    Q    In fact, it might include a third house; right?

8    A    It could include more than one, yes.

9    Q    Okay.  So, now, you don't know whether they're a

10   guess or the actual person who lives there; right?

11   And for most of these, if not all of these, you're

12   going to have to look, if you want to figure out their

13   identity, now you're looking at two, maybe three

14   houses; right?

15   A    Correct.

16   Q    And you would agree with me that if, in fact, the

17   holder of that phone was a guest, then doing the

18   things that you talked about doing, the open source

19   thing and looking at tax records or deeds or I'm not

20   sure what, you weren't real specific on what you were

21   looking at, but looking at those kinds of things, like

22   deeds, tax records, open source data, for that house,

23   if they were a guest, then you're not going to get

24   that; right?

25   A    Right.  You're going to see the person they're

1    associated with.

2    Q    Right.  And nobody on their tax record or maybe

3    you get, I don't know, their power bill, no one says

4    here's Peter Duffey's power bill, and, by the way,

5    here's 10 of his closest friends; right?  You're not

6    going to get that off the power bill; right?

7    A    Correct.

8    Q    So I think you would agree with me that if, in

9    fact, these people were a guest in the home that

10   you're looking at, then you're not going to be able to

11   find their name from any of this open source data that

12   we talked about; right?

13   A    Probably not.

14   Q    So now we're talking about you're having to limit

15   this, and you're having to assume, I guess, or look

16   for them actually living in the house before you even

17   have really a prayer of figuring out their identity;

18   right?

19   A    For associating with the house, then, yes, you

20   would need something.

21   Q    Well, the phone is the only thing that associates

22   it to the house; right?

23   A    Correct.

24   Q    And so what we're talking about is identifying the

25   person holding the phone; right?

1    A    Correct.

2    Q    And when I say "identify," and you tell me if you

3    agree with me, when we're talking about identifying a

4    human being, you're talking about their name; right?

5    A    Sure.

6    Q    Okay.  So all of these, I guess, you could go to

7    the courthouse, if you had an address, and look at the

8    deed; right?  You could get other open source data,

9    figure out who paid the taxes on the house; right?

10   A    Yes.

11   Q    That would give you the owner?

12   A    Correct.

13   Q    But you'd agree with me, if the owner was leasing

14   the house, then you're back in the dark again because

15   now there's lessees in the house, and you don't know

16   who they are; right?

17   A    That's right.

18   Q    And you won't get that from any of this open

19   source data?

20   A    Right.

21   Q    And, of course, there's Facebook; right?  I think

22   you looked on Facebook.

23   A    Correct.

24   Q    Other tax records.  All of this, you would agree

25   with me, requires fairly significant investigative

1   work on your part; right?

2   A    Yeah, you have to look into the data.

3   Q    None of it come from Google; right?

4   A    Correct.

5   Q    And none of it certainly came from Google pursuant

6   to this search warrant; right?

7   A    Correct.

8   Q    Okay.  So let me ask you this:  Ultimately, if you

9   were to get, say, a person's -- even if you were able

10  to figure out what their phone number was living in a

11  house, and then you had one of our phones from Phase 2

12  going to that house, you'd still have to be able to

13  match up their phone number with this anonymous

14  reference number from our Phase 2 data; right?

15  A    Correct.

16  Q    Because there's nothing in the reference number

17  that we got pursuant to this warrant that tells you

18  what their phone number is, at least until you get to

19  Phase 3; right?

20  A    Correct.

21  Q    So even then, in order to match up that phone to

22  that person, you're going to have to probably have a

23  friendly prosecutor, and you're probably going to have

24  to do court process; right?

25  A    Yes.

1    Q    You're going to have to get a search warrant;

2    right?

3    A    Yes.

4    Q    At least grand jury subpoenas to figure out who

5    the subscriber to the phone was?

6    A    Yes.

7    Q    Maybe.  And even -- and you were in law

8    enforcement for eight and a half years, so I think

9    you're going to know the answer to this.  Criminals

10   often use other people's names on their cell phones;

11   right?

12   A    People in general do that, yes.

13   Q    Okay.  And especially, say, drug dealers; right?

14   A    They can, yes, or false names more often than not.

15   Q    They do it all the time; right?

16   A    Yes.

17   Q    Or they use a girlfriend's name; right?

18   A    Correct.

19   Q    Because they don't want their name associated with

20   the phone.

21   A    Right.

22   Q    So in your, I guess, scenario of saying you can

23   maybe uncover the identity of these people, even if

24   you got a person's cell phone at this house and got

25   the subscriber information and figured out their name,

McINVAILLE - CROSS                    151

1    that still doesn't get you there; right?  Because

2    you're not sure, one, whether or not they were the

3    ones holding the phone on May 20th at 5 p.m., or

4    whatever the time is, of 2019; right?

5    A    Correct.

6    Q    The time of this search warrant.

7    A    Right.

8    Q    All right.  So when -- I guess maybe it's a

9    question of semantics, but I just want to ask you, so

10   it's your expert opinion that the information that we

11   got from Google in Phase 2 is not anonymous?

12   A    It's not that it's identifying in terms of names,

13   but, yes, it can lead you to know who that person is

14   based on being able to track where they have been.

15   Q    Okay.  In two hours of one day; right?

16   A    Correct.

17   Q    You think you can figure out who these people are?

18   A    Sure.

19   Q    All right.  Have you figured out who anyone is?

20   A    I haven't, no.

21   Q    Well, you've had over a year.  You haven't figured

22   out the identity of anyone in Phase 2?

23   A    I wasn't actually here to investigate who the

24   people were.  I was trying to determine if it would be

25   possible to do so.

McINVAILLE - CROSS                    152

1    Q    Okay.  But you haven't done it yet?

2    A    No, I have not.

3    Q    Okay.  So when you say it's not anonymous, it's

4    because it could lead you, with extra work, extra

5    investigative activity, maybe lead you to possibly a

6    group of likely suspects; right?

7    A    Correct.

8    Q    And in your mind, that means that's not anonymous?

9    A    Right.

10   Q    All right.  So let's talk about, if we could, your

11   supplemental report.  And that's Defense Exhibit 7;

12   Right?

13          MR. DUFFEY:  Could we get that up?  Do you

14   mind?

15          MS. KOENIG:  Sure.

16   BY MR. DUFFEY:

17   Q    So you would agree with me, looking at your

18   report, right off the bat, you state, and I think

19   everyone appreciates your candor, that you can't

20   replicate the opt-in process that the defendant would

21   have seen.  That's on page 1 of your report.

22   A    That's right.

23   Q    So you can't be sure exactly which of these

24   screens that he saw, if any, from your report; right?

25   A    Can't be 100 percent certain.

McINVAILLE - CROSS                    153

1    Q    Sure.

2    A    Right.

3    Q    And so the Quartz article, which is Defense

4    Exhibit 48, and we don't have to get that up, but

5    that's what it is, you show the screenshot in your

6    report, Defense Exhibit 7, as Figure 1; right?

7    A    Correct.

8    Q    And I think you said this, but let's make it

9    clear, this article was published January 24th of

10   2018; right?

11   A    Right.

12   Q    And I think we've established that Location

13   History on our phone -- I say "our phone" -- the

14   target cell phone here, Mr. Chatrie's phone, was

15   enabled on July 9th of 2018; right?

16   A    Right.

17   Q    So you would agree with me that the Quartz article

18   showing various screenshots was published seven or

19   eight months prior to the enabling on Mr. Chatrie's

20   phone; right?

21   A    Correct.

22   Q    Okay.  And we'll get to the Norwegian test, but

23   that shows a different -- that's from July, and that

24   shows a different screenshot; right?

25   A    The Norwegian?

McINVAILLE - CROSS                    154

1    Q    Yes.

2    A    Yes, correct.

3    Q    So either Quartz is just wrong or something

4    changed in between January and July; right?

5    A    Correct, the language changed.

6    Q    Okay.  So when we look at Figure 1, and this is

7    Figure 1 on Government's 7, this is the Quartz

8    screenshot; right?

9            THE COURT:  Just to be clear, it's Defense 7.

10           MR. DUFFEY:  Oh, I'm sorry.  Defense Exhibit

11   7.

12   BY MR. DUFFEY:

13   Q    Figure 1, this is the Quartz screenshot; right?

14   A    Correct.

15   Q    And you would agree with me, this is not entirely

16   accurate because it cuts off "No, thanks" or "Yes, I'm

17   in" at the bottom of the screenshot; right?

18   A    Yeah, it has to be scrolled down to get to those.

19   Q    Okay.  So we can assume that at the bottom there

20   is a "No, thanks" or "Yes, I'm in"; right?

21   A    Correct.

22   Q    Okay.  And can you preclude the possibility that

23   if you click "No, thanks," that there's a second

24   opt-in page that follows up this to say, like, are you

25   sure, or this is what happens if you do this?

McINVAILLE - CROSS                    155

1    A    I'm not sure if there is.

2    Q    You don't know?

3    A    No, I don't.

4    Q    In fact, the Quartz article, it wasn't really the

5    point of the Quartz article to document the opt-in

6    process; right?

7    A    Right.

8    Q    They had a different subject; right?

9    A    Correct.

10   Q    It wasn't about whether or not this is truly an

11   opt-in process; right?

12   A    No.  I used the screenshot because it showed one

13   of the permission screens.

14   Q    Oh, I'm not attacking you.  I'm just pointing out

15   the point of the article wasn't about opt-in.  It just

16   happened to have screenshots in it; right?

17   A    Correct.

18   Q    Okay.  The second source you went to, the Oracle

19   report -- for the record, that's Defense Exhibit 11.

20   So if we go to page 2 of your report, Exhibit 7, so

21   Figure 3, in this screenshot that you document --

22   excuse me, Figure 2.  This is page 2.

23           MS. KOENIG:  It's page 2 of Exhibit 7.

24           MR. DUFFEY:  All right.

25   BY MR. DUFFEY:

1    Q    This doesn't document at all when this screenshot

2    would have been taken; right?  Or does it?  You tell

3    me.

4    A    I think in another portion they do reference

5    when -- I know they were 2018.  I'm trying to recall.

6    I think it was -- I think it was actually closer to

7    the time frame of Quartz, if I'm --

8    Q    Before July 2018?

9    A    I do believe it was before July.

10   Q    But looking at this, you're not sure because it

11   doesn't document it in your report?

12   A    Not right here, no.

13   Q    Okay.  And, again, much like the Quartz figure,

14   the Quartz screenshot, this does not document if

15   there's any further opt-in or out-out process after

16   clicking either "No, thanks" or "Yes, I'm in"?

17   A    It does not.

18   Q    It doesn't tell you what happens next?

19   A    No, there's no screenshots for that.

20   Q    Okay.  Now, then we go to the Norwegian report,

21   and the Norwegian report itself was Defense 27, but

22   this is on page 3; right?  And the difference here, I

23   take it, is that you have to opt-in, I think you

24   testified.  It now has three things in the opt-in

25   list, I guess you would call it, that has Location

1    History.  And this is Figure 3, "Location History,

2    Device information, Voice & Audio Activity"; right?

3    And those all three are on the list; right.

4    A    Yes, they were on the others, as well.

5    Q    Then you also show the expanded view of Location

6    History.  That, I guess, is that you clicked on the

7    down arrow, and that gives you an explanation of what

8    Location History is; right?

9    A    That's what they did, yes.

10   Q    Okay.  And that says "Location History saves where

11   you go with your devices"; right?

12   A    Yes.

13   Q    To save this data, Google regularly obtains

14   location data from your devices.  This data is saved

15   even when you aren't using a specific Google service,

16   such as Google Maps or Search.  That's on Figure 3;

17   right?

18   A    Yes.

19   Q    You're not contesting that a normal consumer

20   reading that could not figure out that Google is

21   saving their location history, are you?

22   A    No.

23   Q    Okay.  So it's clear, pretty much to anyone who

24   can read, that they're telling you Google is going to

25   save where you go; right?

1   A    Correct.

2   Q    It also says "If you use the device without an

3   internet connection, your data may be saved to your

4   account once you return online"; right?

5   A    Correct.

6   Q    I think that goes to your point that once you

7   enable Location History, it's tracking your phone all

8   the time; right?

9   A    Right.

10  Q    Okay.  It also says, I think, that this data may

11  be saved and used in any Google service where you were

12  signed in to give you more personalized experiences;

13  right?

14  A    Yes.

15  Q    And it tells you, you can see your data, you can

16  delete it, and you can change your settings at

17  account.google.com; right?

18  A    Correct.

19  Q    That's the same language that Mr. McGriff has in

20  his affidavit; right?

21  A    Correct.

22  Q    Okay.  So there's nothing shady about that; right?

23  About McGriff's affidavit, at least to that point;

24  right?

25  A    No.

McINVAILLE - CROSS                    159

1    Q    Same language.  All right.  And then at the

2    bottom, again, there's "No, thanks" or there's "Turn

3    on"; right?

4    A    Correct.

5    Q    Do you think there's any ambiguity there that you

6    are turning on Location History?

7    A    No, it's specifically asking for those three

8    permissions.

9    Q    All right.  And, essentially, and I think this is

10   Defense Exhibit 23, is McGriff's affidavit, the

11   difference really with McGriff's affidavit is that --

12   in his affidavit and his screenshot, Location History

13   stands alone; right?

14   A    Correct.

15   Q    That's really the only difference; right?

16   A    Correct.

17   Q    He doesn't define Location History any

18   differently; right?

19   A    No.

20   Q    Okay.  And there's still a "No, thanks" or "Turn

21   on" at the end of it?

22   A    Correct.

23   Q    Right.  So is there any doubt also that consumers

24   are told -- and this is true, that they can always

25   delete Location History any time they want; right?

1    A    They can, yes.

2    Q    So I know Mr. Price asked you about turning off

3    or, I guess, deleting Google services or Google

4    Assistant doesn't turn off Location History?

5    A    Right, the application.

6    Q    Right.  My question is, though, regardless of

7    that, any time a consumer wants, they can go on their

8    phone and they can say stop taking my -- stop saving

9    my location history; right?

10   A    Correct.

11   Q    And then Google will stop doing it?

12   A    Correct.

13   Q    In fact, they can delete it, and then Google won't

14   have it in the Sensorvault anymore; right?

15   A    Correct.

16   Q    And if Google doesn't have it in the Sensorvault,

17   the government's not getting it even with a search

18   warrant; right?

19   A    The way I understand it, yes.

20   Q    Because it's just not there.

21   A    Right.

22   Q    So that can come either because the person never

23   turns on Location History; right?

24   A    I'm sorry?

25   Q    That can happen -- the government can, I guess,

1    get thwarted on the search warrant by Google where

2    Google says "We don't have any location history."

3    That can happen for two reasons.  One is the person,

4    the holder of the phone, can have never turned on

5    Location History; right?

6    A    Right.

7    Q    Or they can at any time go back on and delete it?

8    A    Correct.

9    Q    Any time before the search warrant comes; right?

10   A    Correct.

11   Q    In which case, in both cases, Google, in response

12   to a government search warrant, would say, Sorry, we

13   don't have anything; right?

14   A    I would think so, yes.

15   Q    Okay.  And I think you've said this, again, but

16   let's make it clear.  There is no way that Google

17   saves this data without the customer in some form or

18   fashion clicking either "Yes, I'm in" or "Turn on" and

19   Location History is at least one of the items up above

20   that choice; right?

21   A    Right.

22   Q    A customer has to agree to Location History or

23   Google is not saving their location data; correct?

24   A    Yes, their location history.  It doesn't have

25   that.

McINVAILLE - CROSS                    162

1   Q    From Mr. McGriff's affidavit, do you have any

2   reason to doubt his one-third of Google users

3   worldwide have Location History enabled?  That means

4   two-thirds do not; right?

5   A    Yeah, there's no way for me to know.

6   Q    Do you have any reason to doubt that?

7   A    No.

8   Q    I mean, you talked about the tens of millions

9   number on direct; right?  You got that from the

10  one-third of Google users worldwide having Location

11  History enabled; right?

12  A    Correct.

13  Q    That means three times that number of Google users

14  don't have Location History enabled; right?

15  A    That's right.

16  Q    Which means they're not -- Google has none of

17  their location data; right?

18  A    They don't have location history.

19  Q    Location history.

20  A    Yes.

21  Q    We'll get to that.

22       So, it's fair to say that tens of millions of

23  Google users have somehow figured out how to use their

24  phones without Location History enabled; right?

25  A    Right.

McINVAILLE - CROSS                163

1   Q    There's millions of people using their phones

2   without Location History enabled?

