1       IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF VIRGINIA
2             RICHMOND DIVISION

3

   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
4                         )
   UNITED STATES OF AMERICA    )
5                       )   Criminal No.
   v.                  )   3:19CR130
6                       )
   OKELLO T. CHATRIE       )   March 5, 2021
7   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _)

8                 **DAY TWO**

9     COMPLETE TRANSCRIPT OF MOTION TO SUPPRESS
      BEFORE THE HONORABLE M. HANNAH LAUCK
10       UNITED STATES DISTRICT JUDGE

11

12  APPEARANCES:

13  Kenneth R. Simon, Jr., Assistant U.S. Attorney
   Peter S. Duffey, Assistant U.S. Attorney
14  U.S. Attorney's Office
   SunTrust Building
15  919 East Main Street, Suite 1900
   Richmond, Virginia  23219
16
   Nathan P. Judish, Assistant U.S. Attorney
17  U.S. Department of Justice
   950 Pennsylvania Ave., NW
18  Washington, Virginia  20530

19       Counsel for the United States

20  Laura J. Koenig, Assistant Federal Public Defender
   Paul G. Gill, Assistant Federal Public Defender
21  Office of the Federal Public Defender
   701 E. Broad Street, Suite 3600
22  Richmond, Virginia  23219

23       Counsel for the Defendant

24      DIANE J. DAFFRON, RPR
       OFFICIAL COURT REPORTER
25    UNITED STATES DISTRICT COURT

279

1    APPEARANCES:   (Cont'd)

2    Michael W. Price, Esquire
     National Association of Criminal Defense Lawyers
3    1660 L Street, NW
     12th Floor
4    Washington, DC   20036

5         Counsel for the Defendant

6

7                   I N D E X

8
                 DIRECT  CROSS  REDIRECT
9
     MARLO McGRIFF          282     374     424
10
     SARAH RODRIGUEZ        445     485     499
11
     JEREMY D'ERRICO        506     550     593
12
     JOSHUA HYLTON          599     623     646
13

14

15               E X H I B I T S

16                                            Page
     DEFENDANT'S EXHIBITS:
17
     No. 18      Federal Search Warrant Application   636
18
     No. 19      State Search Warrants & Application   632
19
     No. 24      Rodriguez Declaration            449
20
     No. 41      AZ Ex. 260                       283
21
     No. 43A     Privacy Policy - Redline         301
22
     No. 44      Jan. 2019 Privacy Policy - Redline   302
23
     No. 45      Oct. 2019 Privacy Policy - Redline   322
24
     No. 51      2019 NYT Article                 303
25

1

2 GOVERNMENT'S EXHIBITS:                                              Page

3 No. 1        CAST PowerPoint Presentation              515

4 No. 2        Geofence Warrant                          522

5 No. 3        Declaration of Marlo McGriff              375

6 No. 3A       Declaration of Sarah Rodriguez            486

7 No. 3B       Supplemental Declaration of McGriff       375

8 No. 3C       Third Declaration of Marlo McGriff        375

9 No. 4        Joshua Hylton Emails with Google          621

10 No. 5        Google Privacy Policy                     386

11 No. 5A       Google Terms of Service                   386

12 No. 6        Special Agent D'Errico's C.V.             511

13 No. 12       Video                                     395

14

15

16

17

18

19

20

21

22

23

24

25

281

1          (The proceedings in this matter recommenced

2     at 9:05 a.m.)

3          THE CLERK:  Day two.  Case No. 3:19CR130,

4     United States of America versus Okello Chatrie.

5          The United States is represented by

6     Kenneth Simon, Peter Duffey, and Nathan Judish.  The

7     defendant is represented by Laura Koenig, Michael

8     Price, and Paul Gill.

9          Are counsel ready to proceed?

10          MR. SIMON:  The United States is ready, Your

11     Honor.

12          MS. KOENIG:  The defense is ready, Your

13     Honor.  Good morning.

14          THE COURT:  All right.  Well, welcome back.

15     We have folks on AT&T.  So I just need to remind our

16     individuals who are joining us by conference call

17     through AT&T that we have a local rule, Criminal Rule

18     53, and a standing order that prohibits the separate

19     recording or transmission or broadcast of this

20     hearing.  We have our court reporter here making our

21     official court record, and there will be no other

22     record made in the case.

23          So thank you all again.  We're all ready to

24     go.  I see that Mr. McGriff is on the stand.

25          And, Mr. McGriff, I have to remind you that

1    you're still under oath.  And we will continue where

2    we left off yesterday.  Thank you all very much.

3              MR. PRICE:  Thank you, Your Honor.  Good

4    morning.

5              THE COURT:  Good morning.

6    BY MR. PRICE:

7    Q    Good morning, Mr. McGriff.

8    A    Good morning.

9    Q    How are you?

10   A    Doing well.  How are you?

11   Q    I'd like to start with just a bit of housekeeping

12   from the end of the day yesterday.  We were talking

13   about Defense Exhibit 41, which is an email chain from

14   January 28, 2017, in which Google employees are

15   discussing the language used to describe Location

16   History.  Do you recognize that email?

17   A    Yes, this is the email from yesterday.

18             MR. PRICE:  I would just move to admit this

19   into evidence, Your Honor.

20             THE COURT:  Is there any objection?

21             MR. SIMON:  No objection, Judge.

22             MR. PRICE:  Thank you.

23   BY MR. PRICE:

24   Q    Now, yesterday you --

25             THE COURT:  I'm just going to say on the

 1   record that it's entered.  We all know it is, but I

 2   hadn't gotten to that page of your exhibit list yet.

 3   Pardon me.

 4           (Defense Exhibit No. 41 is admitted into

 5   evidence.)

 6   BY MR. PRICE:

 7   Q    Yesterday you testified that you didn't know the

 8   precise number of users with Location History enabled

 9   in 2019?

10   A    No, I do not know that precise number.

11   Q    But you did say in your affidavit that roughly a

12   third of active users had Location History enabled in

13   2019?

14   A    Active Google accounts, yes.

15   Q    And that that amounted to numerous tens of

16   millions of Google users.  Could you walk us through

17   how you got to that figure, one-third and numerous

18   tens of millions?

19   A    At the time that that was being prepared, we

20   looked at the total number of users who had Location

21   History enabled for their account.  That figure was

22   prepared over a year ago.  I believe we also looked at

23   the number of active Google accounts.  And then I

24   believe we also looked at, for Location History

25   specifically, whether or not the account was active.

McGRIFF - DIRECT                    284

1    Q    Okay.  Do you recall what the whole number with

2    Location History enabled was?

3    A    I don't recall the whole numbers.  Again, we

4    prepared those, at this point, well over a year ago.

5    Q    So you came out with the figure of one-third.  How

6    did you figure out the denominator?

7    A    We looked at the total number of Google accounts

8    as provided by that team, and we asked at the time for

9    the life of the product.  The number has always

10   roughly been a third.  And so when we were preparing

11   the -- I believe it was the first brief, and then also

12   my first declaration, we verified all the numbers

13   again, and it was still roughly a third.

14   Q    But you have no recollection of what that number

15   was?

16   A    I could not recall that number off the top of my

17   head.  I'm sorry.

18   Q    So within 50 million?

19   A    I do not recall that number off the top of my

20   head.  I'm sorry.

21   Q    All right.  Shift gears a little bit.  I want to

22   call your attention to your third exhibit or your

23   third declaration, which is Exhibit 23, the second

24   page, in which you say Google's records reflect that

25   Okello opted in to the Location History service on

1    July 9, 2018; is that correct?

2    A    That is what it says, yes.

3    Q    At 4:09 UTC?

4    A    That is what it says, yes.

5    Q    And Location Reporting was enabled at the same

6    time?

7    A    That is correct, yes.

8    Q    And that can only happen, according to your

9    declaration, when the opt-in occurs through a device

10   based consent flow?

11   A    That is correct.

12   Q    In other words, you can't -- you can say you're

13   sure it happened on the phone and not on a browser on

14   a desktop?

15   A    That's correct, yes.  Excuse me.  Just to clarify.

16   That it happened on that specific device, yes.

17   Q    Thank you.  On the third page, you say that you,

18   as in Google, does not have a record of the specific

19   interface, i.e., the particular application or setting

20   opt-in screen that Mr. Chatrie used to enable Location

21   History; is that correct?

22   A    That is correct, yes.

23   Q    But as of July 9, 2018, it was possible to opt in

24   to Location History when attempting to use a feature

25   powered by Location History.  That's what you wrote?

1  A    That is correct, yes.

2  Q    And it's true?

3  A    That is true, yes.

4  Q    An example would be the Google Maps application?

5  A    That is correct, yes.

6  Q    Another example would be the Google Photos

7  application?

8  A    That is correct, yes.

9  Q    And another example would be the Google Assistant

10 application?

11 A    At that time we were removing the opt-in through

12 Assistant.  I think one of the things we were looking

13 into was it still possible on that exact date, but

14 there was support roughly in that time period to opt

15 in to Location History through Assistant, yes.

16 Q    You don't mention Google Assistant in your

17 application, do you, or in your declaration?

18 A    In my application --

19 Q    Your declaration, sorry.

20 A    In my declaration, I don't believe I mentioned an

21 exhaustive list of opt-ins.

22 Q    Okay.  And just to be clear, Location History

23 could have been enabled here through the Google

24 Assistant setup?

25 A    That is possible, yes.

McGRIFF - DIRECT                287

1    Q    Okay.  The defense has an expert opinion saying

2    that based on a forensic examination of the phone,

3    Location History was enabled through the Google

4    Assistant app, which was installed at virtually the

5    same time.  You don't have any information to dispute

6    that, do you?

7    A    I do not, no.

8    Q    All right.  So with that in mind, I want to go

9    back and try and clear up a little bit of confusion

10   from yesterday.  You said that you didn't remember if

11   Google had changed its privacy policy on May 25, 2018;

12   is that correct?

13   A    I did not -- I do not recall any location specific

14   changes in the privacy policy in May 2018, that is

15   correct.

16   Q    Okay.  Now, if you were to look at a list of

17   Google's past privacy policies and see those redlines,

18   would that refresh your recollection?

19   A    Possibly.  I don't often browse the broader

20   company privacy policy.

21   Q    Okay.  I'd like to show you a screenshot, if I

22   could, of one of Google's web pages that has a list of

23   all of the previous privacy policies in it.  Do you

24   recognize that?

25   A    I see that this is the privacy policy's page, yes.

McGRIFF - DIRECT                    288

1  Q    Okay.  And it's helpful, actually.  It includes

2  versions showing track changes, comparing one version

3  to the other.  Can you take a look at the bottom of

4  the page and tell us whether Google changed its

5  privacy policy on May 25, 2018?

6  A    That is what the page suggests, yes.

7  Q    And the previous policy that had been in effect

8  since December was in effect since December 18, 2017?

9  A    That is what the page suggests, yes.

10  Q    So if you click on the link for comparison of

11  these two policies, you get something that looks like

12  this.  It's a redline of the new privacy policy

13  compared to the old one.  Does that look correct to

14  you?

15  A    That is correct, yes.

16  Q    So if we go and we look at this comparison, the

17  previous privacy policy didn't mention Location

18  History by name; is that correct?

19  A    Where's the comparison, sir?

20  Q    Oh, I'm sorry.  Can you please turn your attention

21  to what has been marked as Defense Exhibit 43A.  This

22  is the same -- you should have a copy of the document.

23  This is the same document we were looking at

24  yesterday.  It has the Google web page and link at the

25  bottom.

 1              MR. SIMON:  Judge?

 2              THE COURT:  Yes.

 3              MR. SIMON:  I'm going to object to, I think,

 4    the continued insistence despite the witness's

 5    consistent answer.  He says May 2018 wasn't the first

 6    time Location History, to his knowledge, was in a

 7    privacy policy.  They keep showing him May of 2018,

 8    not December of 2017.  If defense counsel is insisting

 9    upon this, put them both next to him, let him look at

10    both policies, and then he can assess.  But I think

11    this redline is -- he's inserting his opinion that the

12    redline, the new words are all inserted as of May of

13    2018.  And there's no indication from just looking at

14    it that that's true.  So I'd ask for more context be

15    given to the witness about these two policies.

16              THE COURT:  I'm going to allow him to use

17    this document for whatever it's worth.  It doesn't

18    independently show up that the December 18th policy

19    existed without this document in it necessarily.  But

20    I think that can be argued one way or the other as far

21    as what inference can be drawn from the document.  And

22    you have argued your inference, and they are arguing

23    theirs.

24              If they have a separate document, then they

25    will respond to your objection, but if this is the one

McGRIFF - DIRECT                    290

1    they're using, then you all will each retain your

2    positions.  So I'm going to overrule the objection.

3            MR. SIMON:  Understood, Judge.

4            MR. PRICE:  Thank you, Your Honor.

5    BY MR. PRICE:

6    Q    So the document that you have here is a comparison

7    of those two provided by Google; correct?

8    A    That is correct.

9    Q    And the crossed out lines, that's the language

10   that was taken out from the December 2017 policy?

11   A    It appears that way, yes.

12   Q    And the language that's not crossed out is the

13   policy in effect as of May 2018?

14   A    That is what it appears to show, yes.

15   Q    I'd like to turn your attention to page 6, if I

16   could.  It says --

17           THE COURT:  Let him get there.

18           MR. PRICE:  Excuse me.

19   BY MR. PRICE:

20   Q    It says at the bottom of the screen there, "You

21   can also turn on Location History if you want to save

22   and manage your location information in your account";

23   correct?

24   A    That is correct, yes.

25   Q    And that is new language that didn't appear in the

McGRIFF - DIRECT                291

1    2017 policy; correct?

2    A    That appears correct.  One question.  Can you go

3    back to the policy's page that you were showing with

4    the comparison?

5    Q    Sure.

6    A    The top of the page.  I believe all of this

7    language is captured under "technologies" to the

8    right.  I don't know if this is an active page or just

9    a screenshot.

10              THE COURT:  So, I see you're interacting with

11   the screen.

12              THE WITNESS:  Sorry.

13   A    I believe this language is -- it appears very

14   familiar from the technologies section of the privacy

15   and terms.  I don't know if this is a screenshot --

16   Q    It's a screenshot.  It's not clickable.  So long

17   as we're talking about it, it may make sense to ask

18   you, the technologies page that you see here is

19   distinct from the privacy policy part of this page;

20   correct?

21   A    It is a separate section, yes.

22   Q    And the information in the technologies page is

23   not actually in the privacy policy's page; correct?

24   A    I believe that's what was done here with this

25   change, that's correct, yes.

McGRIFF - DIRECT                292

1   Q    Thank you.  So, I want to turn your attention back

2   to that redline of the privacy policy and specifically

3   to page 12.

4            THE COURT:  Page 12 now, not page 6?

5   BY MR. PRICE:

6   Q    So, on page 12, it mentioned Location History one

7   other time.  It says, You can turn on Location History

8   if you want traffic predictions for your daily commute

9   or you can save your YouTube watch history to get

10  better video suggestions.

11  A    That is what it says, yes.

12  Q    I want you to take a look at this document and

13  tell me if it says anything else about Location

14  History.

15  A    All 25 pages?

16           THE COURT:  Yes.

17  Q    Yes, please.

18           MR. PRICE:  Your Honor, while we're taking a

19  minute, I wanted to let you know that I'm getting word

20  from my colleagues at NACDL that people on the phone

21  cannot hear what is happening, that they were able to

22  hear at the beginning and that the audio stopped.

23           THE COURT:  Okay.  Just a second.  We'll call

24  IT.  Thanks for letting us know.

25           (AT&T is called.)

McGRIFF - DIRECT                293

1    A    That appears to be correct.  There are two

2    explicit references to Location History in the policy

3    as revised, yes.

4    Q    Thank you very much.  And those are both new

5    editions to the privacy policy?

6    A    It appears that (inaudible.)

7              THE COURT:  Wait a minute.  My court reporter

8    can't get this while the AT&T operator is talking.

9              Okay.  We'll just take a little break.  I'm

10   sorry.

11             THE CLERK:  Are folks able to hear us now?

12             A VOICE:  Yes, we can hear you now.

13             THE COURT:  All right.  Has anybody new

14   joined?  Do I need to give the same admonition?

15             THE CLERK:  I don't know the answer to that.

16             THE COURT:  All right.  I'm sorry.  We had a

17   technical drop of the call.  I do need to remind

18   anybody, if there are new folks there, that you can't

19   under our Criminal Rule 53 or our standing order

20   rebroadcast, record, or telecast any kind of recording

21   or version of this hearing.  Our court reporter is

22   creating our record here.

23             All right.  So why don't you ask the last --

24   I know, Mr. McGriff, you answered the question.  So

25   why don't we start with that, and then we can go

1    forward.

2    A    There are two -- the two references you mentioned

3    are the two mentions of Location History explicitly in

4    the updated version, yes.

5    Q    Thank you.  And those appear to be new editions to

6    the privacy policy?

7    A    That is correct, yes.

8    Q    And the privacy policy doesn't say anything else

9    about Location History other than those two

10   references?

11   A    Yes, the privacy policy appears to include quite a

12   bit of additional information generally, yes.

13   Q    Thank you.  So at some point in 2018, what you

14   were calling yesterday the descriptive text for

15   Location History changed; correct?

16   A    What I was mentioning yesterday is that that

17   language changed, I believe, before 2018, yes.

18   Q    The language changed before 2018?

19   A    That is what I believe based on the document you

20   showed me yesterday, yes.

21   Q    You mean the email?

22   A    The email, yes.

23   Q    And did you see the screenshots from yesterday?

24   A    I did, yes.

25   Q    With the old language, the saves a private map

1    language going through the beginning of 2018 and the

2    saves where you go with your signed-in devices

3    appearing later in 2018?

4    A    I did see those, yes.

5    Q    You would agree that the language changed at some

6    point?

7    A    The language changed at some point within 20- --

8    at some point from 2017 onward, yes.

9    Q    But you can't say exactly when?

10   A    Not off the top of my head, no.

11   Q    Would it depend on the device that somebody was

12   using?

13   A    It would depend -- after the change is made, there

14   are a host of variables that can impact when a

15   specific user saw that change.  As I mentioned

16   yesterday, if I leave here right now and pick up any

17   device that has been sitting on a shelf for three

18   years, the language when that device starts up would

19   be dated to when it was baked into the device.

20   Q    Can I ask you about that?  I was confused

21   yesterday when you said that because my understanding

22   is that you would have to be connected to Wi-Fi and

23   signed in to your Google account in order to even be

24   asked about the permissions for Location History.  Is

25   that correct?

1    A    You would need to be signed in and connected to

2    opt in to Location History, that's correct.

3    Q    And if you were connected to the internet and

4    signed in, the phone would update itself; correct?

5    A    Presumably, yes, that's correct.

6    Q    In fact, one of the first things a phone does when

7    it connects to the internet for the first time is

8    update itself; correct?

9    A    Not all screens and flows are updated, no.

10   Q    So you can't say which consent flow would have

11   been updated when?  It varies?

12   A    Not -- I mean, I don't know how to generalize this

13   statement, but there is not a call to the server for

14   every screen shown in almost any scenario.  Some of

15   that will be local.

16   Q    So sometimes it will update with new language and

17   sometimes it won't?

18   A    No.  The consent copy will not -- is read from

19   the -- well, again, I shouldn't generalize this.

20   Speaking about Location History specifically, you can

21   find a flow that references Location History, the

22   feature, that is baked into an APK.

23   Q    I'm sorry?  What?

24   A    You can find a flow that approaches the feature

25   that says Location History does this.  That is

1    potentially dated.  If it is not a screen that we can

2    update on the server remotely, if it's not checking to

3    get updated copy, those stale flows is what I would

4    call it, we block those.  So those will not work.

5    There's no way to opt in to that flow, but we are also

6    unable to go and change that screen retroactively

7    because it is already baked into the user interface.

8    Q    So if it's an old consent flow, if it's one that's

9    no longer supported, could Location History be

10   successfully enabled?

11   A    It cannot, no.

12   Q    So, in order to successfully enable Location

13   History, the language would have to be updated?

14   A    A successful opt-in needs to be a flow that is

15   currently supported.  If we no longer support the

16   flow, then that opt-in would fail silently, but,

17   again, because it's old.  We don't have a way to

18   return a message in the UI to tell the user that it

19   failed.

20        The user would attempt an opt-in.  It would fail

21   silently.  The server would say "I have an opt-in

22   request from a dated device."  And it will not

23   successfully opt the user in.  The user then would

24   notice that this happened only if they then attempted

25   another flow and were once again prompted to opt in to

McGRIFF - DIRECT                 298

1   Location History.  The user would realize "I thought I

2   already did," but they hadn't, and that's why they

3   would be prompted again.

4   Q    So we know in this case that Location History was

5   successfully opted into?

6   A    That is correct, yes.

7   Q    So in order to do that, it would have been through

8   the updated consent flow?

9   A    It would have been through a currently supported

10  consent flow, that is correct, yes.

11  Q    And that would have been, at least for the

12  descriptive text, what language?

13  A    I don't know how.

14  Q    Would it be the

15  saves-where-you-go-with-your-devices or would it be

16  the creates-a-private-map language?

17  A    It would be some iteration of the copy that was

18  available at that time.  I don't know how I can

19  confirm that.  I remember from the research that we

20  did when I filed the declaration that we were not able

21  to determine the specific UI in that case.  Something

22  that we've changed since then.  We now do track this.

23  But at the time we were not.  So we were unable to

24  provide this specific screen of that opt-in at that

25  time.

McGRIFF - DIRECT          299

1   Q    Okay.  All right.  Thank you.

2        Even though that language may have changed at some

3   point in time, getting rid of the private map

4   language, Google kept it around; correct?  It added it

5   to its 2019 privacy policy January 22.  Do you recall

6   that?

7   A    That that specific copy string was used again?

8   Q    Actually, I would like to turn your attention to

9   Defense Exhibit 44.  This is another redline showing

10  changes between the privacy policies.  This one

11  showing the changes in January 22, 2019.  Is that

12  correct?

13  A    That is what this appears to show, yes.

14  Q    Okay.  And if we could go down to page 4, please.

15  We see that it says that prior to January 22, with the

16  crossed out language, it says -- it used to read, You

17  can also turn on Location History if you want to save

18  and manage your location information in your account.

19  Is that correct?

20  A    That's correct.

21  Q    The old language?

22  A    Yes.

23  Q    But the new language starting on January 22, 2019,

24  reads, You can also turn on Location History if you

25  want to create a private map of where you go with your

McGRIFF - DIRECT                    300

1   signed-in devices; is that correct?

2   A    That is correct, yes.

3   Q    So the private map language came back in January

4   of 2019?

5   A    I never said that it went away.

6   Q    Well, I meant compared to the descriptive text in

7   the consent flow.  It was changed, according to your

8   testimony earlier, that it changed at some point from

9   saves a private map to saves where you go; correct?

10  A    Again, as I mentioned yesterday, we are always

11  looking for ways to further improve and clarify

12  products.  That a specific string was introduced does

13  not necessarily mean a previous string was retired.

14  That the decision was made by someone to include one

15  string versus the other here does not suggest that the

16  other string was deemed no longer usable or invalid.

17  The decision here on -- whoever made the decision on

18  which string to include here felt this was the best

19  for this context.

20  Q    In your opinion, is there a big difference between

21  those two phrases?

22  A    Between -- just to be clear, which two phrases?

23  Q    Saves a private map of where you go and saves

24  where you go with your device.

25  A    Big difference?  Neither changes -- either would

McGRIFF - DIRECT                    301

1    be appended to the Location History consent, and that

2    text did not change in this period.  There seems to be

3    a limited difference in my opinion on these two.

4    Q    Okay.  Thank you.  So even though it says "create

5    a private map of where you go with your signed-in

6    devices," and this is in the privacy policy, the data

7    that gets saved doesn't get saved just on the device;

8    right?

9    A    No.

10   Q    It gets sent to Google?

11   A    That is correct, yes.

12   Q    Who uses it for advertising?

13   A    We use it at the account level to power quite a

14   few features, yes.

15   Q    And sometimes give it to the government?

16   A    We will always comply with a warrant.

17   Q    Okay.  Thank you.

18          MR. PRICE:  Just one housekeeping thing, Your

19   Honor.  I would like to move to admit both Defense

20   Exhibit 43A as well as Defense Exhibit 44 into the

21   record.

22          THE COURT:  Any objection?

23          MR. SIMON:  No objection, Judge.

24          THE COURT:  All right.  They will be entered.

25          (Defense Exhibit No. 43A and Defense Exhibit

McGRIFF - DIRECT                    302

1    No. 44 are admitted into evidence.)

2    BY MR. PRICE:

3    Q    Okay.  So I'm sure you're aware that the *New York*

4    *Times* published an article about Location History in

5    April of 2019.

6    A    Yes, I'm aware of that.

7    Q    So I'd like to show you Defense Exhibit 51.  Is

8    this the article?

9    A    This is the article, yes.

10            MR. PRICE:  Your Honor, I'd move to admit

11   Defense Exhibit 51 into evidence.

12            THE COURT:  Any objection?

13            MR. SIMON:  Judge, we would object to

14   entering this article.  I think the relevance of it is

15   not there, Judge.  And I think it also is basically

16   attempting to enter a legal opinion, various legal

17   opinions, through this article.  He can question on it

18   as background information, Judge, but I think, again,

19   this just opens the record to, I think, even the

20   government putting articles in the record that show

21   the efficacy of solving violent crimes using this

22   warrant.  I'm just not sure why an article like this

23   is necessary to but in the record.

24            MR. PRICE:  Once again, we're not introducing

25   it for the truth of the matter.  We're not going into

McGRIFF - DIRECT                303

1   any detail about what the article says.  Our interest

2   here is in Google's response to it.

3            THE COURT:  All right.  Well, I'll allow it

4   in for that limited purpose.  It certainly is a public

5   record.  I am going to say, Mr. Price, I want you to

6   be consistent about not appearing that you are

7   entering it in for the truth of the matter.

8            MR. PRICE:  I will note that the next time,

9   Your Honor.  Thank you.

10           THE COURT:  So the objection is overruled.

11           (Defense Exhibit No. 51 is admitted into

12   evidence.)

13   BY MR. PRICE:

14   Q    The title of the article is "Tracking Phones,

15   Google is a Dragnet for the Police"?

16   A    Yes, that is the title of the article.

17   Q    And the article's about geofence warrants like the

18   one in this case?

19   A    That is correct.

20   Q    And it specifically talks about Location History?

21   A    It does mention Location History, yes.

22   Q    Thank you.

23           MR. PRICE:  Your Honor, I hate to do this,

24   but I'm getting word again that the phone line has

25   gone dead.

McGRIFF - DIRECT                    304

1              THE COURT:  All right.  We're going to need

2     to not continue questioning while that happens.  Maybe

3     we can get IT in, please.

4              (AT&T is called.)

5              THE CLERK:  Can everyone hear us on the call?

6              A VOICE:  Yes.

7              THE COURT:  Can I ask you all, is there

8     something you hear before the phone call drops?

9              A VOICE:  No.

10             THE COURT:  And everybody has dropped off the

11    phone call, not just some?

12             A VOICE:  Yes.  I checked with a separate

13    party.

14             THE COURT:  All right.  So we're going to

15    call in our IT department and have them checking this

16    hopefully in a way that doesn't interrupt the flow of

17    our questioning here.  I have no idea what's

18    happening.  We have not had this problem before,

19    certainly with our AT&T system, but because of how

20    we're operating, I need to remind you all that you

21    can't rebroadcast this or record it pursuant to our

22    local rule and our standing order.

23             Ms. Koenig?

24             MS. KOENIG:  Your Honor, I just stood up

25    because I know that the Federal Public Defender Office

1    was having a widespread VPN connection problem earlier

2    this morning.  And so since we are also connected with

3    the judiciary, I don't know if it's a broader --

4         THE COURT:  I hear the Federal Public

5    Defender was having a widespread blah, blah, blah.

6         MS. KOENIG:  A broader VPN connection

7    problem.  So employees are remotely connecting in to

8    our servers.  And that was earlier today.  I think the

9    systems are separate, but I don't know if it indicates

10   maybe a broader issue with the AT&T connections that

11   are connected with the judiciary as well.

12        THE COURT:  All right.

13        Certainly, we'll have our IT folks look into

14   it, and we're doing the best -- we do have to keep

15   this process moving.  So I'm going to ask you to keep

16   questioning, please.

17        MR. PRICE:  Thank you, Your Honor.

18   BY MR. PRICE:

19   Q   So, Mr. McGriff, you're aware that the *New York*

20   *Times* article we were just talking about prompted

21   another email exchange between Google employees?

22   A   Is there a specific change you're referring to?

23   Q   Let me show you Defense Exhibit 37.  It's an email

24   chain that begins, I believe, the same day that the

25   *New York Times* article was published.

McGRIFF - DIRECT          306

1   A    Yes, I see that email, yes.

2   Q    Do you recognize it?

3   A    I can't say I recall it specifically, but that is

4   not to suggest that I may not have seen it in the

5   past.

6   Q    You would have been aware of emails responding to

7   the Location History story; correct?

8   A    Sorry.  Are you asking me about this specific

9   exchange?

10  Q    Generally.  You're aware of the other emails?

11  A    I'm aware that the article was discussed, yes.

12  Q    Okay.  And it was discussed here as well?

13  A    That appears to be the focus of this exchange,

14  yes.

15  Q    Thank you.

16         MR. PRICE:  Your Honor, I'd like to move

17  Defense Exhibit 37 into evidence, please.

18         MR. SIMON:  Judge, I'm not going to object

19  because, again, we've let these Google emails in.

20  These are cherry-picked emails from Arizona litigation

21  by Arizona.  This particular email has some back and

22  forth expressing legal opinions that not even this

23  witness or any witness that comes before this Court

24  will be able to express.

25         I think the Court should remove any opinions

McGRIFF - DIRECT                    307

1    about this search warrant that are expressed in any of

2    these emails.  And I think this is the email where you

3    will have a lot of back and forth about the propriety

4    of it.  And I think, again, it's creating a record in

5    which you have folks who won't testify before this

6    Court, who can't be cross-examined, who are expressing

7    opinions about issues of material fact in this case.

8            So I would object to this email being

9    wholesale introduced, particularly as it relates to

10   opinions about the geofence warrant before the Court.

11           MR. PRICE:  Your Honor, the relevant opinions

12   in this email chain just relate to confusion over

13   Location History.  Again, we're not admitting it for

14   anybody's true statement about what Location History

15   does or doesn't do.  Simply to show that Google

16   employees were concerned, confused, and that's all.

17           THE COURT:  So you don't intend to quote

18   this?

19           MR. PRICE:  I do, but not for technical

20   statement or legal opinion.

21           MR. SIMON:  Judge, without that point -- not

22   to continue down this line, but we consistently

23   concede when they make that point, the reality is,

24   Judge, if that is proceeded with in depth, I don't

25   think they can come up with a nontruth-of-the-matter

McGRIFF - DIRECT                    308

1    defense for these emails, particularly one talking

2    about a *New York Times* article addressing the geofence

3    warrant before -- the type of warrant before this

4    Court.  They are quoting from the article.  Some

5    expressing, Oh, this seems like a problem, and others

6    saying, Well, it doesn't.

7              I just think this sort of legal discussion in

8    emails in a record of appeal without clarification

9    creates a lot of confusion that I don't think we ought

10   to put into the record.

11             MR. PRICE:  If I quote a statement like that,

12   Mr. Simon can object.

13             THE COURT:  His point is it's in the record,

14   right?  His point is that when you put in these

15   documents in full, then it's in the record, and so

16   that anybody reading it would be reading the -- not

17   just, oh, it's for the purpose of confusion.  It's

18   that they're saying there's a problem.

19             I have not read through these emails in

20   depth.  I've certainly looked at all of your exhibits.

21   And I am -- I have some concern, especially the way

22   you've been cross-examining this witness by quoting

23   parts of the documents, that it feels as if you are

24   suggesting that the words in the documents are what

25   you are trying to put into the evidence.

McGRIFF - DIRECT                    309

1          What you're having this witness say in

2    response is "I see those words are there."  I'm not

3    sure what you're getting out of that.

4          So I'm going to tell you, I'm going to admit

5    it for the limited purpose, but I'm also leaving open

6    the possibility of it being redacted or removed from

7    the record based on how it is utilized in the future.

8          But, you know, you're walking a thin line

9    here, Mr. Price.  I keep telling you, don't quote the

10   documents as if you are trying to get this witness to

11   adopt what's in them.  I know this is Exhibit 224 from

12   the Arizona case.  It says that.  Everybody is open

13   about it.  And the government is recognizing that this

14   is already a public record somewhere.  But I can tell

15   you, it doesn't say who's involved.  It doesn't say

16   what their position is.  It doesn't say in what

17   context that these emails went back and forth.  We

18   have no foundation for these emails in this court.

19   And this witness saying "I see that's what this

20   document says" is not moving this case forward very

21   much.

22          I am hoping that you will convince me in how

23   you are asking questions about these documents in the

24   future that you are not quoting certain quotes here

25   that feel as if you are trying to put in the record

McGRIFF - DIRECT                    310

1    that Google has made admissions.  Okay?

2           MR. PRICE:  Yes, Your Honor.  The point

3    simply is that --

4           THE COURT:  No, you don't get to summarize

5    the point.  You're not testifying here.  Either you

6    make the point through the witness or you don't.

7           All right.  Please go forward.

8    BY MR. PRICE:

9    Q   Mr. McGriff, are you aware that some Google

10   employees expressed confusion over Location History

11   controls following the *New York Times* article?

12   A   I see that's what's discussed in this email, yes.

13   Q   And were you aware at the time that some employees

14   were concerned and confused over Location History

15   following this article?

16   A   I am aware at the time that discussion was had

17   about this article, yes.

18   Q   So when Google expressed confusion on page --

19   well, this is going to be Bates 63211 to 63212.  And

20   that person writes, "I'd want to know which of these

21   options (some? all? none?) enter me into the

22   wrongful-arrest lottery.  And I'd want that to be very

23   clear to even the least technical people."

24       Is that Google employee expressing confusion over

25   the Location History settings and concern?

McGRIFF - DIRECT                   311

1   A    I have no idea what, from this snippet, this

2   person was attempting to convey.

3   Q    The person didn't know which of the options were

4   available to disable Location History?

5   A    I don't believe --

6        MR. SIMON:   Judge, I'm only going to say this

7   because I think it's the way that the examination has

8   been happening with this witness throughout.   The

9   witness answered that question.   He didn't get the

10  answer he liked.   He is now going back and asking him

11  the same question again.   So is this what he meant?

12  Is this what he meant?   He says "I have no idea."   I

13  don't know how you get away from "I have no idea."

14  But the objection is asked and answered, Judge.

15       MR. PRICE:   I'll move on.

16       THE COURT:   Okay.

17  BY MR. PRICE:

18  Q    Could I turn your attention to page 63213?   That's

19  Bates 63213.

20       THE COURT:   I'm sorry.   What exhibit are you

21  in again?   My apologies.

22       MR. PRICE:   This is Defense Exhibit 37, Your

23  Honor.   It's page 10 of the PDF, Bates No. 63213.

24       THE COURT:   So it's Exhibit 215 from the

25  Arizona.   I misspoke earlier.

McGRIFF - DIRECT                    312

1    BY MR. PRICE:

2    Q    I just want to draw your attention to one other

3    part of this email chain where another Googler

4    responding to the same thread says, "Speak as a user,

5    WTF?  More specifically I thought I had location

6    tracking turned off on my phone.  However the location

7    toggle in the quick settings was on.  So our messaging

8    around this is enough to confuse a privacy focused

9    Google-SWE.  That's not good."  Do you see that there?

10   A    I see that is what's written here, yes.

11   Q    What's an SWE?

12   A    Software engineer.

13   Q    So this is a Google software engineer expressing

14   confusion over the settings for Location History; is

15   that correct?

16   A    This is a -- what is written here is that this is

17   a Google software engineer.  It is not clear to me

18   that they are specifically referring to Location

19   History.  The location toggle that's being referenced

20   here, the toggle that appears in settings at the

21   device level is the Location Master which controls

22   location for the device, which is distinct and

23   separate from Location History.

24   Q    Right.  He seems to be very confused; right?

25   A    Well --

McGRIFF - DIRECT                313

1   Q    The article that he's responding to is the *New*

2   *York Times* article which talks about Location History,

3   correct?

4   A    This article talks about location usage and

5   collection, including Location History.  This exchange

6   specifically mentions multiple settings that control

7   different levels, what access, and type of location

8   information Google has access to.  That statement

9   specifically suggests, from what's written here, does

10  not suggest that it's explicit to Location History.

11       So I would say, yes, this is a Google software

12  engineer expressing some thoughts on a location

13  toggle, which is not specified to be Location History

14  in this context.

15  Q    Okay.  Thank you very much.

16       You're aware that the *New York Times* article

17  prompted another congressional inquiry; is that

18  correct?  In 2019?

19            THE COURT:  Can we be specific?  You have now

20  introduced a second *New York Times* article; am I

21  right?

22            MR. PRICE:  No, this is the only *New York*

23  *Times* article.

24            THE COURT:  It's all April 15?

25            MR. PRICE:  Yes, Your Honor.

McGRIFF - DIRECT                    314

1          THE COURT:  Just a different version.  All

2     right.

3          THE WITNESS:  Which inquiry are you referring

4     to?

5     Q    Can I show you Defense Exhibit 54, please.

6     Shortly after the *New York Times* article ran, the

7     House Committee on Energy and Commerce sent a letter

8     to Google's CEO on April 23, 2019.  Is that correct?

9     A    That is what this exhibit shows, yes.

10    Q    And this is the letter that was sent to Google's

11    CEO?

12    A    That is correct, yes.  Can I ask one

13    clarification?

14    Q    Yes.

15    A    When you say "inquiry," you mention that you

16    also -- there was another inquiry you mentioned

17    yesterday.  What do you mean by "inquiry"?  Just a

18    general outreach with questions or do you mean

19    something more formal?

20    Q    I don't think I had a specific definition.  This

21    letter expressed some concern about Sensorvault and

22    the database Google uses.  That's the database Google

23    uses to store Location History?

24    A    That's correct, yes.

25    Q    Thank you.

McGRIFF - DIRECT                    315

1          Following the *New York Times* article, Google made

2     even more changes, some of which you discussed in your

3     blog post; correct?

4               MR. PRICE:  Excuse me, Your Honor.  I would

5     move to admit the House letter into evidence for the

6     limited purpose of its existence.

7               MR. SIMON:  Judge, we're going to object on

8     relevance grounds, not merely hearsay.  I think beyond

9     that, Judge, in the interest of fairness, defense

10    counsel, at the very least, ought to find Google's

11    response to these questions and put it in the record

12    as well if we're going to put this letter in.  And we

13    at least have that with the Senate letter that also

14    wasn't relevant, but they are questions directed to

15    Google that they -- if we're going to put sort of

16    hearsay into the record on this point, that would be

17    helpful.  But the objection is relevance.  I don't see

18    the point of congressional leaders asking questions to

19    major corporations, how that plays into this hearing.

20              THE COURT:  So, I'm going to overrule the

21    objection as to purported relevance.  It's clear that

22    the defense has a theory that either it's going to

23    shore up or not with respect to how Location History

24    notifications or operations changed.

25              I do agree, though, that -- so it will be for

McGRIFF - DIRECT                    316

1   establishing its relevance in greater context later.

2   And for the limited purposes that we're talking about.

3   I do agree, though, that in fairness, the answer

4   should go in absent objection from Google.

5           And so you sent in a Senate inquiry also, and

6   I think some of the responses were there.  But I want

7   you to work with the Assistant United States Attorney

8   and counsel for Google about whether or not they want

9   to shore up any responses.  That strikes me as a more

10  fulsome record than what you've offered, and you don't

11  necessarily have to offer that, but now that it's been

12  raised, I think we should close the loop.  All right?

13          MR. PRICE:  Thank you, Your Honor.

14          Just to clarify, the Senate letter was a

15  request to the FTC for an investigation.

16          THE COURT:  Right.  Right.  Well, the

17  responses that you submitted were responses to what?

18          MR. PRICE:  The request for an investigation

19  included an attachment, which was a previous letter

20  that Google -- that the senator had sent to Google

21  seeking further clarification.

22          THE COURT:  All right.  So, I'm going to have

23  you all agree.  That's the problem with this, Mr.

24  Price.  Right?  If they are using the phrase

25  "cherrypick," you are allowed to advocate, but if you

McGRIFF - DIRECT                317

1    get called on it, I'm telling you, make a full and
2    fair record.  So I'm going to allow you all to caucus
3    about that, and then place on the record what your
4    decision was or Google's position is and then I will
5    make a final ruling.
6              MR. PRICE:  Thank you.
7              THE COURT:  Thanks.
8    BY MR. PRICE:
9    Q    Okay.  So we've got the *New York Times* article as
10   well as the AP article we talked about the day before,
11   the year before --
12             THE COURT:  I was thinking the AP article.
13   I've got it.  Okay.
14   BY MR. PRICE:
15   Q    And in response to this feedback, was this the
16   feedback you were describing in your blog post when
17   you talked about some of the changes that Google was
18   making to improve Location History?
19   A    These are a few of several signals of feedback
20   that we receive on a regular basis, yes.
21   Q    Okay.  Thank you.  As a result of that feedback,
22   Google made some more changes to the way Location
23   History functions, the controls for users?
24   A    I am not aware of a point in time in the life of
25   the product that we have stopped making improvements

1    and changes to the product.

2    Q    Okay.  One of those changes that you made was the

3    new auto delete function that you wrote about in your

4    blog post; correct?

5    A    Auto delete was not a change specific to Location

6    History.  It was rolled out at this point to several

7    Google products, yes.

8    Q    But it applies to Location History?

9    A    It does apply to Location History, yes.

10   Q    And in your blog post, you were discussing it in

11   the context of Location History?

12   A    In the blog post, it's discussed both in the

13   context of Location History and search.

14   Q    Okay.  I want to ask you about that deletion

15   process, though.

16   A    Yes.

17   Q    Even if a user deletes their Location History

18   data, it doesn't get deleted immediately, does it?

19   A    It's near immediate.

20   Q    There's a deletion process?

21   A    That is correct.

22   Q    And Google doesn't confirm that using Google's

23   tools for deleting location data will actually delete

24   that location data, does it?

25   A    Can you clarify what you mean by confirm?

McGRIFF - DIRECT                    319

1   Q    Sure.  Let me show you Defense Exhibit 45.  It's

2   the October 29, 2019, privacy policy redline, track

3   changes version.

4            THE COURT:  I'm sorry.  What exhibit again?

5            MR. PRICE:  Defense Exhibit 45.

6   BY MR. PRICE:

7   Q    It says Google added a caveat to the -- I want to

8   turn your attention to the "retaining your

9   information" section of the privacy policy.

10           MR. PRICE:  And for the Court, this is on

11  page 15 of the PDF.  The pages are not internally

12  numbered.

13  BY MR. PRICE:

14  Q    There's a section there that says "Retaining your

15  information"?

16  A    Yes.

17  Q    And this is a new section that was added based off

18  of the track changes that you see?

19  A    Expanded?

20  Q    Added.  Added.

21  A    The crossed-out copy here --

22  Q    That's the old language.  And the non-crossed out

23  copy is the new language.

24           THE COURT:  You know what?  He is saying it's

25  expanded.  And I think you can understand that what he

McGRIFF - DIRECT                    320

1    means is that this is longer text than was there

2    previously.  And so bantering with the language with

3    your witness --

4              MR. PRICE:  Maybe I misheard him.  My

5    apologies.  Excuse me.

6              THE COURT:  What?

7              MR. PRICE:  This is -- just that this was,

8    this language wasn't there before.  That's all.

9              THE COURT:  But that's not how you're

10   examining him.  So the way you cross-examine somebody,

11   without injecting your own opinion necessarily, is you

12   say that there's a paragraph that is blocked out;

13   correct?  Correct.  Is it anywhere else in the

14   retaining your information?  No.  Are there paragraphs

15   that are not blocked out?  Yes.  Would that possibly

16   be new information?

17             You don't banter with him about the answers

18   that he's giving you.  The answers that he has given

19   you are the answers that he has given you.  You cannot

20   inject functionally your own opinion about which word

21   is right.  You can cross-examine him so he adopts it,

22   but you cannot inject your own opinion.  Okay?

23             MR. PRICE:  Yes, Your Honor.

24   BY MR. PRICE:

25   Q    I would just like to turn your attention to the

1  language that says "When you delete your data, you

2  follow a deletion process."  Do you see that there?

3  A    Yes.

4  Q    It says, "We follow a deletion process to make

5  sure that your data is safely and completely removed

6  from our servers or retained only in anonymized form";

7  is that correct?

8  A    Yes.

9  Q    And when it says "retained," that's a little bit

10  different than "deleted," isn't it?

11  A    That somehow the transformed data is retained.

12  There's a subtle difference there.  It notes that it's

13  only an anonymized form.

14  Q    So it gets deleted through the deletion process

15  but retained in anonymized form?

16  A    The privacy policy is the privacy policy for

17  Google.  For Location History, it is deleted.  This is

18  generalized to speak to the company-wide policies and

19  practices.  In the case of Location History

20  specifically, it is deleted.

21  Q    So it's deleted from the Location History

22  database?

23  A    That's correct, yes.

24  Q    But it's retained in a different database?

25  A    No, that's not correct.

McGRIFF - DIRECT                     322

1    Q    In anonymized form?

2    A    No.  So, this policy speaks to Google's broader

3    company-wide policies.  What this is specifically

4    noting is that in the deletion process, some

5    information might be retained in anonymized form.

6    What that's referring to is not explicitly referring

7    to Location History.

8         Location History information is also deleted by a

9    process.  There's a single store for that, as

10   mentioned in the last exhibit, Sensorvault.  That

11   deletion is permanent and final.

12   Q    Where is anonymized data that's retained, stored?

13   A    I can't speak to the broader company policy and

14   what specifically they're referring to there.  It's a

15   data type that is outside of my scope.

16   Q    Okay.

17        MR. PRICE:  Your Honor, I would like to admit

18   Defense Exhibit 45, the privacy policy, into the

19   record, into evidence.

20        MR. SIMON:  No objection, Judge.

21        THE COURT:  All right.  It will be entered.

22        (Defense Exhibit No. 45 is admitted into

23   evidence.)

24        THE COURT:  I'm going to say a couple things.

25   I'm hearing something.

McGRIFF - DIRECT          323

1          THE WITNESS:  I am, too.  It's like a radio.

2          THE COURT:  Yes.  And I want that to stop.

3    What am I hearing?

4          MS. KOENIG:  Your Honor, I heard a little bit

5    of something like that yesterday, too, and I'm

6    wondering if perhaps maybe somebody who is on the

7    audio feed may not be fully muted.  I'm not sure.

8          THE CLERK:  I can mute our mics.

9          THE COURT:  No.

10         THE CLERK:  Their mic.  Not us.  Anything

11   coming from that.

12         THE COURT:  I'm going to say, if there are

13   folks on the AT&T line who are talking, we can hear

14   you, and it is disruptive.  If you're in my courtroom

15   here in person, you're not rude enough to speak over

16   any witness who is testifying.  We don't allow it in

17   this court.  And I'm going to tell you all, either you

18   pay attention and you listen or you don't.  I'm still

19   hearing it.  What is it?

20         MS. CARROLL:  I'm being told the audio has

21   gone out again on the phone line.  So I don't know if

22   maybe they can't hear.

23         THE COURT:  Maybe they're talking about the

24   fact that it's gone out.

25         All right.  We're going to take a recess and

McGRIFF - DIRECT                    324

1    figure this out.  I am going to say also, I want

2    counsel table to be a little less vocal.  I don't want

3    people commenting on the type of examination that's

4    happening where I can hear it.

5            I don't want -- Mr. Chatrie, you're allowed

6    to speak to your attorney as much as you wish, but you

7    have to understand there are a lot of microphones

8    there, and it becomes background noise.

9            So, Mr. Gill, I'm just going to ask you -- I

10   don't want you not to talk to your client, of course,

11   but you have to step away from the microphones a

12   little bit because it is disruptive to what is

13   happening in our courtroom, and it's not fair to Mr.

14   McGriff or to Mr. Price that he is distracted or that

15   I am, and not looking at the right exhibit because I

16   get concerned about the demeanor and the

17   professionalism with which we're handling this case.

18           So I want somebody to tell the AT&T folks, if

19   you know, them tell them to hush.  And I will remind

20   them, but we're going to take a 15-minute recess, and

21   my hope is that we will just get the testimony in

22   efficiently and fairly and without disruption.

23           All right.

24           (Recess taken from 10:10 a.m. until 10:35 a.m.)

25           THE COURT:  All right.  Well, welcome back.

McGRIFF – DIRECT                    325

1          Let me just put on record I'm pretty glad

2     we're not doing this by ZOOM, since we have everybody

3     here and are still experiencing technical

4     difficulties.

5          Can I ask if anybody on the AT&T line can

6     hear me?  So that is a no.  So let me say this:  We

7     cannot let this AT&T line trip us up like this.  We

8     are open.  I want to accommodate this, but our

9     courtroom is open, and we have a satellite courtroom

10    that we may not be running today because no one showed

11    up yesterday.  But if people were to show up, you can

12    come on in.  You're welcome to do it.  But this is far

13    too many distractions.  And it's not anybody's fault.

14         And so I'm going to ask those of you who are

15    in touch with folks, let them know we're just going

16    forward.  They're welcome to come on down here and

17    listen and do what they want to do.  But this is, you

18    know, we're an hour and 40 minutes into this

19    proceeding, and we've gotten maybe 40 minutes of

20    testimony, maybe 30.  It's not appropriate for

21    Mr. Chatrie, for our witnesses, for counsel here.

22         And so I am a fan of the First Amendment, but

23    we cannot let this proceeding be driven by folks who

24    want the courtesy of an AT&T line when we are fully

25    open and operational and they can come in here.

McGRIFF - DIRECT                    326

1          I don't know whether or not it's those folks

2     talking.  I am going to just ask them not to if they

3     get back on.  We have our IT working on it.  They're

4     working with AT&T.  We have checked.  Sometimes our

5     CSOs have walkie-talkies.  It sounded a little bit

6     like that to me, but none of them are using them.  So

7     I don't exactly know what's happening.  It's quite

8     possible there are lines crossing, I would think,

9     because we keep getting jumped off of AT&T.

10          But I want to confirm, especially those of

11    you who have colleagues, that you don't object to our

12    just going through this when your colleagues can't

13    hear it.

14          MS. KOENIG:  Your Honor, from the defense's

15    perspective, we are absolutely in agreement that we

16    need to move forward now.

17          THE COURT:  All right.

18          MR. SIMON:  Likewise, Judge.  We're ready to

19    go.

20          MS. CARROLL:  Likewise for Google, as well.

21    Thank you.

22          THE COURT:  All right.  Okay.  We'll work on

23    it, but let's be productive.  We'll continue the

24    examination.

25          Obviously, Mr. McGriff, you're still under

1    oath.  I have to say it every time.

2    BY MR. PRICE:

3    Q    Mr. McGriff, I'd like to call your attention back

4    to Defense Exhibit 47.  This is the second blog post

5    that you wrote.  In addition to adding the auto delete

6    feature, you also wrote in your blog that "It's our

7    goal to help you stay informed about your Location

8    History"; correct?

9    A    Yes.

10   Q    And you said, "If you have chosen to turn Location

11   History on, you will receive periodic email reminders

12   that let you know what data you are saving and ways to

13   manage it"; is that correct?

14   A    Yes.

15   Q    And then in your third declaration, which is

16   Defense Exhibit 23, you also wrote about this.  You

17   said that Google sent monthly timeline updates to some

18   users; is that correct?

19   A    That's correct, yes.

20   Q    And one purpose of those updates was to remind the

21   user that the Location History setting is on?

22   A    Among other things, yes.

23   Q    But Google, again, in your affidavit, pages 8 to

24   9, you wrote that Google has no records reflecting

25   that such emails were sent to Mr. Chatrie.

McGRIFF - DIRECT                    328

1   A    We do not retain records for that long for emails

2   sent, that's correct.

3   Q    So you said that one reason for that "could be

4   because no such emails were sent"?

5   A    That is possible, yes.

6   Q    But you don't know why?

7   A    Again, for the life of the product, we have

8   steadily made improvements.  We have steadily expanded

9   the suite of emails that we send related to the

10  product.  Because of the way we record the emails that

11  are sent in this context, this is too far back for us

12  to say with certainty which emails were or were not

13  sent for a specific account.

14  Q    Thank you.  I'd like to turn your attention now to

15  Defense Exhibit 7, the third page.  This is a

16  screenshot of the opt-in screen when first setting up

17  Google Assistant.  I want to just go through with you

18  here some of the terminology because I feel like we're

19  getting tripped up a little bit.

20       The line -- you've used a few different terms to

21  describe what we're seeing here in terms of text on

22  the screen.  But the line right underneath where it

23  says "Location History," in this case it says "creates

24  a private map of where you go with your signed-in

25  devices," that's the descriptive text?

McGRIFF - DIRECT                    329

1    A    That's the way I would describe it, yes.

2    Q    Okay.  And if you hit that little triangle next to

3    Location History, that's the expansion arrow?

4    A    That's correct, yes.

5    Q    And can we go to page 4.  If you hit that

6    expansion arrow, then you see what's on that

7    screenshot on the far right-hand side, what you've

8    been calling the copy text; is that correct?

9    A    That full block there, that is the Location

10   History consent, yes.

11   Q    So you call that the Location History consent?

12   A    That is the consent copy, yes.

13        THE COURT:  Wait.  Are you on page 3 or 4?

14   Is this where we --

15        MR. PRICE:  This is Figure 3, and I believe

16   it's on page 4.

17        THE COURT:  It's on page 3.

18        MR. PRICE:  Page 3, I'm sorry.  Yes, page 3.

19   BY MR. PRICE:

20   Q    So that block of text, that's the consent copy

21   text?

22   A    It's the Location History consent, yes.

23   Q    The Location History consent.  Okay.  So then can

24   we go down to the next screenshot, please, on page 4.

25   Further down.

1    So, what -- do you see those buttons?  One says

2    "No, thanks" and one says "Turn on"?

3    A    Yes.

4    Q    What are those called?

5    A    That is how a user would accept what's above.  So

6    their dynamic.  As you did in the previous figure, you

7    showed when a user first lands on that screen, you

8    can't turn it on from that screen alone.  Your options

9    as the figure shows are "Skip" or "Next".  If the user

10   says "Skip," they are skipped.  They won't see the

11   subsequent screens.  If the user says "Next," then

12   they're shown what you highlighted in Figure 3.  And

13   then if the user scrolls down, they will see the "No,

14   thanks" or "Turn on."  So those buttons are dynamic.

15   Q    And the only way that you see the consent copy

16   text is if you click on that expansion arrow; right?

17   A    That's correct, the expanded copy, that's right.

18   Q    So you don't actually have to see it in order to

19   hit "Turn on"?

20   A    You have to scroll to the bottom to click "Turn

21   on," yes.

22   Q    But you don't have to see the consent copy text?

23   A    You don't have to expand it there, no.

24   Q    And this whole process, is that referred to as the

25   consent flow?

McGRIFF - DIRECT                    331

1    A    That is a consent flow, yes.

2    Q    So this process is a consent flow?

3    A    That is a consent flow, yes.

4    Q    Thank you for clarifying that.

5         The text -- if we could go to the screen that

6    shows the consent copy text, please.  Thank you.

7         So this text that you see here, that's consistent,

8    in fact, the same as the text that you provided in

9    your third declaration; correct?

10   A    Yes.  Yes, it is.

11   Q    Okay.  But it looks a little bit different in

12   screenshot form than it does in plain text.  Would you

13   agree with that?

14   A    What do you mean?

15   Q    Well, laid out like this in this format, you know,

16   with the copy text hidden behind the expansion arrow,

17   it looks different than just writing out the text on a

18   piece of paper; correct?

19   A    This is, again, a fully dynamic flow.  So, yes, it

20   looks very different when you freeze on individual

21   screens and break it out in this way, yes.

22   Q    So, could we go down to the "Turn on" button.  So

23   the "Turn on" button there is highlighted in blue by

24   default?

25   A    So, it starts off not visible, but once the user

1   interacts with the page and scrolls to the bottom,

2   yes, that button appears in blue.

3   Q    And the "No, thanks" button is not highlighted in

4   blue.  It kind of blends in there?

5   A    The "No, thanks" button is not captured in a blue

6   box, no.

7   Q    Thank you.  And this consent flow for Google

8   Assistant, this looks different than the consent flows

9   that you provided in your third declaration for Google

10  Maps; correct?

11  A    Again, in any of my declarations, I never

12  attempted or suggested that I was presenting an

13  exhaustive exploration of all of our opt-ins.

14  Q    Understood.  It looks different from the consent

15  flow that you showed for Google photos as well;

16  correct?

17  A    This is a variation on a theme of that flow,

18  that's correct, yes.

19  Q    And this variation, instead of asking the user to

20  just enable Location History, there are two other

21  permissions on the screen; is that correct?

22  A    Again, this flow is dynamic.  So if a user saw

23  the -- in your Figure 3, in this exhibit, if a user

24  saw the prompt to set up Assistant, if the user

25  skipped, they would see none of the subsequent

1    screens.  If the user said "Next," they would then see

2    whichever permissions they had not already consented

3    to for the account that were required for this

4    particular feature.  That is unique to this particular

5    flow, that is correct.

6    Q    So if you're setting up Google Assistant for the

7    first time, and you have never enabled Location

8    History, you've never enabled device information, and

9    you've never enabled Voice & Audio Activity, you would

10   see all three permissions on this one screen?

11   A    At that time, that was the case, yes.

12   Q    If you would say "already enabled device

13   information" for some other reason, it wouldn't show

14   up here?

15   A    That is correct, yes.

16   Q    If I had enabled device information and Voice &

17   Audio Activity, it would only show, say, Location

18   History?

19   A    Correct.  If you had not previously opted in to

20   Location History, yes, that's correct.

21   Q    When you group permissions like this together on

22   one page, it's called bundling; right?

23   A    I don't know what its official term would be.  I

24   casually, yes, do often refer to these as a bundled

25   presentation, yes.

1    Q    And bundling can make users share information that

2    they otherwise wouldn't; correct?

3    A    I don't know that that's true.

4    Q    Well, if a user doesn't agree to everything here,

5    then Google would block off access to Google

6    Assistant?

7    A    I don't believe this would prohibit or prevent a

8    user from using Google Assistant.

9    Q    So you're saying it's possible to enable Google

10   Assistant without -- enable Google Assistant for the

11   first time without enabling all three of these

12   permissions?

13   A    I am not the assistant PM, but I don't believe you

14   would be -- I couldn't say that that service would

15   completely block you if you did not consent to all of

16   these.

17   Q    If you click "Turn on," then it enables all three;

18   correct?

19   A    If a user went through the flow and scrolled to

20   the bottom, yes, they would be able to turn on and

21   enable all three, that is correct.

22   Q    And the only other option is "No, thanks"?

23   A    "No, thanks," that's correct.

24   Q    And if the user clicks "No, thanks," is Assistant

25   set up?

McGRIFF - DIRECT                          335

1    A    From this particular flow and these screenshots,

2    the user could skip it entirely.  The user could

3    scroll through and say "Turn on" or the user could

4    scroll through and say "No, thanks".  I am not the

5    assistant PM, and I do not recall what restrictions

6    they had on usage.  I would be surprised if you

7    weren't able to use it at all, but, again, I'm not the

8    assistant PM.

9    Q    But you would agree if you clicked "No, thanks,"

10   Assistant will not be set up at that time; correct?

11   A    It may not be completely set up, but, again, I

12   would be surprised that would you be blocked from

13   using the feature.

14   Q    Does it say that on this page anywhere?

15   A    Say what specifically?

16   Q    That it might be possible to use the feature

17   without clicking "Turn on"?

18   A    It does not say -- again, this is a dynamic

19   screen.  So it would appear different for the user

20   based on whatever their account configuration was.  It

21   is possible that a user approaching this screen, for

22   example, had already consented to device information

23   and Video & Audio Activity, in which case they only

24   saw Location History.  I am not the assistant PM.  I

25   don't recall that Assistant would have blocked you if

1    you said no.

2    Q    Well, you could set it up later, of course; right?

3    A    You could set it up at a different point.

4    Q    But you'd see the same screens, the same consent

5    flow?

6    A    That I couldn't say.  I am not an expert on

7    Assistant.

8    Q    You would agree that Location History here is an

9    account level setting?  That means if you enable it

10   here, it is enabled for all devices across your entire

11   account?

12   A    No.  If you opt in to Location History here,

13   Location History and Location Reporting would be

14   enabled on that specific device.  But if you were

15   signed into multiple other devices, Location Reporting

16   would not be enabled on those devices.  So their

17   Location History was on for the account.  Those

18   devices would not actively be contributing to your

19   Location History.

20   Q    But if you had one device, and you turned it on in

21   this way, it would be on for everything on the phone;

22   correct?  On that device?

23   A    Yes, if a user opted in to Location History

24   through this context at this point in time, July 2018,

25   Location History would have been enabled on their

1    account.  And with that, seven days later on that same

2    device, they would see the warm welcome, as we call

3    it.  Everything would have been enabled on that

4    device, yes.

5    Q    So it doesn't have to be an account level setting,

6    does it?  In other words, it's possible to have

7    Location Reporting only for apps that are actively

8    using a user's location?  This is the way that an

9    iPhone does it, for example.

10   A    I'm not sure that I follow that.

11   Q    IPhone users can choose to give an app permission

12   to use location services only when the app is in use.

13   Are you familiar with that?

14   A    I believe you're conflating Location History with

15   location services.  The same is true on an Android

16   device.  A user can choose which app has access to

17   location on the device.  Those are the app level run

18   time permissions, yes.

19   Q    So on an iPhone, you can restrict it to one app or

20   another?

21   A    On both Android and iPhone, and I believe every

22   other phone manufacturer, you can restrict location

23   access at the app level, that is correct.

24   Q    And Location History specifically?

25   A    Location History is not location services for the

McGRIFF – DIRECT                    338

1   device.

2   Q    Correct, but I'm asking you about Location

3   History.

4   A    But you're making a false equivalency with what's

5   happening on an iPhone.  On both iPhone and Android,

6   there are runtime permissions that control whether or

7   not an app has access to location in the background.

8        On both iPhone and Android, a user can decide

9   whether or not an app, a specific app, has access to

10  the location in the background or only in the

11  foreground.  Those are app level permissions.  They

12  are not tied to Location History.

13       If a user enables Location History for the

14  account, in the context of Android specifically, that

15  information is collected and stored and used in

16  Location History at the account level.

17       Individual apps can access Location History

18  information, but by policy we do not allow those apps

19  to use Location History as a workaround, for example,

20  for current location.

21       So, if a Maps user says "no, Maps, you cannot have

22  my location permission," Maps cannot call Location

23  History and say, Tell me where this user is.  Yes.

24  Q    Okay.  Thank you for clarifying.

25       We talked about this a second ago a little bit,

McGRIFF – DIRECT                    339

1    but if a user goes through and sets up Google

2    Assistant in this way, and then later goes and pauses

3    Location History, Google Assistant will still continue

4    to function; correct?

5    A    Yes, that is correct.

6    Q    But Google doesn't inform the user at the consent

7    flow stage that that is a possibility; correct?

8    A    Again, the consent flow is dynamic.  So a user may

9    or may not be presented, depending on their own

10   account activity prior, with any of these options in

11   the menu.  So what is presented to the user in the

12   context of seeing this specific flow would, again, be

13   based on the user's previous activity across Google

14   products and services.

15        Is the ask to generalize, then, across all users?

16   Q    No, no.  I'm actually asking if you can point me

17   to where in the consent copy text it says that the

18   feature, in this case Google Assistant, would still

19   function even if you pause Location History.

20   A    I don't see in the copy text that it either says

21   the feature will or will not work if the user does not

22   proceed with any of the steps, the various options of

23   this flow.

24   Q    To pause Location History, you can only do that

25   once you've enabled it through the settings panel;

1    right?

2    A    What are you referring to as a settings panel?

3    Q    The settings app on an Android phone.

4    A    Are you referring to a specific point in time or

5    just generally?

6    Q    After it has been enabled.

7    A    So, after Location History has been enabled at the

8    account level, the user can go through the settings on

9    any particular app that uses Location History, so it

10   has Location History powered features.  The user could

11   go through the device level settings on an Android

12   device, and the user could also go to

13   myactivity.google.com where they can view all the

14   activity controls and suspend it there.

15       So you can either do it directly on the device at

16   the settings level through an app on a device, any

17   device that you're signed into, or on a desktop, any

18   laptop, myactivity.google.com and make a change there.

19            THE COURT:  So, Mr. McGriff,

20   myactivity.google.com is really familiar to you, but

21   my bet is it's really hard to transcribe as quickly as

22   you say it, especially with all the dots and stuff.

23   And using phrases like "I'm not the PM," just presume

24   that not all of us knows what a PM is.  So I'm going

25   to ask you to clarify that.  I think I know what it

1   is, but especially with things you're super familiar

2   with, those things come out fast from any human being.

3   And I'm just speaking on Ms. Daffron's behalf.

4           THE WITNESS:  Got it.  For reference, "PM"

5   is product manager.  So I'm not one of the assistant

6   product managers.  And the site specifically I've been

7   referring to as myactivity.google.com is the main

8   settings page where you can view all of your account

9   level settings and manage them, and that can be done

10  either through a mobile browser or on a desktop.

11  BY MR. PRICE:

12  Q   So a user would have to actively, intentionally

13  navigate to that, settings, either through the app,

14  through the settings panel, or through that website

15  that you just gave us?

16  A   That's correct.

17          MR. SIMON:  Judge, I think the answer's fine

18  because he said yes, but I was going to ask to break

19  that down because there are a number of different

20  topic areas there in that question.

21          THE COURT:  You mean, it's a compound

22  question?

23          MR. SIMON:  Correct, Judge.  My apologies.

24  That would be the objection, compound question.

25          THE COURT:  It also seems to repeat what the

1   witness was saying.  But are there more than three

2   ways to change the Location History setting other than

3   the three you just talked about?

4           THE WITNESS:  Those are three paths, the

5   three paths that would be possible, yes.

6           MR. PRICE:  Thank you.

7   BY MR. PRICE:

8   Q   So, if a user takes one of those paths and they

9   find the setting to pause Location History, Google

10  provides a pop-up screen at that point; right?

11  A   There is a screen that explains -- there's a

12  screen that explains what is happening with that pause

13  of the service, yes.

14  Q   Thank you.  Could I draw your attention, please,

15  to Defense Exhibit 27, specifically pages 22 to 23.

16          THE COURT:  I'm sorry.  Remind me of the

17  exhibit number again, please.

18          MR. PRICE:  Exhibit 27, Your Honor.

19          THE COURT:  How about you put on the record

20  what we're looking at aside from the number, please.

21  Q   Mr. McGriff, can you tell us what --

22          THE COURT:  No, you can just put it on.  It's

23  already in evidence.

24          MR. PRICE:  Sorry.  This is Defense Exhibit

25  27 at page, I believe, 23.  And this is the screen

McGRIFF - DIRECT          343

1   that pops up if you attempt to --

2          THE COURT:  I mean name the article, sir.

3   I'm sorry.  I'm not being clear.

4          MR. PRICE:  Oh, I'm sorry.  This is the

5   report from the Norwegian.  It's called "Every Step

6   You Take."

7          THE COURT:  All right.  There we go.

8   BY MR. PRICE:

9   Q   Is this the screen that would come up if you

10  successfully found a place to turn Location History --

11  to pause Location History?

12  A   In any of the numerous paths that a user could

13  take to pause the setting, yes.  This would be the

14  pause copy that appeared at that time, that's correct.

15  Q   Great.  So attempting to pause the service results

16  in this warning that says it "limits functionality of

17  some of Google's products over time, such as Maps and

18  Google Now"; is that correct?

19  A   That is correct.

20  Q   But there isn't a comprehensive explanation of all

21  the services that would be affected; correct?

22  A   That is correct, yes.

23  Q   It just mentions those two.  It doesn't mention

24  Assistant?

25  A   This was not meant to be exhaustive, that's

McGRIFF - DIRECT                       344

1    correct, yes.

2    Q    And it doesn't explain actually how the

3    functionality would be limited for any of those

4    specific apps?

5    A    As mentioned previously, Location History is used

6    and in quite a few products and services and what

7    would be impacted would be wholly dependent on what a

8    specific user was utilizing in their sort of

9    experience across Google products and services.  The

10   copy here is not meant to be exhaustive or describe

11   what every user would experience in terms of change in

12   service, because that would be near impossible.  The

13   screen would have to be -- well, not impossible.  The

14   screen would have to be dynamic and specifically say

15   what was happening in that case.

16       In this case, it's clearly illustrated.  It just

17   has, you know, these would be impacted, such as these

18   would be impact services.

19   Q    But it does not say how the functionality would be

20   limited?

21   A    It does not explicitly say that, no.

22   Q    Okay.  Thank you.

23       I'd like to take a closer look at some of the

24   screenshots for this consent flow process for

25   Assistant.  If we could turn to Defense Exhibit 7 at

1   page 4 again, please.

2          MR. PRICE:  Can we show the one with the

3   copy.

4   BY MR. PRICE:

5   Q   So this is page 3 of Defense Exhibit 7.  And, once

6   again, we have the descriptive text in the Location

7   History that says "Saves where you go with your

8   devices"; correct?

9   A   That's correct, yes.

10  Q   And then the consent copy text on the right-hand

11  side.

12  A   That's correct, yes.

13  Q   That can only be viewed by clicking that expansion

14  arrow?

15  A   That is correct, yes.

16  Q   So it requires extra clicks, at least one, here to

17  learn, for example, that your Location History data is

18  saved with Google and not on your phone?

19  A   Location History is only available through Google.

20  Who else would it be saved with?

21  Q   Well, the descriptive text says "Saves where you

22  go with your devices"; correct?

23  A   Sorry.  Is the suggestion that the descriptive

24  text is suggesting that it's an on-device feature?

25  Q   I'm saying it does not specify one way or the

McGRIFF - DIRECT                    346

1    other, does it?

2    A    I apologize.  I don't believe any of our settings,

3    any of the controls mentioned here explicitly say --

4    make a distinction of server versus on device.

5    Q    I understand that that is how it works now, but as

6    a user, where would the user find that information on

7    this page?

8    A    Just to be sure that I'm clear, you're asking

9    where would a user know that this information is being

10   saved with Google on Google servers versus on the

11   device locally?

12   Q    Correct.

13   A    That is not a distinction that is made on this

14   page, no.

15   Q    It's made on the next page, on the consent copy

16   page?

17   A    That is not a distinction of note in the consent

18   copy.  It is there, but it is not in any way meant to

19   like -- the distinction of whether data is stored on a

20   device locally or on the server is -- I apologize.  I

21   don't know how to respond to that.  It is more -- it

22   is noted in the consent copy, yes.

23   Q    Okay.  But not in the descriptive text?

24   A    No.

25   Q    Similarly, it would require an extra click here on

1    that expansion arrow to learn that data is being saved

2    even when you aren't using a specific Google service;

3    correct?

4    A    On this page, yes.

5    Q    And it requires an extra click, same one, for a

6    user to learn that location data is sent to Google

7    even if the internet connection becomes disabled?

8    A    Sorry.  What are you referring to?  Oh, I see.

9    Sorry.  Yes, that is correct.

10   Q    Thank you very much.

11       So that consent copy text also says some things

12   like Location History helps give -- helps Google give

13   you more personalized experiences; right?

14   A    Yes.

15   Q    Like a map of where you've been?

16   A    Yes.

17   Q    Tips about your commute?

18   A    Yes.

19   Q    Recommendations based on places you visited?

20   A    Yes.

21   Q    And useful ads?

22   A    Yes.

23   Q    Those are all positive things from Google's point

24   of view; correct?

25   A    Yes.

McGRIFF – DIRECT          348

1    Q    They're intended to explain why users might want

2    to enable Location History?

3    A    That's correct, yes.

4    Q    But there isn't any mention here about how

5    frequently Google collects Location History

6    information, is it?

7    A    There is no statement here about the frequency of

8    collection, that is correct, yes.

9    Q    And there's no mention of the quantity of location

10   records that Location History generates; correct?

11   A    There is no statement here, no, that's correct.

12   Q    And there's no mention in that consent copy text

13   that Assistant will work without Location History

14   enabled?

15   A    There is no mention that any of the products or

16   features mentioned here will work without the setting

17   enabled, that is correct.

18   Q    Thank you.  So let me shift gears a little bit.

19   Let's say I'm a user who does not want to have

20   Location History enabled on my device.  To keep

21   Location History off, I have to go through a bunch of

22   different steps, starting from the beginning, the

23   initial setup of the phone; correct?

24   A    Again, the majority of users do not have Location

25   History enabled.  For those users who have Location

1   History enabled, yes, to turn it off, they can take

2   any of the numerous paths I mentioned before, yes.

3   Q    No, I guess what I'm saying is it starts off as

4   off.  The default when you start up a new phone is

5   off; correct?

6   A    Location History -- well, Location History is an

7   account level setting.  Yes, it's an account level

8   setting, and it is off by default.

9   Q    The default is off when you start up a phone, but

10  at least in 2019, the very first thing that would

11  happen after you went through the initial setup and

12  agreed to the terms would be a prompt to enable

13  Location History; correct?  Sorry.  A prompt to enable

14  Google Assistant; correct?

15  A    In 2019?

16  Q    I'm sorry.  July of 2018.

17  A    In 2018, at the beginning of the year, yes, if you

18  set up Google Assistant, you would be presented with

19  the Location History consent if you had not already

20  opted into the service, yes.

21  Q    After you do the initial setup of the phone, that

22  screen, "Meet your Google Assistant," comes up

23  immediately or came up immediately in 2018?

24  A    I cannot speak to exactly when that appears in

25  device setup or under what circumstances.  But

McGRIFF - DIRECT                    350

1    assuming a user got to this screen, yes, this would

2    have been the flow, that's correct.

3    Q    And, obviously, this prompts the user to enable

4    Location History?

5    A    This particular flow, yes, it does.

6    Q    So, in order to keep Location History off, the

7    user would have to skip the step and decline enabling

8    Location History?

9    A    Which, again, the majority of Google accounts do

10   not have Location History enabled.

11   Q    Okay.  After that initial setup process, during

12   the first use of some applications, there's also a

13   prompt to enable Location History; correct?

14   A    For some products that have Location History

15   powered features, yes, that's correct.

16   Q    So, for example, Google Maps, the first time I

17   open up Google Maps with my new setup phone, it's

18   going to ask me to enable Location History; correct?

19   A    Under some set of circumstances in the context of

20   Google Maps at that time a user would have been

21   prompted.  The notification was -- there's a

22   notification priority and depending on the user's

23   activity and behavior, the user may or may not have

24   seen that notification, but, yes, it was a

25   possibility.

McGRIFF - DIRECT            351

1    Q    So, then, to keep Location History off, I would

2    have to decline activating it through Maps, as well;

3    right?

4    A    That is correct.

5    Q    And the same thing with Google Photos; correct?

6    The first time you open Google Photos, there's a

7    prompt to enable Location History for Google Photos

8    Places; is that correct?

9    A    I'm not aware that that was featured in the same

10   way that it was featured in Maps, but for both, again,

11   I would say yes, presented as an option, which the

12   majority of our users do not opt into.

13   Q    So, again, if I wanted to keep Location History

14   off, I would have to decline the invitation to turn it

15   on when using Photos for the first time?

16   A    Yes.  The majority of our users would have

17   declined that, yes.

18   Q    And long pressing the home button on an Android

19   phone, that would also bring up the Google Assistant

20   app; correct?

21   A    In 2018, I believe so, yes.

22   Q    And so if a user hadn't enabled Assistant during

23   that initial setup process, they would be prompted to

24   do it when they pressed the home button with the long

25   press?

McGRIFF - DIRECT          352

A    I don't know under what circumstances a user would

see this specific Assistant flow.  Specifically, as

mentioned before, I'm not sure -- I can't say that

this specific flow would be the one shown at a

subsequent point.

Q    But there would be -- if Assistant is not set up,

the first time it comes up, you would see these

screens; correct?

A    I couldn't say definitively, actually.

Q    Okay.  In any event, to keep Location History off

from the beginning, a user would have to say no

multiple times; correct?

A    No, it would depend entirely on what a user's

activity actions, and across Google products and

services.

Q    So the user would have to decline the invitation

to set up Google Assistant initially; correct?

A    Assuming that a Google user saw that, yes.

Q    The user would have to decline the invitation when

opening Maps for the first time?

A    If the user was prompted with that opt-in flow,

then yes.

Q    And the user would have to decline it when using

Google Photos for the first time?

A    Again, across all products, that user Location

McGRIFF - DIRECT                    353

1    History, if a user was prompted contextually to opt-in

2    with a Location History powered feature, then yes, the

3    user would be presented with the option to say yes or

4    no.

5    Q    Then, again, if Google Assistant came up for some

6    reason, perhaps a long press of the home button, they

7    would have to decline the invitation to set it up

8    then, too; right?

9    A    That's the one I'm not sure about.  I can't say

10   whether or not Assistant had the same flow for that

11   same type of behavior at that point.

12   Q    So, at least three times, maybe four?

13   A    No.  Again, I disagree.  A user may not -- what a

14   user is presented with would depend entirely on the

15   user's behavior.  Not every user uses Google Maps.

16   Not every user uses Google Photos.  So it is very

17   possible that a user saw -- for example, this flow

18   would have required the user to have a connection.

19   The user may have set up their device with no

20   connection, in which case they wouldn't have been

21   presented with the Assistant flow.

22       Device and their connection could mean no send, no

23   Wi-Fi, but in that scenario, the user would have seen

24   none of these prompts.

25       A user could have gone through this initial flow

McGRIFF - DIRECT                          354

1    and then never opened Google Maps and then never

2    opened Photos.  They wouldn't have seen the other

3    ones.

4        So I can't say that a user -- the number of times

5    definitively that any user would have seen any of

6    these prompts, but I can say yes, these would have

7    been the prompts that were available at that time.

8    Q    So, a user who did use Google Maps and Google

9    Photos would have been prompted in this way at least

10   three times; correct?

11   A    Could have been prompted.  Again, all of these are

12   dependent on the user's activities.  There are more

13   important things happening in Maps, for example.  So

14   if you are in an active navigation session shortly

15   after first opening Maps, no, Maps would not prompt

16   you with any opt-in request because you are in the

17   active task completion mode.  The prioritization of

18   that screen would have been too low to warn it to be

19   triggered at that time.  So it is a potential option,

20   but it's impossible to say to what percentage of users

21   and what flow and so forth.

22   Q    So it's at least possible that a user would have

23   to decline the invitation to enable Location History

24   multiple times in order to keep it off?

25   A    Yes, it is possible that a user would have seen

McGRIFF - DIRECT                    355

1    the option to opt-in multiple times, yes.

2            THE COURT:  I'm pretty sure we've covered

3    that territory multiple times.  Let's move on.

4    BY MR. PRICE:

5    Q   Does this increase the chances that a user might

6    turn on Location History by accident?

7    A   It is always possible that a user goes through a

8    flow, might not fully understand or wants to revisit.

9    For that exact reason, in 2017, we introduced what we

10   call the warm welcome notification for any user who

11   opted in to Location History from Q4 2017 on, we

12   triggered a notification in Maps.  It triggered seven

13   days later.

14       Seven days was chosen because we thought at that

15   point we would have sufficient context of a user's

16   activity from a week since turning on the control.

17   And the notification said -- again, it was the warm

18   welcome.  Hey, Location History is on for your

19   account.  Any interaction with that notification

20   brought the user into Timeline where the user would be

21   able to view all the information that we had

22   collected, including the activity, the trips, the

23   places.

24       The hope in introducing that was that even if a

25   user didn't have full context or full understanding

1   about the points you've previously made, the

2   granularity of the information, or the type of

3   information, that the collection was happening

4   passively, like, for example, while driving, that we

5   understood the nuance of activity recognition.

6       The visualization in the Timeline UI, user

7   interface, was very explicit and clear.  So that warm

8   welcome notification was so that a user would see it

9   seven days later, click through, see in full context,

10  and might say, This is not what I intended.  Turn the

11  control off.  There you can access again through the

12  app Timeline.  You can turn Location History -- you

13  know, pause Location History there.

14      The user could also -- we present a full suite of

15  controls.  This is well before auto delete.  But at

16  the time we had delete by day, delete by data range.

17  All of those controls were made available in the

18  context of Timeline.

19      Again, because every product is steadily evolving,

20  I realize some users would not see the notification.

21  So we now send a warm welcome email.  So, again, this

22  speaks to that suite of emails that we send.  So seven

23  days after turning Location History on, we now send an

24  email in addition to the warm welcome email notice

25  because not every user will see the maps notification.

McGRIFF - DIRECT                    357

1  Again, not every user uses Google Maps.

2     So the thought was if you had turned on Location

3  History in a different context, you may not see the

4  Map specific notification.  So now we send the email

5  with that exact same content.

6     That email features prominently at the top direct

7  links to turn Location History on or off.  And in that

8  email, we specifically provide a snippet or insight

9  into the data that's been collected for the first

10  seven days that the user has had the control on.

11     Again, this is all to address the point you're

12  making, that a user might turn it on, and then either

13  not realize the scope or exactly what's collected, and

14  we wanted to provide that additional context.

15  Q   Thank you.  I just wanted -- that was a long

16  answer.  It is the case, based on what you just said,

17  with some qualifications that --

18        MR. SIMON:  Judge, I'm going to object to a

19  continuation of asking the witness to speculate about

20  possible accidents.  But I also think this is, again,

21  going to be a question preemptively that's been asked

22  and answered.

23        MR. PRICE:  I would just like to get a yes or

24  no to my question, because I appreciate Mr. McGriff's

25  answer, but I would really like --

McGRIFF - DIRECT                    358

1           THE COURT:  You may have one follow-up and

2    not, well, how many -- what's the percentage of

3    accidents that could happen?  Is it three accidents,

4    because there's three different ways to turn it off?

5    You may ask one follow-up question.

6    BY MR. PRICE:

7    Q    Requiring users -- or if a user had to repeatedly

8    decline the invitation to enable Location History,

9    would it increase the likelihood of enabling it by

10   accident?

11   A    No.

12   Q    Repeatedly asking somebody to turn it on --

13          THE COURT:  I'm going to let him have this.

14   This is just cross-examination, Mr. Simon.

15   A    The reason I say no is the Maps, for example,

16   prompt that you're mentioning, we only triggered it --

17   I believe that logic was twice per user.  If the user

18   either abandoned, didn't respond, we would show it one

19   more time.  If the user just missed it, we would never

20   prompt them again.

21       In each of these, again, the goal is not to spam a

22   user relentlessly.  You want this on.  You want this

23   on.  So we do have controls in place to ensure.  And,

24   again, it's very nuanced.  It's not -- you know, if

25   you happened to see it but didn't respond, we'll show

McGRIFF - DIRECT                    359

1   you again in a certain period of time.  It wouldn't

2   have been the next day.  There is logic behind this

3   that would say, depending on the product, don't show

4   the user this prompt again for 10 weeks or however

5   many months, until later.

6       Then there's also logic that says if you showed

7   the user and the user explicitly said no, do not show

8   the user again.

9       The logic varies by app and context, but we go out

10  of our way to ensure that we are not doing what you

11  suggest, of just pomeling and pomeling.  There is some

12  logic baked in that would stop it.  And this is at the

13  account level.

14      So signing in to a new device would not suddenly

15  restart all of those triggers.

16  Q   Google did realize it was a possibility, though,

17  correct?  That's why you sent the reminder email, for

18  example?

19  A   The possibility that someone might turn it on?

20  Q   By accident.

21  A   No.  Sorry.  I apologize.  No.  It was the

22  possibility that someone might turn it on and not

23  fully either understand the granularity of the data

24  that's being collected or simply just wouldn't know at

25  that time necessarily, and we wanted to make sure and

McGRIFF - DIRECT                    360

1    reinforce that a user had full visibility into what

2    exactly we were collecting and how that information

3    was being processed.

4    Q    Remind me.  When did you start sending those

5    emails a week later?

6    A    The warm welcome notices started in 2017.  The

7    warm welcome emails, I'd have to check.  I believe, in

8    my declaration, we put a date in for the Timeline

9    monthly emails, which we sent to users every month.

10   So if you turned Location History on in any context,

11   regardless of the surface, we sent you the Timeline

12   email.  And I don't recall the exact date, but it's in

13   one of my declarations that said when those emails

14   started.

15        The warm welcome email, which we added on top of

16   that, I'd have to check to see when we introduced

17   that.  It was not -- I can say definitively it was not

18   in 2018.

19   Q    Not in 2018?

20   A    It was not in 2018.

21   Q    Thank you.  Once Location History has been

22   enabled, there's an option to pause it; is that

23   correct?

24   A    Yes.

25   Q    But there isn't an option to turn it off; correct?

1    A    We use the language "pause," not "off," that's

2    correct.

3    Q    In a user pauses Location History, does it delete

4    existing data?

5    A    It does not, no.

6    Q    It only halts the collection of future data?

7    A    That is correct, yes.

8    Q    So if a user wanted to revoke consent to use past

9    Location History data, pausing it would not do the

10   trick?

11   A    That is correct, yes.

12   Q    And the process of deleting the historical

13   Location History data is completely separate from the

14   act of pausing Location History; correct?

15   A    That is correct, yes.

16   Q    And as we were talking about earlier, that data

17   may be retained in some anonymized form even if

18   deleted?

19   A    Yes.

20   Q    One last question for you here.  If the user

21   deletes the Assistant app after setting it up through

22   this consent flow, Location History stays on; correct?

23   A    Assistant is not an app in this context.  It was

24   not an app in this time frame.  So I don't believe

25   there's a process to delete Assistant.  But if a user

McGRIFF - DIRECT                362

1    were to stop using Assistant, Location History would

2    still be enabled, yes.

3    Q    And Google would continue to collect Location

4    History data even if the user stopped using Assistant

5    completely or attempted to get it off his phone?

6    A    Yes.

7              MR. PRICE:  No further questions.  Thank you.

8              THE COURT:  I have some questions, and I'll

9    allow you to address them on redirect, but I'm going

10   to ask them before the government starts because that

11   will be more efficient.  All right?  So you may have a

12   seat.  Thank you, Mr. Price.

13             MR. PRICE:  Thank you, Your Honor.

14             THE COURT:  I just want to understand,

15   generally, Mr. McGriff, a couple of things.  And maybe

16   you know the answer and maybe you don't.  Either way

17   it's fine.

18             So if Location History, say, is paused and

19   then reactivated, is the data that was collected or

20   retained during the pause time put back into Location

21   History database?  So, like, if you had a timeline,

22   and I'm talking about 2018, about this time, if you

23   had a timeline, would it be a blank or would it dump

24   back in?

25             THE WITNESS:  It would be a blank.  When you

McGRIFF - DIRECT                363

1   pause Location History, our collection is fully paused

2   at that time immediately.  So there would be no

3   information until you resume the service.

4           THE COURT:  Right.  So --

5           THE WITNESS:  It would be a blank.

6           THE COURT:  It would be a blank.  It might be

7   in the Sensorvault some way anonymized?

8           THE WITNESS:  There's no collection

9   whatsoever in Sensorvault during the time that the

10  control is paused.  All of the data in Sensorvault is

11  exclusively collected in the context of Location

12  History.  So when you pause the setting, we stop all

13  collection, and there's no additional storage in

14  Sensorvault for that period.  So you would have a

15  blank until collection resumed.

16          THE COURT:  Not even anonymized?

17          THE WITNESS:  Anonymized here is a bit of a

18  red herring.  Because this was -- that's a general

19  privacy policy for the company.  In the context of

20  us -- sorry.  In the context of Location History,

21  there would be no collection in any capacity in any

22  way if the control is paused.

23          THE COURT:  So when you hit the control, it

24  stops the passive collection like when your phone --

25  it stops it all?

McGRIFF - DIRECT                364

1          THE WITNESS:  Any location collection in the

2    context of Location History is completely stopped.

3          THE COURT:  And it's not reaccessed ever?

4          THE WITNESS:  It is not, no.

5          THE COURT:  So this is a weird question, but

6    Google tracks a lot of data.  Do you track how many

7    people actually read the privacy policy, like how long

8    the window is open?  And, you know, I'm just saying

9    because I think most people don't, but I'm wondering

10   if -- that's not evidence, obviously, and I'll take

11   whatever evidence I have.  But Google tracks a lot of

12   stuff, so I'm wondering if you track when the window

13   is up or if you know how many people actually read it.

14         THE WITNESS:  I don't know.  There are teams,

15   not my team specifically, that look very broadly on

16   the best way to present the flows.  And they look at

17   any number of signals, including user research, to

18   understand how much of these flows users embrace.

19         I can say based on that research, again, not

20   done directly by my team, we have even further refined

21   since this flow.  There have been now two iterations

22   of a presentation based on that feedback.

23         The latest flow, for example, if you were to

24   attempt to opt in to Location History through one of

25   these products, we no longer even do full screen

McGRIFF - DIRECT                    365

1    because of feedback that it takes users out of

2    context.  So we now have what we call the bottom sheet

3    where the same copy and messaging appears, but it

4    comes up from the bottom.  So the user can see above

5    the context where they attempted some activity that

6    triggered it, and then the dialogue comes up from the

7    bottom.

8              That implementation, I believe, is fully

9    rolled out now, but it has been in flight.  Again,

10   these iterations are all informed by user research

11   that that central team is doing around what would help

12   users better understand.  So this is a constant

13   evolution.

14             THE COURT:  Right.  So let's talk about

15   Location History.  Like, do you track how many people

16   hit the carrot, the triangle, to go to the bigger

17   screen?

18             THE WITNESS:  Our team does not, no.

19             THE COURT:  Right.  So when you're saying

20   there's something that comes from the bottom, would

21   that possibly be something like the Location History

22   context that would come up?

23             THE WITNESS:  Yes.  So, now, like, again,

24   this is new UI.  It was not at the time of this.  The

25   bottom sheet comes up.  It shows -- the same copy, I

McGRIFF - DIRECT                366

1   believe, it shows more of it now.  Again, it's all the

2   way to not fully take over the screen, so the user

3   stays in context.  Like you were just attempting to

4   view historical places in Maps, but you don't have

5   Location History on.  So where before, and I believe

6   it's in these exhibits, you would have seen a screen,

7   a full splash, Hey, turn it on.

8        We now leave you in the context, You were

9   attempting to do this, but here is where -- and

10  there's still a carrot there, I believe -- I will have

11  to check -- where a user can view more.  But, yeah,

12  that's the expansion.

13       And then, again, the evolution here is now if

14  a user did say yes in that context, then seven days

15  later we also, in addition to the notification, send

16  the email saying, By the way, this happened.  That

17  kind of a change.

18       THE COURT:  Okay.  So when you turn Location

19  History off, nothing is collected even to target ads;

20  is that right?

21       THE WITNESS:  Any ads measurement powered by

22  Location History is -- there's no new data for that

23  account available because we've stopped collection.

24       THE COURT:  Okay.  And so if you turn

25  Location History off, it also goes off in, like, Web &

McGRIFF - DIRECT                    367

1    App Activity?  Does it go off all the way?

2            THE WITNESS:  So, there's location services

3    for the device completely unaffected by a user's

4    decision with Location History.  Location History is

5    the only store of precise device location.

6            What Web & App Activity is storing now is

7    only course and location.  So if I attempt some

8    activity or a service with Google, and I have opted in

9    to Web & App Activity, they would know that I

10   attempted that activity in Richmond.  And the team is

11   looking -- they coursen the location because they

12   don't need to know that I was in this building in this

13   room for their general purposes.  They just need to

14   know that I'm in Richmond.

15           So Web & App Activity would have some record

16   of, if I opted in, I did or performed some task in

17   Richmond.  If Location History -- if it was on for the

18   account, would have more granular information.  That I

19   was in this building, would be the likely inference.

20   It would understand that I walked to this building.

21   All the details that are visible in Timeline.

22           If I turned Location History off, Web & App

23   Activity would still know, if I opted in, that I was

24   in Richmond.  So when you mentioned ads, Location

25   History does not power all ads.  A lot of the -- any

McGRIFF - DIRECT          368

1   geotargeting or other use of Location for ads is

2   coming from the location services at the device level.

3        The specific type of advertising powered by

4   Location History, the store visits that were

5   mentioned, is only possible for users who have opted

6   in to Location History.  And so if they turned

7   Location History off, then there's no new information

8   coming in for the account.

9        THE COURT:  All right.  So Location Services,

10  can you turn that off, too?

11       THE WITNESS:  Yes.  Location Services is the

12  location master for your device.  You can just say

13  turn off -- no app or service on my device can have

14  access to my location.

15       THE COURT:  So if you have Location Services

16  and Location History turned off, is Google retaining

17  any data?  I mean, in its collection for --

18       THE WITNESS:  We don't have access to any

19  information.  And Location Services at the device

20  level supercedes anything else.  So if you turned

21  Location Services off, and you have Location History

22  on, Location History is not collecting any information

23  because we don't have access to it.

24       Location, both IOS and Android, position

25  location master, if you will, as an ultimate control

1    to say I want this device to have any location

2    awareness or access at all.  And then once that's

3    enabled, you get the different options for each IOS.

4    Sorry.  Operating system.

5         THE COURT:  So if they're both off, nothing's

6    going in in an anonymized fashion to Sensorvault?  I

7    know I'm using, you know, human terms, not Google

8    terms.  Not that Google is inhuman.  But I do like the

9    Monday morning meetings, by the way.  I just have to

10   put that on the record.  That's just fabulous.

11        Okay.  So if they're both off, then Google

12   isn't doing this extra service for its customers from

13   your perspective, collecting information from

14   somebody's privacy perspective; correct?

15        THE WITNESS:  That's correct.  And also, just

16   to be clear, there's no anonymous collection in

17   Location History.  I just want to make that clear.

18        THE COURT:  So none of that goes to the

19   Sensorvault?

20        THE WITNESS:  If Location History is on for

21   your account, everything that's collected is

22   associated with you as a user to that account.  And

23   that is to, in part, help us with the full data

24   management of anything collected for you.  When you go

25   to Timeline and you view all of your data in Location

McGRIFF - DIRECT                    370

1    History, all of those points are associated with you.

2    If you choose to delete a specific point, date, range,

3    specific visit, we are able to give those controls,

4    because all of that information is associated with you

5    as a user.

6             What's available in Timeline is a full

7    distillation of everything that has been collected for

8    your account in the context of Location History.

9             THE COURT:  Okay.  But there's no process

10   where it gets put into a greater data set?

11            THE WITNESS:  We do use an aggregate.  An

12   example would be our COVID mobility reports where we

13   take all of the user's data for a specific area.  We

14   aggregate it.  We anonymized it.  And then we perturb

15   it further by, essentially, adding noise to create a

16   representative model of the aggregate.  And we do that

17   to ensure that when we release the mobility reports,

18   saying this was the -- these were the mobility trends

19   in Richmond when the COVID restrictions were

20   implemented versus seven days later, those models are

21   actually not any of our data, even in aggregate.  It's

22   a representative model of the trends.  And those are

23   what we published in the context of the mobility

24   reports.

25            This is very similar to what we do with

McGRIFF - DIRECT                    371

1   busyness on Maps.  I don't know if you're familiar

2   with the feature.  On Maps, if it's a popular place,

3   we'll show you whether or not that place is usually

4   busy at that time.

5            THE COURT:  Oh.

6            THE WITNESS:  But those busyness bars are --

7   I could delete all of my data.  It's not going to

8   change that bar, because the bars there are actually

9   an aggregate.  They're not -- it's not even a literal

10  aggregate.  It's kind of a sufficiently transformed

11  model that is sufficient for the decision making

12  you're doing when you're looking at Maps.  Is it busy

13  or is it not?

14           THE COURT:  Okay.  So that's a separate model

15  that happens outside the Sensorvault or --

16           THE WITNESS:  Those models are built off of

17  the data that is within Sensorvault and aggregated.

18  Those are so sufficiently transformed that they no

19  longer resemble user data.

20           THE COURT:  All right.  Okay.  Now, I'm going

21  to ask a question because this is just lore.  If you

22  have geofence or Location History, it's not just doing

23  the ground, right?  It's going up?  Like it does 3D?

24  So this is my question:  If you're doing a search,

25  could you know whether you were on the fifth floor

McGRIFF - DIRECT                    372

1   here or the third floor if you were there for a

2   sufficient period of time?

3            THE WITNESS:  Is that information sometimes

4   available in terms of where we understand a device's

5   positioning to be within a building?  Yes.  I can't

6   speak to how, if at all, that factors into the warrant

7   process.  I would be shocked if they're at the point

8   of being so specific to lore as opposed to area.

9            THE COURT:  So, I can tell you I don't know

10  where I hear these things.  I've heard that you could

11  tell whether somebody is in one apartment or another

12  through a geofence.

13           THE WITNESS:  Oh.  I can't speak to the

14  warrant process.  I can say that data itself, it is

15  possible with -- it is possible at just a raw data

16  level to make some estimation of where a user is --

17  where a device is in terms of elevation, yes.  I don't

18  know how that translates to the --

19           THE COURT:  Right.  Well, I would think if

20  you have home Wi-Fi or something, right?

21           THE WITNESS:  There are -- I mean, we've

22  looked at it from several different angles over the

23  years, both in terms of emergency response, someone

24  has a distress, and how we can communicate or how it

25  can be relayed this person is on a specific floor.

McGRIFF - DIRECT            373

1   Again, all of this comes back to location inference.

2   There are a lot of signals that are available, but

3   they're not always available.  So a user may have

4   Wi-Fi enabled; they may not.  And so we look at all of

5   those signals and try to infer, to our best

6   estimation, where you are.

7        This is also true in the context of Maps when

8   you're in a mall.  We will do our best to determine

9   whether you are on the second floor of the mall or the

10  first floor of the mall if we have launched our

11  directory to help you navigate indoors.  But that's a

12  very nascent area.  It's a best guess.

13       So from my understanding of the warrant

14  process, it's not that granular, and I would kind of

15  be puzzled if they asked us for that, only because we

16  would just say okay.  We wouldn't be able to guarantee

17  it in any way.

18       THE COURT:  Right.  What it says is it's a

19  meter -- I can't remember the range.  Anyhow, I've

20  asked my questions.  So you all can follow up on that

21  or not.

22       I appreciate your putting up with my

23  layperson's terms.

24

25

1      CROSS-EXAMINATION

2    BY MR. SIMON:

3    Q   Good morning, Mr. McGriff.  I'm just going to

4    clarify a number of things with you because I think it

5    would be helpful for all involved.

6        What is your day-to-day job at Google?

7    A   I am a Product Manager in Geo.

8    Q   Okay.  So, in that role, what do you do on sort of

9    a day-to-day basis?

10   A   I look at all of the products and features that

11   I'm responsible for, both what is currently in

12   production, what we are currently implementing to be

13   released into production soon, and then also what we

14   might be working on in the future.

15   Q   And so those products that you have some ownership

16   over, are those, to some extent, quite involved with

17   Location History or how do you determine which

18   products you might have some ownership over?

19   A   It steadily evolves over time.  I do have

20   responsibility for Location History overall as a

21   product.  As the defense blog posts reference, I also

22   looked at several broader features for Maps, including

23   Maps incognito mode, other general location aware

24   features and functionality.  But, again, that is

25   steadily evolving over time.

McGRIFF - CROSS                375

1   Q    Okay.  And in this case, I know you were brought

2   in, in part, because of some discussion about Location

3   History; right?

4   A    That is correct, yes.

5   Q    And you submitted -- we've got a smaller binder

6   that's there and that will be used primarily here.  It

7   might go to some defense exhibits.  But in that

8   binder, there are a number of exhibits.  One's marked

9   Government's Exhibit 3.  You can take a look.  And

10  we've got Government's Exhibit 3B and Government's

11  Exhibit 3C.  Those would be the first declaration,

12  supplemental, and the third.

13      Are those the declarations that you submitted in

14  this case?

15  A    3, B, and C, that is correct, yes.

16          MR. SIMON:  Okay.  And, Judge, I'd move to

17  admit those as Government's Exhibits 3, 3B and 3C.

18  They've been admitted as defense exhibits, but --

19          THE COURT:  Right.  There's no objection,

20  right?

21          MS. KOENIG:  Right.

22          THE COURT:  They'll be admitted.

23          (Government's Exhibit Nos. 3, 3B, and 3C are

24  admitted into evidence.)

25  BY MR. SIMON:

McGRIFF - CROSS                    376

1    Q    Now, am I to understand that, as you testify here

2    today, you stand by those declarations; right?

3    A    That is correct, yes.

4    Q    And so your testimony before this Court is merely

5    to clarify through the questions that we ask you;

6    right?

7    A    That is correct, yes.

8    Q    Now, you were asked on direct a number of

9    questions about search warrants, about the geofence.

10   Let's just be clear about it.  Your job is not to

11   respond to geofence warrants, is it?

12   A    Thankfully not, no.

13   Q    In fact, you literally -- when Detective Hylton

14   testifies that he served a search warrant on Google

15   for this geofence in this case, you weren't involved

16   in that at all; right.

17   A    No.

18   Q    And you typically don't get involved unless there

19   is some specific sort of technical question about

20   Location History; right?

21   A    That is correct, yes.

22   Q    Okay.  Now, because there have been so many

23   questions asked to you about the search warrant,

24   despite it not being your job, I do want to ask you,

25   is it your understanding that a Google geofence

1    warrant simply calls on Google to provide, based on

2    probable cause determined by a magistrate, a

3    magistrate judge, maybe an Article III judge, to

4    provide only those devices that have coordinates that

5    fall within a certain geofence if Google so determines

6    that they do?

7    A    That is my understanding, that's correct.

8    Q    So the warrant never calls on Google to provide

9    anything outside of the geofence warrant; is that

10   correct?

11   A    That is correct, yes.

12   Q    Not this case in particular.

13   A    That is my understanding, yes.

14   Q    Now, there have been some questions about Location

15   History information, what happened in this case.  If

16   the government's warrant asked you to give us those

17   location coordinates, that would be responsive; right?

18   A    Yes.

19   Q    And because Google wants to comply with the

20   warrant as is, it only provides Location History

21   information; right?

22   A    Yes.

23   Q    So in looking at your affidavit -- I'll get the

24   right one up.  It's paragraph 16 and 17.  It looks

25   like it's 96-1.  That's going to be your first

McGRIFF - CROSS                        378

1   declaration.  I'll let you look at those paragraphs,

2   16 and 17.

3             THE COURT:  This is Government's Exhibit 3?

4             MR. SIMON:  Correct, Judge.  My apologies.

5   A   Okay.

6   Q   Now, can you explain -- and also maybe take a look

7   at 21 and 22.  Can you explain why -- and they're

8   explained in more detail in 16 and 17 and 21 and 22 of

9   your first declaration, but why don't we have anything

10  other than Location History information returned in

11  this warrant?

12  A   As mentioned, Location History is the precise

13  device storage where you get granular information.

14  WAA would understand, if location was captured in WAA

15  with associated activity, only at a very granular

16  level that you were in Richmond.  Or it would depend

17  on if you went to very -- I have family in Halifax,

18  Virginia.  There's nothing in Halifax, Virginia.  If I

19  go there, I will probably be coursened at a WAA level

20  to being in greater Danville.

21            THE COURT:  WAA is Web & App Activity?

22            THE WITNESS:  Yes, Web & App Activity.

23  A   There are not enough people there.  So it's just

24  coursened to a level where they can guarantee a

25  certain amount of privacy.

1    So these other stores would not have the

2    information that Location History has in terms of the

3    level of detail.

4    Q   Okay.  And that's the same with Google Location

5    Accuracy?

6    A   Google Location Accuracy moves even farther in the

7    opposite direction.  That collection from the time of

8    collection is anonymized.  So it's not associated with

9    a specific user.

10   Q   Okay.  And so the bottom line, the reality of why

11   Google returned Location History information in this

12   case is because it's the only thing responsive to a

13   warrant for coordinates that are within a certain

14   radius at a certain time; right?

15   A   That is my understanding, yes.

16   Q   Now, talking about Google location information,

17   we'll get into sort of the business and how Google

18   does its business with location.  But the 68 percent

19   confidence interval, when we talk about that, to be

20   clear, we're not talking about that broader 150-meter

21   geofence that we draw; right?  That's not where the

22   68 percent is sort of focused on; right?

23   A   Yes.

24   Q   So it's actually focused on what we're looking at

25   as sort of the display radius; right?

McGRIFF - CROSS                 380

1  A    That's correct, yes.

2  Q    So when we talk about 68 percent, we're talking

3  about 68 percent within the blue radius?

4  A    That is correct, yes.

5  Q    Not the geofence that we draw saying only give us

6  devices within this area; right?

7  A    Yes.

8  Q    Okay.  If you want to clarify, go ahead.

9  A    No, no.  Yes.  Your questions made me realize

10 earlier questions.  The answer is yes.

11 Q    Okay.  If we talk about certain points in the data

12 set that we have here, there will be Defense Exhibit

13 3, I think it is, that's under seal, has a number of

14 different data points for the anonymized reference ID

15 numbers we got at the first phase here, within that

16 geofence radius.  And there will be points that will

17 say a Wi-Fi point will be 84 meters.  And then within

18 30 seconds, there's a 387-meter display radius.  And

19 that's a Wi-Fi point.  Could you explain why that

20 might be?

21 A    All of these readings are from device sensors.

22 There could be any number of reasons why the device

23 sensors connect to different signals or record

24 different signals.  I can't offer any specific answers

25 for this case, but it is possible that you get

McGRIFF – CROSS                381

1    different readings at different times.

2    Q    Okay.  As it relates to the accuracy of Google's

3    location information, you would agree that this isn't

4    a shot in the dark for Google, that Google maintains

5    relatively good location information; right?

6    A    It is not a random number generator, no.

7    Q    And it's -- I guess to get to maybe a clearer

8    point, it is a technologically advanced assessment of

9    whether somebody is within a certain place at a

10   certain time; right?

11   A    It is a good-faith attempt to make an informed

12   decision, yes.

13   Q    And so in one particular sort of point, I guess,

14   in that -- sort of that space, is that Google has made

15   the point that Location History information might even

16   be a little bit better or much better than cell-site

17   location information; right?

18   A    That is likely true, yes.

19   Q    So to the extent that we're talking about the

20   folks being within that blue -- in the blue radius,

21   not the broader geofence, Google's got good

22   information on those devices; right?

23   A    Yes.

24   Q    Now, are Google's privacy policies online?

25   A    Yes, they are.

1    Q    They're publicly accessible, then; right?  And so

2    are the terms of service, presumably?

3    A    Yes.

4    Q    And if we were to go on Google today, as defense

5    counsel showed you, we'd find everything Google's ever

6    said about terms of services and privacy policies;

7    right?

8    A    Apparently, yes.

9    Q    And when Google users set up Google accounts, it's

10   my understanding that they would be agreeing to

11   Google's terms of service -- right? -- in the process?

12   A    Yes.

13   Q    And would they also be agreeing to Google's

14   privacy policy?

15   A    I believe so, yes.

16   Q    Now, if I show you -- I think you've looked at it

17   already because it's admitted -- Defense Exhibit --

18   Defense Exhibit 43A, the redlined privacy policy.  I'm

19   not going to spend a ton of time on this.

20          THE COURT:  It'd appreciate it going up on

21   the screen.

22          MS. KOENIG:  Sure.

23   BY MR. SIMON:

24   Q    When we look at this privacy policy --

25          MR. SIMON:  And, Judge, I'm looking at the

1   first page.  It's marked May 25 on the bottom left.

2   Q   When we read the paragraph that starts "Our

3   privacy explains," what's cut out that it explains?

4   A   I'm sorry.  Can you repeat that?

5   Q   What is cut out there?  What is sort of marked

6   out, as defense counsel's sort of insinuating that it

7   was taken out of the policy?  But what is marked out

8   there?

9   A   Well, there was copy that was there that was

10  refined in some way.  So that was replaced with the

11  copy below.

12  Q   Okay.  And so in many ways, what's happening is

13  Google is sort of maybe moving things around as

14  opposed to totally deleting them or inserting them?

15  A   What's happening here is, again, as I mentioned

16  yesterday, with any product, you are always making

17  improvements.  There are always refinements.  There

18  are new technologies, new capabilities, new sensors,

19  new understandings.  So these are living documents

20  that will always evolve to reflect the current

21  context.  All of the inputs of feedback, both from

22  critics and friends, users, all of that is informing

23  in how you continually improve.

24      So the crossed-out portions are the way they stood

25  at some previous point.  The replaced copy is a -- at

McGRIFF - CROSS                          384

1   the time a good-faith attempt at better presenting the

2   previous copy.

3   Q    Okay.  And if you look with me at page 3, I'll end

4   it here, page 3 and 4, but starting with "Information

5   we collect," we collect from your use of our services.

6   Do you see that?

7   A    Yes.

8   Q    And it then begins to provide a list of services

9   that were in that December 18 policy; right?

10  A    Yes.

11  Q    December 18, 2017 policy.  If you go to the next

12  page, page 4, are you there with me?

13  A    Yes.

14  Q    Is "location information" on that page?

15  A    Yes, it is.

16  Q    So that would mean that location information was

17  set forth -- that you all collected location

18  information December 28th of 2017; right?

19  A    Yes.

20  Q    Okay.  Now, in both of these privacy policies,

21  would it be fair to say that Google provides folks

22  with some reasons that third parties might get

23  information on them?

24  A    I believe that is explicitly mentioned, yes.

25  Q    And one of those reasons is a legal reason; right?

McGRIFF - CROSS                385

1    That government might come with a search warrant with

2    probable cause; right?

3    A    The government is crafty, yes.

4         MR. SIMON:  Judge, I think at this point I'd

5    move to admit -- the witness has testified that the

6    privacy policy and terms of services are available

7    online.  We pulled in Government's Exhibit 5 and 5A --

8    I don't think the defense will object to this -- but

9    move in the privacy policy effective January 22, 2019,

10   that's Government's Exhibit 5 and 5A, the terms of

11   service modified as of October 25, 2017.  We'd move to

12   admit those.

13        MS. KOENIG:  Judge, I don't believe he's

14   presented those exhibits to Mr. McGriff to identify or

15   even recognize.  So I think that's the first problem.

16   And the second, I think, is we have to establish

17   relevancy of those.  There may be a relevant reason,

18   but those were certainly something that existed

19   afterwards.

20        MR. SIMON:  Judge, we've -- the privacy

21   policy as of January 22 --

22        MS. KOENIG:  I'm sorry.  I missed the date.

23   But I think you still need to show him the exhibit.

24        MR. SIMON:  Sure.

25   BY MR. SIMON:

McGRIFF - CROSS                    386

1  Q   Can you take a look at Government's Exhibits 5 and

2  5A?  Government's Exhibit 5 is long.  So I'll let you

3  flip through it.

4  A   Exhibit 5 is the privacy policy as of January 22,

5  2019, and Exhibit 5A is the terms of service as of

6  October 25, 2017.

7          MR. PRICE:  Judge, we'd now move to admit

8  Government's Exhibit 5 and 5A.

9          MS. KOENIG:  No objection at this point, Your

10 Honor.

11         THE COURT:  All right.  They are entered.

12         (Government's Exhibit Nos. 5 and 5A are

13 admitted into evidence.)

14 BY MR. SIMON:

15 Q   Mr. McGriff, just to be clear, I know we've asked

16 you about these privacy policies, but the best

17 evidence of Google's privacy policy in terms of

18 service are going to be from the online sources;

19 right?

20 A   That's correct.

21 Q   In this case, the search warrant called for those

22 location coordinates within the radius, and you've

23 noted that only Location History information was

24 responsive to the warrant; right?

25 A   That's correct, yes.

McGRIFF - CROSS                387

1   Q    And that means that if the defendant's account

2   didn't have Location History enabled, we'd get

3   nothing; right?

4   A    That is correct, yes.

5   Q    And I just want to sort of be emphatic about that.

6   It is not that he turned on Location on his device;

7   right?

8   A    That is correct.

9   Q    And so when I say that, it's not that I get a

10  phone, and I say I want to use where I am at this

11  moment; right?

12  A    That is correct, yes.

13  Q    And neither is it if I turn on Google Maps, and I

14  want realtime location services, I don't want to just

15  put in one address and go to another, just doing that

16  doesn't enable Location History, does it?

17  A    No, that is correct.

18  Q    And so when we talk about Location History, we're

19  talking about that setting that you have said

20  two-thirds of your customers have found the ability to

21  not enable; right?

22  A    That is correct, yes.

23  Q    Okay.  And that's in your declaration that

24  approximately one-third have turned it on; right?

25  A    Yes.

McGRIFF - CROSS                    388

1   Q    But even after it's turned on, even after it's

2   turned on, you can delete it?

3   A    Yes.

4   Q    You mention on direct, you said we use the word

5   "pause"; right?

6   A    Yes.

7   Q    Not for deletion, but for turning it off?

8   A    That is correct.

9   Q    And so when it's paused, it is off?

10  A    It is functionally off, yes.

11  Q    Let's be clear about it.  When it's paused, there

12  is no record that would be responsive going forward

13  from Google on the defendant's account; right?

14  A    That is correct.

15  Q    So if I had Location History enabled in this case,

16  the robbery, I think, took place May 20, 2019, if I

17  paused that on May 19, 2019, and I still had location

18  on on my device, and I traveled with it the next day,

19  Location History wouldn't know where I traveled on

20  May 20 that next day; right?

21  A    That's correct.

22  Q    And by the same token, the government could come

23  to you with a warrant five times -- as many times as

24  we wanted.  We wouldn't get information on May 20,

25  2019; right?

1    A    That is correct.

2    Q    All right.  When we talk about the deletion, you

3    mentioned near immediate deletion; right?

4    A    That is correct, yes.

5    Q    Can you clarify what that means?  If I deleted --

6    and maybe -- if you can.  If I deleted my Location

7    History information at 5 p.m. Eastern, would Google

8    turn the information over to the government if they

9    served the warrant the next morning?

10   A    By design, we will return in response to these

11   warrants whatever we have.  The deletion process

12   begins immediately.  There is some point in that

13   process where the data is not retrievable for this

14   purpose.  And the reason it's hard to put an exact

15   point in time on that is we have servers.  The data is

16   stored on tapes and servers.  It will take time to

17   propagate through the full system before data is

18   deleted from tapes.  But I am also certain that we are

19   not getting to the point of retrieving tapes from data

20   centers to respond to the warrant.

21        So there is some point in that flow where

22   eventually it's no longer accessible by the tools

23   because it's too far along in the deletion

24   propagation.  I just -- I don't have a way of putting

25   an exact time on when that happens.

McGRIFF - CROSS                    390

1    Q    So in this case, we -- the robbery happened on

2    May 20, 2019.  We came to Google on June 14 of that

3    same year.  If the defendant had deleted his Location

4    History information, it wouldn't have been available

5    by that point; right?

6    A    If it was deleted the day after, I don't see how

7    it would be possible for it to still be available, no.

8    Q    But as a general matter, the near immediate

9    deletion, you're saying that happens in realtime?

10   A    The request is initiated right away.  Again, it

11   just takes time to propagate down to tapes.

12   Q    Okay.  When we've talked -- and pausing means it's

13   obviously turned off.  Deletion means it's deleted.

14   And when it's paused, it's paused?

15   A    Yes.

16   Q    I wanted to go through with you the opt-in to

17   Location History process that you've described in

18   multiple of your declarations, both the first and the

19   third, which will be 3 and 3C, if you want to

20   reference them as we go through it.

21        Google has server side protections -- correct? --

22   in terms of what information goes into the so-called

23   Sensorvault?

24   A    Yes.

25   Q    So if a user doesn't follow that consent flow,

1   Google rejects collecting the Location History

2   information; right?

3   A    I would flip it and say that collection is not

4   initiated unless there's been a valid consent, yes.

5   Q    And the defense has shown you a number of -- a

6   number of screenshots.  And I'll get to those with

7   you.  But the opt-in on this device, I know you don't

8   have the specific user interface, but we have Location

9   History information on this phone.  It had to follow a

10  verified consent flow that Google had at that time;

11  right?

12  A    Yes.

13  Q    And that consent flow, as you noted, a verified

14  consent flow would be the same across all applications

15  and devices?

16  A    It's the same consent that was acknowledged in

17  some context, yes.

18  Q    When we talk about the consent flow that you were

19  talking about on direct for Google Assistant and the

20  consent flow generally, there is always a process by

21  which you would have to see what you're consenting to

22  on the page; right?

23  A    There is some reference to -- yes.  Yes.

24  Q    And you'd have to scroll down to get to the

25  buttons in question?

McGRIFF - CROSS                    392

1          THE COURT:  The what question?

2          MR. SIMON:  I'm sorry.  The buttons.

3          THE COURT:  So, I think, especially at the

4     end of your sentences, which usually include your key

5     aspect of the question, I'm having trouble hearing it.

6          MR. SIMON:  Okay.  Apologies, Judge.

7          THE COURT:  That's fine.

8     BY MR. SIMON:

9     Q    You'd have to go down to the "Turn on" or "No,

10    thanks" buttons before you consented to, in this case,

11    Location History; right?

12    A    In that specific flow, yes.

13    Q    Now, in your supplemental declaration, and I think

14    you stated on the record that you stand by these

15    declarations, you noted that the defense expert was

16    wrong when he said all you had to do to have

17    successfully enabled Location History information was

18    click "Yes, I'm in" on Google Maps; right?

19    A    Yes.

20    Q    At the same time, the screen that the person would

21    be seeing on Google Maps does say that Google

22    periodically stores your location; right?

23    A    Yes.

24          THE COURT:  So, are you moving into evidence

25    3B?

McGRIFF - CROSS                    393

1          MR. SIMON:  Judge, I think we've already

2    moved in 3B.  I moved them all in together, 3A, 3B,

3    and 3C.

4          THE COURT:  Oh, I thought you just did 3A and

5    3C.

6          MR. SIMON:  No.  If I did, I do want to move

7    in 3B.

8          THE COURT:  There's no objection, right?

9          MS. KOENIG:  That's right.

10          THE COURT:  It's in.

11   BY MR. SIMON:

12   Q    Now, with respect to the Google Assistant opt-in,

13   did you have a chance to previously watch videos that

14   the defense counsel have provided in preparation for

15   this hearing?

16   A    If I remember correctly, I saw two videos, yes.

17   Q    Did you happen to see possibly a "Got To Be

18   Mobile" video?

19   A    I believe so, yes.

20   Q    I'm going to show you what was formerly marked as

21   Defense Exhibit 8.

22          MR. SIMON:  But I've marked it, Judge, for

23   this hearing, Government's Exhibit 12.  It's a video,

24   Judge, that I just think will play for about 15

25   seconds, and then skip to a certain point in the

McGRIFF - CROSS                    394

1    video.

2              THE COURT:  All right.  Is there any

3    objection to the use of this exhibit?

4              MS. KOENIG:  I don't know what the --

5              MR. SIMON:  This is the "Got To Be Mobile"

6    video that you provided to us in preparation for the

7    November hearing that was no longer on the list for

8    this hearing.

9              But we can play it, Judge.

10             MS. KOENIG:  I think we need to have a couple

11   of questions that are laid.  So we had that on our

12   exhibit list.  I'll tell the Court that we don't know

13   when that video was made.  So if we can lay a

14   foundation about when that was created, that will be

15   helpful.

16             MR. SIMON:  Judge, ample hearsay has been

17   admitted in this hearing, one.  I think it's a YouTube

18   video.  We can do that through our expert later

19   subject to connection on the date on that.  That has a

20   date to it that defense counsel provided to us again.

21   This is how we have the video and that the witness has

22   said he's watched.  I'd like to have him watch the

23   video and say he's watched it.  And to the extent that

24   --

25             THE COURT:  Was it played in the earlier

McGRIFF - CROSS                    395

1  hearing?

2          MS. KOENIG:  It wasn't.  Your Honor, this

3  video is a video that we had identified as a potential

4  exhibit for the November of 2020 hearing that we had

5  to continue.

6          All I'm saying, there is a date that is

7  associated with the video, but that is the video

8  creation date, not when the -- that is the video

9  posting date, not when the video was created,

10  necessarily.

11          THE COURT:  All right.  Well, I will admit it

12  subject to those objections.

13          You know, we're establishing a full record

14  here.

15          MS. KOENIG:  Sure.  And I appreciate that.

16          The other thing I'll just note for the Court

17  is that the video skips.  I indicate to the Court that

18  we had anticipated potentially introducing this.  We

19  just noticed some flaws with this, and I just wanted

20  to bring them to the Court's attention before we watch

21  it.

22          THE COURT:  Okay.  Well, that's different

23  than objecting to its entry.  Okay.  It's entered.

24          (Government's Exhibit No. 12 is admitted into

25  evidence.)

McGRIFF - CROSS                    396

1        MR. SIMON:  Thank you, Judge.  We'll play it.

2        (Video is played.)

3  BY MR. SIMON:

4  Q   Mr. McGriff, in this video, is this what we're

5  talking about when we talk about Location History

6  information?

7  A   No.

8  Q   Okay.  This is just sort of what you would agree

9  to if you wanted Google Maps to have realtime

10 information?

11 A   Any app, yes.

12 Q   Any app.  Okay.

13     (Video is played.)

14 Q   Is this where if you were going to enable Location

15 History on this phone, a Samsung Galaxy S9, at setup,

16 is this a possible consent flow screen you'd see on

17 Location History?

18 A   This is a possible flow, yes.

19 Q   Okay.  Is Location History on the screen by

20 itself?

21 A   It is.  As I mentioned previously, the user would

22 be presented with whatever consents were not already

23 agreed to that were required or suggested required in

24 this context.  So the only one that was prompted here

25 is Location History, yes.

McGRIFF - CROSS                 397

1    Q    And to get past this page, you'd have to choose --

2    what are the options there?

3    A    Two options, "No, thanks" or "Yes, I'm in."

4    Q    Okay.  And, again, the line down at the bottom

5    reminds the user.  It appears that they can go to

6    account -- myaccount.google.com; is that right?

7    A    That's correct, yes.

8    Q    To change those settings?

9    A    Yes.

10             MR. SIMON:  Judge, no further questions on

11   Government's Exhibit 12 at this point.

12             THE COURT:  All right.

13   BY MR. SIMON:

14   Q    Well, just to reiterate.  This is a possible

15   consent flow, as well -- right? -- that the defendant

16   might have encountered in July of 2018?

17   A    That's possible.  The screen immediately before is

18   saying, hey, there's Assistant.  Do you want this?

19   And this following screen, "Yes."

20   Q    Where Location History stands alone?

21   A    That's correct, yes.

22   Q    Do you have any reason to believe that that's not

23   a Samsung Galaxy S9 Plus?

24   A    I am not an expert on Samsung devices.

25   Q    Understood.

McGRIFF - CROSS                398

1        Now, I want to talk about the reality of Google
2   Assistant and sort of the value that it has, to some
3   extent.
4              THE COURT:  The value it has to what?
5              MR. SIMON:  To some extent.
6              THE COURT:  Okay.
7   BY MR. SIMON:
8   Q    The Google Assistant -- in opting in through
9   Google Assistant doesn't change that to have Location
10  History information.  You first, at least, have to
11  turn location settings on a device on; right?
12  A    That's correct.
13  Q    And that's just if I have my phone, again, I need
14  to tell my phone you can get my location.  So it
15  wouldn't change that?
16  A    Correct.
17  Q    It doesn't change that I would have to get to a
18  screen like we've just seen in Government's Exhibit
19  12, or as defense has posited, where you've got a few
20  more options.  You'd have to say either, "Yes, I'm in"
21  or "Turn on" or "No, thanks"?
22  A    That's correct.
23  Q    And at the same time you'd also have to make sure
24  that location reporting is on just beyond the device;
25  right?  It's, like, the app level setting?

1  A    Location reporting -- the control that is a

2  subsetting of Location History is enabled on the

3  device that you opted in on if it is a mobile device

4  that can be used for Location History.  We don't

5  support all form factors.  So, for example, you can't

6  opt in to Location History through a TV.  But if you

7  were signed into any other devices, it would not

8  enable location reporting on those devices remotely,

9  no.

10 Q    Just to be clear about your testimony on direct,

11 you don't believe that pressing "No, thanks" that's

12 set forth in Defense Exhibit 7, pages 3 and 4, that

13 that would mean you can't use Google Assistant; right?

14 A    That's not my understanding, no.

15 Q    There was some discussion of -- and, obviously,

16 you'd have to turn on the device.  And there's the

17 point about signing in to your Google account.  So you

18 still -- if I have a phone, and I have Location

19 History enabled, you could actually just sign out of

20 the Google account altogether on a phone; right?

21 A    That's correct.

22        THE COURT:  Wait, wait, wait.  What do you

23 mean by that?  Sign out --

24 BY MR. SIMON:

25 Q    So, you can help me explain it.  There are -- when

McGRIFF - CROSS                  400

1    I have a phone, and I set up a phone, if I tie a

2    Google account to the phone, then the phone has my

3    Google account connected to it; right?

4    A    Yes.

5    Q    And I would have to be signed in to that Google

6    account for Location History information to be

7    accessible; right?

8    A    Yes.  You can add a Google account -- multiple

9    Google accounts to a device.  Just as easily as you

10   can add them, you can remove them.  So you can sign in

11   and out of accounts on a device, yes.

12   Q    And those application level options, talking about

13   in your declaration, particularly the third one, I

14   think it's from paragraph 25, where you talk about you

15   could say allow an application to use my location

16   sometimes, deny it, allow it only while I'm -- or

17   allow it all the time.  Those options are available on

18   both Android and iPhone?

19   A    Yes, those are the operating system, OS, level

20   controls for app access to location.

21   Q    Okay.  And there's a lot of sort of discussion

22   about privacy concerns of Google users.  You'd agree

23   that there's a sort of varying level of interest in

24   privacy by different users; right?

25   A    There are varying degrees of privacy

McGRIFF - CROSS                401

1  considerations, yes.

2  Q   So there is some discussion that some people are,

3  like, convenience seekers.  I've seen that phrase

4  used.

5  A   Yes.

6  Q   And so by that, I don't mind what Google is asking

7  for -- right? -- because what I'm interested in is

8  going from point A to point B, and I want realtime

9  traffic directions; right?

10 A   That is possible, yes.

11 Q   With respect to the two-thirds of folks who have

12 not enabled Location History, your testimony on that

13 one-third piece is that that has been consistent

14 across the time that Location History has been enabled

15 or has been a product; right?

16 A   For the life of the product, yes.

17 Q   How long has it been a product of Google's?

18 A   Many years now.

19         THE COURT:  How many?

20         THE WITNESS:  Many years now.  I believe it

21 was made a product in 2015 or 2016.

22 BY MR. SIMON:

23 Q   So over the course of those -- in this case, by

24 the time you have 2019 -- four years, the number has

25 been roughly the same, a-third of users have enabled

1    it?

2    A    That's correct.

3    Q    Two-thirds have decided not to collect Location

4    History information?

5    A    That's correct.

6    Q    And, again, the only reason that you had anything

7    to give us under geofence warrant is because Location

8    History was enabled on the defendant's account?

9    A    That is correct, yes.

10   Q    There was some questions on direct about the

11   search that Google does to give us the responsive

12   information.  You don't posit -- right? --that you

13   gave us anything other than 19 devices in this case?

14   A    I have no visibility into the processing and

15   servicing of these warrants.

16   Q    Right.  So I'm making a mistake there, too, in

17   asking warrant-related questions.  But to the extent

18   that Google responds to the warrant, it is always

19   going to be for only the devices that were within a

20   radius at a certain period of time; right?

21   A    That is correct.

22   Q    And is there a possible way in which -- we've

23   talked about sort of the indexing possibly, the grid

24   and location coordinates.  Isn't there a way that

25   Google could possibly keep folks who are in Richmond

1    on a certain side of town -- I'm going to use the

2    right words here -- sort of separate them out in terms

3    of their location coordinates just based off of where

4    they are at a certain period of time?

5    A    Is the question is it possible to refine the scope

6    of the request?

7    Q    To refine the scope -- the manner in which Google

8    goes about getting information inside of its own

9    servers.

10   A    Objectively, yes.  This process could be refined

11   and crafted in a number of ways, yes.

12   Q    On the Google side; right?

13   A    On all sides, yes.

14   Q    When we talk about -- but the warrant in this

15   case, specifically, you agree, just asks for folks who

16   Google determines is within a certain radius at a

17   certain period of time; right?

18   A    That's correct.

19   Q    So it would only be our interest in this case, and

20   the government's interest in other cases, to know

21   which devices were at the site of an alleged crime;

22   right?

23   A    That is my understanding, yes.

24   Q    And the manner in which Google undertakes this

25   search, that is not directed by the government; right?

McGRIFF - CROSS                    404

1   A    No.

2   Q    And when I use "search" -- not to cut you off.

3   When I use "search," I'm not using that in the context

4   of sort of the Fourth Amendment.  And when you say

5   "searching the database," you're not talking about the

6   issues at hand here; right?

7        Let me ask it another way:  You're not a lawyer;

8   correct?

9   A    Far from it.

10  Q    And I'll just leave it there.

11       The discussion of anonymized devices and

12  deidentified is a phrase that Google uses; right?  The

13  release of data by Google responsive to the request,

14  particularly just focusing on the first stage here,

15  give us the devices within a certain period of time at

16  the site of an alleged crime.  That does not give us

17  the name of the individual involved; right?

18  A    That's correct.

19  Q    It does not give us a phone number of the person

20  involved; right?

21  A    That is correct.

22  Q    It doesn't tell us anything other than the

23  location coordinates that are responsive to them being

24  at the site of an alleged crime at the time alleged in

25  the warrant; correct?

McGRIFF - CROSS                    405

1   A    That is correct, yes.

2   Q    The discussions of Google's business model,

3   location information matters to Google's bottom line

4   in terms of money; right?

5   A    I cannot speak to the impact on our bottom line

6   overall as a company.

7   Q    I guess to use a phrase, location information that

8   users provide you can be used as a commodity within

9   the business?

10  A    I would say -- I would generalize that slightly to

11  say that location awareness is a core component of

12  computing broadly in all contexts at this point in

13  time.

14  Q    Okay.  Computing broadly --

15  A    Just there are very few products and services

16  beyond Google that don't rely on some location

17  awareness, whether it be to understand whether or not

18  you can view content in a specific area.  I mean,

19  there are broad uses of location information generally

20  in terms of just how information technology works

21  today.

22  Q    Okay.  In looking at some of sort of the uses that

23  when Google is providing goods and services to its

24  customers and doing so in an effective way, that's a

25  part of Google's business model; right?

McGRIFF - CROSS                    406

1   A    Our goal is to be effective, yes.

2   Q    And I ask that sort of basic question because when

3   we look at --

4          MR. SIMON:  Can we pull up the first

5   affidavit of Mr. McGriff.  This is Exhibit 3.

6   BY MR. SIMON:

7   Q    In paragraph 5, you sort of note that the use of

8   this information sort of allows a user to store and

9   record their movements and travels; right?

10  A    That's correct, yes.

11  Q    And you sort of used that -- this information is

12  used to do, among other things, sort of make -- sort

13  of make different -- give sort of targeted ads that

14  might be of value?

15  A    Location History isn't used for ads targeting.

16          THE COURT:  I'm sorry.  What was your answer?

17          THE WITNESS:  Location History is not used

18  for ads targeting.  It's specifically used for ads

19  measurement.

20          THE COURT:  For ads --

21          THE WITNESS:  Measurement.

22          THE COURT:  Measurement.  Okay.

23  BY MR. SIMON:

24  Q    And I think that you corrected me there.  So the

25  point is location is what is used for those types of

1    improvements; right?

2    A    That's correct.

3    Q    Bottom line location, not necessarily what's

4    stored as responsive to this search warrant?

5    A    That's correct.

6    Q    But they're both, in a broad sense, location?

7    A    They are all location, yes.

8    Q    But, again, the only thing we get in this case is

9    what's stored in the Sensorvault, and that's only

10   Location History?

11   A    That is correct.

12   Q    In paragraph 14, I'm just going to ask you to read

13   it and sort of explain for us what you're getting at

14   there.

15   A    Let me read the whole thing.

16        So, this specifically speaks to ads measurement,

17   and what I had previously mentioned in the context of

18   the COVID mobility reports or other sort of aggregated

19   deidentified uses of this information.  It's not from

20   an advertisement or advertising perspective.  It's not

21   that I specifically, as a user, went to a specific

22   space or place.

23        The interest in use here is the effectiveness of

24   I as -- not I at all.  That some percentage of people

25   saw this and went to this place.

McGRIFF - CROSS                    408

1    So paragraph 14 is speaking at a very high level

2    to the fact that in its aggregate, anonymized form,

3    this information can be used to measure the

4    effectiveness.  And so that's the measurement, ads

5    measurement.

6    Not -- no way do we share, and never have we

7    shared, explicitly that I went to a specific place

8    with a third party.

9    Q   Understood.  But it's used in an aggregated --

10   A   Correct.

11   Q   In stepping to -- because, again, they're

12   different location services.  Just the ability to

13   track location is different than what's stored in the

14   Sensorvault as Location History.  So I'm going to ask

15   you about just the location services generally.

16   A   Okay.

17   Q   Those are -- those coordinates, not relevant to

18   this particular warrant, but if I use Google Maps,

19   say, on my phone, you all would use the coordinates

20   from Google Maps to improve services or me as a user

21   of Google Maps?

22   A   I don't know what you mean in that context.

23   Location services at the device level, that would be

24   available to Google Maps.  So depending on whether you

25   gave Maps access to -- there's those options you

1    mentioned; always, never, while in use.  So if Maps

2    did not have access to location, then it would not

3    have location awareness.  If you granted Maps while in

4    use, it would only have access to device location

5    while you were using Maps, meaning Maps was in the

6    foreground.  And if you said always, then Maps will

7    have location access even when you're not using Maps.

8         So in terms of Maps' specific access to location,

9    it would be determined by those permissions and what

10   the user granted.

11   Q    Okay.  Let's say a user grants Google information

12   on its location when using Google Maps.  Do you use

13   any of that location -- this is different from

14   Location History information, but do you use any of

15   that location to sort of do things like provide

16   realtime traffic updates?

17   A    That's a great question.  Traffic updates and

18   understanding, there are any number of signals that

19   inform that.  Again, that's an aggregate.  So it's not

20   somehow my experience driving from here, three blocks

21   over, is directly going to change what you see on your

22   navigation experience.

23        But, you know, if several thousand people drove

24   this way and encountered the same issue, that in

25   aggregate would be reflected.  That location signal is

1    one of many signals, yes.

2    Q    Okay.  And things sort of like the -- you

3    mentioned the ads, but if I give Google my location,

4    just generally, you would ensure that I might receive

5    more relevant ads based on location; right?

6    A    Are you speaking about a specific app or do you

7    just mean Google generally being location aware?

8    Q    I mean, you can talk about it however you want to,

9    but I understand Google has a lot of products, and so

10   I don't think it's of great value to go product by

11   product.  But just in general, the use of location

12   information as provided by users, not the Location

13   History, but just location services reporting to

14   Google, do you all use that in terms of offering

15   better services to customers, and if so, how do you do

16   it?

17   A    So location is very broad.  As I mentioned, you

18   have at its coursest level location used to understand

19   are we able to deliver a certain type of content in

20   this area where we understand the user to be.  Are we

21   able to -- you know, is the user in an area where we

22   should be providing certain services to begin with?

23   That's location at its most course level.

24        Then you get down to a still course level, just a

25   granular city understanding.  If you were to open

McGRIFF – CROSS                411

1    search right now and say "pizza near me" or "baked

2    goods," the search results would be informed by our

3    best understanding at that time of where you are.  And

4    that understanding would be directly informed by

5    whatever service -- whatever consented access we have

6    to your location.

7        So if you had completely turned off all other

8    device signals, we will have at a very course level if

9    you search for "pizza near me," the fact that that

10   request is hitting our server, we will have some

11   concept, but you might see that the pizza results are

12   all over the Richmond region.

13       If you then enabled -- you can keep going down

14   giving us more access to different controls.  You can

15   opt in to Location History on that device and actively

16   be reporting from that device and attempt that exact

17   same query, and we would have a much more refined

18   understanding of when you said "pizza near me," go

19   right outside.  There's a place next door.

20       So there are a lot of layers to the onion, but we

21   will look to -- our responsiveness or what we are

22   presenting to the user will be directly informed by

23   what we have access to in that specific context on

24   that specific device for that account.

25   Q   I wanted to ask some questions, as well, about,

1    just generally, some of the exhibits that came in --

2              THE COURT:  So, Mr. Simon.  I'm sorry to

3    interrupt you, but do you have a while to go on your

4    cross-examination?

5              MR. SIMON:  I don't think a while to go,

6    Judge, but I think 15 more minutes possibly.  I was

7    going to ask my co-counsel if they wanted me to touch

8    anything else.

9              THE COURT:  Right.  You know, we are now

10   hitting in -- it's almost -- it's 20 of one.  We've

11   been sitting here for a while.  So we could either let

12   you finish if it's going to be -- but I don't want to

13   lose folks.  You know, sugar levels may be high or low

14   or whatever it is.

15             MR. SIMON:  Okay, Judge.  I think we can move

16   it along.

17             THE COURT:  Okay.  I'm not trying to rush

18   you.

19             MR. SIMON:  No, no, I understand.

20   BY MR. SIMON:

21   Q    In regards to the functionality of the phone or of

22   a device, when we're talking about, again, the ability

23   to move in realtime and get realtime, like I'm saying

24   traffic updates, that's a location at the device level

25   setting, but also maybe location reporting; right?

McGRIFF - CROSS                413

1    A    You have -- yes.

2             THE COURT:  So it's location device and

3    Location Reporting, is that what you said, Mr. Simon?

4             MR. SIMON:  Yes, Judge.

5    A    To be clear, Location Reporting is specifically

6    capital L, capital R, is a subsetting of Location

7    History.  If you do not have Location History on, you

8    can't enable Location Reporting.  Location Reporting

9    and Location History, distinctly separate from

10   location services at the device level.

11        If location services at the device level are

12   enabled, and you, for example, in your example, I

13   think you were specifically talking about Maps.  You

14   would still have the ability to get access to some

15   location awareness to use Maps.  You don't use

16   Location History to use Google Maps.

17   Q    And that's the case for, really, any realtime sort

18   of update on movements kind of application; right?

19   Location History is not needed for that?

20   A    It depends on what specifically you're referring

21   to, but, yes, there are a lot of realtime updates that

22   are possible with only current location, yes.

23   Q    With respect to the emails that are sort of, I

24   think, I use the phrase "cherrypicked" from the

25   Arizona litigation that Arizona has with Google.  Is

McGRIFF - CROSS                    414

1    it your testimony -- it's my understanding that your

2    point is that's indicative of an ongoing sort of

3    conversation that Google employees have.

4    A    Google employees have a lot of opinions, yes.

5    Q    And to the extent that they've been entered here,

6    I think it's fair to say that you don't generally

7    agree with those opinions as they've been expressed.

8    A    Google employees have a lot of opinions.  I will

9    always listen to Google employees and what they have

10   to say.

11   Q    That worked.  But I wanted to also allow you to

12   comment a bit more about Oracle.  You mentioned on

13   direct examination that Oracle will give the least

14   favorable view to Google.  Can you expand on what you

15   meant by that?

16   A    Everyone has a narrative.  Some facts fit more

17   comfortably in a narrative than others.  That is

18   certainly everyone's privilege in advancing a

19   narrative.

20   Q    Mr. McGriff, I realize I went over a number of

21   things with you, but I do want to end with sort of,

22   again, the most, in my estimation, sort of the most

23   important pieces of what we've discussed.

24        Location History is the only information

25   responsive to a geofence search warrant; correct?

McGRIFF - CROSS                415

1    A    That is correct, yes.

2    Q    And the reason that Google provided only Location

3    History information is because Web & App Activity

4    isn't responsive; right?

5    A    It is no longer responsive, that's correct, yes.

6    Q    And Google Location Accuracy or services, as it

7    was formerly known, is not responsive?

8    A    Not capable of being responsive, yes.

9    Q    And when we say "responsive," we're saying you

10   cannot put devices within a certain period of time

11   within a certain radius sufficiently to turn that

12   over; right?

13   A    It is not possible, that is correct.

14   Q    Okay.  And your testimony here today as it relates

15   to Google Assistant is that you're either going to see

16   a consent flow consistent with Location History being

17   on a page with a few other options or Location History

18   being on a page by itself; right?

19   A    Reiterating that I am not the Google Assistant

20   product manager, my understanding of that flow is that

21   it is dynamic, and depending on a user's previous

22   activities and interaction with Google products and

23   services, they would see some variation of that flow

24   if they chose to set up Assistant at that time.

25   Q    After a user enables Location History information,

McGRIFF - CROSS                416

1   separate and apart from whether they have location

2   services on, they can delete it; right?

3   A    Yes.

4   Q    Yes?

5   A    Yes.

6   Q    Okay.  And near immediate deletion occurs when

7   they seek to delete it; right?

8   A    Yes.

9   Q    And, third, they can pause it; right?

10  A    Yes.

11  Q    And pausing means it is entirely off?

12  A    There is no new collection, that's correct.

13       MR. SIMON:  No further questions, Judge.

14       THE COURT:  All right.  I'm going to ask one

15  question.  And I'm going to allow you to stand there

16  in case it prompts anything.

17       If I were to log in to a Google function on

18  someone else's phone, where does that Location History

19  go?  Does it go to the phone?

20       THE WITNESS:  If you had previously opted in

21  to Location History for your account, and then you

22  signed in to another person's phone, if you were --

23  there's a fork there.  If on your previous device, you

24  had turned Location History on and were actively

25  reporting for some period of time, and then you

McGRIFF - CROSS                    417

1    immediately switched and added your account to another

2    device, then that device would start contributing to

3    your Location History.  It would not start

4    contributing to -- let's say it was my device and I

5    didn't have Location History on, you would not

6    suddenly enable Location History for my account.  The

7    collection on that device would be to your account,

8    not to my account.

9              THE COURT:  Okay.  So if I'm on my law

10   clerk's phone, and I log in to my account, say we both

11   have Location History, does the Location History go --

12   where does it go?

13             THE WITNESS:  For both of you, and you both

14   have opted in to Location History, then for both of

15   you it will be logged in your accounts on our servers.

16             THE COURT:  But if hers is off, then it just

17   goes to me?

18             THE WITNESS:  If she has not opted in to

19   Location History or if she has paused it, then there

20   would be no collection for her account from the

21   information on the device.  It would only be to your

22   account.

23             THE COURT:  All right.  I'm not sure that's

24   relevant, but I'm doing my best to make sure I have a

25   full record.

McGRIFF - CROSS                    418

1        I don't want to confuse what you've said.

2    Does that prompt a question?

3            MR. SIMON:  Judge, that was a fine question

4    for me, but I have -- I do have -- I did want to ask

5    about the 68 percent thing, and it's the last

6    question.

7            THE COURT:  That's fine.  I'm really not

8    trying to rush you.  Some folks sitting just need hope

9    that they're going to stand soon.  We've gotten that

10   in their heads, and so everybody can refocus.  So do

11   your job.  You're fine.

12           MR. SIMON:  Understood, Judge.

13   BY MR. SIMON:

14   Q   I did want to explore.  We talked a little bit

15   earlier about the technological advancement piece.  I

16   was asking that in a broad way because I'm not refined

17   in that space, but the GPS points that are returned in

18   the first stage where we say give us everybody who's

19   in the geofence radius, how does Google come up with

20   those points?  How does Google assess those points?

21   A   I don't believe there's any assessment in the

22   actual sensor data reported.  So when I talk about the

23   evolution of technology, if you're using -- think

24   about the device that you were using -- the mobile

25   device that you were using in 2014 versus the device

1    that you're using today.  Presumably, you've updated

2    your device at least one time maybe.  The sensors on

3    your hardware will be immanently better than sensors

4    on older hardware.

5        So when I talk about improvements in technology,

6    it's in the hardware itself and the sensors

7    themselves.  We are not doing any interpretation on

8    what the sensors report.  The sensors say, "This

9    device was in this place."  And we are recording that.

10   I believe it's mentioned in one of my declarations.

11   It is captured in that suite of things that we collect

12   in the location proto.

13       And so we are just saying this device said this to

14   me at this time, captured in time, stored on server.

15   There's no editorializing of that raw location point.

16   Q   Okay.  And I guess my question is:  Do you have an

17   understanding of what goes into creating a GPS point

18   and particularly one that Google would collect?

19   A   Nothing beyond sort of the standard sensor

20   information that's collected there and put into the

21   report.

22   Q   Okay.  And what's the standard sensor information?

23   A   We're looking at -- I mean, it's the triangulation

24   of where we have -- you need to be somewhere where you

25   can actually triangulate on at least three satellites.

1   So the device needs to be somewhere where you can

2   bounce off of three satellites, and they can say,

3   "Based on these three readings, you are likely here."

4        To my understanding, that is the extent of the

5   limitation of GPS being captured.

6   Q   And what about in terms of Google's Wi-Fi

7   collection, Wi-Fi point collection?

8   A   If Wi-Fi scans are happening, they are yet another

9   signal that is captured.  In terms of the raw point,

10  it is, again, just another piece of information.

11  Q   Okay.  And no -- does Google sort of assess

12  anything about their Wi-Fi point accuracy?

13  A   It's difficult to build a house on a potentially

14  moving foundation.  So you could move all of these

15  access points tomorrow, and then your device might

16  think something's different.

17       I don't know if you've had this experience.  In

18  San Francisco, if you use BART, the BART station in

19  downtown San Francisco happens to think it's in

20  Oakland.  So if you open your phone there and say, "I

21  want an Uber," it will think you're in Oakland.

22  That's just how they've assigned and how they're

23  handling data through their Wi-Fi network.  So those

24  are possible, but we don't make any -- I don't have

25  any statements on the quality or how that might shift.

McGRIFF - CROSS                421

1    Q    But Google -- I guess the assessment by Google of

2    the Wi-Fi access points is in that display radius.

3    The assessment of the Wi-Fi points is in the display

4    radius, and, as you testified earlier, that 68 percent

5    goes to whether they're inside that display radius?

6    A    That's correct.

7    Q    All right.

8         MR. SIMON:  No further questions, Judge.

9         THE COURT:  All right.

10        MS. KOENIG:  Your Honor, I have a pretty

11   short redirect, and so I think no more than 10

12   minutes.  And so if that gives everybody enough

13   hope --

14        THE COURT:  I'm telling you, like, my court

15   reporter is -- it's just too much.

16        MS. KOENIG:  Okay.

17        THE COURT:  I appreciate your effort, but I

18   usually try to keep it at an hour and a half or two,

19   and that's largely because of the sort of focus that

20   certainly Ms. Daffron has, but also a witness could

21   use a break.  So I appreciate your effort, but I think

22   we are going to take a lunch break.

23        MS. KOENIG:  Okay.

24        THE COURT:  All right.  So we're now at

25   almost one.  Can we do 1:30?  Does that give people

1   enough time?

2          MR. SIMON:  That works, Judge.

3          THE COURT:  All right.  So, I'm going to tell

4   you that I actually don't know the status now, but as

5   we were beginning to speak, we have learned that AT&T

6   had opened a ticket to the problem, and it's on their

7   end.  And they did not have a time frame for

8   resolution.  So we may know more now, but I'm not

9   going to ask.  We'll update you as we come back in.

10  So I think we certainly made the right call.

11         I do want us to be cognizant of time.  We

12  still have witnesses to go.  And so I really am going

13  to ask you all to -- we spent a lot of time with

14  folks, and I want the questioning to be crisp and

15  thoughtful.  I want you to do your job, but I really

16  wasn't sure we'd go over into today, and that we still

17  have as many witnesses as we do is shocking to me.

18         So I'm just going to put that bug in your

19  ear, and hope that you are -- now that we have lots of

20  foundation about how Google works and other things,

21  that we just do what we need to do from here on out.

22         MR. SIMON:  Understood, Your Honor.

23         THE COURT:  All right.  Mr. McGriff, thank

24  you.  You are coming back, apparently, just for 10

25  minutes or so.  So you're still under oath.  And I do

 1   appreciate everybody's good efforts.  All right?

 2   Thank you.

 3            (Luncheon recess taken at 12:53 p.m. until

 4    1:30 p.m.)

 5            THE COURT:  All right.  So we're continuing

 6   our hearing.  Do we have any AT&T participants?

 7            THE CLERK:  No.

 8            THE COURT:  No.  All right.  Well, hopefully,

 9   you were able to speak with your colleagues.

10            All right.  So we're prepared for

11   cross-examination.

12            Mr. McGriff, are you chilly?

13            THE WITNESS:  Sorry.  I was outside earlier.

14            MS. KOENIG:  I think we're on redirect, but

15   it is an adverse redirect.

16            THE COURT:  Oh, adverse redirect.

17            MS. KOENIG:  It feels like a lot of cross

18   today, I will agree.

19            THE COURT:  Yeah, I got distracted.

20            Do you want us to hang that up for you, sir?

21            THE WITNESS:  No, this will be fine.  Thank

22   you.

23            THE COURT:  Okay.

24

25

1       REDIRECT EXAMINATION

2   BY MS. KOENIG:

3   Q   Good afternoon, Mr. McGriff.

4   A   Hi.

5   Q   I'm Laura Koenig.  We met in the hallway outside

6   of court yesterday.

7           THE COURT:  You definitely have to talk into

8   microphone and slowly.

9           MS. KOENIG:   Thank you.

10  BY MS. KOENIG:

11  Q   I'm Laura Koenig.  We met yesterday outside of the

12  courtroom.  And I'm one of Mr. Chatrie's attorneys.

13      I have a question based on the Court's question to

14  you at the end of -- toward the end of Mr. Simon's

15  questions.  When the Court asked if Judge Lauck were

16  to put her, if she had a Google account, if she had

17  put it on her law clerk's phone, and both Judge Lauck

18  and her law clerk had enabled Location History in

19  their accounts, would the phone report the device's

20  location in the Location History timeline to both the

21  clerk's account and to Judge Lauck's account?

22  A   There are a few variables, but, to be clear, if

23  the clerk -- the actions of the clerk and the

24  Judge's -- the clerk and Judge's accounts are fully

25  separate as it pertains to Location History.  Nothing

1   that either does impacts the other's account.   So

2   anyone adding their account to another device or vice

3   versa does not impact what that specific account has

4   consented to or not.

5       If both accounts had Location History -- it's

6   irrelevant, but if both accounts had Location History

7   on, and then they were added to the same device, then

8   both accounts would be updated with information as

9   reported from the sensors on that specific device.

10  Q   Okay.  So if the law clerk takes the phone

11  independently to her own home, it would indicate on

12  Judge Lauck's timeline in Judge Lauck's Location

13  History timeline that Judge Lauck's account or device

14  that was activated, her Location History would

15  indicate a mark at the law clerk's home?

16  A   Yes.  That is one of the reasons why, with varying

17  degrees of success, I try to always be consistent in

18  saying it is where a device is, not necessarily that

19  the person is with the device they are signed into.

20  Q   I appreciate precision.  Thank you.

21      Going back to the questions that Judge Lauck was

22  asking at the end of Mr. Price's question, I want to

23  make sure that I am clear, because there's pause and

24  deletion.  So if a user pauses Location History, the

25  data that had previously been -- the Location History

1    data that had previously been connected and placed in

2    the Sensorvault, pausing Location History does nothing

3    to remove that data from Sensorvault; right?

4    A    That is correct, yes.

5    Q    And, similarly, if I were to delete Location

6    History that had previously been stored in the

7    Sensorvault, that does nothing to change -- that

8    action by itself does nothing to change that my device

9    will continue sending Location History data to

10   Sensorvault?

11   A    If Location History is on for the account and a

12   user goes and deletes all or some subset of the data

13   collected for that account, it will not impact the

14   fact that Location History is on for the account.  The

15   user would have to explicitly turn Location History

16   off for the account.

17   Q    And so, therefore, it would continue moving

18   forward past that deletion point collecting the data;

19   right?

20   A    That is correct, yes.

21   Q    Okay.  Government's Exhibit 12, which was that

22   video that we had a little discussion about, do you

23   remember that video?

24   A    I do.

25   Q    At the beginning of that video, I think a matter

1    of seconds into that video, there was a terms and

2    conditions screen.  Do you remember seeing that?

3    A    I do, yes.

4    Q    And that terms and conditions screen, that was

5    Samsung's terms and conditions; right?

6    A    I believe so, yes.

7    Q    Okay.  In terms of the privacy policies that we've

8    been looking at on the website versions, those are the

9    complete privacy policies that Google sets forth on

10   their website; right?

11   A    Those are our published privacy policies, yes.

12   Q    And when a user activates a cell phone, do they

13   get an abbreviated version of the privacy policy when

14   they go through the process of setup?

15   A    I don't actually know and certainly can't speak to

16   the broader ecosystem of products and services where a

17   user might create an account or see that.

18        I can't speak to the format of whether it's a --

19   of how it's presented.  I'm sorry.  I wouldn't be able

20   to say anything with certainty about that

21   presentation.

22   Q    So the answer is you don't know?

23   A    I don't know, yeah.

24   Q    When we are talking about the data that is in

25   Sensorvault, this is data that is for worldwide users;

McGRIFF – REDIRECT                428

1    correct?

2    A    If you are able to create a Google account now,

3    you are able to opt in to Location History.  We don't

4    collect Location History in every area, but you are

5    able to opt in to the control if you are able to

6    create a Google account.

7    Q    So let's go through.  What areas do you not

8    collect Location History from?

9    A    I don't have the exhaustive list in my mind, but

10   they are whatever U.S.-sanctioned countries, I

11   believe.  So if you traveled to China, I believe we

12   will not collect for you there.  So that's if a U.S.

13   account holder who has opted in to Location History

14   travels to China and, you know, or for some reason we

15   detect that you're in a region where we can't collect,

16   we won't.  But I apologize.  I rarely look at that

17   list.  So I don't know all of the countries that are

18   on that list.

19   Q    Sure.  China has a few people in that country;

20   right?

21   A    Yeah.

22   Q    So any person who is living in China and has a

23   Google account, they would not be able to generate

24   Location History on their phone or through their

25   device?

```
 1   A    It gets complicated around all the heuristics that

 2   we would use to understand where a user is.  So I

 3   can -- you know, how do you handle Hong Kong?  What do

 4   you do if the user connects via VPN and spoofs their

 5   location to say they're somewhere else?  There are

 6   just a host of variables.

 7        We do our best through a set of heuristics to

 8   identify where we believe a user is, and in good faith

 9   attempt to identify when a user is in a sanctioned

10   area.  If we believe on our side that a user is within

11   a sanctioned area, we will stop collection.  But,

12   again, some signals are more explicit than others.

13        A Chinese-based SIM, for example, would be a very

14   strong signal that this is probably a device that

15   should not be collected.

16   Q    Sure.  So when we're talking about the two-thirds

17   of active Google users that you're not collecting

18   Location History data on, that includes some of these

19   people -- right? -- that live in countries where you

20   just simply don't collect location data; right?

21   A    If I'm remembering the statement, the statement is

22   that only one-third of the accounts have the control

23   on.  So are you -- you're saying of the users who have

24   not enabled Location History for their account --

25   Q    Let's go back and look at the statement.
```

McGRIFF - REDIRECT                    430

1   A    Yeah.

2   Q    So if you can turn to your first declaration,

3   which is Exhibit No. 21, and I believe your

4   numerous-tens-of-millions statement is in paragraph

5   13.  So the statement says, in paragraph 13, second

6   sentence, "While a more precise percentage is

7   difficult to calculate, in part due to fluctuating

8   numbers of users, in 2019 roughly one-third of active

9   Google users, i.e., numerous tens of millions of

10  Google users had LH enabled on their accounts."

11       So when we went back to Mr. Price's questions

12  earlier this --

13            THE COURT:  You just have to be sure we can

14  hear you and you're not going too fast.

15            MS. KOENIG:   Thank you.

16  BY MS. KOENIG:

17  Q    When we go back to Mr. Price's questions from this

18  morning about how it is that you got to that one-third

19  figure, it appears from what you put in paragraph 13

20  that you looked at all -- the broader number of Google

21  users in the first sentence; right?  You start with

22  the math of how many Google users do we have?

23  A    That's correct.  The number of -- specifically,

24  the statement refers to in the way this is usually

25  measured in terms of active Google users.  So it's not

1    simply that there's an account, but it's an actual

2    active account.

3    Q    Sure.  Fair enough.  Active Google users.

4         But then when you're looking at the one-third, it

5    indicates it's one-third of active Google users who

6    had enabled Location History on their accounts; right?

7    A    That's correct.

8    Q    But I think what I'm hearing you say, and I want

9    to make sure I'm hearing you right, is that some

10   Google users who are active would not be able to

11   activate Location History simply because of where they

12   are?

13   A    Yes, that is true.

14   Q    Okay.  And going back to the question, I think,

15   that Mr. Simon was trying to ask, but I want to make

16   sure I'm clear about the answer again, he asked you,

17   like, would it be possible to segregate data points in

18   the Sensorvault by geographic location.  And I believe

19   your answer to that question was yes; right?

20   A    Sensorvault is indexed, as I mentioned -- I don't

21   remember whose question it was.  Sensorvault is

22   indexed by Google account.  So all of the tools are

23   designed to search and query generally by account.  So

24   it is not possible today to say to Sensorvault you

25   can't query by location directly.  You have to do it

1    by account.  You need to search each account, and then

2    see within that account do you have any coordinates

3    that fit this area.

4        Unfortunately, we're not able to search across all

5    the accounts at a high level and say show us all the

6    accounts in this area.

7    Q    So Sensorvault is not segregated by geographic

8    location?

9    A    It is not, no.

10   Q    Sensorvault is also -- the data that is produced

11   in response to a geofence warrant is nothing that --

12   that that data -- Google would never otherwise produce

13   that type of data from the Sensorvault; right?

14   A    The warrant includes -- when you say "that type of

15   data," what are you --

16   Q    Yeah.  That was not a great question.  Let me

17   phrase that again.  So when you get -- the ultimate

18   result of a geofence data is that at the third stage

19   identifying information from a user's account can be

20   turned over based on the link to the device ID that is

21   stored in Location History; is that right?

22   A    That is correct.

23   Q    And aside from a geofence warrant, you would never

24   otherwise produce that information from the

25   Sensorvault?

McGRIFF - REDIRECT                    433

1    A    There is no other instance where I'm aware that we

2    do that; that's correct.

3    Q    It's not a practice that Google normally does to

4    produce identifying information through the Location

5    History database?

6    A    That is correct, yes.

7    Q    So it's certainly not at business practice that

8    you have; right?

9    A    That is correct, yes.

10   Q    Okay.  You have been the Location History Product

11   Manager since 2016?

12   A    That is correct, yes.

13   Q    And how many people are there on the Location

14   History teams?  I'm assuming there are more than one

15   team.

16   A    It is difficult to answer.  Do you mean in terms

17   of product managers, software engineers?

18   Q    Let's talk about how many -- how many different

19   kinds of teams do y'all have over at Location History?

20   Probably a few; right?

21        MR. SIMON:  Judge, I think in keeping with

22   the Court's -- I'll use the word "admonition" before

23   we left, I'm going to object as outside the scope.  I

24   did, obviously, ask about the emails, but I didn't go

25   into how many people worked with him or was he the top

1    guy as compared with 15 others under him.  I just

2    think it's outside the scope, and we should move on to

3    the next witness, Judge.

4         MS. KOENIG:  Sorry.  Actually, Judge, this

5    question is completely unrelated to the emails, but

6    it's more related to -- Mr. Simon was asking some

7    questions about what Google uses Location History for.

8    I'm just trying get a sense of how many employees are

9    dedicated to this Location History project.

10        THE COURT:  All right.  I'll allow it.

11   A   Directly in terms of fully dedicated, I believe

12   everyone involved has multiple responsibilities.

13   Fully dedicated, it would be tens.  In terms of

14   engineers, yeah, I would say tens.

15   Q   Then there are additional probably tens or dozens

16   of other people who work with you all but are not

17   fully dedicated?

18   A   Well, there are -- as I mentioned when I was asked

19   about my role, I look over Location History, but I

20   also look over a host of other features and products

21   within Maps.

22        Then you have, for example, there is a marketing

23   team that supports geo as a whole.  I don't have a

24   direct marketing need every day, so I don't have a

25   dedicated -- there's no dedicated marketing resource

1    for our platform.  There is a dedicated resource.  We

2    just don't call them that -- or that resource has

3    other responsibilities.

4    Q    Sure.

5    A    Similarly, we have a writer that we work with.

6    The writing team works with several teams.  So I don't

7    include them in that group of sort of horizontal

8    resources that we leverage that would very much be a

9    part of our team but not fully dedicated to our team.

10   Q    Sure.

11   A    In terms of fully dedicated to our team, the best

12   reference would be software engineers, and we have

13   tens working on this project.

14   Q    Tens with an S at the end; right?

15   A    Tens with an S on the end, yeah.

16   Q    So is it fair to say that Location History is an

17   important project or product for Google?

18   A    I won't feign to know Google's broader

19   prioritizations and where we sit in that stacking.  We

20   are certainly one team within the sort of broader

21   scope of location, yes.

22   Q    And it's certainly not Google's goal to diminish

23   the number of users of Location History; right?

24   A    No.

25   Q    In fact, it would be more likely that it is

McGRIFF - REDIRECT                436

1    Google's goal to increase the users of Location

2    History; right?

3    A    That's fair, yes.

4    Q    So let's go back to what Location History does.

5    So Location History tracks where a user's device is;

6    right?

7    A    Yes, for users who opt-in, yes.

8    Q    And it can track a user every hour of the day;

9    right?

10   A    There are a host of variables involved there, but

11   yes, if a user has Location History enabled, we will

12   collect whatever we have -- whatever is accessed from

13   that device.

14   Q    And Location History can actually track a user

15   hundreds of times a day; right?

16   A    Depending on activity, yes.

17   Q    Maybe even thousands of times a day?

18   A    I don't think it would get that high.

19   Q    There are only so many minutes; right?

20   A    Well, there's also the reality if it got that

21   high, there are just general device performance

22   questions and other things, so yeah.  There is some

23   upper bound.

24   Q    Fair enough.  Location History can track a user

25   even when the user is not actually using the app from

1  which they enabled Location History.  We have gone

2  over that; right?

3  A   It varies by platform, Android versus Apple, but

4  yes.

5  Q   And as we know, unless a -- when a user deletes

6  the past Location History, unless a user affirmatively

7  disables Location History, Google continues to collect

8  the future Location History data points from that

9  device?

10 A   Sorry.  I can't parse that.

11 Q   So when a user deletes the past Location History,

12 unless that user goes out on their own and

13 affirmatively disables Location History; right?

14 A   That is correct.  Deletion is a separate process

15 from turning on --

16 Q   Let me make this more simple.  Let me take out

17 that middle part.  So when a user deletes past

18 Location History, Google continues to collect the

19 future Location History from that device; right?

20 A   Yes.

21 Q   Okay.  And as we know, I think you've indicated

22 earlier today, Google is going to respond and turn

23 over data in response to search warrants; right?

24 A   It is my understanding that we will respond to any

25 valid request when compelled, yes.

1  Q    Okay.  And you said yesterday, and I think even

2  the exact quote you used today or statement you made

3  today was, We are always looking for ways to further

4  improve and clarify how we talk about the product;

5  right?

6  A    All products, yes.

7  Q    But also specifically included in that, Location

8  History; right?

9  A    Yes, including Location History.

10 Q    And so it would be pretty clear if the descriptive

11 text -- right? -- that line that is right below

12 Location History before you hit the drop down arrow,

13 it would be pretty clear if the descriptive text at

14 the opt-in stage said something like, If you enable

15 Location History, you'll be allowing us to track you.

16 You will be allowing us to track you every hour of

17 every day.  You will be allowing us to track you even

18 if you're not using this particular Google

19 application.  You will be allowing us to continue

20 tracking you if you delete your past Location History.

21 We turn your Location History over to law enforcement

22 when they get a valid warrant.  That would make more

23 clear what's happening; right?

24 A    That would provide additional clarity for some,

25 yes.

1  Q    But you're not going to do that; right?

2  A    I respectfully disagree with that suggestion.

3  That is entirely -- the ongoing evolution in any

4  product is to be more clear, be more precise.  We are

5  steadily looking for ways to improve all products and

6  services, including Location History.  In part, the

7  warm welcome notice, the email, the monthly emails we

8  created, the now yearly summary email that we send,

9  all of those not only tell you what we collect, but

10 give a very visual and clear tangible way.

11      So it's not just words.  Hey, here are a blurb of

12 words that most nonlawyers or privacy-minded people

13 will never read.  We actually visualize it and make it

14 very tangible.  You went from point A to point B.

15 Here is what we understand those places to be.  Here

16 is how we understand you traveled between point A and

17 point B, all with an eye toward making it very human

18 readable and consumable in a tangible way.

19 Q    Sure.  And I appreciate that that's the back-end

20 take that you all have done; right?  But those emails,

21 that presumes that someone's going to open up

22 something that they might otherwise presume is junk

23 mail; right?

24 A    That is why we have rolled out both notices that

25 were originally tied just to Maps.  And to the point

1    you just made, in this time frame, we expanded to make

2    it an operating system notification.  So at the OS

3    level, whether or not you're using a Google product or

4    service, it just appeared Location History is enabled

5    for this account.

6        And any interaction with that notification, open

7    settings, where very promptly a user would see that is

8    on and be able to turn it off.  So it's not just that

9    we had a per product notification.  It's not that we

10   simply sent one email.  We send monthly emails.  We

11   send an annual email.  We send an email seven days

12   after opt-in.  But in addition, we now also do it at

13   the OS level.

14       So we've steadily rolled out continued

15   notifications and prompts, and on all of them at the

16   top we prominently feature the controls to disable it

17   if the content that the user sees highlighted there is

18   not what they intended.

19   Q    Sure.  But wouldn't the most clear way be to just

20   put all that in the descriptive text, so when the

21   person turns it on, they know exactly what they're

22   getting into at that moment?

23   A    That assumes that every user is reading the

24   descriptive text in detail.  What you just read would

25   have been a full page of text, so on most mobile

1    devices a wall of text appearing.

2        It's certainly possible.  I can't say that you're

3    wrong.  But I would say, again, that's a wall of text,

4    and it is not -- I'm not aware of anything that would

5    suggest that users would be more inclined to read a

6    wall of text versus a blurb of text.  I'm not aware

7    that anyone has come to the proper exact science that

8    two-thirds of a full screen versus one-third is right.

9        I think part of this evolution over the years has

10   been:  What is the way to reach users where they are?

11   So for the user who doesn't read or expand the carrot,

12   for the user who maybe moves quickly past that but

13   will see the email in seven days, for the user who

14   doesn't see emails but will get an app notification,

15   for the user who dismisses all notifications -- like,

16   you're trying to figure out the best way.  There's no

17   slam dunk for any of them would be my opinion.

18   Q    Sure.  And it sounds like it's fair to say that

19   you all are very aware at Google that people are not

20   inclined -- users are not inclined to read blocks of

21   text; right?

22   A    Some are, to be quite clear.  If they weren't,

23   Location History opt-in would be 100 percent.  Some

24   people are reading it.  The majority of users are

25   reading it and saying no.

McGRIFF - REDIRECT                    442

1    Q   Or it's the people that are in China that can't

2    activate it; right?  When you're saying the majority

3    of people, you can't assume that the majority of

4    people are making an informed decision to not opt-in.

5    You don't have an evidentiary basis to say that;

6    right?

7    A   I'm sorry.  Just so I'm clear, are you suggesting

8    that we -- that Google, as a company, has majority of

9    its users in China?

10   Q   No, no, no.  I'm saying that when we are talking

11   about the other two-thirds of Google -- active Google

12   users who have not enabled Location History, you

13   indicated that that feature of the two-thirds includes

14   people who have these devices in countries where they

15   cannot enable Location History; right?

16   A   Anywhere you can create a Google account, you can

17   enable Location History.  We may not be able to

18   collect data in that region based on where you travel

19   or any kind of variables, but you can still opt-in on

20   the account level.

21       The reason for that is I can create a Google

22   account right now on a desktop or my laptop, not

23   connected to a mobile device.  I may never attach a

24   mobile device to my account.  I still have Location

25   History on for an active Google account.

McGRIFF - REDIRECT                443

1    Q   Sure.  But then if you are not -- let's say you

2    activate a Google account in China; right?  You

3    activate it in the United States.  You buy the phone

4    and you're here visiting.

5           MR. SIMON:  Judge, I'm going to object.  The

6    witness has testified that Location History --

7           MS. KOENIG:  I'll move on, Your Honor.  I'll

8    move on.  It's not an important point.

9    BY MS. KOENIG:

10   Q   But going back to the part you all are very aware

11   that some users, if not many users, will not read

12   blocks of texts; right?

13   A   I disagree with that characterization of my

14   statement.  We are aware that there are a wide range

15   of users, different proclivities in terms of what they

16   will and will not do.  Our focus is figuring out the

17   way to reach as many users as possible, which is why

18   we steadily refine the tools that we use to reach

19   users.

20       Some will resonate with some users.  Some will

21   not.  That's why we continue to refine and evolve.

22   That is what I keep referring to as the further

23   improvements.  You never stop.  You are always looking

24   at ways you can improve these flows.

25   Q   But at no time in 2018 or 2019 did we have

McGRIFF - REDIRECT                444

1   something as clear as what we decided today, that

2   language that I proposed to you, that was never

3   apparent to a user in the descriptive text; right?

4   A   We never used the copy that you just suggested in

5   any flow that I'm aware of, that is correct.

6          MS. KOENIG:  No further questions, Your

7   Honor.

8          THE COURT:  All right.  May this witness be

9   excused?

10          MS. KOENIG:  Yes.

11          MR. SIMON:  From the United States, yes,

12   Judge.

13          THE COURT:  All right.  So, Mr. McGriff, I

14   want to thank you very much for your time.  You are

15   excused.  We appreciate your coming in.  You still

16   can't talk to other witnesses certainly about what

17   you've testified to.  And, in fact, we should

18   sequester the testimony until this hearing is over.

19   All right?  Thank you, sir.

20          (The witness was excused from the witness

21    stand.)

22          MS. KOENIG:  Your Honor, next the defense

23   calls Sarah Rodriguez.

24          THE COURT:  So that is Sarah Rodriguez, Madam

25   Court Reporter.

RODRIGUEZ - DIRECT                445

1          MS. KOENIG:  I'll have her spell her name.

2     Don't worry.

3

4        SARAH RODRIGUEZ, called by the Defendant, first

5     being duly sworn, testified as follows:

6

7          THE COURT:  Before you sit down, have we

8     cleaned out that area?

9          MS. KOENIG:  I don't believe we have.

10         THE COURT:  So, Ms. Rodriguez, I'm just going

11    to ask you to step aside a little bit so we can apply

12    some disinfectant.  Sorry.  That's awkward, but I'd

13    rather be safe.

14         Thank you so much for helping with that.

15         Ms. Rodriguez, my court reporter can only

16    hear you through the microphone.  So you can take your

17    mask off.  Obviously, we're cleaning things off.  And

18    you have more disinfectant, towels, and hand sanitizer

19    anytime you want to use it.  Okay?

20         THE WITNESS:  Thank you.

21      DIRECT EXAMINATION

22    BY MS. KOENIG:

23    Q   Good afternoon.

24    A   Good afternoon.

25    Q   You are here today -- oh, please tell us your

RODRIGUEZ - DIRECT                    446

1  name, please.

2  A    Sarah Rodriguez.

3  Q    Can you spell your last name for the record,

4  please.

5  A    R-O-D-R-I-G-U-E-Z.

6  Q    Thank you.  And you are here today in response to

7  a defense subpoena; right?

8  A    I believe so.  I haven't seen the subpoena myself,

9  but that's what I've been told, yes.

10 Q    Fair enough.  And you work at Google; right?

11 A    That's correct.

12 Q    And you just moved into a new position very

13 recently there; right?

14 A    About a month ago, that's correct.

15 Q    And so you are currently a Tooling and Programs

16 Lead and Legal Investigation Support?

17 A    That's correct.

18          THE COURT:  A what?  What was the first word?

19          MS. KOENIG:  Tooling and Programs Lead.

20          THE COURT:  Tooling?

21          MS. KOENIG:  Tooling.

22          THE COURT:  Okay.

23 Q    Lead and Legal Investigation Support?

24 A    That's correct.

25 Q    And it seems as though you all at Google tend to

RODRIGUEZ - DIRECT                447

1   refer to Legal Investigation Support as LIS?

2   A    That's correct.

3   Q    And before you were the Tooling and Programs Lead,

4   you were a Team Lead -- right? -- for Legal

5   Investigation Support?

6   A    Correct.

7   Q    And how long had you done that?

8   A    I had done that for about two and a half years.

9   Q    Maybe three years, one month?

10  A    Correct.

11  Q    And before that you were a legal specialist at

12  Google?

13  A    That's correct.

14  Q    What were your duties as a legal Specialist at

15  Google?

16  A    I worked on a domestic criminal team.  And our

17  team processed law enforcement requests for user data

18  coming in the form of subpoenas, court orders, and

19  search warrants.

20  Q    And you graduated from San Francisco State

21  University in 2004?

22  A    That's correct.

23  Q    That was with a Bachelor's of Arts in Liberal

24  Studies?

25  A    Correct.

RODRIGUEZ - DIRECT                    448

1    Q    You have not gone to law school; right?

2    A    I have not.

3    Q    And you don't have any other advanced degrees?

4    A    That's correct.

5    Q    So your experience in the legal investigation

6    support team is practical; right?

7    A    Correct.

8    Q    In response to a subpoena to Google that

9    Mr. Chatrie had obtained in 2020, you wrote a

10   declaration; right?

11   A    Correct.

12   Q    In the big binder that is right in front of you,

13   we've got a bunch of tabs in there.  Thankfully, you

14   don't get asked about too many of them, I think.  But

15   you made a declaration on March 11 of 2020.  Does that

16   sound right?

17   A    Correct.

18   Q    And you made that declaration under oath?

19   A    Correct.

20   Q    And if you can turn to tab Defendant's Exhibit

21   24 --

22           MS. KOENIG:  And Ms. Hancock, if I can have

23   the screen over here activated, that would be helpful.

24   Q    If you'll take a look at that for just a moment.

25   It's Defense Exhibit 24.  So it should be -- there we

RODRIGUEZ - DIRECT                449

1    go.  Is that a copy -- is Defense Exhibit 24 a copy of

2    the declaration that you signed on March 11, 2020?

3    A    It appears to be.

4         MS. KOENIG:  And, Your Honor, I move to

5    introduce Defense Exhibit 24.

6         THE COURT:  Any objection?

7         MR. SIMON:  No objection, Judge.

8         THE COURT:  All right.  It will be entered.

9         (Defense Exhibit No. 24 is admitted into

10   evidence.)

11   BY MS. KOENIG:

12   Q    I want to turn your attention now to your

13   responsibilities when you were at your most recent

14   position at Google as the Team Lead for LIS.  Your

15   responsibilities as that Team Lead included processing

16   law enforcement requests directed at Google; right?

17   A    That's correct.

18   Q    And geofence warrants were a part of those law

19   enforcement requests; right?

20   A    That's correct.

21   Q    When did Google begin receiving geofence warrants?

22   A    To my knowledge, I believe our first came in in

23   2016.  I'm not exactly sure when within that year, but

24   that's the first that I was aware that we were

25   receiving those.

1   Q    By June of 2019, how many geofence warrants had

2   Google received?

3   A    I don't know the numbers as of that month,

4   specifically.  In 2019, I believe we received around

5   9,000 total requests for warrants specifically with

6   some subset of that.

7   Q    9,000 total warrants and a portion of those

8   warrants were geofence warrants?

9   A    9,000 total geofence requests.  So, in some cases,

10  law enforcement isn't aware that they need to submit a

11  warrant.  So they may have submitted other lower level

12  legal process to obtain records.  So that's included

13  in those 9,000.  So, some subset was specific

14  warrants.

15  Q    Okay.  And a geofence warrant -- we've talked

16  about this a lot.  I'm just going to ask you a couple

17  questions to make sure that you're on the same page as

18  we all are.

19      A geofence warrant is one that requests all

20  Location History data that Google has for a particular

21  geographic area in a particular time frame; right?

22  A    That's correct.

23  Q    And the warrant does not identify, necessarily, a

24  particular suspect; right?

25  A    Not in a way that Google would typically be able

1   to process it.

2   Q   So when we're talking about what Google turns

3   over, Google turns over all of the Location History

4   data points within that defined area and defined time

5   frame.

6   A   I'm sorry.  Can you say that again?

7   Q   Google turns over all Location History data points

8   that you all calculate fall within that geographic

9   area and that defined time frame; right?

10  A   Correct.

11  Q   And each Location History data point is associated

12  with a device ID number; right?

13  A   Correct.

14  Q   Each data point that comes from that same device

15  will have the same device identification number.

16  A   So the device ID's reference within Location

17  History, yes, I believe that's correct.  A user may

18  have multiple devices reporting Location History, in

19  which case that device might be different per user,

20  but per device, that should be accurate, correct.

21  Q   If I have a phone right here, and I'm reporting

22  Location History, my phone has one device ID in the

23  Sensorvault database; right?

24  A   Related to your Google account.  So if another

25  Google account is associated with that same device and

RODRIGUEZ - DIRECT                    452

1   is reporting Location History from that device, then

2   that separate Google account may have a different --

3   Q   Thank you for that clarification.  I'm sorry.  I

4   stepped over the words.  Thank you for that

5   clarification.

6           THE COURT:  Ms. Koenig, please slow down.

7           MS. KOENIG:  Okay.

8           THE COURT:  I can barely hear you, which I'm

9   pretty sure means that Ms. Daffron can't type that

10  fast.

11          MS. KOENIG:  Okay.  Thank you.

12  BY MS. KOENIG:

13  Q   Let's turn to Defense Exhibit 3.  I'm not going to

14  put it up on the screen.  It's something that we have

15  put under seal, but if you can look at Defense Exhibit

16  3, please.

17      I'll just tell you that this is the -- what the

18  government produced to the defense as the returns in

19  the Google correspondence that were provided in

20  connection with the returns as it relates to this

21  specific case.

22  A   Okay.

23  Q   So if you turn to page 6 of Exhibit 3, which is

24  just the beginning of the first spreadsheet for the

25  Stage 1 return.

453

1    A    Okay.

2    Q    In that column, we see the label "device ID";

3    right?

4    A    Correct.

5    Q    And we just went over that the device ID -- I

6    guess the better way to phrase it would be the device

7    ID is unique to each device as it relates to one

8    account on the device?

9    A    Correct.

10   Q    So, for example, the first device ID that is

11   identified -- I'm on page 6 of Defense Exhibit 3 --

12   that has five data points that were generated for that

13   device ID; right?

14   A    Yes, that would appear to be the case.

15   Q    And then it goes on to list a bunch of other data

16   points for other device IDs; right?

17   A    Correct.

18   Q    And ID is just an abbreviation for identification?

19   A    Right.  And specifically within this Location

20   History realm.  So these device IDs are not

21   identifiers for any other specific Google account.

22   It's not cross-referenced outside of Location History.

23   Q    Sure.  And that's a point I want to talk about

24   with you.  So within Location History, if I have my

25   cell phone here, I have just one Google account that's

1   associated with that phone.  That is my phone's device

2   ID as it resides in the Location History database;

3   right?

4   A   In the context of Location History, yes, this

5   device ID that's listed here is the one that's related

6   to your Google account and the device that's reporting

7   that data and stored within your Google account.

8   Q   And so if, let's say, the Chesterfield County

9   Police Department gets more than one -- I'm pointing

10  at them because that's who this law enforcement agency

11  is.  If they get more than one geofence warrant, and

12  my device ID number for that cell phone is swept up in

13  a warrant, warrant No. 1, and it gets swept up in a

14  second warrant, if that same device ID number shows

15  up, it's the same device attached to that one account;

16  right?

17  A   To my knowledge, that would be the case.  I'm

18  not -- our team isn't responsible for defining these

19  device identifiers.  So if there's any sort of

20  collisions on the actual side that we pull the data

21  from, I wouldn't be aware of that.

22  Q   But you have no information to the contrary;

23  right?

24  A   Correct.

25  Q   Okay.  So, in response to geofence warrants

1    generally, Google developed a process for handling

2    such warrants; right?

3    A    Correct.

4    Q    And Google requires as a part of that process that

5    the geofence warrant have a defined geographical area;

6    right?

7    A    Correct.

8    Q    Is there a geographical area that Google considers

9    too big?

10   A    Not generally.  It's very contextual to each

11   individual warrant that we review.  So it would be

12   determined based on that specialist who's handling the

13   warrant to review, and then coordinate with our legal

14   counsel to determine if it's a warrant that we need to

15   have sort of a conversation with the law enforcement

16   agent that had submitted it.

17   Q    Okay.  So, are there parameters -- and if --

18   let's -- so it sounds like there is a process; right?

19   The warrant comes in to a Google specialist; right?

20   You have to say yes or no.  I see you shaking your

21   head, but we have to make a record.

22   A    Sorry.  Yes.  So it would come into our system,

23   and then a specialist would pick that warrant up to

24   start processing it.

25   Q    And it's up to the specialist to decide if it

1    seems too big, like, the geographic area is too big?

2    A    It's up to the specialist to determine if it needs

3    further review by our counsel team.

4    Q    If the specialist thinks, eh, this just looks too

5    big, they go to the lawyers; right?

6    A    They'll take it to the lawyers.  There may be an

7    intermediate step where they engage with a law

8    enforcement officer to collect more information about

9    the investigation itself to provide that context in

10   our consult with legal counsel.

11   Q    So that process happens -- that back and forth

12   process happens between Google and its various

13   employees and counsel and with the law enforcement

14   officer; right?

15   A    That's correct.

16   Q    So Google also -- when did Google create this

17   three-step process?

18   A    I believe there was discussion around it in 2018.

19   And the discussion also involved agencies within law

20   enforcement.  So our, like, CCIPS is an agency that

21   works -- that we often engage with -- not us

22   specifically, but our counsel engages with to discuss

23   sort of certain procedures that may be relevant for

24   the way that we -- that Google will need to handle

25   these types of requests, especially with reverse

1    Location History being a relatively new type of

2    request that Google has started to receive.

3              THE COURT:  So, Ms. Rodriguez, I'm going to

4    ask you to say the words of the agency that you just

5    gave the initials for so our court reporter can get it

6    on the record.

7              THE WITNESS:  I'm not sure what it stands for

8    exactly.  So I know it's computer crimes, but it's a

9    federal agency that is related to the handling of

10   those types of requests.

11             THE COURT:  And the full acronym is?

12             THE WITNESS:  CCIPS, C-C-I-P-S.

13             THE COURT:  I'm sorry?

14             THE WITNESS:  C-C-I-P-S.

15             THE COURT:  Okay.  Thank you.

16   BY MS. KOENIG:

17   Q    Do you know when in 2018 that that policy was

18   developed?

19   A    I don't know exactly.

20   Q    Has that policy changed over time?

21   A    Yes.  In the early days, we didn't have a policy

22   set forth.  So there was a very, you know, sort of

23   extended processing and engagement with our counsel

24   team on the legal investigation side engaging with our

25   law enforcement and information security counsel team

1    to guide us through how we should be engaging with

2    these types of requests.

3    Q    How many warrants has Google objected to because

4    the geographical area was too big as it was listed in

5    the warrant?

6    A    I don't know that.

7    Q    So Google also requires that the geofence warrant

8    have a defined time frame; right?

9    A    Correct.

10   Q    And is there a time frame that Google considers to

11   be too long?

12   A    No.  Again, it would be, you know, based on the

13   context of the warrant itself in conjunction with the

14   actual area of the geofence as well.

15   Q    Would you go through that same process that if the

16   warrant comes in, the legal specialist gets it; right?

17   You've got to say yes.  I'm sorry.  I see that you

18   nodded your head.

19   A    That's correct.

20   Q    And if the specialist says, eh, I just think this

21   is too long, then they'll go to the lawyers again?

22   A    It would be the same process.  They may collect

23   information from law enforcement to provide context in

24   their conversations with counsel, and then they would

25   further discuss with counsel what the appropriate

RODRIGUEZ - DIRECT                    459

1   action would be.

2   Q    So that same back and forth between Google and the

3   law enforcement agent; right?

4   A    Correct.

5             THE COURT:  That's a yes, right?

6             THE WITNESS:  Correct, yes.

7   BY MS. KOENIG:

8   Q    And, again, how many warrants has Google objected

9   to because the time frame was too long?

10  A    I don't know that.

11  Q    Are there geofence warrants that Google considers

12  too sensitive, say, like, politically to comply?

13  A    Not as a policy.  Again, it would be contextual

14  based on circumstances that are included in the search

15  warrant itself or that we may be aware of because it's

16  a very public sort of circumstance that we are -- you

17  know, know external to Google.

18  Q    And so are you aware of any examples where Google

19  has refused to comply because it was too sensitive?

20  A    No examples where we've refused to comply, no.

21  Q    Is there a policy about that or is that simple the

22  back and forth that we have talked about?

23  A    It would be the back and forth.  I mean, I think

24  there's not a policy in place, but our specialists

25  know that if there is anything that strikes them as

1   being, you know, needing more information from our

2   counsel team, then they will escalate directly to our

3   counsel team to have that review.

4   Q   A fair amount of discretion is initially placed

5   with the specialist that receives the warrant; right?

6   A   Correct.

7   Q   All right.  So once you have the warrant that has

8   the geographical area and the defined time frame, and

9   you have this back and forth, the first thing that you

10  do is you turn over, at the first stage, all of the

11  Location History data points within the geofence to

12  the law enforcement officer; right?

13  A   That are within the specified time frame on the

14  warrant.

15  Q   And then you wait for the government to come back,

16  and they may ask for additional Location History data

17  points beyond the scope of the initial request?

18  A   Right.  So it would be Location History data that

19  was outside of the geofence and outside of the initial

20  time frame.

21  Q   And that's the second step of the process; right?

22  A   Correct.

23  Q   And in the second step, can the government ask for

24  all Location History data points no matter the

25  geographical area?

RODRIGUEZ - DIRECT                461

1   A    So, it would be limited to devices that were

2   identified by their device ID in the Step 1 of the

3   warrant.

4   Q    Okay.  Has Google objected to geofence warrants

5   because the geographical area in the second step was

6   too big?

7   A    We aren't applying the geographical area

8   constraint to that.  So it's really more the time

9   constraint that's applied.

10  Q    The geographical area means nothing, really, in

11  the second phase; right?

12  A    I mean, it's applicable because it's derived from

13  the Step 1 processing, but in the way that we handle

14  these types of requests, the area at that point is

15  already -- it's already narrowed by the records that

16  were produced in Step 1.

17  Q    Sure.  But for any device ID that the data is

18  returned in the second stage, there are no

19  geographical limits for that second stage?

20  A    To my knowledge, no.

21  Q    So that data could come from houses; right?

22  A    I'm not sure I understand the question.

23  Q    The location data points that are returned in the

24  second stage, it could come from houses, as an

25  example; right?

RODRIGUEZ - DIRECT          462

1   A    The phrasing is a little confusing to me.  So the

2   location information would come from the device always

3   as reported to us.  It could include a path through a

4   house.

5   Q    Let me phrase that a little bit better.  The data

6   could indicate that the device in the second stage was

7   in a house, for example; right?

8   A    Sure.  We wouldn't know that at the time, because

9   the legal specialist wouldn't review any of the data,

10  the actual content of the data itself, or plot it on a

11  map.  So it could include that.

12  Q    That device could be anywhere; right?

13  A    Correct.

14  Q    A place of worship; right?

15  A    Correct.

16  Q    Schools; right?

17  A    Correct.

18  Q    Hospitals?

19  A    Any physical location that could have a device

20  within it.

21  Q    Okay.  In the second step, has Google objected to

22  geofence warrants because the time frame that was

23  expanded in the second step was too long?

24  A    Yes.  And to qualify, the too long is in relation

25  to what was initially ordered on the warrant.  So the

1    warrant may also include, as in this case, specific

2    parameters, so it was plus or minus 30 minutes.

3         So if the law enforcement officer had come back

4    and said "I want an hour on either side of the

5    original time frame," that would not be permitted

6    within the context of this warrant.

7    Q   If time frame is listed -- if the expanded time

8    frame is listed in the warrant, are there any times

9    where Google has objected to say that time frame, the

10   expanded time frame in the second stage that's listed

11   in the warrant, is too long?

12   A   In the initial warrant, we may have.  I haven't

13   been involved directly with any of those types of

14   objections, but we may have.

15   Q   Would it follow that same process where the

16   specialist would identify this issue, then bring it to

17   the lawyers?

18   A   Correct.

19   Q   And then Google would go back to the law

20   enforcement officer?

21   A   That's correct.

22   Q   And there would be some sort of negotiation

23   between Google and the law enforcement officer?

24   A   There would be a conversation.  In many

25   circumstances, if there's an issue with the actual

1    wording of the language on the warrant itself, it may

2    be -- we may require law enforcement to obtain an

3    amended or a newly-issued warrant that addresses the

4    issue that we have identified in the warrant text.

5    Q    Okay.  Thank you.

6         Is there a time limit on when law enforcement must

7    come back to request the additional Location History

8    data in the second step?

9    A    Yes.  So our system does only retain the records

10   for a certain period of time.

11   Q    How long does it retain them for?

12   A    Roughly, 60 days.

13   Q    So from the time that the Stage 1 data is

14   produced, that data stays wherever you put it for 60

15   days?

16   A    Right.  It's sort of depending on the actual

17   processing of the warrant.  So there's certain events

18   that trigger whether that data is then collected to

19   actually purge.  But, roughly, 60 days after the

20   production of the initial stage of the warrant we

21   would be able to then respond to and produce on the

22   follow-up stages to the warrant.

23   Q    How does Google determine that 60-day limit?

24   A    That's guidance from our legal counsel.

25   Q    Okay.  And when did Google create that guidance?

1   A   It's evolved over time.  I don't have a specific

2   date or even month.  A lot of the evolution has

3   happened since 2018 through this most recent year.

4   Q   Has that guidance changed over time?

5   A   Yes.  In conjunction with our tooling, which is

6   what determines whether the data is automatically

7   purged at the time, that it would be, you know, 60

8   days or so.

9   Q   What do you do if the law enforcement officer

10  comes back and makes the second stage request after

11  the 60-day time frame has past?

12  A   We may ask them to submit a new warrant.

13  Q   Are there any times where you just go run the data

14  again?

15  A   It would be under the close direction of counsel

16  if we were to do sort of a secondary search,

17  basically, which is what that would be for us.

18  Q   But that would be at the discretion of Google?

19  A   At counsel's discretion.

20  Q   Google counsel's discretion; right?

21  A   Correct.

22  Q   Do you know if Google has objected because law

23  enforcement -- well, you've already answered that

24  question.  Never mind.

25      Will Google comply with if the officer comes back

1    in the second stage and asks for additional Location

2    History beyond the scope of the initial request on all

3    of the device IDs from the Stage 1 return?

4    A    I'm sorry.  Can you say that one more time?

5    Q    So, if -- so, Stage 1 -- like in this case --

6    right? -- we have 19 device IDs that are returned;

7    right?  You're shaking your head yes.

8    A    Yes.

9    Q    And in this case, the law enforcement officer

10   Detective Hylton, asked for the Stage 2 information,

11   the expanded data on all 19 devices; right?

12   A    Yes.

13   Q    And so Google seemed to do something; right?

14   Like, explain to us what Google did in response to

15   that.

16   A    So, based on my understanding of the events, one

17   of our specialists who was handling this specific case

18   had reached out to the detective to explain -- the way

19   the language in the warrant reads is that Step 2 is

20   supposed to be narrowed from Step 1.  So all 19

21   devices were produced in Step 1.  In order to make

22   Step 2 actually useful in identifying devices that

23   were aligned with the facts of the investigation,

24   which Google doesn't know, the law enforcement officer

25   would need to review those and determine which devices

1    were relevant to the investigation and submit a

2    request specific to those devices.

3    Q   Okay.  So, we'll come back to the specific example

4    in this case, but does that happen in every case that

5    law enforcement comes back from Stage 1 and asks in

6    Stage 2 for expanded data on every device that is

7    listed in Stage 1?  Is there always sort of an

8    objection to that by Google?

9    A   Not always, no.

10   Q   When would it not happen?

11   A   If the law enforcement officer had demonstrated a

12   narrowing in their request.  So if there were a lower

13   number of devices from Stage 1 to Stage 2, then that

14   would be the only real kind of reflection to Google

15   and to our specialist team that the request from Stage

16   1 had been narrowed in the Stage 2 request.

17   Q   So Google requires that there be less device IDs

18   requested or there be data requested on fewer device

19   IDs in Stage 2 than in Stage 1?

20   A   I wouldn't say it's necessarily a requirement.

21   It's a signal to us of, you know, following the actual

22   three-stage protocol.

23   Q   So are there times, then, where Google has gotten

24   a request from law enforcement, and the law

25   enforcement officer is requesting the expanded data in

1   Stage 2 on all devices listed in Stage 1, presuming

2   there's more than one device -- right? -- and you

3   don't object?

4   A   It would likely be a conversation with our counsel

5   team in those circumstances in order to determine if

6   there would be a necessary conversation with law

7   enforcement at that point.

8   Q   So that same process.  Specialist has a question,

9   goes to legal counsel at Google; right?

10  A   Correct.

11  Q   Maybe there's a conversation with a law

12  enforcement officer; right?

13  A   Correct.

14  Q   Okay.  If it's -- is there any guidance that

15  Google has about how much narrowing has to happen?

16  A   There's guidance from our counsel team, but

17  nothing that's developed as sort of a policy or you

18  must adhere to this in every single circumstance.

19  Q   Is the guidance like in a percentage form, like we

20  want 25 percent less devices?  I mean, what does the

21  guidance tell you?

22  A   Not any sort of percentage form.  There is still

23  that discretion that the legal specialist has in being

24  able to apply the policies that counsel has provided

25  to us.

1    Q    Do you know how many warrants Google has objected

2    to because the officer requested the expanded data on

3    every device that was listed in Stage 1?

4    A    I don't know that.

5    Q    All right.  So then we get to the third step.  And

6    once you turn over the data points in the second step,

7    you wait for the government to come back and ask for

8    the identifying information on the account user for

9    the particular device IDs; right?

10   A    Correct.

11   Q    So that information, the identifying information,

12   includes an account user's email address?

13   A    Correct.

14   Q    And it includes, if you have it, a name that's

15   associated with the user account; right?

16   A    Yes.

17   Q    And is there a time limit on that when law

18   enforcement has to come back and request the third

19   step data?

20   A    Right.  It would be consistent.  Roughly, 60 days.

21   Q    Is it 60 days from the time that the second stage

22   is turned over or is it 60 days from the time of Stage

23   1?

24   A    From the second stage.

25   Q    So to get from Stage 1 to Stage 3 could be a

RODRIGUEZ - DIRECT                470

1    matter of 120 days?

2    A    Correct.

3    Q    Again, how did you determine that 60-day limit at

4    Google?

5    A    That's a counsel determination.

6    Q    Has that changed over time?

7    A    That's correct.

8    Q    That it has changed over time?

9    A    Yes.

10   Q    How long has the 60 days been in effect?

11   A    I don't have a specific date of when that was

12   launched.

13   Q    Has it been since 2018?

14   A    It's evolved since 2018, but the 60-day sort of

15   determination, I don't have a date for it.

16   Q    Okay.  If law enforcement makes the third stage

17   request outside of the time limit based on Google's

18   policy, the 60-day policy, what do you do?

19   A    So it would be a similar scenario at Stage 2 where

20   we may ask law enforcement to obtain a new warrant in

21   order to produce that information.

22   Q    Are there times where you don't necessarily ask

23   them to go back and get a second warrant?

24   A    At counsel's discretion, yes.

25   Q    Will Google comply if the officer comes back in

RODRIGUEZ - DIRECT                    471

1    the third step and asks for the account user

2    information from all of the device IDs listed in Stage

3    2?

4    A    I'm sorry.  What's the question?  Will Google

5    comply with that?

6    Q    Yes.

7    A    Based on the way that we understand guidance from

8    counsel is that once we've produced Stage 3

9    information, no additional information is to be

10   produced on that warrant.

11   Q    I didn't say that very well.  I'm sorry.  So if

12   you have, you know, you have a number of device IDs

13   that are listed in Stage 2 data, if the law

14   enforcement officer comes back in the Stage 3 request

15   and requests the account user information for all of

16   the device IDs listed in the second stage, will Google

17   comply with that?

18   A    Possibly.  It depends on the warrant and, you

19   know, sort of the circumstances related to that.

20   Q    So, the same back and forth process.  The

21   specialist gets the third stage request, does a gut

22   check, goes to counsel; right?

23   A    That's right.

24   Q    And if counsel thinks it's important, you all will

25   engage in further discussion with the law enforcement

RODRIGUEZ - DIRECT                        472

1    officer?

2    A    Correct.

3    Q    Okay.  So let's go back to the specific requests

4    in this case.  In this particular case, Detective

5    Hylton submitted the geofence warrant to Google on

6    June 20th of 2019?

7    A    Correct.

8    Q    And the warrant was dated for June 14, 2019;

9    right?

10   A    I believe that's the case.

11   Q    You can look at your affidavit, absolutely, or

12   your declaration.  That's Defense Exhibit 24.

13   A    That's correct, June 14, 2019.

14   Q    Thank you.  And Google provided the Stage 1 return

15   information on June 28th of 2019?

16   A    That's correct.

17   Q    And then the Stage 1 return provided Location

18   History information from 19 devices; right?

19   A    Correct.

20   Q    On July 2, 2019, Detective Hylton emailed Google

21   requesting additional location data beyond the scope

22   of the initial request.  So made the second stage

23   request for all 19 devices from the Stage 1 return;

24   right?

25   A    That's correct.

RODRIGUEZ - DIRECT           473

1  Q   And so July 8 of 2019, Detective Hylton leaves two

2  messages for a Google LIS specialist regarding his

3  earlier Stage 2 requests?

4  A   That's correct.

5  Q   And the Google employee called Detective Hylton

6  back that same day; right?  July 8th?

7  A   That's correct.

8  Q   And the Google employee had to explain to

9  Detective Hylton the narrowing process; right?

10  A   Correct.

11  Q   In that the warrant required Detective Hylton to

12  narrow the number of devices he was seeking the

13  expanded information for?

14  A   Right.

15  Q   They did that -- the specialist did that because

16  Detective Hylton had not narrowed the devices that he

17  was seeking the information for; right?

18  A   Correct.

19            MR. SIMON:  Judge, I think the

20  characterization of the search warrant would be better

21  and it would be more appropriate for this record if

22  she allowed the witness to, at the very least, see the

23  search warrant, what it reads, and then -- because

24  that is a lot of testifying about -- went outside the

25  scope.  I just think it would be good for the witness

RODRIGUEZ - DIRECT                474

1   to look at that.

2            THE COURT:  Is it in her declaration?

3            MS. KOENIG:  Yes.

4            THE COURT:  It's in the declaration, Mr.

5   Simon.

6            MR. SIMON:  Understood, Judge.

7            THE COURT:  She's already testified to it.

8   So overruled.

9   BY MS. KOENIG:

10  Q    So the Google employee had to specifically advise

11  Detective Hylton about the narrowing process because

12  he hadn't narrowed the list; right?

13  A    Correct.

14  Q    And in this particular case, was there a specific

15  directive that was given to Detective Hylton about how

16  much he had to narrow it from Stage 1 to Stage 2?

17  A    Not to my knowledge there weren't any indications

18  from the individual that processed the warrant that

19  that was discussed, but I wasn't involved in the call

20  directly.

21  Q    And the Google employee who talked to Detective

22  Hylton also had to advise him about what types of

23  information would be produced in the later stages of

24  the warrant; right?

25  A    Correct.

1   Q   Okay.  It didn't seem to Google maybe that

2   Detective Hylton was familiar with the stages of the

3   process that Google had set forth?

4   A   I couldn't characterize what -- that's what my

5   report was thinking at the time.

6   Q   Let's now go to Defense Exhibit 1.  You can flip

7   to the beginning of Defense Exhibit 1, and I'll put it

8   on the screen for you, as well.

9         THE COURT:  So, apparently, Mr. Simon, your

10   objection is sustained.

11         MS. KOENIG:  It's getting a little ahead of

12   me, Judge.

13   BY MS. KOENIG:

14   Q   All right.  So this is a warrant that's dated

15   June 14, 2019, from Detective Hylton.  Did you review

16   the geofence warrant in this case before preparing

17   your declaration?

18   A   Yes, I did.

19   Q   Did the language -- let's skip to the attachments.

20   If you go to the third page of the document, page 3

21   says Attachment 1.  And then the fourth page says

22   Attachment 2.  It's got a page number at the bottom

23   that says 2, but it is the fourth page of Exhibit 1.

24         So Attachment 2 is the language that describes the

25   three-step process that Google requires in these

RODRIGUEZ - DIRECT                476

1   geofence warrants; right?

2   A    That's correct.

3   Q    Did this language in this geofence warrant

4   regarding the three-step process that Google designed

5   seem similar to language in other geofence warrants

6   regarding the three-step process?

7   A    It appears similar.

8   Q    At some point did Google generate a template for

9   law enforcement officers to use in seeking the

10  geofence warrants?

11  A    Not to my knowledge.  But that was what I was

12  referring to before with the CCIPS sort of engagement

13  in helping to socialize the concept of these types of

14  warrants and the three-step protocol.

15  Q    So were you aware of any guidance that Google

16  helped create with CCIPS to give to law enforcement

17  officers about how to seek these warrants?

18  A    I'm not aware of the crafting of any guidance,

19  just the sort of discussions or engagement.

20  Q    Okay.  So let's go back to the first stage of the

21  process.

22          MS. KOENIG:  Actually, just a moment, Judge.

23  BY MS. KOENIG:

24  Q    Okay.  So sometimes there have been times when

25  Google has notified users that their Location History

1    was swept up in a geofence search; right?

2    A    Correct.

3    Q    Do the LIS specialists -- do you all issue that

4    notification?

5    A    That's correct.

6    Q    How does that happen?

7    A    Do you want me to describe the process?

8    Q    I do, yes.

9    A    So, in reviewing the search warrant, we will look

10   for the appropriate nondisclosure order within the

11   warrant.  If none exists, we may engage with law

12   enforcement to let them know that our process is to

13   notify users before disclosing data.

14        The process is somewhat different in reverse

15   Location History because we don't know the users that

16   we would notify until the third stage.  So at that

17   point in time in the processing of a reverse Location

18   History warrant, we would --

19              THE COURT:  A reverse Location History

20   warrant.

21              THE WITNESS:  Sorry about that.  I'll try to

22   be a little slower.

23   A    So in the processing of a reverse Location History

24   warrant at Stage 3 where the user would be

25   de-anonymized, we would actually disclosure the

1    subscriber information for that Google account prior

2    to that production if there is not a nondisclosure

3    order and a law enforcement agent has indicated that

4    they have no objection to Google notifying the users.

5    In this circumstance, our team would prepare a

6    standard form email to send to the users that we would

7    then be disclosing the information related to their

8    account.

9    Q    Okay.  I'm going to break that down, because that

10   was a little -- there are several stages of that

11   process.  So, first, you talked about if the warrant

12   has a nondisclosure order, what do you mean by that?

13   A    It's possible there's one in this warrant.

14   Q    You can take your time and look at it.

15   A    So I'm not seeing the language just in sort of a

16   cursory review here.  Within the warrant, there would

17   typically be an order from the judge indicating that

18   Google is not to disclose to any users associated with

19   the investigation or legal process.

20       It could also be a secondary legal order from the

21   warrant itself that's specific to the same order from

22   the Court that Google not notify the users related to

23   this legal process.

24   Q    But you don't see that nondisclosure order in this

25   warrant at all?

RODRIGUEZ - DIRECT                479

1  A    Not in this that I have in front of me.  Let me

2  just double check.

3  Q    Sure.  Take your time.

4         MR. SIMON:  Judge, I can clarify.  I think

5  the -- so, in part, and this will be subject to

6  Detective Hylton talking about it, there was a

7  nondisclosure order that was gotten later in the

8  process.  And I recognize now that we didn't provide

9  the nondisclosure order.  And I'm happy to do that,

10  but that's why it wasn't attached here.  It's gotten

11  at a separate time because those have to go through a

12  circuit judge is my understanding.  So that's, in

13  part, why there was a delay.

14         So I'll just note it's not attached to the

15  search warrant.

16         THE COURT:  Well, it might be important to

17  this examination.  Is there a way to get a copy of it?

18         MR. SIMON:  Sure.  I think we can figure out

19  that pretty quickly, Judge.

20         MS. KOENIG:  How quickly because I'm almost

21  done?

22         THE COURT:  How quickly because she's almost

23  done?

24         MR. SIMON:  Judge, not at this precise

25  moment.  I can represent to the Court that it wasn't

RODRIGUEZ - DIRECT                480

1   something that, in my mind, was really sort of going

2   to the heart of what we were discussing here, and

3   never really crossed my mind as something we needed to

4   turn over.  But it also wasn't given to me.  So I

5   haven't withheld it.  He's mentioned it to me, and

6   it's just my mistake for not getting it and handing it

7   over.  But I will represent we have a nondisclosure

8   order.  We'll provide it to them and do that.

9           THE COURT:  Well, do you have a sense of how

10  long it was?  Was it a day?  A couple hours?  A week?

11          DETECTIVE HYLTON:  Your Honor, it would have

12  been the day that it was actually submitted to Google.

13  I believe it was June 20.

14          THE COURT:  Well, how do you want to proceed,

15  Ms. Koenig?

16          MS. KOENIG:  I will let them produce it, and

17  we'll talk about it with Detective Hylton, I think.

18          THE COURT:  Okay.

19  BY MS. KOENIG:

20  Q   When there is a notification -- if there isn't a

21  nondisclosure order, then what was the next phase?

22  Like, what happens?  So you wait until the warrant

23  gets to Stage 3, and then you notify all of the users

24  whose information is about to be turned over in Stage

25  3?

1  A    Right.  So, the first step at Stage 3 is

2  evaluating if that nondisclosure order was submitted

3  prior to our processing of that Stage 3 request.  If

4  we don't have a nondisclosure order, we do engage with

5  the law enforcement officer, again, in a form email to

6  notify them that, you know, if you are to obtain a

7  nondisclosure order, you may submit it to us, but we

8  won't be able to produce subscriber information at

9  Stage 3 until you provide us with that nondisclosure

10 order or you let us know that you have no objection to

11 Google notifying the user.

12     So that process happens first.  If we receive

13 information that the law enforcement officer has no

14 objection to Google notifying, then we will move on to

15 actually notifying the users that we would be

16 producing their subscriber information in Step 3.

17     So just those users that were requested by the law

18 enforcement officer at Stage 3.

19 Q    Okay.  What does the notice tell the individual

20 whose information is about to be turned over?

21 A    It lets them know that we received legal process

22 associated with their account.  Typically provides

23 them seven days to provide us with a court-stamped

24 copy of a motion to quash, intending to, you know,

25 sort of engage within the court system on the search

1    warrant itself.  And we will, therefore, hold

2    production of that subscriber information until

3    they -- either the law enforcement officer agent or

4    the lawyer representing the attorney lets Google know

5    that the motion has been either approved or denied.

6    Q    So in every case where geofence warrant is

7    obtained, you will follow that process unless there's

8    a valid nondisclosure order?

9    A    Correct.

10   Q    Is there any language that you need specifically

11   in the nondisclosure order to consider it valid?

12   A    Basically, there has to be a clear order from the

13   Court that Google is not to notify in regards to this

14   legal process, notify our users in regards to this

15   legal process.

16   Q    When you say "clear order," is that subject to

17   that same kind of back and forth where Google will

18   review it and decide what they think is clear or not?

19   A    It can be.  Only -- and it would be with our legal

20   counsel depending -- so if it's within the warrant

21   itself, in some cases we may receive the affidavit,

22   and the affidavit may include a statement from the law

23   enforcement agent indicating basically the statement

24   to the judge asking for a nondisclosure order.  And in

25   that circumstance, it's not very clear to Google

 1   whether the judge was also, you know, sort of so

 2   ordering that request from the agent.

 3       So in those circumstances, there will be that sort

 4   of coordination with our legal counsel to review and

 5   determine what the next steps would be.

 6   Q   And next steps could include going back to the law

 7   enforcement agent; right?

 8   A   Correct.

 9           MS. KOENIG:  Okay.  I have no further

10   questions, Your Honor.  Thank you.

11           THE COURT:  I have a question, and I'm going

12   to let you stand there so that -- well, actually, I'll

13   let you address it on whatever it is.

14           MS. KOENIG:  Redirect.

15           THE COURT:  Redirect.

16           MS. KOENIG:  Thank you, Your Honor.

17           THE COURT:  It's odd under the law because

18   you're an adverse witness, normally it's direct.

19           MS. KOENIG:  Your Honor, I will -- I have one

20   more thing.  Mr. Gill had provided me a possible

21   explanation of the acronym.

22   BY MS. KOENIG:

23   Q   Does CCIPS -- does it sound -- is your

24   recollection that it may stand for Computer Crimes and

25   Intellectual Property Section?

RODRIGUEZ - DIRECT                    484

1   A    Sounds accurate.

2   Q    Okay.

3             MS. KOENIG:   Thank you.

4             THE COURT:   All right.   So, Ms. Rodriguez, do

5   you have any sense of what you, as a Google employee,

6   or what Google would consider realtime information?

7   We're hearing testimony about, you know, getting Maps

8   information in realtime.   Do you have any

9   understanding of what realtime means?

10             THE WITNESS:   In this context -- or I guess

11  in the Maps context, no.   In my context as a legal

12  specialist, realtime would, for the most part, mean a

13  Title III, like a wiretap or a pen register trap and

14  trace order that my team also processes.   But in the

15  context of Location History, we don't have that

16  concept.   We don't have the capability of installing

17  sort of a realtime kind of tracking process for

18  Location History data.

19             THE COURT:   So the difference I hear you

20  saying, and correct me if I'm wrong, is that realtime

21  is sort of as it's ongoing.   It's not historic.

22             THE WITNESS:   Correct.   In the context of how

23  I have been trained and engage with this material,

24  that's my understanding of what realtime would mean

25  for the legal investigations team.

1          THE COURT:  So within, say, you know, an hour

2    period -- I don't know.  I don't want to go outside

3    our record, but if there were over 50 points, so just

4    under one per minute, that would not be considered

5    realtime; is that right?  I know it's all different

6    time.  So I'm not trying to put words in your mouth.

7    So answer as you see fit.

8          THE WITNESS:  Right.  From my perspective,

9    all the records that we produce in response to reverse

10   Location History warrants are stored.  So it would not

11   be realtime in the context that I understand realtime.

12         THE COURT:  Okay.  That's my question.

13         THE WITNESS:  Thank you.

14     CROSS-EXAMINATION

15   BY MR. SIMON:

16   Q    Good afternoon, Ms. Rodriguez.

17   A    Good afternoon.

18   Q    The discussions with the Computer Crimes and

19   Intellectual Property Section that have been

20   mentioned, those are discussions between, I presume,

21   Google's lawyers and the folks from CCIPS; right?

22   A    Correct.

23   Q    And as far as you're concerned, those are sort of

24   the -- that's the back and forth that you mentioned,

25   primarily?

RODRIGUEZ - CROSS                486

1    A    Correct.  I have no direct involvement in that.

2    Just awareness of, you know, sort of the fact that

3    discussions are happening at that level.

4    Q    Okay.  And I know that it's already been admitted

5    by the defense, but I'll ask you, there's a smaller

6    book in front of you, a binder.  And I'll show you

7    what's marked as Government's Exhibit 3A.

8    A    Okay.

9    Q    Do you recognize that as your declaration?  I'll

10   give you a second to look at the pages there.

11   A    Yes, it would appear to be.

12            MR. SIMON:  Judge, I'd move to admit

13   Government's Exhibit 3A.

14            THE COURT:  No objection, right?

15            MS. KOENIG:  It's already been admitted, Your

16   Honor.  It was admitted --

17            MR. DUFFEY:  As a defense exhibit.

18            MS. KOENIG:  But I have no objection.

19            THE COURT:  No objection.  Yes.

20            (Government's Exhibit No. 3A is admitted into

21   evidence.)

22   BY MR. SIMON:

23   Q    When we talk about the geofence warrant, I'm just

24   going to sort of go through some of the points that

25   you've made in your declaration.  And to the extent

1    you want to clarify them, feel free.

2        But the geofence warrant calls for the anonymized,

3    deidentified location coordinates for folks who fall

4    within a certain radius.  So for a defined geographic

5    area during a defined time frame; right?

6    A    That's correct.

7    Q    And at the time the focus is the unidentified

8    suspect of that alleged crime; right?

9    A    From law enforcement's perspective?

10   Q    Correct.

11   A    To the extent that they indicate that to us, that

12   would be our understanding.

13   Q    Understood.  And when processing geofence

14   warrants, you've said you've seen sort of the period

15   between a few minutes and a few hours?

16   A    Correct.

17   Q    Okay.  And the -- that time span's limited to that

18   geographic area until the second stage when you get

19   what you've referred to as contextual -- or will get

20   contextual Location History information?

21   A    Correct.

22   Q    And I will show you what's in front of you as

23   Government's Exhibit 2.

24          MR. SIMON:  And it's not been admitted,

25   Judge, but I'll ask to question from it subject to

RODRIGUEZ - CROSS                488

1    connection --

2              THE COURT:  I'm sorry.  I'm having trouble.

3              MR. SIMON:  I'll ask for it to be admitted

4    subject to connection to our witness's testimony that

5    this is the warrant.  This is Government's Exhibit 2.

6              THE COURT:  All right.

7              MR. SIMON:  I'm going to question from it.

8    Can we bring it up?

9    BY MR. SIMON:

10   Q   If we look at what's -- there's red page numbering

11   on Government's Exhibit 2.  If you look at page 4 with

12   the red numbering as the guide, I want to highlight

13   the second full paragraph, not "for each type," but

14   starting "law enforcement officers."

15   A   Yes.

16   Q   The paragraph that says "law enforcement officers

17   will return a list."  I think it's the next one.  I'm

18   sorry.

19        Now, it's your understanding -- right? -- that

20   this is the second stage after you all have returned

21   the first stage of deidentified devices within the

22   geographical area?

23   A   Correct.  This would be the second stage.

24   Q   And in looking at -- I'm sorry.  It was the second

25   paragraph that was already highlighted.  I'm just

1    jumping around a little bit.

2        You would agree with me that in the second

3    paragraph, it reads that law enforcement officers will

4    review that first stage; right?

5    A    Correct.

6    Q    And will in an effort to narrow down the list of

7    accounts; right?

8    A    Correct.

9    Q    And law enforcement officers, it reads in the next

10   sentence, will attempt to narrow the list down by

11   reviewing the time stamped location coordinates for

12   each account and comparing against the time -- the

13   known time and location information that is specific

14   to the crime; right?

15   A    Correct.

16   Q    Now, you mentioned on direct -- and we can just

17   leave that up.  You mentioned on direct the number of

18   geofence warrants -- geofence requests.  About 9,000

19   in 2019?

20   A    Right.  It was around that volume.

21   Q    And when you have the warrants, it's your

22   understanding that a judge has determined that there

23   is probable cause for this information; right?

24   A    That's my understanding.

25   Q    And to the extent that there is going to be any

1    dispute, it's either going to be Google deciding to

2    quash that or seeking to quash that search warrant;

3    right?

4    A    If there's a dispute as to the validity of the

5    warrant?

6    Q    Yes.

7    A    Google would object to processing that warrant if

8    there were a dispute as to its validity.

9    Q    Then if, like in this instance, you comply with

10   the warrant as mandated by a judge, then a defendant

11   who is arrested in relation to that warrant can seek

12   to dispute its propriety; right?

13   A    I'm not familiar with the steps that would

14   typically come once Google produces the data.

15   Q    Understood.  And how many sort of different places

16   have signed off on these warrants in your experience?

17   Has it been limited to certain districts, certain

18   states, or is it broad?

19   A    So, we've received from many agencies within the

20   domestic United States.

21   Q    When you say "many agencies," you mean from many

22   agencies, you've received warrants signed off by

23   judges?

24   A    Correct.

25   Q    Or magistrates?

RODRIGUEZ - CROSS                491

1    A    Correct.

2    Q    In the case of responding to this warrant, I just

3    want to be clear for the record's sake with you, as

4    well as I was talking with Mr. McGriff.  The first

5    stage just calls on Google to give us the anonymized,

6    deidentified location coordinates for devices that

7    were within that radius at that specified time; right?

8    A    Devices that had reported location coordinates

9    within the geofence.

10   Q    Okay.  And then Google determines, based on the

11   location information that they have, what is

12   responsive to the warrant; right?

13   A    We would search our system, our Location History

14   storage system, in order to determine what's

15   responsive to the warrant.

16   Q    And we had some discussion about that storage

17   system earlier, but would you agree that it's possible

18   for Google to work within that storage system to index

19   sort of device information according to where the

20   latitude and longitude comes back from?

21   A    I'm not sure I understand the question.

22   Q    Okay.  So I think it's in part because I think the

23   concept is a bit foreign to me, too.  But this notion

24   of the warrant comes back.  Google then responds to

25   the first stage.  And by doing that, Google enters the

1    location coordinates to find out which device IDs were

2    present; right?

3    A    So, for -- so processing Stage 1, we would enter

4    in the coordinates, the geofence coordinates that were

5    provided on the warrant and the time frame, and that

6    conducts a search across all of our Location History

7    in order to identify the actual responsive location

8    coordinates that are stored at the user level.  So

9    that would -- I'm not sure if that answers your

10   question.

11   Q    Sure.  I think that just the follow-up would be

12   that Google could then sort of -- they could work

13   around the way in which they save that Location

14   History information; right?  So I could -- I'm

15   positing that I could save the location information to

16   account for users that were in a certain period at a

17   certain time, even before the government comes back

18   and requests that information; right?

19   A    At Stage 2?

20   Q    I'm just talking generally about the Location

21   History information database, the Sensorvault.  That

22   you all could take the information that is stored in

23   there and determine that we're only going to store --

24   store based off of a certain grid, a location

25   coordinate grid; right?  To say that we'll only put

1    these devices that were here at this time here.

2    A    I think this might be a little bit outside of my

3    domain of knowledge.

4            THE COURT:  I'm going to be honest,

5    Mr. Simon.  I found that a little confusing.

6            MR. SIMON:  Understood, Judge.  And I think

7    that ultimately Mr. McGriff was probably our best

8    understanding of that issue.

9    BY MR. SIMON:

10   Q    With respect to the second step, your declaration

11   recognizes that the information that is provided at

12   Step 2 of the warrant is more than just about sort of

13   picking out a suspect; right?

14   A    So the information provided at Step 2, I think

15   this warrant might sort of outline maybe what law

16   enforcement is looking for in terms of comparing the

17   information against the known kind of facts of the

18   case that they're investigating.

19   Q    And I think that sort of brings to the point about

20   sort of the facts of the case.

21       When the search warrant is submitted to Google

22   through the enforcement database, you only get the

23   attachment that shows the process by which to complete

24   the warrant; right?  That's one piece that you get.

25   A    That Google receives?

1   Q    Yes.

2   A    Correct.  We receive the legal process as uploaded

3   by the law enforcement agent to the LER system.

4   Q    And you don't receive the affidavit that the law

5   enforcement officer submits to the judge?

6   A    It varies.  In some circumstances, the law

7   enforcement agent may also include the affidavit.  In

8   some cases, they do not.  And it also varies whether

9   it's a requirement to submit the affidavit along with

10  the search warrant.

11  Q    Google didn't receive the affidavit in this case,

12  did it?

13  A    I didn't recall.

14  Q    Okay.  When talking about the information at the

15  second step, you note in your declaration that you can

16  do a number of things with contextual information at

17  the second step; right?

18  A    Do a number of things --

19  Q    So, in looking at paragraph 10, in particular, you

20  note that you can -- that using that contextual

21  Location History information at the second stage can

22  allow law enforcement to -- it can assist in

23  eliminating false positives and assist in determining

24  if devices were just moving through possibly?

25  A    Correct.  In paragraph 11, mentioning the, you

1    know, law enforcement in eliminating devices that were

2    not in the target location for a long enough period of

3    time.

4    Q    And at the same time also can sort of assess --

5    determine whether a certain ID is relevant or not

6    relevant; right?

7    A    Correct.

8    Q    So that's just sort of the broader process of

9    determining how to investigate a case.  And that will

10   be contingent upon what facts are relevant to a

11   particular crime; right?

12   A    Right.  And Google wouldn't necessarily have any

13   visibility into the actual facts of the investigation.

14   Q    Understood.

15           THE COURT:  I'm just going to be clear.  That

16   was Defense Exhibit 3A?

17           MR. SIMON:  I apologies.  That was 3A.  I

18   probably am referring to them all as 3.

19           THE COURT:  No, I'm not sure there was a

20   number on the record.  That's fine.

21   BY MR. SIMON:

22   Q    And we've had emails in this case.  I don't know

23   if you've had a chance to see those emails.  Have you

24   seen the emails between Detective Hylton and Google

25   law enforcement?

RODRIGUEZ - CROSS                496

1  A    I reviewed the materials associated with the

2  processing of the warrant when I wrote my declaration,

3  but I haven't seen anything since.

4  Q    Okay.  So when you're asked about the amount of

5  communication between Detective Hylton and Google,

6  you're not directly familiar, but maybe talking to

7  other folks about it?

8  A    Reviewing what we have associated with the

9  processing of the warrant, but -- and in conversation

10  with the individual that processed the warrant

11  directly.

12  Q    Would it surprise you if I told you that after the

13  July 1 email and the July 2 email for the second stage

14  that Detective Hylton had not heard back from Google

15  yet?

16  A    It wouldn't surprise me.

17  Q    Would it surprise you if I told you that Detective

18  Hylton was the one who actually initiated a call with

19  Google on July 8?

20  A    That they spoke to someone after calling Google?

21  Q    Correct.  That Detective Hylton was the one who

22  reached out to Google on July 8.

23  A    I do recall that there was a voicemail left for, I

24  believe, one of our counsel team members.

25  Q    So the representation that there was any

1    information being sent from Google to Detective Hylton

2    prior to July 8, his call on July 8, that's not

3    correct; right?

4    A    Well, I believe the Stage 1 was produced.

5    Q    Sorry.  I should rephrase that.  There were not

6    any communications from July 1 through July 8 on the

7    side of Google until Detective Hylton called; right?

8    A    Right.  As far as I'm aware, there was no

9    conversation until that July 8 with an actual Google

10   representative.

11   Q    And you would agree that with respect to making

12   sense of these geofence warrants, it is important to

13   know all the facts of the case; right?

14   A    It's helpful in many circumstances.

15   Q    So when we talk about things like relevance to an

16   investigation, knowing all of the facts in terms of

17   what you have, whether it be starting with sort of

18   whether the culprit appeared to be talking to other

19   people, that would be relevant; right?

20   A    In the context of this warrant, I'm not sure how

21   relevant it would have been.  But in my processing of

22   other warrants, it has been helpful to have an

23   understanding of the facts of the case that law

24   enforcement has.

25   Q    And I just mean it, to be clear, I mean it from

1    the context of law enforcement looking at these

2    warrants trying to make sense of what information is

3    useful.  All those facts are critical to making that

4    determination; right?

5    A   For law enforcement?

6    Q   Correct.  To determine what to request at Stage 2

7    of this warrant.

8    A   I would imagine so, that that would be helpful for

9    them to know.

10           MR. SIMON:  One moment, Judge.

11           Judge, I have been told how to ask that

12   question about indexing.  So I'm going to try it once

13   more, if you don't mind.

14   BY MR. SIMON:

15   Q   Could Google, to your understanding, index the

16   Location History in the Sensorvault by geographical

17   location instead of by account?

18   A   I honestly don't know.  I could guess that it was

19   technically possible, but I don't know what other

20   limitations may be at play because I don't monitor the

21   database or the structure of the database directly.

22   Q   Understood.

23           THE COURT:  Thank you, Mr. Simon.

24           Ms. Koenig.

25           MS. KOENIG:  Sorry, Ms. Hancock.  I will need

RODRIGUEZ - REDIRECT                    499

1    one more assist with the --

2              THE CLERK:  You should be good to go.

3              MS. KOENIG:  Okay.  Great.

4

5         REDIRECT EXAMINATION.

6    BY MS. KOENIG:

7    Q    All right.  Just a few more questions, Ms.

8    Rodriguez.

9         Let's -- so, Mr. Simon was asking you about what

10   attachments would have been submitted to Google, I

11   think, and I think we can clarify this.

12        So, as we know, Google requires that there has to

13   be a defined geographical area -- right? -- before

14   they'll process the warrant?

15   A    Correct.

16   Q    And there also has to be a defined time frame;

17   right?

18   A    Correct.

19   Q    Okay.  So if you can go back to Defense Exhibit 1

20   -- I know we're switching back and forth with

21   different numbers for the same exhibits.  It's

22   confusing.

23        So if you look at the first page of Defense

24   Exhibit 1, which at the top says "Affidavit for Search

25   Warrant."  In that affidavit, in paragraph 28, that

RODRIGUEZ - REDIRECT                    500

1    appears to list out the geographical area; right?

2    This is page 1 of that exhibit.  I'm sorry.  I see you

3    flipping back through.

4    A    I don't think I have -- so this starts with

5    Attachment 1 as page 1.  And I don't -- in Exhibit 1.

6    Q    Okay.  Let me show you what's on the screen.

7    There may have been a page that got flipped around.

8              THE COURT:  It's farther back in Exhibit 1.

9              MS. KOENIG:  Thank you, Your Honor.

10             THE COURT:  It's a little bit out of order, I

11   think.

12             THE WITNESS:  I can look at the screen.

13             THE COURT:  It's the last page in Exhibit 1.

14   A    I think this ends with search warrant inventory in

15   return, and then it goes back to Attachment 1.

16   Q    I am so sorry about that.  Well, let's look at the

17   screen.  Let's look at the page in Exhibit 1 which is

18   labeled "search warrant" at the top.

19   A    Okay.  I do have that.

20   Q    Okay.  So, in that page, nowhere on that page does

21   it indicate what is the time frame or the geographical

22   area to be searched; right?

23   A    That's correct.

24   Q    In fact, it says "see attached"; right?

25   A    Correct.

RODRIGUEZ - REDIRECT                501

1    Q    Okay.  And so following that, we see what's the

2    next page after that.  We see what's labeled as

3    "search inventory and return"; right?  I'm not

4    indicating you all would have seen that.

5    A    Correct.

6    Q    And then there is the Attachment 1 after that;

7    right?

8    A    Correct.

9    Q    And the Attachment 1 that follows the search

10   warrant itself appears to be identical to Attachment 2

11   in the same exhibit that is attached to the affidavit

12   in support of the application?

13   A    In the -- what you had shown on the screen before,

14   that representation, that would appear to be the case.

15   Q    In Attachment 1 here, as it is attached to the

16   search warrant, that is the document that indicates

17   the date and the time in the first bullet point;

18   right?

19   A    That's correct.

20   Q    And then on the second page of that, it indicates

21   in the geographical area above the picture with the

22   circle of the geofence what geographical area is to be

23   searched; right?

24   A    That's correct.

25   Q    And the paragraphs between those two items discuss

1   the process, the three-step process that we've already

2   talked about; right?

3   A    That's correct.

4   Q    And so if all that had been submitted to Google

5   was the page that lists -- that at the top says

6   "search warrant" -- right? -- if that was all that had

7   been submitted, there was no way you would have

8   processed that; right?

9   A    Right.  If there weren't -- if it said "see

10  attached," but there weren't any corresponding

11  attachments, then that's correct, we wouldn't be able

12  to process this warrant as is.

13  Q    And if the cover page didn't indicate the

14  geographical area or the time frame; right?

15  A    Correct.  If this warrant -- as it currently looks

16  on the screen right now and in the exhibits, if that's

17  all that there was, then Google wouldn't have enough

18  information to process the warrant.

19  Q    Thank you.

20       When you are processing a warrant, does it matter

21  to Google if it's a judge that issues the geofence

22  warrant versus a person who is a magistrate that's not

23  a lawyer?

24  A    It varies by jurisdiction, as I understand it in

25  my training on the legal investigations team.  So we

RODRIGUEZ - REDIRECT                503

1    may accept search warrants signed by magistrates and

2    we would accept search warrants signed by a judge.

3    Q    And so the training -- or you would accept it from

4    a jurisdiction that allows magistrates to issue such

5    warrants; right?

6    A    Correct.

7    Q    And speaking of your training, when we talked

8    about that back and forth process between Google and

9    the law enforcement agent on the different stages of

10   the process, do you all, as LIS employees, do you get

11   training on how to handle those types of issues about

12   when you need to go to legal counsel?

13   A    Correct.  We get training.  We also have a regular

14   sort of engagement, you know, scheduled on a weekly

15   basis with our law enforcement counsel.

16   Q    And Mr. Simon had asked you about the Stage 1

17   process, and you had replied that all users have to be

18   searched.  And we've been talking about numerous tens

19   of millions.  Do you have any idea how many millions

20   we're talking about in terms of what the Stage 1

21   search is of?

22   A    I don't.

23          MS. KOENIG:  Okay.  No further questions,

24   Your Honor.  Thank you.

25          From the defense perspective, she can be

RODRIGUEZ - REDIRECT                504

1    excused from her subpoena, Your Honor.

2          MR. SIMON:  And from the United States, as

3    well, Judge.

4          THE COURT:  All right.  Well, Ms. Rodriguez,

5    I want to thank you for coming here and for

6    testifying.  You are excused.  Until we're done with

7    the proceeding, I would continue to consider you under

8    sequestration.  Just don't talk to folks about what

9    you've testified to, even though you're not subject to

10   recall.  And you probably could.  It just keeps the

11   record cleaner, if you're willing to keep things

12   close.  We do appreciate your coming.

13         THE WITNESS:  Understood.

14         THE COURT:  And you are excused.

15         THE WITNESS:  Thank you.  Do you want me to

16   sanitize this?

17         THE COURT:  If you don't mind, sir, could you

18   clean it off afterward?

19         MR. MELTON: Yes, Your Honor.

20         THE COURT:  You're good.  Thank you.

21         THE WITNESS:  Thank you.

22         (The witness was excused from the witness

23    stand.)

24         THE COURT:  In fact, since we're calling a

25   new witness, and it's been almost an hour and a half,

1    how about we take a 15-minute recess.  And so that

2    will be until 3:35.  How's that?

3           MS. KOENIG:  Your Honor, the defense has no

4    other witnesses to present at this stage.  And I think

5    we will be ready for the next government witness.

6           THE COURT:  All right.  Well, that's good to

7    know.  Even more reason to take a break.  See you in

8    15 minutes.

9           (Recess at 3:20 p.m. to 3:44 p.m.)

10           THE COURT:  All right.  I understand we

11    talked about some logistics, which is why we're coming

12    back a little late.  Do you all have a sense of how

13    much longer we will be going?  Can we finish today?

14           MR. SIMON:  Judge, I don't intend to -- and I

15    certainly am happy to keep an eye on the clock, but I

16    don't intend for the direct to be more than 45 minutes

17    or so.  I think a lot of it is contingent upon cross

18    in both instances.  But there are a handful of topics

19    to cover with each witness.

20           THE COURT:  Right.  So 45 minutes each?

21           MR. SIMON:  I think so, Judge.

22           THE COURT:  What do you all think?  I'm

23    willing to stay late.  Otherwise, I would think it

24    would make sense to bring the second witness in on

25    Monday.  We can't go tomorrow because all the

D'ERRICO – DIRECT                    506

 1   electricity is shut down.

 2          MS. KOENIG:  We would prefer to get it done

 3   today, if at all possible.

 4          THE COURT:  Well, I think if both parties are

 5   willing to stay a little late, and I apologize to the

 6   inconvenience for the marshals and everybody else.  I

 7   just think the better part of valor would be to

 8   finish.  And so I will encourage you all to be

 9   efficient while, of course, representing your clients

10   with zeal.  So we're ready.

11          MR. SIMON:  Judge, we'd call Special Agent

12   Jeremy D'Errico.

13

14      JEREMY D'ERRICO, called by the United States,

15   first being duly sworn, testified as follows:

16

17      DIRECT EXAMINATION

18   BY MR. SIMON:

19   Q   All right.  Special Agent D'Errico, can you spell

20   your name for the court reporter, please.

21   A   Yes.  My first name is Jeremy, J-E-R-E-M-Y.  My

22   last name is D'Errico, D-apostrophe-capital

23   E-R-R-I-C-O.

24   Q   And you are with the Federal Bureau of

25   Investigation; right?

D'ERRICO - DIRECT                    507

1    A    Yes, I am.  I'm a special agent with the FBI.

2    Q    And how long have you been there?

3    A    I've been with the FBI since 2012.

4    Q    Okay.  In what role are you currently in there?

5    A    Currently, I'm a special agent.  Prior to being a

6    special agent with the FBI, I was a computer scientist

7    with the FBI.

8    Q    And do you have any specialized role there with

9    the FBI?

10   A    I do.  I'm part of the cellular analysis survey

11   team.  We abbreviate it as CAST.  It's a team that is

12   specially trained of about 80 special agents and task

13   force officers stationed across the country

14   specifically trained to conduct historical cell-site

15   analysis.

16   Q    Okay.  What other positions have you held while

17   you've been with the FBI?

18   A    When I first became a special agent with the FBI,

19   I was on the cyber squad investigating computer

20   intrusions and other highly technology investigations.

21   Currently, I'm on the violent crime squad where I

22   brought my technology expertise to help use advanced

23   technology in the investigations of violent crime.

24   Q    And in your work with the CAST team, do you

25   undergo any certifications or trainings?

1   A    Yes.  As part of the CAST team, we have over -- or

2   I have more than 300 hours of training to be able to

3   certify for the team.  And that starts with a basic

4   training, an overview of how to conduct historical

5   cell-site analysis.  And then from there, the top

6   students move on to the next class, which is an

7   advanced class in historical cell-site analysis.

8        From there, the top students, again, get invited

9   to what we call a field training exercise, which is

10  where we discuss more advanced topics as well as add

11  time constraints to our work simulating a command post

12  situation for, say, a fugitive or a child abduction.

13       From there, again, the top students move into a

14  four-week certification phase where we go through

15  training from the FBI from the cellular carriers,

16  including AT&T, Verizon, Sprint, T-Mobile, and U.S.

17  Cellular, as well as over a week of instruction from

18  the Florida Institute of Technology on how radio

19  frequencies work, and additional practical exercises.

20  And that culminates with a practical exam, which we

21  need to pass in order to complete the certification.

22  Q    All right.  Now, as a member of the CAST team, are

23  you called on to assess GPS data points provided by

24  cellular companies and other technology companies?

25  A    Yes, I am.

D'ERRICO - DIRECT                    509

1   Q   Okay.  And same with Wi-Fi points?

2   A   Yes, correct.  Generally, any type of location

3   points.

4   Q   Okay.  And in the course of your time, have you

5   done that with -- done that assessment with Google

6   location information?

7   A   Yes, I have.  I've reviewed over a million lines

8   of Google Location History, whether it be from a

9   geofence or a location history attributed to someone's

10  accounts, as well as conducted what I call

11  observations of Google Location History data in play.

12  Q   Have you personally attempted to assess the

13  accuracy of Google location coordinates?

14  A   Yes, I have.  I've taken out equipment several

15  times to drive around, record my actual GPS location

16  with a stand alone device.  And then on another

17  device, I've collected all of the Wi-Fi access signals

18  that I could hear, as well as the signal strengths,

19  and I used Google's geolocation API, which takes the

20  information from the Wi-Fi access points and returns

21  to me a location, a latitude and a longitude and a

22  point on the map, as well as a display map radius,

23  just as they do with Location Accuracy on the Google

24  devices.

25          THE COURT:  What's a geolocation API?

1           THE WITNESS:  Geolocation API, API stands for

2    Application Programmer Interface, and it is a way for

3    me to send information to Google, Google to process

4    it, and send me a response.

5           So I send them the information, and then

6    evaluate the response back.  I compare their location

7    that they provided and their maps display radius that

8    I measured with an independent device.

9    Q    Now, have you ever successfully located anyone

10   using Google location information?

11   A    Yes, I have.

12   Q    Can you tell us about that?

13   A    This is information that myself and the CAST team

14   regularly uses in child abductions, in locating

15   fugitives that do not want to be found by law

16   enforcement, and other folks that may have gone

17   missing.

18   Q    Have you been certified as an expert before?

19   A    Yes, I have.

20   Q    In what fields have you been certified?

21   A    Historical cell-site analysis and location data

22   analysis is generally the title we use.

23           MR. SIMON:  Judge, at this point I'd move the

24   Court to declare Special Agent D'Errico an expert in

25   the field of location, data analysis, including

 1   Google's Location History information.

 2              THE COURT:  Any objection?

 3              MR. SIMON:  No, Your Honor.

 4              THE COURT:  Okay.

 5              MR. SIMON:  And, Judge, I've handed the

 6   exhibit earlier -- the witness the exhibit earlier, as

 7   well as defense, Government's Exhibit 6.  It's Special

 8   Agent D'Errico's C.V., and I move to admit it at this

 9   time.

10              THE COURT:  Any objection?

11              MR. SIMON:  No, Your Honor.

12              THE COURT:  All right.  It will be admitted

13   as well, and he is certified as an expert.

14              (Government's Exhibit No. 6 is admitted into

15   evidence.)

16   BY MR. SIMON:

17   Q   Now, Special Agent D'Errico, have you worked with

18   geofence warrants before?

19   A   Yes, I have.

20   Q   About how many have you worked with?

21   A   Geofence warrants, at least a dozen, probably

22   more.

23   Q   Okay.  Now, did Google provide any data under this

24   geofence warrant any different than what they provided

25   to you in the past?

1   A    The records have been consistent with this among

2   the other geofence warrants I have worked.

3   Q    Now, just to -- we've talked about geofence

4   warrants, obviously, for a few days now, but how would

5   you describe a geofence warrant?

6   A    A geofence warrant is when the government obtains

7   a search warrant commanding Google to provide all of

8   the devices that have Location History records within

9   a particular area and within a particular time frame.

10   Q    And in the course of your time assessing Google

11   geofence warrants, have you come to believe that there

12   are certain best practices in terms of putting

13   together a geofence warrant?

14   A    Yes, I have.

15   Q    Okay.  And can you tell us some of those best

16   practices particular as relates to a radius?

17   A    Yes, particularly to drawing the geofence, it

18   differs between investigations from investigation to

19   investigation.  In the example of a bank robbery,

20   we're looking for a few things.  We need to cover the

21   area of the crime, the bank, but we're also looking

22   for areas where the subject may have entered the area

23   or exited the area.  We're looking for areas where the

24   suspect may have parked a vehicle, because we know a

25   few things about bank robberies.

1      (A) They don't always park in the front space in

2   the front of the bank to go in and rob that bank.

3      (B) We typically see them park a little bit of a

4   distance away, sometimes in the next parking lot.

5      We also know that Google location records in a

6   normal interval occur approximately every two minutes.

7   So we need to take these calculations into effect when

8   we're drawing a radius or a box for a geofence

9   warrant.

10      We try not to capture roadways or other areas

11  where many people may be passing through unless it

12  could be relevant to the investigation.  Whereas, in a

13  child abduction, we may want to capture a roadway so

14  that we can talk to people that may have seen the

15  child walking across or along the roadway.

16      So it really varies based on the type of crime and

17  the layout of the crime scene area.

18  Q   Now, did you prepare a report, a presentation, in

19  anticipation of this hearing?

20  A   Yes, I did.

21  Q   I'm going to show you the pages of Government's

22  Exhibit 1 and let you take a look at those.  It's in

23  the folder in front of you.  Do you see Government's

24  Exhibit 1 there?

25  A   Yes, I do.

D'ERRICO – DIRECT                    514

1    Q    Is that the presentation that you prepared?

2    A    Yes, it is.

3              MR. SIMON:  All right.  We move to admit

4    Government's Exhibit 1.  I know it's been questioned

5    on already.

6              THE COURT:  No objection?

7              MR. PRICE:  Your Honor, there is one slide

8    that we anticipate having an objection to.

9              THE COURT:  Okay.  Do you want to lay the

10   foundation for it now so it doesn't go on the record?

11             MR. PRICE:  Sure.  This would be Slide

12   No. 47.

13             THE COURT:  What is the basis of the

14   objection?

15             MR. PRICE:  Relevance, Your Honor.  It's our

16   understanding that this web page and the language on

17   it --

18             THE COURT:  Okay.  I'm having trouble with

19   your mask.

20             MR. PRICE:  It's our understanding that this

21   web page and the language on it did not exist until

22   2020, long after the events in question in this case.

23             MR. SIMON:  Judge, I think my response to

24   that objection to relevance is that we've seen

25   exhibits come in and out of evidence with no regard

1  for, I think, dates in part because it does offer some

2  context here in terms of what location services and

3  Location History mean to Google.  And I think that's

4  certainly more of a weight, particularly at this

5  hearing.  So, Judge, I'd ask to leave that slide in in

6  the presentation.

7          THE COURT:  I'm going to make the same ruling

8  I did with respect to much of what you entered in.

9  You can cross-examine about it and argue the weight of

10 it, and present the weight of it, but we're really not

11 in an evidentiary hearing in any event, and I'm trying

12 to keep the record full so that whatever arguments

13 need to be made can be supported and challenged in a

14 complete way.  So it's overruled.

15         MR. PRICE:  Thank you, Your Honor.

16         (Government's Exhibit No. 1 is admitted into

17  evidence.)

18 BY MR. SIMON:

19 Q   Now, Special Agent D'Errico, I want to talk

20 about -- you heard me earlier, I'm sure, ask witnesses

21 about GPS points and Wi-Fi points.  I want to talk

22 about, first, the Slide No. 3 here.

23         MR. SIMON:  And I'm just referring to the

24 page numbers that will be on the bottom right, Judge,

25 of each page.

1    BY MR. SIMON:

2    Q   Can you explain for us what we're talking about

3    when we talk about a GPS point?

4    A   Yes.  The GPS points in the record, and those are

5    points that have a source of GPS, those points are

6    primarily captured using the Global Positioning

7    System.  And the Global Positioning System uses a

8    network of satellites that are in orbit around the

9    earth, and they are constantly broadcasting signals.

10        The phone, the mobile device, needs to hear at

11   least four of those signals in order to determine the

12   latitude, the longitude, the altitude, and the time.

13   And there's information specifically coded into those

14   satellite transmissions, those broadcasts, that allow

15   the device to do that.

16        Now, in order to get a good fix or a good location

17   with GPS, you need to be able to hear those satellites

18   or the device has to hear those satellites.  So GPS

19   does not work very well inside of buildings such as

20   this but works very well outside, and is what we

21   typically rely on for navigation, realtime navigation

22   with a GPS device or turn-by-turn navigation.

23   Q   Now, we didn't just get GPS points in the returns

24   here; right?

25   A   Correct.  We also received points that were

 1   primarily derived using Wi-Fi access points, and

 2   they're marked as Wi-Fi in the source column.

 3   Q    In Slides 4 and 5, do you explain that?

 4   A    Yes, I do.

 5   Q    Okay.  And so looking at sort of Slide 5 -- and

 6   we'll bring up both 4 and 5 next to each other.  But

 7   when we talk about Wi-Fi fingerprinting, can you

 8   explain what we're talking about there?

 9   A    Yes.  On page 5 is an illustration of Wi-Fi

10   fingerprinting, and this is a technique that is used

11   to determine the location of a device using Wi-Fi

12   access points.  And Wi-Fi access points are stationed

13   all over, right?  So if you are able to access Wi-Fi

14   on your phone, you're within range of a Wi-Fi access

15   point.

16        Now, the way that fingerprinting works is that

17   there's a two-step method.  The first step, which is

18   above the dotted line on page 5, is what we call

19   training data.  And this is when we have a phone that

20   can hear access point No. 1, access point No. 2, and

21   access point No. 3, or, in this case N, because it can

22   be more than three access points.

23        It hears these access points, doesn't necessarily

24   have to connect to those access points, but hears them

25   and can measure the signal strength of them.

D'ERRICO - DIRECT                518

1      Also at the same time, the mobile device is taking

2   a GPS coordinate.  So it's actually determining its

3   location with GPS but also collecting the Wi-Fi

4   broadcast in the area.  And what happens with this

5   data is it's sent up to Google as part of the Location

6   Accuracy service.  And that Location Accuracy service

7   is an opt-in service on Android phones that allows

8   Google to collect the approximate location of Wi-Fi

9   access points.

10              THE COURT:  I'm sorry.  Can you use the

11  phrase again?  Location what service?

12              THE WITNESS:  Location Accuracy.

13              THE COURT:  Okay.

14  BY MR. SIMON:

15  Q   In looking at Slide 6, does Google notify

16  individuals that they will be using Wi-Fi access

17  points to assess location devices?

18  A   They do.  Can I go back to Slide 5 and finish the

19  bottom?

20  Q   Sure.

21  A   I'm sorry.  So, we talked about the training data

22  set up top.  The next set comes in on the bottom of

23  that page where a phone does not collect a GPS

24  coordinate, but it does collect the Wi-Fi access

25  points and the signal strengths.  It can then send

1   that information to Google, which collected a database

2   and created a fingerprint, so to speak, and associated

3   the same access points with similar signal strengths

4   to determine an approximate location.

5        So there's no need to know an exact location for

6   every access point in the world.  What we need to know

7   is the access points in relationship to others and

8   approximate signal strengths.  Using that information,

9   we are able to efficiently determine a location

10  without using GPS.

11       And there's occasions where we don't want to use

12  GPS because GPS is very expensive on the battery.  We

13  heard Mr. McGriff testify that there might be problems

14  if there were thousands of points, particularly GPS

15  points, from a device.  So Wi-Fi is a less expensive

16  but still accurate method of providing the approximate

17  location of a device.

18  Q    Okay.

19  A    Thank you.

20  Q    And to go back to my previous question, is Slide 6

21  demonstrating Google's notification to customers that

22  it uses Wi-Fi access points to assess location?

23  A    Yes, it does.

24            THE COURT:  You're so far away from the

25  microphone.

D'ERRICO - DIRECT                520

1           MR. SIMON:  I apologize.

2           THE COURT:  You're talking to him, but we're

3    the people who need to hear it.

4           MR. SIMON:  No, I understand.  And I moved a

5    little bit, so I'll try to maintain --

6           THE COURT:  That's fine.

7    BY MR. SIMON:

8    Q    So I'm looking at Slide 6.  Is that slide

9    demonstrating Google's notification to its customers

10   that they use Wi-Fi points to assess location?

11   A    Yes, there's two places on Google's site that

12   discussions Wi-Fi and the use of it.  So in the top

13   block, Google says, To improve location services,

14   Google uses publicly broadcast Wi-Fi data from

15   wireless access points and GPS, cell towers, and

16   sensor data.  Only publicly broadcast Wi-Fi

17   information is used to estimate the location of a

18   device.

19        In a separate article, it also talks about how you

20   can, as a Wi-Fi point owner, opt-out of Google using

21   your Wi-Fi access point in location services.

22        And on the bottom, Google also talks about their

23   Google location services, otherwise known as Google

24   Location Accuracy.  That uses information of nearby

25   Wi-Fi mobile networks and device sensors to improve

D'ERRICO - DIRECT                521

1   its location device or its location data using the

2   Android phone.

3   Q   Okay.  Now, I want to show you what we've marked

4   as --

5            THE COURT:  I'm just going to ask a question.

6   You said there's a separate article about how you can

7   turn it off.  That's not reflected on this slide;

8   right?

9            THE WITNESS:  Correct, that is not reflected

10  in the slide.

11           THE COURT:  Okay.

12  BY MR. SIMON:

13  Q   And I just want to now have you look at

14  Government's Exhibit 2.

15  A   Excuse me?

16  Q   Government's Exhibit 2.

17  A   Yes.

18  Q   Do you recognize the pages set forth in

19  Government's Exhibit 2?

20  A   Yes, I do.

21  Q   What is it?

22  A   This is the search warrant and affidavit that

23  Detective Hylton submitted for the Google geofence

24  warrant.

25  Q   Okay.  And that's a fair and accurate depiction, I

1    presume, of that application?

2    A    Yes, it is.

3              MR. SIMON:  Judge, we move to admit

4    Government's Exhibit 2 at this point.

5              THE COURT:  Okay.  No objection; correct?

6              MR. PRICE:  No objection, Your Honor.

7              THE COURT:  Okay.  It's entered.

8              (Government's Exhibit No. 2 is admitted into

9    evidence.)

10   BY MR. SIMON:

11   Q    Now, let me ask you about the geographical area.

12   We've talked about that phrase throughout the few

13   days.  What geographical area was deemed relevant to

14   the search warrant in this case, looking at Slides 8

15   and 9?

16   A    And this is back in Defense Exhibit 1?

17   Q    Defense Exhibit 1, yes.

18   A    So Slide 8 on my report, Defense Exhibit 1, shows

19   a red dot towards the center of the slide with a red

20   circle around that slide.  The red dot is the center

21   of that geofence, whereas the red circle illustrates

22   the effective geofence, which is 150 meters away in

23   every direction from that center point.

24   Q    Okay.  And so this is the geofence radius we have.

25   Now, did you put slides together to sort of

1   demonstrate what factual points went into developing

2   that geofence?

3   A    Yes, I did.   Slide 9 goes into that point.   So

4   it's important for us to capture all areas where

5   somebody could stash a car or hide a car, and also all

6   areas where somebody could arrive or leave from this

7   crime scene.

8        So, in this case, what was done was the geofence

9   on the right side goes up to but doesn't cover the

10  road, which is Price Club Boulevard, traveling north

11  to south and curving towards the west under the

12  geofence.   On the south side of the geofence, that

13  area covers the area behind Journey Christian Church,

14  which is the church where we received information that

15  a suspicious blue Buick was parked, and it also covers

16  the wooded area, because we know that subjects when

17  fleeing a bank robbery may not --

18  Q    Special Agent D'Errico, I'm sorry to interrupt

19  you, but can we look at, while you're explaining this,

20  Slides 10 and 11, because I think some of those points

21  might be in there; right?

22  A    Yes.   We also cover the area south because we know

23  subjects may flee through the woods and may not use

24  the road system.

25       On the left, we cover up to the adjoining

D'ERRICO - DIRECT                    524

1    business, which we can see also covers some trails.

2    And then to the north, we try to cover as much of the

3    parking lot as we can but try not to cover the area

4    near the Hampton Inn.

5         And on Slide 10, we have additional information

6    laid on the map, particularly yellow markers that

7    indicate the approximate location where we saw the

8    subject via surveillance cameras from both Journey

9    Christian Church and from Call Federal Credit Union.

10        There are two triangles or partial triangles on

11   the maps with the points attached to the side of the

12   church.  The one in purple towards the bottom is the

13   field of vision of one of the cameras, one of the

14   surveillance cameras, that we were able to obtain

15   surveillance footage from.

16        The one towards the top, in orange, is, again, a

17   field of view of a second surveillance camera that we

18   were able to get coverage from or a video from during

19   the time of the robbery.

20        And then we have video surveillance from the area

21   withinside the Call Federal Credit Union.  And each

22   one of those yellow pinpoints indicates a point where

23   I observed the subject on this map.

24        So we can see that there were video observations

25   that start on the bottom with No. 1 and travel the

1    parking lot in between the church and the credit union

2    towards the north, and then there's points,

3    specifically points 4, 5, and 6, where the subject

4    moves towards the Call Federal Credit Union.

5         There's point 7, which is inside Call Federal

6    Credit Union.  And then points 8, 9, and 10 show

7    points where the subject was running from the Call

8    Federal Credit Union towards the -- well, out of the

9    field of vision but south back towards where we

10   originally saw him on video.

11   Q    Now, did you assess for your presentation -- and

12   these slides are coming up on the screen as well, if

13   it's easier to see them.  Did you assess and compare

14   the geographical area covered by the geofence in this

15   case with what's covered by a cell tower dump?

16   A    Yes, I did.

17   Q    Is that reflected in Slide 13?

18   A    Yes, it is.  Slide 13 shows the approximate area

19   of coverage that I would expect to receive if we

20   conducted a tower dump for this crime.

21   Q    Now, before you go into it, just for the record,

22   how would you describe a cell tower dump?  What is it?

23   A    A cell tower dump is when we obtain a 2703(d)

24   court order to obtain communication records from the

25   cellular providers that correspond to communications

1    that happen on a particular cell tower.

2        And, typically, when we obtain tower dumps, we

3    look to obtain any cell site that would provide

4    coverage to the subject area.  In this case, the Call

5    Federal Credit Union.

6        We know that cell phone towers overlap, and that's

7    what allows us to move seamlessly from one cell tower

8    to the next cell phone tower.  So we choose three to

9    make sure we are getting complete coverage or as much

10   coverage as possible of that target area, that subject

11   area.

12   Q    And we heard earlier that cell tower dumps provide

13   phone numbers; is that right?

14   A    That's correct.  When the phone companies respond

15   back to the 2703(d) order, they provide the actual

16   phone numbers used in the communication.  So they are

17   not anonymized.  They are the actual telephone numbers

18   used in that course of the communication.

19   Q    What, if anything, does the government tell a

20   cellular telephone company to do in terms of how they

21   would provide that information?  Do we tell them how

22   to go about finding the information from the cell

23   tower?

24   A    No, we don't direct them on how to respond to the

25   Court order other than directing them to provide

1    records that cover that area.

2         So my understanding is that they use the processes

3    that they have in order to obtain those records that

4    they use in their ordinary course of business.

5    Q    And what -- you've dealt with both types of

6    warrants, geofence warrants and cell tower dumps,

7    which can come by a subpoena; right?

8    A    A cell tower dump?

9    Q    Yes.

10   A    I've only obtained them with a 2703(d) or a search

11   warrant.

12   Q    The -- but the information that comes from the

13   cell tower dump and the geofence warrant, which one

14   provides more data back?

15   A    Typically, more data is received in the tower

16   dump.  It will provide -- yeah, more information

17   typically is from a tower dump.  It does depend, but

18   usually it's a tower dump.

19   Q    When I sort of say "information," it's like each

20   phone number that comes out of there belongs to a

21   particular user; right?

22   A    That's correct.  We get the actual phone number of

23   the user that was in this area as well as the

24   direction from the tower.  So it's not just that they

25   were in that area, but it's the direction from that

D'ERRICO - DIRECT                    528

1   tower that we also obtain.  So an approximate location

2   for that device.

3   Q    Just for the record, you can subpoena, then, the

4   subscriber information for those phone numbers; right?

5   A    We can.  We can use a subpoena to obtain

6   subscriber information or use other databases to

7   attempt to determine the actual -- the person who has

8   it in their hand.

9   Q    Now, we've talked about the various stages of the

10  geofence warrant.  Did you go about providing a

11  summary of the records returned in the first stage for

12  your presentation?

13  A    Yes, I did.

14  Q    Okay.  I'm going to have you take a look at Slide

15  17.

16         THE COURT:  I'm going to ask a question

17  before you get there.  Looking at Slide 13, the blue

18  area, I presume, is the area where you might get

19  information from a tower dump; is a right?

20         THE WITNESS:  That's correct.  And I've

21  estimated that based on all of these towers in the

22  area because we know that towers overlap.  So we

23  estimated that the three towers that are inside the

24  blue area would be the towers that would be dumped in

25  response to a tower dump order.  And that approximate

1    coverage area would be approximately the size of that

2    blue outlined area.

3              THE COURT:  So how big is the blue outlined

4    area?

5              THE WITNESS:  I didn't do an area comparison,

6    but on the bottom of the map, Your Honor, there is a

7    scale that indicates that it's 4 kilograms between

8    those two points.  So width-wise, Your Honor, I would

9    say at the widest part, and I am just eyeballing this,

10   it may be 7 or 8 kilometers wide at the widest part

11   traveling east to west.  And then traveling the area

12   north to south, this area may be about 10 kilometers

13   north to south.

14             THE COURT:  All right.

15             THE WITNESS:  Also on that map is the red

16   circle indicating the size of the geofence.

17             THE COURT:  Right.  Okay.  Thank you.

18   BY MR. SIMON:

19   Q    Now, looking at the summary of records from Phase

20   1 and Slide 17, if we look at the top here, it says,

21   Initial Google Geofence records provided by Google and

22   the first 15 of 209 records.  What's meant by the

23   first 15 of 209 records?

24   A    This is just a sample of what the records look

25   like when they come to us from Google.  And, actually,

1    they're not even this pretty.  But they contain

2    several columns of information, including a device ID

3    that's going to be unique for the device inside this

4    geofence, the date and the time, the latitude and the

5    longitude providing an approximate location.  And I

6    should say the center of the approximate location for

7    the device.  The source of the device, which is, my

8    understanding, the primary sensor that was used to

9    obtain this.

10        In this case, we saw records with GPS or Wi-Fi.

11   There's also records out there in other Geofences that

12   use cellular towers and will be reported under cell.

13        And then the last column is the map display

14   radius, which is the true area around the center point

15   where Google believes that device may be.

16   Q    Okay.  Now, did you -- and let me ask you, you

17   mentioned the map display radius.  Whenever we see

18   that, it has the same meaning across these returns;

19   right?

20   A    Correct.  That M stands for meters.

21   Q    How would you -- I think you've done it.  Would

22   you describe sort of our best understanding of map

23   display radius?

24   A    Map display radius is the area where Google

25   believes that the device is located.  So while they

1    provide us latitude and longitude coordinates, that's

2    not the actual location of where Google believes it

3    is.  That's the center of the location where Google

4    believes it is.

5        If I could, I would draw maps without a center

6    point in it and just a bubble because that's a better

7    representation, but it's hard to get the scale or it's

8    hard to understand how many points are then layered on

9    there.

10       So in the maps that I have, I'll draw it with the

11   center point as well as the bubble around the display

12   radius, understanding that it's not the point that

13   Google is saying that the device is at, it's inside

14   the bubble where Google is saying that the device is.

15   Q   Okay.  Now, looking at Slide 20, did you plot all

16   the points returned in Stage 1 of the warrant?

17   A   Yes, I did.

18   Q   Okay.  Is this an indication of those plot points?

19   A   Yes, this is all 209 points for Stage 1 of this

20   search warrant return plotted on the map with both

21   their center coordinates marked by the markers, the

22   red or blue markers, and then the display radiuses

23   associated with each of those points.

24   Q   There was some discussion of the 387-meter radius

25   that one of these points provided.  Can you explain

D'ERRICO - DIRECT                    532

1    why we had such a large radius for one point and then

2    right before that right there was a smaller radius?

3    A    Yes.  So in the records, there are two records

4    that are very close in time.  I believe it's within 30

5    seconds.  But more noteable is that they were both

6    Wi-Fi records, and they had the exact same latitude

7    and longitude.

8         The first record had a display radius of about --

9    I believe it was 84 meters.  So a smaller display

10   radius that was inside the geofence.

11        The second point, about 30 seconds later, had the

12   same exact center coordinates, but it had a much

13   larger display radius, 387 meters.  And in my

14   experience analyzing these records, that's indicative

15   to me that the device is moving, that it's traveling.

16   And for some reason, unknown to me, a new center

17   coordinate was not obtained by that phone.  But based

18   on the other sensors in the phone, such as a gyroscope

19   which determines the tilt and the angle of the phone,

20   or the accelerometer, which determines how fast a

21   phone is traveling, Google can use these sensors

22   together and determine that this phone moved, and I'm

23   going to adjust my display radius to account for that

24   movement.

25        Unfortunately, it's not as simple as just using

1    the GPS coordinates or just using the Wi-Fi

2    coordinates.  There are lots of different sensors that

3    go into these calculations.

4    Q   Now, did you ultimately -- I know you did.  You

5    reviewed the warrant in this case; right?

6    A   Yes, I did.

7    Q   And did the warrant call on Google to return any

8    information at that first phase?  We're just talking

9    about the first step of the search warrant.  Did it

10   call on Google to return any information that it

11   determined fell outside of that geofence radius?

12   A   No, it did not.  The first stage asked for

13   information regarding points inside the geofence.

14   Q   Okay.  Now, I'm looking at Slide 21.  Is this an

15   example of, again, sort of what area is covered by the

16   geofence as opposed to the cell tower radius?

17   A   That's correct.  I plotted all of those points

18   that we saw on page 20 in the geofence onto the map

19   that has the outline of the estimated tower dump area.

20   Q   Okay.  And with respect to the records that we saw

21   plotted in Slide 20, can we take a look at Slide 22.

22   Is this a fuller summary of those records?

23   A   It is.  This is a summary device-by-device that

24   lays out how many records we received for each device,

25   the first time that we received a record or the

1  earliest record for each device, the latest record for

2  each device, and then we also looked at the smallest

3  display radius, and the largest display radius.

4      And then I took a look just to see how many of

5  those display radiuses extended beyond the geofence

6  area and then what was the maximum distance beyond

7  that geofence area.

8  Q   When we say "extend beyond," again, we're talking

9  about just that blue radius that might fall a little

10 bit outside the geofence but for which Google has

11 concluded they are inside the geofence?

12 A   Correct.  All the center points are within the

13 geofence.  And these are the map display radiuses for

14 each of those center points.

15 Q   Okay.  In looking at -- you were just testifying

16 about those two points that have, sort of within 30

17 seconds, a different -- a vastly different Wi-Fi

18 radius point.  Is that set forth in the device ID line

19 that ends 4289?

20 A   It does.  702354289.

21 Q   Okay.  Now, how many points were provided in that

22 first phase of records returned by Google?

23 A   209.

24 Q   How many of those points belong to the defendant?

25 And can you state for the record which of these

1  accounts on page 22 belongs to the defendant?

2  A   Yes.  The defendant is the device ID second from

3  the bottom.  It's 1716665659.  And the records -- we

4  received 38 records for that device beginning at

5  4:20 p.m. and ending at 4:54 p.m.

6  Q   Okay.  And if I'm looking here, it appears we

7  don't have the header of each of these columns, but is

8  it right that only one of his points have any radius

9  that extends at any point?  The bubble might go a

10  little bit outside of the geofence?

11  A   That's correct.  There was one Wi-Fi point that

12  would extend 26 meters outside the radius.  And that's

13  the equivalent to a few parking spaces.

14  Q   Okay.  And, now, did you plot the defendant's

15  records?

16  A   Yes, I did.

17          MR. SIMON:  Can we look at Slides 23 and 24.

18          THE COURT:  Let me just -- 26 meters is

19  26 yards; right?

20          THE WITNESS:  Approximately.  It's not exact.

21          THE COURT:  That's two parking spaces?

22          THE WITNESS:  Oh, I'm sorry.  A few parking

23  spaces.  So a park space is typically about 3 meters

24  wide.  So that would be about, what did I say it was?

25  Twenty-six.  So about six to seven parking spaces.

D'ERRICO - DIRECT                    536

1        THE COURT:  All right.

2        THE WITNESS:  And that's width, not depth?

3        THE COURT:  Right.

4   BY MR. SIMON:

5   Q    If we look at the -- particularly Slide 24.  When

6   you talk about a point extended beyond the geofence

7   radius, which point, looking on Slide 24, is that

8   point?

9   A    The point that extends beyond is that point that's

10  furthest north.  And the center of that point is in

11  the parking lot towards the north or the furthest

12  north of the parking lot of the church.

13  Q    Would it be fair to say that a very small portion

14  of that display radius extends beyond the geofence?

15  A    Correct, a majority -- a significant majority is

16  withinside the geofence.

17  Q    And every other plot point there is well within

18  the geofence; correct?

19  A    Yes, it is.

20  Q    Now, did you also -- we've talked about Phase 1.

21  What happens in the second stage of the warrant?  How

22  does that work?

23  A    The second stage of the warrant is where Detective

24  Hylton sent to Google a list of device IDs that were

25  identified as being relevant to the investigation for

1    additional location data for those device IDs.  And

2    that would include, I believe, 30 minutes prior and 30

3    minutes following the original geofence time frame

4    with no restraints on location, so that we can see the

5    path of travel for these devices.

6    Q   Is that the -- what we heard Sarah Rodriguez refer

7    to as sort of the second stage, being that contextual

8    Location History information?

9    A   That's correct.  It provides context for us so

10   that if there is somebody that is just driving by, we

11   try to eliminate them if we can.  If there is somebody

12   that is in another parking lot, still within the

13   geofence and not in the area, we try to eliminate

14   them, if we can, or we may need more additional

15   information to evaluate them as a suspect and either

16   eliminate or include them as a suspect.

17   Q   Now, did you do the same thing that you did at the

18   first stage with those second round records in terms

19   of summarizing what we got back?

20   A   Yes, I did.

21   Q   All right.  Looking at Slide 26, is this the --

22   are these the summaries of those records?

23   A   These are.  It summarizes the nine device IDs that

24   we obtained records for from Google in Stage 2.

25   Q   And it looks like the number of records this time

1  is a bit larger.  We've got more records; right?

2  A   That's correct.  This time we received 680

3  records.

4  Q   Okay.  And if we look at the far right, there is a

5  smallest maps display radius and a largest maps

6  display radius.  Describe those.

7  A   That's correct.  So, similar to how I analyzed the

8  Stage 1 data, I also looked at the size of the display

9  radiuses for the Stage 2 data.  And those columns

10 reflect the smallest display radius for that device

11 and the largest display radius for each device.

12 Q   And how many of those records in the second stage

13 belong to the defendant's account?

14 A   The defendant, again, device ID 1716665659, the

15 second line from the bottom.  We received 94 records

16 for the defendant's device.

17 Q   And this is a second stage that gives that

18 additional 30 minutes on each side of the time, but

19 also has no regard for -- at this point we're outside

20 of the geofence now; right?

21 A   That's correct.  We can see the path of travel for

22 each of these devices or if they were stationary for

23 this time, we could see that as well.  But it does not

24 have the geographical constraints of being immediately

25 in the area of the bank robbery.

D'ERRICO - DIRECT                    539

1    Q    And these second stage records, to the extent we

2    get them, that's after a discussion generally between

3    law enforcement, maybe the prosecutor and others

4    involved; right?

5    A    Correct.  We evaluate each of the devices and

6    determine if this device could be a witness to the

7    crime, could be a suspect to the crime, could be an

8    accomplice.  We evaluate each of them to make a

9    determination.

10   Q    And what, if anything, goes into consideration

11   of -- and particularly in this case, was there any

12   consideration of the need to not only inculpate

13   somebody, sort of inculpatory evidence, but

14   exculpatory evidence?

15   A    Absolutely.  We would like to exclude as many

16   people as possible.  And we can use the second stage

17   to do that, to make sure that we're looking at the

18   person that's actually responsible for committing this

19   crime.

20   Q    Okay.  In looking at Slides 27 and 28 -- I'm

21   sorry, 28 and 29, are these the plotting of the

22   defendant's records at Stage 2?

23   A    Yes.  So Slide 28 shows the complete records for

24   the defendant in Stage 2 from about 3:50 p.m. through

25   5:50 p.m.

1    Q    All right.  Let's look at the left side here.

2    Maybe we'll just bring it up by itself, Slide 28.

3         Can you walk us through the numbers here?  Is this

4    going in sequential order, the one through seven boxes

5    here?

6    A    Yes.  So the first records we received are on the

7    top of the page, the bubble to the right.  The box is

8    marked with a No. 1.  There's two records in that

9    area, both with the exact same latitude and longitude,

10   the exact same center point.  And those points are at

11   3:53:10 p.m. and 3:55:20 p.m.

12        The first point is 104 meters.  And then we see

13   that second point expand to nearly 1800 meters, which,

14   again, is indicative to me of travel.

15        Then we see the device show up on -- towards the

16   top left of the slide illustrated by Box 2 with a

17   similar situation, 3:57:23 p.m. and 3:59:32 p.m., two

18   records with the exact same center points, exact same

19   latitude and longitude, the first one with a smaller

20   display radius of 92 meters, and the second one with a

21   larger display radius of over 1700 meters.  Again,

22   indicative of travel.

23   Q    In looking at those two points, just to make sure

24   we're talking about this right, this is prior to the

25   robbery; right?

1    A    Yes, it is.

2    Q    And so these, again, are records at the second

3    stage that are going to give us more context about

4    where folks are moving?

5    A    That's correct.

6    Q    In looking at now -- you went through one and two.

7    The third box here, can you go through those?

8    A    Excuse me.  Which boxes?

9    Q    The third box of records on Slide 28.

10   A    Yes.  The third box contains the records in the

11   immediate vicinity.  Just about all the records for

12   the geofence.  And those are records for the time of

13   4:01 p.m. to 4:54 p.m.  And those records are in that

14   immediate vicinity of the Call Federal Credit Union

15   and Journey Christian Church.

16   Q    And so this is 54 of the records that we got at

17   the second stage?  I'm sorry.  These are records that

18   would be in both stages; right?

19   A    Correct.  Box 3 are records that would be -- not

20   all -- I don't believe all of them are in the second

21   stage, but most of them are.  They're in that area.

22   Q    Then you can -- can you walk us through what else

23   we have here?

24   A    Yes.  Box No. 4 illustrates a GPS trail.  So when

25   I map these records, I think it's important to denote

1    the source of the record.  So my red points are going

2    to be GPS-based records and my blue points are going

3    to be Wi-Fi-based records.

4         So we can see a trail in rapid succession more

5    detail than we see anywhere else on this map of points

6    from 4:58 p.m. to 5:04 p.m. with very small display

7    radiuses of 3 meters to 10 meters leading away from

8    the area of the bank robbery, down towards the area of

9    288, which is the road that traverses west to east on

10   the bottom of the map.

11   Q    Okay.  Now, did you ultimately look at some sort

12   of final records from this supplemental return?

13   A    I did.  Records 5, 6, and 7, those blocks,

14   illustrate travel back towards the Mason Dale Drive

15   area with the box with No. 7, the 18 Wi-Fi records,

16   being in that immediate area of Mason Dale Drive.

17   Q    In looking at Slide 29, is this the area of Mason

18   Dale?

19   A    Yes, it is.  I've drawn all of the Wi-Fi points

20   and the display radiuses on the map, as well as I

21   tried to point out every residence that is either

22   touched or in the area of those locations provided by

23   Google.

24   Q    What residence, ultimately, did Detective Hylton

25   conclude, based on additional investigation, belonged

1    to the defendant?

2    A    The address was 4702 Mason Dale Drive.  The box is

3    the second box down on the right side, which points

4    pretty much to the center of the screen.

5    Q    Now, using any of these particular Wi-Fi points,

6    is it apparent exactly which house is hitting these

7    Wi-Fi points?

8    A    No.  These records are not clear enough for me to

9    say go get a search warrant to arrest or conduct a

10   search of a house in this area.  Additional

11   investigative steps are needed in order to refine this

12   data and determine where this device actually was

13   located at this time.

14   Q    Okay.  And so this is -- this is the full extent

15   of the second stage that we see here?

16   A    That's correct, yes.

17   Q    Okay.  Now, looking at Slides 31 and 32, what

18   happens at the third stage of the warrant?

19   A    The third stage is where we go to Google again,

20   and we submit to them the device IDs of which we want

21   subscriber information for those device IDs.  We

22   requested three device IDs.  And Google provided four

23   things.  They provided a file that maps the device ID

24   that was in our geofence warrant to the account's

25   Google ID.  And based off that Google ID, they

1    provided the subscriber information for that account.

2    And that's because that device ID is not a unique

3    identifier across the entire Google-sphere.  It is

4    only a unique identifier within an account and within

5    this geofence.

6    Q   In looking at, on the right side, at Slide 32, is

7    that the precise subscriber information we got for

8    this defendant's device at the third stage?

9    A   That's correct.  So up top there's the table of

10   the GAIA ID, which is the Google ID with the device ID

11   that we mentioned before being associated with the

12   defendant, 1716665659.  We can see that that

13   associated Google ID is listed in the subscriber

14   information file that is on the lower part of the

15   page, which is associated with the account that

16   contains the name Jamaican Media with an email address

17   of okellochatrie55@gmail.com.

18   Q   Okay.  Does it appear, the created on date there?

19   There's a line that says "created on" on the right

20   side on Slide 32.  What is that?

21   A   Yes.  Three lines above the highlighted Google

22   account ID there is a created on date, which indicates

23   that this account was created on August 20, 2017 at

24   6:04 p.m. UTC.

25   Q   And between August 2017 and July 2018, according

1    to Google records, Location History wasn't enabled on

2    the relevant device; right?

3    A    Can you repeat that question?

4    Q    Well, let me ask it this way, because I think you

5    have some facts about this.  When the phone that the

6    defendant enabled Location History on, the Samsung

7    Galaxy S9, do you have a sense of when that phone came

8    to market?

9    A    I do.  I believe --

10   Q    It's Slide 38.

11   A    Yes.  It came to market on March 16, 2018, which

12   is several months after the date of the creation date

13   for this Google account.

14   Q    Okay.  And I think that my question that was going

15   to be there, I'll just scratch that from the record.

16   It wasn't to the point.

17        Now, with respect to the third round of

18   information that we got on the three IDs, did you

19   ultimately plot the points for the other two devices

20   that we requested subscriber information on?

21   A    Yes, I did.

22   Q    Okay.  Let's look at the device that ends in 2662

23   and Slides 33 and 34.

24   A    Slide 33 indicates the one point that we received

25   back, the one record of Location History that we

1    received in Stage 1 for device 907512662.  And that

2    plots a center point over the Journey Christian Church

3    at about 4:35 p.m., prior to the time of the bank

4    robbery.

5    Q    Okay.  And so why go back at the second stage

6    here?

7    A    Well, there are several reasons.  So, the first

8    reason is this is a device that was present in the

9    area of the bank prior to the bank robbery.  And we

10   know that sometimes when people want to hide their

11   location, they'll turn their phones off.  And if their

12   phone is turned off, no additional Location History

13   would be reported for that device.  So it's

14   significant to us that there is a point inside the

15   geofence that occurred prior to the bank robbery with

16   no points after the bank robbery.  Because we also

17   believe that after a subject has robbed a bank, that

18   they are going to flee the area and not be -- or not

19   have any additional Location History records within

20   this geofence several minutes after the bank robbery.

21   Q    And, now, what about on the right side?  Are we

22   seeing the second stage records after we've requested

23   the second stage on this device?

24   A    That's correct.  This is a plot of the second

25   stage records which travel a bit in the area.  The

D'ERRICO – DIRECT                547

1    first record that we have is 4:35 p.m. in the vicinity

2    of the Journey Christian Church, and that's towards

3    the top of the page with a call out box on the right

4    side.  That is the same point that we saw in the last

5    slide.

6        The next reference point on the slide is travel

7    towards the south ending up near box No. 2 where there

8    are records at 4:47 and 4:53 p.m.

9        After this box, the phone retraces some of its

10   steps north and then ends up near the apartment

11   complex just south of the Call Federal Credit Union in

12   Boxes 3 and 4.  And to me, this is indicative of a

13   trail of somebody that could have dropped off somebody

14   in the parking lot, traveled a ways, and then returned

15   to possibly pick up somebody that traveled through the

16   woods between the Call Federal Credit Union and the

17   apartment complex directly south of that area.

18   Q   Okay.  And there was a third device that we saw

19   subscriber information on; correct?

20   A   That's correct.  That was device -1662304683.

21   Q   And you plotted those points on Slides 35 and 36?

22   A   Yes, I did.

23   Q   All right.  Now, tell us, when we pull those up on

24   35 and 36, what we see in Slide 35 at Stage 1 inside

25   the geofence and why go back at Stage 2 and get

1    supplemental records on this particular record?

2    A    Yes.    These initial records that we received in

3    Phase 1 shows us three Wi-Fi points.    Two of the

4    center points are directly on top of the Call Federal

5    Credit Union and one location point is towards the

6    right that covers the area of the Journey Christian

7    Church.    These points are between 4:44 and 4:47 p.m.

8    And for the same reasons that I discussed prior, we

9    know that subjects may turn off their phone to avoid

10   transmitting Location History or device or being

11   observed on the cellular network to obscure their

12   location.

13       So with this device having points before and no

14   points after, we thought this was -- we needed

15   additional records to be able to see the context of

16   this travel.

17   Q    What about the second stage?    Is that on the right

18   side?

19   A    Yes, Slide 36 provides that context of travel for

20   us.    And the first record we see is towards the center

21   of the screen.    There is a cluster of points marked by

22   box No. 1 at 4:39 p.m.

23       There's another cluster of points that traveled

24   northeast on Hull Street towards box No. 2, which is

25   the area of the Call Federal Credit Union and the

549

1    Journey Christian Church.  And those records are there

2    at 4:44 through 4:47 p.m.

3         And then we see the phone travel back east -- I'm

4    sorry -- travel west on Hull Street Road or appearing

5    to be traveling -- appearing to be near Hull Street

6    Road marked with box No. 3 at 4:55.

7         This becomes interesting to us because we see

8    somebody that starts away from the bank, moves towards

9    the bank, and then immediately leaves that area, which

10   could indicate that they are dropping somebody off at

11   that bank.

12   Q    Now, just let me end with a question going back to

13   Slides 23 and 24.  We've talked about the

14   investigation in this case and, in particular, I'm

15   looking at the defendant's plot points on 23 and 24

16   when they come up.  Did you and Detective Hylton reach

17   a conclusion about whether this was the account, just

18   based on Stage 1, that belonged to the person who

19   robbed the Call Federal Credit Union on May 20, 2019?

20   A    Based on several pieces of evidence, including

21   witness testimony that indicated there was a

22   suspicious blue Buick parked behind the church, which

23   is notated on Slide 24 with the green box in the area

24   where the red GPS points are clustered, combined with

25   the video observations from the Journey Christian

1    Church and the Call Federal Credit Union, and the

2    description of the individual and the visual of the

3    individual, we determined that this was likely the

4    device that belonged to -- that most resembled the

5    device that would belong to the subject of the bank

6    robbery.

7    Q    And this is based merely off of the returns that

8    came at the first stage that called for Google to only

9    return devices that it determined were inside that

10   geofence radius at the time of the crime; correct?

11   A    That's correct.  That is relying solely on that

12   Stage 1 data without evaluating any of the contextual

13   data that we received at Stage 2.

14            MR. SIMON:  No further questions, Judge.

15            THE COURT:  Cross?

16            MR. PRICE:  Yes, Your Honor.  Thank you.

17       CROSS-EXAMINATION

18   BY MR. PRICE:

19   Q    Special Agent D'Errico, I just want to pick up

20   right where you left off.  You didn't stop at Stage 1

21   in this case; correct?

22   A    No, we did not.

23   Q    You still got the Stage 2 data?

24   A    That's correct.

25   Q    And you got the Stage 3 data, as well?

1    A    That's correct.

2    Q    Even though you were confident about your Stage 1

3    findings?

4    A    We were confident in that was the device; however,

5    the note that was passed to the bank robber -- or

6    passed in the bank indicated that there may be

7    additional suspects involved with this crime.  So, in

8    order to evaluate and investigate this crime fully, we

9    felt that we needed to look at the other devices that

10   could possibly be related to the investigation.

11   Q    And, in fact, you ended up requesting account

12   detail information on three of those devices; correct?

13   A    I did not.  Detective Hylton did.

14   Q    Thank you.  Have you received any specific

15   training on geofence warrants?

16   A    I have not received specific training.  My

17   training comes in the form of my education with my

18   degree as a computer scientist, my education from

19   James Madison University with a bachelor's in computer

20   science, my training from Johns Hopkins University

21   with my master's in security informatics.  This

22   training has provided me with the foundations to

23   understand these complex topics of wireless

24   communication and location data analysis.  Pair that

25   with my independent study of patents issued by Google

1    or obtained by Google and academic papers that discuss

2    how it's possible to derive approximate locations

3    using Wi-Fi access points and other reference material

4    as well.

5    Q    But you haven't received any specific trainings on

6    geofence warrants?

7    A    Google has not provided us any training on Google

8    geofence warrants.

9    Q    And there aren't any Justice Department policies

10   on Geofence warrants, are there?

11   A    I'm not aware of any policies, per se.  We have

12   policies that talk about investigative techniques that

13   we can use, but nothing that focuses particularly on a

14   geofence warrant.

15   Q    And, similarly, there aren't any Justice

16   Department procedures for obtaining geofence warrants,

17   are there?

18   A    There's not procedures, but in working with CCIPS,

19   Computer Crimes and Intellectual Property Section of

20   the Department of Justice, we are able to obtain what

21   we call a "go by," which assists us in the language

22   needed to obtain a geofence search warrant.

23   Q    A go by.  Could you explain a little bit more

24   about that?  Did you give one to somebody in this

25   case?

D'ERRICO - CROSS                    553

1    A    I don't recall that I provided any go bys in this

2    case.  But a go by, for us, is a document that has

3    wording and points to remember to make sure we include

4    in a search warrant.  For example, Google has specific

5    information that they need in order to process the

6    search warrant.  They need a location point.  They

7    need a radius or another shape to form that geofence.

8    They also need a time period in order to obtain the

9    records.

10        And then with the process that I understand has

11   been discussed between CCIPS and Google, we follow the

12   steps that they have laid out in order to work with or

13   in order to serve Google with this search warrant to

14   make sure that Google understands what we are

15   requesting and that we understand what we'll receive

16   back as part of that search warrant process.

17            MR. PRICE:  Your Honor, we have long

18   suspected that the government used a template of some

19   sort in this case.  We've asked for it repeatedly in

20   discovery and have not received it.  And so I would

21   request that the government provide us with a copy of

22   this go by so that we can review it.

23            MR. SIMON:  Judge, we have -- we didn't use

24   any Department of Justice go by in this case.  I think

25   it's been pretty clear that any request from

 1   counsel -- and I'm not sure why this is coming up.

 2   We've had numerous conversations in this case.  There

 3   have not been any discovery issues.

 4          The questions were about whether Detective

 5   Hylton used go bys, what go bys he used.  We told them

 6   as much as we could about that.  He's going to

 7   testify.  To the extent that they're asking for some

 8   Department of Justice go by, we've not declined to

 9   give them anything less than what we have.

10          And they certainly have Detective Hylton's

11   federal search warrant.  So I'm not sure what the go

12   by discussion is.  Every search warrant signed by any

13   magistrate or any magistrate judge has some language

14   that is "in consultation with others."

15          So I'm not sure what the point of this

16   request is because we've given as much as we can give.

17          MR. PRICE:  Your Honor, we believe that the

18   go by is important to this case.  We think that the

19   sort of plug and play nature of some of these warrants

20   raises serious questions about the potential good

21   faith involved in the warrant process.

22          THE COURT:  But wasn't the testimony that --

23   just that they didn't use a DOJ go by?  Was access

24   given to a DOJ go by in this case to anyone?

25          THE WITNESS:  Your Honor, I didn't swear out

D'ERRICO - CROSS                                    555

1    the warrant nor did I provide a go by to Detective

2    Hylton in this investigation.

3              MR. SIMON:  Judge, testimony would reveal, as

4    defense counsel knows, that there was a federal search

5    warrant obtained by Detective Hylton prior to this

6    one, as well as, I think, another state search warrant

7    or two.  They have those search warrants that

8    Detective Hylton obtained previously.  Only one is

9    under seal that they don't have.  So I'm not -- I'm

10   just not sure what we're getting at here, to be quite

11   honest.

12             THE COURT:  I don't see the relevance if it

13   hasn't been used in this case and you have other

14   information that pertain to Detective Hylton.  If

15   there's a sort of catch and replace process going on,

16   he wasn't involved.  He's using what you have the

17   information about what he used.

18             MR. PRICE:  It's also unclear to us where the

19   language in Detective Hylton's warrant, even if it

20   came from somebody else, originally came from.

21             THE COURT:  I think that's just too far

22   afield.  There's no evidence about his turning to a

23   DOJ go by.  And any warrant is going to use language

24   from previous warrants; from another agency, from

25   another law enforcement program, from the state versus

D'ERRICO - CROSS                    556

1    the federal.  That's the nature of how warrants are

2    sworn out here.  And if you have previous warrants

3    he's used, I think that's what you're entitled to.

4              MR. PRICE:  Okay.  Thank you, Your Honor.

5    BY MR. PRICE:

6    Q    You wouldn't say you know more about geofence

7    warrants than Google; right?

8    A    Google, the entity?  No, I would not.

9    Q    You don't have some unique knowledge that Google

10   doesn't about geofence warrants; right?

11   A    No, not that I know of.

12   Q    So, for example, you don't know when and why

13   Location History points are collected, do you?

14   A    Yes, in particular, we do.  We know that Location

15   History points can be collected based on the testimony

16   we heard earlier when a device is set up to opt in to

17   Location History.

18        And if I could go back to the prior question, I

19   don't know that Google is doing the analysis that we

20   do on our search warrants when we see this

21   information.  And we learn a lot about this geofence

22   data and this Location History data by reviewing and

23   doing test observations and using this information in

24   the field to ultimately recover a fugitive or a phone

25   or somebody else that has committed a crime that's

D'ERRICO - CROSS                557

1   been in that area.

2       So from the analytical perspective, using it in

3   the law enforcement setting, I may have some more

4   knowledge than Google because that is not how Google

5   uses their data.

6   Q   I'd like to show you an email that you sent to the

7   government about this issue.

8   A   Okay.

9   Q   Page 15, please.

10              THE COURT:  Of what?

11              MR. PRICE:  I'm sorry.  This is not in

12  evidence, Your Honor.  This is a set of emails that

13  the government turned over in discovery in

14  anticipation of Special Agent D'Errico's testimony.

15              THE COURT:  All right.

16       So this is just to refresh his recollection?

17              MR. PRICE:  Yes, Your Honor.

18  BY MR. PRICE:

19  Q   Could you scroll down just a little bit.

20       So could you read the sentence that begins with

21  "Few observations"?

22  A   "Few observations.  They really don't go into how

23  they are determining location based on Wi-Fi, nor how

24  they draw their display radiuses.  I don't think we

25  need to press them for it, but it would be nice to

1    know."

2    Q    And then a little bit further down on the page.

3    Could you read the highlighted line and the line right

4    before it?

5    A    "Here are some other things that would be good for

6    Google to explain to fully understand this data.  When

7    and why points are collected.  For example, in our

8    case, there is a very frequent collection of Location

9    History."  And that sentence continues.

10   Q    So you had confusion, at least at this point in

11   time, about when and why Location History points were

12   being collected?

13            THE COURT:  We don't know when this was

14   written, because you haven't put it on the record.

15            MR. PRICE:  Sorry.  This was written on

16   March 9, 2020.

17   A    I don't think there is confusion as to when

18   Location History points are collected.  I don't

19   understand exactly at a certain time why a location

20   point is collected, but I do understand that when the

21   device is set up appropriately, that Location History

22   will be collected.

23   Q    Thank you.  You understand how Google uses

24   location data for advertising; correct?

25   A    I do understand some ways that Google uses it, not

D'ERRICO - CROSS                    559

1   comprehensive.

2   Q    And that this kind of advertising is, in fact,

3   very lucrative for Google?

4   A    I don't know of Google's exact breakdown on their

5   location-based advertising.

6   Q    You didn't prepare a slide on that for your CAST

7   report?

8   A    As far as location-based advertising, no, I did

9   not.  Advertising in general, yes.  Advertising was

10  about 86 percent of Google's revenue.

11  Q    And you prepared other slides specifically about

12  how they were using location data to conduct radius

13  targeting and store conversion visits; correct?

14  A    Sure.  Is there a slide we can refer to?

15  Q    Yes, there is.

16         MR. SIMON:  Judge, I'm not obviously going to

17  object.  It's in the presentation.  I would just note

18  that I didn't ask any direct third-party

19  doctrine-related questions.

20         THE COURT:  I'm just going to let the record

21  be full.  And the whole slide is in.

22         MR. SIMON:  I understand, Judge.

23  BY MR. PRICE:

24  Q    Can I draw your attention to Slide 40, and Slide

25  50, and Slide 40, 41 and 42?

D'ERRICO - CROSS                    560

1          THE COURT:  40, 41 and what?

2          MR. PRICE:  42, Your Honor.

3    Q    On Slide 40, you're demonstrating that Google is a

4    profitable company; correct?

5    A    I'm demonstrating the revenues, and particularly

6    the point of this slide is to discuss the amount of

7    advertising revenues that comprises Google's entire

8    revenue as well as the main products that Google uses.

9    That was per their 10K reports and other information.

10   Q    Thank you.  And the main Google product that

11   drives its revenue is what?

12   A    I believe it's advertising.

13   Q    Thank you.  Can we go to the next slide?

14        Here you have a slide on target ads to geographic

15   location, and you refer to something called radius

16   targeting; is that correct?

17   A    That's correct.  On Slide 41, it illustrates some

18   of the information on the Google ads help page, which

19   indicates that a company can draw a radius around a

20   location in order to target ads.

21   Q    Thank you.  Can we go to the next one.  And here's

22   a slide about store visit conversions.

23          THE COURT:  Slide about what?  You really

24   are --

25          MR. PRICE:  Store visit conversions.  Sorry,

1    Your Honor.

2            THE COURT:  Okay.

3    A    Yes, Slide 42 does talk about store visit

4    conversions similar to what Mr. McGriff talked about

5    earlier today.

6    Q    Thank you.  And this is a method of advertising

7    for Google based off of location?

8    A    This is information that Google had on their

9    website, on their Google ads site.

10   Q    And it's about advertising using location data;

11   correct?

12   A    I believe these are metrics that they can provide

13   back to folks that place ads.

14   Q    Thank you.  Okay.

15        So advertising based on location data is not the

16   same thing as serving a geofence warrant on Google;

17   correct?

18   A    Can you repeat that question, please?

19   Q    Advertising based on location data in not the same

20   as serving a geofence warrant on Google?

21   A    I don't know that I can draw that conclusion.

22   Q    Well, when businesses place ads with Google, they

23   don't receive any location data about the users and

24   devices they're trying to target; correct?

25   A    That's correct.

D'ERRICO - CROSS                  562

1    Q    And they can't ask for more data on where people

2    saw their ads, can they?

3    A    I don't know what they can ask for.

4    Q    They can't ask for more information about where

5    someone went 30 minutes after seeing an ad; correct?

6    A    I don't know that information.

7    Q    It's true for store visit conversions that Google

8    does not provide user location data directly to those

9    businesses?

10   A    I believe Mr. McGriff testified today that they

11   don't provide location data to folks that -- companies

12   that do ads.  I believe his testimony was that they

13   provide information in aggregate that no longer

14   resembles an individual's location.

15   Q    Correct.  And the same is true for radius

16   targeting, as well; right?

17   A    The same -- can you repeat that?

18   Q    Businesses who engage in radius targeting do not

19   get user location data as a result from Google?

20   A    I'm only aware of Mr. McGriff's testimony today.

21   Q    So the only reason the government was able to

22   obtain Location History data in this case from Google

23   was because they served them with a warrant; right?

24   A    There -- well, there are a couple of factors.

25   There was Location History turned on, and there was

D'ERRICO - CROSS                563

1  Location History available.  And the government served

2  a search warrant for those records which were held in

3  Sensorvault because the Location History was enabled

4  on the defendant's phone, which allowed Google to be

5  responsive to the search warrant that was obtained and

6  served by the government.

7  Q    So Google wouldn't have compiled these records and

8  sent them to you if you didn't serve them with a

9  warrant; correct?

10 A    They serve them in exigent circumstances.  They

11 are responsive to law enforcement if we request, using

12 a search warrant or other legal process, for records

13 that they hold.

14 Q    Have you ever obtained geofence data without using

15 a warrant?

16 A    I take that statement back.  Google is very

17 particular about that and does not allow it on

18 exigent.  They will allow Location History on exigent

19 circumstances but still insist that we obtain a search

20 warrant on a geofence.  Thank you for allowing me to

21 correct that.

22 Q    Thank you.  And the warrant here required Google

23 to do things with location data that it would not do

24 for any business seeking to advertise through Google;

25 correct?

D'ERRICO - CROSS                    564

1   A    I'm not aware of all of Google's business

2   practices.

3   Q    Would Google conduct a geofence search for an

4   advertiser?

5   A    Again, I'm not aware of Google's practices.

6            MR. SIMON:  Judge, I think we -- I'm trying

7   to be fair about this and not stand up unnecessarily.

8   We've had two Google witnesses discussing this search

9   warrant.  They've been asked questions.  They've

10  answered them.  The expert's been in the courtroom.

11  Why we're going down the path of asking FBI Special

12  Agent D'Errico about Google's internal business

13  practices, which everybody is going to agree Google is

14  the best evidence of that, I don't understand the

15  relevance and why we continue to go down this path

16  with this witness.

17           THE COURT:  Sustained.

18           MR. PRICE:  I'll move on.

19  BY MR. PRICE:

20  Q    So you compare the area of the geofence warrant in

21  this case to the area of a hypothetical tower dump;

22  correct?

23  A    Are you referring to a particular slide?

24  Q    Yes.  In your presentation, the one with the --

25  let me pull it up for you.  This would be Slide

D'ERRICO - CROSS                    565

1    No. 21.

2    A    Could you repeat your question?

3    Q    So, in your report, you compare the area of the

4    geofence warrant in this case to the area of a

5    hypothetical tower dump?

6    A    Yes.  We didn't actually obtain this tower dump,

7    but based on my training and experience with cell

8    phone towers, this is the best representation that I

9    could draw of the approximate coverage area of that

10   tower dump.

11   Q    Would you agree with Google's statement in its

12   amicus brief in this case that a tower dump requires a

13   provider to produce only records of the mobile devices

14   that connected to a particular cell tower at a

15   particular time?

16   A    Yes.

17   Q    So you suppose the area of the tower dump in your

18   hypothetical based on three Sprint towers nearby the

19   bank; correct?

20   A    That's correct.  This is an example of a tower

21   dump for Sprint.  We would also do a tower dump for

22   T-Mobile, Verizon, and AT&T, or any other carrier that

23   provided service to this area.  And that drawing would

24   look different because they have towers in different

25   places.

D'ERRICO - CROSS                    566

1        I chose Sprint in this case because Sprint is the

2   service provider for the defendant's phone.

3   Q    So in your hypothetical, you suppose the area of

4   this tower dump based on three Sprint towers?  That's

5   it.

6   A    No, that's not it, actually.  I drew this line

7   using many of the towers that are on this page,

8   because what we know about cell phone towers is that

9   they -- and this is information that we have learned

10  directly from the carriers because our training

11  includes training by network engineers at the

12  telephone companies, including Sprint, that when

13  they're planning out their network, they place towers

14  where they need coverage areas, and they do not place

15  towers where they do not need coverage area.  And

16  their goal is to provide a certain level of customer

17  satisfaction, and that includes providing coverage

18  area.  And that coverage area, it can be determined by

19  approximating maybe about 70 percent to the next

20  tower.

21       So in my drawing, in my estimation of the area of

22  the tower dump, I looked at each of the three towers

23  inside that I selected, and then I drew my line

24  approximately 70 percent to its nearest tower.  And

25  that's how I approximated the area of the tower dump.

D'ERRICO - CROSS                    567

1   Q    So you looked at a map to see where the towers

2   were?

3   A    Yes, I plotted the Sprint towers.

4   Q    And then you drew a line around that area to

5   indicate the coverage of those towers?

6   A    I drew the line to indicate the approximate

7   coverage of the areas.  We don't know the exact

8   coverage of the areas, but based on a map and based on

9   my training and experience, this is an approximation

10  of the area that would be covered in a tower dump if

11  we were to do one for that area.

12  Q    Thank you.  And you can see on the satellite map

13  whether the area is an urban or rural area?

14  A    I can tell if there are greenery or major roads or

15  even some secondary roads.  I don't have a complete

16  listing of what is in each of these locations.

17  Q    Okay.  By looking at a map like this, you could

18  begin to approximate how many people might be affected

19  by the hypothetical tower dump here; right?

20  A    It depends on many factors.  It depends on

21  businesses.  It depends on travel.  That's not

22  something that I estimate.

23  Q    But because of your training and experience as a

24  CAST team member, you would know that each tower has a

25  maximum number of users that it can handle at one

D'ERRICO - CROSS                           568

1    time?

2    A    That's true.  There is a maximum at one time.

3    Q    That's called a tower load?

4    A    I don't have an exact phrase for it, but there is

5    an upper number of which there will be a point where

6    the tower will be saturated and no additional phones

7    would be able to make any communications off of that

8    tower.

9    Q    Overloaded towers, they'll drop calls if there are

10   too many people trying to connect at the same time or

11   transfer them to another tower?

12   A    It depends.  So cellular communication is complex,

13   and there's lots of different factors at play.  So

14   just because -- let me particularize this to Sprint.

15   If we were to ask Sprint for a tower dump, Sprint

16   would be able to provide calls that were originated

17   and ended in this area during the time frame that we

18   requested.

19   Q    So in a hypothetical like this, of course dealing

20   with Sprint -- by the way, when you get tower dump

21   results from Sprint, those are only for people who use

22   the network for either phone calls or text messages;

23   correct?

24   A    I believe I just answered that.

25   Q    It doesn't include data transfers?

D'ERRICO - CROSS                569

1    A    Sprint at the time of this would not have included

2    data.

3    Q    So if you did a tower dump on just one of these

4    Sprint towers, you would have a rough idea of the

5    maximum number of users you could possibly get in an

6    hour period?

7    A    I don't have a maximum number.  I'm not aware of

8    what the maximum number is.

9    Q    Mr. McInvaille testified yesterday that according

10   to your hypothetical, you'd probably net about a

11   thousand users per tower.  Does that sound about right

12   to you?

13   A    I don't have a frame of reference for that.  I

14   would not be able to make an estimate on that.

15   Q    Do you have any information that would contradict

16   Mr. McInvaille's estimation?

17   A    I'm trying to recall back to tower dumps that I've

18   seen before.  I just -- at this point I don't have a

19   good frame of reference.

20   Q    So you don't have anything to contradict

21   Mr. McInvaille's conclusion?

22   A    I don't.  Not at this time.

23   Q    Thank you.

24        So you're aware that Location History information

25   is determined differently than cell-site location

D'ERRICO - CROSS                    570

1    information; correct?

2    A    As it's -- can you rephrase that question?

3    Q    You're aware that Google Location History

4    information is calculated differently than cell-site

5    location information?

6    A    It can be, but it's not always.  It depends on how

7    the cell carriers are determining locations for

8    phones.  So a cell carrier could use the GPS sensor in

9    a phone to determine a location of the phone.

10   Q    Could a cell carrier use the Wi-Fi networks, the

11   Wi-Fi fingerprinting that you described earlier in

12   your testimony?

13   A    I don't think so.  I don't think that's part of

14   the E911 Phase 2.

15   Q    So it's calculated differently than just plain old

16   CSLI; right?

17   A    Not all information is calculated differently.

18            THE COURT REPORTER:  CSL?

19            MR. PRICE:  CSLI, cell-site location

20   information.  I apologize.

21   BY MR. PRICE:

22   Q    Location History data is usually calculated using

23   GPS or Wi-Fi; correct?

24   A    We see sources of GPS, Wi-Fi, or cell fairly

25   regularly.

1    Q    There are no cell records in this case; correct?

2    A    That's correct, no cell records in this case.

3    Q    And Google prefers to use Wi-Fi or GPS before

4    using cell data; correct?

5    A    I don't know what their preferences are.

6    Q    Did you listen to Mr. McGriff's testimony

7    yesterday?

8    A    I did listen to it.

9    Q    And he explained that cell-site location is less

10   preferred because it's less accurate, generally

11   speaking?

12   A    I don't remember his exact testimony about that

13   point.

14   Q    Okay.  In any case, with GPS and Wi-Fi

15   fingerprinting, there are no cell phone towers

16   involved; correct?

17   A    That's correct.

18   Q    Okay.  So that means there's no way to get

19   Location History data just by identifying nearby cell

20   phone towers?

21   A    In this case, there were no Location History

22   records obtained using exclusively or primarily the

23   cell phone tower.  I don't know that the cell phone

24   tower was not included in the calculation for Wi-Fi or

25   GPS, but I know there were no records marked cell,

D'ERRICO - CROSS                    572

1  which to me would indicate that the cell tower would

2  be the primary sensor used to determine Location

3  History.

4  Q    So you have to rely on Google to determine which

5  devices were present.  There's no way to identify a

6  couple of towers nearby; correct?

7  A    There is a way to identify a couple of towers

8  nearby, and we could have obtained a tower dump to

9  obtain that information.  In this case, we did not.

10  Q    Let me rephrase.  I mean that Google will not

11  respond to a request for Location History information

12  based on the location of a cellular tower; right?

13  They testified earlier today that they do not index

14  their Location History database in that manner.

15  A    I'm sorry.  I'm not understanding the question.

16  Q    Google testified earlier today that they do not

17  index their Location History database by location.

18  They index it by user.

19  A    Is that a question?

20  Q    Was that your recollection of Google's testimony,

21  as well?

22         THE COURT:  How did they hold stuff in the

23  Sensorvault.  That's the testimony he's talking about.

24         THE WITNESS:  Yes, I understand that -- I

25  believe it was Ms. Rodriguez that said that they have

1    their Sensorvault data indexed by user, whether it was

2    device ID or Google account.  I believe it was indexed

3    by Google account.

4    BY MR. PRICE:

5    Q   We can turn to Google's amicus, as well.  Google

6    explains -- I believe this is page 14 of Google's

7    amicus brief, Defense Exhibit 2.  Google says, "The

8    steps necessary to respond to a geofence request are

9    thus quite different from and far more intrusive than

10   responses to requests for a CSLI or tower dumps"?

11   A   Which page is that on?

12   Q   This is page 14 of the amicus brief.  It's the

13   highlighted language or will be highlighted in a

14   moment.

15   A   I see that paragraph, yes.

16   Q   You don't disagree with that, do you?

17   A   That it is more intrusive?  I don't believe that

18   it is more intrusive.

19   Q   They go on to explain, they say, A tower dump

20   requires a provider to produce only records of the

21   mobile devices that connected to a particular cell

22   tower at a particular time.  But because Location

23   History is different, Google has no way to identify

24   which of its users were present in the area of

25   interest without searching the Location History

D'ERRICO - CROSS                              574

1  information stored by every Google user.

2  A    I see that paragraph, yes.

3  Q    You disagree with that?

4  A    So, I don't -- it's hard for me to compare because

5  I don't know exactly how the cell phone carriers store

6  their data.  If their data is stored in a central

7  database, then they have to search every record in

8  their database to obtain the tower dump records.  So I

9  don't know that I have enough information to fully

10 evaluate that.

11 Q    So you don't have enough information to contradict

12 their statement that says Google has to search across

13 all Location History journal entries -- I'm sorry.

14 We're on page 12 to 13, the bottom page 12 to the top

15 of page 13.  Instead, Google has to search across all

16 Location History journal entries to identify users

17 with potentially responsive data --

18          THE COURT:  Don't read it too fast.

19 BY MR. PRICE:

20 Q    -- in order to comply with the request.

21 A    Do I disagree with that?  No.  They need to do a

22 search of the Sensorvault database for locations that

23 are responsive to the geofence.

24 Q    And you don't have any information to contradict

25 their next statement that Google has to run a

D'ERRICO - CROSS                575

1  computation against every set of coordinates to

2  determine which Location History records match the

3  time and space parameters of the warrant?

4  A   I don't have any information to contradict that.

5  Q   Do you know how many users had Location History

6  enabled when Google executed the geofence warrant

7  here?

8  A   I only know the information that was provided by

9  Mr. McGriff and his affidavits, which I believe he

10  talked about tens of millions.

11  Q   That's right.  Google says that roughly one-third

12  of active Google users had Location History enabled on

13  their accounts, and that that translates to numerous

14  tens of millions of Google users.  You don't disagree

15  with Google about that, do you?

16          MR. SIMON:  Judge, I'm going to object again

17  to, I think, questions that are basically attempts to

18  testify.  Asking this witness who says he has no

19  personal knowledge of Google's internal practices, the

20  Court has already sustained that objection.  I think

21  we should move off, Judge, based on relevance this and

22  also personal knowledge, asking questions about

23  Google's internal process.

24          This witness is going to consistently say

25  Google's got the best answers on their internal

D'ERRICO - CROSS                    576

1    process.

2              MR. PRICE:  We can move on, Your Honor.

3              THE COURT:  Okay.  Good.

4    BY MR. PRICE:

5    Q    Regardless of the ultimate number, they're

6    searching everybody with Location History enabled at

7    the time; correct?

8    A    Again, I have to defer to Google on that.  They

9    conduct the query of their database.

10             THE COURT:  That's actually not moving on.

11             MR. PRICE:  Okay.  We can move on to the next

12   part.

13   BY MR. PRICE:

14   Q    Records from a Sprint tower dump don't show every

15   device that's in the area; correct?

16   A    No.  Records from a Sprint tower dump show the

17   devices that were making calls or receiving calls in

18   that area that were on the Sprint network.

19   Q    So, in addition to being on the Sprint network, as

20   we just discussed a second ago, a user would have to

21   be making a phone call, receiving a phone call,

22   sending or receiving a text message to show up in that

23   tower dump with Sprint?

24   A    Yes, with Sprint.  There has to be a network

25   transaction occurring.

D'ERRICO - CROSS                577

1   Q   I want to get your take on whether you agree with

2   Google here.  They say, on page 9, of their amicus

3   brief --

4          THE COURT:  Wait a minute.  Didn't we just

5   have an objection to this, that this witness can't say

6   whether or not this is the best answer that Google

7   does?  So you can go through the whole brief.  He's

8   already said to you he can't agree or disagree because

9   Google knows the answer, and he doesn't.  Am I wrong

10  about that?  Well, it doesn't matter, because I'm

11  saying you can't ask it.

12          MR. PRICE:  Yes, Your Honor.

13  BY MR. PRICE:

14  Q   In fact, law enforcement did not get a tower dump

15  in this case; correct?

16  A   That's correct, we did not get a tower dump.

17  Q   And it wouldn't have been useful, at least for

18  Sprint, if the suspect did not make a phone call,

19  receive a phone call, send or receive a text message

20  during this time?

21  A   If he did not, but he did.

22  Q   A tower dump would not have registered him if he

23  did not?

24  A   That's correct.  If he did not make a call, the

25  tower dump would not register that.  If he did not

1   make a call or a text or receive a call or a text.

2   Q    And even if the suspect did show up in a tower

3   dump in this case, you wouldn't have any way of

4   identifying that suspect based solely on the tower

5   dump in one instance?

6   A    That's incorrect.  So our investigative plan would

7   have been to compare the tower dump to a list of blue

8   Buicks, owners of blue Buicks, that we were prepared

9   to obtain from the Department of Motor Vehicles.

10  Whereas, one tower dump alone sometimes is not enough,

11  we did have another data set to compare it to even if

12  it was not a tower dump.

13      So in that case, this case, we were prepared to

14  obtain data from the Department of Motor Vehicles of

15  blue Buicks, the same vehicle that was reported to us

16  by a witness being behind the Journey Christian

17  Church, the suspicious vehicle, and compare the

18  registered owners of those vehicles to the phone

19  numbers in the tower dump.

20  Q    So you're saying there was another way you could

21  have worked this case without doing a geofence

22  warrant?

23  A    What I'm saying is there's many investigative

24  techniques out there, and the investigative technique

25  that we used first was the Google -- or that we used

D'ERRICO - CROSS           579

1    prior to using the tower dump was the Google geofence.

2    Q    So there was another way you could have done this,

3    but you chose not to?

4    A    I didn't make that decision.

5    Q    The government chose not to?

6    A    I think I answered that question.  The first

7    technique that we decided to use or the technique we

8    decided to use earlier was a Google geofence.  And if

9    that had not had results, that we did have other

10   investigative techniques that we could have used.

11   Q    Thank you.  You said you used 2703(d) orders to

12   obtain tower dumps.  Is that still true?

13   A    Yes, it is.

14   Q    You don't get warrants for those?

15   A    No, we do not.

16   Q    Not even after the Supreme Court's decision in

17   *Carpenter*, 2018, requiring a warrant for cell phone

18   location -- historical cell phone location

19   information?

20   A    No, it is not required.  *Carpenter* does not

21   comment on tower dumps, nor does it comment on

22   location data less than seven days.

23   Q    So it's your practice not to get warrants for

24   tower dumps?

25   A    There is discretion that a 2703(d) can be used for

1    a tower dump or a search warrant can be used.

2    Q    You said you don't tell companies how to conduct a

3    search in the case of a tower dump, for example?

4    A    I am not an expert in their internal systems.  We

5    provide a search warrant with the information that we

6    are requesting on their records.  They conduct the --

7    they obtain those records, however they will, and they

8    provide those to us.

9    Q    So you've never seen a search warrant for a tower

10   dump that specifies the towers to be searched?

11   A    Sometimes we do specify the towers to be dumped

12   because we have information that those towers would

13   cover the area in question.

14   Q    That is in your hypothetical, for example, with

15   Sprint?

16   A    Those are the towers that I likely would have

17   searched or requested be searched for a tower dump.

18   Q    Okay.  So when Google produces data in response to

19   a geofence warrant, they include this display radius;

20   correct?

21   A    That's correct.

22   Q    And in his first declaration, Mr. McGriff wrote

23   that a radius -- let me just pull that up.  It's

24   Defense Exhibit 21, Mr. McGriff's first declaration at

25   page 9.  And Mr. McGriff wrote, "A radius around a

D'ERRICO - CROSS                                581

1  user's estimated location that shows the range of

2  location points around the stored Location History

3  coordinates that are believed to contain, with 68

4  percent probability, the user's actual location."

5  A    I see that in paragraph 25.

6  Q    And you understand that 68 percent to be Google's

7  confidence that somebody is within that display

8  radius?

9  A    I believe that is exactly what it says.  That if

10 they see those conditions 100 times, 68 percent of the

11 time that it will be inside that geofence or, excuse

12 me, inside that map display radius.

13 Q    And 68 percent is the industry standard for this;

14 right?

15 A    68 percent is approximately the industry standard,

16 yes.

17 Q    But regardless of that 68 percent confidence, if a

18 user's estimated location falls within the radius of

19 the geofence, then Google treats that user as falling

20 within the scope of the geofence; correct?

21 A    If the center point of the Location History record

22 is within the geofence, then Google does provide it

23 responsive to a search warrant.

24 Q    Even though there's no greater probability that

25 the user is in the dead center of that display radius

D'ERRICO - CROSS                582

1    as opposed to off by the edge?

2    A    That's correct.  Google doesn't provide a

3    percentage that it's going to be in the northwest

4    corner versus the northeast corner versus the south of

5    that map display radius.

6    Q    And the map display radius often extends the

7    geofence as drawn?

8    A    I don't agree with that characterization.  I don't

9    think it often extends beyond on our Stage 1 data.

10   Q    It does -- it extends beyond the geofence in this

11   case; correct?

12   A    There are select points that extend beyond but

13   not -- nowhere near a majority of points.

14   Q    Okay.  But that fact, the fact that the display

15   radius exceeds the geofence circle, means that false

16   positives are possible when you conduct a geofence

17   warrant; correct?

18   A    It is -- I believe Google testified to it.  They

19   are making a good faith effort to determine the

20   location of that device.  Their technology is not

21   100 percent, but they are providing a good faith

22   effort in order to determine the location of that

23   device.

24   Q    So you agree with Google, false positives are

25   possible?

1    A    False positives are possible.

2    Q    Was there a false positive in this case?

3    A    I don't know.

4    Q    Perhaps one of the three that made it all the way

5    to Stage 3?

6    A    Could you -- which one would you like to discuss?

7    Q    Let's take a look at your report on page 31.  The

8    user with device ID 2, ending in 2662?

9    A    907512662?

10   Q    Correct.  That was one of the three device IDs

11   that made it all the way to Stage 3; correct?

12   A    That's correct.

13   Q    Can we look at page 34 of your report.  This is

14   the Stage 2 data plotted for that device ID; correct?

15   A    That is correct.

16   Q    And there's only one point in all of that data

17   that falls within the geofence as drawn; correct?

18   A    There is one center point that is in the geofence.

19   There is another GPS point that has its display radius

20   overlapping into the geofence.

21   Q    And when you were looking at this data, did you

22   consider the time intervals between data points?

23   A    Yes, I did.

24   Q    And were you able to determine from that time,

25   from those intervals, whether this individual was

1   likely walking or driving?

2   A   I don't remember my exact assessment.  Looking at

3   this data now, it appears that the person was

4   traveling at vehicle speeds.

5           MR. PRICE:  And can we please bring up

6   Defense Exhibit 5.

7   BY MR. PRICE:

8   Q   This is the three-paths video that Mr. McInvaille

9   created detailing the Stage 2 data for three of the

10  individuals caught up in this geofence.  This is the

11  user that we have referred to as Mr. Blue.  I'd like

12  to play the video for you so you can see the trail of

13  his data as it goes and touches inside of that

14  geofence.

15      (Video is played.)

16  Q   So based on the time lapse in between those points

17  and the fact that they are almost all on roads, you

18  were able to determine that that person was likely

19  driving?

20  A   Well, in that case, I can't eliminate that the

21  person ducked into that parking lot, dropped somebody

22  off, and then continued north on Price Club Boulevard.

23  Q   Can we take a look at Price Club Boulevard there

24  and ZOOM back for a second.

25      So, somebody driving along Price Club Boulevard

1    from the south of our screen up to the north would

2    have to drive on the road; correct?

3    A    Yes.

4    Q    They couldn't drive through the trees and right

5    over the church and onto the road on the other side;

6    right?

7    A    That's correct.  If you're driving in a vehicle,

8    generally you need to stay on the roads.

9    Q    So, based on your training and expertise, looking

10   at this data, isn't it likely that this person was

11   driving on the road next to the geofence?

12   A    Again -- well, it appears that they approach, but

13   I cannot rule out that that person did not turn into

14   the parking lot, drop somebody off, and then resume

15   travel on that road.

16   Q    So if false positives are possible, false

17   negatives are possible, too; correct?

18   A    Yes, they are.

19   Q    Okay.  So you testified that the effective

20   geofence radius here, that was your words, "effective

21   geofence radius," was 150 meters?

22   A    That's the radius that we requested from Google,

23   and they were responsive.  All points fell withinside.

24   All of the center points for the Location History data

25   fell within that geofence.

D'ERRICO - CROSS                586

1   Q   So that's the requested geofence radius; correct?

2   A   Yes, that's the geofence radius.

3   Q   The effective geofence radius would have to take

4   into account the display radius for all the different

5   location points; correct?

6   A   It is possible that that device is outside the

7   geofence.  It is also possible that point is inside

8   the geofence.  I don't have enough information to

9   evaluate that.

10  Q   The display radius means that the geofence, when

11  it is run, as we just discussed, may pull in people as

12  a false positive who were not, in fact, inside that

13  geofence; correct?

14  A   Yes, it's possible.

15  Q   So they would be, then, outside the geofence and

16  mistakenly labeled as inside; correct?

17  A   Yes, that's possible.

18  Q   So if it is pulling in people who are outside of

19  the geofence as drawn, the effective range of that

20  geofence must be larger than the geofence as drawn?

21  A   The person could be outside the geofence.  We just

22  don't have enough information to evaluate exactly

23  where they are.

24       MR. PRICE:  Could we look at Slide 22,

25  please.  Slide 20, my apologies.

D'ERRICO - CROSS                      587

1    BY MR. PRICE:

2    Q    So, in this case, the one user who had a display

3    radius of 387 meters based on Google's data, there was

4    a 68 percent chance that that person was somewhere

5    inside that very large blue circle; correct?

6    A    That's correct based on Google's testimony.  There

7    is a 68 percent chance that they're inside that

8    circle.

9    Q    So the effective range of this particular geofence

10   warrant exceeded the geofence as drawn by, what was

11   it, 290 meters?

12   A    I can't agree with that conclusion because we

13   don't know the actual location of the device.  That

14   bubble covers the entire geofence, and that device

15   could be inside the geofence.  It could be outside but

16   it could also be inside.  So I can't really evaluate

17   that because I don't have enough information to

18   determine if that device was actually inside or

19   actually outside.  And that's the thing about this

20   data.  They are estimated locations for us, so that we

21   can determine the estimated location of the device in

22   order to move forward our investigation.

23   Q    As you testified earlier, it's just as likely that

24   someone is at the center of that big blue circle as it

25   is that they are right by the edge; correct?

D'ERRICO - CROSS                588

1    A    Google doesn't provide any indication where in

2    that display radius they are.  They just provide the

3    display radius, the center point, and say it's a

4    68 percent chance that they are in that area.

5    Q    So there's a 68 percent chance that, say, the user

6    was standing at the edge of that circle 290 meters

7    outside the geofence?

8    A    No, I think your math is incorrect.  What Google

9    is saying is there is a 68 percent chance that they

10   are inside that geofence.  They're not saying that

11   there's a 68 percent chance that they are at the

12   intersection of Hull Street and Price Club Boulevard,

13   and they're not saying there's a 68 percent chance

14   that they're down in the cul-de-sac at the bottom.

15   They're saying there's a 68 percent chance that the

16   device is inside that geofence.

17        And that is, yep -- and that's what they have

18   provided to us.

19   Q    That's fine.  Thank you.  You don't know exactly

20   why the display radius was so big for this particular

21   user, do you?

22   A    I don't know the exact reasons, but based on my

23   knowledge and analysis of previous Google location

24   records, this indicates that there was some travel,

25   some motion on this device, because the point prior to

D'ERRICO - CROSS                    589

1    this large radius was the exact same latitude and

2    longitude as this large point, and the first point was

3    also a much smaller radius.

4    Q    So there could be any number of reasons why that

5    one point generated such a large display radius here?

6    A    I'm aware of that reason for it, but there may be

7    others, yes.

8    Q    And you don't know exactly how Google calculates

9    their display radius; correct?

10   A    No, I don't.  That's a Google question.

11   Q    That's sort of their secret sauce, isn't it?  It's

12   proprietary is what I mean to say.

13   A    I don't know.  They have not provided it to us.

14   Q    When you use Google's API to estimate your display

15   radius for the drive test that you do, you don't get

16   to see the calculations that Google does.  You just

17   send it off to them; correct?

18   A    That's correct.  I just send the information to

19   Google, and they respond back with a latitude and

20   longitude and a display radius.

21   Q    That's because their algorithm, their way of

22   calculating that display radius is considered

23   proprietary?

24   A    I don't know if they've marked it proprietary.

25   I'm not familiar with their internals.

D'ERRICO - CROSS    590

1   Q    But you do know that the display radius can be

2   quite large.  In fact, much larger than 387 meters.

3   A    I have seen large display radiuses before, yes.

4   Q    And the largest one in this case was 1,842 meters;

5   correct?

6   A    I don't know off the top of my head, but I see a

7   large one in Stage 2 data of 1,842.

8   Q    Any others?

9   A    Sure.  There's another one that's 1,797 meters.

10  Q    And there is one that is 1,838 meters, too;

11  correct?

12  A    Yes.  Those three points out of the 680 are large.

13  Q    In fact, there were three others with display

14  radii exceeding 1,000 meters here.  There are four

15  points.

16  A    In see four points listed on Slide 26.  That's

17  what I'm referring to when I look at the large map

18  display radius.

19  Q    Okay.  Thank you.  So, to sum up, you don't know

20  how big the display radius is going to be for any

21  given point before you do the geofence warrant;

22  correct?

23  A    That's correct.

24  Q    You don't know how the display radius is actually

25  calculated?

D'ERRICO - CROSS                    591

1   A    That's correct.

2   Q    You don't know how far beyond the geofence it's

3   going to extend?

4   A    That's correct.

5   Q    And you don't know how many hits you're going to

6   get in Stage 1?

7   A    That's correct.  That's why we ask Google for the

8   information with the search warrant.

9   Q    You haven't seen Google's policies on responding

10  to geofence warrants?

11  A    I'm assuming those are internal policies.  I have

12  not seen any.

13  Q    So you don't know how big a radius is acceptable

14  to Google?

15  A    These are -- I'm not aware of Google's internals.

16  Q    And if you get Stage 1 data, you're not certain

17  how many users Google is going to provide Stage 2 data

18  for; correct?

19  A    Google provides Stage 2 data for the users that we

20  request following the narrowing process.

21  Q    There's no fixed number of users that you have to

22  narrow it down by between Stages 1 and 2; right?

23  A    Not that I know of.

24  Q    So, it's sort of up to -- it's a bit of a

25  negotiation with Google about what is acceptable in

D'ERRICO - CROSS                     592

1    terms of Stage 2 returns?

2    A    Well, it's written pretty particularly in the

3    search warrant that the government -- I believe it's

4    will attempt to narrow.  And that is that's part of

5    the process.

6    Q    And if they attempt and Google doesn't find it

7    sufficient, what happens?

8    A    Google will come back to us initially, and they

9    may say -- or they may want to have a discussion on

10   what the circumstances are.  I was not part of that in

11   this case.  I can't speak to what happened in this

12   case as far as that.

13   Q    And the same sort of discussion process would

14   happen between Stages 2 and Stages 3; correct?

15   A    I know that based on the testimony of

16   Ms. Rodriguez today.

17   Q    And the geofence warrants that you've dealt with?

18   A    Generally, when we ask for the device IDs, we have

19   narrowed it down sufficiently and Google provides

20   those.

21   Q    So you've had these discussions with Google

22   before?

23   A    No, because we have -- Google has been responsive

24   to the geofence warrants that I've submitted.

25   Q    Okay.  Thank you very much.

D'ERRICO - CROSS                593

1    A    Yes.

2            MR. PRICE:  No further questions, Your Honor.

3            THE COURT:  All right.  Is there any

4    redirect?

5            MR. SIMON:  Judge, I'd ask three questions

6    and --

7            THE COURT:  Okay.  And then we'll take a

8    recess.

9        REDIRECT EXAMINATION

10   BY MR. SIMON:

11   Q    Can we pull up Government's Exhibit 1, Slide 24.

12       Special Agent D'Errico, you were asked about a lot

13   of plot points, none of which -- the large display

14   radius had nothing to do with the defendant's account;

15   correct?

16   A    That's correct.

17   Q    And if we're talking --

18           THE COURT:  Okay.  I don't know why.  I'm

19   really having trouble.  Move the microphone up so it

20   sort of captures you.

21           MR. SIMON:  I didn't fix the mic, Judge.

22   You're right.

23   BY MR. SIMON:

24   Q    Special Agent D'Errico, the discussion about the

25   display radius for that one point that was considered

1   relatively large, that was a different user's account,

2   not the defendant's account; correct?

3   A    That's correct.

4   Q    And if we're talking about the defendant's

5   account, we would be looking at Slide 24; right?

6   A    That's correct.  Slide 24 shows the initial Stage

7   1 data for the defendant's phone.

8   Q    And so if we're talking about that 68 percent, I

9   want to be clear about it, the 68 percent number

10  relates to the fact that the individual to Google's

11  best estimate based on its technology would be within

12  that blue display radius; right?

13  A    That's correct, that blue display radius.  And you

14  can see some of these points in yellow are right on

15  the edge of those display radiuses.  So they can be

16  anywhere in there, but these points are consistent

17  with the defendant being in those locations.

18  Q    Okay.  And with respect to the search warrant and

19  what the search warrant requests from Google, it asks

20  Google to send us back who you have determined is

21  within the red geofence radius; right?

22  A    That's correct.

23  Q    Now, the accuracy of Google points, you've done

24  some testing we talked about; right?

25  A    Yes, I have.

1   Q    What have you determined about the accuracy of

2   Google's location points if you've come to a

3   percentage yourself in terms of your own location

4   points?

5   A    I don't have a particular percentage, but what

6   I've learned is that sometimes Google is a little too

7   conservative with their display radius, particularly

8   in Wi-Fi points, and that sometimes Google misses the

9   mark by several meters.  Single digit meters.  So the

10  point would fall outside of the display radius, but it

11  is still in the immediate vicinity of the area.

12       So, for example, if a point -- from this data,

13  what we're seeing is that the device is in this area.

14  This is not saying -- it's not a miss such that the

15  device is in California or Illinois or even north of

16  Richmond.  When we have seen misses by the Google

17  location data, it's by very small amounts, especially

18  in areas like this that have Wi-Fi coverage.  And that

19  actual location might be just outside of the map

20  display radius that they show.

21       So, whereas Google does aim for 68 percent inside,

22  there is a percentage that is right outside, just

23  outside that display radius based on the observations

24  that I've had.

25  Q    When you say "conservative," can you just explain

1   what you mean by that word "conservative"?

2   A    Yes.   That Google has made -- I'm sorry.   Maybe

3   that's not the right word.   Google has made that

4   display radius a little smaller than it should have

5   been.   And that if Google increased its map display

6   radius by 10, 20 meters, that point would fall inside

7   that new display radius.   So what I'm saying is when a

8   point misses, it's outside the 68 percent, it's

9   generally still in that area.   It's a near miss, not a

10  flagrant miss of putting a device in Washington, D.C.,

11  or even the other side of Chesterfield County.

12  Q    Okay.   And then, last question, looking at Slide

13  28, the supplemental records for the defendant's

14  phone, there was some talk about the large display

15  radiuses at the second stage when we've moved outside

16  of the geofence and asked for records -- for these

17  additional records for these devices.

18       Looking at, again, box 1, that's one of those

19  large points, 1797 meters.   Two minutes before, it's

20  104.   Again, what is that indicative of based on your

21  training and experience?

22  A    That's indicative of travel.   So in boxes 1, the

23  two points have the exact same latitude and longitude.

24  So there's a single marker in the middle.   And what

25  happens is that first point is a hundred-meter radius,

1    104-meter radius.  And for some reason when the phone

2    goes to take the next measurement, which is about two

3    minutes later at 3:55, for some reason unknown to me

4    the center point is not updated to a new latitude and

5    longitude.

6         But what happens, I believe, is based on the

7    sensors in the phone, the accelerometer, which

8    determines speed, and the gyroscope, which determines

9    tilt, is that using those additional signals, it can

10   estimate approximately how far away that device is.

11        So we still deem these accurate even though they

12   are a larger circle.  It may not be as precise, but

13   it's still accurate as to the device is somewhere in

14   that area.

15             MR. SIMON:  No further questions, Judge.

16             THE COURT:  So, I'm going to ask one question

17   I really don't want to open up a can of worms, but I

18   just want to be clear.  If Google is saying in the

19   display radius, there's a 68 percent chance that the

20   device is in that radius, what does the other

21   32 percent reflect?  That it's not there?

22             THE WITNESS:  That the device would be

23   outside of that display radius.  And in my experience

24   with testing this data and doing my own measurements,

25   a lot of those points are what I would characterize as

1   near misses, which means still in the general area,

2   but maybe they're a football field away.  Maybe

3   they're 100 meters away.  Maybe they are 20 meters

4   away.  But they are still in that general area.  And

5   we are not looking at folks that are in Washington,

6   D.C. or other geographic areas.  That's been my

7   experience with this data.

8            THE COURT:  All right.

9            MR. SIMON:  Nothing further, Judge.

10           THE COURT:  Can this witness be excused?

11           MR. SIMON:  From the United States, Judge,

12   yes.

13           MR. PRICE:  For the defense, yes, Your Honor.

14           THE COURT:  All right.  Thank you, Special

15   Agent, for your time.

16           THE WITNESS:  Thank you.

17           (The witness was excused from the witness

18    stand.)

19           THE COURT:  We're going to take a recess.

20   I'd like to keep it just to 6:15.  That's only 12

21   minutes, but I am being the antithesis of an Eastern

22   District judge.  I have had trials here where somebody

23   told me at lunch to cut my witness list in half

24   because I was taking too long.  So I really just want

25   you all to get your job done, but also be mindful of

599

1    everybody's time, especially with asking repetitive

2    questions.  All right.  Okay.

3              (Recess taken from 6:03 p.m. to 6:15 p.m.)

4              MR. SIMON:  DO we need to put him under oath,

5    Judge?

6              THE COURT:  Yes, of course.

7              I was going to say we're going to put him

8    under oath.  Detective Hylton, we'll ask you to stand

9    for that.

10             I'm also going to say that it's been a long

11   day, and we cannot go any more than an hour without a

12   break.  So if you guys understand that, there are a

13   lot of people here who are very tired.  And so I'm

14   going to accommodate them, of course, as I have you

15   perhaps a little too much.  So one hour per break.

16   And it really would be nice if we ended in an hour.

17             All right.

18

19        JOSHUA HYLTON, called by the United States, first

20   being duly sworn, testified as follows:

21

22        DIRECT EXAMINATION

23   BY MR. SIMON:

24   Q   Detective Hylton, can you state your name for the

25   record, please.

HYLTON - DIRECT

1   A    Yes, sir.  It's Joshua Hylton, spelled

2   H-Y-L-T-O-N.

3   Q    Okay.  And you're a Task Force Officer with the

4   FBI; right?

5   A    That's correct.

6   Q    And which task force are you with?

7   A    The Violent Crimes Task Force in Richmond,

8   Virginia.

9   Q    How long have you been there?

10  A    Since December of 2016, sir.

11  Q    And you've been in law enforcement since 2011;

12  right?

13  A    That's correct.

14  Q    With Chesterfield?

15  A    Yes.

16  Q    Police Department?

17  A    Yes, sir.

18  Q    Okay.  Now, when you started your career, what

19  kind of crimes did you investigate?

20  A    Initially, as a patrol officer, just the average

21  patrol-type crimes, larcenies, things of that nature,

22  assaults, vehicle infractions.  And, I believe, in

23  August 2015 I was assigned to our Persons Unit who

24  investigates violent crimes to people.

25            THE COURT:  Did you say "Persons Unit"?

HYLTON - DIRECT                601

1          THE WITNESS:  Yes, ma'am, in Chesterfield.

2          So that's what we called it at the time.  Now

3    we've broken it up into sections of robbery and

4    homicide.

5          When I was first assigned to the unit, I

6    investigated homicides or suspicious deaths, missing

7    persons cases, natural deaths, accidental deaths,

8    robberies to the person, whether it be a street

9    robbery or what we call a drug rip robbery, or, of

10   course, a commercial robbery, as well.

11         THE COURT:  Drug rip?

12         THE WITNESS:  Yes, ma'am.  Essentially, a

13   drug deal that has gone bad for one party or the other

14   where someone will attempt to purchase whatever drug

15   it might be, and then they get robbed.  I apologize

16   for the term.

17         Commercial robberies, such as bank robberies,

18   major assaults, shootings, rapes, things of that

19   nature.

20   Q    How many robberies have you investigated?

21   A    It's hard to say, as a primary investigator, but

22   at least well over 100.

23   Q    Okay.  Did any of those robberies involve alleged

24   conspiracies?

25   A    Yes, sir.

1   Q    Have you gotten any training in your role as a law

2   enforcement officer?

3   A    Yes, sir.

4   Q    What's that?

5   A    Well, the Chesterfield County Basic Police

6   Academy, which lasted over seven and a half months,

7   approximately two months of field training with

8   another officer or more experienced officers.

9   Likewise, when I became a detective, we had a period

10  of training where we had to be evaluated by another

11  investigator for different cases that we were working

12  for approximately a month or so.

13       Various training that's come up over the years

14  whether it be search warrant preparation, search

15  warrant execution, various legal updates, things of

16  that nature.  Electronic data collection, examination,

17  things like that.

18  Q    So, now going to sort of the practical piece, have

19  you obtained search warrants in the past?

20  A    Yes, sir.

21  Q    Okay.  How many would you say?  And if you can't

22  estimate that, sort of what types of search warrants

23  have you obtained?

24  A    It would be hard to quantify that.  Somewhere

25  between 50 and 100 easily, I guess.  So, social

HYLTON - DIRECT                    603

1    media-type search warrants; Instagram, Facebook, live

2    pings where we're trying to figure out where a suspect

3    is or a subject is based on their cell phone location.

4    Of course, the Google search warrants or geofence

5    search warrants, search warrants involving DNA

6    collection, tower dump search warrants, residential

7    search warrants, vehicle search warrants, search

8    warrants where I need to take a picture of a person's

9    body that could have been a suspect of a rape or

10   something of that nature.  Historical-type search

11   warrants.

12   Q    Is that historical location?

13   A    It could be historical location, that's correct.

14   Q    Okay.  Now, getting to the particular type of

15   warrant in this case, a geofence warrant, have you

16   obtained any geofence warrants in the past?

17   A    I have.

18   Q    How many prior to this case?

19   A    Three prior to this investigation.

20   Q    And were all of those signed by judges?

21   A    Yes, sir.

22   Q    Okay.  What type?  Was it federal or state?

23   A    The first geofence warrant I acquired was actually

24   in this district.  The Honorable Judge David Novak, I

25   believe.  And then the two subsequent search warrants

HYLTON - DIRECT                    604

1    were acquired by Chesterfield Circuit Court judges.

2    Q    Okay.  Now, prior to getting the search warrant in

3    this case, did you consult with prosecutors about

4    geofence warrants?

5    A    With the prior warrants, yes.

6    Q    What, if anything, did they tell you about the

7    appropriateness of getting these types of warrants as

8    a legal matter?

9            MS. KOENIG:  Judge, objection.  That is a

10   legal conclusion which we have no witness to be able

11   to testify about what advice was given, and that is

12   not the appropriate question to be given in this case.

13   This Court is to determine whether this warrant was

14   valid.

15           MR. SIMON:  Judge, it goes to the issue of

16   good faith and, I think, hearsay as to what he was

17   told or the advice that he's gotten about the

18   propriety of these warrants is relevant.

19           THE COURT:  Why don't you just ask one

20   question in the negative?  Have you ever been told

21   it's not legal?

22           MR. SIMON:  Okay.

23   BY MR. SIMON:

24   Q    Have you ever been told it's not legal to get

25   these?

1  A    No, sir.

2  Q    Now, the previous warrants that you obtained,

3  these previous geofence warrants, were they

4  substantially similar to the one you obtained in this

5  case?

6  A    They were mostly similar, that's correct.  A few

7  of them had more locations because of the more

8  robberies to investigate.

9  Q    Did they generally use the 150-meter radius?

10 A    All but the search warrant that's sealed

11 currently.

12 Q    Okay.  Now, prior to getting the search warrant in

13 this case, did you receive any directive from

14 leadership in your office at Chesterfield P.D.?

15 A    I did, from my lieutenant and the courts.

16 Q    Okay.  What, if anything, did they tell you about

17 where to go get your search warrant in this case?

18 A    If possible, we would acquire our search warrants

19 through a magistrate judge.  Sorry.  Not a magistrate

20 judge, a Chesterfield County magistrate.

21      If for some reason a magistrate would not sign our

22 warrants, we would schedule a meeting with an

23 assistant commonwealth's attorney.  We would speak

24 with them about the matter and then try to schedule a

25 time to see a circuit court judge.

HYLTON - DIRECT                     606

1   Q    Why at that directive?

2   A    We were -- at the time we were overburdening the

3   courts, and specifically the on-call judge.  At least

4   that was my understanding of it.

5   Q    And that concern was coming from the Court?

6   A    That's correct.

7   Q    Okay.  Now, was this the first geofence warrant in

8   which you actually obtained the returns from Google?

9   A    Yes.

10  Q    Why hadn't you obtained the returns previously?

11  A    Most of the incidents I was searching or working

12  on prior to this particular geofence warrant weren't

13  ones that were immediately concerning the public's

14  welfare and safety.

15  Q    Okay.  But did you request the information back

16  from them?

17  A    Not in the same way that I did in this particular

18  investigation.  But yes, I submitted the search

19  warrants, and I was awaiting a return.

20  Q    Now, are you familiar at all with Google's

21  internal practices about how they execute these

22  warrants?

23  A    No, sir, other than I submit them to Google, along

24  with a nondisclosure order.  They receive them and

25  then process them however it is that they do that.

1    Q    Now, there's been some discussion about cell phone

2    dumps.  Why didn't you get a cell tower dump in this

3    case?

4    A    It may have been an investigative technique that I

5    would have done later, but in this particular

6    instance, normally I reserve a tower dump search

7    warrant for multiple crimes, multiple incidents,

8    locations, things of that nature.

9    Q    Okay.  Now, let me -- before we get into the heart

10   of the search warrant, can you explain for the Court

11   what happened on May 20, 2019?

12   A    Yes, sir.  I was on duty or rather just got off

13   duty, and I was informed by supervision that there was

14   a bank robbery that had just occurred at the Call

15   Federal Credit Union on Hull Street Road around the

16   Genito area with a loss of approximately $195,000.

17       I came back on duty to respond out to the bank

18   robbery as that was kind of my primary focus with

19   Chesterfield at the time.

20       After my response to the scene, I interviewed

21   witnesses, I reviewed surveillance camera video from

22   both -- or at that time mostly just the Call Federal

23   Credit Union Bank.

24       Through a culmination of all those investigative

25   things that I had done at that point, I learned that a

1   suspect had come from the southwestern corner of the

2   Journey Christian Church, which is a building adjacent

3   and to the east of Call Federal Credit Union, at

4   approximately 4:50 in the afternoon.

5       That same subject walked north in the parking lot,

6   and then towards the front of the bank itself while

7   holding what appeared to be like a cell phone to the

8   side of his face or the side of his head.

9       That party then entered the bank, and we were able

10  to get kind of a fuller shot of what he looked like.

11  It was a black male.  Witnesses described him, I

12  think, in his twenties or thirties, approximately.

13  Witness advised that he had a Jamaican accent, that he

14  had kind of a scruffy beard and braided hair

15  underneath of what was a round maybe fisherman's hat.

16  He had reflective sunglasses and a reflective traffic

17  vest.

18      He approached one teller while still having a cell

19  phone up to the side of his face.  He removes that

20  cell phone, walks up to what we call a victim teller,

21  presents a demand note.  And I guess we can get into

22  that further if you'd like.

23      But basically saying, I have your family as a

24  hostage, your loved ones as a hostage outside.  I have

25  my -- I don't recall exactly how it says.  But I know

1   people outside that have your family as hostage.  If I

2   see law enforcement responding, they may be hurt.  You

3   or your co-workers may be hurt.

4       The clerk advised the suspect, Hey, I don't have

5   that much money.  I don't have a $100,000 to give you.

6   At which point he produces a silver or a black firearm

7   and demands that all of the patrons and both employees

8   of the bank come to the center area just as you enter.

9       He forced everyone to the ground kneeling or

10  sitting, and, again, at gunpoint.  Demanded who had

11  access to the safe.  The manager at the time advised

12  that he did and kind of where the safe was located

13  within the bank, which was in one of the back corners.

14      The suspect at that point stood everybody up, and,

15  again, forced them all at gunpoint to the back of the

16  bank where the safe was located, ultimately, again,

17  putting everyone on the ground, and then forcing the

18  manager at the time to open the bank's vault or safe.

19  And then that's when he was able to take that money,

20  the $195,000 that I spoke of, bank bands, insinuating,

21  you know, what drawers and things that they came from.

22      Then, I believe, he collected a cell phone or two,

23  and then started to exit, and then he kind of threw

24  the cell phone devices somewhere within the business.

25  And then kind of fled that same pattern around the

HYLTON - DIRECT                610

1   front of the bank and then back towards the

2   southwestern corner of the Journey Christian Church.

3   Q   Okay.  What, if anything, did the phone trigger

4   for you in terms of investigative techniques?

5   A   For me, it meant that he could have possibly been

6   speaking with a coconspirator.  And then, obviously,

7   for the purposes of the Google geofence warrant, that

8   Google may have actually collected data that could

9   have implicated him as being in the area at the time

10  of the robbery.

11      In combination with the phone, possibly being on a

12  phone call, and then the demand note to the victim

13  teller, it told me that there was a possibility that

14  he could have a lookout, that he could have a driver

15  nearby or someone that was kind of keeping watch for

16  law enforcement.

17  Q   Okay.  Now, prior to him entering the bank --

18  we've had some testimony.  There was a witness who

19  said they saw a suspicious blue Buick behind the sort

20  of church area; right?

21  A   Yes.  That was an employee of the Journey

22  Christian Church that was leaving somewhere between

23  4:30 and 4:40 in the afternoon.

24  Q   Now, the geofence warrant in this case was

25  obtained on June 14, 2019; right?

HYLTON - DIRECT          611

```
 1    A    Yes, approximately, like, three weeks or so after

 2    the robbery occurred.

 3    Q    Did you conduct any investigation in the interim?

 4    A    I did.

 5    Q    Did you get some leads?

 6    A    We did.

 7    Q    Okay.  Tell the Court a little bit about that.

 8    A    I believe an estranged girlfriend or wife or

 9    whatever she was called in and basically said "I know

10    who did this robbery.  It's my ex-boyfriend."  So,

11    obviously, you know, he had some physical

12    characteristics that were similar.  He actually wore a

13    fisherman style hat.

14         We were able to find him, interview him.  I

15    gave -- I believe I acquired a search warrant to

16    acquire his cell phone device.  We did some

17    examinations on his phone.  We found that he wasn't in

18    the area at the time.  He wasn't familiar with Call

19    Federal Credit Union.  He didn't frequent the area,

20    even provided an alibi, I believe.

21         And we also had another party that one of the

22    employees of a separate Call Federal Credit Union had

23    brought to our attention that also had a blue Buick

24    Lacrosse, I believe, and also came into a Richmond

25    bank earlier that day wearing a traffic vest.
```

HYLTON - DIRECT                      612

1        So my immediate concern at the time was this might

2   be a likely suspect.  We ran that to the ground as

3   well.  We were able to identify who that party was,

4   and we were actually able to find that he was on an

5   ankle monitor for, I believe, a crime that he

6   committed in Richmond.

7        And then, of course, we were able to look at the

8   GPS plots and data and see that he was nowhere near

9   the Call Federal Credit Union in question today.

10  Q    And you go and you get the geofence warrant

11  sometime thereafter; right?

12  A    That's correct.

13  Q    I will show you what is marked as Government's

14  Exhibit 2 and what's been admitted, and that's your

15  search warrant; correct?

16  A    Yes, sir.

17  Q    That's your application?

18  A    That's correct.

19  Q    Now, when you submit this -- once you get the

20  search warrant signed off by the magistrate, is it

21  right that you submit -- what if we look at pages 4

22  and 5?

23  A    Yes, that goes along with the search warrant.

24  Q    Okay.  And what else do you submit?  Is it page

25  10?

613

1    A    I'm sorry.  The prior affidavits and 10 is going

2    to be an attachment to the actual search warrant

3    that's submitted to Google.

4    Q    Okay.  So if we look at -- I made a mistake.  If

5    we look at pages 4 and 5, we can put them next to each

6    other and take a look.  This is part of what you will

7    submit to Google; right?

8    A    Yes.  Well, specifically, this is part of the

9    affidavit to acquire the search warrant, but, yeah,

10   there's data associated with this that also goes along

11   with the search warrant attachment.

12   Q    You don't actually submit what we will go through

13   as the factual recitation of the case to Google;

14   correct?

15   A    No.

16   Q    Okay.  And the only other thing you submit in

17   addition to pages 4 and 5 would be page 8, if we look

18   at it; right?

19   A    Yes, that's correct.

20   Q    And just for purposes of the record, when I

21   mention these page numbers, I'm talking about the red

22   page numbering on Government's Exhibit 2.

23   A    Yes.

24   Q    Now, did you -- I just want to talk about the

25   substance of what you provided to the magistrate in

HYLTON - DIRECT                614

1    getting this search warrant.

2              THE COURT:  Wait a minute.  The questions you

3    were just asking him about are what went to Google?

4              MR. SIMON:  Correct, Judge.

5              THE COURT:  So just give me, again, the page

6    numbers that went to Google, please.

7    BY MR. SIMON:

8    Q    Pages 4 and 5, correct, Detective Hylton?

9    A    The actual -- for me what was actually presented

10   to Google would be page 8, page 10, and page 11 as far

11   as in my affidavit and search warrant go.

12   Q    Just to be clear, you're using the word

13   "affidavit," but that's not -- you don't actually

14   submit to them the probable cause.

15   A    Yes, they don't get any probable cause narrative

16   associated with the crime itself.

17   Q    Okay.  Now, looking at page 6, did you advise the

18   magistrate of the note that the suspect left with the

19   bank teller?

20   A    Yes, sir.

21   Q    Okay.  Can we highlight that?  You mentioned

22   earlier that the note indicated that the suspect was

23   potentially working with other people.

24   A    Yes, sir.

25   Q    Can you note for us where -- and it's highlighted

1    on the screen for you -- sort of where in there you

2    got that inkling?

3    A    Pretty much the first and second sentence.  Would

4    you like me to read it?

5    Q    Sure.

6    A    Okay.  "I've been watching you for sometime now.

7    I got your family as hostage and I know where you

8    live, if you or your coworker alert the cops or anyone

9    your family and you are going to be hurt.  I got my

10   boys on the lookout out side.  The first cop car they

11   see am going to start hurting everyone in sight, hand

12   over all the cash.  I need at least 100k and nobody

13   will get hurt and your family will be set free.  Think

14   smartly.  Everyone safety is depending and you and

15   your coworkers action so I hope they don't try nothing

16   stupid."

17   Q    And did you also at the same time advise the

18   magistrate that the suspected bank robber had a

19   cellular telephone?

20   A    Yes, sir.

21   Q    Can we look at the paragraph starting "upon

22   investigative response"?

23   A    Yes.

24   Q    Is this the paragraph in which you advise the

25   magistrate about the cellular telephone?

1    A    That's correct.

2    Q    Can you go ahead and read some of this paragraph

3    starting with the first few lines?

4    A    Sure.  Upon investigative response, law

5    enforcement officials reviewed the bank's surveillance

6    video prior to the robbery and noted the UNSUB, which

7    is an unknown subject, had a cell phone in his right

8    hand and appeared to be speaking with someone on the

9    device.  Subsequently, your affiant finds it necessary

10   and prudent to request that Google provide geofencing

11   data in order to assist with the investigation.  In

12   the undersigned's training and experience, when people

13   act in concert with one another to commit a crime,

14   they frequently utilize cellular telephones and other

15   such electronic devices, to communicate with each

16   other through Wi-Fi, Bluetooth, GPS, voice calls, text

17   messages, social media accounts, applications, emails,

18   and/or cell towers in the area of victim-businesses,

19   and in this case, located at 3640 Call Federal Drive,

20   Chesterfield, Virginia 23235.  Furthermore, the

21   requested data/information would have been captured by

22   Google during the requested time.

23   Q    Okay.  And if we go to page 7, did you then advise

24   the magistrate about Google location information,

25   Google accounts, and cellular telephones, a bit more

HYLTON - DIRECT                    617

1   information there?

2   A    Yes, sir.

3   Q    If we look at the second paragraph, is that one of

4   the places in which you tie the fact that Google --

5   that folks can have Google accounts on their cellular

6   telephones?

7   A    Yes, sir, that's correct.

8   Q    And then if we look at paragraph 3, as well.

9   A    Yes, sir, that's correct, as well.

10  Q    Now, in addition to -- in this particular

11  paragraph, paragraph 3 on page 7, notes Android phones

12  as a place where Google accounts might be included.

13  Did you also advise the magistrate that Google

14  accounts could be on non-Android phones?

15  A    That's correct, through applications of similar

16  sorts.

17  Q    Now, did you tie the fact that Google location

18  information -- or Google accounts are on phones, but

19  did you also tie the fact that Google collects

20  location information from these phones?

21  A    Yes, sir.

22  Q    If we look at paragraphs 4 and 6, and I think

23  we'll have to look at them one at a time.  Look at

24  paragraph 4 here.  Is this one of the paragraphs in

25  which you advised -- in which you advise the Court

1   that Google location information could be captured by

2   cellular telephones?

3   A    Yes, sir, that's correct.

4   Q    Now, looking at paragraph 6 on page 7 of

5   Government's Exhibit 2, is this another paragraph in

6   which you noted to the magistrate why location

7   information might be on a cellular telephone?

8   A    That's correct.

9   Q    And why that -- and noted that that location

10  information is tied to a Google account?

11  A    Yes, that's correct.

12  Q    Now, have you in your personal experience ever

13  encountered a situation set forth in paragraph 6 there

14  using images or videos on a cellular telephone to

15  solve a crime?

16  A    Yes, sir.

17  Q    Can you tell us about that?

18  A    Sure.  In a few instances that I've investigated

19  crimes, I've had an abduction at gunpoint, knifepoint,

20  where a subject was carjacked and then taken to the

21  place of a robbery.  When we ended up developing a

22  lead or a target in that particular investigation, we

23  were able to gain probable cause, conduct a Facebook

24  search warrant for his data, and he actually had

25  multiple GPS plots showing that he was in the area of

1    the robbery, and actually posting pictures and things

2    of that nature associated with the robbery in the

3    general area of the parking lot of the business that

4    was robbed.

5         And similar type instances where I've worked other

6    robberies where suspects have had metadata associated

7    with an image or even video prior to and after a

8    robbery where he's taking pictures of himself,

9    flashing money subsequent to the robbery, or flashing

10   a firearm and even a mask prior to actually committing

11   a robbery.

12             MR. SIMON:  Judge, I've got a few more

13   questions, probably two or three, I think.

14   BY MR. SIMON:

15   Q   With respect to this pervasiveness of cell phones

16   in American society, did you set that forth in

17   paragraph 7 of this on page 7?

18   A   Yes, sir.

19   Q   Is that the Pew Research study set forth there?

20   A   That's correct.  Although, it was likely dated at

21   the time as that was September 2013.

22   Q   In addition to the fact that all of this

23   information is out there, and we talked about

24   paragraph 6, but did you also in paragraph 5 explain

25   for the magistrate how this information would be

1    helpful in terms of locating an individual?

2    A    Yes, that's correct.

3    Q    Can we highlight paragraph 5 here.  Can you read

4    that?

5    A    Sure.  "This applicant knows that location data

6    can assist investigators in forming a fuller

7    geospatial understanding and timeline related to a

8    specific criminal investigation and may tend to

9    identify potential witnesses and/or suspects.  Such

10   information can also aid investigators in possibly

11   inculpating or exculpating persons of interest."

12   Q    So that paragraph notes the potential interest in

13   witnesses as well?

14   A    That's correct.

15   Q    Again, this affidavit, pages 6 and 7, that we just

16   went through, Google had no knowledge of these facts;

17   correct?

18   A    That's correct.

19   Q    And it's typical practice not to give these

20   companies the actual facts of the case; right?

21   A    That's correct.

22   Q    Now, I'm just going to end with quickly showing

23   you Government's Exhibit 4.  It's a number of pages

24   there.  Just take a look at them.  Do you recognize

25   the pages in Government's Exhibit 4?

HYLTON - DIRECT                    621

1    A    Yes.

2    Q    What are those?

3    A    These are correspondence between myself and Google

4    through email.

5    Q    Okay.  And that's an accurate reflection of those

6    emails?

7    A    Yes, sir.

8              MR. SIMON:  Judge, we move to admit and

9    publish briefly these emails.

10             MS. KOENIG:  No objection.

11             THE COURT:  All right.  They'll be entered.

12             (Government's Exhibit No. 4 is admitted into

13   evidence.)

14   BY MR. SIMON:

15   Q    Now, let me ask you just some quick questions

16   here.  The emails that were sent to Google, was there

17   a fair amount of follow-up via email?

18   A    No, I don't believe any except for the receipt of

19   the stages during the process.

20   Q    Okay.  And so when you talked with -- Sarah

21   Rodriguez mentioned that at some point you talked with

22   someone from Google on July 8.  Did you initiate that

23   communication?

24   A    I did, but I believe I called twice.

25   Q    Why did you call on July 8?

HYLTON - DIRECT                    622

1    A    It was either to receive the first or to try to

2    receive Stage 1 at a faster rate of speed due to the

3    exigency of the suspect posing a danger to the public

4    and then also being a possible flight risk.

5    Q    The July 8 communications, that came after you

6    received the first round; right?

7    A    Yes, that's correct.

8    Q    So when you called on July 8, you were trying to

9    get the second round of information?

10   A    Correct.

11   Q    And prior to that you had sent two emails;

12   correct?

13   A    Yes.

14   Q    And had received no communication from Google?

15   A    That's correct.

16   Q    Throughout these emails, did you tell anything to

17   Google about the dangerousness of the situation?

18   A    I did.

19   Q    And these emails were sent in consultation with my

20   office; right?

21   A    That's correct.

22              THE COURT:  Consultation with whom?

23              MR. SIMON:  Consultation with my office.

24              THE COURT:  Okay.

25              MR. SIMON:  No further questions, Judge.

HYLTON - CROSS                    623

1          THE COURT:  Is there cross?

2          MS. KOENIG:  Yes, sir.

3          MR. SIMON:  Judge, I think I moved Exhibit 4

4   in already.

5          THE COURT:  You did.

6      CROSS-EXAMINATION

7   BY MS. KOENIG:

8   Q    Good evening, Detective.

9   A    Good evening.

10  Q    I want to start with the surveillance videos.  So

11  you looked, as a part of the investigation, at the

12  widest surveillance videos that the bank had provided;

13  right?

14  A    That's correct.

15  Q    And you looked at those before June 14th of 2019?

16  A    Yes, ma'am.

17  Q    And those surveillance videos include outside

18  areas of the bank; right?

19  A    That's correct.

20  Q    And you also looked at the church surveillance

21  videos; right?

22  A    Yes, ma'am.

23  Q    And the church surveillance videos include

24  directions that face from the church toward the bank;

25  right?

HYLTON - CROSS                          624

1   A    That's correct.

2   Q    And include wide swaths of that parking area;

3   right?

4   A    Yes, ma'am.

5   Q    I want to make sure, you had looked at that before

6   you filed for this warrant on June 14th of 2019;

7   right?

8   A    I believe so.

9   Q    And you also had a witness that was at the church;

10  right?

11  A    Yes, ma'am.

12  Q    And that witness said that that person saw -- that

13  that witness saw one individual walking toward a blue

14  Buick; right?

15  A    No, ma'am.  One individual inside of a blue Buick.

16  Q    I'm sorry.  And did they provide a description of

17  the person that was inside of the vehicle?

18  A    That description changed in three different

19  interviews with that individual.  I believe the

20  initial was a black male.  Then, I think, it became a

21  person or a male.  And then I don't recall what the

22  last interview was.

23  Q    All right.  When you watched the bank surveillance

24  videos, you saw no one else that you could not account

25  for except for the suspect in the fisherman's hat and

1    the traffic vest; right?

2    A    Yes, ma'am, that's correct.

3    Q    And when you watched the church surveillance

4    videos, you saw no one else that you could not account

5    for except for the suspect in the fisherman's hat and

6    the traffic vest; right?

7    A    That's correct.

8    Q    You did not put those details in your affidavit to

9    the magistrate; right?

10   A    No, ma'am.  If they're not in there individually,

11   they're not in there.

12   Q    All right.  In going to your statement --

13   A    Actually, ma'am, I do apologize.  I did mention, I

14   believe, in a part of my affidavit where a suspicious

15   subject was seen parked behind the southwestern corner

16   of the church.

17   Q    Sure, but you didn't mention that you hadn't --

18   you had seen surveillance video and you had not seen

19   any other possible codefendants on the surveillance

20   video.

21   A    That's correct.  No other codefendants were seen.

22   Q    All right.  And you also didn't see any hostages

23   being held anywhere outside of the bank; right?

24   A    No, ma'am.

25   Q    I want to make sure I heard.  How many -- before

1    June 14 of 2019, how many geofence warrants had you

2    applied for?

3    A    Three.

4    Q    One is a search warrant from April 11 of 2019 in

5    Chesterfield County; right?

6    A    That's correct.

7    Q    One is a federal search warrant from February 22,

8    2019, from this courthouse, Judge Novak?

9    A    That's correct.

10   Q    What is the third one?

11   A    The third one is the one that's under seal.  It's

12   a homicide investigation.  It was also obtained in

13   April, but I -- did you say the first was obtained on

14   the 8th or April 8th?

15   Q    April 11.

16   A    April 11.  I believe the other is actually

17   April 8.

18        MS. KOENIG:  Your Honor, I don't mean to

19   belabor this point.  We have asked ad nauseam for

20   these warrants.  I have asked several times.  I have

21   emails from Mr. Simon that indicate that the only two

22   warrants that he had applied for before were the state

23   search warrant that I have identified on April 11 of

24   2019 and the federal search warrant.  I do not have a

25   copy of any third search warrant, and I'm asking for

1   that yet again.

2          MR. SIMON:  Judge, we've given every search

3   warrant that we can get access to in this case.  I

4   also would have to look at the briefs.  I'm pretty

5   sure we indicated three.  I don't want to say anything

6   that's wrong.

7          What I can tell you is that I know I can't

8   get access to the third.  That's an ongoing homicide

9   investigation.  And the ACA there certainly is not

10  inclined to unseal that.  That's my understanding.

11  And so that's sort of the fullest extent that I can

12  get into that.  But, as I've noted, we've given

13  everything that we have.

14         THE COURT:  All right.  I'm going to allow

15  you all to brief that up later based on the record

16  that you can establish.  Five pages each.

17         THE WITNESS:  If I can, ma'am.  That matter

18  hasn't even come up in court yet.  It's actually

19  scheduled to be January of 2022.

20  BY MS. KOENIG:

21  Q   All right.  So let's go back to your training and

22  experience.  You have not received any specific

23  training about geofence warrants; right?

24  A   No, ma'am, I have not.

25  Q   And you've not received any training specific to

1   how to request geofence warrants; right?

2   A    No, ma'am.

3   Q    You learned about geofence warrants through other

4   police officers that you work with; right?

5   A    That's correct.

6   Q    All right.  So let's look at Defense Exhibit --

7   I'm sorry.  If we could pull up Government's Exhibit

8   2, please.  Thank you.  All right.  Government's

9   Exhibit 2 is the geofence warrant in this case; right?

10  A    Yes, ma'am.

11  Q    All right.  So let's look at Attachment 1, which

12  is on page 3.  And if you can flip in the defense

13  exhibit book to Defense Exhibit 19, please.

14  A    I apologize.

15  Q    It is the big one.

16  A    You said 19, ma'am?

17  Q    Yes.  I'll just kind of save you a little bit of

18  time.

19  A    I'd appreciate it.

20  Q    Absolutely.  So that exhibit comprises two

21  warrants.  If you'll see that there's a warrant --

22  I'll wait until you get there.

23            THE COURT:  I'm not there yet either.

24            MS. KOENIG:  Sorry, Your Honor.

25  BY MS. KOENIG:

1    Q    All right.  So would you agree with me that that

2    exhibit contains two warrants, one of which has the

3    warrant -- the affidavit file number of 42 at the

4    beginning?

5    A    Yes, ma'am.

6    Q    And then the subsequent pages to that are related

7    to that warrant; right?

8    A    That's correct.

9    Q    And then the second warrant is affidavit file

10   No. 472; right?

11   A    Are we speaking of my search warrant at this

12   point?

13   Q    That's correct.

14   A    That's correct.

15   Q    So that's 472 is your search warrant; right?  You

16   can look at it.

17   A    Yes, ma'am.

18   Q    So look at Attachment 1 from the geofence warrant

19   in this case.  Just keep your page.  Don't change the

20   page.

21   A    Sorry.

22   Q    That's okay.  So I want you to compare Attachment

23   1 from Government's Exhibit 2 to Attachment 1 in the

24   affidavit that you filed in file No. 472.

25   A    So, just to clarify, Detective Humphries

HYLTON - CROSS                    630

1    Attachment 1 versus my Attachment 1.

2    Q   Correct.  Let's just make this easier.  Detective

3    Humphries filed for the affidavit in search warrant

4    number -- the affidavit file No. 42; right?

5    A   Correct.

6    Q   Detective Humphries is somebody that you work with

7    at the Chesterfield County Police Department; right?

8    A   Yes, that's correct.

9    Q   All right.  So, again, let's look at the

10   Attachment 1 from Government's Exhibit 2 and compare

11   that to Attachment 1 in file No. 472, which is the

12   second warrant in Exhibit 19.

13   A   Yes, ma'am.

14   Q   Those are the same; right?

15   A   As far as I can see, they're pretty much the same.

16   Q   While we're on Attachment 1, let's look at file

17   No. 42, which is the first warrant, Defense Exhibit

18   19.

19   A   Okay.

20   Q   So when you look at Attachment 1 -- Attachment 1,

21   go to Detective Humphries --

22   A   Yes, I'm on Detective Humphries'.

23   Q   Okay.  Attachment 1 in Detective Humphries'

24   affidavit, which is file No. 42, is also the same as

25   the search warrant Attachment 1 in this geofence

HYLTON - CROSS                         631

1   warrant case, in our case; right?

2   A    Yes, ma'am.

3   Q    All right.  Let's go to Attachment 2 of

4   Government's Exhibit 2.  All right.

5        So Government's Exhibit 2, Attachment 2, please

6   compare that to your search warrant in file No. 472,

7   which you got, which is the second warrant, that's in

8   Defense Exhibit 19.

9   A    Without directing looking at them, I believe it's

10  going to be the same since I'm the one that filed it,

11  or, sorry, I'm the one that acquired it.

12  Q    And the only thing that's different, right, is the

13  date and time?

14  A    Correct.

15  Q    The crime that is associated and the geographic

16  area to be searched; right?

17  A    That's right.

18  Q    So let's compare Government Exhibit 2, Attachment

19  2, to Detective Humphries' Attachment 2 in file

20  No. 42.

21  A    Okay.

22  Q    And, again, the only substantive changes, right,

23  are the date and time that applies and the geographic

24  location; right?

25  A    Yes, ma'am.  And then the way that the --

HYLTON - CROSS                632

1   Q    There's a little formatting change; right?

2   A    Correct.

3   Q    All right.  So you did not draft either Attachment

4   1 or Attachment 2 for your June 14, 2019 warrant in

5   this case; right?

6   A    Not solely by myself, no.

7   Q    Okay.  And you mentioned already that you had

8   applied for a --

9           MS. KOENIG:  Judge, I move to admit Defense

10  Exhibit 19?

11          THE COURT:  Any objection?

12          MR. SIMON:  Judge, I would object to it being

13  entered into the record.  I think it's fairly clear

14  he's using a go by, but I don't know why we'd want a

15  different detective's search warrant in this

16  particular record.  It has nothing to do with this

17  case or the probable cause in his warrant.

18          THE COURT:  Well, she's using it to say it's

19  the same language.  So she's acknowledging they're

20  different things.

21          MR. SIMON:  Okay.

22          THE COURT:  So that's overruled.

23          (Defense Exhibit No. 19 is admitted into

24  evidence.)

25  BY MS. KOENIG:

1   Q    And I forgot to ask you, Detective, although it is

2   apparent from the face of the application --

3             THE COURT:  You are talking to your computer.

4             MS. KOENIG:  Thank you.

5   BY MS. KOENIG:

6   Q    I forgot to ask you, did file No. 42 that

7   Detective Humphries got --

8   A    Yes.

9   Q    He got that affidavit -- he filed for that search

10  warrant on January 8 of 2019; right?

11  A    Yes, ma'am.

12  Q    All right.  So, let's turn -- you mentioned a

13  federal search warrant.  The federal search warrant

14  is -- let's look at Defense Exhibit 18.

15  A    Are we still going to be using mine as a

16  reference, as well?

17  Q    We are.  You know where I'm going.

18  A    All right.  Go ahead.

19  Q    So this is the federal search warrant that you

20  applied for; right?

21  A    Yes, ma'am.

22  Q    All right.  And you got this warrant on

23  February 22, 2019?

24  A    Uh-huh.

25  Q    And that's a yes or a no?

1   A    Yes, ma'am.  Sorry.

2   Q    That's okay.  Let's look at Attachment A of the

3   federal warrant.  It's ECF page No. 20 at the top.

4   A    Page 20?

5   Q    Yes.

6   A    All right.  Thank you.

7   Q    So when we are looking at Attachment A and

8   comparing Attachment A -- so Attachment A is the

9   property to be searched; right?

10  A    Yes, ma'am.

11  Q    All right.  And that is a similar purpose for

12  Attachment 1 in Government's Exhibit 2; right?

13  A    That's correct.

14  Q    All right.  The language varies dramatically;

15  right?

16  A    Somewhat, and that's mostly actually due to the

17  structure of the federal warrant versus the state

18  search warrant.

19  Q    Sure.  Well, aside from -- the only thing that

20  actually is the same in terms of the language is the

21  place where Google accepts legal process in Mountain

22  View, California; right?

23  A    That's correct.  And that's actually listed in a

24  different place in my affidavit and search warrant.

25  Q    That's fine.  So, then we get locations A through

1    O on that page; right?

2    A    Yes.

3    Q    And you put together locations A through O; right?

4    A    I did.

5    Q    You did not draft that paragraph above the

6    locations A through 0; right?

7    A    No, I didn't specifically -- that was kind of the

8    go by situation that we were referring to earlier.

9    Q    All right.  So, let's go to Attachment B in

10   Defense Exhibit 18, and that starts on page 31 of the

11   ECF at the top of that exhibit.

12   A    Okay.

13   Q    All right.  So, again, we're going to compare.  So

14   Attachment B in Defense Exhibit 18 is items to be

15   seized and searched; right?

16   A    Yes, that's correct.

17   Q    And the purpose of that attachment is similar to

18   the purpose of Attachment 2 of Government's Exhibit 2;

19   right?

20   A    Yes, ma'am.

21   Q    All right.  And that outlines the three-step

22   process -- Attachment B sets out the three-step

23   process that Google created for geofence warrants?

24   A    Yes, ma'am.

25   Q    So when we compare Attachment B in Defense Exhibit

HYLTON - CROSS                    636

1    18 to Attachment 2 in Government's Exhibit 2, those

2    are different; right?

3    A    Yes, ma'am, slightly different.

4    Q    Slightly?

5    A    Well, in the way that they're laid out, but the

6    information that I'm seeking is still the same.

7    Q    But there's not a single sentence in Attachment B

8    in Defense Exhibit 18 that is the same as Attachment 2

9    in Government's Exhibit 2; right?  You can take your

10   time.

11   A    Okay.

12        Not on this particular page I'm looking through

13   right now.

14   Q    It's a pretty short second page.

15   A    That's correct.

16   Q    And you also didn't write Attachment B to the

17   federal search warrant; right?

18   A    As in come up with the language myself?  No,

19   ma'am.

20   Q    Correct.  Thank you.

21            MS. KOENIG:  I move to admit Defense Exhibit

22   18, Your Honor.

23            MR. SIMON:  No objection, Judge.

24            THE COURT:  It will be entered.

25            (Defense Exhibit No. 18 is admitted into

HYLTON - CROSS                637

1   evidence.)

2   BY MS. KOENIG:

3   Q    When you were putting together the geofence

4   warrant in this case in Government's Exhibit 2, you

5   did not have a suspect; right?  You had a body.  You

6   didn't have any individual person; right?

7   A    That's correct.  I did not have a name attached to

8   the suspect at that time.

9   Q    All right.  And the only way you gained the

10  suspect in this case was through the geofence warrant;

11  right?

12  A    In this particular instance, yes.

13  Q    And you ultimately identified Okello Chatrie as a

14  suspect in this case?

15  A    I did.

16  Q    And you investigated Mr. Chatrie's background?

17  A    Yes, ma'am.

18  Q    You knew he was Jamaican?

19  A    I did.

20  Q    You knew he came to the United States from Jamaica

21  in 2017?

22  A    That's correct?

23            THE COURT:  You are --

24            MS. KOENIG:  I'm sorry, Your Honor.

25  BY MS. KOENIG:

HYLTON - CROSS                    638

1  Q    Let's talk now about when you presented the

2  affidavit that you assembled in Government's Exhibit 2

3  to the magistrate.

4  A    Okay.

5  Q    You went to Magistrate David Bishop; right?

6  A    That's correct.

7  Q    Did you know that Mr. Bishop had never before

8  issued a geofence warrant?

9  A    I did not.

10 Q    Was he the only magistrate on duty when you

11 presented him with a geofence warrant application in

12 the case?

13 A    It's been a while.  Normally, they have two or

14 three on duty.

15 Q    How did you present it to him?

16 A    In the way that it's kind of seen here.

17 Q    I'm sorry.  Maybe I'll be more specific.  How did

18 you physically present it to him?  Did you just hand

19 it to him?

20 A    Yes, ma'am.  I walk up to him.  I hand him the

21 affidavit.  I sign it in front of him.  I swear.  Then

22 he takes that paperwork, and he reviews it himself,

23 and then decides if there's probable cause based on

24 what he's reading in the four corners of the actual

25 affidavit itself.

HYLTON - CROSS                       639

1   Q    Did Mr. Bishop ask you any questions about the

2   contents of the application?

3   A    I don't recall any questions asked.

4   Q    Did he seek to modify anything in the affidavit at

5   all?

6   A    No, ma'am.

7   Q    Did he just read it and sign it?

8   A    That's my understanding.  He could have consulted

9   with someone.  I wasn't sure.

10  Q    Did he read it in front of you?

11  A    I don't believe so.

12  Q    How long did it take?

13  A    I don't know.  It's been 2019.  I couldn't advise.

14  Q    More than 15 minutes?

15  A    I would assume so.

16  Q    More than 30 minutes?

17  A    I don't know.  I'm sorry.

18  Q    All right.  So, going back to the --

19            MS. KOENIG:  Let's see if we can switch

20  screens to the government's screen, Ms. Hancock.

21  BY MS. KOENIG:

22  Q    So going back to Attachment 2 of Government's

23  Exhibit 2, which is page 5, on the second page or on

24  that page, second page of Attachment 2, there is a

25  picture; right?

HYLTON - CROSS                     640

1    A    Yes, ma'am.

2    Q    And that is the geofence itself; right?

3    A    That's correct.

4    Q    And so you have a description of that area above

5    the picture; right?

6    A    Yes.

7    Q    And that description says, "An area encompassing

8    the Call Federal Credit Union and an adjacent

9    business"; right?

10   A    Yes.

11   Q    That adjacent business you're referring to is the

12   Journey Christian Church?

13   A    That's correct.

14   Q    And that's the much larger building to the right

15   of the credit union in the picture that we're looking

16   at?

17   A    That's correct.

18   Q    And so you've obviously been a detective in

19   Chesterfield for a little while; right?

20   A    Yes, ma'am.

21   Q    And you went to the bank the day of the robbery;

22   right?

23   A    I did.

24   Q    You knew it was the Journey Christian Church next

25   door; right?

HYLTON - CROSS                    641

1    A    Yes, ma'am.

2    Q    And you knew that the Journey Christian Church is

3    what we would call a mega church?

4    A    It was a church within a --

5    Q    It's a very large church.

6    A    Yes, it's a large building, but it's actually an

7    old Costco or something to that nature.

8    Q    Sure.  And you know a lot of people attend that

9    church; right?

10   A    No, ma'am.

11   Q    You don't know that?

12   A    I don't know any person to my knowledge that goes

13   to that church.

14   Q    All right.  Let's talk about the time frame for

15   the execution of the warrant.  So if we can look at

16   Government's Exhibit 4.  I guess I can pull it up on

17   mine.  Let me do that.  All right.  So you submit --

18   are you there?

19   A    Yes, ma'am.

20   Q    Okay.  So page 1.  You submit -- you get the

21   warrant on June 14, 2019; right?

22   A    That's correct.

23   Q    You submit it to Google on June 20, 2019; right?

24   A    Yes.

25   Q    You sent some follow-up information to Google on

1   June 25, 2019; right?

2   A    Yes.

3   Q    And Google provides you the Stage 1 response on

4   June 28, 2019?

5   A    That's correct.

6   Q    And in the Stage 1 response, you get the location

7   data on the 19 devices?

8   A    Yes.

9   Q    And then on July 1, 2019, you make the first Stage

10  2 request?

11  A    That's right.

12  Q    On July 2, you make a second Stage 2 request?

13  A    Yes, ma'am.

14  Q    And on July 8, you make a third Stage 2 request;

15  right?

16  A    Yes, that's correct.

17  Q    And then after you make that email request on

18  July 8, 2019, that's when you leave the two messages

19  for the LIS specialist at Google; right?

20  A    Yes, ma'am.

21  Q    And that person calls you later that day; right?

22  A    They did.

23  Q    All right.  So then July 9 is when you narrow down

24  the Stage 2 request to nine devices?

25  A    That's correct.

1    Q    And you get the second stage return on the same

2    day?

3    A    Yes, ma'am.  Looks that way.

4    Q    And then July 10, you make the Stage 3 request?

5    A    Yes.

6    Q    And then July 11, you email again asking for the

7    Stage 3 data?

8    A    Yes.

9    Q    And then July 11, you get the Stage 3 data?

10   A    That's correct.

11   Q    All right.  So I want to talk to you about search

12   warrant returns.

13   A    Okay.

14   Q    The purpose of a -- well, a search warrant return

15   is a document that notifies the Court when you execute

16   the search warrant; right?

17   A    Yes, ma'am.

18   Q    When you execute a geofence search warrant, it's

19   executed when you send it to Google; right?

20   A    That's correct.

21   Q    And you send it via the LER system; right?

22   A    Yes, ma'am, the L-E-R system, yes.

23   Q    And in return, you also report -- in the return,

24   you also report back to the Court what items you

25   gathered during the search; right?

HYLTON - CROSS                    644

1   A    That's correct.

2   Q    All right.  So let's look at Government's Exhibit

3   2, which I will pull up on the screen.  No, I don't

4   have it.  Government's Exhibit 2 on page 9.

5           MS. KOENIG:  Ms. Hancock, if we could ask, if

6   we could get the government's screen, that would be

7   great.  All right.  Thank you very much.

8   BY MS. KOENIG:

9   Q    So we are looking on page 9 of Government's

10  Exhibit 2 at the "search inventory and return" on this

11  case; right?

12  A    Yes, ma'am.

13  Q    So, in the execution part on the right-hand side,

14  you indicate that the search warrant was executed on

15  July 14, 2019, at 10:30 in the morning.

16  A    That's correct.

17  Q    And that's not true; right?

18  A    That's correct, not when it was forwarded to

19  Google, that's correct.

20  Q    And we just discussed that when you forward it to

21  Google, that is the execution of the warrant; right?

22  A    Yes, ma'am, that's when Google receives the

23  warrant.

24  Q    All right.  You filed this return on June 19 of

25  2019; right?

1  A    Yes, ma'am, that's when it was submitted

2  physically to Google through the LERS website.

3  Q    Well, we'll come back to that in a second.

4       So, in the bottom half of the search inventory and

5  return, there's a portion that has your signature.

6  I'm assuming that's right above executing officer?

7  A    Yes.

8  Q    It's about the same as my signature.  I'll tell

9  you, I'm not going to give you grief about that.

10      And then the date is June 19th of 2019; right?

11 A    That's correct.

12 Q    And the statement above that says, "The statement

13 above is true and accurate to the best of my knowledge

14 and belief"; right?

15 A    Yes, ma'am.

16 Q    And you indicate that what you had received and

17 seized pursuant to this warrant is data; right?

18 A    That's correct.

19 Q    All right.  So this is June 19th of 2019.  When we

20 go to Government's Exhibit 4 at page 1, you do not

21 submit the Google -- the geofence warrant in this case

22 to Google until June 20th, the day after you file a

23 return; right?

24 A    Yes, ma'am, that's correct.  This is their

25 response to having received it in the LERS program.

1  Q    And you also don't receive any data, even the

2  Stage 1 data, until June 28th of 2019; right?

3  A    That's correct.  Sounds correct.

4  Q    And then you don't receive the final Stage 3 data,

5  which is ultimately what you're seeking, until July 3?

6  I'm sorry.  July 11 of 2019?

7  A    That's the Stage 3 data?

8  Q    Yes.

9  A    Yes, ma'am, that's correct.

10             MS. KOENIG:  No further questions.

11             MR. SIMON:  Judge, I just want to put on the

12  record something about the sealed search warrant.

13             THE COURT:  Okay.  So there's no further

14  questions?

15             MR. SIMON:  A question.

16             THE COURT:  All right.  It's going to be a

17  couple minutes, because we're about two minutes away

18  from one hour.

19             MR. SIMON:  Judge, I think it might literally

20  take three minutes.

21             THE COURT:  All right.

22        REDIRECT EXAMINATION

23  BY MR. SIMON:

24  Q    Detective Hylton, the search warrant that's under

25  seal, did you seek to get that record from the

HYLTON - REDIRECT                647

1    Assistant Commonwealth's Attorney?

2    A    I believe I did.

3    Q    And what, if anything, did he tell you about

4    whether he wanted keep that search warrant sealed?

5    A    She.  And she told me no, it was sealed.

6    Q    And that she wanted to keep it sealed; correct?

7    A    That's correct.

8              MR. SIMON:  No further questions, Judge.

9              THE COURT:  All right.  Can this witness be

10   excused?

11             MS. KOENIG:  From the defense' perspective,

12   yes, Your Honor.

13             MR. SIMON:  From the United States, yes.

14             THE COURT:  All right.  You may be excused,

15   sir.

16             (The witness was excused from the witness

17    stand.)

18             THE COURT:  So there's no further evidence;

19   am I right?

20             MR. SIMON:  No further evidence, Judge.

21             THE COURT:  So this is what we're going to

22   do.  We're going to take a recess.  I'm going to have

23   you guys talk about what the next process is.  I

24   presume you're going to order a transcript.  So I want

25   you to sort of talk about that, and then hopefully not

1    very long we'll put something on the record.

2            If y'all need time to talk about, you know,

3    the five-page submission about the sealed warrant, fit

4    that in.  If you think you can't get it done tonight

5    because folks are too blurry eyed, we can do

6    something, I guess, by ZOOM on Monday as far as

7    scheduling.  But I want to try to close this up,

8    realistically, as far as what the next steps will be.

9    All right?

10           MR. SIMON:  Understood, Judge.

11           THE COURT:  Okay.  So we're going to take a

12   brief recess.

13           Thank you, Officer Hylton.  I did that late.

14   Thank you for your testimony.

15           OFFICER HYLTON:  Yes, ma'am.

16           (Recess taken 7:15 p.m. until 7:27 p.m.)

17           THE COURT:  All right.  What are our

18   logistics?

19           MS. KOENIG:  Your Honor, we've spoken with

20   Ms. Daffron, who's let us know when the transcript can

21   be ready, and based on that, we would request that by

22   April 30th the defense submit a supplemental motion to

23   suppress that addresses the legal issues on the basis

24   of the facts and evidence presented.

25           The government would file their response on

1   May 21st.  And then the defense would file a reply on

2   June 4.

3           In terms of the state search warrant that

4   Detective Hylton discussed that's under seal, the

5   understanding is that the government -- or my

6   understanding is that the government is going to

7   review -- because my question is whether or not

8   Attachments 1 and 2 in that warrant are different than

9   what is in Government's Exhibit 2.  And so they are

10  going to review that and get back to us, and if we

11  have any further issues past that, I'll let you know.

12          THE COURT:  Okay.

13          MS. KOENIG:  I think that addresses the

14  issues.  And I've spoken with Ms. Hancock.  Instead of

15  keeping everyone here tonight to sort out exhibits,

16  we'll sort them out next week.

17          THE COURT:  No, I think that makes great

18  sense.

19          So we'll issue that order with respect to

20  briefing.  If you all want to schedule just an

21  argument after that, we can also consider that date,

22  so that's on the record at the same time.  And I don't

23  know if you all will want that argument.  I presume

24  you might actually.  Right?

25          MS. KOENIG:  I'm sorry.

650

```
 1              THE COURT:  Will you want argument?

 2              MS. KOENIG:  Yes.

 3              THE COURT:  Let me see if I have a calendar.

 4   I know I have a calendar because I asked my clerk for

 5   one, but that was a whole day ago.

 6              How about we call you about potential

 7   argument dates, and that will be in the order at the

 8   same time.  All right?

 9              MS. KOENIG:  Yes, Your Honor.  Thank you.

10              THE COURT:  That way I can check my record.

11              And let me ask, this is just on these

12   motions.  You're going to rest on the motions that we

13   have as to the houses and the other materials?

14              MS. KOENIG:  We'll wait until the Court

15   resolves this motion, I think, before we need to

16   resolve those.

17              THE COURT:  Okay.  So they will just remain

18   in place pending, and we will -- obviously, this

19   precedes all of that.

20              MS. KOENIG:  That's right.

21              THE COURT:  All right.  So I appreciate your

22   efforts.  I do think it will be worth going through

23   the exhibits.  I have taken notes, and we have, and

24   it's important that we get the record exactly the way

25   we want it to be, including not just substituting your
```

651

1   43A, Ms. Koenig, but also substituting the documents

2   that we excised pages out of.

3          MS. KOENIG:  That's right.

4          THE COURT:  So that we have just one full

5   record, and that everybody is agreeing upon what we

6   have.  All right?

7          MR. SIMON:  Understood, Judge.

8          THE COURT:  So, Mr. Chatrie, I apologize that

9   we go through these proceedings and talk about you in

10   the third person the whole time, but I want you to

11   know that obviously we're doing that because that's

12   how it's supposed to work.  Your attorneys are

13   speaking on your behalf, and I can see that you have

14   been engaged exactly as you should be during this

15   process.  And I want to be sure that you stay in close

16   contact with your attorneys so that you can ask them

17   any questions about what's going forward.

18          They have been very good about letting me

19   know anything that they think needs to be addressed,

20   either they think themselves and/or you want them to

21   say that.  So I definitely want you to continue to be

22   engaged in that process.

23          And I appreciate everybody's hard work.  I

24   appreciate everybody who had to stay late.  I think

25   it's better to finish tonight, but I am aware, for

652

1    instance, Mr. Chatrie, you still have a drive, which

2    means other folks are driving with you.  So I just

3    please ask, be safe, and thank you for your good work.

4    All right?

5              THE DEFENDANT:  Thank you, Your Honor.

6              (The proceedings were adjourned at 7:30 p.m.)

7

8        I, Diane J. Daffron, certify that the foregoing is

9     a correct transcript from the record of proceedings

10     in the above-entitled matter.

11

12                      /s/
      _____    _____

13     DIANE J. DAFFRON, RPR, CCR       DATE

14

15

16

17

18

19

20

21

22

23

24

25