1

```
 1            IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF VIRGINIA
 2                     RICHMOND DIVISION

 3

   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
 4                                  )
     UNITED STATES OF AMERICA       )
 5                                  )  Criminal No.
     v.                             )  3:19CR130
 6                                  )
     OKELLO T. CHATRIE              )  June 24, 2021
 7   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _)

 8

 9            COMPLETE TRANSCRIPT OF ARGUMENT
                 ON MOTION TO SUPPRESS
             BEFORE THE HONORABLE M. HANNAH LAUCK
10              UNITED STATES DISTRICT JUDGE

11

12   APPEARANCES:

13   Kenneth R. Simon, Jr., Assistant U.S. Attorney
     Peter S. Duffey, Assistant U.S. Attorney
14   U.S. Attorney's Office
     SunTrust Building
15   919 East Main Street, Suite 1900
     Richmond, Virginia   23219
16
     Nathan P. Judish, Assistant U.S. Attorney
17   U.S. Department of Justice
     950 Pennsylvania Ave., NW
18   Washington, Virginia   20530

19          Counsel for the United States

20   Laura J. Koenig, Assistant Federal Public Defender
     Paul G. Gill, Assistant Federal Public Defender
21   Office of the Federal Public Defender
     701 E. Broad Street, Suite 3600
22   Richmond, Virginia   23219

23          Counsel for the Defendant

24              DIANE J. DAFFRON, RPR
                OFFICIAL COURT REPORTER
25            UNITED STATES DISTRICT COURT
```

```
 1              (The proceedings in this matter commenced at

 2   10:10 a.m.)

 3              THE CLERK:  Case No. 3:19CR130, United States

 4   of America versus Okello Chatrie.

 5              Mr. Kenneth R. Simon, Jr., Mr. Peter S.

 6   Duffey, and Mr. Nathan P. Judish represent the United

 7   States.

 8              Mr. Paul G. Gill, Ms. Laura G. Koenig, and

 9   Mr. Michael W. Price represent the defendant.

10              Are counsel ready to proceed?

11              MR. SIMON:  The United States is ready, Your

12   Honor.

13              MR. GILL:  The defendant is ready, Judge.

14              THE COURT:  Well, thank you all.  Obviously,

15   we're here for argument.  I want to be sure that you

16   all know that you should proceed as you are

17   comfortable with respect to COVID protocols.  We have

18   lifted largely most of what we're doing.

19              If you approach the lectern, please, I still

20   think you should use our disinfectant in between

21   speakers just out of safety.

22              All right.  I'm ready to hear argument.

23   Obviously, you have presented me with a good deal of

24   information.  So I'll hear what you have to say.

25              MR. PRICE:  Good morning, Your Honor.
```

1          THE COURT:  Good morning.

2          MR. PRICE:  At issue in this case is a

3   geofence warrant authorizing the search of numerous

4   tens of millions of people without probable cause for

5   a single one of them.  It was a dragnet of epic

6   proportions.  A general warrant.  The very thing the

7   Fourth Amendment was designed to prevent.

8          It's obvious, or at least it should have

9   been, that valid warrants don't look like this.

10   There's a lot that's new about this case, but it's not

11   new that a warrant must be supported by probable

12   cause.  It is not new that a warrant must be

13   particularized.

14          So it's striking that this warrant leaves

15   basic questions about what can be searched and seized

16   up to Google and the government to work out, to play

17   judge.

18          Good faith should therefore not apply.  Valid

19   warrants do not look like this.  It was so profoundly

20   overbroad, so lacking --

21          THE COURT:  Sorry.  I think you may have to

22   be a little closer to the microphone.  I'm sorry.  Or

23   pull it up.  Yes, that's better.

24          MR. PRICE:  I'm saying good faith should not

25   apply.  That this warrant was so overbroad, so

1 profoundly lacking in particularity that no reasonable

2 officer could have relied on it.

3 　　　　As a result, Mr. Chatrie seeks this court to

4 hold the warrant unconstitutional, to suppress the

5 evidence obtained from it and all the fruits thereof.

6 　　　　I'd like to talk this morning first about

7 overbreadth, then particularity, and good faith.

8 First, I think it's very important to understand what

9 happened here at the beginning when the initial search

10 took place.  When the government got a warrant

11 compelling Google to search the account records of

12 tens of millions of people.  This was not something

13 that Google normally does.  It's not something that

14 Google would have done absent the warrant.  They were

15 acting in this case as a government agent compelled by

16 the warrant.

17 　　　　The search that Google did, the initial

18 search of numerous tens of millions of people, is

19 state action, no less than the seizure of the 19

20 accounts that followed or any of the steps, the

21 warrant after that.

22 　　　　Google ads do not work this way.  Google does

23 not advertise and provide location information about

24 its customers to advertisers.  Google's advertising

25 system doesn't sort through accounts in this manner.

5

1          The Sensorvault is, of course, not indexed

2     according to location.  It is indexed according to

3     user account.  And that is intentional.  It's not that

4     Google flipped a coin and decided to do it this way.

5     It is irrelevant that they could have done it some

6     other way.  Here it is organized by user account

7     because it is user data.  It is not Google's business

8     records.

9          It is not enough to simply cite statistics

10    about Google's popularity or how many people have cell

11    phones to establish probable cause for the kind of

12    search that took place in this case.

13         There was not probable cause to search ten

14    million user accounts.  There wasn't probable cause to

15    search 19 or 9 or even 1.  There certainly wasn't

16    probable cause to seize the account records of 19

17    people who happened to be nearby.

18         The Supreme Court has already weighed in on

19    this, at least in the physical world.  The idea that

20    you can search people just because they are nearby to

21    a crime was foreclosed by the Supreme Court in *Ybarro*,

22    *Ybarro v. Illinois*.  It said, "Mere propinquity is not

23    enough.  You must have probable cause with respect to

24    each person searched and seized."

25         Here the government did not have probable

1  cause to seize all 19 accounts after the initial

2  search.

3          THE COURT:  Well, before you get there, I

4  want you to explain to me how the fact that the tens

5  of millions that were being searched were anonymized,

6  they are not identified users, how that does or does

7  not affect whether it's a search.

8          MR. PRICE:  So, if you're talking about the

9  numbers that were attached to each individual's

10 account, those are unique identifiers that Google

11 provided.  So they're not anonymized for this time

12 only.  They are static identifiers associated with

13 people's location history Sensorvault accounts.

14         So aside from the fact that it is possible to

15 identify people based off of even a small segment of

16 data, it would be trivial for the government in this

17 case to obtain a subpoena, to go back to Google and to

18 say, Okay, now please tell us the subscriber

19 information for that anonymized number.  They would

20 not need to go back to a court to seek a warrant for

21 that information once the Stage 1 data is turned over.

22         Those anonymized numbers associated with

23 individual accounts, frankly, are not truly anonymous.

24 It is very easy for the government to go back and get

25 that information without a warrant just using a

7

1    subpoena for subscriber records.

2            THE COURT:  Okay.

3            MR. PRICE:  We would argue, Your Honor, that

4    there was not -- we do argue that there was not

5    probable cause to search or seize even one person's

6    location history data in this case.  There is no nexus

7    between the robber and location history.  There is

8    some indication that the suspect had a cell phone, but

9    there is no indication, certainly not in the warrant,

10   that location history was enabled, something that only

11   about a third of Google users have.

12           There was a -- if you take Google's view of

13   it, there was a complex seven-step process that was

14   required to enable it.  We would say it was probably

15   not that voluntary and knowing, but nonetheless, only

16   a third of Google users have this enabled.  So it is

17   not enough to just say that the suspect had a cell

18   phone.  It's not clear if that suspect, that cell

19   phone, was connected to Google.  And it's not clear

20   that that cell phone, if it was connected to Google,

21   had location history enabled.

22           And, furthermore, given the uncertainty in

23   Google's method of estimating location, there was at

24   least another 32 percent chance that records would not

25   be available, that somebody would be located outside

1   of that geofence.

2            So I think the percentage is certainly below

3   30 percent, even if you just take it by statistics.

4   But we're saying that statistics are not enough here.

5   There needs to be something that directly connects the

6   warrant to the individual and the data being searched,

7   that generalities or statistics about Google's

8   popularity are not enough, that warrants must be --

9   probable cause must be individualized.  And here it

10  was not.

11           THE COURT:  To be fair, at least some courts

12  have relied on statistics at least to approve warrants

13  in the past; is that right?

14           MR. PRICE:  If you're speaking about the

15  Illinois cases in particular, yes.  One of the judges

16  in that case looked at the statistics as an important

17  factor in making that determination.  But we argue,

18  Your Honor, that statistics alone can never be enough,

19  that there must be some individualized connection in

20  each case.  Otherwise, it would be simple for the

21  government to recite those same statistics in every

22  single case to say the facts of the crime, to say that

23  there were cell phones involved, which is not much to

24  accomplish these days, and that Google collects a lot

25  of data, which is true.  There would be no instance in

1 which the government couldn't obtain a geofence

2 warrant.

3         That is why the Fourth Amendment requires

4 that warrants be individualized, that proximate cause

5 be individualized.

6         The government mentions the possibility of

7 locating witnesses with the geofence warrant, but it

8 is pure speculation that there were witnesses that the

9 government had not yet identified.  It seems that the

10 most relevant witnesses the government would have

11 already identified as being in the bank and/or through

12 the surveillance cameras that they used initially, and

13 that any additional witnesses found inside of

14 buildings nearby or apartment complexes would,

15 frankly, not have much to contribute.  As one judge

16 noted, they would have to be able to see through their

17 walls, for starters.

18         The other thing I would say to that

19 specifically is that the warrant is clearly focused on

20 identifying a suspect, not on identifying witnesses.

21 Witnesses are mentioned only once in passing in the

22 context of some general information about how Google

23 works.  The clear focus of this warrant, the entire

24 purpose of that three-step process, is designed to

25 find the suspect, not to identify witnesses.

1          The same can be said of co-conspirators,

2     which are never mentioned once in the warrant

3     application.  And, in fact, investigators knew that

4     the suspect was seen alone coming to and from the bank

5     based on the surveillance video.

6          So, once again, there are no facts to support

7     this idea that the warrant was somehow being used for

8     witnesses or co-conspirators in addition.

9          THE COURT:  Well, they're saying there's not

10     direct evidence, but they're saying because somebody

11     was using a phone, it's likely while they were in the

12     bank, at least there might be probable cause that

13     they're calling a lookout.

14          MR. PRICE:  I'm sorry?

15          THE COURT:  That they are calling a lookout.

16          MR. PRICE:  So, in this case, it appears that

17     the government did an initial investigation and was

18     aware that there wasn't another individual in the

19     vicinity at the time.  If that was the focus, it's not

20     impossible that it --

21          THE COURT:  So what makes you say they did

22     the initial investigation and they knew there was not

23     somebody there?

24          MR. PRICE:  I believe Detective Hylton

25     testified about the review of surveillance video they

1    did ahead of time, I believe it's in the CAST report

2    as well, showing one individual leaving their car,

3    going to the bank and back.

4           So if there was a concern that somebody else

5    dropped somebody off or picked somebody up, that was

6    already known at the time and most likely the reason

7    the warrant is not seeking information at all about

8    co-conspirators.  They are not mentioned once.

9           So I think to argue that that was the point

10   of this warrant and that there was cause for that just

11   isn't supported on the record.

12          The whole point here, Your Honor, is that the

13   government had no suspects.  They were conducting a

14   reverse warrant.  They were starting with a bunch of

15   data and trying to find a suspect based off of that.

16   That is the reverse of how these warrants usually work

17   when the government goes to Google and asks for

18   information about a particular account or accounts or

19   at least identifiable accounts.  Here the whole

20   process was turned on its head.

21          I'd like to shift gears to particularity, if

22   Your Honor doesn't have any questions about

23   overbreadth.

24          THE COURT:  Well, I guess I want to confirm,

25   a lot of your arguments point out that the breadth of

1   the search is quite overpowering and that there were

2   other alternatives that the government could have

3   done.  Is there a legal requirement that the

4   government use the less intrusive means to do an

5   investigation?

6         MR. PRICE:  No.  There's no requirement that

7   the government use the least intrusive means.  I think

8   it is different, however, to use a geofence warrant in

9   the sense that it was more intrusive, but it is a way

10  of trying to take a shortcut.  There are, and were in

11  this case, other avenues of investigation that the

12  government could have pursued, traditional lines of

13  investigation that they did not, and instead went to

14  Google and said, "Google, tell us who robbed the

15  bank."  This was an easy way out in some sense.

16        THE COURT:  So, Mr. Price, what I want to

17  understand is why you're saying the shortcut is

18  illegal.  So there's no requirement for the least

19  intrusive means.  So, you know, one would hope that

20  the government wouldn't waste resources in an

21  investigation.

22        MR. PRICE:  I see.

23        THE COURT:  So what makes this illegal?  It

24  turns it on its head, but sometimes you turn something

25  on its head and that's a good thing.

1        MR. PRICE:  So there's nothing illegal about

2   taking a shortcut per se, but this particular shortcut

3   was so far afield from anything that any other court

4   has signed off on.  Certainly not the Supreme Court,

5   not any circuit court, and there are now two different

6   district courts, federal district courts, that have

7   agreed that these warrants are unconstitutional.  And

8   so I think we're focusing not on the fact of a

9   shortcut, but that this particular shortcut is

10  completely unsupported by probable cause, and also

11  fails the particularity requirement of the Fourth

12  Amendment very badly at every step of the search.

13      Step 1, for example, goes back to this point

14  about basic questions being left unanswered and left

15  up to Google and the government to sort out.  For

16  example, which database to search:  Location History,

17  the Sensorvault versus Web & App Activity or Google

18  Location Services.  This was something that clearly

19  the government had discussed with Google ahead of

20  time, and they were both aware of which databases were

21  going to be searched, but it wasn't in the warrant.

22      One reason it might not have been in the

23  warrant is because that would require specifying that

24  not all devices have location history enabled.  So

25  just saying we're going to search Google and Google

1   has location information about people makes it seem

2   like everybody has this location information when, in

3   fact, a third of Google users have this enabled.

4        So leaving out that fact wasn't a small

5   thing.  It very much dictated the overall scope of the

6   search, which, of course, then led to tens of millions

7   of people.

8        The warrant did not specify how to count if a

9   device is inside that geofence.  So we know, for

10  example, from one of the Illinois cases, as well as

11  the Kansas case that just came out, that the

12  government is fully aware of this phenomenon of

13  display radius extending beyond the geofence.

14       In fact, in two other cases at least, the

15  government asked for -- explicitly told the judge that

16  the display radius will extend beyond the geofence and

17  that the government wants the data from everybody

18  whose display radius even touched the geofence.

19       Another way to do it -- I should say that

20  that method is likely to produce the largest number of

21  false positives.  If you are looking for anybody whose

22  display radius intersects with that geofence in any

23  way, there's going to be a high percentage that some

24  of those people are going to never have been in that

25  geofence at all.  In fact, we know that happened in

1  this case in at least one instance where somebody was

2  driving by and pulled in.

3       That's not the only way to do it.  If you

4  wanted to minimize the number of false positives, you

5  could say, Return only the devices whose entire

6  display radius is inside the geofence.  And that would

7  eliminate the possibility of false positives or at

8  least drastically reduce it.

9       So there are multiple ways of going about

10  this.  And the government is aware of them.  This

11  warrant did not specify.  And it left it up to Google

12  and the government to sort out.  The government says

13  that Google correctly interpreted what they were

14  intending, but none of that would be apparent to a

15  magistrate looking at the face of this warrant.

16       It was likewise unclear what that geofence

17  covers.  There was no indication -- well, the

18  government says that it was unusually specific because

19  they identified a latitude and longitude and drew a

20  precise circle around that, but that area is a

21  congested urban area encompassing not just the bank,

22  but a church and roads, at least, plus the businesses

23  and apartments nearby that got swept in as a part of

24  that effective range.

25       So we know that the effective range of the

1   geofence in this case was not 150 meters, that it was

2   387 meters, more than twice the distance of the

3   original geofence, reaching not just that bank and the

4   church, but Hull Street and Price Club Drive, Ruby

5   Tuesdays, the Hampton Inn, A.M. Davis, Mini-Price

6   Storage, the Genito Glen Apartments, and the Rockwood

7   Village Senior Apartments.  These are all places that

8   were effectively covered by the search that the

9   government requested here, none of which was ever

10  signed off on by a judge or a magistrate.

11          The information presented to the magistrate

12  showed a nice circle around the bank and the church

13  and didn't mention the possibility that it would

14  search people outside of that circle, and that the

15  things outside of that circle that might be searched

16  included apartment complexes, private businesses, a

17  hotel.  These are constitutionally-protected spaces.

18  So that is significant.

19          And it is difficult to say that a warrant is

20  narrowly tailored when most of the devices identified

21  will have nothing whatsoever to do with the crime.

22          So even at Step 1, Your Honor, there were

23  significant basic questions left unanswered, left to

24  Google and the government to work out amongst

25  themselves.

```
 1          In some instances, maybe that arrangement had
 2   already been worked out, but it wasn't spelled out in
 3   the warrant.  That's for sure.
 4          Step 2 and Step 3 were far more explicit
 5   about the degree of discretion given to the
 6   government.  Step 2 explicitly says that the
 7   government is going to narrow down the list and decide
 8   which people will have additional contextual location
 9   data revealed to the police.  And that's the two hours
10   total and wherever those individuals happen to go
11   regardless of the geofence itself.
12          So it is at that stage completely up to the
13   government to decide who to search, who to get more
14   information from.  Google pushed back.  There was
15   certainly a back and forth between Google here that
16   illustrates this point very well, this negotiation
17   between the government and Google over what is a
18   reasonable amount of data to turn over in Stage 2.
19          But that is fundamentally a question that a
20   judge should be answering, that should not be left,
21   and cannot be left under the Fourth Amendment, up to
22   the government to decide on its own.
23          Step 3 --
24          THE COURT:  Well, before you get there, I
25   have a question.  So, with respect to Step 1 and the
```

1    identification of the 19, is there any dispute about

2    how those 19 numbers were identified or how Google

3    turned that information over to the government?

4              MR. PRICE:  How it actually happened in this

5    case?

6              THE COURT:  Well, you're saying it got down

7    to 19.  So my question is, what is your position about

8    how it got down to 19?

