IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.                       ) | Case No. 3:19cr130 |
| ) | |
| OKELLO T. CHATRIE,        ) | |
|       Defendant ) | |

## MR. CHATRIE'S SENTENCING POSITION

Okello Chatrie, through counsel, files this position with regard to sentencing pursuant to Rule 32 of the Federal Rules of Criminal Procedure. Mr. Chatrie has received and reviewed the presentence report ("PSR") with the assistance of counsel. He has no additional amendments, corrections, or objections to the PSR. Mr. Chatrie stands before the Court as a result of his convictions for bank robbery, in violation of 18 U.S.C. § 2113, and brandishing a firearm during and in relation to that robbery, in violation of 18 U.S.C. § 924(c), after he pled guilty to those crimes pursuant to a conditional plea agreement. The advisory sentencing guideline range for the robbery offense is 57 to 71 months of imprisonment. The Court must sentence Mr. Chatrie to seven consecutive years on the gun count. For the reasons discussed below, a total sentence of 130 months—46 months on Count One and a consecutive 84 months on Count Two—is sufficient but not greater than necessary to satisfy all of the applicable concerns set forth in 18 U.S.C. § 3553(a).

    **I.**    **In evaluating a request for a variance, the Court continues to review the sentencing factors in 18 U.S.C. § 3553(a).**

After considering the appropriately-calculated guideline range, courts are to consider all the factors under 18 U.S.C. § 3663(a) in reaching the appropriate, individualized sentence for the

particular case. *See Gall v. United States*, 552 U.S. 38, 49 (2007); *Kimbrough v. United States*, 552 U.S. 58, 90 (2007) (observing that the Guidelines "now serve as one factor among several courts must consider in determining an appropriate sentence"). In evaluating variance motions, the Court must evaluate all of the § 3553(a) factors and determine whether the most appropriate sentence in the case is one that falls outside of the guidelines. *Gall*, 552 U.S. at 46-51 (observing that the sentencing process under the advisory sentencing guideline scheme requires the Court to 1) accurately calculate the advisory guidelines; 2) use the guidelines as a starting point; 3) give "both parties an opportunity to argue for whatever sentence they deem appropriate;" 4) consider all of the § 3553(a) factors in determining an appropriate sentence based on all of the unique facts and circumstances of the case; 5) consider, if a variance is appropriate, the extent of the variance; and 6) adequately explain the chosen sentence).

In addition to the advisory guideline range, the other factors that a court must consider when determining an appropriate sentence include the nature and circumstances of the offense and the history and characteristics of the defendant, 18 U.S.C. § 3553(a)(1); the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public, and provide the defendant with appropriate correctional treatment, *id.* at § 3553(a)(2); the kinds of sentences available, *id.* at § 3553(a)(3); the need to avoid unwarranted disparity among defendants with similar records and conduct, *id.* at § 3553(a)(6); and the need to provide any restitution to any victims of the offense, *id.* at § 3553(a)(7). Pursuant to 18 U.S.C. § 3553(a), courts must "impose a sentence sufficient, but not greater than necessary to comply with the purposes" of sentencing.

## II.	Discussion of the facts related to the § 3553(a) factors

Okello Chatrie is a twenty-seven-year-old man who has spent the last three years in local custody, waiting to be able to move on with his life in one direction or another. While Mr. Chatrie appreciated and appreciates the import of the significant legal issues in his case, being separated from his family and his culture and being locked up for the first time in his life without basic things most of us take for granted—like regular access to the outside environment, fresh foods, and the ability to be by oneself—has weighed heavily on him. He looks forward to a change in his circumstances—the chance to move to the Bureau of Prisons, where at least he will be able to walk the yard and hopefully find some moments of quiet.

An opportunity for solitude is something that Mr. Chatrie craves desperately. As Dr. Bartlett's psychological evaluation report and the presentence report recount, Mr. Chatrie has suffered a tremendous amount of trauma over the course of his short life. *See* Ex. A at 2-8. Mr. Chatrie, through no fault of his own, was born into a place that was overrun with violence and poverty. *See* Ex. B (describing years of uncontrolled violence in Spanish Town, Jamaica) and Ex. C (reporting, despite optimism in 2013 that violent crime would abate soon, that in 2018—the year after Mr. Chatrie immigrated to the United States—crime rates had gotten so bad that the government declared a state of emergency). Violent street gangs had overrun Mr. Chatrie's community. *Id.* Violent crime was so extensive that police officials themselves resisted being assigned to oversee the area. *See* Ex. B at 1. Gang members carried out vicious killings—including beheadings, causing business owners to shutter their stores. *Id.* Even once the number of shootings and murders began to decrease in the mid-2010's for a period of time, the number of robberies, burglaries, and rapes increased. *Id.*