3   A    Right.

4   Q    You're not saying in your opinion these people, I

5   don't know, are just stupid because they don't know

6   how to turn it on?

7   A    I'm not saying anything about those people.

8   Q    Does that seem reasonable to you that tens of

9   millions of people would be using a phone without

10  Location History when they really wanted Location

11  History on?

12  A    I don't know why you would make the choice one way

13  or another.  That's completely up to the user.

14  Q    All right.  Okay.  Well, let me ask you this:

15  Location Services is clearly not the same thing as

16  Location History; right?

17  A    Right.

18  Q    So Location Services, enabling that, that's what

19  really gets you, I guess, according to Google, kind of

20  the fun stuff of the phone; right?  That allows the

21  phone to know where it is at all times; right?

22  A    Right.

23  Q    Realtime?

24  A    Right.

25  Q    And so if you wanted to -- you have Location

1    Services enabled, you can turn on Google Maps and say,

2    Take me to the nearest Chick-fil-A, and it will tell

3    you right then, Go down the road, take a right, and it

4    will direct you there; right?

5    A    Right.

6    Q    Because it's tracking you realtime because you

7    have Location Services enabled; right?

8    A    Right.

9    Q    And you have Google Maps enabled and all the other

10   things; right?

11   A    Right.

12   Q    But that is not the same thing as Location

13   History; right?

14   A    No.

15   Q    Because if you have Location Services enabled, you

16   can do all the fun stuff that I call it, but without

17   Location History enabled, Google's not saving any of

18   that; right?

19   A    Not that I'm aware of, no.

20   Q    It doesn't go into the vault; right?

21   A    I'm not sure.  I don't know for sure.  That would

22   be Google, but --

23   Q    Well, I'm asking you, in your expert experience,

24   if you don't have Location History enabled, Google's

25   not saving the data; right?

1   A    It's not saving Location History.  I don't know if

2   they're still saving some location information is all

3   I'm saying.

4   Q    Well, do you think they're saving your Location

5   Services data when you've told them not to enable

6   Location History?

7   A    So, look -- yeah, Location History is you creating

8   that data that's being stored to you.  There's still

9   advertising data and things being collected.  I just

10  was trying to say, as far as Location History goes,

11  you can have Location Services running and either have

12  Location History either running or not.  Two different

13  things away from whether or not they still collect

14  some location data in other ways.  But as far as

15  Location History goes --

16  Q    They do not?

17  A    Right.

18  Q    So if Google tells you that the only thing the

19  government gets from a search warrant is Location

20  History, do you have any reason to doubt that?

21  A    No.

22  Q    And, therefore, I'm asking you if Location History

23  is not enabled, the government's not getting any

24  location data out of Google; right?

25  A    Correct.

1   Q    We've talked real quick about our second search

2   warrant, and that's Defense Exhibit 8.  And that had a

3   whole bunch of plots; right?

4   A    Yes.

5   Q    That's the second government's search warrant that

6   focused just on Mr. Chatrie's account; right?

7   A    Correct.

8   Q    It had a whole bunch because we covered, I think,

9   a little over 30 days of him traveling around; right?

10  A    Correct.

11  Q    But you're aware that that came after he was ID'd

12  as the likely suspect of this crime; right?

13  A    I understand that.

14  Q    I mean, Google didn't pick him; right?  We picked

15  him; right?

16  A    Correct.

17  Q    And as I think I just said, this was a search

18  warrant; right?

19  A    Right.

20  Q    It was issued to Google; right?

21  A    Correct.

22  Q    Signed by a judge or a magistrate; right?

23  A    Correct.

24  Q    Okay.  And I think you were asked, but if we could

25  go back to Government's 1, page 24.  This is, in fact,

McINVAILLE - CROSS                    167

1    the device ID ending in 5659; right?

2    A    Correct.

3    Q    This is Mr. Chatrie's phone?

4    A    Correct.

5    Q    That's what we said.  You would agree with me that

6    this is pretty precise information about Mr. Chatrie's

7    phone; right?

8    A    Yes, sir.

9    Q    In fact, all the red dots on the corner there are

10   GPS marks; right?

11   A    That's correct.

12   Q    And all of the map radiuses are completely within

13   the 150-meter geofence with the exception of one;

14   right?

15   A    Correct.

16   Q    And it's multiple hits both around that large

17   church and also around the bank; right?

18   A    Right.

19   Q    In your law enforcement experience, do you

20   question why the government would have gone after a

21   second search warrant on this phone?

22   A    No.

23        MR. DUFFEY:  Judge, if I could just have one

24   second, I think I'm about done.

25        All right, Judge.  Thank you.  I think I'm

1    done.

2            THE COURT:  I do have one question.

3            Sir, do you know how towers store

4    information?  Do they store it by tower?  So if you're

5    doing a tower dump, what are you downloading?

6            THE WITNESS:  So the carriers will look for

7    how they store it.  I don't know if they store it,

8    necessarily, tower per tower, but when they do that

9    search, they are searching based on the tower

10   location.  So they will query for, you know, in the

11   tower dump instance, a period of time for a specific

12   tower that the location referenced.  It's searched

13   based on usage of the tower.

14           THE COURT:  So you don't know if the download

15   comes from just the tower or from a bigger database?

16           THE WITNESS:  Likely going to come from a

17   larger database.  I doubt that the tower location is

18   holding all of the records.

19           THE COURT:  All right.

20           MR. DUFFEY:  May I ask two follow-ups to

21   that?

22           THE COURT:  Of course.

23   BY MR. DUFFEY:

24   Q   So, first, to be clear, when you're talking tower

25   dump, you're getting that information not from Google,

1    you're getting that from a cell phone provider; right?

2    A    Correct.

3    Q    So that's Verizon or AT&T or T-Mobile or some of

4    those people?

5    A    Correct.

6    Q    And I think the Judge's question about what

7    database it comes from, tower dumps, we give them or

8    law enforcement gives them an address; right?  And

9    they say, Here are the likely towers that if that

10   person was near that location, here are the likely

11   towers that they were hitting off of; right?

12   A    Correct.

13   Q    That a phone would have been connecting to; right?

14   A    Yes.

15   Q    And then they get -- I guess, to clarify, the data

16   is not stored at the tower, but the data is stored and

17   saved, I guess, through each tower; right?  Meaning

18   once Verizon figures out, Okay, there's two towers

19   that are at issue here, they go back.  They're

20   searching their database just for those two towers;

21   right?

22   A    Right.

23   Q    To figure out which phones likely were hitting off

24   of those towers; right?

25   A    Correct.

1   Q    Okay.  And, again, then they give up actual phone

2   numbers, not anonymous reference numbers; right?

3   A    That's right.

4   Q    Okay.

5        MR. DUFFEY:  That's all I have, Judge.

6        THE COURT:  Okay.  Thank you.

7        MS. KOENIG:  Your Honor, I'm going to try to

8   do this myself up here at the podium, but I'll need to

9   have the screen switched to the podium monitor,

10  please.  Perfect.

11       REDIRECT EXAMINATION

12  BY MS. KOENIG:

13  Q    All right, Mr. McInvaille.  Before I lose track of

14  my last thought, in terms of the tower dump, so

15  when -- is it -- how does a phone -- when we have a

16  tower dump, what is the number doing?  Like, the phone

17  that is received in the tower dump, what does it mean

18  that that phone has done with that tower?

19  A    Generally, it's because a call or a text -- in

20  most cases, it's because a call or a text has

21  occurred.

22  Q    Like, did it connect -- did that particular device

23  connect with that tower?

24  A    Yes.

25  Q    And so when the company is searching for all the

1   devices that connected with that tower, is it just

2   looking for the phones that connected with that tower?

3   A   Yes, it's the ones that they actually have records

4   for.  So, again, kind of in that scenario of earlier

5   when you asked or when it was asked if a phone is just

6   sitting idle, while it will communicate or at least

7   interact with the network, that's not information

8   that's generally, it can be in some cases, recorded.

9       Most of what you see in the tower dump is due to

10  calls or texts.  There are other instances, but that's

11  generally what's being requested.

12  Q   If I'm a judge, and I'm issuing a warrant for,

13  like, a tower dump of Tower A, does that require the

14  phone company to look through the data for the phones

15  that connected to Tower B?

16  A   I don't think so.  I would think they would be

17  able to narrow it down just by the tower that they are

18  actually looking for.

19  Q   Because it's specific to, like, a -- they record

20  the data as to which tower it connected with; right?

21  A   Right.

22  Q   Okay.  Let's go way back to the Google account

23  itself.  And so we've talked about a Google account

24  that's at issue in this case.  Is the Google account

25  in this case a Gmail account?

McINVAILLE - REDIRECT                    172

1    A    Right, it is.

2    Q    So when we say "Google account," we're meaning

3    that Mr. Chatrie had a Gmail email address?

4    A    Yes.  You have to create one for an account.

5    Q    Okay.  What type of phone did Mr. Chatrie have?

6    A    It was a Samsung S9.

7    Q    Is that an Android phone?

8    A    It is.

9    Q    Who makes Android?

10   A    The Android operating system is a Google product.

11   Q    Okay.  When we go back to Mr. Duffey's questions

12   about the search that's run in the Stage 1 returns, do

13   we know how Google runs the return?

14   A    Other than looking inside of the Location History

15   database and drawing, you know, actually using the

16   latitude and longitude to figure out where at -- you

17   know, if this data would actually fall within there.

18   That's all I really know about how they conduct that

19   search through that database with the latitude and

20   longitude.

21   Q    So let's go back to that latitude and longitude

22   point, and let's talk about it in context of Wi-Fi and

23   GPS.  When we looked at Defense Exhibit 3, what are

24   the two types of sources of data, the location data,

25   that are in that Stage 1 return?

1   A    And you're referring to the Wi-Fi and GPS portion?

2   Q    Yes.

3   A    Yes, those are two of the sources that are in

4   there.

5   Q    The GPS and Wi-Fi?

6   A    Yes.

7   Q    So what is GPS?  I know you said it was Global

8   Positioning System, but what does that mean?

9   A    So that's using satellites to locate a GPS-enabled

10  device.

11  Q    So I've got my phone in the courtroom.  If I'm

12  connecting to a GPS satellite, how does that work?

13  A    So, you don't really connect to it.  The

14  satellites are broadcasting information down that can

15  be used.  So GPS, you don't have the issues of loading

16  up the GPS system.  It's because you're just receiving

17  the information.  Your device is resolving where it is

18  based on the information it's receiving.

19  Q    And that's very accurate information?

20  A    It can be.

21  Q    And then with Wi-Fi, how do we generate Wi-Fi

22  location data if a phone connects to a router?

23  A    So, very basically, as far as how Google does it,

24  it is based on generally knowing where the access

25  point is, because they don't know the exact place

within, say, your home that your access point is, but they're able to figure out that, hey, this access point is generally here at Laura's house.

Based on signal strengths, they can measure to and from that device. Then you can, with a few of those, resolve if I know where points A, B, and C are, and the phone is getting signals from A, B, and C based on signal strength, and probably some other information that they put along with that, they're able to resolve a location.

Q So I want to make sure because this is, I think, a compact issue. Let me make sure I understand each point.

So, somehow Google has determined where all these Wi-Fi routers are?

A We, or Google users, share that information.

Q How do we do that?

A Your phone -- one of the things that you'll set up in the initial setup of a device is whether or not you want to share that type of information with Google. I don't recall the specific wording of it, but there is a place in here, Would you like to share that type of information? So being able to, say, share with Google, this is a -- you don't specifically tell them this, but your phone will tell it, like, hey, I'm

McINVAILLE - REDIRECT                    175

1    here.  And this is also what I see at the time, so

2    that it can be used later to make those type of

3    requests.

4    Q    And so when we see in Defense Exhibit 3 in the

5    column that is regarding the sources, when we see a

6    Wi-Fi connection, does it mean that that phone has

7    actually connected to that router?

8    A    No, it's not like going somewhere to, like, your

9    friend's house and connecting to the Wi-Fi.  It just

10   simply sees the identifiers for that access point that

11   it's broadcasting.  A connection between those doesn't

12   have to be, like, user name/password kind of

13   connection.

14   Q    So if I'm at my house and I have a Wi-Fi router,

15   and I have shared somehow this information with Google

16   that I have a Wi-Fi router, do they keep that

17   information?

18   A    Yes.  You don't have to share it.  It could be

19   your neighbors that your neighbor's device or

20   something picked this up and shared it.  It's a

21   community effort, pretty much, through Google.

22   Q    And so if you happen to be driving past my house,

23   can your phone see my Wi-Fi router?

24   A    It's possible, depending on how far away it is,

25   things like that.  But, yes, in general, your phone

1   would -- you know, say it's in close proximity to the

2   road, you could see yours and your neighbor's, as

3   well.

4   Q   So if you are -- if in the points of data that

5   list out Wi-Fi, it doesn't mean that the person was at

6   the -- like, in the building or in any way associated

7   with the router from the place that the Wi-Fi is

8   indicating there's a longitude and latitude?

9   A   Right.  It's not a user name/password interaction.

10  This is just that it sees the identifiers for that

11  specific point.

12  Q   What do you know about the ranges of Wi-Fi

13  routers?

14  A   Generally, probably looking at 150 feet or so for

15  a normal router.  I'm sure you could -- you know,

16  different sets could be bigger or smaller, but that's

17  kind of generally what people look at.

18  Q   So when Google is estimating the longitude and

19  latitude that's listed in Columns D and E of Defense

20  Exhibit 3, how are they estimating that longitude and

21  latitude?

22  A   Again, with Wi-Fi, it's because they're using

23  those -- the kind of mostly known location of access

24  points, signal strength values, to resolve a location.

25  Q   So if a Wi-Fi point, the longitude and latitude is

1    based on where Google thinks the Wi-Fi router itself

2    is?

3    A    That's a piece of it, yes.

4    Q    And so when you're looking at the Wi-Fi data point

5    that's plotted, the longitude and latitude, we're not

6    talking -- or are we talking about the longitude and

7    latitude that Google thinks the device was at or where

8    the connection to the Wi-Fi router is?

9    A    That's where it thinks the device was at that

10   given time.

11   Q    But within this larger radius?

12   A    Correct.

13   Q    So the phone or the device could be anywhere

14   within that blue circle?

15   A    Correct.

16   Q    Okay.  I want to turn to Defense Exhibit 3.  And

17   if you'll look -- we've been talking a lot about the

18   Stage 1 returns, which I think begin at page 6 and

19   maybe end around page 12, and I want you to look at

20   the Stage 2 returns.

21   A    Is that in the same --

22   Q    In the same exhibit.  The Stage 2 portion of

23   Exhibit 3, which is the second spreadsheet.

24   A    Okay.

25   Q    Does that portion of Exhibit 3, the Stage 2 data

1    returns, does that also have a maps display radius?

2    A    Yes, all of the Location History data does.

3    Q    Can you look through those map display radiuses

4    and tell us some of the larger numbers that you see?

5    A    On the first page, the largest is 179.   The

6    smallest, I believe, is 16, it looks like.

7    Q    Let's go to the next page.

8    A    This page, the largest is 413, it looks like.

9    That's on line 42.

10   Q    Let's go to the third page.

11   A    Line, it looks like, 75 is 164 meters.

12   Q    Then let's go to the next page.

13   A    100 meters is line 104.

14   Q    Okay.   The next page.

15   A    Line 157 is 1,797.

16   Q    And let's go to the next page after that.

17   A    Line 170 is 64.

18   Q    What's the next page after that?

19   A    156 meters, line 231.

20   Q    Next page after that.

21   A    Looks like 55, which is line 264, 55 meters.

22   Q    Can you go to the next page?

23   A    210.   It is line 292.

24   Q    Let's go to the next page after that.

25   A    Line 322 is 1,573.

McINVAILLE - REDIRECT                179

1    Q    Let's just have you kind of more quickly flip

2    through and tell us if you see any other large numbers

3    that are over a thousand.

4    A    It's the page that begins on the Column 397 or Row

5    397 through 429.  Row 420 is 1,026.  The final page

6    begins with Row 661, ends in 681.  The Row 681 has

7    1,838 meters.

8    Q    Okay.  So is it fair to say that the map display

9    radius varies depending on the longitude and latitude

10   point, the individual data point?

11   A    Each point has their own display radius.

12   Q    Had the geofence swept in one of these data points

13   that had a map display radius of over a thousand feet,

14   the effective radius of the geofence would have been

15   multiple thousands of feet just in the radius, in the

16   diameter?

17   A    If you look at it as if the -- if that point had

18   fallen within the fence and that circle extended, and

19   then if the phone could be anywhere within that

20   circle, then I guess you could look at it that way.