9              MR. PRICE:  I see.  So our position is that

10   the search, the initial search, was of the numerous

11   tens of millions of people.  The 19 was the data

12   seized from that search.

13             Now, there was a -- and I think is a question

14   here that relates to particularity about how Google

15   identified those 19 people.  Google chose to say that

16   anybody whose center points of their location -- so

17   Google estimates location in a circle, and the

18   latitude and longitude points are simply the center of

19   that circle, wherever it happens to be.

20             The warrant in this case, the way Google

21   interpreted it, was that anybody whose center point

22   was inside the geofence was produced to the government

23   as a part of that 19.  I'm saying that there were

24   other ways of going about doing that, which the

25   government is fully aware of, and it just wasn't

1    spelled out one way or the other.

2            So one privacy protective way of doing this

3    would be to say only return people whose display

4    radius was entirely within the geofence.  In other

5    words, those would be much more precise readings

6    perhaps because of GPS as opposed to Wi-Fi or

7    cell-site location information.  It would drastically

8    reduce the number of false positives.  And, as I

9    mentioned once before, we know of one, and it's likely

10   there are at least five in this case of those 19.  So

11   it wasn't -- this decision had consequences.  And how

12   you count who's in the circle matters.

13           And if it matters to determining how many

14   sets of records you get to seize, then that's got to

15   be something that is clear in the warrant to begin

16   with.  That can't be left up to officer discretion or

17   Google's discretion down the road.  And we make no

18   distinction between Google and the government in this

19   case.  They are acting together, according to that

20   warrant.

21           THE COURT:  Is that what other courts have

22   done?

23           MR. PRICE:  So, the Illinois cases were

24   decided.  The opinions were issued there without the

25   benefit of the record that we are here.  And the

1    Kansas case, which was just decided, appears to be

2    based on the records in the Illinois cases in terms of

3    the factual records.

4           So one thing that those courts did not

5    consider, perhaps because it wasn't known to them at

6    the time, was the scope of this initial search that

7    took place and how it differs, for example, from tower

8    dumps or other types of searches.

9           I think had that information been known to

10   those magistrate judges, that they would have perhaps

11   at least paid some attention to that fact.  It was

12   just not before them.  So I believe they were under

13   the impression that Google was able to search records

14   just in that location.

15          THE COURT:  Well, I guess I was getting to

16   your comment about agency.  That Google and the

17   government are -- you said Google is an agent of the

18   government.  Have other courts made that finding?

19          MR. PRICE:  So, we do not argue that this is

20   a private search.  Google was -- which is that test

21   for a government agent.  Google was acting according

22   to a warrant.  It was compelled by legal process to

23   assist the government; therefore, the government was

24   not only aware of what Google was doing, but the

25   government was directing what Google was doing.

1           And if Your Honor is looking for a cite on

2      that, I would cite *Skinner v. Association of Railway*

3      *Labor Executives* for the point that if you -- as the

4      government requires, say, an employer, to conduct a

5      drug test of their employees, that even though that's

6      an employer, not the government, they're doing that

7      testing at the behest of the government according to a

8      statutory requirement, here a warrant, and therefore

9      it is government action.

10          So I would say that what Google was doing

11     here was government action.  It was directed by the

12     government.

13          Steps 2 and 3.  Step 3, like Step 2, gave

14     sole discretion to the government to decide which

15     users would have their identifying information

16     revealed.  It is the same problem as in Step 2 in that

17     the warrant explicitly gives this power to the

18     government, which, of course, would have been obvious

19     to the government as well as the magistrate who signed

20     it.

21          There isn't a good response to that.  And so

22     the government's answer to it is that the whole

23     three-step process doesn't matter at all, that this is

24     just show, and they are, in fact, entitled to Stage 1,

25     2, and 3 data on everybody identified in that initial

1    geofence.

2         The problem with that is that it guts any

3    argument that the three-step process has

4    constitutional significance.  And while it might take

5    care of some of the particularity problems, it doubles

6    the problems with probable cause.  To say that no, the

7    government actually had probable cause to search the

8    information of all 19 people for two hours wherever

9    they went, and to know exactly who they were, that is

10   unsupportable from the facts.  There is no allegation

11   in the warrant or affidavit that other people that

12   might be identified here were involved in the crime

13   and would have evidence of criminal activity in their

14   accounts.  So it really does lay bare the probable

15   cause problem if that's the answer to particularity.

16        It also would raise questions about whether a

17   magistrate looking at this warrant would reasonably

18   interpret that to be what it means.  And so that is a

19   relatively new argument the government has advanced,

20   but I think if that is the route they choose to go, we

21   would have questions about whether that's an accurate

22   representation of what the warrant says.

23        Your Honor, the government also suggests that

24   the warrant be severed and that perhaps Step 2 and

25   Step 3 can be separated from Step 1.  The problem with

1  severing in this case is that no part of this warrant

2  was supported by probable cause.  There is nothing to

3  sever.

4          The de-anonymization doesn't matter for the

5  reasons that I explained a little bit earlier, that it

6  is possible to -- in fact, very trivial to identify

7  people based off of those Sensorvault ID numbers with

8  a mere subpoena.  And that the whole process itself

9  was nothing more than a fig leaf designed to obscure

10 the magnitude of the search and seizure in this case.

11         If I can touch briefly on the question about

12 whether this was a search.  I know that that's

13 something that the government has brought up as well.

14 We certainly believe that *Carpenter* is the best

15 analogy to this situation and that the Court should

16 not try and rely on relics like *Smith* and *Miller*,

17 outdated Supreme Court cases that are very far afield

18 from the facts here.

19         *Carpenter* was concerned with information that

20 reveals the privacies of life.  Location history

21 reveals the privacies of life just like CSLI and GPS.

22 The government even got a warrant in this case,

23 perhaps recognizing that fact.  But if we want to go

24 down that route and talk about *Carpenter*, and there

25 are two points that the government has made for why it

1    doesn't fit, one that it is voluntarily conveyed to

2    Google, and we are arguing that it is not truly

3    voluntary, that it is not truly shared in this same

4    sense that CSLI is not truly voluntary and shared with

5    the company.

6         Here the process -- the difference being it

7    is technically possible to turn on and off location

8    history; however, that process of turning it on and

9    off was highly deceptive and at the very least not

10   meaningful or informed.  But even if the Court doesn't

11   want to go down that route, mapping and navigation

12   apps are an essential feature of modern smartphones.

13        This was something that the Supreme Court

14   recognized in *Riley* and in *Carpenter*, but when

15   explaining the importance of cell phones to people in

16   daily life, the Court recognized explicitly that

17   mapping and navigation services are a part of that.

18   And it's difficult to imagine a modern smartphone that

19   would not provide those types of services.

20        Here, I think, because of the way that Google

21   set up their opt-in process for location history,

22   because of the way that they warned users against

23   turning it off, saying their functionality of their

24   phone would be degraded, that things would no longer

25   work if they turned it off, there is a suggestion here

1    that this was essential to those basic features of the

2    phone.  And it would not have been apparent to users

3    that they could turn it off and still use maps or

4    still use Google Assistant because Google didn't tell

5    them that.  In fact, it told them the opposite.  If

6    you turn this off, bad things are going to happen to

7    your phone.

8            So a reasonable user, looking at this, may

9    not understand what they're turning on.  And Google

10   may warn them, and does warn them, against turning it

11   off, saying that a basic function of their phone is

12   going to be degraded if they do that.  So, in that

13   sense, we would argue that, as in *Carpenter*, this

14   information was not voluntarily provided.

15           THE COURT:  So, Mr. Price, I don't want to

16   ask this question in a confusing manner, but I

17   probably will.  So, I think, for instance, this

18   argument, you are suggesting that Google is

19   essentially burying information about how to turn off

20   location history and suggesting that turning off

21   location history is problematic to the working of the

22   phone, and at the same time you're saying only a third

23   of folks have it turned on.  So aren't those

24   propositions contradictory?

25           MR. PRICE:  Well, I think the ease of turning

1    it on might explain some of the volume there.  But

2    it's not necessary at the end of the day to find that.

3    I think even if some -- there are going to be people

4    in this world who actively want location history on

5    their phone.  Perhaps Mr. McGriff wants it on his

6    phone.

7            I do not believe that doing so means that he

8    has no expectation of privacy in that data, that only

9    people that get duped into turning it on have an

10   expectation of privacy.  I think, as Google explains,

11   this is user content.  This is user property in the

12   same way that email and photos stored with Google are

13   user property and user content.  And, therefore,

14   searching any bit of that, even a little bit, is a

15   search.

16           Google likens it to keeping a travel diary.

17   So if you are interested in this feature, and you turn

18   it on, Google says, Well, we're storing it in your

19   account.  Just like you might create a map with

20   pushpins of where you've been, here's a digital

21   equivalent that you can go back, and you can look at,

22   and it's in your account, and it's accessible in the

23   same way as your email, as your photos.  And they

24   treat it the same way.  They treat it as user content.

25   According to Google, it's not a business record.

1           What business record -- companies do not

2     generally let customers delete their business records,

3     yet that is something that Google permits with

4     location history here.  You can edit your location

5     history.

6           THE COURT:  Right.  So I understand those

7     points.  So my question was the dissonance between

8     saying both that it is not voluntary to give it over

9     because it's so hard to turn off placed next to the

10    fact that two-thirds of folks don't have it on, which,

11    presumably, means they've turned it off.

12          MR. PRICE:  Certainly some people are not

13    enabling location history.  Some people may not have

14    occasion to or need to enable Google Assistant or may

15    be wise at this juncture to what location history is.

16          I think either way you look at it, under sort

17    of expectations of privacy test under *Carpenter* or as

18    user data, user content that is their property, it's a

19    search.  So what I'm saying is there are two ways of

20    getting there.  And it's not necessary to find that

21    somebody got duped in order to reach the conclusion

22    that the Fourth Amendment protects this information.

23          THE COURT:  Okay.

24          MR. PRICE:  The idea that -- the other

25    argument the government advances is that *Carpenter*

1    shouldn't apply because the length of time here was

2    shorter than the seven days that the Court was talking

3    about in *Carpenter*.  I want to address that briefly,

4    first by noting that the reason the Supreme Court

5    chose seven days was not because it's a magic number.

6    It was the shortest amount of time of all of the court

7    orders for location history.  So the shortest one was

8    for seven days.  That's the one the Court considered.

9    And it is worth noting that in response to that court

10   order, the government only actually received two days'

11   worth of location information.

12        But the Court was clearly recognizing that

13   CSLI requires some stitching together in order to

14   paint this mosaic, to paint a picture of somebody's

15   daily life, because any one location point from

16   Southside location information is going to give only a

17   fairly rough estimate of where somebody is.

18        The Supreme Court talks about putting

19   somebody inside of a pie wedge that's, you know, a

20   couple miles wide.  And we would say that CSLI, at

21   least a little bit of it, is probably enough to

22   identify somebody's neighborhood or the ZIP code that

23   they're in, but it is not going to be sufficient to

24   say which house they were in.

25        And so the Court was looking for a way to

1    say, Well, how much of this do we need before it

2    becomes a problem, before you can figure out where

3    somebody was and what they were doing?  And that's how

4    we end up with seven days.

5            But the test, what they're fixated on, is

6    what that information reveals.  How much of that

7    information do we need to get to the privacies of

8    life?  And our argument here is that geofence data is

9    far more potent than CSLI.

10           Even a little bit of Google's location

11   history data is going to be sufficient to identify

12   somebody inside of their home or a church or another

13   business nearby, and you don't need as much data to

14   get the same sort of information.

15           I would also add that because of the

16   precision involved here, because it does rely on GPS,

17   and it does pinpoint people inside of their homes, as

18   we demonstrated to the Court, that there's an

19   additional consideration here that wasn't present in

20   *Carpenter*, which is monitoring people inside of

21   constitutionally-protected spaces.

22           The Supreme Court has been clear on this a

23   number of times.  The best examples are *Kyllo* and

24   *Karo*, K-Y-L-L-O and K-A-R-O.  In *Kyllo*, the Court

25   looked at the use of new technology, the thermal

1    imager.  Even though it was only trained on a house

2    for a few moments, a couple minutes at most, law

3    enforcement was able to determine what was happening

4    inside that house, whether there were people inside

5    that house.  And that was enough for the Court to say

6    it's a search.  There is something special about homes

7    under the Fourth Amendment.  They are the first among

8    equals, so to speak.

9         And using technology to pierce those walls

10   and see what's going on inside and learn information

11   you wouldn't otherwise be able to learn is a search,

12   even if you do it for a little bit of time.

13        *Karo* was the same sort of case with an

14   electronic beeper that had been hidden inside of a

15   drum of chemicals inside the back of a car.  That car

16   was driven onto private property.  And then the

17   government was able to tell when that drum of

18   chemicals was moved.

19        And that was, once again, information that

20   the government would have been unable to know

21   otherwise because it was occurring within a

22   constitutionally-protected area that they didn't have

23   a warrant to go and search.  And the Court said you

24   can't achieve by other means what you wouldn't be able

25   to otherwise do, that the use of technology doesn't

give you a free pass.  It, in fact, invites more

scrutiny.  And that's been the lesson ever sense,

especially with *Jones* and *Riley* and *Carpenter*.

So I would also say that the government had

to know it would get this information through either

the effective range of Step 1, or, clearly, in Step 2

when people are going about their business and coming

home, or going to home, and then we see that dot just

sitting right on top of their house.

That was something that should have been

obvious to anyone asking for this sort of warrant that

even if it didn't get constitutionally-protected

spaces in Stage 1, it was certainly going to get them

in Stage 2.  But, once again, even in Stage 1, the

geofence encompasses the entirety of a church in

addition to the bank.  And so I don't think it's for

nothing that the vast majority of data points

attributed to Mr. Chatrie, all but two, from location

history put him either inside the church or right next

to it in a car.

And so the idea that this can't reveal

information about people in constitutionally-protected

spaces is false.  And it should have been obvious that

that was what was going to go happen to anyone who was

seeking such a warrant.

1        THE COURT:  So are you asserting at all that

2   any of the data turned over placed Mr. Chatrie in his

3   house?

4        MR. PRICE:  No.  We're not asserting that the

5   data here placed Mr. Chatrie in his house, no.

6        THE COURT:  Okay.

7        MR. PRICE:  The government argues that this

8   is just like the search of one place.  That they name

9   Google.  They said they put down Google's corporate

10   address, that that's one place, and it's just like

11   searching one place.  They get to search everywhere in

12   that one place.

13        I think that's a sleight of hand.  It ignores

14   the mechanics of the search here.  This was not like

15   searching one house.  This was like searching

16   10 million houses, or safe deposit boxes may be even a

17   better example.  If you want to look at what this

18   might be like in the physical world, it would be like

19   going to a bank and asking the bank, saying, We're

20   looking for a weapon.  We think it's in one of your

21   safe deposit boxes.  We would like you to open up

22   every single safe deposit box in the country and look

23   for this weapon.

24        That is the equivalent of what happened here.

25   It wasn't a search of one place.  It was a search of

1  10 million places or numerous tens of millions of

2  places.  And to try and say that this was just a

3  search of one place at Google's headquarters is to

4  ignore the nature of this data, to ignore that it

5  belongs to numerous tens of millions of individuals

6  and not to Google.

7         Lastly, Your Honor, I'd like to discuss good

8  faith briefly, unless you have additional questions.

9         So we argue that *Leon* should not apply.  That

10 three, at least, of the exceptions that *Leon*

11 specifically identifies apply in this case.  And all

12 three exceptions relate back to the probable cause and

13 particularity problems that we've discussed so far,

14 that the judge in this case, the magistrate in this

15 case, acted -- abandoned his judicial role, acted as a

16 rubber stamp.  Looked at this warrant for 15 -- 30

17 minutes behind closed doors.  Didn't ask a single

18 question before signing off on it.  Didn't care to ask

19 how many people might be searched or how the

20 government would handle the selection process in

21 Stages 2 and 3.

22         This was a warrant that doesn't look like any

23 other warrants yet the judge asked no questions.  This

24 was a warrant that explicitly gave the government the

25 authority to decide who to search and did not ask any

1  questions.

2       These are basic questions about probable

3  cause and particularity.  But instead of addressing

4  them as magistrate judges in Illinois and Kansas did,

5  the judge here simply signed off and left everything

6  up to Google and the government to work out.

7       The warrant was so lacking in probable cause,

8  so overbroad, that no officer could reasonably rely on

9  it.  There wasn't probable cause to search one

10 person's Google account.  There certainly wasn't

11 probable cause to search 19, and there was not

12 probable cause to search tens of millions.  Even if

13 the government didn't understand that it was going to

14 search numerous tens of millions of people, it

15 certainly would have understood that the search they

16 had in their mind was still going to bring in a vast

17 majority of people who were not involved in the crime

18 at all, for whom they had no probable cause to search

19 and would not have been able to get a warrant to

20 search under other circumstances.

21      It was only because of this fig leaf of a

22 three-step process that made it seem like this is

23 something that's okay.  Looking at it, it is

24 plainly -- plainly they had no suspects.  They did not

25 have probable cause to search Mr. Chatrie's account or

1   anyone else's.  This was a fishing expedition.  That

2   should have been known to anybody looking at this

3   warrant.

4          Likewise, it was so obviously deficient in

5   particularity that it also fails under *Leon*.  Giving

6   this sort of discretion to law enforcement alone is

7   what the particularity requirement was designed to

8   prevent, to make sure that every petty officer didn't

9   have the authority to go rummaging through everyone

10  else's private papers, yet that is exactly what

11  happened here.

12         No, it would not be objectively reasonable to

13  believe that officers would have unbridled discretion

14  to search through the location history of millions of

15  people, especially when they didn't have any suspects.

16         So, Your Honor --

17         THE COURT:  Well, let me ask you this because

18  a not insignificant amount of your briefing suggests

19  that this task force officer really didn't know what

20  he was doing, didn't know that what he was asking for

21  asked for more specific information when he got a

22  group of 19 in the first instance, and that he should

23  have known it was his requirement to narrow it down.

24  So I'm trying to figure out how that feeds in to what

25  you're saying about the discretion should not go to

1    the government when it appears that you're saying it's

2    Google who's doing all this, or at least most of it,

3    the thought processing and the narrowing down.  Is

4    that entirely dependent on your argument that Google

5    is an agent of the government so they functionally are

6    the government even if this task force officer really

7    didn't understand how the process worked?