3

Mr. Chatrie and his family experienced that violence personally. When Mr. Chatrie was just five years old, he, for the first time, saw people being murdered as he walked home from school. *See* Ex. A at 3. Mr. Chatrie had walked by a bar on his way home and saw three or four people riddled with bullets, lying in a pool of blood. *Id*. The shooter then came back around and shot the bodies again to ensure their deaths. *Id*. Such shootouts were common in the area. *Id*. "I then came to realize that what was going on around me was a war." *Id*. Those shootouts came even more directly to Mr. Chatrie's home. *Id*. at 4. When Mr. Chatrie was about twelve years old, a neighbor woman had argued with a gang leader. The gang leader threatened to kill the woman and her family and burn their house to the ground. *Id*. One night, he did just that. Mr. Chatrie and his family heard gunshots and awoke to find the neighbor woman's house on fire—a blaze that trapped and killed the woman and her family. *Id*.

Mr. Chatrie's own mother was attacked violently by four men and hospitalized for two weeks. *See* ECF No. 233 at ¶69. After several years, she became quite sick. *See* Ex. A at 5. One evening, while Mr. Chatrie and his family were getting ready to turn into bed, he grew concerned about his mother. *Id*. He went into her room to check on her. She told him to watch television while she went to the bathroom. The next thing Mr. Chatrie knew, he heard a noise from the bathroom. He went in and found his mother foaming at the mouth and gasping for air. *Id*. He roused his sisters and yelled out the front door for help. A neighbor piled them into the neighbor's car and started driving them to the hospital. *Id*. Mr. Chatrie sat in the backseat with his mother's head cradled in his lap. She took her last breath before they even made it to the hospital. *Id*.

The loss of his mother has devastated Mr. Chatrie. She was a person he relied on for protection. She protected them as best as she knew how from the violence outside their home— moving them to a rural area once she left Mr. Chatrie's father. *Id*. She was the kind of mother

4

who would give her children what food she had before she would take a bite herself. *Id.* at 2. She did take some of her anger at others out on Mr. Chatrie, *id.* at 2-4, but Mr. Chatrie deeply loved his mother. "When she died, all of my love and light died. And all my life changed forever, for the rest of my life. Nothing in my life was the same." *Id.* at 6. Except for a handful of counseling meetings at Northern Neck Regional Jail, Mr. Chatrie has never been able to get any professional help for the enduring grief he suffers from after losing his mother.

Nor has Mr. Chatrie been able to be effectively treated for the post-traumatic stress disorder and recurrent major depressive disorder that he suffers from. *See* Ex. A at 9-10. "As a complex trauma victim, Mr. Chatrie is chronically distressed, intermittently overwhelmed by intrusive symptoms, and hypervigilant to threats. As a result, he will be most successfully detained in a calm and quiet atmosphere. Placement in a cell with other inmates who are loud, unruly, or antagonizing is not ideal for his mental health." *Id.* at 10. While incarcerated, Mr. Chatrie will benefit greatly from any trauma-informed therapy that the Bureau of Prisons can offer him.

Typically, the Court could and would order that the probation office make available the types of supportive services that Mr. Chatrie would benefit from most while he was serving a term of supervised release. But, Mr. Chatrie will most likely[1] be deported at the end of his sentence in this case. And such an action entails more loss for Mr. Chatrie. Mr. Chatrie first came to the United States only after being given status as a legal permanent resident. *See* ECF No. 233 at 2. The robbery conviction in this case will almost certainly be deemed an aggravated felony under 8

---

[1] If Mr. Chatrie's appeal is denied, the convictions in this case will make Mr. Chatrie deportable. *See, e.g.*, 8 U.S.C. 1101(a)(43)(F). Should Mr. Chatrie's convictions in this case be vacated at any point, he may have more options for immigration relief. Additionally, the country conditions in Jamaica may deteriorate before Mr. Chatrie's release from custody to the extent that additional forms of immigration relief could become available. Because the possibility for immigration relief depends on factors that have not yet and may not come to fruition, it is not feasible for Mr. Chatrie to take a position at this point about whether he would be eligible to seek any forms of relief from deportation in immigration court.

U.S.C. § 1101(a)(43)(F)—meaning that not only will Mr. Chatrie serve a lengthy sentence in this case, he will also lose the right he once had to work and live in the United States as a legal permanent resident. Should Mr. Chatrie be deported at the end of his sentence in this case, Mr. Chatrie asks that the Court not impose a term of supervised release upon his release. The Sentencing Commission has found that the Court "ordinarily should not impose a term of supervised release in a case in which supervised release is not required by statute and the defendant is a deportable alien who likely will be deported after imprisonment." *See* U.S.S.G. § 5D1.1(c). The Commission has made this direction after finding that "[i]f such a defendant illegally returns to the United States, the need to avoid adequate deterrence and protect the public ordinarily is adequately served by a new prosecution." *Id.* at app. n.5. So too here.