21   Q    So is there any way for a judge or law enforcement

22   to know ahead of time what the effective radius of the

23   geofence is going to be?

24   A    I guess knowing what I know is that the only thing

25   that you can, as far as that search goes, is knowing

McINVAILLE – REDIRECT                 180

1    that the estimated latitude and longitude would have

2    to fall within the circle for it to be captured.

3    Q    But the effective radius could end up being

4    thousands of feet or meters larger than that; right?

5    A    In that scenario, I guess, yes.

6    Q    I want to talk about the device ID that's listed

7    in Column A of Defense Exhibit 3.  The government

8    asked you a number of questions about whether that's

9    tied to a phone number, and you've indicated that you

10   don't have any information that it is.  Is that right?

11   A    Correct.

12   Q    Have you reviewed Ms. Rodriguez's declaration,

13   which is Defense Exhibit 24?

14   A    Yes.

15   Q    By Ms. Rodriguez, I mean Sarah Rodriguez from

16   Google.

17   A    I have.

18   Q    And in reviewing that, do you have any indication

19   that the device ID remains the same from one geofence

20   search to another?

21   A    Say that again.

22   Q    In reviewing Ms. Rodriguez's affidavit, does it

23   indicate to you whether the device ID, that number in

24   Column A, remains the same for each device from

25   geofence search to geofence search?

1   A    The way it's described, it appears that the kind

2   of global identifier that would face out through the

3   accounts is stripped, but that that number that you

4   see within these requests is an identifier that stays

5   with that particular device, but only within the

6   Location History database.  It does not reach outside

7   of that database.

8   Q    So if I have a device ID of 123, I think they're

9   more complicated than that, but if there's a device ID

10  number of 123, and device ID No. 123 is swept up in

11  geofence warrant one, if I see device ID No. 123 in

12  geofence warrant No. 2, does that mean that that is

13  the same device?

14  A    Based on reading her declaration, I believe so.

15  Q    Is there any obligation that the law enforcement

16  officers who obtain the returns from Google have to

17  return the data after they have used it in any way?

18  A    I'm not aware of any.

19  Q    Okay.  Let's talk now about some of the questions

20  that Mr. Duffey was asking you about your follow-up

21  investigation.  As a former law enforcement officer,

22  were you a detective?

23  A    I was.

24  Q    And as a detective, is it your job to do police

25  work and follow-up work?

1    A    That's what I did.

2    Q    Such as get search warrants?

3    A    Yes.

4    Q    And do surveillance?

5    A    Yes.

6    Q    And try to track people down from various location

7    data points?

8    A    Yes.

9    Q    Were you successful in doing that?

10   A    I believe so.

11   Q    Is that the nature of detective work is you have

12   to actually do the work?

13   A    It is.  I mean, connecting the dots is what you

14   do.

15   Q    Obviously, law enforcement officers would like

16   their jobs to be easier; right?

17   A    Sure.

18   Q    But there are sometimes stumbling blocks?

19   A    There's work to be done.

20   Q    But you still have to work around that?

21   A    Yes.

22   Q    When we were talking in advance of today, do you

23   have an example of two data points that would apply to

24   you today but nobody else probably?

25   A    Yeah.  I recall you asking me this before, and I

1   kind of used the example of me coming here today.

2   Q    How would that work?

3   A    I think I'm the only person.  I haven't seen any

4   of my neighbors, but I think I'm the only person from

5   my cul-de-sac who traveled from Holly Springs, North

6   Carolina, to the federal courthouse today.  I don't

7   think there's anybody else.  So those two points would

8   be --

9   Q    Sufficient to identify you?

10  A    Yes.

11  Q    Okay.  And, obviously, the more points of data you

12  have, is it more likely that you're going to get a

13  precise narrowing down of who the identity is of that

14  person that's carrying that device?

15  A    Can be.  With what I do, more data is -- we always

16  want more data.  It helps everything when you can --

17  the more you know.

18  Q    I want to turn now to the screens that we were

19  talking about.  So if we go to Mr. McGriff's

20  affidavit.  And so this is Defense Exhibit 23 at page

21  3.  If you can turn to that exhibit, please.

22  A    Say that again.

23  Q    Defense Exhibit 23 at page 3.

24       I'm sorry.  So on Footnote 2 of page 3, Mr.

25  McGriff refers to, like, a second screen; right?

McINVAILLE - REDIRECT            184

1   A    Yes.

2   Q    And have you been able to determine that -- and if

3   we look up, we see on that above, that page flips into

4   paragraph 8 of Defense Exhibit 23.  And that portion

5   has the Location History in bold, and then under that

6   it says "Saves where you go with your devices"?

7   A    Yes.

8   Q    And then under that it has "Location History.

9   Saves where you go with your devices"?

10  A    Yes.

11  Q    And so when Mr. McGriff seems to be talking about

12  the second screen, we've been able to determine, is

13  that really just the language that's under the drop

14  down arrow?

15  A    That's what it looks like.  This language that you

16  see in this under No. 8 is the same that we saw in

17  most of the other screenshots that actually show the

18  expansion arrow selected.

19  Q    Because when Mr. McGriff is writing this, he's

20  indicating I don't have the screenshots -- right? --

21  of activating this?  And so I'm describing what

22  language would have been presented?

23  A    I don't believe so.  I don't think he turned

24  over -- I think that's correct.

25  Q    And so when we see the "Saves where you go with

1   your devices" language in the examples that you have

2   put forth in Defendant's Exhibit 7, all the user has

3   to see under Location History is "Saves where you go

4   with your devices," in the Norwegian example,

5   specifically, and then they can click yes, and that

6   will turn on?

7   A    Yes, you can.

8   Q    And that's it?  You don't have to look at any of

9   that other expansion arrow?

10  A    You don't have to, no.

11  Q    And going back to -- I just want to make sure I'm,

12  again, clear about turning on Google Assistant.  So if

13  I have my phone.  I just push that little circle

14  button at the bottom; right?  That's the home button?

15  A    Yeah, I believe that's the icon that's used.

16  Q    And you just hold it and press it for a couple of

17  seconds?

18  A    It's not even really a couple of seconds.  It's

19  more of just, you know, if you were clicking on

20  something on a website, how you normally just tap the

21  screen.  This is more of just a press, a longer

22  version of that touch.

23  Q    And so if you're doing that for the first time,

24  and you haven't already activated Google Assistant,

25  it's going to take you to the setup process; right?

McINVAILLE – REDIRECT                    186

1    A    From what I've seen, yes.

2    Q    And then when you're doing that, you either have

3    to choose yes, I'm going to do it or no, I'm not going

4    to do it to turn on Google Assistant?

5    A    Right.  You either "Skip" the setup of Google

6    Assistant or you go "Next," and have to choose

7    permissions.

8    Q    So you just have to do two clicks; right?  The

9    long press of the home button and then the "Yes, I'm

10   in"; right?  You just have to do two clicks; right?

11   Or two presses or two movements of your hand?

12   A    I guess it would actually be three.

13   Q    What would the movements be?

14   A    You're long pressing to launch the app.  When that

15   comes up, then you see the "Meet your Google

16   Assistant" screen.  You can select "Skip" or "Next."

17   If you select "Next," it takes you to the permission

18   screen where you have to make the selection of "Turn

19   on" or "No, thanks."

20   Q    So, thank you for correcting me.  So it's three

21   presses, and that could happen within probably less

22   than a second; right?

23   A    I guess, yeah, you could.

24   Q    Okay.  Is it pretty easy to turn on Google

25   Assistant, then?

McINVAILLE - REDIRECT          187

1    A    Yeah, it can be.

2    Q    And anywhere in the screens that have you found in

3    the research of what the screens themselves would have

4    looked like to a user setting up Google Assistant on

5    July 9th of 2018, does it indicate that deleting

6    information, that if you accept Location History, does

7    it ever indicate that deleting your information

8    doesn't stop you from tracking information in the

9    future?

10   A    I'm not sure.  Ask that again.

11   Q    So if we go down to the drop down menu, your

12   location history.  And the bottom says -- I'm sorry.

13   Not that.  Not that portion.  The -- so the paragraph

14   that's right above the boxes that say either "No,

15   thanks" or "Turn on."  So this is on page 4 of

16   Exhibit 7, which is the second set of the July 2, 2018

17   screenshots from the Norwegian Consumer Council.

18   A    Yes.

19   Q    That paragraph that begins "This data may be saved

20   and used in any Google service."  And the second

21   sentence says that you can delete the Location History

22   data; right?

23   A    Yes.

24   Q    Does that in any way indicate that if you delete

25   the Location History data, that it will still keep

McINVAILLE - REDIRECT          188

1   tracking Location History data in the future?

2   A    No, I don't think it indicates that it won't.  If

3   just by simply deleting your old location history, no,

4   I don't think that indicates that it will stop

5   collecting more information.

6   Q    But if I were -- like, if I had Location History

7   enabled, and I deleted at this time my location

8   history, would it still keep tracking my location

9   history even if I deleted the old information?

10  A    If you allow it to continue to be enabled, then,

11  yes, it would.

12  Q    But there's no -- when you delete it, is there a

13  portion of the deletion information that tells you

14  that you are not going -- that location history

15  information will still continue to be gathered from

16  you?

17  A    I'm not aware that that's the way that it's

18  displayed, but deleting it is not going to stop it

19  from -- deleting your old history is not going to stop

20  it from collecting.

21          MS. KOENIG:  If I can have just a moment,

22  Your Honor.

23          No further questions, Your Honor.  Thank you.

24          THE COURT:  All right.  Can this witness be

25  excused?

```
 1              MS. KOENIG:  He may, Your Honor.

 2              THE COURT:  All right.  Excused excused or

 3    subject to recall?

 4              MS. KOENIG:  Subject to recall, Your Honor,

 5    by the defense.

 6              THE COURT:  All right, sir.  You may stand

 7    down.  Thank you for your testimony.

 8              Because you might be subject to recall, it's

 9    still as if you're testifying.  You can't talk to

10    anybody about what you've testified to or what anybody

11    else has testified to.  Thank you.

12              (The witness was excused from the witness

13     stand.)

14              MS. KOENIG:  Your Honor, if we could take a

15    brief break before we begin the next witness.

16              THE COURT:  Yes, I think it's a good time to

17    do that.  So we could go -- we'll go until just five

18    minutes of three.  That's a little more than 15

19    minutes.

20              MS. KOENIG:  Thank you, Your Honor.

21              THE COURT:  So we'll take a recess.  Again,

22    nobody violate our sequester order that continues to

23    be in place.  All right?  Thank you.

24              (Recess at 2:35 p.m. to 2:55 p.m.)

25              THE COURT:  All right.  So we're returning
```

1    from our break.  I need to, if we have folks online to

2    remind them that our Local Rule Criminal Rule 53

3    prohibits, and our standing order, prohibits anybody

4    from recording or broadcasting or telecasting these

5    proceedings.  It is as if you are in court with us.

6    And we have one court reporter making our official

7    record.

8            So I understand we have a new witness, who is

9    actually in the witness box, but who needs to be

10   called and sworn.  Right?

11           MR. PRICE:  Thank you, Your Honor.  The

12   defense calls Marlo McGriff to the stand.

13

14     MARLO MCGRIFF, called by the Defendant, first

15   being duly sworn, testified as follows:

16

17           THE COURT:  All right.  Mr. McGriff, we are

18   adhering to COVID protocol here.  Obviously, you can

19   see we have plastic barriers.  We're not within 6 feet

20   of each other unless folks have taken necessary

21   precautions.  You have sanitizer there and hand

22   sanitizer.

23           When you're testifying, the only way that my

24   court reporter can hear you is through the microphone.

25   So you can either testify with or without a mask.  I

McGRIFF - DIRECT                191

1    just want to be sure that it is going through the

2    microphone so we can hear you clearly.  All right,

3    sir?

4              THE WITNESS:  Okay.

5              THE COURT:  All right.  Thank you.

6              MR. PRICE:  And, Your Honor, I just wanted to

7    remind the Court that we have agreed to treat Google's

8    witnesses, including Mr. McGriff, as adverse in this

9    case.

10             THE COURT:  All right.  I do need to remind

11   you all of one thing.  On the break, I was notified

12   that I have to attend an important conference call at

13   5 o'clock.  And so we're going to have to break before

14   5 o'clock.  Otherwise, I wouldn't do it, but it is

15   apparently enough that we have to take a break.  So we

16   will be doing that, just to give you the advance

17   notice.

18             MR. PRICE:  Understood.  Thank you, Your

19   Honor.

20

21      DIRECT EXAMINATION

22   BY MR. PRICE:

23   Q   Mr. McGriff, hi.  Good afternoon.  I'm Michael

24   Price.  I'm an attorney with Mr. Chatrie.  Thank you

25   for being here today.

McGRIFF - DIRECT                    192

1      You are a Location History Product Manager for

2  Google?

3  A    That's correct.

4  Q    And that means you're responsible for the Location

5  History product?

6  A    That's correct.

7  Q    And you've had that position since 2016?

8  A    That's correct.

9  Q    And you joined Google in 2011?

10  A    Yes.

11  Q    So you're very familiar with Google?

12  A    That's correct.

13  Q    And you're very, very familiar with Location

14  History in particular?

15  A    Yes.

16  Q    So you've helped develop it for the last five

17  years?

18  A    That's right.

19  Q    And now you lead the cross functional location

20  history team?

21  A    That's correct.

22  Q    So that means you're not just familiar with how

23  Location History works, but how it works with Google's

24  other services?

25  A    That's correct.

McGRIFF - DIRECT                    193

1   Q    And does that include Google Assistant?

2   A    Some aspects of Assistant, yes.

3   Q    And you filed three declarations in this case;

4   correct?

5   A    That's correct.

6   Q    Your first on March 11th, 2020?

7   A    I believe so, yes.

8            MR. PRICE:  Can we bring up Defense Exhibit

9   1.

10  Q    This is the first declaration that you filed in

11  this case?

12  A    Yes.  You said this is Exhibit 1?

13  Q    Yes.  It has previously been admitted, and it's

14  Defense Exhibit 1.

15           MS. KOENIG:  21.

16           THE COURT:  21.

17           MR. PRICE:  21, I'm sorry.

18  Q    Okay.

19  A    Yes.

20  Q    Great.  So Location History was not initially

21  designed to assist law enforcement investigations, was

22  it?

23  A    That's correct.

24  Q    It was designed to support Google's Timeline

25  feature as you explain on page 9?

McGRIFF - DIRECT                    194

1          THE COURT:  Are we entering this into

2   evidence?

3          MR. PRICE:  It is already in evidence, Your

4   Honor.

5          THE COURT:  No, it's not.  No. 3 is in

6   evidence.

7          MS. KOENIG:  I have Exhibit 21 is admitted

8   into evidence with Mr. McInvaille, Your Honor.

9          THE COURT:  Oh, it sure is.  My apologies.

10  It's 22 that isn't.  My apologies.

11  A   That's correct.  It mentions, if I'm looking at

12  page 9, it mentions Timeline as a feature, yes.

13         THE COURT:  So, sir, I didn't hear a word of

14  that.  So I think the microphone needs to be a little

15  closer to you.  And it's natural when you're sort of

16  looking away from the document at the document that

17  you also turn away from the microphone.  It's an

18  unnatural way to speak, but we want to be sure that we

19  get it accurately.  All right?

20         THE WITNESS:  Okay.  Sorry about that.

21  BY MR. PRICE:

22  Q   So could you repeat that answer?  Location History

23  was designed to support Google's Timeline feature;

24  correct?

25  A   That's correct.

McGRIFF - DIRECT                    195

1    Q    And as you wrote in your first declaration, also

2    on page 9, "The purposes for which Google designed

3    Location History do not depend on any individual

4    stored Location History data points"?

5    A    That's correct.

6    Q    In other words, Google can infer where a person is

7    heading with their device even with a few points

8    registering along their path?

9    A    I'm not sure that I follow that question.

10   Q    Google uses Location History to infer a user's

11   location; correct?

12   A    I wouldn't use it -- I wouldn't frame it in that

13   way, but various signals are used to infer where a

14   user is.  That's how we infer a user's location.  And

15   then those inferences are stored, which create the

16   history.

17   Q    Sure.  And if somebody is traveling along a path,

18   and one dot is kind of off out of the way, Location

19   History will snap that point right back onto the path;

20   correct?

21   A    Only if it makes sense.  We do filter out like an

22   outlier because that sort of teleportation can happen.