8              MR. PRICE:  Right.  So I think it's

9    significant that the government and Google had worked

10   out some of these details ahead of time.  Even if

11   Officer Hylton didn't know all of them personally,

12   this was a go by.

13             THE COURT:  When you say "Google," you're

14   talking about the corporate level interaction with the

15   Department of Justice?  Is that what you mean?

16             MR. PRICE:  Well, initially, it was developed

17   between CCIPS and Google's legal team, and then here

18   we had specific back and forth with respect to this

19   warrant as well.

20             So, yes, we're saying that Google was

21   functionally acting at the government's discretion

22   here, that Google was compelled to act as a result of

23   that warrant.  Google was attempting to follow that

24   warrant.  That's what they were saying in response to

25   Detective Hylton when he asked for all 19 at Stage 2

1    twice.  And Google said, Well, we're complying with

2    this warrant that we're legally obligated to follow,

3    and you're not following the process.

4           So I think it reiterates that Google is

5    acting in a manner that is compelled by law, that they

6    are trying to, at least, follow the letter of that

7    warrant, even if the government wasn't.  But that,

8    more generally, the questions that Detective Hylton

9    maybe had about this process are attributable to the

10   fact that this is not a normal process.  This is not

11   something they receive training on.  This is not

12   something that there are policies about.  This is not

13   something that is normally done.  And so one would

14   expect, then, there to be some confusion and questions

15   about how it is executed.

16          This is a reverse warrant.  This is not

17   something like Detective Hylton or others would have

18   normally seen or used when you're obtaining

19   information about an individual, an individual account

20   with a warrant that identifies that account.  That is

21   the way that this normally happens.

22          THE COURT:  Doesn't this record show that he

23   had done three geofence warrants before?  Am I wrong

24   about that?

25          MR. PRICE:  I don't believe it was three

1   before, but --

2          THE COURT:  I thought it was one federal and

3   two state.

4          MR. PRICE:  I thought it was at least one,

5   maybe two.

6          THE COURT:  So anyhow, he's done it before.

7   So it's not normal, but it's not new either, right?

8          MR. PRICE:  I suppose that is fair.  It's

9   fairly new.  Even if this is only the second or third

10  time.  This is only the first time that we've actually

11  had an opportunity to discuss this stuff in front of a

12  judge.  So all of the decisions prior to this, as Your

13  Honor knows, were done *ex parte* based solely on the

14  records available from this case at the time and

15  whatever the government submitted.  We still don't

16  actually have copies of the warrants in any of those

17  cases.  They're all still under seal.

18         THE COURT:  I just want to ask sort of random

19  questions to make sure I don't forget them.

20         The United States argues that as far as the

21  opt-in process, that this court should be bound by the

22  testimony of Mr. McGriff because he was able to

23  testify to the specific time frame under which Mr.

24  Chatrie would have been using his phone, and so that

25  your expert, who spoke about different opt-in trees,

1    consent flows, that I should disregard those.  Are you

2    in agreement with that?

3              MR. PRICE:  No, Your Honor.  I think

4    Mr. McGriff was able to identify the date and time at

5    which location history was enabled, which is only

6    information that Google has, but Mr. McGriff was not

7    able to say explicitly which consent flow or how it

8    would have appeared to somebody like Mr. Chatrie.  And

9    we put forth both of those possibilities.  At the time

10   there was the "saves a private map" language and the

11   "saves where you go with your device" language, which

12   happened -- the change happened close in time to when

13   location history was enabled.  Mr. McGriff was unable

14   to say exactly which one because he didn't know the

15   operating system and software -- sorry.  The operating

16   system version that was running on Mr. Chatrie's

17   phone.

18              So I think the implication there is that

19   there's some sort of rollout process, and that it

20   doesn't all happen literally at once like flipping a

21   switch.

22              So, I guess, taking a step back from that,

23   what I would say is that either of those two consent

24   flows take you to the same place.  That neither of

25   them describe location history in a sufficient way to

1    give users informed consent over what they were

2    agreeing to.  In both instances it was less than a

3    sentence worth of text that somebody was required to

4    look at.  And in the case of Google's Assistant, it

5    was bundled with two other choices about enabling

6    Voice & Audio Activity as well as device information,

7    both of which would have been necessary to run Google

8    Assistant, according to Google.

9          So, in either instance, whether you want to

10   go with "saves a private map" or "saves where you go

11   with this device," we do not believe that that would

12   be sufficient to give informed consent.  And we do

13   believe that the testimony that Mr. McInvaille

14   provided to the Court and the research that he

15   provided or he was able to present to the Court, which

16   the government did not contradict and Google did not

17   contradict, I think both Google and the government

18   were asked if they had any information to contradict

19   Mr. McInvaille's testimony, and they said no to both.

20         THE COURT:  All right.  So, you mention a

21   couple of times, perhaps more than that, both in

22   argument and in briefing, that through the steps that

23   this warrant proceeded from, Step 1 to 2, to Step 2 to

24   3 with no supervision, is it the case that by

25   requiring an officer, an executing officer or law

1    enforcement officer, to have each return at Step 1

2    reviewed, and then before you go on to Step 2 or at

3    Step 2, would that solve the constitutional concerns?

4         MR. PRICE:  I think it might alleviate one

5    concern with particularity.  What it does not address

6    is the Step 1 confusion, let's put it that way, about

7    what is to be searched and seized in the first

8    instance, which database is going to be searched, what

9    are you counting, what area are you actually

10   searching.  All of those at Stage 1 were still left up

11   to Google and the government to decide.

12        So Stage 2 and Stage 3 is more obvious

13   because it explicitly leaves that decision up to the

14   government.  But Stage 1 is just as deficient in

15   particularity.  Even if it doesn't explicitly leave

16   that decision up to Google and the government, it

17   effectively did.

18        THE COURT:  So I want to confirm, you say

19   that the government and Google had agreed to certain

20   parameters, for instance, searching Sensorvault.  Is

21   it the case that my record shows that the government

22   agreed to that or that Google just did that knowing

23   that the other repositories wouldn't have responsive

24   information?

25        MR. PRICE:  So I don't think we have as much

1   visibility as we would like into the origins of these

2   warrants with CCIPS and Google discussing, but I don't

3   think that ultimately matters to the outcome here.

4           THE COURT:  So that's what I was trying to

5   get to before.  When you're saying that there's a

6   discussion between Google and the government about

7   what is going to be searched, i.e., Sensorvault,

8   you're not saying that Task Force Officer Hylton had

9   that discussion with anybody at Google.  You're saying

10  Google legal office had that conversation with CCIPS.

11          MR. PRICE:  It appears that that's what

12  happened.  What I am saying at the end of the day is

13  that a judge didn't say it one way or the other, which

14  is what's required.  I don't know who suggested what

15  first, but the information was never presented in the

16  warrant or application.  It never mentions location

17  history once, and that's a fundamental decision about

18  what gets searched that should have been up to a judge

19  and not some combination of Google and the government.

20          THE COURT:  At any level, corporate level --

21          MR. PRICE:  Correct.

22          THE COURT:  -- or with this particular

23  warrant.

24          So, with respect to the --

25          MR. PRICE:  I was just going to go grab a

1   note.

2            THE COURT:  You can go ahead.  Maybe it

3   addresses some of my questions.

4            MR. PRICE:  First, I wanted to add to Your

5   Honor's question about which consent flow would have

6   been operative at the time.  Mr. McGriff on pages 295

7   to 297 of the transcript acknowledges that he was

8   uncertain of what language was baked in at that point

9   in time into the phone.  So that's the source of the

10  uncertainty as to which particular language was or

11  would have been seen.

12           And as we've mentioned, either way it

13  shouldn't effect the outcome, I think, too, too much.

14  The consent flow issue is also interesting here

15  because we talked about what happens when you attempt

16  to turn it off, and those sort of warnings that you

17  get.  However -- and this speaks to the voluntariness

18  point as well -- merely turning it off does not delete

19  the stored information that Google may have.  So even

20  if I turned off my location history right now, if I

21  didn't actively then go and delete everything, the

22  search would still run against me as everyone else.

23           Similarly, even if you delete that

24  information, it doesn't actually turn off location

25  history.  So enabling or when Google enabled an auto

1    delete feature long after the facts of this case, you

2    might be mistaken for thinking that that would have

3    some effect on the collection of location history.  In

4    fact, it does not.  And it further adds to the

5    confusion here.

6         And lastly, we'd say that the consent flow

7    isn't as probative of the expectations of privacy as

8    the way that Google treats that data.  So Google

9    considers location history to be user content.  It

10   stores it as user content in user accounts.  That's

11   why their system is indexed this way because it

12   belongs to the users.  It is not Google's business

13   record.  And whatever weight the Court wants to put on

14   that consent flow, it doesn't change the fact that

15   that is individual data, the modern equivalent of

16   their private papers stored in an individualized

17   account.

18        THE COURT:  All right.  So my first question

19   is, with respect to good faith, if Task Force Officer

20   Hylton had gotten even one geofence warrant before and

21   there is even one case that says that it's

22   permissible, why doesn't that satisfy good faith?

23        MR. PRICE:  There was no case saying it was

24   permissible at the time.  All of these Illinois cases

25   came after this case.  In fact, they were using some

1   of the early record in this case to base their

2   decisions on.  So there was no court decision on this.

3          In fact, I would say the -- if anything,

4   however, the Supreme Court's focus on probable cause

5   and particularity for the last few hundred years would

6   signal to a reasonably well-trained officer that they

7   need both probable cause supporting their warrant and

8   that it must be particularized.  Both of those things

9   were glaringly absent here and that should have been

10  apparent on its face to both Detective Hylton and to

11  the magistrate who signed it.  And the fact that

12  Detective Hylton had done this once or twice before, I

13  don't think changes that whatsoever.  Especially, if

14  there was no pushback or --

15          THE COURT:  We don't know, right?  All we

16  know is that he had at least one approved, right?

17          MR. PRICE:  We know, Your Honor, that Google,

18  at least, reports having received quite a few of

19  these.  And it is interesting to note that this is the

20  first case where it's actually being tested in court.

21  Part of the reason that happens is because the

22  geofence warrants are not always successful in

23  identifying a suspect.

24          There was a different arson case being

25  investigated in North Carolina where the geofence

1  warrant was reported in the news but failed to

2  actually identify a suspect.  And that could have been

3  for any number of reasons, but one good one would be

4  he was one of those two-thirds that did not have

5  location history enabled.

6         There's a large number of these warrants that

7  do not produce results.  It is a fishing expedition.

8  You're not always going to get a fish every time.

9         THE COURT:  So what of the cases that we now

10  have do you think I should look to most closely when

11  reviewing your position?

12         MR. PRICE:  I'm sorry?  Which --

13         THE COURT:  Which of the reported or

14  unreported but available geofence cases that we now

15  have is the one or two that you think I should look to

16  most closely when reviewing this case?

17         MR. PRICE:  I think Judge Weisman's opinion

18  and Judge Fuentes's opinion are both very informative

19  and well reasoned based on the facts that were

20  available to them.  I would say none of these opinions

21  attempt to grapple with the scope of the search at

22  Stage 1, which, simply, I don't believe was apparent

23  at the time.  But of the four that are out there now,

24  certainly Judge Weisman and Judge Fuentes have very

25  strong reasoned opinions when it comes to probable

1    cause and particularity.

2            THE COURT:  All right.

3            MR. PRICE:  Thank you very much, Your Honor.

4            THE COURT:  I think those are my questions

5    for now.

6            MR. PRICE:  Okay.  Thank you very much.

7            THE COURT:  Okay.  Thank you.

8            All right.  So I think this is a good time to

9    take a brief break.  And we'll be back in 15 minutes,

10   which takes us to 11:40.  All right?  And we'll begin

11   with the government's position.  We'll take a recess.

12           (Recess taken from 11:25 a.m. to 11:40 a.m.)

13           THE COURT:  All right.  I'll hear from the

14   government.

15           MR. JUDISH:  Thank you, Your Honor.  Nathan

16   Judish on behalf of the United States.

17           As we've argued consistently in this matter,

18   there are three separate and independent reasons why

19   this court should deny the defendant's motion to

20   suppress.

21           First, that the defendant had no reasonable

22   expectation of privacy in any of the information the

23   government obtained from Google.

24           Second, that the government obtained it

25   pursuant to a valid warrant.

1          And third, that investigators relied on the
2    warrant in good faith.
3          I think the logical way to talk through this
4    is to start with the question of a reasonable
5    expectation of privacy.  So I will begin with that.
6          I think that whether someone has a reasonable
7    expectation of privacy turns in large part on the
8    nature of the disclosure.  And the Supreme Court has
9    repeatedly held that one retains no reasonable
10   expectation of privacy in information voluntarily
11   disclosed to a third party.
12         And so I think it's really important to take
13   a close look at the notion of the services Google
14   provided here.  And, essentially, Google's function
15   here is as a location-based service provider.  And so
16   the real question is, what does a user of
17   location-based services disclose to a location-based
18   service provider in order to obtain location-based
19   services?  And I think the answer is pretty clear.
20   The user discloses location information.
21         So consider what Google actually -- the
22   services they -- the nature of the services they
23   actually provide to the defendant.  The main service
24   that you disclose your location for is to get
25   recommendations with your commute; driving

1   instructions and such.

2          So what does that mean?  This isn't -- this

3   isn't a case of someone just having Google store their

4   location in order to create a map, although that may

5   be one thing that they do, but you also disclose your

6   location so Google, as a service provider, can help

7   you get from one place to another quickly.  And that

8   involves not only Google knowing where you are and

9   where you're going, but also Google knows where

10  everyone else is going at the same time as well.  So

11  what you have, generally, is vast numbers of people

12  disclosing their location to Google from which Google

13  can assess where they are and how fast they're going

14  and from which Google can spot traffic problems and

15  tie-ups, one way or another, and then Google sends out

16  advice.

17         You know, I'm driving down here last night on

18  I-95 and Google says there's an accident up ahead.

19  You can save 21 minutes by taking another route.

20  Google doesn't know that just from my location.

21  Google knows that from the location information it's

22  getting from everyone.

23         So what we see here is that Google is using

24  everybody's location to essentially provide useful

25  advice to everyone.  This is not people keeping their

1  location secret or private or anything like this.

2  This is a big communal effort to pool location

3  information in a way which lets Google then provide

4  generally beneficial advice to everyone.  And so it's

5  just not kept to yourself.

6         And it's true that Google doesn't normally

7  disclose any particular individual's advice [sic] to

8  others in giving out that advice, but it's clear from

9  controlling Supreme Court precedent in the *Miller* case

10  that that doesn't matter.  The point is, users

11  disclose their information over to Google, and then

12  Google, you know, is free to use that information and

13  act on it, and so on.

14         THE COURT:  Well, I do think you have to

15  address the fact that, you know, *Miller*, and what

16  we're discussing here, are facts of a different order.

17  Right?  So it is not the case, or I guess I should ask

18  you, do you think that folks are knowingly or

19  willingly giving over information about their location

20  that Google updates every two minutes?  I just don't

21  think you can say that.

22         Most folks don't know, I think, that Google

23  is keeping this on a two-minute loop.

24         MR. JUDISH:  Well, as an initial matter, you

25  can deduce just from the driving services that they're

1   looking at your location pretty much directly.  I

2   mean, it is really like there's something going on

3   right now, and they act on it right now.  Google has

4   to know your information right now and act on it.

5           And beyond that, I mean, Google says, and

6   it's also clear that we know from the *Smith v.*

7   *Maryland* case that it doesn't matter whether you know

8   or not that they're going to store information.  The

9   fact that you disclose it is sufficient.

10          So in *Smith*, you know, there was an argument

11  that, well, customers didn't know that the phone

12  company would actually keep records of that

13  information, and there it didn't matter.

14          But, you know, as far as the -- and in

15  addition to sort of being able to tell from using the

16  service --

17          THE COURT:  So I'm going to stop you there.

18  Are you saying there is no aspect of the facts in

19  either *Smith* or *Miller* or our case that differentiates

20  them?  The numbers we're dealing with here, if they

21  are exponentially more than those in the other cases,

22  that it doesn't matter?

23          MR. JUDISH:  I mean, I don't think the

24  frequency of storage makes much difference.  I mean,

25  you can store -- I would say, one, are users aware of

1   it?  Well, they certainly can be because unlike with

2   the phone company where you can't really see all the

3   information the phone company has traditionally stored

4   about you, your records are available to you at

5   Google.  You can log on, look at your account.  You

6   can go and see everything that they have stored.  So,

7   that's, I mean --

8           THE COURT:  So, I'm going to say, sir, you

9   are speaking really quickly.  And I can see that my

10  reporter is trying to keep up with you, but I can hear

11  everything you're saying.  We just have to be sure

12  that the record follows, too.

13          MR. JUDISH:  I will try to slow down, Your

14  Honor.

15          THE COURT:  Okay.  Thank you.

16          MR. JUDISH:  So, anyway, with Google you can

17  see everything that you see stored.  And so, you know,

18  users can be aware of exactly what there is.

19          And, in addition, once you agree to Google

20  saying "saves where you go with your devices," I think

21  the frequency of it just doesn't make that much

22  difference after that.

23          I mean, you can store whether it's -- you

24  know, because people move quickly.  In order for that

25  to work well, they have to store relatively often.

1    And just a small, you know, small intervals, I think

2    just don't have a great deal of significance.

3              So, another, I think, noteworthy aspect of

4    how Google uses the information is in their

5    advertising and the radius targeting that they do.

6              So Google, from location history, they

7    make -- to begin with, they make certain inferences

8    about your interests, and they target useful

9    advertisements to you based on that.  Again, that's

10   more than just a storage service, but it goes beyond

11   that.  The radius targeting part is they will sell to

12   customers or to advertisers the ability to place

13   advertisements to people within a certain radius.  And

14   then in order to measure the effectiveness of that,

15   they will subsequently examine location history

16   information of users to see whether they have actually

17   visited the particular store that was doing the

18   advertising.

19             So that's -- I mean, that's really

20   essentially the equivalent to a geofence because it's

21   around the particular store that has done the

22   advertising.  So Google is doing with its own data

23   that users provide to it, and they're quite up front

24   about this, something which is remarkably similar to

25   geofencing, you know, a geofence around the individual

1  advertiser's stores in order to, you know, provide

2  this store visit conversion statistic to the users.