Mr. Chatrie has no prior criminal convictions. And the record in this case indicates that this case is a complete aberration for Mr. Chatrie. Mr. Chatrie's own behavior the day of the robbery corroborates his lack of experience committing such crimes. One of the victim tellers described Mr. Chatrie as "unorganized, scared, and sweaty. 'Honestly, the thing that scared me most about him was how many times he kept putting his finger on the trigger. I thought he might accidentally shoot us from being so nervous. I don't think he's done this many times before.'"[2] Mr. Chatrie's written apology to the victims of the crimes upon his arrest also reflects his own remorse at the harm he caused. "Am sorry for what I Did To you on that day Hope you forgive me I didn't mean to scare you I was just in need of the money again am sincerely sorry." *See* ECF No. 233 at ¶24. Mr. Chatrie was and remains truly remorseful for his actions.

One other unique fact that the Court should consider in this case is that the government has already recovered an incredibly large amount of the money stolen. The guidelines in this case are

---

[2] This account is reflected on page 159 of discovery.

in part driven by the amount of money that happened to be at the bank when Mr. Chatrie robbed it. *See* ECF No. 233 at ¶35. Mr. Chatrie had no idea that the day he entered the bank was a day that the bank happened to have far more cash on hand than normal because the bank would be resupplying ATMs with cash. When Mr. Chatrie was arrested, he still had more than $102,000 of the proceeds—nearly $100,000 of which was still in bank wrappers—at his home. *See id.* at ¶4. If the Court took account of the money that remains lost currently, Mr. Chatrie's guidelines would be one level lower[3]. *Compare* U.S.S.G. § 2B3.1(b)(7)(B) (requiring threshold of $20,000 for one-level enhancement) *and* § 2B3.1(b)(7)(C) (requiring threshold of $95,000 for two-level enhancement).

Ultimately, Mr. Chatrie has never served any consequential amount of time in custody before his arrest in this case. Now, he has spent three years in jail and faces many more years in prison regardless of whether the Court imposes his requested sentence of a total of 130 months. He has suffered through COVID infections twice during that time, both times laboring more than someone with a mild case perhaps due to his childhood history as an asthmatic. Two of his grandparents died in Jamaica since he has been incarcerated. Mr. Chatrie's incarceration prevented him from being able to celebrate and honor their lives with his family. He allowed his attorneys to ask for several extensions of briefing schedules and hearing dates in order to proceed with full-throated evidentiary hearings because of the important issues involved in this case. And this Court has rightfully found that the warrant in his case was unconstitutional. But, because of the Court's ruling on good faith, Mr. Chatrie will not benefit from that finding of unconstitutionality as others likely will in the future. All of these factors counsel that a total sentence of 130 months—46

---

[3] That would translate to an advisory guideline range on Count One of 51 to 63 months (offense level 24 at criminal history category I). Adding in 84 consecutive months for Count Two would total 135 to 147 months.

7

months on Count One and a consecutive 84 months on Count Two—is sufficient but not greater than necessary to satisfy all of the applicable concerns set forth in 18 U.S.C. § 3553(a).

      Mr. Chatrie is focused now on moving forward with positive changes ahead in his life. He is eager to leave the local jails—to be able to walk outside and feel the sun shine on his skin, to be able to have access to programming that can help occupy his mind and his time, and to be around a larger population of others detained. To that end, he asks the Court to recommend to the Bureau of Prisons that he be designated to serve his sentence at the federal correctional institution in Ft. Dix, New Jersey. FCI Ft. Dix has a fairly large inmate population and thus, more available programming options than many other facilities. FCI Ft. Dix's proximity to New York, which still has a fairly large Jamaican community, may also increase the chances that Mr. Chatrie may connect with some other Jamaicans in prison. Mr. Chatrie's complete isolation from the culture that he grew up in and celebrated with his family in Richmond's Jamaican community has further made his local incarceration more difficult. One of Mr. Chatrie's greatest desires is simply to be understood—to connect with others that see him as he sees himself. Mr. Chatrie deserves that.

## Conclusion

      For the foregoing reasons, Mr. Chatrie asks the Court to impose a total sentence of 130 months—46 months on Count One and a consecutive 84 months on Count Two. A total sentence of 130 months is sufficient, but not greater than necessary to address the sentencing factors set forth in 18 U.S.C. § 3553(a).

                                                                       Respectfully submitted,
                                                                      OKELLO T. CHATRIE

                 By:               /s/             
                                       Laura Koenig
                                       Va. Bar No. 86840
                                       Counsel for Defendant
                                       Office of the Federal Public Defender

701 E Broad Street, Suite 3600<br>
Richmond, VA 23219-1884<br>
Ph. (804) 565-0881<br>
Fax (804) 648-5033<br>
laura_koenig@fd.org