23              THE COURT:  That sort of what?

24              THE WITNESS:  Sorry.  There can be an outlier

25   point.  But, logically, if I was here, and then

McGRIFF - DIRECT                196

1    there's one point I'm sitting in -- let's say I was

2    sitting here for an hour.  And there's one point

3    that's not where I've been sitting for the hour.

4    That's an outlier point, but yes.

5    Q    My point is, it's precise enough for what it was

6    designed to do for Timeline?

7    A    That's correct.

8    Q    And that's why you wrote, "Location History" --

9    this is also on page 9, Slide 2, this is why you

10   wrote, "Location History is sufficiently precise and

11   reliable for these purposes for which Google designed

12   Location History"; correct?

13   A    That's correct.

14   Q    That indicates, though, that there's maybe more

15   than one purpose for Location History; correct?

16   A    Yes.

17   Q    Another purpose of Location History, as you wrote

18   in the same paragraph, is to serve ads based on user

19   location?

20   A    Yes.

21   Q    And for some advertisers you also provide

22   information about store visit conversions; is that

23   true?

24   A    That's correct.

25   Q    Could you explain what store conversions are?

McGRIFF - DIRECT          197

1    A    So, for Location History, we never share anyone's

2    location history with a third party.  So there's no

3    instance where you would share with a third party that

4    I went into a particular store.  What Location History

5    is used for in terms of advertising is very

6    specifically ads measurement.  And so that is for a

7    particular campaign, how many users who saw a

8    particular ad actually went to one of those stores.

9    And that's the store visit conversion or ads

10   measurement you're referring to.

11           THE COURT:  Okay.  You're just talking too

12   quickly.  I'm so sorry.

13           THE WITNESS:  I'm sorry.

14           THE COURT:  It sounds as if that's the way

15   you normally talk, but pretend like I'm three, and

16   slow down a little, if you don't mind.

17           THE WITNESS:  Yes, absolutely.

18   BY MR. PRICE:

19   Q    So Google is doing this in a privacy protective

20   way; correct?

21   A    That's correct.

22   Q    It's not giving user location data over to stores

23   about who was around?

24   A    No.

25   Q    And businesses can also use Google to target ads

1   based on a device's location?

2   A    Not using Location History, though.

3   Q    Right.  They're not using the user's thing.

4   They're going to Google, and they're attempting to

5   target ads based on geography?

6   A    Yes.

7   Q    Okay.  In fact, it's possible to do something

8   called radius targeting; is that true?

9   A    Yes, but I'm not totally familiar on the full ad

10  suite of products.

11  Q    My understanding is that it allows a business to

12  target ads to users that are within a certain distance

13  of that business.

14  A    That sounds correct, yes.

15  Q    And there's a minimum radius that advertisers can

16  select when doing that; right?  You can't make your

17  radius 4 meters or something like that?

18          THE COURT:  Okay.  Now you're also fading

19  out.

20          There you go.

21          MR. PRICE:  Sorry.

22  BY MR. PRICE:

23  Q    There's a minimum radius that advertisers must

24  adhere to.  They can't select I believe it's less than

25  a kilometer or less than a mile radius?

McGRIFF - DIRECT                    199

1    A    That sounds correct.

2    Q    And those businesses don't actually get to see

3    which devices are in the area; correct?

4    A    Not that I'm aware of, no.

5    Q    And the businesses can't go back to Google and ask

6    for more information about where a particular user was

7    half an hour before or half an hour later?

8    A    No.

9    Q    They can't get any information at all about

10   individual users; correct?

11   A    Not that I'm aware of, no.

12   Q    And that's true even when you're tracking store

13   visit conversions, no exceptions?

14   A    That's correct.

15   Q    So Google filed an amicus brief in this case.  Are

16   you aware of that?

17   A    Yes.

18   Q    You're probably familiar with it.  You probably

19   helped put it together?

20   A    Yes.

21          MR. PRICE:  I'd like to bring up Defense

22   Exhibit 2.

23   Q    Is this the amicus brief?

24   A    Which --

25   Q    It's also on your screen as Defense Exhibit 2.

McGRIFF - DIRECT                    200

1   A    I don't think my screen is actually updating.

2   It's been static on the same --

3            MS. KOENIG:  It is different, but they are

4   white papers with letters on them.

5            THE WITNESS:  Maybe it just looks the same.

6   BY MR. PRICE:

7   Q    It should say "Brief of Amicus Curiae Google LLC."

8   A    I see it.  Thank you.

9   Q    So that's the amicus brief that Google filed that

10  you helped prepare?

11  A    Yes.

12           MR. PRICE:  I'd like to admit that into

13  evidence, Your Honor.

14           THE COURT:  No objection, right?

15           MR. SIMON:  No objection, Judge.

16           THE COURT:  It will be admitted for purposes

17  of the hearing, too.

18           MR. PRICE:  Thank you.

19           (Defense Exhibit No 2 is admitted into

20  evidence.)

21  BY MR. PRICE:

22  Q    So on pages 5 to 6, Slide 4, the brief goes out of

23  its way to correct a misconception in this case;

24  correct?

25  A    That's correct.

McGRIFF - DIRECT                    201

1    Q    Google says that a geofence warrant is not really

2    analogous to a so-called tower dump?

3    A    Yes.

4    Q    And the brief states, "In fact, while Google

5    Location History information bears some similarities

6    to those types of data in some respects, it is

7    different in important ways that are highly relevant";

8    right?

9    A    Yes.

10   Q    And it goes on to explain, with respect to cell

11   site location information, which is how tower dumps

12   work, "When law enforcement seeks access to CSLI,"

13   cell site location information, "it is thus asking the

14   wireless carriers to produce its own business records

15   showing when a particular device connected to a cell

16   site within a particular period of time.  A request

17   for a tower dump likewise seeks the wireless carrier's

18   own business records.  In that case, identifying every

19   phone that connected to a particular cell site or

20   tower in a particular period"; correct?

21   A    Yes.

22          THE COURT:  What page are you on?

23          MR. PRICE:  That is page 9, Your Honor.

24          THE COURT:  Thank you.

25   BY MR. PRICE:

McGRIFF - DIRECT                    202

1    Q    And there are only so many people that can connect

2    to one cell tower at a time; right?

3    A    That's correct.

4    Q    And so there's sort of an upper limit on the

5    number of users that can be searched as a result of a

6    tower dump?

7    A    That I don't know.

8    Q    Well, if you're choosing, say, three towers to

9    search, and there's a maximum number of people that

10   can be on one tower at a time, would you agree there's

11   a maximum, there's a cap?

12   A    That has to be some cap, yes.

13   Q    There's a natural limit?

14   A    Yeah.

15   Q    And that would be true even if the tower dump

16   involved more than one tower.  There would still be

17   that sort of upper limit.  And that differs from how

18   geofence searches work; right?

19   A    That's correct.

20   Q    That's because -- and this is on page 8 of your

21   first declaration, which is Exhibit 21, Defense

22   Exhibit 21.  You explain that's because, unlike tower

23   dumps, Google does not know which users may have saved

24   Location History data before conducting the search and

25   running computations; correct?

McGRIFF - DIRECT                    203

1   A    That's correct.

2   Q    And going back to the amicus, and I apologize for

3   the -- this is Slide 7 at page 12.  Google says it

4   "has no way to know ex ante which users may have

5   Location History data indicating their potential

6   presence in particular areas at particular times"; is

7   that correct?

8   A    That's correct.

9   Q    So, unlike a tower dump, there is no way of just

10  searching Location History records for people in one

11  area in the way that you do with a tower dump by

12  looking at a tower?

13  A    That's correct.

14  Q    You have to search all of the records for every

15  user with Location History enabled; right?

16  A    Yes.

17  Q    And this is at your first declaration, page 8,

18  Slide 8.  You say in your first declaration, To

19  conduct a geofence search, Google must search across

20  all Location History data to identify users with

21  Location History data during the relevant time frame;

22  correct?

23  A    Yes.

24  Q    And you then have to run a computation against

25  every set of stored Location History coordinates to

McGRIFF - DIRECT                    204

1  determine which records match the geographic

2  parameters in the warrant?

3  A    Yes.

4  Q    And then, as Google explains in its amicus,

5  similarly, page 12, "In order to comply with the first

6  step of the geofence protocol, therefore, Google must

7  search across all Location History journal entries to

8  identify users with potentially responsive Location

9  History data, and then run a computation against every

10 set of coordinates to determine which Location History

11 records match the time and space parameters in the

12 warrant"?

13 A    Yes.

14 Q    So for every geofence warrant, Google has to

15 search across all Location History journal entries,

16 and then it has to run a computation against every set

17 of coordinates; correct?

18 A    Yes.

19 Q    In other words, you had to search everybody with

20 Location History enabled?

21 A    Yes.

22 Q    That's what happened in this case?

23 A    Yes.

24 Q    To look for users in the geofence provided by the

25 warrant, Google had to search literally everybody with

McGRIFF - DIRECT                    205

1   Location History enabled?

2   A    Yes.

3   Q    I want to try and figure out just how many people

4   had their data searched in this case.  So Google

5   searched all accounts with Location History enabled,

6   and in your first declaration -- this would be the

7   fourth page, paragraph 13 -- you say, In 2019, roughly

8   one-third of active Google users, i.e., numerous tens

9   of millions of Google users, had their Location

10  History enabled on their accounts?

11  A    Yes.

12  Q    Numerous tens of millions.  That's a lot.

13  A    Yes.

14  Q    Can you tell us precisely how many?

15  A    At that point in time, I cannot.

16  Q    Let's try it a different way.  Google owns

17  Android; right?

18  A    That's correct.

19  Q    And you know that Android has a Twitter account?

20  A    I'm certain they do, yes.

21  Q    And occasionally it tweets updates about Android.

22  Yes?

23  A    Yes.

24  Q    And in May 2019, Android said they had 2.5 billion

25  active users; is that accurate?

McGRIFF - DIRECT                    206

1   A    I have not seen that tweet.

2   Q    Well, I believe we can show it to you.  It's

3   Defense Exhibit 55.

4   A    The tweet says 2.5 billion active devices.  It

5   doesn't speak to accounts.

6   Q    As a rough estimate, would that differ

7   significantly from the number of users?

8              MR. SIMON:  Judge, I'm going to object.  He's

9   answered the question.  He said he doesn't know.  The

10  pressing on, I think particularly given the time

11  constraints, the witness had answered the question to

12  the extent he has personal knowledge.

13             THE COURT:  Just finish answering that

14  question and we will move on.

15  A    I wouldn't be able to say.

16  Q    Okay.

17             THE COURT:  Are you moving that into evidence

18  or not?  Is it just demonstrative?

19             MR. PRICE:  It was just demonstrative, Your

20  Honor.

21  BY MR. PRICE:

22  Q    If you had to take a rough estimate at the number

23  of active users in 2019, do you think it would be much

24  different than 2.5 billion?

25  A    I would not even know where to begin to make that

McGRIFF - DIRECT                    207

1    assessment.

2    Q    So you don't know how many people have Location

3    History enabled?  I mean, presumably, you said you're

4    in charge of the Location History product.

5    A    Yes.  If the question is how many users were opted

6    in to Location History in 2019, I do not know that

7    number off the top of my head.  My clarifying

8    questions would be at a particular point in 2019,

9    because it's not a static number?  Or were you just

10   looking for a rough range or average?  But, again, I

11   wouldn't know that off the top of my head.

12        I remember at the time of preparing this that it

13   was roughly a third, the Android number, but I do not

14   know the Android number again off the top of my head.

15   Q    And if we take, for example, if we say 2.5 billion

16   as the Android number, a third of that would translate

17   into about 800 million, just generally.

18   A    The Android number here was referencing devices,

19   though.  I, for example, have multiple devices, but

20   only one account that I'm using across all those

21   devices.

22   Q    In your estimation as the Location History Product

23   Manager, would you estimate that there were more or

24   less than 800 million users with Location History

25   enabled at some point in 2019?

1   A    Users as in they have the account on, Location

2   History on, or Location History on and actively

3   reporting?

4   Q    Enabled on their accounts.

5   A    That I couldn't say.  That I couldn't say.

6   Q    Okay.  In any case -- all right.  We'll move on.

7        I want to talk about how Google processes Location

8   History geofence warrants.  When Google receives a

9   geofence warrant, what happens?  What is the process?

10  A    I'm not involved in the processing of the warrants

11  in any way.

12  Q    Do you know if there are any rules that Google has

13  about the size of a geofence warrant?

14  A    I know at a high level the team works to be

15  sure -- at a high level I know that there's some back

16  and forth in terms of the refinement of the request,

17  but I'm not involved in the details of that

18  refinement.

19  Q    What do you mean, back and forth about the

20  refinement of a request?

21  A    Just clarification.  Do we have the right details?

22  There's some process.  I believe there's someone else

23  who's a witness who can speak to it in detail, but I'm

24  not involved in that process at all.

25  Q    So you don't know if there's an upper limit on the

McGRIFF - DIRECT                    209

1    size of a geofence that Google would respond for?

2    A    I am not involved in that at all day-to-day.

3    Q    If we asked for all the data in a city over a

4    two-week period, would Google comply with that?

5    A    I can say with certainty they likely wouldn't, but

6    I have no idea what their parameters are for that.

7    Q    Do you know what the rules are for narrowing

8    things down at each stage of the process?

9    A    I do not.

10   Q    So when the government comes back in Stage 2 and

11   says, Well, you know, we want all of them, do you know

12   if that's okay or not?

13   A    Again, my knowledge and involvement with that

14   process is limited to something is wrong in their

15   processing, and there's an ask to understand why some

16   particular aspect of retrieving whatever they've

17   decided fits within scope is not retrieving in the way

18   that it should.

19   Q    What do you mean "not retrieving in the way that

20   it should"?

21   A    That there's some delay or some sort of just

22   general process breakdown.  I'm often engaged to --

23   not often, but when it happens, I'm engaged to assist

24   with looking into the issue, but, again, I'm not

25   involved in either the receipt of or the processing of

1   or the response to.

2   Q   Okay.  You're aware that Google has notified some

3   users when they've been the subject of a geofence

4   warrant; right?

5   A   That's correct, yes.

6   Q   You're aware that just recently Google notified a

7   Minneapolis user who is the subject of a geofence

8   warrant targeting protesters following the death of

9   George Floyd?

10  A   I was not aware of that, no.

11  Q   Were you aware that Google notified a user in

12  Florida who is the subject of a geofence warrant from

13  the Gainesville Police Department?

14  A   I was not aware of that, no.

15  Q   In which cases are you aware of Google notifying

16  users of a geofence warrant?

17  A   I am not involved in any way in the day-to-day

18  processing of geofence warrants, their receipt, any

19  responses.  That is not involved in my day-to-day

20  whatsoever.

21  Q   Are you aware that Google never notified

22  Mr. Chatrie that he was the subject of a geofence

23  warrant in this case?

24  A   I would not be able to comment on that.

25  Q   I assume you don't know, then, the rules for when

1    Google will notify users that they are the subject of

2    a geofence warrant?

3    A    I do not know that, I'm sorry.

4    Q    Okay.  I want to go back to your first

5    declaration, page 7.  It says, "Location History is

6    the only form of location data that Google maintains

7    that Google believes to be responsive to a geofence

8    request"?

9    A    That is correct, yes.

10   Q    And Location History is the only form of location

11   data that was produced to the government in this case?

12   A    To my knowledge, yes.

13   Q    So no Google Location Accuracy data, no Web & App

14   Activity data?

15   A    No.

16   Q    And the reason for that is because only Location

17   History -- well, let me take a step back.  When the

18   government makes a geofence request, does it specify

19   that it wants to search only Location History?

20   A    I don't believe so.

21   Q    And Google does actually maintain location data

22   apart from Location History in Web & App Activity, for

23   example?

24   A    Some location information can be captured in Web &

25   App Activity, yes.

1    Q    But Location History was the only repository of

2    location data that Google searched in this case?

3    A    Yes.

4    Q    That's because only Location History is

5    sufficiently granular to be responsive and searchable?

6    A    That is my understanding, yes.

7    Q    And only Location History is able to pinpoint a

8    user's estimated location with enough precision?

9    A    That is correct.

10   Q    So Google decided that only Location History was

11   precise enough to be searched in response to a

12   geofence warrant?

13   A    That is my understanding, yes.

14   Q    Okay.  Now, even though you said pinpoint, and

15   this is page 8 of your declaration, the location data

16   points reflected in Location History are really

17   estimates; is that right?

18   A    That's correct.

19   Q    A user's actual location doesn't necessarily align

20   perfectly with any one isolated data point?

21   A    Yes.

22   Q    There's a confidence interval, a number associated

23   with each set of Location History coordinates that

24   reflects Google's confidence in those coordinates?