3         THE COURT:  Yeah, but they don't identify --

4  I mean, they explicitly don't tell the advertisers who

5  they are identifying.

6         MR. JUDISH:  They don't.

7         THE COURT:  So it's not generally the same.

8         MR. JUDISH:  Well, again, the equivalent for

9  the purpose of showing that the information is

10 disclosed to Google, and it's really not necessary for

11 the third-party doctrine for Google to, then, normally

12 in the ordinary course of business disclose it to

13 others.  Just like a bank doesn't normally disclose

14 your expenses to third parties outside the bank, but

15 what you look at is what is disclosed to the party

16 from whom the government got information.

17        And I think it's clear from that advertising

18 function that you are disclosing your location

19 information to Google.

20        And then that's just -- this so far has just

21 been analyzing the nature of the service Google

22 provides.  It's also worth looking more carefully at

23 the opt-in process and what it takes.

24        And as Mr. McGriff pointed out in his

25 testimony and affidavits, it really takes a

1    multiple-step process before Google knows -- will

2    ultimately store someone's location history.

3            So you start off with a cell phone.  It's

4    just a little electronic device sitting there.  It

5    doesn't know its location unless you first turn on the

6    feature for your cell phone to get it to determine its

7    location.  So that's the first step you have to take.

8            Now the phone knows its location, but it's

9    not telling anyone because you haven't told it to

10   share that information with anyone.  So the next step

11   you have to take is you have to tell it to -- adjust

12   your phone so it will share that information with apps

13   so apps can provide you location-based services.  So

14   you do that and now the information may be shared with

15   a Google app.

16           Well, okay.  Google -- that's fine.  Google

17   may be able to use that location information, but it

18   still doesn't know who you are because you haven't

19   signed on to the Google app on your device.  So that's

20   another step you have to take before Google will end

21   up with location information.

22           Okay.  So you sign in on your device and now

23   Google can determine your location.

24           THE COURT:  Slow down.

25           MR. JUDISH:  Slow down.  This is still too

1   fast?  All right.

2         So now Google can determine your location

3   information.  And it still won't store that

4   information unless you take the additional step of

5   opting in to location history.  So all those things

6   are affirmative steps you have to make before Google

7   will store your location history.

8         And so then I want to address, because we

9   have it in such detail, the actual opt-in process for

10  location history.  And here I think it's important --

11  I just want to say a bit about the record.

12        So, McGriff testified first through a sworn

13  affidavit, and then he affirmed with his testimony

14  that he stuck by his affidavits.  This is from

15  Government's Exhibit 3C at paragraph 7.  Under the

16  supported consent flow as of July 9, 2018, across all

17  applications and services and across all Android

18  devices and operating systems a user who opted in to

19  LH, location history, either directly from within

20  device settings or when attempting to use a feature

21  powered by LH, such as features within the Google Maps

22  application.

23        THE COURT:  So when you read, you're even

24  faster, which is what every human being does.

25        MR. JUDISH:  Would be presented with an

1    opt-in screen containing the following text.

2          So McGriff said, you know, this was across

3    all devices, across all operating systems.  This was

4    necessary opt-in language.  And what he said also in

5    his testimony was that this consent copy has been

6    static.  That's on page 271 of the transcript.  He

7    said there was possible additional descriptive copy

8    which could change, and that, the descriptive text, he

9    personally could not be sure about, but the actual --

10   this actual consent copy, he said, was static and was

11   essential in order to opt-in.  So that's why I think

12   this court can look at the -- this consent opt-in he

13   presented in his affidavits and be sure that that is,

14   in fact, what he would have seen when he -- what the

15   defendant would have seen when he opted in.  And what

16   that says is "saves where you go with your devices"

17   and "this data may be saved and used in any Google

18   service you are signed in to give you more

19   personalized experiences.  You can see your data,

20   delete it, and change your settings at

21   account.google.com."

22         So, I think this text really gives the core

23   of what you're agreeing to.  It says that Google's

24   going to save where you go with your devices, and it

25   says that Google can use that is information to

1    provide you with services.  And that's what happens

2    with Google's location-based services.  And to that

3    you're given a choice, either "no thanks" or "turn

4    on," and we know because the defendant opted in on

5    July 9, 2018, that he did, in fact, say to turn it on.

6            All right.  So, I think all of this shows

7    that the defendant did, in fact, voluntarily disclose

8    his information.  What does the law say here?  Well,

9    the principle that -- over and over in every single

10   case, the Supreme Court that has addressed it, it's

11   held that one retains no reasonable expectation of

12   privacy in information voluntarily disclosed to third

13   parties.

14           To be clear, this is not just about business

15   records.  The defendant keeps characterizing --

16   they're saying, well, these are not business records.

17   I don't think it -- I mean, I think Google is clearly

18   using the records for a business purpose, but the

19   third party doctrine does not depend on whether or not

20   something is a business record.  It applies to

21   conversations you do in the presence of others, for

22   example.  We know that from the *Hoffa* case.

23           The Supreme Court has affirmed it in multiple

24   other contexts.  We have it for everything you give to

25   an accountant.  That's the *Couch* case.  We have it for

1   telephone dialed number information in *Smith v.*

2   *Maryland*.  We have it for bank records in *Miller*.  And

3   the Supreme Court has never, ever rejected that

4   principle.

5          Now, *Carpenter*, the Supreme Court, obviously,

6   did not find it applied, but the key point about

7   *Carpenter* is that the reason it didn't apply is that

8   the Supreme Court found that the cell-site records

9   were not voluntarily disclosed to the phone company.

10  And it did that for three reasons.  And if you look at

11  those three reasons, none of them apply to the

12  location history or location information disclosed to

13  a provider of location-based services.

14         First, the cell-site records are collected

15  automatically if you just power up the device.  No

16  other affirmative action is necessary.  So if you want

17  to make phone calls, send texts, you get a cell phone.

18  It just happens behind the scenes automatically, and

19  there is no special opt-in process.  There's certainly

20  nothing that looks like what we have here.

21         The Supreme Court also noted the

22  impossibility of deleting your cell-site records,

23  whereas here, not only, you know, you can delete your

24  location history stored by Google any time you want.

25  And it's -- significantly, this fact is emphasized

1    over and over again by Google, even in its very

2    minimal consent, you know, short brief text in the

3    opt-in process.  It highlights the fact you can review

4    and delete your information at account.google.com.  If

5    you look at the Google privacy policy, it further has

6    a long section explaining all the different ways you

7    can delete your Google data.  You know, individual

8    data, service by service data, getting rid of your

9    account, all that is explained at length in the Google

10   privacy policy.  So, that is not at all like cell-site

11   records.

12           And, finally, the Supreme Court noted that

13   having a cell phone was indispensable for

14   participation in modern society.  Well, I think it's

15   quite clear that that's not the case of Google

16   location history.  Obviously, one way to establish

17   that is empirically.  We know now that only about a

18   third of Google customers have their location history

19   enabled.  And the second way you can establish that

20   it's not essential to participation in modern society

21   is looking at the features associated with Google

22   location history.  They're okay.  They're helpful in

23   some circumstances, but they're just not that big a

24   deal.  The tips on your commute, finding your phone,

25   you know, useful advertising all may be nice to some

1    customers, but they're not indispensable to

2    participation in modern society.

3            THE COURT:  Well, to be fair, you should

4    address why Mr. Chatrie is turning to that argument.

5    It's because Google requires a warrant under the

6    Stored Communications Act.  And so they're saying

7    that's an indication that Google is calling it a

8    business record.  Right?  Isn't that what they're

9    saying?

10           MR. JUDISH:  They're saying Google says it's

11   not a business record, but I don't think whether it's

12   a business record or not has bearing on whether it's

13   indispensable for participation in modern society.

14   So --

15           THE COURT:  Yeah, but they're not arguing --

16   they're arguing under the Stored Communications Act

17   that it's content.  Right?  That's what they are

18   arguing.

19           MR. JUDISH:  That's what Google is arguing.

20   So I think whether something is classified as content

21   under the Stored Communications Act is not that

22   important here.  It affects the rules, the statutory

23   rules, for what kind of process the government can use

24   to get information, but I think as a Fourth Amendment

25   matter, it's not critical.  The question is whether

1   Google has -- whether the records are voluntarily

2   disclosed to Google or not.

3          So, and the same thing, the conversations in

4   *Hoffa* were certainly content.  That's people speaking.

5   But because it was voluntarily disclosed to the

6   persons who heard them, it didn't affect the -- the

7   Fourth Amendment was not impacted when the hearer

8   disclosed that information to the government.

9          So the -- whether its content has some, you

10  know, legal significance on the kind of process you

11  get.  So I recently saw that Google had objected to a

12  proposed state law in Texas that would allow warrants

13  to get prospective location information from Google.

14  They say because it's content, actually the federal

15  law requires a wire tap order.  I mean, all this is

16  complicated statutory stuff, but not really implicated

17  in this case.  This case is about the Constitution and

18  the Fourth Amendment, not statutory definitions or

19  statutory rules.

20          I would note another point -- well, I guess,

21  on just -- it's worth saying a little bit about

22  *Carpenter*.  *Carpenter* is, as the Supreme Court

23  emphasized, you know, a narrow case.  It's about

24  protecting long-term comprehensive location

25  information.  The Supreme Court was clear that it said

1 a warrant would be required for seven days or more.

2          The defense here is citing *Carpenter*,

3 essentially, for the notion that anything -- private

4 or sensitive information requires a warrant.  That is

5 not *Carpenter*.  That's not what *Carpenter* held, nor is

6 it what any court subsequently has decided.  I think,

7 you know, *Carpenter* is no longer a totally new case.

8 This week is its third anniversary a couple of days

9 ago.  I'm not aware of any courts who have interpreted

10 it so broadly.

11          Instead, it's a uniformly -- courts have

12 taken the Court, you know, at its word and treated it

13 as a narrow opinion designed to protect comprehensive,

14 long-term location information.

15          THE COURT:  So address what they just argued.

16 Right?  They said, yes, that nobody has broadened it

17 because we're the first folks that now know exactly

18 what Google is doing, and we know how in depth it is,

19 and that it covers, even if it's only a third of

20 users, it's tens of millions.  And if a court had

21 known that, they might have come out differently.

22          Just agree, first of all, that other courts

23 did not have that information.

24          MR. JUDISH:  So, I don't think other courts

25 had that information, other courts who have ruled thus

far.  So, I think, I mean, that's very different than
the *Carpenter* issue because, first*, Carpenter* is, you
know -- we aren't obtaining comprehensive, long-term
information about all those other people.  In fact, I
think it's quite doubtful that there is any Fourth
Amendment significance at all for anyone whose
information we did not return or who was not returned
for other than the 19 people.  I mean, I don't think
it's a search with respect to the 19.

THE COURT:  Wait.  You're going way too fast.
I didn't hear the last sentence at all.

MR. JUDISH:  So leaving aside the 19 people,
just talking about all of the others, I don't think
that there's any Fourth Amendment significance at all
to a provider the way a provider like Google uses
automated processes to find very narrow specific
information in a large database.  You know, I don't
think there's any significance for people whose
information is not returned to the government.  So --

THE COURT:  Wait.  Wait.  I'm going to ask a
question about that.

So with respect to how Google does the
search, first of all, they are saying that Google is a
government agent.  Do you agree with that?  Under the
law, that they are treated as an agent.

1          MR. JUDISH:  I don't think it's clear.  When

2     you're talking about compulsory process -- and from

3     Google's point of view, this works an awful lot like a

4     subpoena.  And I'm not sure that someone responding,

5     complying with compulsory process of one sort, is

6     really quite the same as other kinds of agency

7     relationships.

8          So I don't think -- I wouldn't concede that

9     it's an agency relationship.  I think things are

10    different in terms of compulsory process.  You know,

11    when you're in litigation, and the other side receives

12    a subpoena, are they really your agent when they're

13    complying with a subpoena?  I don't think it's clear

14    on that.  I don't think there are cases -- I'm not

15    aware of cases that specifically address that.

16          THE COURT:  Right.  Okay.  So they're saying

17    you're not aware of it because we're the first folks

18    that know that when the government says we want to do

19    a geofence for this particular period of time, now we

20    know that it's functionally Google who says, Okay,

21    we're going to look at this area, and we're going to

22    do it in this time frame, and it's our algorithm about

23    how it works, and you don't get to know the algorithm.

24    Right?

25          So, if you get a subpoena, it is not the

1    case -- well, maybe there are cases, but it's not the

2    case that a business can say to you "I'm not going to

3    tell you how I search for documents," right?

4           MR. JUDISH:  Well, I mean, Google is

5    telling -- Google's quite clear now about how they

6    respond to the process.  I mean, we give them the

7    coordinates, and they look at each data point in their

8    system, and they decide whether it falls within the

9    range or not.

10          I mean, the part that Google is more

11   secretive about is how they calculate the people's

12   location in the first instance.  I mean, that's the

13   part which -- you know, so how did they come up with

14   the particular numbers in their system for all those

15   data things.  But once they get -- they work here

16   quite clearly, everything they did, once they got the

17   warrant from us.

18          THE COURT:  Well, that may be a little bit

19   too simplistic because they said there is a range.

20   They said that they found a range.  They said there's

21   a probabilistic return rate, like 68 percent they

22   found appropriate for advertising, right?  So I have

23   to say, useful advertising is more a Google term than

24   it might be a user term, but, anyhow, it's

25   advertising.  They target advertising.

1        So it is -- they're not saying that in a way

2   that the government can test that it's reliable.

3   Right?  So this is what Mr. Price was just saying.  He

4   was just saying, Yeah, we don't know about the ones

5   that haven't made hits or why because they haven't

6   made hits.

7        So why is the government allowed to just say,

8   Google, we think you're doing it right, and we'll use

9   it when it hits?  Isn't that something the government

10  should have some input in?  It's different than a

11  subpoena.

12        MR. JUDISH:  All of that stuff happened prior

13  to the government getting the process in this case.

14  Google has its own internal algorithms which they use

15  to estimate where its users are.

16        THE COURT:  I know, but you get the warrant

17  knowing they have this system you don't understand,

18  correct?

19        MR. JUDISH:  Well, I mean, we've looked at

20  the data that they produce, and we've seen that it's

21  pretty accurately what --

22        THE COURT:  It's 68 percent.  Or are you

23  saying it's better than 68 percent?

24        MR. JUDISH:  I'm saying that it seems

25  consistent with the notion that 68 percent of the time

1    the user falls within the display radius at the point

2    that Google estimates that they are.  And I believe we

3    had testimony saying that the rest of the time it's

4    not like it's super far off.  It's often near the

5    outside bounds of that, of the circle that Google has.

6         So it's not like it could be, you know, you

7    think it's in Richmond, and you're right 68 percent of

8    the time it's near the bank, and the other time it's,

9    you know, across town or in another state or something

10   like that.  That's not the way it works at all.

11        And so what you have here, essentially, is

12   information which is, you know, like all information,

13   you know, it has some uncertainty in it, but it goes

14   to -- it would ultimately go to the weight given the

15   evidence, not the admissibility, because we've

16   observed the information and it seems to be -- work

17   the way Google describes it.  That it --

18        THE COURT:  Do I have any evidence about how

19   often the geofence fails?  Like how often there's just

20   a zero hit?

21        MR. JUDISH:  You mean, like we get a geofence

22   and it ultimately proves unsuccessful in locating

23   anyone or any evidence?  I don't think there's

24   anything in the record about that, Your Honor.

25        THE COURT:  So here's the commonsensical

1    layperson's perspective.  And so I'm really trying to

2    give you an opportunity to explain it away.  If there

3    were drug testing that were 68 percent reliable, would

4    it be admitted?

5              MR. JUDISH:  I mean, I think -- I mean, I

6    don't know about the context of drug testing, but, I

7    mean, I think it's, you know, the definition of

8    evidence is fairly broad.  And so I would say it's

9    evidence, but it's not all that reliable evidence, and

10   you would hope there would be more reliable evidence.

11             And so, you know, in a case like this, if we

12   go to trial, you would certainly want more than just

13   the geofence information, and yet it's still evidence

14   that the government collects, and then it helps direct

15   their further investigation, which, if things go well,

16   comes up with evidence which is even stronger and

17   better and more probative of guilt or innocence.  But

18   it's clear that this meets the standards of what is

19   evidence because, you know, it is helpful information

20   which helps prove the facts which are at issue in the

21   case.

22             THE COURT:  Okay.

23             MR. JUDISH:  So, a bit more -- I wanted to

24   touch a bit more on the law associated with the

25   third-party doctrine.

1        First, the defense was just -- made a point

2   saying that sometimes you can use this information to

3   place a person in a private space, which they suggest

4   is a problem under *Knotts* and *Karo*, but *Knotts* and

5   *Karo* aren't third-party doctrine cases.  *Knotts* and

6   *Karo* involve installing surreptitious transponders and

7   tracing them.  In those circumstances, we if get

8   information from a private space without a warrant,

9   that's a problem because it's a search.

10        Here, however, when we rely on the

11   third-party doctrine, that's not an issue because the

12   leading or a leading third-party doctrine case is the

13   landline telephone case *Smith v. Maryland* where every

14   time someone makes a landline call from their house,

15   we place them in their house.  And the Supreme Court

16   says that does not matter.  It's still information

17   which is voluntarily disclosed to a third party.  That

18   issue is explicitly addressed in *Smith v. Maryland*.

19        Again, I just note that subsequent to

20   *Carpenter*, the cases have all interpreted it narrowly.

21   Within the last few weeks we had a Seventh Circuit

22   case, *Hammond*, which held that there is no reasonable

23   expectation of privacy in getting like six hours or so

24   of prospective latitude-longitude-GPS-type data from

25   an individual cell phone.

1          And the Court looks at *Carpenter* and says

2     *Carpenter* is only about long-term location

3     information.  And so that *Hammond* case is three times

4     the duration of the information at issue here.  And

5     still the Court found that the Fourth Amendment was

6     not violated.

7          THE COURT:  But isn't *Hammond* different in

8     that they had a suspect in mind?  What the defense is

9     saying here is that it's a reverse search.  It's like

10    we don't know who it is.

11         MR. JUDISH:  *Hammond* was a specific person,

12    but as far as whether one has a reasonable expectation

13    of privacy in the information in the first place, I

14    just don't see -- I don't think it makes a difference.