25   A    Yes.

1    Q    And this number is expressed in meters as a

2    radius?

3    A    Yes.

4    Q    And it's called the display radius; is that

5    correct?

6    A    Yes.

7    Q    So it can be visualized as a shaded circle around

8    the coordinates?

9    A    Yes.

10   Q    The magic blue circle around the blue dot?

11   A    Yes.

12   Q    And on pages 8 to 9, you say Google aims to

13   accurately capture roughly 68 percent of users with

14   this method?

15   A    Yes.

16   Q    Or, in other words, there's a 68 percent

17   likelihood that a user is somewhere inside of that

18   shaded circle, or at least that's Google's goal?

19   A    Yes.

20   Q    That means there's a 32 percent chance that

21   they're outside of that circle altogether?

22   A    Yes.

23   Q    Not necessarily at the blue dot?

24   A    Yes.

25   Q    Is it just as likely that the user's actual

McGRIFF - DIRECT                    214

1   location would be near the edge of that circle as

2   opposed to smack dab in the middle?

3   A    Yes.

4   Q    So you're equally confident -- you're confident

5   that the user is in that circle, 68 percent, but where

6   you put those coordinates doesn't necessarily

7   translate into that same amount of confidence.  You're

8   still only 68 percent confident?

9   A    That the device is within those coordinates, yes.

10  Q    Okay.  So, moving on to page 9, you stated that if

11  the estimated location, the stored coordinates in

12  Location History, falls within the radius of the

13  geofence request, then Google treats that user as

14  falling within the scope of the request; correct?

15  A    Yes.

16  Q    So, in other words, if the blue dot is inside of

17  that geofence, inside of that radius, then Google will

18  consider it responsive to the warrant?

19  A    Yes.

20  Q    You consider it responsive even if that shaded

21  circle, the confidence interval display radius, falls

22  partly outside the radius of the geofence request?

23  A    That is my understanding, yes.

24  Q    So you can have a little blue dot right close to

25  the edge of that geofence with a big display radius

McGRIFF - DIRECT                215

1    that goes way beyond it, and that user is still going

2    to be recorded in the geofence return?

3    A    Yes.

4    Q    So you consider it responsive even if the shaded

5    circle falls partly outside?  And even then, you can't

6    say where inside that circle the user was?

7    A    No.

8              THE COURT:  What question did you answer?  He

9    asked two questions.  Do you think if it's outside the

10   circle, it's responsive?

11             Why don't you rephrase the question.

12   BY MR. PRICE:

13   Q    So even if part of that display radius falls

14   outside of the geofence, it's still considered

15   responsive?

16   A    Yes.

17   Q    Even though there's a 68 percent chance that that

18   person is somewhere outside the actual geofence within

19   that display radius?

20   A    Yes, that would still be considered responsive.

21   Q    Even though there's a 32 percent chance that

22   they're not even there and somewhere else?

23   A    Yes.

24   Q    Okay.  So there's a significant likelihood that at

25   least some of the users identified as being inside the

1   geofence might have been outside of that geofence?

2   A    There is a possibility, yes.

3   Q    Google has to draw the line somewhere; right?  And

4   this practice makes sense from Google's perspective?

5   A    This is the process, yes.

6   Q    The warrant didn't tell you to do it this way;

7   right?

8   A    This is the process by which we respond to these,

9   yes.

10  Q    It's Google's process.  It didn't tell you to do

11  this in the warrant?

12  A    (Nodded head affirmatively.)

13  Q    And no court told you to do that; right?

14  A    This particular process of identification?

15  Q    Yeah, to draw the line and say, well, we're going

16  to report people whose blue dots are inside, and

17  that's the way it's going to work.

18  A    This is the process that we use to respond to

19  these, yes.

20  Q    Okay.  So false positives are possible here?

21  A    Yes.

22  Q    And you say this, page 9 of your first

23  declaration, 17.  You said, "As a result, it is

24  possible that when Google is compelled to return data

25  in response to a geofence warrant, some of the users

McGRIFF - DIRECT                217

1   whose locations are estimated to be within the radius

2   described in the warrant, and whose data is therefore

3   included in data production, were in fact located

4   outside the radius"?

5   A    Yes.

6   Q    False negatives are possible, too; right?

7   A    Yes.

8   Q    So if somebody was standing -- if somebody was

9   actually right outside that geofence radius, but

10  Google estimated their location as being inside of it

11  or, I'm sorry, other way around.  If the blue dot

12  falls outside the geofence, you don't include it even

13  though the person could have been inside of that

14  geofence?

15  A    That's correct.

16  Q    Okay.  Even if part of the shaded circle falls

17  within the geofence, if that blue dot is outside,

18  nothing?

19  A    Yes.

20  Q    The warrant, once again, didn't tell you to do it

21  that way?

22  A    This is our process, yes.

23  Q    The Court didn't tell you to do it that way?

24  A    This is our process, yes.

25  Q    It's just your process.  Great.

McGRIFF - DIRECT                    218

1     All right.  I want to switch gears a little bit

2   here and talk about some of the feedback that Google

3   has received about Location History.  You published a

4   blog for Google on December 9, 2019; correct?

5   A    Yes.

6   Q    It was titled "Updates to Incognito Mode and Your

7   Timeline in Maps"?

8   A    Yes.

9   Q    Let me show you Exhibit 47.  Is this the blog

10  post?

11  A    Yes.

12          MR. PRICE:  Your Honor, I'd like to introduce

13  this into evidence, please?

14          THE COURT:  Any objection?

15          MR. SIMON:  No objection, Judge.

16          THE COURT:  It will be entered.

17          MR. PRICE:  Thank you.

18          (Defense Exhibit No. 47 is admitted into

19  evidence.)

20  BY MR. PRICE:

21  Q    So you wrote --

22          MR. PRICE:  This is on 19, Laura.

23  Q    You wrote that throughout this year, we've focused

24  on making it easier to control, manage, and delete

25  your Location History information; correct?

A    Yes.

Q    And earlier that year, same year, you published

another blog post for Google.  This one on May 1,

2019.

A    Yes.

Q    It was titled "Introducing Auto Delete Controls

for Your Location History and Activity Data"?

A    Yes.

Q    Is this the blog post?

A    Yes.

        MR. PRICE:  Your Honor, this is Defense

Exhibit 46.  We'd like to move it into evidence, as

well.

        THE COURT:  Any objection?

        MR. SIMON:  No objection.

        THE COURT:  It will be entered.

        (Defense Exhibit No. 46 is admitted into

evidence.)

Q    So you wrote, "We work to keep your data private

and secure, and we've heard your feedback that we need

to provide simpler ways for you to manage or delete

it"; correct?

A    Yes.

Q    I would like to talk about some of that feedback

for a second that you received.  In fact, Location

McGRIFF - DIRECT                    220

1    History has received some significant media attention

2    and received significant media attention in 2018; is

3    that correct?

4    A    Yes.

5    Q    And that attention was pretty negative?

6    A    It was mixed, yes.

7    Q    In January 2018, there's an online type magazine

8    called "Quartz," and they published an article

9    discussing Location History.  Do you mean that?

10   A    Yes.

11   Q    It was titled, "If You're Using An Android Phone,

12   Google May Be Tracking Every Move You Make."  This is

13   the article?

14   A    Yes.

15            MR. PRICE:  This is Defense Exhibit 48, Your

16   Honor.  And I would like to move it into evidence.

17            MS. KOENIG:  It already is in evidence.

18            MR. PRICE:  It already is in evidence.  Thank

19   you.

20   Q    So speaking of Location History, it says,

21   "Although the product behind those transmissions is

22   opt-in, for Android users it can be hard to avoid and

23   even harder to understand"; correct?

24   A    Yes.

25   Q    And it goes on to say, "While it is not enabled on

McGRIFF - DIRECT                221

1    an Android phone by default, or even suggested to be

2    turned on when setting up a new phone, activating

3    Location History is subtly baked into setup for apps

4    like Google Maps, Photos, the Google Assistant, and

5    the primary Google app"; correct?

6    A    Yes, that's what the article says.

7    Q    And then it adds --

8              THE COURT:  There's an objection.

9              MR. SIMON:  Judge, I just object to the way

10   in which this is being entered into evidence,

11   particularly that first sentence.  I didn't object at

12   the time, but the way the record is going to read is

13   that Mr. McGriff is saying that he agrees with this.

14   I would prefer, Judge, and I think the record would be

15   clearer, if he's going to put these assertions in

16   front of the witness, ask him to assess them.

17             THE COURT:  At the very least --

18             MR. PRICE:  Your Honor, I am not -- sorry.

19             THE COURT:  Okay.  You can respond.

20             MR. PRICE:  We are not introducing these

21   articles for the truth of the matter.  We are

22   introducing them because they constitute feedback

23   which Google received.

24             THE COURT:  I know, but what you're doing is

25   saying that the declarative statements, and you're

McGRIFF - DIRECT                222

1   starting it by saying "It says this.  Is that right?"

2   He says yes.  It's going to create a record where you

3   can cut off the front where you say it says this,

4   quote it, and then say yes.

5         So what we're trying to do is create a fair

6   record here.  You are getting him to indicate that

7   there are statements in this article and whether or

8   not he knew them.  And so that is really the point.

9         I would agree that this way it's being asked,

10  it sounds as if you're trying to get him to, although

11  you're not doing it that way, but it does sound as if

12  you're trying to get him to sound as if he's agreeing

13  with a declaration.

14        So it's sustained to that degree.  And I'll

15  just ask you to use the nuances.  You're still making

16  your point.  But do it in a different way.

17              MR. PRICE:  Okay.

18  BY MR. PRICE:

19  Q    The article here criticized Location History;

20  correct?

21  A    Yes.

22  Q    And the article looked at testing multiple phones

23  to see what this process was like; correct?

24  A    Yes, it did.

25  Q    And it faulted Google, didn't it?

McGRIFF - DIRECT                    223

1    A    The article did, yes.

2    Q    And it faulted it because it said that none of the

3    apps used the same language to describe what happens

4    when Location History is enabled; correct?

5    A    That is one of the things they cited, yes.

6    Q    And it also criticized Google for not explicitly

7    indicating that activation will allow every Google

8    app, not just one seeking permission, to access

9    Location History data.  So they're complaining about

10   account level nature of the setting.

11            THE COURT:  The what?

12            MR. PRICE:  Account level nature of the

13   setting.

14            THE COURT:  You need to look at the

15   microphone.

16   A    Yes, they are in the article.

17   Q    Okay.  And that account level setting, that means

18   that when you turn on Location History through one

19   app, it's on for the entire account; right?

20   A    When you opt in to Location History, you are

21   opting in for your account, yes.

22   Q    Thank you.

23        So the press didn't stop with the Quartz article.

24   I imagine you're aware that the Associated Press also

25   published an article about Location History in 2018?

McGRIFF - DIRECT                    224

1   A    Yes, I am aware of that article.

2   Q    Is this the article?

3   A    That is the article, yes.

4   Q    It's titled "Google Tracks Your Movements, Like It

5   or Not"?

6   A    Yes, that's the title of the article.

7   Q    Thank you.

8            MR. PRICE:  And this is Defense Exhibit 49,

9   Your Honor.  And we would ask to move this into

10  evidence, as well.

11           THE COURT:  Any objection?

12           MR. SIMON:  Judge, we just reiterate our

13  earlier objections.  We think it lacks relevance,

14  particularly when you have a Google witness here to

15  address the issue.  It's obviously hearsay.

16  Understanding that the rules of evidence wouldn't

17  strictly apply here, but I think the best route here

18  is to question the witness about, like, the Quartz

19  article assertions.  But I know the Court has

20  previously ruled, but we'd object to it being entered

21  into evidence.

22           THE COURT:  Right.  He's allowed to make his

23  case.  I will allow it for the limited purpose, not

24  for the truth of the matter, but to the extent it

25  has -- the witness has already testified that he was

McGRIFF - DIRECT                    225

1   aware of the article.  And so I think it is relevant

2   for background information.  And you all can

3   cross-examine with respect to weight.  All right?

4          MR. SIMON:  Understood.

5          MR. PRICE:  Thank you, Your Honor.

6          Sorry.  I did move to have the article

7   introduced.  I'm not sure if there was a ruling on

8   that, Your Honor.

9          THE COURT:  Right.  I overruled the

10  objection, and so it will go in.

11         MR. PRICE:  Thank you.

12         (Defense Exhibit No. 49 is admitted into

13  evidence.)

14  BY MR. PRICE:

15  Q   So the article's main complaint here is that it

16  says, "Even with Location History paused, some Google

17  apps automatically store time-stamped location data

18  without asking."  That's just the complaint in the

19  article; correct?

20  A   That's the complaint in the article, yes.

21  Q   But it was a complaint that Google ended up taking

22  pretty seriously, especially given the interest from

23  members of the Senate, for example?

24  A   We take all complaints seriously, yes.

25  Q   Here the article actually quoted United States

McGRIFF - DIRECT                    226

1    Senator Mark Warner; correct?

2    A    Yes, the article does quote the Senator.

3    Q    And he complained that it's frustratingly common

4    for technology companies to have corporate practices

5    that diverge wildly from the reasonable expectations

6    of their users.  Was that his statement?

7    A    That was his statement, yes.

8    Q    You were aware that he made that statement;

9    correct?

10   A    I was aware that he made that statement, yes.

11   Q    And at the end, it quotes a Yale researcher, Sean

12   O'Brien, and he called this practice disingenuous;

13   right?

14   A    That is what he said, yes.

15   Q    So this was a pretty negative report about

16   Location History from Google's perspective; correct?

17   A    It was not a flattering report, that's correct.

18   Q    Google actually tracked the media coverage of this

19   report; correct?

20   A    As we do often for all media reports, yes.

21   Q    And Google prepared what's called an issue

22   coverage report for this article for four days?

23   A    That's correct, yes.

24   Q    I'd like to show you Defense Exhibit 38, please.

25   Are these the issue coverage reports that you were

McGRIFF - DIRECT                    227

1   referring to?

2   A    That's correct, yes.

3   Q    And it makes it clear that this story was pretty

4   widely covered; correct?

5   A    That's correct, yes.

6   Q    If we check out one of those reports --

7             THE COURT:  What exhibit are you on?

8             MR. PRICE:  Sorry.  Excuse me?

9             THE COURT:  Which exhibit?

10            MR. PRICE:  Sorry.  This is Defense Exhibit

11   38, Your Honor.

12            THE COURT:  38?

13            MR. PRICE:  Yes.  And I forgot to move it

14   into evidence.  I would move for this to be admitted

15   into evidence, as well.

16            THE COURT:  Is there any objection to Defense

17   38?

18            MR. SIMON:  No objection, Judge.

19            THE COURT:  All right.  It will enter.

20            (Defense Exhibit No. 38 is admitted into

21   evidence.)

22   BY MR. PRICE:

23   Q    So if we look at the issue coverage reports, we

24   see that Google wrote, the AP tweeted the story out,

25   which created a surge of social chatter, approximately

McGRIFF - DIRECT                228

1    8,000 re-tweets.  And the story was picked up by 60

2    plus outlets, including the *New York Times*, *U.S. News*

3    *and World Report*, and the *Washington Post*; is that

4    accurate?

5    A    That's accurate.

6           THE COURT:  It's accurate that it's in there.

7    You're continuing to ask the questions in the same

8    way.  And so, you know, you're making points, but you

9    are making the points.  It's the witness who needs to

10   be able to talk about what it is that is or is not in

11   an exhibit.

12          That is what is in the exhibit.

13          MR. PRICE:  Thank you, Your Honor.

14   BY MR. PRICE:

15   Q    Google's report explained the coverage themes for

16   these stories; is that correct?

17   A    That's what's in the report, yes.

18   Q    And the report noted the top two themes for this

19   article?  It said, the report said, that 69 percent of

20   the coverage mentioned the lack of user consent/creepy

21   factor?

22   A    That's what is in the report, yes.

23   Q    And the report also noted that a third of the

24   coverage was about misleading controls?

25   A    That's in the report, yes.

1    Q    Just a few days later, Google changed the language

2    on its help page.  On its Location History help page.

3    You're aware of that, I assume?

4    A    Yes.

5    Q    It was in response to this article; is that

6    correct?

7    A    Which update are you referring to specifically?

8    Is it an exhibit here?

9    Q    It was three days later.  And that would have been

10   on August 17, 2018.

11   A    Is there an exhibit here I can look at?

12   Q    Yes.  We'll get there.

13        So three days later -- sorry -- three days later

14   it was reported that Google changed its Location

15   History help page, as well; is that correct?

16   A    I can't say that we made an update three days

17   later.