15    I mean, I think that it would be -- it would be -- you

16    know, those are very different kind of warrants

17    between a warrant for an individual's location and

18    this type of warrant.  But as far as whether one has a

19    reasonable expectation of privacy in the information,

20    really, I don't see how that can turn on the

21    particular kind of legal process the government got to

22    obtain it or didn't get to obtain it.

23         The question of whether there's a reasonable

24    expectation of privacy, I think, is sort of prior to

25    whatever kind of process the government uses to obtain

1   it.

2          One final thing on this point, just referring

3   to *Smith* and *Miller* as relics, I mean, you know, most

4   Supreme Court cases don't, like -- they don't, like,

5   age out after a little while.  They get reversed by

6   the Supreme Court or they remain binding law.  The

7   Supreme Court actually affirmed them in *Carpenter* that

8   they were still -- their continuing validity.  So I

9   just don't think you can dismiss continued binding

10  Supreme Court precedent.

11          THE COURT:  They're not talking necessarily

12  about the law.  They're talking about the technology

13  involved.  I mean, you have to concede this is

14  different technology.  The scope is what they're

15  talking about, the breadth, the numbers, the detail.

16  So, you know, in the hearing that I saw, and I think

17  Google suggests, that if you were to go backward, as

18  these folks are, you have -- you can make a map of

19  where you were.  You can make a little line of where

20  you were within a period of time.  And so two hours.

21          The question is, if you're voluntarily giving

22  over your information, is the notice that Google is

23  giving putting you on notice that at any two-hour

24  period you can be mapped exactly where you are?

25  That's their point, right?  That, sure, if you're

1   driving down on 95, maybe intellectually you can say,

2   Oh, you know, I have maps on.  There's a

3   tractor-trailer crash, and they're going to take me

4   down Route 1 instead.  But does that really -- does

5   that really put a user on notice that every two hours

6   of their life Google can track what you're doing in a

7   comparable way?  So you're saying yes.

8           MR. JUDISH:  "Saves where you go with your

9   devices" doesn't have qualifications with it.  There

10  are no limitations.  I mean, I think, you know, that's

11  what they do.  That's what they say they'll do, and

12  that's what they do, and that's what they show you

13  they do if you log -- if you go where they direct and

14  look at the data that's stored.

15          I just don't know.  "Saves where you go with

16  your devices" and we really mean it?  I mean, I think

17  the defense kind of explored this, and what you end up

18  if you start trying to cover much more than that is

19  the wall of text, which nobody would read.

20          THE COURT:  The what?  I'm sorry?

21          MR. JUDISH:  The wall of text was the phrase

22  that Mr. McGriff used when defense counsel suggested a

23  rather lengthy description that they thought that

24  Google should provide.  And if they did anything like

25  that, we'd hear, well, nobody reads that.  So,

1   instead, what Google does is they provide a very

2   concise description, "saves where you go with your

3   devices," which captures what it is, and then they

4   have an arrow, an expansion arrow, which goes into

5   more detail, and they have a link where you can go to

6   the website and actually see the data.  I just

7   don't -- I don't think you can do more to explain, you

8   know, than that to effectively get across what's

9   happening here.  You tell them what you're doing and

10   you let them see the data.

11          THE COURT:  Well, not to mince words, but do

12   you think it would make a difference to a user if it

13   said "updated every two minutes"?

14          MR. JUDISH:  No, I don't.  People want the

15   service.  And if you don't do it every two minutes,

16   it's not going to be all that effective.  It's saving

17   where you go with your device.  People move quickly

18   quite frequently and make brief stops in places, and

19   so it wouldn't actually serve its purpose if they did

20   much less.

21          THE COURT:  All right.

22          MR. JUDISH:  So, moving on to the warrant, if

23   you don't have any more questions on the expectation

24   of privacy.

25          THE COURT:  If I do, I'll go back.

1           MR. JUDISH:  All right.

2           So the magistrate here had a substantial

3   basis for issuing this warrant.  And the question here

4   for this court is not would this court issue the

5   warrant exactly like this.  It's whether the

6   magistrate had a substantial basis for issuing the

7   warrant.  And so, you know, several -- there have been

8   in recent times several magistrate judges, federal

9   magistrate judges, who've issued opinions on this.

10          They sometimes want more in the way -- they

11  say I want more particularity in this way.  This

12  application is too broad.  Those do nothing to show

13  that there's a problem here, because, you know, the

14  facts of those cases are different.

15          In one case, the geofence extends out into a

16  denser urban area.  In one case it involves a facility

17  with several layers of apartments above it.  And so

18  getting a geofence there is just factually very easily

19  distinguished from here.

20          So if you -- the question is, first, did the

21  magistrate have a substantial basis for finding

22  probable cause?  And the question here is, was there a

23  fair probability that Google had evidence of crime?

24  And the facts set forth in the affidavit were

25  sufficient to establish that.

1           The affidavit showed that a crime had been

2   committed, that the robber appeared to be using a cell

3   phone, and then established that most people have --

4   or that most cell phones are smartphones, that all --

5   nearly all Android and some Apple smartphones will be

6   linked to Google, and that Google can store location

7   information.  That established a fair probability that

8   Google would, in fact, have evidence of the crime.

9           And I think it's important to note here that

10  evidence is not just about identifying the robber,

11  but, you know, one of the purposes of it was to form a

12  fuller geospatial understanding of the -- that's from

13  page 5 -- of the warrant and timeline related to the

14  investigation.

15          And so I sort of see the geofence warrant in

16  this case as sort of similar in quality to

17  surveillance videos.  It gives you a picture of what

18  went on at this armed bank robbery, at the time of it,

19  sort of the people, where they were, where they're

20  coming and going.  So it's a way of going and

21  essentially getting a new perspective on a crime

22  scene.  And it certainly does that.  And so that's

23  good evidence and, you know, a fair probability that

24  there was evidence of a crime.

25          Again, it can be used to identify

1    accomplices.  You know, it mentioned other potential

2    witnesses, and they may not have been able to spot any

3    other witnesses before they sought the warrant, but

4    there could have been someone sitting in the car there

5    back where the defendant parked.  And so the notion

6    that it was too late to -- sorry.  I don't mean

7    witness.  Accomplice.  That it was too late to look

8    for other accomplices.  Absolutely not.  It was a

9    totally appropriate part of this warrant to look for

10   accomplices.  It was -- that's included and is the

11   basis for the warrant and is part of the reason why

12   there was probable cause to get this particular

13   warrant.

14         All this, the sort of a broad interpretation

15   of what is acceptable for a search warrant, is

16   confirmed by the Supreme Court's decision in

17   *Messerschmit v. Millender* where they talk about sort

18   of the broad -- sort of different reasons you might

19   want to gather evidence, including things like

20   (unintelligible) defenses and stuff.

21         THE COURT:  You are really --

22         MR. JUDISH:  I apologize for that, Your

23   Honor.

24         THE COURT:  I didn't hear what you said.

25         MR. JUDISH:  So, in -- a broad conception of

1    evidence is confirmed by the Supreme Court's decision

2    in -- I'll just call it *Millender* -- in which they

3    look at a warrant and look at the reasons behind the

4    warrant, and it's things like rebutting possible

5    defenses.  So it's a very broad conception of what

6    constitutes evidence under a search warrant.

7           And this warrant sought this location

8    information not just to identify the robber, but also

9    for these other purposes, which are explicitly

10   mentioned in the affidavit.  So the notion of the

11   affidavit being all about finding the robber just

12   isn't true.  You know, we don't look to, like, well,

13   it's mostly about this other topic, and, therefore,

14   this thing mentioned in the affidavit doesn't count.

15   That's not the way things work.

16           THE COURT:  So I'm just going to totally

17   change courses so that I can have you address this on

18   this record.  And I'm going to tell you right now, I

19   don't think it's an issue, but this is obviously a

20   state warrant from a state magistrate.  And so this

21   magistrate was fully impowered to do what he did.

22           I guess I would want you to say this

23   magistrate, who had, I don't know, a couple years

24   experience, did not have a law degree, right?  He had

25   a college degree.  And it's a pretty broad warrant.

1    And so my question is, do you think that the Virginia

2    law should hold under this circumstance, right?  I

3    mean, federal magistrate judges have law degrees.  And

4    it's not clear to me that the General Assembly, when

5    it was figuring out how magistrates work in the

6    commonwealth of Virginia, were anticipating that they

7    could sign warrants that searched tens of millions of

8    user records.  So I just want you to state this on the

9    record.

10          MR. JUDISH:  I think the magistrate was

11   authorized under Virginia law to issue warrants, and

12   the government doesn't always get to pick and choose.

13   I think we have testimony in the record that there

14   was -- the preference of the Virginia courts was to go

15   to the magistrates rather than the state judges.  So

16   when judges -- we do what we're told, Your Honor.  And

17   this is constitutionally permissible under *Tampa v.*

18   *Shadwick*, and this was a judge authorized for Virginia

19   to issue warrants.

20          I still -- I still -- I disagree with the

21   characterization of this being a search of tens of

22   millions of people.  I think the government obtained

23   no information about those -- about anyone other than

24   the 19.

25          The government can't tell, you know, if

1  you're not among those 19, anything about where you

2  were that day.  It doesn't know whether or not you

3  have a Google account.  What does the government know

4  about those 19 people?  It doesn't know whether you

5  have a Google account or not.  It doesn't know whether

6  you activated location history or not.  It can't tell

7  anything about those people.

8          THE COURT:  Why don't you distinguish the

9  example he used about, okay, we're going into a bank.

10  We know one of your boxes has a gun, but we want to

11  look at them all.

12          MR. JUDISH:  Well, I think the difference is

13  that this is, you know, among other things, this is a

14  database which Google has free access and free rein

15  to, and so it's entirely appropriate in a context

16  where Google operates freely within a database to --

17  for it to have Google go through and make a very -- to

18  search through it and -- search through it not in the

19  Fourth Amendment sense, in the computer science sense,

20  to look through the database in order for that -- to

21  find that narrowly targeted information.

22          A couple of points on this.  You know, this

23  is not an entirely new thing.  I mentioned in our

24  brief the *Ameritech v. McCann* case.  I think a

25  subpoena for the phone records of everyone in the

1    country would be a very troubling subpoena and

2    overbroad under almost any circumstance you can

3    imagine.  However, for decades, you know, because

4    phone companies store local calling information, index

5    it only by the outgoing number and not the incoming

6    number.  When they receive a subpoena asking them who

7    called -- you know, if they asked, like, "Who called

8    Nathan Judish?"  They have to look through their

9    entire database and sort through that entire thing in

10   order to get the limited information about who

11   actually did that.

12          So searching through a giant database to find

13   limited information is not a new thing.  *Ameritech v.*

14   *McCann* is not about a Fourth Amendment challenge.

15   It's about who pays for that, whether the government's

16   on the suit for the cost.  No one has thought that

17   there's a Fourth Amendment problem with looking

18   through the huge database in order to get this very

19   narrow targeted set of information.

20          Also, you know, another point that comes out

21   of *Smith v. Maryland* is that Fourth Amendment

22   protections really should not depend on a service

23   provider's internal business practices which are not

24   visible to the public.

25          THE COURT:  Not -- I'm sorry?

1          MR. JUDISH:  Which are not in any way visible

2    to the public.  And so in *Smith*, you know, the issue

3    was whether it mattered that phone companies did not

4    normally keep a record of the local phone calls that

5    people dialed.  And the Supreme Court says that

6    doesn't matter.  It has no constitutional

7    significance.  It would make a crazy quilt of the

8    Fourth Amendment for that kind of thing to matter.

9          THE COURT:  It would make it -- I'm sorry?

10         MR. JUDISH:  A crazy quilt is the official

11   term.

12         And so here, the fact that Google indexes its

13   database like this is entirely invisible to the

14   public.  You know, as we've pointed out, Google could

15   just as easily have stored this data in a different

16   manner partitioned not by account but by location.

17   The database would have the exact same information.

18   It would search -- sorting through it would produce

19   the exact same outcome from the government, and yet

20   the Google's computers would not have to look at all

21   the data at all.  All they would have to look at is

22   the data for whatever relevant partitions had the data

23   for the geofence.

24         So the fact that this could be done without

25   sorting through everyone's data strongly suggests that

1    there's no great Fourth Amendment significance to the
2    fact that Google sorts through the data before turning
3    over to the government only this tiny subset of the
4    information.  So, it doesn't make it a search.
5           I don't think I was searched by this geofence
6    warrant.  I don't think anyone whose information the
7    government got back nothing from, I don't think the
8    government learned anything about the rest of us.  I
9    just don't see how that's an invasion of a reasonable
10   expectation of privacy when the government learns
11   nothing about you.  I don't think --
12          THE COURT:  But that presumes that Google is
13   not an agent of the government.
14          MR. JUDISH:  I don't know if it presumes that
15   or not.  I mean, it's really -- it's -- I can't think
16   of any case involving a search so insignificant that
17   the Supreme Court would think of that as a search.
18   What you learn is just so -- I don't even think you
19   learn anything.
20          THE COURT:  Well, they say what you learn is
21   an anonymized number that's static that is a person or
22   an account.  And so you can readily with a subpoena
23   find out who that is.  So you're learning something,
24   they're saying.
25          MR. JUDISH:  We learn something about those

1   19 accounts.  It is, to some extent, anonymized, but

2   I'm talking about the supposed tens of millions of

3   other searches.  Those we learn nothing about.  And so

4   that's what I'm saying I just don't think that has any

5   Fourth Amendment significance.

6          The defense now -- a lot of its argument is

7   about all the people who have location history about

8   whom the government learned nothing, not an anonymized

9   account number, not whether they exist or not,

10  nothing.  We learned information about 19 accounts.  I

11  think it's fair to debate whether that's a search or

12  not.  But what did we learn about those supposed tens

13  of millions?  Where was the invasion of privacy when

14  the government learned nothing?  And Google learned

15  nothing that they already didn't know.  There's a

16  giant database which they search through anyway.  They

17  didn't learn anything from it.

18         So, I want to go to the discretion issue

19  associated with the warrant.  The first thing I would

20  say is this warrant just left no discretion whatsoever

21  to Google.  Google did exactly what it was directed

22  to.  The warrant directed Google to disclose location

23  information within a particular -- of devices which

24  were present in a specified circle of 150 meters

25  during -- in a disclosed two hours of location

1  information for them during the time of the robbery.

2         And Google had no discretion about what

3  database it looked through.  Google should look

4  through every database it has which contains

5  information which is responsive to the warrant.

6         THE COURT:  All right.  So you know what?  I

7  want to be sure we're paying attention to time.  When

8  did we start?  11:40.  All right.  We can keep with

9  this discretion issue, and then we'll probably take a

10  break.

11         MR. JUDISH:  So, Google did what they were

12  directed to do.  And everything they did is what the

13  warrant directed.  So, it isn't --

14         THE COURT:  So, Mr. Judish, you have to

15  address more specifically what they said.  Right?  So

16  you can say Google did exactly what it was supposed to

17  do.  Right?  So that's fine.  But they don't say that.

18  So you have to tell me why they're wrong.

19         What they say is that it just said search

20  your databases, and somehow Google only searched

21  Sensorvault.  And there's nothing on the record that

22  says why didn't they search Web & App Activity.

23  Right?  So they're saying somewhere there's discretion

24  there or an agreement, but nobody knows where.

25         MR. JUDISH:  Sorry, Your Honor.  There is

1    stuff in the record.  What's in the record is McGriff

2    saying that the Sensorvault database is the only

3    database which contains sufficiently granular

4    information to be responsive to the warrant.

5         THE COURT:  Sufficient what information?

6         MR. JUDISH:  I don't know the exact words,

7    but he says both in his -- that it's the only -- it's

8    the only database with sufficiently granular

9    information to be responsive to the warrant.  So

10   that's why they don't search the others.

11        As a recipient of compulsory process, they're

12   supposed to, you know, know what they have that's

13   responsive.  As a -- someone who helps prosecute other

14   cases, I was hoping we'd learn in this case that they

15   had more information that they hadn't been disclosing

16   to us that would be helpful in other investigations.

17   Turns out, according to McGriff, they don't have that

18   information.  So what else -- if there's nothing else

19   responsive, then they've done their job pursuant to

20   the warrant and disclosed what they were directed to

21   disclose.

22        THE COURT:  So you're saying it's okay that

23   Google knows that, but that the government doesn't

24   know that they have only searched one?

25        MR. JUDISH:  I'm saying that it was

1  appropriate for Google to do what the warrant said and

2  give all the information they had about information

3  which falls within the scope of the warrant.  And

4  Google -- the providers always know their databases

5  best.  And so the warrant is very specific about

6  information it wants.  And so Google, then, should

7  look through all the information it has.  And it's

8  okay for Google to know that and not us.  I mean, they

9  don't always tell us everything --

10        THE COURT:  So do you think that the phrase

11  "sufficiently granular" is at all subjective?

12        MR. JUDISH:  I mean, the -- that's McGriff's

13  testimony.  He says there aren't other databases which

14  are responsive to the warrant.

15        THE COURT:  Well, he says that aren't

16  sufficiently granular.  So how do we test that?

17        MR. JUDISH:  Well, I mean, Google receives

18  the warrant, and it complies.  I mean, I think that he

19  explained that it would be like databases which would

20  tell you that someone is in Richmond.  Obviously, a

21  database that tells you some information that tells

22  you someone is in Richmond isn't going to be

23  responsive because it's not going to place someone in

24  this circle.

25        And so the warrant itself is quite clear.  We

1    want information about, you know, where you can --

2    about location within this circle.  And so Google had,

3    and apparently complied, with its obligation to go

4    look at whatever data it had which could place someone

5    within a circle like that.  So --

6         THE COURT:  And so neither the magistrate nor

7    the agent needs to know that?

8         MR. JUDISH:  No, I don't think so, Your

9    Honor.  We know that Google has location information.

10   And so like Google's internal names for it and things

11   like that, I don't think that's critical.  Whatever

12   information they had which can place someone in the

13   geofence is going to be evidence of crime, and it's

14   appropriate to ask them for that information.

15        So as far as the three-step process goes, do

16   you want to take a break before we move on to the

17   discretion associated with the three-step process or

18   shall we continue?

19        THE COURT:  You know what?  I think we should

20   take a break.  So it's now twenty of one.  We should

21   take a 40-minute break so people can eat if they want

22   to.  So we'll go until 1:20.  All right?  We'll take a

23   lunch recess.

24        (A luncheon recess is taken from 12:40 p.m.