18   Q    The Associated Press published an article just a

19   few days later about that change.  Are you aware of

20   that?

21   A    Is that in this book?

22   Q    We can show you the article if you'd like.  Would

23   that help?

24   A    Well, I guess, the Associate Press reported that

25   we made -- that Google made a change three days later.

McGRIFF - DIRECT                    230

1   Q    Yes.

2   A    So if that's in there, yes, then that is what they

3   reported.

4   Q    And you do recall Google making a change to its

5   Location History help page shortly after this article?

6   A    I recall in some period of time, yes, we made

7   updates to our pages.

8   Q    Okay.  That's fine.  The bad press, so to speak,

9   here had some ramifications for Google in terms of

10  oversight from the federal government; is that

11  correct?

12  A    It did.

13  Q    In May 2018, are you aware that two United States

14  Senators wrote a letter to the Federal Trade

15  Commission about Location History?

16  A    Yes.

17            MR. PRICE:  And this is 36, Laura.

18  Q    Is this the letter?

19            THE COURT:  Okay.  Is this Defense Exhibit

20  36?

21            MR. PRICE:  This is Defense Exhibit 53, Your

22  Honor.

23            THE COURT:  Okay.

24  Q    I'd like to show you what's marked as Defense

25  Exhibit 53.  It's a letter from two United States

McGRIFF - DIRECT                    231

1    Senators; correct?

2    A    Yes.

3              MR. PRICE:  Your Honor, I would like to move

4    this letter into evidence.

5              THE COURT:  Any objection?

6              MR. SIMON:  Judge, I think there are multiple

7    letters in Exhibit 3 (sic), including Google's

8    response on January 12, 2018.  We'd obviously object

9    generally based on what we've talked about before, but

10   I understand the Court will admit it not for the truth

11   of the matter asserted, but for -- just to allow the

12   question.

13             THE COURT:  All right.  I'm going to allow

14   this for the limited purpose that we have been looking

15   at these documents.

16             So, to make a record, this is Defense Exhibit

17   53, which is a letter dated May 11, 2018, that has a

18   signature of Richard Blumenthal from the United States

19   Senate.

20             It then has something marked an attachment.

21   And the attachment says "Letter from Susan Molinari.

22   Received by Senators Blumenthal and Markey."  And that

23   is then followed by a January 12, 2018 document on

24   Google letterhead.  So it predates this May 18th

25   letter.

McGRIFF - DIRECT                           232

1          And then there is something that has an

2     Attachment 4.  So you have to be clear about what

3     you're admitting and under what circumstances.

4          The United States is correct that it's

5     confusing to say we're admitting just one letter.

6     There's actually a series of documents here.

7          So you can ask questions to establish why

8     they're there, but the whole -- what so far we have

9     admitted is part of 53, the May 11, 2018 letter.

10          MR. PRICE:  Yes, Your Honor.  Thank you.  And

11     the exhibits that go along with it include previous

12     correspondence.  There's one in particular that we

13     have an interest in.  It's Attachment 4, which

14     includes a screenshot of the Google Assistant setup.

15          THE COURT:  There is no Attachment 2, letter

16     from Susan Molinari?

17          MR. PRICE:  No, Your Honor.  It's Attachment

18     4.

19          THE COURT:  No, no, no.  I'm in your exhibit

20     that you put in front of the Court.  Right after

21     Senator Blumenthal's letter, there is a page that says

22     Attachment 2, letter from Susan Molinari.  Received.

23          MR. PRICE:  We do not need to introduce that

24     into evidence.

25          THE COURT:  Because it's not there, right?

McGRIFF - DIRECT                    233

1            MR. PRICE:  I have not seen it.

2            THE COURT:  Well, it's your exhibit.  Then

3     there is -- yes.

4            MR. SIMON:  Judge, it's a part of our book,

5     and it's what we've seen.  And certainly if we're

6     going to introduce the letter from the senators, we'd

7     certainly want Google's statement to the Quartz

8     article and the like.

9            THE COURT:  All right.  So there are four

10    attachments, and you're not objecting that the exhibit

11    goes in as presented because it will be the full

12    exhibit.  Is that correct, Mr. Simon?

13           MR. SIMON:  Correct, Judge.  Thank you.

14           THE COURT:  It will be admitted, then.

15           (Defense Exhibit No. 53 is admitted into

16    evidence.)

17           MR. PRICE:  Thank you, Your Honor.

18    BY MR. PRICE:

19    Q    I just want to turn to the body of the letter here

20    because it seems to put Google on notice that Location

21    History has some -- that the Senate had some concerns

22    with Location History; is that correct?

23    A    Just one point.  Where this started was a walking

24    away from the AP article which came out after this

25    letter.  This letter was sent on May 11.  The AP

McGRIFF - DIRECT                    234

1   article was from August, I believe, later that year.

2   Q   The Quartz article, I believe, preceded this and

3   is cited in the letter --

4   A   That's correct.

5           THE COURT:  He's correct about the AP

6   article; right?

7           MR. PRICE:  Pardon me?

8           THE COURT:  He's correct about the AP

9   article.

10  BY MR. PRICE:

11  Q   You are correct about the AP article.

12  A   Okay.  Because I just wanted to be clear.  When

13  you had previously asked me was I aware of additional

14  scrutiny, I said yes.  Then you referenced this

15  letter, but this letter was written before that

16  article.

17      So this letter was in response to the Quartz

18  article, not the additional scrutiny that came as a

19  result of the AP article.

20  Q   Yes.

21  A   Okay.

22  Q   The letter criticized Google's Location History

23  practices for -- this is 38 -- frequently

24  mischaracterizing the service and degrades the

25  functionality of products in order to push users into

McGRIFF - DIRECT                    235

1    providing permission, so says the letter.

2        Would you agree that's what it says?

3    A    That's what it says in the letter, yes.

4    Q    And the letter also says that these factors raise

5    serious concerns -- raise serious questions about

6    whether users are able to provide informed consent.

7    Were you aware of that criticism, as well?

8    A    That's what is in the letter, yes.

9    Q    And I don't mean to be belabor this, but it does

10   go on to say that Google's policies and explanations

11   raise questions about their characterization of basic

12   consumer protection terms, such as opt-in, opt-out,

13   notice, consent, and anonymization according to the

14   letter?

15   A    That is what's in the letter, yes.

16   Q    The letter calls the consent process confusing,

17   42?

18   A    That is what's in the letter, yes.

19   Q    And it cites Attachment 4.  Attachment 4 -- is

20   that correct?  It cites Attachment 4?

21   A    That's correct, yes.

22   Q    And is this Attachment 4?

23   A    I'm sorry.  I didn't hear the question.

24   Q    Is this Attachment 4?

25   A    Yes, that is Attachment 4.

McGRIFF - DIRECT                    236

1    Q    What does it show?

2    A    This is one of the Google Assistant permission

3    prompts.

4    Q    And that includes Location History; correct?

5    A    At that time it included Location History, yes.

6    Q    The letter goes on to add that most consumers do

7    not understand the level of granularity and reach of

8    Google's data collection, and that there's serious

9    questions about whether they have provided informed

10   consent and maintain reasonable ability to avoid

11   participating in this collection.  Are you aware of

12   that criticism, as well?

13   A    That is what's in the letter, yes.

14   Q    And the letter concludes by asking the FTC to open

15   an investigation into the potential deceptive acts and

16   practices used by Google to track and commoditize

17   American consumers.  Are you aware that the letter

18   called for an investigation?

19   A    I am aware that that is what's in the letter, yes.

20   Q    So in addition to the news articles, and the

21   Senate inquiry, Google got sued over Location History

22   in 2018.  Are you aware of that?

23   A    Which particular case are you referring to?

24   Q    The case is called *In re:  Google, Location*

25   *History Litigation*.  It's a class action out of the

McGRIFF - DIRECT                    237

1   Northern District of California.

2   A    Yes.

3   Q    I'd like to show you Defense Exhibit 26.  Is this

4   the complaint in this case?

5   A    Yes.

6   Q    And you're aware of the complaint in the lawsuit?

7   A    I am aware of this complaint, yes.

8            MR. PRICE:  Your Honor, I would move to

9   introduce the amended complaint for -- not for the

10  truth of the matter, but for the fact that it exists.

11           THE COURT:  Is there an objection?

12           MR. SIMON:  Judge, I'd object to relevance.

13  Obviously, it's hearsay through and through.  But

14  moreover, what we have, and the United States wouldn't

15  object to things like the exhibit emails that are

16  going to come from *Google v. Arizona* that shows

17  communications between Google as a part of that

18  litigation internal discussions.  This is literally

19  just some class action lawyer, presumably in

20  California, that decided to go after Google.

21           The fact that it exists, the witness just

22  admitted it.  Putting it in the record, I think, does

23  nothing more than continue sort of a broadside against

24  Google more than just the article.  This is just

25  accusing Google of all kinds of things.  And I don't

1    see any relevance to this being in the record.

2              THE COURT:  These are just allegations.  Why

3    do we need to know -- has this class action completed?

4              MR. PRICE:  It hasn't, Your Honor.  The

5    reason that we are talking about these things is

6    because things like the newspaper articles, the

7    congressional inquiries, and the lawsuits appear to

8    have changed Google's behavior, changed Google's

9    policies, and, in particular, have something to do

10   with the relevant changes here to the Location History

11   language.

12             So we're trying to establish what happened,

13   what changed, why, and whether it was sufficient.

14             THE COURT:  Well, I'm not going to admit this

15   yet until you establish some fact that Google did that

16   somehow you can say comports with something in the

17   complaint.  And even then, I'm not sure.  These are

18   just allegations.  This is not -- this is not relevant

19   to facts of what we need to consider in this case

20   except that Google knew that the suit was ongoing and

21   that it was about Location History.

22             So I'm going to sustain that objection.

23             MR. PRICE:  Okay.

24   BY MR. PRICE:

25   Q   Mr. McGriff, you're still aware of the lawsuit;

McGRIFF - DIRECT                239

1   correct?

2   A    I am aware of this lawsuit, yes.

3   Q    It was filed just three days after that Associated

4   Press story on August 17?

5   A    I don't know how I would know.

6   Q    It's right at the top of the page.

7   A    If the date is there, then that's when it was

8   filed, yes.

9   Q    The main allegation here, and I don't mean to

10  belabor this point either, is that Google "retains and

11  continues to collect location data" --

12          THE COURT:  Are you quoting from the

13  complaint?  Because I just said it's not admissible.

14          MR. PRICE:  I'm not admitting it, Your Honor,

15  I'm just trying to establish --

16          THE COURT:  You're quoting it.  You're

17  admitting it by saying it.

18          MR. PRICE:  Okay.  I'll move on.

19          Your Honor, the allegations in this case, we

20  understand that they are allegations.

21          THE COURT:  What I said is, if you can show

22  something that happened later that Google did that

23  then you can show was alleged in this complaint, and

24  there's some temporal proximity, then it is possible

25  that this would be admissible.  If you don't show yet

McGRIFF - DIRECT                    240

1    that there has been a change, no, it's not admissible.

2             MR. PRICE:   Okay.

3    BY MR. PRICE:

4    Q    There has been some discussion at Google since at

5    least 2017 about changing the Location History

6    language on the opt-in screen; is that correct?

7    A    Are you referring to the consent or are you just

8    referring to -- what language are you referring to

9    specifically?

10   Q    The language for opt-in to Location History

11   through apps in particular or at setup where it says

12   "Saves a private map of where you go."  That language

13   changed; correct?

14   A    There has been discussion for the life of the

15   product about what is the best copy to relay what the

16   feature does, yes.

17   Q    And you're aware that there are hundreds of pages

18   of emails and documents that have been submitted to

19   the Attorney General in Arizona discussing these sorts

20   of changes?

21   A    Yes, I am aware.

22   Q    Specifically, on February 2, 2017, there's an

23   email in which some Google engineers called Location

24   History a mess.  Does that sound familiar to you?

25   A    I can't recall that specific copy, but if it's in

an email or document somewhere --

Q Perhaps I can refresh your recollection. Can I show you Defense Exhibit 36, please. It's up on your screen, as well.

A Just one clarification point. The screen has a black box on the side, so I can't see the text on the side, which is why I keep looking in the book.

I do see it on there as well, though.

Q I don't know how to --

A It's fine. I follow along with the book, but that's why I keep looking to the book and not the screen. It cuts it off.

Q Okay. So you can see there in the book?

A Yes.

Q And you can see that a little bit later on in that chain another Google employee described the location products as a "work in progress," and that Google was "trying to rein in the overall mess that we have with regards to data collection, consent, and storage"?

A That is what's mentioned in this, I guess, email exchange, yes.

Q And you have another Google employee who says, "How can we do a great job of respecting people's privacy when they don't want to share their location?"

A That is what's written in the exchange, yes.

McGRIFF - DIRECT                    242

1    Q    And the same person says, "Can we have a

2    foreground only model?  Lots of users don't care about

3    Location History."

4    A    That is what's mentioned in the exchange, yes.

5    Q    What's a foreground only model?

6    A    I cannot even feign to understand what this person

7    is referring to.

8    Q    Does it refer to apps that are actively running as

9    opposed to passively in the background?

10   A    I believe what -- well, it's conflating several

11   points.  It's speaking to foreground only collection,

12   which would be app specific, which is inherently not

13   the nature of what Location History is or how its

14   collection works.  So this person is offering

15   suggestions.

16   Q    Okay.  Thank you.  A little bit later in that

17   exchange, you can see at the bottom of your screen, it

18   says -- there's another Google employee who wrote, "Do

19   users with significant privacy concerns understand

20   what data we are saving?  Do they know how to control

21   when we store location information?"

22   A    That is a question asked in the exchange, yes.

23   Q    And then, finally, you have a Google employee

24   writing, "We have Location as a product umbrella that

25   includes Location History and a bunch of other stuff

McGRIFF - DIRECT                    243

1    that's super messy.  And it's a Critical User Journey

2    to make sense out of this mess"?

3    A    That is what's in the article or exchange, yes.

4    Q    This is what Google employees were discussing in

5    2017 or is a recognition that there was a problem?

6    A    There was some discussion about Location History,

7    yes.

8              MR. PRICE:  Sorry, Your Honor.  Can I have

9    one second?

10             THE COURT:  Pardon me?

11             MR. PRICE:  May I have one second?

12             THE COURT:  Sure.

13             MR. PRICE:  Your Honor, I would move to admit

14   Defense Exhibit 36 into evidence, please.

15             THE COURT:  Objection?

16             MR. SIMON:  No objection, Judge.

17             THE COURT:  Okay, it will be entered.

18             (Defense Exhibit No. 36 is admitted into

19   evidence.)

20   BY MR. PRICE:

21   Q    I'd like to turn your attention to Defense Exhibit

22   40.  This is another February 2017 thread where a

23   Googler says, "Personally, I can't think of a world

24   where we do a good and thorough job with runtime

25   permissions across Google apps that doesn't confuse

1    the hell out of our users."  Are you aware of that

2    email.

3    A    I'm aware that that is a statement in this email,

4    yes.

5            MR. SIMON:  Judge --

6            MR. PRICE:  I would like to move Defense

7    Exhibit 40 into evidence, as well, Your Honor.

8            MR. SIMON:  Judge --

9            THE COURT:  Is there an objection?

10            MR. SIMON:  Judge, I would only ask -- I'm

11    not going to object to it being admitted, but a lot of

12    these emails, including Defense Exhibit 40, has

13    multiple pages, and I recognize that there's been prep

14    here, but just to give the witness a second to look at

15    the pages before pointing out the one sentence would

16    be, I think, helpful.

17            THE COURT:  That makes good sense.

18            So this is Defense 40, which is marked as

19    Exhibit 236 in the first page.  And I'm going to enter

20    it into evidence.

21            And I will say, with your last set of

22    questioning, you were going back and forth from one

23    page to a page previous, and that was confusing.  So I

24    agree that you should be clear and certainly allow

25    Mr. McGriff time to absorb it.

McGRIFF - DIRECT                    245

1          MR. PRICE:  Thank you, Your Honor.

2          (Defendant's Exhibit No. 40 is admitted into

3    evidence.)

4    Q    This is page 5 of that PDF, of Exhibit 236.

5          THE COURT:  I confused us by saying 236.

6    It's 236 in the Arizona case.  We should use our own

7    exhibit numbers.