25   until 1:25 p.m.)

1          THE COURT:  All right.  Mr. Judish, I'm not

2   sure if this gets to what you're going into, but I am

3   going to just be sure that I've covered the questions

4   that I think pertain to what you just argued.

5          So I spoke to you about sort of the frequency

6   with which Google updates and stores the information,

7   and I used two minutes.  I think that's on the record,

8   but I know that in our data return it was as quick as

9   30 seconds.

10         So in response to my question, you said, "I

11  don't think it would matter to users if they knew it

12  was every two minutes."  So I'd like you to address

13  the evidence that I saw and heard that Google was

14  concerned about that.  The emails that said, "Count me

15  among the Googlers that had no idea we were doing

16  this."  And that Google actually changed its policies

17  as far as notification because, in part, of that

18  process, which all happened after Mr. Chatrie's case

19  as far as I know.

20         MR. JUDISH:  Your Honor, I think it's hard to

21  attribute the specific changes in Google's terms and

22  service and banners and all that to any specific

23  thing.  I mean, McGriff explained there was an ongoing

24  process and a continued attempt to improve their

25  process.  So I just don't think you can draw any

1    particular inferences on any particular language from

2    anything in the record.

3          I do think that it's just -- the thing to

4    look at is -- you know, one way of looking at it is do

5    what people do fall within the scope of the consent

6    given by people who opted into it.  You know, "saves

7    where you go with your devices" really means saves

8    where you go with your devices.  And so whether it is,

9    you know --

10          THE COURT:  So it's not -- even though Google

11    employees who work for the company that said "saves

12    where you go with your devices" were surprised, that

13    doesn't matter?

14          MR. JUDISH:  I mean, there's a lot of

15    employees who work for Google.  There's a lot of

16    people in the country, but I think the real question

17    to look at, that we normally look at in Fourth

18    Amendment consent situations, does this fall within

19    the scope of the consent.  And if you say "saves where

20    you go with your devices," then you agree to that,

21    then Google can save where you go with your devices.

22    There is, you know, in the world of computers, lots of

23    data gets generated in almost everything we do.  To

24    me, the unremarkable thing about this case is just how

25    little data the government obtained.

1        THE COURT:  You're going afar from what my

2    question is.  So you're saying that it's within the

3    scope of the consent because this one sentence was

4    enough, and it wouldn't have mattered if you said it

5    is updated every two minutes because it's incorporated

6    within that sentence, and it wouldn't have mattered as

7    far as it being consent that it was updated every 30

8    seconds because it's incorporated because "Saves where

9    you go with your devices" says "Saves where you go

10   with your devices."

11       So what do I do, if anything, with the

12   reality that no one reads that stuff?  Nobody reads

13   the privacy policy.  What do I do with that?

14       MR. JUDISH:  I mean, courts do pay attention

15   to privacy policy (unintelligible) --

16       THE COURT:  You definitely have to speak up.

17   I don't know if the microphone is too far away from

18   you or what.

19       MR. JUDISH:  I'm sorry.

20       Courts certainly do pay attention to privacy

21   policy in terms of service.  The *Adkinson* case in the

22   Seventh Circuit is an example of that.  But this is

23   more than just an obscure privacy policy thing.

24       The noteworthy thing about the opt-in process

25   is how it is done through a relatively small amount of

1  text that Google has worked hard to get people to

2  read.  It's not long.  "Saves where you go with your

3  devices."  This isn't a case where you're getting

4  bogged down by, you know, those gigantic

5  scroll-down-click-through things that we often have to

6  look at.

7         So, I mean, I don't think it's fair to assume

8  that people won't actually read that one little

9  sentence before they agree to it.  And, I mean, in any

10 case, people are generally bound by their agreements,

11 but Google really does a much better job than most

12 other providers in getting people to agree to terms of

13 service in trying to do this in a way that people will

14 actually read and pay attention to.

15        That's one thing I took away from the McGriff

16 testimony is they're trying hard, and they have done a

17 pretty good job, I think.  If I were to sit back and

18 try to think what will people actually see?  It's not

19 the wall of text.  It's something like what Google did

20 here with the, like, "Saves where you go with your

21 devices," and like one or two or three other lines for

22 further explanation.  And then if people want more,

23 it's available.  That's pretty good.

24        THE COURT:  So tell me -- I mean, it doesn't

25 matter whether you and I think it's good.  The

1   question is whether or not it's constitutional and

2   appropriately giving notice.

3          So where is an individual on notice about how

4   precise the geolocation is?  So one issue is if you're

5   getting a phone number, right, you're getting a phone

6   number.  But we heard testimony that this location can

7   be as specific as within 2 meters.  So if you're

8   getting updated every two minutes, if it's two

9   minutes, I mean, our return had some that were 30

10  seconds, if you're getting updated every 30 seconds

11  within 2 meters, are you saying that's not

12  qualitatively different as far as a notice and an

13  opt-in process?  Where does it say we know exactly

14  where you are?

15          MR. JUDISH:  Well, there is mention in GPS

16  data somewhere in all this.  I'd have to look to see

17  where it is.  But people know that GPS is accurate to

18  within a few meters.  And there's mention of Wi-Fi.  I

19  don't know if it's as readily known, but people who

20  know anything about this know that Wi-Fi is accurate,

21  but not as accurate as GPS, but it's still reasonably

22  accurate.  And also it says because -- and this is,

23  again, quite remarkable.  Google says from the little

24  opt-in screen "You can review your data" and it gives

25  you a link.  And you can go and you can actually see

1   the data.  So that's distinguishes it from the

2   information stored by phone companies.  And even in

3   the *Smith* days, you didn't know what data you had.

4   Here you really can.  Google will tell you every bit

5   of data it stores about you.  You can download it all

6   in one piece if you want and take a look at it or you

7   can look at it online.  So Google's not hiding the

8   ball.

9           THE COURT:  So most of the GPS cases that I

10   am aware of that say it's constitutional involve

11   instances where folks are being followed on public

12   roads.  So I think what the defense is saying here is

13   that one of the issues is that this GPS data, or

14   whatever it is, within 2 meters can include

15   constitutionally protected spaces like a church.  So

16   that's what I have in front of me.

17           They're not claiming that we found

18   Mr. Chatrie in his house.  But they're saying he was

19   in a church.  You can't do that.

20           MR. JUDISH:  Again, Your Honor, I think I

21   covered this point before, but *Knotts* and *Karo* are

22   about surreptitious tracking.  They're not about

23   information disclosed to a third party.

24           In *Smith v. Maryland*, that involved a

25   landline telephone.  There were people sitting in

1    their house making phone calls.  You can place a

2    person, in those days, on a call on a landline phone

3    also within a few meters, because how long were the

4    phone cords?  Not that long, typically.  But in any

5    case, they certainly placed people within a private

6    space.  And the Supreme Court said it didn't matter,

7    that you could determine people were in their home

8    within a private space because the person was

9    disclosing the information to a third party.

10          And here people are choosing to disclose

11   their information to Google in order for Google to

12   provide them with location-based services.  So it

13   doesn't violate the Fourth Amendment when Google then

14   shares that information with the government.

15          THE COURT:  So if you're making a phone call

16   out of your house, you're in a private space.  So I

17   guess if you make five phone calls in one day, the

18   government is aware you're in your house five times in

19   one day or at least a phone number is being dialed out

20   in one day.  But with respect to most of the tower

21   dump cases, right, isn't it the case that it's not

22   seeking a single data point, right?  It's like

23   watching a phone go down a street.  Am I right about

24   that?  So you're going to different towers?

25          MR. JUDISH:  Most of the published cases have

1    involved searching multiple towers.  Certainly not all

2    tower dump cases are like that.  Sometimes we're just

3    interested in dumps at a particular place and a

4    particular time.

5            Mostly that's going to be useful if there's,

6    you know, a place where there's not a lot of people.

7    I remember one case that I consulted on, someone had

8    dumped a body in an obscure location sometime between

9    midnight and 6:00 a.m.  In that case, a single place

10   tower dump would be helpful.

11           THE COURT:  Right.  So when you get a tower

12   dump, is it the case -- and I guess I want you to

13   compare what's happening in this with us here.

14           So I think what you're saying is Google looks

15   at not tens of millions, but lots of records that the

16   government doesn't really see.  Do they disclose the

17   bigger amount?

18           MR. JUDISH:  No, Your Honor, not at all.

19           THE COURT:  Stage I is not disclosed at all?

20           MR. JUDISH:  Stage 1, we get information

21   about the 19 individuals who had data points present

22   in the geofence during the hour of the bank robbery.

23   That's it.  They don't give us any information about

24   tens of millions.  We don't know how many people there

25   are.  We don't know how many people have location

1    history enabled or anything like that.  All we get

2    information on is 19 people.  There's nothing beyond

3    that.

4              THE COURT:  So if you're getting a tower

5    dump, when you're dumping the towers, are you getting

6    just the 19 people three times or are you getting

7    everything on the tower?  Is the government doing the

8    comparing?

9              MR. JUDISH:  The government does the

10   comparing on tower dumps.  So typical tower dumps

11   often involve hundreds of thousands of records.  So

12   that's why, as we explained in our briefs, this

13   process -- the geofence warrants tend to be much more

14   limited than a tower dump because in tower dumps, we

15   actually learn information about a lot more people

16   being in the vicinity for each tower dump we get.

17             THE COURT:  But that discounts that Google is

18   looking at that information, right?

19             MR. JUDISH:  Yes.

20             THE COURT:  They're saying Google is the

21   agent.  So the government is getting information.

22   They're just only turning it over to another part of

23   the government, the 19 names?

24             MR. JUDISH:  I would not say the government

25   is getting any information about those other people.

1          THE COURT:  I know you wouldn't say that.

2     That wasn't my question.  My question was, they're

3     saying that Google is the agent, and so when they're

4     looking at those, that they are at least accessing

5     information about numerous individuals.

6          MR. JUDISH:  Yes, Your Honor.  I would note

7     that Google accesses that information anyway.  That's

8     how their system works.  So Google isn't learning

9     anything it wouldn't use or didn't already know.

10          It's in their Sensorvault database, which

11     they access frequently for whatever purposes they

12     have.  They're looking to try to do what they call

13     semantic information, being able to analyze someone's

14     location history to determine things which would be

15     useful for Google for advertising purposes and stuff

16     like that.  So Google looks through the location

17     history.  So it's --

18          THE COURT:  So are you saying that Google

19     does that through separate searches, that it's not an

20     algorithm that just works that out?  This is

21     different, isn't it?  I mean, Google doesn't go in and

22     say, or do they, who is near the federal courthouse so

23     that I can advertise, as a lawyer, on average in a

24     particular period of time?

25          MR. JUDISH:  I think that's exactly what you

1   can do if you want.  That's what Google calls radius

2   targeting.  You can say I want --

3           THE COURT:  You can't say "you."  You have to

4   say who can say, who's controlling it.

5           MR. JUDISH:  Sorry.  An advertiser can say to

6   Google, "I want to target people within a kilometer of

7   the federal courthouse."  And then Google will target

8   ads to those people.  Google describes this process on

9   its website.

10          And then afterwards, if you have your law

11  office at some particular place, Google will then do a

12  geofence of people who visit your law office to see

13  those people who it targeted advertisements to, which

14  of them subsequently visit your law office.  And then

15  it will tell you how many there are in that.  So that

16  really requires Google to do a geofence of people

17  visiting your law office.  You know, it's checking to

18  see of these people who they targeted the

19  advertisements to, do they later visit this very

20  specifically defined location.  So it's really very

21  closely related to what is done here with a geofence

22  warrant and --

23          THE COURT:  You keep referring to the *Smith*

24  case, and I may not be remembering it well, but didn't

25  the *Smith* case involve use of an operator?

1          MR. JUDISH:  No.  No, Your Honor.  I mean, it

2     would have been an electronic pen register device in

3     *Smith*.

4          THE COURT:  Okay.  All right.

5          So I'm just going to ask you to address as

6     you go forward, *Carpenter* is focusing on what reveals

7     the privacies of life, right?  So I want you to use

8     that lens as you describe to me how you're going

9     through the stages.

10          MR. JUDISH:  All right.  So I just want to

11     put on the record one citation before I move on to the

12     three-step process.  We talked about where Mr. McGriff

13     explained that location history was the only

14     information sufficiently granular to respond to a

15     geofence warrant.  You can find that in his first

16     affidavit, which is Government's Exhibit 3 at

17     paragraph 20.

18          So the three stages, the three-step process,

19     the first thing I'd say is that I actually, you know,

20     as the Magistrate Judge Harjani in Illinois explained

21     in his opinion, the multi-step process really does

22     lack constitutional significance.

23          I mean, the key thing here is that we

24     establish probable cause and specify with

25     particularity for all of the information that we

1   potentially could have obtained.  Google very much

2   likes the three-step process.  And I think it's an

3   affirmatively good thing that has some additional

4   ability to provide sort of practical privacy

5   protections while still enabling our investigations to

6   proceed.  But that doesn't mean that it's

7   constitutionally significant.  That's exactly what

8   Magistrate Judge Harjani said.  You know, it could

9   have practical benefits, not constitutionally

10  significant.  But the key issue before this court is

11  whether the issuing magistrate had a substantial basis

12  for his determination that the evidence the government

13  could potentially obtain was, in fact, evidence of

14  crime and for that reason it established probable

15  cause for it.

16          But anyway, the way it works is that the

17  first step of the three-step process, all that we got

18  pursuant to that is the latitude and longitude

19  coordinates, which were in the specified geofence, the

20  circle with the radius of 150 meters.

21          THE COURT:  You just, you know, you have to

22  be slower.  You just do.  Because I don't know what

23  those numbers were.  I read them, but our court

24  reporter has to get them as you say them.

25          MR. JUDISH:  All right.

1        All we get from the first step of the

2   geofence is the latitude and longitude coordinates,

3   which actually fall within the geofence during the

4   hour of the robbery.

5        So if people, to the extent people came and

6   went from outside during the Step 1 information, we

7   don't get that.  It's just if the latitude and

8   longitude points in the Sensorvault database fall

9   within the circle during that hour, then we get those

10  along with an anonymized reference number from which

11  we cannot, without more from Google, determine any

12  identity information.

13       So that, you know, as far as privacy of life

14  goes, I just don't think that's all that private.

15  Certainly going to a bank is not a particularly

16  private activity.

17       I do feel obliged to note that I don't think

18  that -- to say *Carpenter* is about protecting the

19  privacies of life, it can't go that far.  You'd have

20  to overrule *Smith* and *Miller*.  Who you dial on a

21  telephone, that's private.  Your financial

22  transactions, those are private things.  I think we

23  really do have to take *Carpenter's* word that it's

24  about long-term location information.

25       But anyway, addressing the Court's question

1    as to how private the information is, your presence in

2    that 150-meter radius, I think, is not all that

3    private.  Obviously, there is a church there.  It is

4    hard for me to believe that one can protect oneself

5    from a bank robbery by choosing to rob a bank next to

6    a church and using the church parking lot.  And there,

7    I guess, I would point to the Fourth Amendment

8    principle that you can't rely -- it has to be about

9    violation of your Fourth Amendment rights.  You don't

10   have standing to challenge Fourth Amendment violations

11   of others.

12          And whatever the defendant was doing the day

13   of the bank robbery, I don't think he's claimed that

14   he was going to church.  So he -- so I don't think

15   that has any impact --

16          THE COURT:  Does he have to claim that?

17   What's his obligation?

18          MR. JUDISH:  I mean, if the issue is to try

19   and assert that his privacy interests were invaded, he

20   needs to explain how his privacy interests were

21   invaded.  And so that's the issue which I think he

22   fails on because the defense keeps talking about the

23   potential privacy invasion of people being found

24   inside their home.  They don't claim that he was found

25   inside his home.  They talk about privacy issues

1   associated with church.  They don't say he was

2   associated with church.  He's got to claim his privacy

3   invasion, that his privacy interests were invaded.

4         So one case I can cite on that is the Seventh

5   Circuit case *Patrick*, which involved use of a

6   cell-site simulator to locate the subject of an arrest

7   warrant.  And *Patrick* tried to claim that use of the

8   cell-site simulator violated the privacy interests of

9   others nearby because the cell-site simulator, which

10   is a device which has essentially a direction antenna,

11   which locates where nearby cell phones are, violates

12   the privacy of others nearby.

13         The Seventh Circuit says no, under *Rakas*, you

14   don't have standing to assert any privacy violations

15   of others.

16         THE COURT:  So are you saying that factually

17   Mr. Chatrie was not in the church?

18         MR. JUDISH:  I don't -- to my knowledge he

19   parked near the church.  I have no knowledge that he

20   was in the church.  I don't know of anything in the

21   record on that.  I mean --

22         THE COURT:  Was he within 2 meters of the

23   church?

24         MR. JUDISH:  He may have been, Your Honor.  I

25   don't think -- I think there may be stuff in the

1    record.  I think his coordinates are plotted.  And so

2    that would be the place to look for that.  I can't

3    state with certainty.  So that's the first step.

4         The second step of the warrant, you know,

5    that enabled the government to get all of the location

6    history over a two-hour interval of the individuals

7    whose information was disclosed in the first step.

8    And so that does, you know, potentially implicate

9    greater privacy interests because you can't have

10   people going to and from the area.  But, again, I

11   don't think Mr. Chatrie has pointed out any

12   particularly heightened privacy interests of his which

13   were infringed.

14        And in any event, I think the real issue is,

15   was there a substantial basis for the magistrate's

16   determination that this would be evidence of crime?

17   And, you know, the additional contextual information

18   is extremely helpful in showing what people's roles in

19   the criminal activity was.  And so it was evidence of

20   crime, and therefore appropriately fell within the

21   scope of the warrant.

22        THE COURT:  And so I may be getting ahead of

23   where you are about to argue, but explain to me -- my

24   understanding is that with this degree of certainty of

25   the radius, there is a 150-meter radius, but then a

1   broader radius that may actually be implicated.  Am I

2   right?

3          MR. JUDISH:  Google has, you know, there's

4   chance for errors in the data.  There's no question

5   about that.  The warrant directed Google to disclose

6   the points where the points calculated by Google fell

7   within the radius, but there was certainly some chance

8   of false positives in that.  And, again, I just think

9   that that would go to the weight given the evidence as

10  opposed to whether or not it is actually evidence of

11  crime.