8    BY MR. PRICE:

9    Q    So page 5 of Defense Exhibit 40.

10         MR. SIMON:  Judge, I don't think we have

11   exact page numbers.  The bottom right of all of these

12   *Google v. Arizona* emails what appears to be, like, a

13   Bates stamp in their last five or three numbers,

14   however you want to say it, but it looks like, you

15   know, for this email it starts -- is this 236?

16         MR. PRICE:  We can move on.  I actually don't

17   have any other questions about this chain.

18         THE COURT:  Well, you just quoted something.

19   Why don't you put on the record where you quoted it

20   from.  Something about "I can't imagine where," blah,

21   blah, blah.

22   BY MR. PRICE:

23   Q    This is the fifth physical page.

24         THE COURT:  Look at the Bates number on the

25   bottom right.  You can also identify it by what the

1   first sentence is at the top of the page.

2          MS. KOENIG:  It's not showing me the exhibit,

3   Kathy.

4          THE CLERK:  I think you must have turned it

5   off.

6          MS. KOENIG:  Let me unplug it and try it

7   again.  There we go.

8   BY MR. PRICE:

9   Q   Do we have it here?  So this is the page that is

10  Bates stamp No. GOOG --

11         THE COURT:  Just the last five digits.

12         MR. PRICE:  27381.

13         THE COURT:  Thank you.  And what did you

14  place into the record?

15         MR. PRICE:  I'll read it again.  It says,

16  "Personally, I can't think of a world where we do a

17  good and thorough job with runtime permissions across

18  Google apps that doesn't confuse the hell out of our

19  users."

20         THE WITNESS:  I don't think that's on that

21  page.

22         THE COURT:  No, it's not.

23         MR. PRICE:  27379.

24         THE COURT:  All right.  It's in the first

25  full paragraph of 27379 that has a large redacted

McGRIFF - DIRECT                247

 1    block right before it, and it's sent, Monday,

 2    February 27, 2017, 23:37:44.  All right.  Now we know

 3    where you are.

 4              MR. PRICE:  Thank you for your patience.

 5    BY MR. PRICE:

 6    Q   So, in addition to these 2017 emails, Google

 7    employees responded to the AP article in 2018, as

 8    well; correct?

 9    A   Is there a specific response you're speaking to or

10    just generally that we were aware of the AP article?

11    Q   Well, I'd like to show you Defense Exhibit No. 32.

12    Do you have it?

13    A   Yes, I do.

14    Q   Great.  So, you recognize this as an email chain

15    in which Google employees are expressing concerns over

16    the AP article?

17    A   The entire exchange is redacted except for one

18    section.

19    Q   There's one section that's not redacted from

20    August 13, 2018 at 9:38 a.m.

21    A   That's correct.

22    Q   And you recognize that as an email in response to

23    the 2018 Associated Press article?

24    A   That's correct, yes.

25    Q   Okay.  The email says that Google employees -- and

McGRIFF - DIRECT                248

1   this is the page we're looking at here.  It's page 4

2   of the PDF.

3           THE COURT:  No, it is Bates No. 1523.

4           MR. PRICE:  Bates No. 1523.

5           THE COURT:  We do not have page numbers on

6   the PDFs.

7           MR. PRICE:  That is true.

8   BY MR. PRICE:

9   Q   So on the page marked 1523, the email says that

10  Google employees had what they called an "Oh Shit"

11  meeting -- excuse my language, Your Honor -- meeting

12  about the AP article; is that correct?

13  A   It is my understanding that that is a regular

14  meeting that that team has.

15  Q   That's a regular meeting that the team has?

16  A   That's correct.  That's why it says "our Monday

17  morning 'Oh Shit' meeting."

18  Q   Good to know.  It says, "Both comms and policy are

19  looking for an update on where we are in terms of

20  fixing Location History."  Is that what it says?

21  A   That is what it says, yes.

22  Q   And Google prepared a PowerPoint of the impact of

23  this AP article on Location History; is that correct?

24  A   Is that an exhibit that I can --

25          MR. PRICE:  Actually, I apologize, Your

McGRIFF - DIRECT                    249

1    Honor.  Before we move on, I would like to introduce

2    Defense Exhibit 32 into the record.

3              MR. SIMON:  No objection, Judge.

4              THE COURT:  All right.  It will be moved into

5    evidence.

6              (Defense Exhibit No. 32 is admitted into

7    evidence.)

8              MR. PRICE:  As well as Defense Exhibit 40.

9              MS. KOENIG:  I'm sorry.  We did that one.

10             MR. PRICE:  We did that one.  Okay.

11             THE COURT:  40 you're not objecting to?

12             MR. SIMON:  Without objection, Judge.

13             THE COURT:  It will be entered.

14             (Defense Exhibit No. 40 was admitted into

15    evidence on page 244.)

16   BY MR. PRICE:

17   Q   So Google prepared a PowerPoint presentation of

18   the impact of the Associated Press article on the

19   Location History product; is that correct?

20   A   Are you referring to a specific PowerPoint?

21   Q   I am.  I'll bring it up as Defense Exhibit 33.

22   It's from August 16, 2018.

23   A   Yes, a PowerPoint was prepared for this incident

24   as we would for any incident.

25   Q   And we are on Bates No. 01458, Your Honor.

McGRIFF - DIRECT                    250

1           THE COURT:  Uh-huh.  Thank you.

2   BY MR. PRICE:

3   Q    One slide here -- and this is 56, Laura -- shows a

4   large jump in searches for -- that's Location History.

5   It's Bates No. 01475.

6           THE COURT:  47 --

7           MR. PRICE:  Five.

8           THE COURT:  Five.  Okay.

9   Q    Are you aware?

10  A    Yes, I'm aware that this slide quotes a spike

11  here, yes.

12  Q    It shows a very large increase in the number of

13  search queries related to Google Location History; is

14  that correct?

15  A    That's correct.

16          MR. PRICE:  I'd like to move Defense Exhibit

17  33 into evidence.

18          THE COURT:  Any objection?

19          MR. SIMON:  No objection.

20          THE COURT:  It will be entered.

21          (Defense Exhibit No. 33 is admitted into

22  evidence.)

23  BY MR. PRICE:

24  Q    In fact, I don't know if this is surprising or was

25  surprising to you, but Google has never actually

1    advertised Location History to its users; is that

2    correct?

3    A    Can you clarify what you mean by "advertise"?

4    Q    Sure.  I'll show you Defense Exhibit 34.  Tell me

5    when you have it.

6    A    34, yes.

7              MR. PRICE:  Let us get the Bates stamp number

8    for you, Your Honor, before proceeding.  I do not

9    believe -- so this does not have Bates stamps, but it

10   is on page 37 of the actual document.

11   BY MR. PRICE:

12   Q    Do you have it?

13   A    Yes.

14   Q    Okay.  It says, As of today, we have not located

15   online advertisements for Location History or Web &

16   App Activity.  If we locate any such responsive

17   materials, we will promptly produce these

18   representative examples.

19        So the question is whether Google has ever

20   advertised Location History to its users?

21   A    I see.  So it's specifically referencing

22   newspapers ads, magazines ads.  In that context, no,

23   we have not run any newspaper ads or magazine ads that

24   I'm aware of, no.

25   Q    Thank you.

McGRIFF - DIRECT                    252

1          MR. PRICE:  Your Honor, I'd like to move

2    Exhibit 34 into evidence as well.

3          THE COURT:  Any objection?

4          MR. SIMON:  No objection, Judge.

5          (Defense Exhibit No. 34 is admitted into

6    evidence.)

7    BY MR. PRICE:

8    Q   Referring to Location History settings, Google

9    employees once again emailing, and this is Defense

10   Exhibit 30, had some more to say about the Associated

11   Press article.  Can you go down?  All right.

12        So this is page 7 of the actual PDF, and we'll get

13   a Bates stamp number in a second.  It is Bates 01271.

14   Are you aware of these emails?  These are from

15   August 14, 2018.

16   A   I see that these are emails, yes.

17   Q   And they're referring to location settings.  You

18   have one Google employee here who writes, "It's a bit

19   complicated, and we might need better messaging."  Do

20   you see that?

21   A   That is what the message says, yes.

22   Q   Are you aware of that?

23   A   I see that now, yes.

24   Q   And another Google employee wrote -- this is on

25   Bates 01270.  Another Google employee wrote, "I agree

McGRIFF - DIRECT                253

1   with the article.  Location off should mean location

2   off; not except for this case or that case."  Do you

3   see that on the email?

4   A    I see that that's what's written here.

5          THE COURT:  Where is it?

6          MR. PRICE:  This is Bates -- there you go.

7          THE COURT:  I got it.

8   BY MR. PRICE:

9   Q    And then it goes on to say, "The current UI" --

10  what's UI?

11  A    User interface.

12  Q    "The current UI feels like it is designed to make

13  things possible, yet difficult enough that people

14  won't figure it out.  New exceptions, defaulted to on,

15  silently appearing in settings menus you may never

16  see."

17      So these are all responses to -- Google employees

18  responding to the 2018 AP article; is that correct?

19  A    These are people responding to the AP article,

20  yes, that's correct.

21  Q    Great.

22          MR. PRICE:  Your Honor, I would like to

23  introduce Defense Exhibit 30 into evidence, please.

24          MR. SIMON:  Judge, I would ask to -- I would

25  object to a fair amount of this coming in.  So I

1    wouldn't object to 1266 through 1271, that top email

2    on 1271, getting in, but if the Court looks through

3    1271 through 1287, it's a lot of talk about stuff that

4    I don't think -- well, it's not relevant at all.  The

5    former President in is there, China restrictions in

6    there, Elon Musk, a lot of stuff that should be

7    redacted if the Court's going to allow this to be

8    introduced.

9            I would note that I think Defense Exhibit 35

10   is a cleaner version of this.  I could be wrong on

11   that.  But either way, I'd ask for the Court to admit

12   it subject to the extraneous emails at the bottom

13   starting on 1271 through 1287 being cut out.

14           MR. PRICE:  I don't think we have a problem

15   with that either.  We have no intention of asking

16   about Elon Musk or the former President.

17           THE COURT:  All right.  So the bottom half of

18   1271, which starts with "On Monday, August 13, 2018,"

19   blocked out entity "wrote," and the remainder of the

20   exhibit will be excluded and not entered into

21   evidence.

22           I agree that there seems to be some

23   duplication in Exhibit 35.

24           MR. PRICE:  Yes, Your Honor.  These emails

25   are duplicated in multiple places.  The reason that we

McGRIFF - DIRECT                    255

1    chose to use this version of it was because it

2    included the original formatting from those emails.

3    So you're more able to see who's writing what, which

4    people.

5              THE COURT:  Okay.  So the front part from

6    1266 to the top of 1271 and the cover page, which has

7    no number, will be admitted.  And the rest is

8    excluded.

9              (Defense Exhibit No. 30 is admitted into

10   evidence.)

11   BY MR. PRICE:

12   Q    In fact, this email chain continues in Defense

13   Exhibit 31, and it is not all contained in one

14   exhibit.  So I direct your attention, Mr. McGriff, to

15   Defense Exhibit 31, which is the same thread of emails

16   from August 14, 2018.  And this is Bates 01289.  Let

17   me know when you have it.

18   A    I have it, yes.

19   Q    So one Google employee writes that it is

20   "Definitely confusing from a user point of view if we

21   need googlers explain it to us."

22        And a little bit further down.  Is that correct?

23   Sorry.

24   A    That is what it says, yes.

25   Q    And a little further down, user adds or an

1   employee adds -- this is Bates 01290.  "Also seems
2   like we are not very good at explaining this to
3   users." Going on -- is that correct?
4   A    That is what it says.
5   Q    And then another Google -- the same Google
6   employee writes, "Indeed we aren't very good at
7   explaining this to users.  Add me to the list of
8   Googlers who didn't understand how this worked and was
9   surprised when I read the article."
10  A    That is what was written there, yes.
11  Q    So these are Google employees who are reading this
12  article and are surprised to learn how Google's
13  location settings actually work?
14  A    I would frame it as this is a group of Googlers
15  commenting on the interaction of Google settings, yes.
16  Q    That same employee goes on to say, "Of course, we
17  shouldn't have to explain this to users.  The real
18  failure is that we shipped a UI that confuses users
19  and requires explanation"; correct?
20  A    That is what it says, yes.
21  Q    And that person goes on to suggest that "We should
22  redesign the UI so it's obvious what's happening, and
23  make it easy for users to choose the settings they
24  want in one place without parsing complex details
25  about product interactions."  Is that what it says?

McGRIFF - DIRECT                    257

1  A    Yes.  I have no idea what UI they are talking

2  about, but that is what it says.

3  Q    And there's only one more thing that we can read

4  on this chain.  One more user just wrote, "Please

5  don't comment!"

6  A    That is what is written, yes.

7  Q    So from these emails -- excuse me one second.

8              MR. PRICE:  Your Honor, I would like to move

9  to admit Defense Exhibit 31, please.

10             THE COURT:  Objection?

11             MR. SIMON:  Judge, subject to the same

12 objection, there's a lot of extraneous talk.  I think

13 it's at all extraneous between 1293 and 1309.  So we

14 wouldn't object to admitting it but cutting out those

15 pages.

16             MR. PRICE:  That's acceptable to us, as well.

17             THE COURT:  All right.  It will be admitted

18 through 1292, and not 1293 through 1309.  I have an

19 extraneous document in here, I think.  It looks to be

20 a LexisNexis search.  Does somebody have that at the

21 end?

22             MS. KOENIG:  It was probably my putting this

23 together too hastily, Your Honor.

24             THE COURT:  All right.  Well, to the extent

25 it just looks as if somebody looked up a particular

1    case, it seems unrelated.  So that will not be

2    admitted either.

3            MR. PRICE:  Thank you, Your Honor.

4            (Defense Exhibit No. 31 is admitted into

5    evidence.)

6    BY MR. PRICE:

7    Q    Okay.  So following the AP story, following -- the

8    Google employees wrote to each other about this issue

9    over Location History; correct?

10   A    Employees discussed the article, yes.

11   Q    And then Google changed its privacy policy --

12   correct? -- in May of 2018?

13   A    The privacy policy?

14   Q    Uh-huh.  On May 25, 2018, Google issued an update

15   to its main privacy policy.  Are you aware of that?

16   A    I don't recall that.

17   Q    Perhaps I can refresh your memory.

18            MR. PRICE:  Can we see Defense Exhibit 43,

19   please.

20   Q    I'm showing you a redline version of the policy

21   when it was enacted on May 25.

22   A    Okay.  Sorry.  This is not -- okay, yes.  There

23   was a privacy policy update in May, yes.

24   Q    And this is the privacy policy that was updated?

25   A    Yes, this is a privacy policy update from

1    May 2018.

2    Q    Okay.  And the previous one had --

3    A    But -- sorry.  I guess why I'm confused, this

4    privacy policy that you're referring to here was

5    before the AP article.

6    Q    I'm sorry.  It was a change before the AP article

7    after the Senate inquiry and after the Quartz article;

8    is that correct?

9    A    I'm sorry.  There was -- the -- I think these

10   things are orthogonal.  The privacy policy was updated

11   full stop independent of inbound letters specifically

12   from senators about Location History.

13   Q    I'm not saying that -- I'm not asking you if one

14   caused the other.  I'm just asking if this was the

15   privacy policy --

16           THE COURT:  Well, you sort of are.  You're

17   saying after the AP article, Google updated its

18   privacy policy.  So you're suggesting there is a

19   relationship.  So let him answer the way he wants to

20   answer.

21   A    Yeah.  These are orthogonal events.  There are

22   many moving pieces happening all the time.  I assure

23   you, there's no way Google updated its privacy policy

24   in two weeks.  If the Senate letters were May 11, this

25   is May 25.  So this privacy policy update must have

1    been well in flight well before those letters were

2    received, which would not be related to the AP article

3    or the communication in that group digest about

4    response to the AP article.

5        So I guess that's why I'm just saying they're

6    orthogonal.  There are a series of things that

7    happened in the arc of everyone is always making

8    further improvements, yes.

9    Q   And Google had been talking about making changes

10   for quite some time to this language going back to at

11   least 2017, as we discussed earlier; correct?

12   A   In the privacy policy?

13   Q   The Location History language.

14   A   For the life of the product we have -- every

15   Google product we are always looking for ways that we

16   can provide further transparency and clarity.

17   Q   Does the feedback that you receive either in the

18   press or from members of Congress impact those

19   discussions?

20   A   I think all feedback informs those discussions on

21   a regular basis, yes.

22   Q   All right.  Great.  This privacy policy change

23   happened on May 25, 2018; is that correct?

24   A   That's correct, yes.

25   Q   Okay.  And you recognize this privacy policy

McGRIFF - DIRECT                    261

1    change?