12         THE COURT:  Well, what they're saying is one

13  of the issues is that if you're signing a warrant -- I

14  mean, I think they say it's almost twice as much, like

15  378 meters, 387 meters, that a magistrate is not on

16  notice that it could be actually twice as large, the

17  area that you're searching, given the rate of

18  potential certainty.

19         MR. JUDISH:  First, I just want to go into

20  the facts.  I think they significantly exaggerate the

21  actual inaccuracy.  There are a few individual points

22  which have large errors associated with them, but if

23  you look at the actual data, which is in the record,

24  every single one of those will have another point for

25  the same device with the same center and a much

1    smaller radius.

2          And as Agent D'Errico testified, what that

3    actually means in practice is that the phone started

4    at the smaller place and then went somewhere, and

5    Google isn't sure where.  So it's not that these are

6    devices which may have been the whole time super far

7    away.  It's that the way that Google -- you know, they

8    have indication that a device is on the move, but they

9    don't know where.  So they, you know, they keep

10   estimating the same center point.  But their

11   uncertainty grows.

12         But the more general point, as far as the

13   magistrate and what was in the affidavit, I think

14   people understand that cell phone measurements are

15   inaccurate, and, thus, I think a commonsense

16   magistrate would know not every location information

17   point is going to be perfect.  So I don't think -- and

18   I understand the defense has dropped its argument that

19   it was a, you know, somehow a violation that we didn't

20   include this information in the affidavit.  I think

21   that showed up in some of their briefs, but not their

22   final one.

23         One other point I'd like to make about the

24   three-step process is that it's clear from the Playpen

25   cases that doesn't violate the Fourth Amendment if the

1    government chooses to obtain less than the maximum

2    amount of information it's authorized to under a

3    warrant.

4         In the Playpen cases, we were going after a

5    child pornography website on the Dark Web, and we

6    obtained a warrant authorizing us to use code to

7    identify people who logged on to the site.  We made

8    explicit in our affidavit that we were authorized to

9    use this code to identify anyone who accessed the

10   site.

11        We, in fact, were likely to target our code

12   more narrowly than that, and that's ultimately what we

13   did.  And this was challenged just as a vast number of

14   cases -- I think there's over 100 Federal District

15   Court cases and there are 11 Federal Court of Appeals

16   cases dealing with challenges to this warrant.  I

17   don't think any court has found that that language was

18   problematic.

19        THE COURT:  Well, what is different, though,

20   is that every person who logged on to that account

21   violated the law 100 percent.  So not 100 percent of

22   people who were near the bank violated the law, like

23   way, way less than 100 percent.

24        MR. JUDISH:  Yes, that's absolutely right.

25   But the key, what they have in common, is that there

1    was a substantial basis for the magistrate judge's

2    determination that all of the evidence you're entitled

3    to, all of the information we were entitled to, was

4    evidence of a crime.  And that's what counts.  And so,

5    again --

6              THE COURT:  It counts because it was an

7    illegal website.  How is that not a completely

8    different situation?

9              MR. JUDISH:  Well, the warrants are used to

10   seize evidence of crime, and that can be direct

11   evidence that someone is guilty, but it can also be

12   other information as well.  And so the issue is

13   whether a magistrate has a substantial basis to think

14   it was okay or proper that all of the user location

15   information we were authorized to seize would in fact

16   be evidence of crime.  It doesn't have to all -- all

17   the people don't have to be guilty.  The question is,

18   is what we're authorized to get evidence?  And here it

19   was.

20             It's like I said.  It gives us an ability to

21   reconstruct the scene of this crime.  It helps us

22   identify accomplices.  It helps us find witnesses.

23   It's all appropriate evidence of crime, which can

24   appropriately be seized pursuant to a warrant.

25             And, yes, there's not all criminals in this

1    case, but it is all evidence, and as long as we

2    establish probable cause and identify with

3    particularity evidence, I think it's entirely okay for

4    us to then be selective within what the subset of what

5    would establish probable cause and identify with

6    particularity what we ultimately take away.

7         I think that happens, you know, all the time

8    in search warrants is, you know, we have a warrant.

9    You don't have to, you know, raze a house to find

10   every bit of evidence in a house that you're searching

11   even though, you know, you can keep looking harder and

12   harder and find more of the key thing that you

13   establish probable cause and identify with

14   particularity the things that you are authorized to

15   seize.

16        In any event, if the Court does have a

17   problem with Step 2 of the warrant, I think the

18   appropriate thing is severance.  This is a warrant

19   which is usually conducive to sever.  The process was

20   done.  The language of the warrant is separate.  The

21   process is done in separate steps.  This is a warrant

22   which is just enormously easy for the Court to --

23   would be enormously easy for the standard severance

24   doctrine to apply.  From the Step 1 information in

25   this case, it was sufficient to identify which account

1    likely belongs to the robber, and so the fruit of the

2    poisonous tree would not extend to our subsequent

3    investigation and all of the subsequent evidence we

4    obtained in this case after we first obtained the

5    geofence warrant information.

6         THE COURT:  So you're saying because you had

7    19 names, you have had enough to identify Mr. Chatrie?

8         MR. JUDISH:  Because we had 19 sets of

9    location information in that 150-meter radius, and we

10   could -- and from the other information obtained at

11   the scene of the robbery, including surveillance

12   videos and eyewitnesses, we knew where Chatrie had

13   come from and, you know, parked, gone into the bank

14   and returned.  And the location information of

15   Mr. Chatrie from the geofence warrant was sufficiently

16   consistent with that testimony that we could still

17   tell that he was the one, the robber.

18        THE COURT:  So why did you ask for further

19   information on all 19?

20        MR. JUDISH:  I mean, there's other

21   possibilities which need to be explored, ruled out,

22   like having co-conspirators.  And so I think that a

23   lot of that is -- that is helpful to, you know --

24   investigators tend to be thorough.  And they wanted

25   to, you know, be able to get that information because,

1    you know, some of that information was not entirely

2    inconsistent or, you know, some of that information,

3    you know, suggested that it had some aspect that one

4    might be a co-conspirator like, you know, data

5    suddenly halting suggesting someone turned off their

6    phone.

7              THE COURT:  So, wait.  I'm sorry.

8              MR. JUDISH:  I think because there was a

9    possibility of co-conspirators is one possibility to

10   search or to obtain additional information.

11             THE COURT:  So, I guess, then, I'm going to

12   ask you, clearly the terms of the warrant said narrow

13   it down, and your task force officer didn't.  And then

14   Google said you have to narrow it down.  And explain

15   to me what happened there.

16             MR. JUDISH:  I mean, the warrant says attempt

17   to narrow it down.  And, you know, and we ultimately

18   did narrow it down.  And so I don't quite -- so, if

19   you look at the actual execution, we did narrow it

20   down.  So I don't see any, as an initial matter, I

21   don't see any significance with the, you know, with

22   the fact that it was contemplated to obtain more than

23   we actually did.  I don't recall what was in the

24   record regarding why we initially asked for all 19.

25             THE COURT:  Well, I mean, there were other

113

 1    things in the record like Google saying they didn't

 2    think the agent knew what he was doing.  That's the

 3    only explanation we have it may be wrong, but that is

 4    in the record.  So --

 5            MR. JUDISH:  I don't recall.  I mean, I think

 6    it's really -- I'm not aware of the Fourth Amendment

 7    violation from contemplating but not executing a

 8    warrant in an improper way even if it would be

 9    improper.

10            THE COURT:  I'm just trying to get the record

11    straight.

12            MR. JUDISH:  I'm sorry.  I don't recall.

13            THE COURT:  So how did we get to nine?

14            MR. JUDISH:  Those were the ones which the

15    agent thought were most -- the greatest continued

16    relevance to the case.

17            THE COURT:  And do we know why?  Are there

18    parameters that direct to the agent about why?

19            MR. JUDISH:  The warrant very much leaves

20    this to the government's discretion.  And I say,

21    again, I think these are of no constitutional

22    significance.  You know, part of the reason why is

23    definitely the question of whether these people could

24    actually be additional co-conspirators.  And I think

25    that's a primary reason for a continued look at other

1   suspects.

2         THE COURT:  Okay.

3         MR. JUDISH:  I'll turn now to good faith if

4   you don't have further questions on the warrant

5   itself.

6         THE COURT:  If I do, I'll come back to them.

7         MR. JUDISH:  All right.  So, suppression, the

8   Supreme Court has said, is a remedy of last resort and

9   used only where its benefits outweigh its heavy cost.

10  And what you have here really is a new investigative

11  technique.

12        So when a new investigative technique comes

13  along, there's not a lot of case law to look at

14  because -- well, there's no case law to look at.  And

15  so what is an agent supposed to do?

16        And so the Fourth Circuit looked at this in

17  *McLamb* in the context of the Playpen cases, and what

18  the Fourth Circuit said is that in these, you know,

19  the agent should consult with the expert prosecutors,

20  and if they do that, then it's appropriate to apply in

21  good faith.

22        Well, it's not because it's not -- they

23  consulted with the prosecutors, and the prosecutors

24  think it's okay.  And then they also take it to a

25  judge, and the judge thinks it's okay.  And that's

1    exactly what Agent Hylton did in this case.

2         And I think it's worth noting, particularly

3    in the context of you going to the state magistrate,

4    that this was not the first time that Hylton had

5    obtained one of these warrants.  He had actually

6    gone -- this was his fourth.  It actually is in the

7    record, and we've disclosed two of those warrants to

8    the defense.  The third remains under seal.  That one

9    hasn't been disclosed.  But he had previously gone to

10   both a United States magistrate judge and to two

11   Virginia state judges, and they hadn't raised any

12   problems with it.  They had signed off on it.

13        So, what more can an agent do?  The

14   prosecutors have no objection to it, a federal judge

15   has no objection to it, two state judges have no

16   objection to it.  At this point it's hard to

17   understand why it would be objectively unreasonable

18   for the agent to believe that it's appropriate to seek

19   a geofence warrant.

20        That is exactly what the Fourth Circuit has

21   suggested that he do.  And in *McLamb*, and under those

22   circumstances, suppression, the cost -- the harms of

23   suppression will very much outweigh the benefits.  If

24   ultimately the courts -- other courts who look at this

25   decide that it shouldn't be done that way, then,

1    obviously, it's going to stop.

2          That's what -- in the *Carpenter* case, that

3    stopped the practice of using historical cell-site

4    location information.  But *Carpenter* himself, the

5    Court did not ultimately suppress the cell phone

6    location information obtained and used against

7    *Carpenter* because of the good faith exception.

8          The benefits don't have to outweigh the harms

9    when you're talking about -- in the context of new

10   investigative techniques.  It's also worth noting and

11   closely related to this is we heard from Google more

12   than 8,000 of these over the course of, I believe, a

13   year.  So it's clear from that the decisions made by

14   the judges that Hylton has consulted with are not

15   significantly different than the decisions being made

16   by a whole host of other judges around the country,

17   state and federal.

18         Or, alternatively, we can apply the

19   traditional *Leon* good faith analysis to this.  Under

20   the *Leon* good faith analysis, there's no suppression

21   if we rely on good faith on a warrant.  And there's a

22   few exceptions to that, but none of those exceptions

23   really apply here.

24         And one is that the affidavit is so lacking

25   in indicia of probable cause that reliance on the

1    warrant is unreasonable.

2         But there is probable cause here.  We had a

3    robbery.  We had a guy with a cell phone.  And the

4    affidavit linked that directly to Google having

5    evidence of the cell phone's location.  And that

6    establishes a fair probability that Google had

7    evidence of crime, but it's certainly not wholly

8    lacking in indicia of probable cause.  So under the

9    *Leon* good faith, the evidence should not be

10   suppressed.

11        Similarly, in terms of particularity, the

12   warrant is not so lacking in particularity that

13   reliance is unreasonable.  It specifies exactly the

14   information that the warrant is seeking.  The two

15   hours of location information or devices which fall

16   within this 150-meter circle during the hour of the

17   robbery.  And that's really quite particular.  That's

18   stuff that Google's algorithm can go through and

19   separate.  It's just -- it's not wholly unreasonable

20   to think that as to a particular warrant, I mean,

21   clearly, some variation of that sort of thing

22   thousands of judges around the country are agreeing

23   that it's appropriate.  And at the time there was no

24   contrary decision.  And now we have just like a

25   handful of those, like there's three or four

1   magistrates who have written on this, one of whom

2   thinks it's wholly unreasonable, and others who sort

3   of based on the facts of the case think the government

4   should do a slightly better job.  It doesn't suggest

5   that there's anything wholly unreasonable about the

6   government's reliance on the warrant in this case.

7          So, those cases, you know, generally suggest

8   that, certainly the Weisman decision and the Kansas

9   decision the defense just circulated, suggest that

10  there's nothing fundamentally wrong with geofence

11  warrants.  The government just needs to be very

12  careful about establishing probable cause in

13  particularity.

14         By that standard, the warrant in this case

15  clearly passes the good faith.  I mean, the probable

16  cause here is unusually strong because, you know, the

17  robber was seen actually carrying and using a cell

18  phone.  That actually hasn't been the cases, in those

19  other cases.  They've just tended to make that

20  assumption.  But here we've actually got that.  So

21  it's just not wholly lacking in probable cause, not

22  wholly lacking in particularity.

23         And similarly, there's no evidence here that

24  the judge abandoned his judicial role.  The judge did

25  what judges are supposed to do.  He reviewed the

1    affidavit and then he signed the warrant.  I mean, the

2    kind of case that the Supreme Court talks about for

3    someone abandoning their judicial role is the case --

4    the example they give is *Leon*.  And what that actually

5    involves is a judge who decided to help with the

6    execution of the warrant, that he actually went to the

7    scene to be searched and decided what could and

8    couldn't be seized.

9         Well, that's what the Supreme Court means

10   when it says a judge who abandons his judicial role,

11   you know, that you don't apply the *Leon* good faith.

12   And there's nothing like that here.  This magistrate

13   reviewed the warrant affidavit and signed the warrant,

14   and that's entirely appropriate, and so *Leon* good

15   faith applies in this case.

16        And if you don't have any further questions,

17   we'd ask the Court to deny the suppression motion.

18        THE COURT:  I do have a question.  I think I

19   can discern from what you're arguing what case you

20   think I should rely on for purposes of my evaluation

21   of this case, but why don't you just tell me on the

22   record.

23        MR. JUDISH:  The Harjani opinion is one

24   geofence case issued by a magistrate judge who

25   bothered to write up his opinion, and I think that

1    there's a lot to commend that.  And there's also the

2    cell-tower dump.  *James* is reasonable similar as a

3    case, you know, at least involving evaluation of

4    probable cause and particularity.

5         The District Court opinion in that case finds

6    that cell-tower dump warrants are appropriate.

7         THE COURT:  All right.  So I think I've heard

8    maybe both sides a little bit talk around or near or

9    maybe directly suggest two things.  One is that this

10   warrant might be stronger if Google stored its

11   information in a different way, if it was stored by

12   location.  So the question is, what's the upshot of

13   that?  Does any court have the power to say that?

14   Would there have to be a congressional determination

15   to make that happen?  And I think I want to ask

16   generally, I see that the government is steering away

17   from the Stored Communications Act, and I want to

18   confirm that you are resting this entirely on a

19   constitutional analysis.

20        I mean, one of the issues is, of course,

21   right, there is no statute that addresses geofencing.

22   Right?  And, in fact, there's been no statute

23   addressing almost any more recent electronic

24   surveillance process because it develops so quickly

25   that almost as soon as something gets passed, say, in

1    two and a half years, it's obsolete.

2         So I want to hear what you have to say about

3    what I have the power to do or the appropriate action

4    I should be taking, and if there's any statutory

5    obligation with respect to what's going on.

6         MR. JUDISH:  I do think they'll start with

7    the Stored Communications Act part.  I do think this

8    compelled disclosure of the information is governed by

9    the Stored Communications Act.  I just don't think it

10   matters for purposes of a motion to suppress because

11   the act itself has no statutory suppression remedy.

12   And so it just doesn't matter.

13        Whenever you get into a Fourth Amendment --

14   the Stored Communications Act matters enormously --

15        THE COURT:  Wait.  You have to slow down.

16        MR. JUDISH:  Sorry.

17        THE COURT:  Okay.  Just start right over and

18   act like I don't know what you're about to say.

19        MR. JUDISH:  All right.

20        The Stored Communications Act contains no

21   suppression remedy.  It contains a section 18 U.S.C.

22   Section 2707, which specifies that the remedies in the

23   statute are the only available remedies for the

24   violation of the statute.  And 2707 includes various

25   damages provisions, but not a suppression remedy.  And

1    there are various cases confirming, in fact, there is

2    no suppression for a statutory violation.

3            And, you know, I think the *Smith* case in the

4    Ninth Circuit, I think.  Anyway, but here because the

5    only issue for this court is whether the evidence

6    should be suppressed, the Court just doesn't need to

7    focus deeply on the questions of how this information

8    falls within the --

9            THE COURT:  Does it need to or can't?

10           MR. JUDISH:  I'm not sure why it would be

11   relevant.  I mean, you certainly -- I'm never going to

12   tell a judge what it can or can't do.  But I just

13   don't see the relevance to this case.  I mean,

14   sometimes we can argue that that's an additional

15   reason against suppression.  But, you know, like a

16   good faith reliance on a statute.  But here the

17   government has not advanced that position.  We have

18   argued good faith based on *Leon*.

19           So -- and as far as the structure of Google's

20   database, I don't think, you know, I never want to

21   willingly waive the government's authorities or

22   powers, but I'm certainly not in a position of making

23   any claim that a court has authority to tell them how

24   to structure their database.

25           I think the main argument that we make based

 1    on the structure of their database is the argument

 2    that Fourth Amendment rights should not turn on

 3    internal prior practices which are not visible to the

 4    public, and the structure of their database is one of

 5    those things.  And, thus, the fact that this could be

 6    done in a way which would allow Google to -- Google's

 7    machines to filter very narrowly, strongly suggests

 8    that there is no search of millions of people when its

 9    database requires a broader filter.

10         THE COURT:  And with respect to -- does the

11    government have any position about whether or not a

12    review at each step by a neutral magistrate would be

13    necessary or beneficial or better?

14         MR. JUDISH:  I mean, I think if we can, as I

15    believe we did here, establish probable cause for all

16    of the evidence from the start, it's fine to do so.  I

17    don't think it does any harm to have additional steps.