2    A    I have not looked at this in some time.  Is there

3    a specific section?

4    Q    Yes, I just want to admit this.  So I would like

5    to know if you recognize this as Google's privacy

6    policy from May 25, 2018?

7    A    I could not certify that this is the privacy

8    policy as it stood on May 25, 2018.  It does appear to

9    be some iteration of the privacy policy at some point,

10   but that was several years ago now.

11   Q    It says that the -- if you go back up to the

12   top --

13            THE COURT:  Is there objection to him using

14   this at the very least as a demonstrative exhibit?  I

15   mean, this is essentially how this witness has

16   identified most of these exhibits.  It's not being

17   offered for the truth of the matter.  It says it's

18   May 25.  It's a redline version.  Can we at least

19   treat it on that basis?

20            MR. SIMON:  Yes, Judge.  Yes.

21            THE COURT:  Okay.  So it's admitted on that

22   limited basis.

23            MR. PRICE:  Thank you, Your Honor.

24            (Defense Exhibit No. 43 is admitted into

25   evidence.)

McGRIFF - DIRECT                    262

1  Q    It says that the previous policy had been in

2  effect since December 18, 2017, right up at the top

3  there.

4           THE COURT:  You really have to --

5           MR. PRICE:  Sorry.

6  BY MR. PRICE:

7  Q    I'm at the first page at the very beginning where

8  it says "last modified," right underneath "privacy

9  policy."  There's December 18, 2017 crossed out, and

10 the next date there that's not crossed out is May 25.

11 A    Oh, I see.  That is the crossed out date.  This

12 shows that this was an update after the December 18,

13 2017 update, yes, that's correct.

14 Q    Are you aware that the previous policy, the one

15 that was in effect until December 18, 2017, did not

16 mention Location History whatsoever?

17 A    I was not aware of that, no.

18 Q    Were you aware that this is the first version that

19 mentions Location History by name?

20 A    Can you point me to the context where this

21 introduces Location History?

22 Q    Yes.  We are on page -- it was 7 of the PDF

23 itself.  It doesn't come with its internal page

24 numbers.

25           THE COURT:  So just say what headings are on

1   it so we can look through the document quickly.

2   BY MR. PRICE:

3   Q   It's under the heading "Your location

4   information."  I'm at the bottom of the page that

5   contains that heading.

6   A   I would have to check to confirm, but that does

7   not ring correct to me, because we do have -- on the

8   location policies page, there is a mention and has

9   been a mention of Location History.  We did make an

10  update to that page to further refine the language

11  around Location History in 20- -- either later 2018 or

12  early 2019, but that was a refinement to existing

13  copy, not the introduction of.

14      In this particular draft where you have

15  redactions, is there a suggestion that all of this

16  content is new?

17  Q   There shouldn't be any redactions --

18  A   Sorry.  Not redactions.  I meant the crossed out

19  copy.

20  Q   This is Google's redline.  It's available on their

21  website.  The crossed out language is the old

22  language, and the language that isn't crossed out is

23  the new language.

24          THE COURT:  Okay.  I'm still not with you,

25  unfortunately.  So what part of the page is your

McGRIFF - DIRECT                    264

1    Location History on?  Is it your --

2              MR. PRICE:  "Your location information."

3              THE COURT:  All right.  Now I'm with you.

4    BY MR. PRICE:

5    Q    Just to clarify, I'm asking about the privacy

6    policy that we're looking at, not the help pages.

7    A    I understand.  And this might just be my

8    misunderstanding of how it's structured or maybe how

9    it's labeled externally, but we do have on the broader

10   company policy's page under "technologies," there's a

11   whole section about location usage.  That copy was

12   refined, but it existed, which is why I'm surprised.

13   I would need to check.

14   Q    The copy that you're describing, is that the same

15   as the privacy policy or is that that something

16   different?

17   A    There's a broader privacy policy that has

18   sections, and one of those sections is like a

19   subsection.  It's, like, policies.google.com/location

20   or technologies/location, something like that.  And

21   there exists a description of the location copy.  That

22   was refined in this time period.  It wasn't

23   introduced.

24   Q    The technologies page and the copy that is there

25   is not included in the privacy policy itself?

McGRIFF - DIRECT                      265

1  A   I believe it is a part of the privacy policy

2  because I think you have to go to the privacy -- I'd

3  have to check.  I don't know.

4         THE COURT:  He's not giving you the answer

5  you want.  He's not able to say that this is the first

6  time it ever appeared.  What he has just testified is

7  that there is some kind of web policy that he is aware

8  of, and he just said, I would be surprised if this

9  were the first time it were in the privacy policy

10  because I'm aware that we had it in a bigger website

11  policy that had been refined.

12         So you just didn't get the answer you wanted,

13  even though you're going to argue that because it

14  doesn't have strike-throughs, this was the first time

15  it came in.  He's given you the answer he has.

16         MR. PRICE:  Thank you, Your Honor.  We will

17  move on.

18  BY MR. PRICE:

19  Q   Google changed the opt-in language for Location

20  History in 2018; correct?

21  A   By opt-in language, do you mean the consent?

22  Q   Yes.

23  A   The Location History consent itself has not

24  changed.

25  Q   The language in the consent flow didn't change at

McGRIFF - DIRECT                266

1    all during 2018?

2    A    The consent flow is not the consent.  The actual

3    Location History consent has not changed.

4    Q    I'm speaking about the consent flow --

5             THE COURT:  Why don't you show an example.

6             MR. PRICE:  Laura, can we pull up

7    Mr. McInvaille's report.

8    BY MR. PRICE:

9    Q    Let me turn your attention to Defense Exhibit 7.

10            MR. PRICE:  Can you go up a little bit,

11   Laura?

12   BY MR. PRICE:

13   Q    So we see a screenshot here from early in 2018.

14   The language under Location History says "creates a

15   private map of where you go with your signed in

16   devices."

17   A    That's what is it says, yes.

18   Q    Right.  And can we go to the next figure, please.

19   This is a screenshot provided by Oracle, also in early

20   2018.  And it says "creates a private map of where you

21   go with your signed-in devices."

22   A    That is what it says.

23   Q    Right underneath Location History.

24        Can we look at the third one from the Norwegian

25   Consumer Council from July 2nd of 2018?  And in the

1   middle screenshot underneath Location History, it

2   says, "Saves where you go with your devices."

3   A   That is what it says, yes.

4   Q   So that language is different from the previous

5   two screenshots that we just discussed?

6   A   That is not the Location History consent copy,

7   which is in the expanded block in the third exhibit

8   you reference, but the descriptive copy did change,

9   yes.

10  Q   And that changed in 2018; is that correct?

11  A   That changed as a result of GDPR, yes.

12  Q   Do you know when it 2018 it changed?

13  A   When was -- I couldn't say exactly.

14          THE COURT:  As a result of what?  I'm sorry,

15  sir.

16          THE WITNESS:  Sorry.  One of the requirements

17  of GDPR was that we be able to centrally serve all

18  strings from a single data store.  So part of our

19  compliance with that policy was to standardize all of

20  these strings because they were leading from the same

21  store.  That work was in flight in 2018.

22          So depending on when the screenshots were

23  taken, you might see some slight variations as you

24  just pointed out in these two screens for the

25  descriptive copy itself, yes.

McGRIFF - DIRECT                        268

1          THE COURT:  All right.  So GDPR?

2          THE WITNESS:  That's the General Data

3    Protection Regulation.

4          THE COURT:  Thank you.

5    BY MR. PRICE:

6    Q    That was a new law enacted in Europe governing the

7    privacy rights of individuals and their data?

8    A    That is correct, yes.

9    Q    So -- but Google had been discussing the need to

10   change this particular language for quite some time;

11   correct?

12   A    No.

13   Q    No?  You're not aware of the emails discussing the

14   need to change the "creates a private map" language?

15   A    Sorry.  I think some things are being conflated.

16   Which emails are you referring to?

17   Q    These are part of the *Arizona v. Google* emails,

18   the emails that Google turned over to the Arizona

19   Attorney General.

20   A    If I recall -- I would need to see the exchange,

21   because if I recall the exchange you're referring to,

22   it's referring to a different set of disclosures that

23   we were working to align our presentation, but is

24   there an example here?

25   Q    Sure.

McGRIFF - DIRECT                    269

1            MR. PRICE:  Can we show Defense Exhibit 41,

2      please?  And this is Bates 57339.

3            MR. DUFFEY:  379?

4            MR. PRICE:  57339.

5      A    I see it, but to my previous point, this exchange

6      is referring to a different string of copy.  It's not

7      referring to the -- what's being discussed at the

8      bottom is not related to the "creates a private map."

9      The "creates a private map" in quotes there is like

10     the language was just like a flag of the page where

11     this language appears, but this exchange specifically

12     was in reference to the conflation with WAA that was

13     discussed, which is why it was relevant in the Arizona

14     matter.

15     Q    When did this copy appear that's being discussed?

16     A    There's that descriptive string that says "saves a

17     map of the places where you go with your signed-in

18     devices" or "creates a private map."  That is not what

19     we were discussing here.  This exchange at the bottom

20     is specifically referring to -- yeah, this was

21     broader.  I guess, maybe I'm not following the

22     connection.

23     Q    Well, the consent flow, at least the initial

24     screen with the one-line description, changed sometime

25     in 2018.  It used to say "creates a private map," and

McGRIFF - DIRECT                    270

1    it doesn't anymore.  This email exchange appears to be

2    talking about whether to change the "creates a private

3    map" language, which a Google employee describes as

4    one of the most admired pieces of prose in the privacy

5    space at Google.

6    A    Okay.  I'm just not following.  I apologize.  This

7    language is referring -- so, the exchange here is

8    referring very broadly to the descriptive copy, yes.

9    Maybe I'm missing the point.  Sorry.  What's the

10   question for me?

11   Q    It says that Google had a long, mostly political,

12   fight over the private map language.  I apologize.

13   It's on the next page.

14            THE COURT:  340?

15            MR. PRICE:  Yes, Your Honor, in the middle of

16   the page.

17   A    I'm sorry.  That is what it says, yes.

18   Q    And you don't recall what this is in reference to?

19   A    No.  It says what it's in reference to.  This is

20   in reference to the descriptive copy.  It's not

21   related to the Location History consent copy at all.

22   It's how exactly it's framed.  And this discussion is

23   in the context of the alignment of all the copy

24   because we were going to consolidate and all read from

25   the same central store.

1  Q   So you're saying there was secondary copy, that

2  second screen that you're talking about, that

3  contained this language at some point?

4  A    No.   There's the LH consent copy, which has been

5  static.   That has not changed.   And then there was

6  descriptive copy that would appear in a snippet either

7  immediately before, and then there's also immediately

8  after.

9       In that time period, we were looking at refining

10 and aligning the descriptive copy strings because

11 prior to that point, they were all baked into the

12 native apps.

13      So if you had to make a change, for example, on

14 IOS, you had to submit an update to the app store.   If

15 you had to make a change on Android, you had to

16 publish a new APK.   We had to do it manually.

17      Part of what we were doing in 2018 was aligning so

18 that these were all readable from some single store.

19 And they weren't baked into the app.   Instead the app

20 was just calling to say what string should I show in

21 this WAA.

22      So there was lot of discussion around how can we

23 further refine all of those strings to make them

24 consistent with each other in terms of their framing.

25 This exchange is specifically referencing, it sounds

1  like, several of the different controls.  So, yes,

2  several of the different controls and balancing the

3  pros and cons of different options.

4      They don't speak specifically to the consents

5  because the consents weren't being changed.  It's just

6  simply to the descriptive copy around the consents.

7  Q   So this is talking about a change to the

8  descriptive copy?  That one line underneath where it

9  says Location History.

10  A   The exchange is speaking to the descriptive copy

11  around the consent, that's correct.

12  Q   And one employee actually goes on to say, "My

13  preference is 'Saves where you go with this device'";

14  correct?

15  A   Yes, I see that here.

16  Q   And that is very, very similar to what the first

17  screen in the Location History consent flow, the

18  descriptive screen, ends up being changed to; correct?

19  A   That is correct, yes.

20  Q   So was it a coincidence?

21  A   So, this is from 2017, January.  So coincidence

22  with what?

23  Q   That -- you're saying that this discussion is not

24  referencing a change to the Location History

25  description during the consent flow process.

McGRIFF - DIRECT                    273

A    I apologize.  Maybe I'm getting confused.  There
are always discussions in flight around how we can
further improve our products and services and further
clarify.

     This discussion from 2017 is about changes that
might be suggested to, it looks like, various
controls, including Location History, to further
improve transparency around them.  So that is that.

     So, yes, it is a discussion across several
controls over further improvements that can be made to
their descriptive copy, yes.  And then you're linking
this to the 2018 update?  To the Location History
page?

Q    No, I'm saying --

          THE COURT:  Exhibit 17, are you comparing it
back to Exhibit 17?  That's his question.  You showed
him Exhibit 17 -- Exhibit 7, your expert's report.  Is
that what you're trying to carry it back to?

          MR. PRICE:  Excuse me?  We're talking about
the -- I'm sorry.

          THE COURT:  The descriptive text on Exhibit 7
under Location History from 7-2-2018, which is how you
began this process, says "saves where you go with your
devices."  Is that the link you're trying to make?

          MR. PRICE:  Yes.  I'm asking if the

1  discussion here had to do with the language that we

2  see in this language change that eventually happened

3  in 2018.

4  BY MR. PRICE:

5  Q    My question for you initially was, a discussion

6  about this language had been in the works for quite

7  some time, since at least 2017.

8  A    I see.  So this is why -- I don't think you can

9  flatten it in the way that you're attempting to,

10 because of the screenshots being from a point in time.

11 For example, I could leave this courtroom right now

12 and go to a Best Buy and buy a device that's three

13 years old and take it off the shelf and take

14 screenshots.  The images that I see would be taken

15 today but be a reflection of what was baked into that

16 device when it was shipped to the shelf three years

17 ago.

18     So the screenshots here, the date of the

19 screenshots is not sequential in terms of when we

20 release the copy updates.  So the language decisions

21 being discussed here in your Exhibit 41 around "saves

22 a map," those were likely introduced into production

23 shortly after.  It is highly probable that --

24 especially because these are from a series of

25 different sources with very different narratives and

McGRIFF - DIRECT                    275

1    very different agendas.

2        Oracle is going to find the least favorable

3    example.  And so they'll use a screenshot that's

4    beneficial to them.  In a research study, they might

5    just choose to benchmark when they're looking across

6    several different sources.  And they'll take

7    screenshots that were beneficial to them.

8        So from the screenshots alone, I can't say -- and

9    you can correct me if I'm wrong -- I can't say that

10   this change was before that change or was tied to the

11   Exhibit 41 discussion.

12       Based on reading these exchanges, this 2017

13   discussion was baked and put into prod, and at some

14   point percolate into -- I'm sorry.  Into production.

15   And at some point percolated into product.  These

16   screenshots are just at different points in time in

17   the life of the product.

18       So that is how you see the evolution here is not

19   directly tied to the previous things we've been

20   discussing, like the AP article or other changes that

21   were happening in 2018.

22           THE COURT:  All right.  We're done.  So it is

23   10 minutes almost after when I said I have to leave

24   because I have a conference call that is an emergency.

25   And so I apologize for the abrupt ending, but we'll

McGRIFF - DIRECT                    276

1   continue this tomorrow.

2          And, sir, you will still be under oath.  You

3   can't discuss your testimony with anyone.  That will

4   give us time.  Maybe all of us will be a little more

5   clearheaded about what relates to what, not at

6   5 o'clock in the evening.  And we'll pick up from

7   there.  So the cross will continue.

8          I'm going to remind everybody to make sure

9   that your witnesses are sequestered.  Can we start

10  tomorrow at nine?

11         MR. PRICE:  Yes, Your Honor.

12         MR. SIMON:  Yes, Your Honor.

13         MR. GILL:  That's fine, Judge.

14         THE COURT:  All right.  So we will begin

15  tomorrow at nine.  And if folks want to call in, they

16  may do so then.

17         Is there anything else I need to cover?

18         MR. SIMON:  Nothing further, Judge.

19         MR. PRICE:  Nothing further.  Thank you, Your

20  Honor.

21         THE COURT:  Okay.  My apologies for this call

22  happening, but I have no control.

23         (The proceedings were adjourned at 4:55 p.m.)

24

25

1        I, Diane J. Daffron, certify that the foregoing is

2   a correct transcript from the record of proceedings

3   in the above-entitled matter.

4                              /s/

5        _____   _____

6        DIANE J. DAFFRON, RPR, CCR       DATE