18    It could be structured to require to have a magistrate

19    make an additional finding along the way, and there

20    would be no problem with that.

21         So I think it's not necessary, but not in any

22    way problematic to involve a magistrate in multiple

23    decisions.

24         THE COURT:  Right.  And so if -- I guess I

25    want you to unpack exactly why the ability to delete

1    the information, if Mr. Chatrie could figure that out,

2    how it affects my analysis.

3           MR. JUDISH:  I think one way it affects your

4    analysis is it distinguishes this from *Carpenter* and

5    why *Carpenter* said the third-party doctrine didn't

6    apply.  *Carpenter* had three reasons for why third

7    party didn't apply to cell-site information.  One of

8    them was that it could be deleted.

9           THE COURT:  All right.  And so I'm not quite

10   sure how to phrase this, but -- so if there's probable

11   cause here, obviously, there's video surveillance that

12   a robbery occurred.  Is the government's position that

13   there would still be probable cause to do this

14   geofence if there were no video or any indication that

15   Mr. Chatrie had a phone?

16          MR. JUDISH:  It can be.  I mean, cell-tower

17   dumps in the *James* case, for example, there was no

18   evidence that the defendant had a phone, and the Court

19   still found that probable cause was established.  I

20   mean, probable cause is a common sense determination

21   by the magistrate whether there's a fair probability

22   that the target had prior evidence of crime.  And so

23   you certainly can have that.

24          In another of the cases, I think the Harjani

25   opinion, that involves criminal activity of the sort

1   that it looks like it was probably more than one

2   person involved, and so that gives rise to an

3   inference of a likely cooperation among people, and

4   people use cell phones to communicate and cooperate.

5   So you have to look at the facts of any particular

6   case and make a determination of whether they

7   establish a fair probability.

8           So sometimes I think you can establish

9   probable cause regardless of whether a person has a

10  phone.  It's really --

11          THE COURT:  So I guess I'm trying to find out

12  where it stops.  Like when don't you have probable

13  cause if you don't have evidence of using a phone,

14  probable cause for a geofence?

15          MR. JUDISH:  I think it's really -- it's -- I

16  think it just depends on the facts of the case and

17  whether you think there will be evidence of crime.

18  And this is a determination made by magistrate judges.

19  This court obviously doesn't need to confront that in

20  this case because this is a case with a cell phone.

21  But I do think that, you know, the fact that if there

22  really is, you know, a fair probability that Google

23  will have location information of someone who

24  committed a crime, a warrant should issue, and it

25  shouldn't be an argument that, well, that happens a

1  lot.  It is true that we're able to solve lots of

2  crimes because we establish probable cause in lots of

3  circumstances.  That is an affirmatively good thing.

4          So I don't think that an argument I've seen

5  from at least one magistrate judge in the recent

6  Kansas opinion that we can't have too many of these

7  geofence warrants is correct.  I think the issue is,

8  can we establish probable cause?  And you can't say

9  this isn't probable cause because you're going to

10  solve too many crimes that way.

11          THE COURT:  I think that's a little different

12  from saying when isn't there probable cause, right?  I

13  mean, no one is going to say let's not solve crimes.

14  Right?

15          MR. JUDISH:  Right.

16          THE COURT:  Defense counsel is not going to

17  say that.  That's not what they're arguing.

18          MR. JUDISH:  I apologize, Your Honor.  I

19  guess the way I should say it, the Court seems to

20  think that warrants shouldn't issue because they would

21  issue in too many cases, and -- but that's not --

22          THE COURT:  I'm not asking that question.

23  I'm asking when doesn't it issue?  I'm saying, give me

24  an example.

25          MR. JUDISH:  I mean, there's -- I mean, I

127

guess you could have an example where it's clear that

a guy wasn't carrying a cell phone.  You know, if

someone walks in with, you know, pocketless gym shorts

and a T-shirt and commits a crime, you can probably

tell by looking at him or from video surveillance

footage that there is no phone on this guy.  And in

that case, I think there wouldn't be probable cause.

THE COURT:  All right.  Okay.  I think that's

it.

MR. JUDISH:  All right.  Thank you, Your

Honor.

THE COURT:  Can I ask you how long you think

your response is going to be?

MR. PRICE:  I will try and keep it very

brief, Your Honor.

THE COURT:  Well, that is about as particular

as whether it's granular.

MR. PRICE:  Sorry about that.  I have three

points.  I think less than 10 minutes.

THE COURT:  Okay.

MR. PRICE:  Counsel tells me maybe 15.

THE COURT:  Maybe 15.  All right.  I'm going

to give Ms. Daffron a little bit of a break.  I just

think that, you know, maybe she'll buy me a cupcake

after.

```
 1              All right.  We'll take a 15-minute recess.
 2              (Recess taken from 2:22 p.m. until 2:40 p.m.)
 3              MR. JUDISH:  Your Honor, I just want to make
 4    -- correct the transcript in one place.  I did not do
 5    a great job explaining this.
 6              THE COURT:  That's fine.  Please approach the
 7    podium to do that.
 8              MR. JUDISH:  Thank you, Your Honor.
 9              Regarding the reasons behind the second stage
10    of the search, they are explained by Agent D'Errico at
11    page 546 of the transcript.  So I'll stop there.
12              THE COURT:  Wait.  I'm sorry.
13              MR. JUDISH:  Okay.  So -- all right.  I won't
14    stop there.
15              THE COURT:  Yes.
16              MR. JUDISH:  So, Agent D'Errico was asked why
17    go back at the second stage.  And at 546, he says
18    there are several reasons.  I know I need to talk more
19    slowly.  I'm sorry.
20              So the first reason is, this is a device that
21    was present in the area of the bank prior to the bank
22    robbery.  And we know that sometimes when people want
23    to hide their location, they will turn their phones
24    off.  And if their phone is turned off, no additional
25    location history would be reported for that device.
```

1  So it's significant to us that there is a point inside

2  the geofence that occurred prior to the bank robbery

3  with no points after the bank robbery because we also

4  believe that after a subject has robbed a bank, that

5  they are going to flee the area and not have any

6  additional location history records within the

7  geofence several minutes after the bank robbery.

8            THE COURT:  All right.

9            MR. JUDISH:  That's all, Your Honor.

10           THE COURT:  All right.  Thank you, sir.

11           MR. PRICE:  Good afternoon, Your Honor.  Can

12  you hear me okay?

13           THE COURT:  I can.

14           MR. PRICE:  All right.  I'd like to begin by

15  correcting a few points for the record.

16           The first is that radius targeting, which is

17  that form of advertising the government was talking

18  about, does not use location history according to

19  Google.

20           THE COURT:  Wait.  Say that again.  Radius --

21           MR. PRICE:  Radius targeting, this idea that

22  you can advertise to everybody around the courthouse

23  if you're a lawyer.  While that may be possible,

24  Google has stated -- it's at page 197 to 98 of the

25  transcript -- that location history is not used for

 1   that purpose.

 2          Second, with respect to traffic predictions,

 3   once again, pages 407 to 408 of the transcript

 4   explains how Google does not use location history but

 5   uses aggregated data and percentages with added,

 6   quote, noise to prevent any possibility of ID'ing

 7   individual devices.

 8          And then, finally, with respect to the

 9   questions about how the government narrowed things

10   down in Step 2 and then Step 3, we should note that

11   one of the three finalists, so to speak, was, in fact,

12   one of the false positives.  So somebody who was just

13   driving by, likely never within that geofence at all,

14   and was reported as being inside of it, therefore it

15   had Stage 2 data under the government's reveal, and

16   then Stage 3 data as well.  That was one of the false

17   positives.

18          THE COURT:  Okay.

19          MR. PRICE:  So I want to touch briefly on a

20   few points.

21          First, this idea that location history is

22   voluntary because of the process involved, and the

23   mere fact that it is stored with Google, a third

24   party.

25          Almost everything the government said about

1   the voluntariness of enabling location history can be

2   said of Gmail, of Google email.  It is stored by

3   Google.  It is transmitted by Google.  Google

4   advertises off of emails.  And yet even the government

5   agrees that email deserves Fourth Amendment

6   protection.  I suppose they have to after the Six

7   Circuit's decision in *Warshak* and their representation

8   to the Supreme Court in *Carpenter* that email requires

9   a warrant to get.

10          That is not something that the Supreme Court

11  has weighed in on.  And under a strict reading of the

12  Stored Communications Act, as it still exists, the

13  government did, in fact, argue they did not need a

14  warrant to obtain email that was older than 180 days.

15          The Sixth Circuit in *United States v. Warshak*

16  found that email, despite being housed on Google's

17  servers or on other servers, deserved the same kind of

18  privacy as one's papers and effects.  That is the

19  modern day scion of one's private papers and effects.

20          All of those points we can attribute, as

21  well, to location history.  The Stored Communications

22  Act, while not determinative, is certainly relevant to

23  the reasonable expectation of privacy analysis.

24          Google considers location history to be

25  content and users understand that content is their

1    data and it is protected from unauthorized disclosure.

2         Likewise, this is different from a subpoena,

3    fundamentally different from a subpoena, because

4    Google is not searching its own business records.  The

5    government is not asking to search preexisting records

6    that Google already has in the same way that a cell

7    company might have data about how many people use a

8    tower in order to figure out whether to add another

9    tower or why calls might be getting dropped.

10        Google never runs a search to figure out who

11   was around the bank or who was around.  They don't

12   have towers.  They have no need for this, to have

13   location data sorted by location.  It is considered,

14   once again, user content, and that is why the

15   database -- the Sensorvault is structured in that way.

16   It is a reflection of this idea that location history

17   is content.  It belongs to users.  It is their data.

18   They can manipulate it.  They can delete it.  It is

19   not Google's data.

20        I want to touch briefly on the idea that

21   *Carpenter* hasn't been applied or expanded since

22   *Carpenter* was decided.  The government cites *Hammond*,

23   which is a case about realtime cell-site information,

24   as well as historical cell-site information; 127 days

25   of it actually.  And there the Court found that a

1  search of the 127 days of historical cell-site

2  information was a search, but that the good faith

3  doctrine applied. Why? Because the 2703(d) order was

4  issued prior to *Carpenter* being decided.

5  So, in fact, the vast majority of cases that

6  have been decided since *Carpenter* follow a similar

7  pattern recognizing that these cases take some time to

8  percolate up. And some of the searches that we're

9  still seeing right now were executed prior to June of

10  2018.

11  So those cases are just coming up now, and

12  the vast majority of them holding that *Carpenter*

13  doesn't apply do so on good faith grounds.

14  The other case that the government cites,

15  also a Seventh Circuit case, *Adkinson*, did involve a

16  tower dump, but the government didn't conduct it. The

17  suspect in that case, the defendant in that case, was

18  accused of robbing multiple T-Mobile stores. So

19  T-Mobile, on its own, looked at its own cell-site

20  records to try and figure out which T-Mobile customers

21  had used their towers near those stores. So it wasn't

22  government action in the same way that we have here.

23  And I think that leads in nicely to this

24  larger point that Google was acting as a government

25  agent. There would be no Step 1 data without Google's

1    participation.  And Google would not have done any of

2    this had it not received compulsory legal process.

3    Google, in this sense, can't be anything but a

4    government agent at Step 1.  The government is

5    outsourcing the search function to Google.  It's that

6    simple.

7            Finally, I want to touch on the *McLamb*

8    Playpen good faith argument.  As Your Honor correctly

9    pointed out, that case turned -- was based on the fact

10   that there was probable cause for every computer that

11   was searched.  So the issue there was not probable

12   cause.  The issue in *McLamb* was a very complicated

13   jurisdictional question about the reach of Rule 41 and

14   whether judges in one district could issue warrants

15   that applied extraterritorially to other

16   jurisdictions.

17           At the time there were multiple conflicting

18   court decisions in the country about this.  And it

19   was, admittedly, something of a close call.  So in

20   that case, consulting with attorneys and prosecutors

21   would make a lot of sense.  But there was no question

22   about whether probable cause was necessary.  That is a

23   fundamental question, a fundamental Fourth Amendment

24   question that has to be answered in every single case.

25   And it is antithetical, I think, to the Fourth

1    Amendment to say that the government can get away with

2    a warrant that doesn't have probable cause or lacks

3    particularity simply because they checked with the

4    prosecutor.

5              That rule, if read that broadly, would

6    eviscerate the Fourth Amendment.  Anything that a

7    government agent wanted to do, they could just clear

8    with the prosecutor, and so it would be good faith at

9    the end of the day.  I don't think that's the rule in

10   *McLamb*.

11             Once again, the Court was not looking at a

12   basic question like were these warrants supported by

13   probable cause.  It was a very technical, legal

14   question about the reach of Rule 41.

15             THE COURT:  Well, to be clear, they're saying

16   that, regardless of anything in *McLamb*, they had

17   probable cause here because they had a video of

18   somebody robbing a bank using a phone.

19             MR. PRICE:  I don't think that having a phone

20   in and of itself is enough to establish probable

21   cause.  If only a third of Google users have location

22   history enabled, and not all people who have cell

23   phones have Google phones, and some of the people who,

24   because of the way that the 68, 32 percent error rate

25   works, at least some of those people who might have

1  been there will not show up there within the geofence

2  because of this idea of false positives and false

3  negatives.  So I think there's actually a few more

4  steps to do to go from having a phone to probable

5  cause.

6          And as we know from *Riley*, and the

7  government's own statistics, having a cell phone is a

8  fairly common thing.  And I have no doubt that in a

9  case where the suspect was not seen with a cell phone,

10 perhaps wearing gym shorts and a T-shirt, that the

11 government would say he left the phone in his car or

12 that they might need to get a warrant or look for

13 witnesses or co-conspirators anyways.

14         I think there is a lot of work to be done on

15 the probable cause front to go from a cell phone was

16 seen to there's probable cause for searching location

17 history.

18         THE COURT:  Okay.

19         MR. PRICE:  That's all.  Thank you very much,

20 Your Honor.

21         THE COURT:  I'm going to ask you one question

22 based on their argument.  It seems that part of what

23 they're saying is that the probable cause was based on

24 the fact that there was a crime and that getting the

25 results of the geofence would help reconstruct the

1    crime.  That it's just an investigative tool.  And so

2    there's probable cause to know that the way that folks

3    were operating around, it's just a different type of

4    surveillance, and that it would, at least probably,

5    show evidence that a crime had been committed.

6         MR. PRICE:  I think there's a lot of

7    information that might be helpful in the abstract.

8    And nobody is preventing the government from obtaining

9    this information.  The idea is simply that they must

10   have probable cause to do it.

11        So it may be useful to get the location

12   history data of people inside the bank, but then

13   identify those people inside the bank and seek a

14   warrant for their location history information if all

15   you're trying to do is just get a better sense of the

16   scene.  In the same way that you would go and identify

17   the surveillance cameras in the area and get the video

18   from there, you wouldn't start with every surveillance

19   video camera in the country, and then narrow it down

20   to the ones around the bank.

21        So I think while there may be lots of

22   information that's useful in terms of solving crimes,

23   the Fourth Amendment limits what the government can

24   get based on probable cause and particularity.  Thank

25   you.

1          THE COURT:  Thank you.

2          All right.  Well, I want to thank you all for

3    your efforts and for your argument.

4          I am, not surprisingly, going to issue a

5    written opinion.  You all have submitted lots of

6    documents, and I've heard testimony, and I want to be

7    sure you have a decision that you can read and either

8    agree with or disagree with, and then move on from

9    there.

10          I certainly will do so as swiftly as I can.

11    And, certainly, we've been working on it, and we will

12    continue working on it.  So we're not behind the ball,

13    but we're not where you guys are.  We haven't

14    finishing our briefing.

15          So how is it, with that understood, how is it

16    that you want to proceed?

17          MS. KOENIG:  Good afternoon, Your Honor.

18          THE COURT:  Good afternoon.

19          MS. KOENIG:  I think Ms. Daffron is probably

20    grateful that I wasn't talking very much today.

21          But I think in terms of the defense

22    perspective, obviously there are other motions that

23    are pending.  I will say that the Court's

24    determination of this motion, I think, will make

25    dispositive some other issues in the case regardless

1    of how the Court rules.

2            So from the defense perspective, I would ask

3    that the Court continue to hold the other motions in

4    abeyance until after the decision on this motion.  I

5    don't believe at this point we need to reset a trial,

6    but if that becomes necessary, obviously we can do

7    that once the Court makes a decision.

8            THE COURT:  Right.  Does the government have

9    a perspective?

10            MR. SIMON:  Judge, we don't mind the Court

11    holding those motions in abeyance.  To the extent the

12    Court wanted to rule from the four corners of the

13    search warrant, I don't believe we intend to elicit

14    additional evidence on those motions.  So we'll just

15    defer to the Court on whether it holds it in abeyance

16    or not.

17            THE COURT:  All right.

18            Well, what I will certainly do is not rule on

19    those issues without notice.  I think that's fair.

20    And so I will decide this particular motion, which is

21    clearly the heart of what we're discussing, and then

22    we will handle the other motions accordingly, but not

23    by surprise.  So you can presume that I would handle

24    it that way.

25            I'm not going to schedule a trial date.  So

1   this means that this motion is under advisement,

2   including all the findings that I've made with respect

3   to the complexity of the case, the fact that we've had

4   testimony from across the country, unusual sets of

5   affidavits.

6          It is the fact that the speedy trial

7   continues to be held in abeyance for a bit because it

8   outweighs the public's interest in a speedy trial, and

9   Mr. Chatrie's, given the weight and the seriousness of

10  the issues before me.

11         But I do tell you all that we are on it, and

12  I am aware that, especially with COVID and with folks

13  being unable to travel from California to testify in

14  person, that this is an unusually long pendency in a

15  case, and I am taking that into account as I approach

16  it.  All right?

17         Is there anything else I need to cover?

18         MR. SIMON:  Nothing further, Judge.

19         MS. KOENIG:  Not from the defense, Your

20  Honor.  Thank you.

21         THE COURT:  All right.  Well, you all have

22  done a tremendous job.  And thank you for your time,

23  and I will issue my opinion.  Thank you.

24         (The proceedings were adjourned at 3:00 p.m.)

25    I, Diane J. Daffron, certify that the foregoing is

1    a correct transcript from the record of proceedings

2    in the above-entitled matter.

3
                              /s/
4                   _____   _____
                    DIANE J. DAFFRON, RPR, CCR      DATE
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25